# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, 131 Interpark Blvd. San Antonio, TX 78216;<br><br>LAS AMERICAS IMMIGRANT ADVOCACY CENTER, 1500 E. Yandell Dr., El Paso, TX 79902;<br><br>FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, P.O. Box 86299, Tucson, AZ 85754;<br><br>*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity, 245 Murray Lane SW, Washington, DC 20528<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, 245 Murray Lane SW, Washington, DC 20528;<br><br>PETE R. FLORES, Senior Official Performing the Duties of the Commissioner for U.S. Customs and Border Protection, in his official capacity, U.S. Customs and Border Protection 1300 Pennsylvania Ave. NW Washington, DC 20229;<br><br>MICHAEL BANKS, Chief of U.S. Border Patrol, in his official capacity, 1300 Pennsylvania Ave. NW, Washington, DC 20229;<br><br>DIANE SABATINO, Acting Executive Assistant Commissioner, CBP Office of Field Operations, in her official capacity, 1300 Pennsylvania Ave. NW, Washington, DC 20229;<br><br>U.S. CUSTOMS AND BORDER PROTECTION, 1300 Pennsylvania Ave. NW, Washington, DC 20229;<br><br>CALEB VITELLO, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity, 500 12th St., SW, Washington, D.C. 20536; | No.<br><br>**COMPLAINT** |

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, 500 12th St. SW, Washington,
DC 20536;

MARCO RUBIO, Secretary of the U.S. Department
of State, in his official capacity, 2201C St. NW,
Washington, DC 20520;

U.S. DEPARTMENT OF STATE, 2201C St. NW,
Washington, DC 20520;

JAMES MCHENRY, Acting Attorney General of the
United States, in his official capacity, 950
Pennsylvania Ave. NW, Washington, DC, 20530;

U.S. DEPARTMENT OF JUSTICE, 950
Pennsylvania Ave. NW, Washington, DC, 20530;

DONALD J. TRUMP, President of the United States,
in his official capacity, 1600 Pennsylvania Ave. NW,
Washington, DC 20220;

*Defendants*.

## INTRODUCTION

1.     Via the Immigration and Nationality Act ("INA"), Congress has created a comprehensive statutory system allowing noncitizens fleeing persecution or torture to seek protection in the United States. Congress has given these individuals statutory rights to apply for asylum and other protections. And it has prohibited the government from returning these individuals to places where they face persecution or torture. Congress, too, has enacted an exclusive set of procedures for removing noncitizens from the United States and adjudicating their claims for protection. In doing all this, Congress has struck a careful balance between the interest in quickly removing those who cannot qualify for protection and the need to ensure that people are not wrongfully placed at risk of persecution or torture in another country.

2.     This suit concerns the Executive Branch's attempt to wipe away these statutes by fiat. On January 20, 2025, the President issued a proclamation that purports to prohibit noncitizens "from invoking [these] provisions of the INA … , including" the asylum statute. Proclamation 10888, § 2, *Guaranteeing the States Protection Against Invasion*, 90 Fed. Reg. 8333 (Jan. 20, 2025) ("Proclamation"). And under the Proclamation, the government is doing just what Congress by statute decreed that the United States must *not* do. It is returning asylum seekers—not just single adults, but families too—to countries where they face persecution or torture, without allowing them to invoke the protections Congress has provided. Indeed, the Proclamation does not even exempt unaccompanied children, despite the specific protections such children receive by statute.

3.     The Proclamation is as unlawful as it is unprecedented. Principally, it invokes Section 212(f) of the INA, 8 U.S.C. § 1182(f), which authorizes the President to "suspend the entry" of "all [noncitizens] or any class of [noncitizens]" "as immigrants or nonimmigrants" when their entry "would be detrimental to the interests of the United States." But this authority to

"suspend entry" on its face does not empower the President to *summarily expel* noncitizens already physically present in the United States, much less to do so in violation of the protections and procedures Congress provided in the INA. That is why the Executive Branch for four decades has, without exception and across administrations, concluded that Section 212(f) does not authorize the President to displace rights to seek asylum or other statutory protections. That solid wall of authority includes a 1984 opinion from then-Assistant Attorney General of the Office of Legal Counsel Theodore B. Olson; a 2018 regulation promulgated by the Departments of Justice and Homeland Security of then-President Trump; and a 2024 regulation promulgated by the same Departments under then-President Biden. Nor does the other statutory provision that the Proclamation invokes, INA § 215(a)(1), 8 U.S.C. § 1185(a)(1), provide the President with authority to unilaterally override the protections Congress has afforded those fleeing danger.

4.    Insofar as the Proclamation suggests that the President has constitutional authority to declare an "invasion" and thereby displace Congress's statutes, this case presents an even more extreme example of presidential overreach than the one the Supreme Court struck down in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952). Whatever the outer limits of the President's constitutional authorities, they do not confer a *preclusive* power that permits the President to dispense with the statutes relevant here. And immigration—even at elevated levels— is not an "invasion."

5.    "[T]his wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). If the Proclamation may lawfully abrogate the statutory protections at issue here, then every future President may sweep away at whim the protections that Congress provided in the INA. Our separation of powers rebels at that idea.

## JURISDICTION AND VENUE

6.      This case arises under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*;

the INA, 8 U.S.C. § 1101 *et seq.*, and its implementing regulations; the Foreign Affairs Reform

and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, Title XXII, § 2242, 112 Stat.

2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231), and its implementing regulations;

the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 8 U.S.C. § 1232; and the

United States Constitution.

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. *See also* 8

U.S.C. § 1252(e)(3). Because this suit seeks relief other than money damages and instead

challenges Defendants' unlawful actions, the United States has waived sovereign immunity from

this suit. 5 U.S.C. § 702.

8.      Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are officers of

the United States acting in their official capacity and agencies of the United States, Defendants

reside in this District, and a substantial part of the events or omissions giving rise to the claim

occurred in this District. *See also* 8 U.S.C. § 1252(e)(3).

## PARTIES

### A. Plaintiffs

9.      Plaintiff Refugee and Immigrant Center for Education and Legal Services

("RAICES") is a nonprofit, non-partisan organization headquartered in San Antonio, Texas.

RAICES' mission is to defend the rights of immigrants and refugees; empower individuals,

families, and communities of immigrants and refugees; and advocate for liberty and justice.

RAICES provides free and low-cost immigration legal services to underserved immigrants—

including adults, families, and unaccompanied noncitizen children seeking asylum and related

3

protections—and is the largest immigration legal services provider in Texas. A central aspect of RAICES' work is providing legal services to migrants seeking asylum and other statutory protections upon crossing the border. The summary expulsion of migrants under the Proclamation without access to asylum or other statutory protections significantly impedes RAICES' core work.

10.    Plaintiff Las Americas Immigrant Advocacy Center ("Las Americas") is a nonprofit legal services organization based in El Paso, Texas, dedicated to serving the legal needs of low-income immigrants, including asylum seekers, in Texas and in New Mexico. An essential part of Las Americas' work is providing pro se and limited forms of legal assistance to adult immigrants detained in the Immigration and Customs Enforcement ("ICE") El Paso jurisdiction, including immigration counseling and legal services to asylum seekers. This work includes assisting asylum seekers in preparing for asylum fear interviews and representing them both during those interviews and throughout the subsequent review process. In 2024, Las Americas staff and volunteers provided approximately 197 credible fear interview orientations. Las Americas also provides direct representation to people seeking asylum and other forms of protection in immigration court. The summary expulsion of asylum seekers under the Proclamation without access to asylum or other statutory protections significantly impedes Las Americas' core work.

11.    Plaintiff Florence Immigrant & Refugee Rights Project ("Florence Project") is a nonprofit organization headquartered in Tucson, Arizona, with additional offices in Phoenix and Florence, Arizona. The Florence Project provides free legal and social services to detained adults and unaccompanied children facing removal proceedings in Arizona. The Florence Project provides direct representation to people seeking asylum and other forms of protection and also provides "Know Your Rights" trainings and other forms of pro se assistance to immigrants detained in Arizona. In recent years, the Florence Project has served over 10,000 detained adults

and children annually, many of whom are seeking asylum and other forms of protection. The summary expulsion of asylum seekers under the Proclamation without access to asylum or other statutory protections significantly impedes the Florence Project's core work.

**B. Defendants**

12.     Defendant United States Department of Homeland Security ("DHS") is a cabinet-level Department of the federal government. DHS and its components, Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP"), are the agencies of the federal government principally charged with implementing and enforcing the Proclamation.

13.     Defendant Kristi Noem is the Secretary of DHS. Defendant Noem is sued in her official capacity. In that capacity, Defendant Noem is responsible for overseeing enforcement and implementation of the Proclamation by all DHS personnel.

14.     Defendant CBP is the DHS component responsible for the initial processing and detention of noncitizens who are apprehended at or between U.S. ports of entry.

15.     Defendant Pete R. Flores is the Senior Official Performing the Duties of the Commissioner of CBP. Defendant Flores is sued in his official capacity. In that capacity, Defendant Flores is responsible for overseeing CBP personnel implementing and enforcing the Proclamation.

16.     Defendant ICE is the DHS component responsible for carrying out removal orders and overseeing immigration detention.

17.     Defendant Caleb Vitello is the Acting Director of ICE. Defendant Vitello is sued in his official capacity. In that capacity, Defendant Vitello is responsible for ICE's implementation and enforcement of the Proclamation.

18.     Defendant Michael Banks is the Chief of U.S. Border Patrol. The Border Patrol is

responsible for border security between ports of entry. Defendant Banks is sued in his official capacity. In that capacity, Defendant Banks is responsible for implementing and enforcing the Proclamation between ports of entry.

19.     Defendant Diane Sabatino is the Acting Executive Assistant Commissioner of the CBP Office of Field Operations ("OFO"). OFO is the largest component of CBP and is responsible for border security, including immigration and travel through U.S. ports of entry. Defendant Sabatino is sued in her official capacity. In that capacity, Defendant Sabatino is responsible for implementing and enforcing the Proclamation at ports of entry.

20.     Defendant United States Department of State ("State Department" or "State") is a cabinet-level Department of the federal government. The State Department is charged with assisting DHS in implementing and enforcing the Proclamation.

21.     Defendant Marco Rubio is the Secretary of State. He is sued in his official capacity. In that capacity, Defendant Rubio is responsible for working alongside Defendant Noem to implement and enforce the Proclamation.

22.     Defendant United States Department of Justice ("DOJ") is a cabinet-level Department of the federal government. DOJ is charged with assisting DHS in implementing and enforce the Proclamation.

23.     Defendant James McHenry is the Acting Attorney General of the United States, the principal officer in charge of DOJ. He is sued in his official capacity. In that capacity, Defendant McHenry is charged with assisting DHS in implementing and enforcing the Proclamation.

24.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity. In that capacity, he issued the Proclamation challenged in this lawsuit and oversees its implementation and enforcement.

# FACTS

## I.    Legal Background

25.    The United States has long sheltered refugees seeking a haven from persecution, and the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, enshrined that national commitment in the general asylum statute. The Refugee Act, as modified over time, reflects "one of the oldest themes in America's history—welcoming homeless refugees to our shores," and it "gives statutory meaning to our national commitment to human rights and humanitarian concerns…." S. Rep. No. 96-256, at 1 (1979), *reprinted in* 1980 U.S.C.C.A.N. 141. One of Congress's "primary purposes" was "to bring United States refugee law into conformance" with international refugee treaties and the bedrock principle that individuals may not be returned to countries where they face persecution or torture. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987).

### A.    Congress's Three Forms of Protection for Individuals Fleeing Persecution or Torture.

26.    Federal law provides three primary forms of protection for individuals fleeing persecution or torture: asylum under 8 U.S.C. § 1158; withholding of removal under 8 U.S.C. § 1231(b)(3); and protection under the Convention Against Torture ("CAT"), *see* 8 U.S.C. § 1231 note. All three forms of protection are available to noncitizens who are inadmissible under the INA. Indeed, withholding of removal and CAT protection are available *only* to individuals who receive orders of removal—and they are mandatory for individuals who qualify.

27.    *First*, "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival … ), irrespective of such [noncitizen's] status," may apply for asylum. 8 U.S.C. § 1158(a)(1). Both DHS and DOJ have promulgated regulations implementing this provision. *See, e.g.*, 8 C.F.R. § 208.13 (DHS); 8 C.F.R. § 1208.13 (DOJ). To qualify for asylum, a noncitizen must show a "well-founded fear of

persecution" on account of "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42).

28.    Section 1158 contains a handful of narrow bars to asylum eligibility. *See* 8 U.S.C. § 1158(a)(2), (b)(2)(A). The Secretary of Homeland Security and the Attorney General "may by regulation establish additional limitations and conditions" on asylum eligibility, but only if those limitations and conditions are "consistent with" the asylum statute. *Id.* § 1158(b)(2)(C); *see id.* § 1158(d)(5)(B) (the Secretary and the Attorney General "may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter"); Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (transferring many functions relating to federal immigration law to the Secretary of Homeland Security).

29.    *Second*, via the withholding of removal statute, Congress has prohibited the government from removing a noncitizen "to a country if … the [noncitizen's] life or freedom would be threatened in that country because of the [noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). This form of relief requires the applicant to meet a higher burden on the likelihood of harm—showing that it is more likely than not to occur. *INS v. Stevic*, 467 U.S. 407, 429-30 (1984). But where the applicant makes this showing, protection is mandatory. This mandatory protection is required by treaty obligations under the 1951 Refugee Convention and the 1967 Protocol relating to the Status of Refugees. *See Cardoza-Fonseca*, 480 U.S. at 429, 432-35, 436-38.

30.    *Third*, the CAT, implemented by FARRA, prohibits the government from returning a noncitizen "to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." 8 U.S.C. § 1231 note. Both DHS and DOJ have promulgated implementing regulations under which applicants carry their burden to show an

entitlement to relief if they establish "that it is more likely than not that [they] … would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c) (DHS); *see* 8 C.F.R. § 1208.16(c) (DOJ); *see also* 8 C.F.R. § 208.18(a)(2) (defining "torture" for purposes of the CAT).

### B. Congress's Procedures For Removing Noncitizens.

31.     Congress has also carefully specified the procedures by which noncitizens may be removed from the United States. These procedures are designed to ensure that noncitizens have a fair chance to present claims for asylum, withholding of removal, and CAT protection.

32.     "Unless otherwise specified" in the INA, a removal proceeding before an immigration judge ("IJ") under 8 U.S.C. § 1229a is "the sole and exclusive procedure" by which the government may determine whether to remove an individual. 8 U.S.C. § 1229a(a)(3). Noncitizens in these proceedings receive full hearings in immigration court and have a host of procedural rights, including the right to adversarial hearings before immigration judges and the right to retain and be represented by counsel. Noncitizens can contest the factual and legal allegations against them and apply for relief from removal. They also receive the opportunity for appellate review before the Board of Immigration Appeals and a federal court of appeals. 8 U.S.C. §§ 1229a, 1252(a) *et seq.*

33.     In 1996, Congress established expedited removal to "substantially shorten and speed up the removal process" for certain noncitizens arriving without immigration documents. *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020); *see* 8 U.S.C. § 1225(b)(1). Expedited removal by statute applies only to a limited class of noncitizens who are inadmissible because they lack valid entry documents (such as visas) or attempt to enter by fraud or misrepresentation. 8 U.S.C. § 1225(b)(1)(A); *id.* § 1182(a)(6)(C), (a)(7). Historically, these expedited removal procedures have been applied to certain noncitizens who arrive at a port of entry or are apprehended near the border after entering without inspection.

9

34.     When Congress created the expedited removal system, it balanced its desire to facilitate "efficient removal" against "a second, equally important goal: ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020). Thus, Congress took care to safeguard access to asylum by ensuring that noncitizens were screened to determine whether they had a "credible fear" of returning to their country of origin. Specifically, if a noncitizen expresses the intention to seek asylum or a fear of removal, they are entitled to an interview with an asylum officer, the outcome of which is subject to review by an immigration judge. Additionally, the statute requires the Attorney General to "provide information concerning the asylum interview described in this subparagraph to [noncitizens] who may be eligible." 8 U.S.C. § 1225(b)(1)(B)(iv). And a noncitizen "who is eligible for such interview may consult with a person or persons of the [noncitizen]'s choosing prior to the interview or any review thereof." *Id*. The purpose of the interview is to screen fear claims. Noncitizens pass the screening standard if they establish a "credible fear" of returning to their country of origin, defined by statute as a "significant possibility" that the individual "could establish eligibility for asylum" in removal proceedings. *Id*. § 1225(b)(1)(A)(ii), (b)(1)(B)(v). Once the noncitizen shows a credible fear—a "low screening standard," 142 Cong. Rec. 25,347 (1996)—they are entitled to a full removal hearing (with administrative and judicial review) in which to attempt to make out their asylum claim.

35.     By contrast, if the asylum officer finds no credible fear, the noncitizen can request review of that decision by an immigration judge. If the IJ disagrees with the asylum officer and finds a credible fear, the noncitizen is then placed in regular removal proceedings under 8 U.S.C. § 1229a. 8 C.F.R. § 1208.30(g)(2)(iv)(B). If, however, the IJ affirms the asylum officer's adverse finding, the applicant is subject to removal "without further hearing or review." 8 U.S.C.

§ 1225(b)(1)(A)(i), (B)(iii); *see id.* § 1252(a)(2)(A), (e).

36.    The credible fear interview is also used to screen claims for withholding of removal and CAT relief.

37.    Unaccompanied noncitizen children, whom the Proclamation does not exempt, have special statutory protections under the INA and the TVPRA. Under those laws, unaccompanied noncitizen children, except those from Mexico and Canada, may not be placed into expedited removal proceedings and instead "shall" be placed in full removal proceedings in immigration court where they may seek various forms of relief, including protection from persecution or torture. 8 U.S.C. § 1232(a)(5)(D).

38.    Over the past decade, the federal government has repeatedly sought to limit eligibility for asylum and to limit the procedural protections for individuals seeking asylum and other forms of protection, invoking the statutory authority of the DHS Secretary and the Attorney General to create additional limitations and conditions on asylum and applications for asylum. Overwhelmingly, courts have invalidated those attempts. *See, e.g.*, *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669-70 (9th Cir. 2021). And none of those attempts have gone nearly as far as the Proclamation.

39.    In 2024, a bipartisan group of lawmakers crafted legislation that would have provided "border emergency authority" to limit access to asylum and streamline removal procedures when encounters at the southern border exceeded certain thresholds. *See* Border Act of 2024, S. 118-4361 (May 16, 2024). That legislation spurred fierce debate, but it never became law.

**C.    Sections 212(f) and 215(a)(1) of the Immigration and Nationality Act.**

40.    The Proclamation relies principally on Section 212(f) of the INA. That section provides: "Whenever the President finds that the entry of any [noncitizens] or of any class of

11

[noncitizens] into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all [noncitizens] or any class of [noncitizens] as immigrants or nonimmigrants, or impose on the entry of [noncitizens] any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f).

41.    Congress first enacted Section 212(f) in the Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 212(e), 66 Stat. 163, 188 ("1952 Act"). The 1952 Act long predates Congress's creation of the comprehensive set of protections from removal that exist today.

42.    Section 212(f) does not empower the President to expel noncitizens from the United States, much less to do so in a manner that contradicts the specific restrictions on the removal of noncitizens that Congress imposed elsewhere in the INA, including the asylum statute, the withholding of removal statute, FARRA, TVPRA, and the expedited removal statute.

43.    Noncitizens who are "physically present" or "arrive[] in" the United States have a statutory right to apply for asylum. 8 U.S.C. § 1158(a)(1). So while Section 212(f) authorizes the President to suspend "entry," it does not authorize the President to override the asylum rights of noncitizens who are already physically present in the United States. Likewise, even if the President suspends the entry of certain noncitizens, Section 212(f) does not authorize the removal of noncitizens in contravention of Congress's direction that the government "may not remove [a noncitizen] to a country if … [their] life or freedom would be threatened in that country" on protected grounds, 8 U.S.C. § 1231(b)(3)(A), or to a country in which "it is more likely than not that he or she would be tortured" upon removal, 8 C.F.R. § 208.16(c)(2).

44.    Not until 1981 did a President invoke Section 212(f). *See* Kelsy Y. Santamaria et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)*, at 22 (2024) ("CRS Report"). Ever since, Presidents have invoked Section 212(f) to render

noncitizens inadmissible. *See id.* at 4-22. Never has a President invoked Section 212(f) to expel individuals who are already physically present in the United States or to bar such individuals from seeking relief from removal.

45.    Since 1981, the Executive Branch has expressly and repeatedly recognized that Section 212(f) does not permit the President to alter the asylum rights and procedures that Congress enacted elsewhere in the INA.

46.    In 1984, then-Assistant Attorney General for the Office of Legal Counsel, Theodore B. Olson, considered whether Section 212(f) permitted the President to "eliminate the asylum rights of noncitizens who had hijacked a plane and, as a condition of the plane's release, been flown to the United States." *Securing the Border*, 89 Fed. Reg. 81156, 81163 n.53 (Oct. 7, 2024). In 1984, the 1980 Refugee Act provided only that the "Attorney General shall establish a procedure for [noncitizens] physically present in the United States or at a land border or port of entry, irrespective of such [noncitizen's] status, to apply for asylum." Pub. L. No. 96-212, § 208(a), 94 Stat. 102, 105 (1980). Even so, Assistant Attorney General Olson determined that Section 212(f) did not permit the President to displace the asylum statute. 89 Fed. Reg. at 81163 n.53.

47.    Congress subsequently amended the asylum statute to its present form, expressly providing that "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including a [noncitizen] who is brought to the United States after having been interdicted in international or United States waters), irrespective of such [noncitizen's] status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) [of this title]." Act of 1996, Pub L. No. 104-208, Div. C, Title VI, § 604(a), 110 Stat. 3009-690 (1996). In 1996, Congress comprehensively overhauled the immigration laws, including by creating the expedited removal system. Congress

never, however, amended Section 212(f) to permit the President to abrogate the rights Congress had provided via the asylum statute and other forms of protection.

48.     "Although Presidents have invoked section 212(f) at least 90 times since 1981 … none of those proclamations were understood to affect the right of noncitizens to apply for, or noncitizens' statutory eligibility to receive, asylum." 89 Fed. Reg. at 81163 n.53 (*Securing the Border* rule discussing the history of presidential invocations of Section 212(f)).

49.     In 2018, during President Trump's first term, his Administration recognized that a proclamation under Section 212(f) did not affect asylum rights. President Trump had issued a Section 212(f) proclamation suspending the entry of noncitizens between southern border ports of entry. Proclamation 9822, *Addressing Mass Migration Through the Southern Border of the United States*, 83 Fed. Reg. 57661, 57663 (Nov. 9, 2018). DHS and DOJ, however, conceded that a noncitizen "whose entry is suspended or restricted under … a [Section 212(f)] proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the [noncitizen] should not be in the United States, would remain subject to various procedures under immigration laws[,]'' including ''expedited-removal proceedings'' in which they could "raise any claims for protection[.]" *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55934, 55940 (Nov. 9, 2018). The Departments therefore invoked separate regulatory authority under the asylum statute itself to promulgate regulations that purported to deem ineligible for asylum noncitizens who entered in violation of the proclamation. *Id.* at 55952 (codified at 8 C.F.R. § 208.13(c)(3) (DHS) and 8 C.F.R. § 1208.13(c)(3) (DOJ)). Those regulations were enjoined and ultimately vacated as violating Congress's directive that any "additional limitations and conditions" on asylum eligibility must be "consistent with" the remainder of the asylum statute. *E. Bay Sanctuary Covenant v. Trump*, 932

F.3d 742, 771-73 (9th Cir. 2018) (affirming injunction of regulations); *see OA v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) (vacating regulations).

50.    In 2024, DHS and DOJ reaffirmed what had "been the Executive Branch's consistent position for four decades" and recognized that a proclamation under Section 212(f) "cannot affect noncitizens' right to apply for asylum, their eligibility for asylum, or asylum procedures." 89 Fed. Reg. at 81163. This "longstanding understanding," the government explained, "follow[ed] from the text and structure of the governing statutes." *Id.*

51.    In *Trump v. Hawaii*, 585 U.S. 667 (2018), the Supreme Court considered a proclamation that imposed a "travel ban" on noncitizens from certain countries, issued pursuant to Section 212(f). That proclamation rendered the impacted noncitizens inadmissible but did not override their right to seek asylum or other forms of protection that Congress has protected by statute. And while the Supreme Court, in upholding that proclamation, noted the "broad discretion" that Section 212(f) conferred, the Court "assume[d]"—consistent with the Executive Branch's longstanding position—that Section 212(f) "does not allow the President to expressly override particular provisions of the INA." 585 U.S. at 689.

52.    The other provision on which the Proclamation relies, INA § 215(a)(1), 8 U.S.C § 1185(a)(1), likewise does not authorize the President to abrogate the protections that the INA provides to noncitizens present in the United States. Section 1185(a)(1) provides that, "[u]nless otherwise ordered by the President, it shall be unlawful … for any [noncitizen] to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1).

53.    As with Section 212(f), the authority under Section 215(a)(1) to condition entry on

"such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe" does not authorize the President to abrogate limitations that Congress elsewhere provided in the INA. This provision has typically been invoked in conjunction with Section 212(f). And consistent with the Executive Branch's recognition that "this provision 'substantially overlap[s]' with" Section 212(f), *Hawaii*, 585 U.S. at 683 n.1 (quoting Brief for Petitioners 32-33), the Executive Branch has never before claimed—and indeed has expressly disavowed—that it empowers the President to "impose [a] condition and limitation on asylum eligibility." 89 Fed. Reg. at 81164 n.56.

    **D.    The President's Constitutional Authority.**

    54.    The Proclamation also invokes Article II and Article IV, Section 4 of the U.S. Constitution.

    55.    Article II vests in the President "[t]he executive Power," U.S. Const. art. II, § 1, and requires the President to "take Care that the Laws be faithfully executed," *id.* § 34.

    56.    Article IV, Section 4 states that the United States "shall guarantee to every State in this Union a Republican Form of Government" and "shall protect each of them against Invasion."

    57.    Whatever the outer limits of these authorities, they do not authorize a preclusive power that permits the President to abrogate Congress' exclusive procedures for removing noncitizens, *see* 8 U.S.C. §§ 1229a, 1225(b), or the statutory protections that Congress has granted to noncitizens in the United States, *see* 8 U.S.C. § 1158(a)(1) (asylum); 8 U.S.C. § 1231(b)(3) (withholding of removal); 8 U.S.C. § 1231 note (CAT protection).

    58.    Immigration, even at heightened levels, does not constitute an "invasion" within the meaning of Article IV, Section 4 or any other part of the Constitution.

**II.    The Proclamation and Its Implementation.**

    59.    In November and December 2024, encounters at the Southwest border—including

16

both at and in between ports of entry—fell to the "lowest level since August 2020 and lower than the monthly average for 2019." CBP, *CBP Releases December 2024 Monthly Update*, https://www.cbp.gov/newsroom/national-media-release/cbp-releases-december-2024-monthly-update (Jan. 14, 2025).

60.    Nonetheless, on January 20, 2025, the President issued the Proclamation. 90 Fed. Reg. 8333. This Proclamation marks the first time that any President has asserted that 8 U.S.C. §§ 1182(f) or 1185(a)(1), or the Constitution, permits the Executive Branch to unilaterally override the immigration laws Congress enacted for the protection of people who face persecution or torture if expelled from the United States.

61.    The preamble states that the President "ha[s] determined that the current situation at the southern border qualifies as an invasion under Article IV, Section 4 of the Constitution of the United States."

62.    The preamble states that "[t]he INA provides the President with certain emergency tools"—specifically, 8 U.S.C. §§ 1182(f) and 1185(a)(1). The preamble recognizes that, "[h]istorically, Presidents have used these statutory authorities [only] to deny entry of designated classes and categories of [noncitizens] into the United States through ports of entry." But the preamble asserts, without citation to authority, that "if the President has the power to deny entry of any [noncitizen] into the United States, and to impose any restrictions as he may deem appropriate, this authority necessarily includes the right to deny the physical entry of [noncitizens] into the United States and impose restrictions on access to portions of the immigration system." And the preamble further asserts that, notwithstanding the INA, "[t]he President's inherent powers to control the borders of the United States, including those deriving from his authority to control the foreign affairs of the United States, necessarily include the ability to prevent the physical entry

of [noncitizens] involved in an invasion into the United States, and to rapidly repatriate them to an alternative location."

63.    Section 1 of the Proclamation states that, pursuant to 8 U.S.C. §§ 1182(f) and 1185(a), "the entry into the United States" of noncitizens engaged in the "invasion across the southern border is detrimental to the interests of the United States" and that entry into the United States "shall be suspended" until the President issues a "finding that the invasion at the border has ceased." Section 2 states that these same noncitizens "are restricted from invoking provisions of the INA that would permit their continued presence in the United States, including, but not limited to, [the asylum statute], 8 U.S.C. 1158, until [the President] issue[s] a finding that the invasion at the southern border has ceased."

64.    Neither Section 1 nor Section 2 defines the class of noncitizens they cover, stating only that the provisions apply to noncitizens "engaged in the invasion across the southern border." Sections 1 and 2 do not distinguish between individuals who cross between ports of entry and those who present at ports of entry and, accordingly, appear to cover both groups.

65.    Section 3, also issued pursuant to 8 U.S.C. §§ 1182(f) and 1185(a), asserts that the entry of noncitizens who do not provide federal officials "with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of … 8 U.S.C. 1182(a)(1)-(3)[] is detrimental to the United States." These provisions of the INA set forth grounds of inadmissibility related to health, crimes, and national security. Section 3 of the Proclamation then suspends entry of noncitizens who do not provide such information and restricts their access to the asylum and other INA provisions "that would permit their continued presence in the United States." The Proclamation does not acknowledge that the INA makes those protections available to noncitizens who are inadmissible on these or other grounds

18

66.    Section 4 of the Proclamation, relying on purported "authorities provided to the [President] under Article II of the Constitution" and "the guarantee of protection against invasion required by Article IV," "suspend[s] the physical entry of any [noncitizen] engaged in the invasion across the southern border of the United States." Section 4 further directs the DHS Secretary "to take appropriate actions … to achieve the objectives of this proclamation." Section 4 does not expressly state whether the President has invoked these constitutional powers only to prevent noncitizens from physically entering the United States, as opposed to expelling them from the United States. Nor, unlike Sections 2 and 3, does Section 4 state that it restricts access to statutory protections under the immigration laws concerning the removal of noncitizens already within the United States. The preamble, however, asserts that the President's constitutional powers include the ability "to rapidly repatriate [noncitizens] to an alternative location."

67.    Section 5 of the Proclamation directs the DHS Secretary, "in coordination with the Secretary of State and the Attorney General," to "take all appropriate action to repel, repatriate, or remove" all noncitizens engaged in the "invasion across the southern border" until the President "issue[s] a finding that the invasion at the southern border has ceased." The Proclamation does not explain why current levels of border encounters constitute an "invasion," identify the point at which encounter levels would no longer constitute an invasion, and provides no timetable for that review.

68.    Defendants are implementing the Proclamation on a large scale and to devastating effect. On information and belief, Defendants are implementing the Proclamation according to its terms. In particular, pursuant to the Proclamation, Defendants are summarily expelling noncitizens who are physically present in the United States without allowing them an opportunity to seek asylum or withholding of removal and without complying with the procedures required for regular

removal proceedings under 8 U.S.C. § 1229a or expedited removal proceedings under Section 1225(b). Asylum seekers are also being systematically expelled from the United States without being provided credible fear interviews—the absolute minimum that Congress required to ensure that people subjected to expedited removal would not be returned to persecution or torture.

69.    On information and belief, Defendants are also relying upon the Proclamation to deny migrants at the Southern border any meaningful opportunity to apply for CAT protection.

70.    These expulsions, which Defendants are effectuating to implement and enforce the Proclamation, are occurring extraordinarily quickly—often within hours—for individuals who can be flown on military jets to Mexico or their home country directly from the border. People have been told by Defendants that asylum "does not exist," have witnessed materials about the asylum process being torn from facility walls by Defendants, and have been expelled by Defendants without being offered a chance to make a phone call to anyone, much less an attorney. Defendants are holding noncitizens who cannot be removed so expeditiously in ICE or CBP custody until a flight is available and are still denying them access to asylum and the other forms of protection that Congress has provided by statute.

71.    None of the sources of law on which the Proclamation relies—Section 1182(f), Section 1185(a)(1), or the Constitution—applies here or can lawfully displace the protections set out in the asylum statute, the withholding of removal statute, FARRA, TVPRA, the expedited removal statute, or the other provisions of the INA.

72.    Even under the standards articulated in *Trump v. Hawaii*, the Proclamation does not satisfy the predicate requirements for invoking Section 212(f). First, the Proclamation fails to define the "class of [noncitizens]" whose entry is suspended, as Section 212(f) requires, insofar as it purports to apply to noncitizens "engaged in the invasion across the southern border" without

20

further defining which noncitizens it covers. Second, the Proclamation does not satisfy Section 212(f)'s predicate requirement that the President must adequately "find" that the entries it restricts "would be detrimental to the interests of the United States," particularly because all or nearly all of the noncitizens subject to the Proclamation are already inadmissible. Third, insofar as the Proclamation rests on a finding that it would be detrimental to the interests of the United States to apply Congress's statutes providing access to asylum and other forms of protection to individuals covered by the Proclamation, this finding cannot sustain the Proclamation. Congress via statute has determined that noncitizens must be able to access asylum and other forms of protection.

## HARMS TO PLAINTIFFS

73.     RAICES' core work includes representing noncitizens—including adults, children, and families—in regular removal proceedings under 8 U.S.C. § 1229a and in bond proceedings before the immigration courts and the Board of Immigration Appeals. In regular removal proceedings RAICES represents people seeking asylum, withholding of removal, and protection under CAT, among other forms of relief. RAICES is also one of the very few organizations that provides telephonic counseling to individuals detained in CBP custody. Representing noncitizens in accessing and navigating the credible fear process is a central component of RAICES' work.

74.     The Proclamation seriously impedes RAICES' core work and activities. The Proclamation provides for the summary expulsion of noncitizens without the ability to raise claims for asylum, withholding of removal, and CAT protection pursuant to the credible fear process and the other safeguards of the immigration statutes. As a result, the Proclamation eliminates RAICES' ability to engage in its core work of representing noncitizens in the credible fear process to which they are entitled by statute. With the Proclamation in effect, RAICES has stopped receiving calls from individuals and families in CBP custody seeking assistance with the credible fear process.

75.    In addition, the Proclamation prevents noncitizens from passing credible fear interviews and being referred to regular removal proceedings, or otherwise being placed in regular removal proceedings, where they would have the chance to have full hearings on the merits of their claims for protection. The Proclamation therefore eliminates RAICES' ability to represent newly arriving noncitizens with protection needs both in regular removal proceedings as well as in the credible fear process. The Proclamation therefore seriously impairs RAICES' ability to carry out its core work and organizational activities.

76.    RAICES is being required to divert resources to respond to the Proclamation's impact on its operations. Among other things, RAICES must expend resources studying the Proclamation and attempting to ascertain its full scope and impact, about which Defendants have provided no public guidance; searching for alternate ways to contact detained individuals and families to provide information and legal services; updating "know your rights" materials; and training staff on the Proclamation and these other operational changes.

77.    Las Americas' core work includes representing asylum seekers and noncitizens detained by the U.S. government in both expedited removal proceedings under 8 U.S.C. § 1225(b) and regular removal proceedings under 8 U.S.C. § 1229a. In regular removal proceedings, Las Americas represents detained people seeking asylum, withholding of removal, and protection under the CAT, among other forms of relief from removal. In expedited removal proceedings, Las Americas provides consultation and legal representation to asylum seekers throughout the credible fear interview process, including assistance in seeking immigration judge review of negative credible fear determinations by asylum officers. In addition, Las Americas provides services on the Mexico side of the border, educating people who intend to seek asylum about the process that they will face.

78.     The Proclamation seriously impedes Las Americas' core work and activities. The Proclamation provides for the summary removal of noncitizens without the ability to raise claims for asylum, withholding of removal, and CAT protection pursuant to the credible fear process and the other safeguards of the immigration statutes. As a result, the Proclamation eliminates Las Americas' ability to engage in its core work of representing noncitizens in the credible fear process to which they are entitled by statute.

79.     In addition, the Proclamation prevents noncitizens from passing credible fear interviews and being referred to regular removal proceedings, or otherwise being placed in regular removal proceedings, where they would have the chance to have full hearings on the merits of their claims for protection. The Proclamation therefore eliminates Las Americas' ability to represent newly arriving noncitizens with protection needs in regular removal proceedings as well as in the credible fear process. The Proclamation therefore seriously impairs Las Americas' ability to carry out its core work and organizational activities.

80.     Las Americas is being required to divert resources to respond to the Proclamation's impact on its operations. Among other things, it must expend resources studying the Proclamation and seeking to ascertain its full scope, about which Defendants have provided no public guidance, in order to provide appropriate counsel to noncitizens; divert resources to respond to questions about the Proclamation and present emergency "know your rights" sessions; and revise the materials its staff use to provide guidance to people in Mexico planning to seek protection in the United States.

81.     The Florence Project's core work includes providing free legal services to detained adults and unaccompanied children throughout Arizona. This includes providing services to people seeking asylum, withholding of removal, and CAT protection, in both expedited removal

proceedings under 8 U.S.C. § 1225(b) and regular removal proceedings under 8 U.S.C. § 1229a. In addition, the Florence Project provides services on the Mexico side of the border, educating people who intend to seek asylum about the process that they will face.

82.    The Proclamation seriously impedes the Florence Project's core work and activities. The Proclamation provides for the summary removal of noncitizens without the ability to raise claims for asylum, withholding of removal, and CAT protection pursuant to the credible fear process and the other safeguards of the immigration statutes. As a result, the Proclamation eliminates the Florence Project's ability to engage in its core work of representing noncitizens in the credible fear process to which they are entitled by statute.

83.    In addition, the Proclamation prevents noncitizens from passing credible fear interviews and being referred to regular removal proceedings, or otherwise being placed in regular removal proceedings, where they would have the chance to have full hearings on the merits of their claims for protection. The Proclamation therefore eliminates the Florence Project's ability to represent newly arriving noncitizens with protection needs in regular removal proceedings as well as in the credible fear process. The Proclamation therefore seriously impairs the Florence Project's ability to carry out its core work and organizational activities. The Florence Project has not been able to serve a single noncitizen who entered the United States since the Proclamation took effect and it has been denied access to detention facilities where these noncitizens are being held.

84.    The Florence Project is being required to divert resources to respond to the Proclamation's impact on its operations. Among other things, it has had to quickly update materials explaining asylum law and the procedures to seek asylum; spend additional time educating the community on these changes, including at a single event that had more than 100 participants; add hotline hours; change signage for posting in jails; and expend time and resources seeking to

identify new ways to try to provide people with information about their rights.

85.     In addition, Plaintiffs face a risk of lost funding. Because these organizations receive funding that is meant, in large part, to be spent serving asylum seekers and people who have recently arrived in the United States, the indefinite block on access to the U.S. immigration system is likely to reduce each organization's asylum-seeking client base, which will in turn influence funding that is based on the number of individuals served.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (VIOLATION OF THE ASYLUM STATUTE, 8 U.S.C. § 1158(a)(1))

86.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

87.     The INA provides that, with certain exceptions not applicable here, "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival … ), irrespective of such [noncitizen's] status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C.] § 1225(b)." 8 U.S.C. § 1158(a)(1). Both DHS and DOJ have promulgated regulations implementing the asylum statute. *See, e.g.*, 8 C.F.R. § 208.13 (DHS); 8 C.F.R. § 1208.13 (DOJ).

88.     The Proclamation and Defendants' actions to implement and enforce the Proclamation violate 8 U.S.C. § 1158(a)(1) and its implementing regulations by barring noncitizens in the United States from applying for or receiving asylum.

89.     None of the sources of law on which the Proclamation relies—Section 1182(f), Section 1185(a)(1), or the Constitution—applies here or can lawfully displace the protections set out in Section 1158(a)(1) and its implementing regulations.

## SECOND CLAIM FOR RELIEF
## (VIOLATION OF THE WITHHOLDING OF REMOVAL STATUTE,
## 8 U.S.C. § 1231(b)(3))

90.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

91.     The withholding of removal statute, 8 U.S.C. § 1231(b)(3), precludes the removal of noncitizens to countries where it is more likely than not that their "life or freedom would be threatened … because of [their] race, religion, nationality, membership in a particular social group, or political opinion." Both DHS and DOJ have promulgated regulations implementing this provision. *See* 8 C.F.R. § 208.16(b) (DHS); 8 C.F.R. § 1208.16(b) (DOJ).

92.     The Proclamation and Defendants' actions to implement and enforce the Proclamation violate 8 U.S.C. § 1231(b)(3) and its implementing regulations by barring withholding of removal for noncitizens in the United States.

93.     None of the sources of law on which the Proclamation relies—Section 1182(f), Section 1185(a)(1), or the Constitution—applies here or can lawfully displace the protections set out in Section 1231(b)(3) and its implementing regulations.

## THIRD CLAIM FOR RELIEF
## (VIOLATION OF THE FOREIGN AFFAIRS REFORM AND RESTRUCTURING ACT
## OF 1998, CODIFIED AT 8 U.S.C. § 1231 NOTE)

94.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

95.     FARRA, 8 U.S.C. § 1231 note, and applicable DHS and DOJ regulations implement the CAT and prohibit the government from returning a noncitizen to a country in which "it is more likely than not that he or she would be tortured." 8 C.F.R. § 208.16(c)(2) (DHS); 8 C.F.R. § 1208.16(c)(2) (DOJ)

96.     The Proclamation and Defendants' actions to implement and enforce the

Proclamation violate FARRA and its implementing regulations by depriving noncitizens of a meaningful opportunity to present CAT claims.

97.    None of the sources of law on which the Proclamation relies—Section 1182(f), Section 1185(a)(1), or the Constitution—applies here or can lawfully displace or undermine the protections set out in the Convention Against Torture and FARRA.

**FOURTH CLAIM FOR RELIEF**
**(VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION**
**REAUTHORIZATION ACT, 8 U.S.C. § 1232(a)(5)(D))**

98.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

99.    The TVPRA, 8 U.S.C. § 1232(a)(5)(D), mandates that "[a]ny unaccompanied [noncitizen] child sought to be removed by [DHS]," except certain unaccompanied children from Canada or Mexico, "shall be … placed in [regular] removal proceedings" in immigration court under 8 U.S.C. § 1229a.

100.    Insofar as the Proclamation and implementation deprive unaccompanied children from non-contiguous countries of the right to a hearing in regular removal proceedings, or to seek asylum, withholding or CAT protection, they violate the TVPRA.

101.    None of the sources of law on which the Proclamation relies—Section 1182(f), Section 1185(a)(1), or the Constitution—applies here or can lawfully displace or undermine the protections set out in the TVPRA.

**FIFTH CLAIM FOR RELIEF**
**(VIOLATION OF THE IMMIGRATION AND NATIONALITY ACT,**
**8 U.S.C. § 1101, *ET SEQ.*)**

102.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

103.    The INA, 8 U.S.C. § 1101, *et seq.*, sets out the sole mechanisms established by

Congress for the removal of noncitizens.

104.    The INA provides that removal proceedings before an immigration judge under 8 U.S.C. § 1229a are "the sole and exclusive procedure" by which the government may determine whether to remove an individual, "[u]nless otherwise specified" in the INA. 8 U.S.C. § 1229a(a)(3). One mechanism otherwise specified in the INA is the expedited removal system, including its credible fear screening process. *Id.* § 1225(b)(1). The expedited removal statute states that if a noncitizen "indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the [noncitizen] for an interview by an asylum officer," and the noncitizen may not be removed pending that interview and, if requested, review by an immigration judge. *Id.* § 1225(b)(1)(A)(i)-(ii). The expedited removal statute further provides that a noncitizen "who may be eligible" for "the asylum interview [just] described" has a right to be provided "information concerning the asylum interview" and to "consult with a person or persons of the [noncitizen]'s choosing prior to the interview." *Id.* § 1225(b)(1)(B)(iv). And the expedited removal statute provides that the government "shall provide by regulation and upon the [noncitizen's] request for prompt review by an immigration judge of a determination … that the [noncitizen] does not have a credible fear of persecution," including "an opportunity for the [noncitizen] to be heard and questioned by the immigration judge, either in person or by telephonic or video connection." *Id.* § 1225(b)(1)(B)(iii)(III).

105.    The Proclamation and Defendants' actions to implement and enforce the Proclamation are unlawful because they result in removals without compliance with the procedures required by the INA and its implementing regulations, including the requirements to refer for credible fear interviews noncitizens who indicate an intention to apply for asylum or a fear of persecution; to provide information about credible fear interviews to noncitizens who may be

28

eligible; and to provide for review of adverse credible fear determinations by immigration judges.

106.    None of the sources of law on which the Proclamation relies—Section 1182(f), Section 1185(a)(1), or the Constitution—applies here or can lawfully displace the procedures required by the INA and its implementing regulations.

## SIXTH CLAIM FOR RELIEF
### (SUBSTANTIVE VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A))

### (Applicable to all Defendants except President Trump)

107.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

108.    The APA requires courts to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

109.    The Departments of Homeland Security, State, and Justice are "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

110.    In implementing the Proclamation, as set out above, Defendants have acted contrary to 8 U.S.C. §§ 1158(a)(1), 1225, 1229a, 1231(b)(3), 1231 note, and 1232(a)(5)(D), as well as their implementing regulations.

111.    None of the sources of law on which the Proclamation relies—Section 1182(f), Section 1185(a)(1), or the Constitution—applies here or can lawfully displace the provisions of law described in the prior paragraph.

112.    Further, in implementing and enforcing the Proclamation, Defendants have acted arbitrarily and capriciously. Among other arbitrary actions and omissions, Defendants have failed to provide reasoned explanations for their actions; failed to consider relevant factors; relied on factors Congress did not intend to be considered; and departed from past practices and policies

without reasoned explanations for doing so.

## SEVENTH CLAIM FOR RELIEF
## (PROCEDURAL VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(D))

### (Applicable to all Defendants except President Trump)

113.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

114.    The APA requires courts to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

115.    The Departments of Homeland Security, State, and Justice are "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

116.    In implementing and enforcing the Proclamation, Defendants have changed the substantive rights of noncitizens physically present within the United States to seek asylum, withholding of removal, or protection under the CAT and have departed from the procedural and substantive standards set forth in their regulations implementing the INA, without following the rulemaking procedures required by the APA, *see* 5 U.S.C. § 553.

## EIGHTH CLAIM FOR RELIEF
## (VIOLATION OF SEPARATION OF POWERS)

117.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

118.    Under fundamental separation-of-powers principles, the President cannot ignore or override Congress's careful and longstanding decisions to provide protections for noncitizens fleeing danger.

119.    The Proclamation and Defendants' actions to implement the Proclamation violate these separation-of-power principles and exceed the President's constitutional authority.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs request that the Court grant the following relief:

  a.     Declare that the Proclamation is unlawful in its entirety;

  b.     Enjoin Defendants from implementing or enforcing the Proclamation and vacate

any implementing guidance;

  c.     Require Defendants to pay Plaintiffs reasonable attorneys' fees and costs;

  d.     Grant any other and further relief that this Court may deem just and proper.


Dated: February 3, 2025                    Respectfully submitted,

                                           /s/ Lindsay C. Harrison
Lee Gelernt (D.D.C. Bar No. NY0408)        Lindsay C. Harrison (D.C. Bar #977407)
Omar C. Jadwat*                            Zachary C. Schauf (D.C. Bar #1021638)
American Civil Liberties Union Foundation  Logan C. Wren (D.C. Bar #1780385)*
Immigrants' Rights Project                 Mary-Claire Spurgin (D.C. Bar #90029537)*
125 Broad Street, 18th Floor               Jenner & Block LLP
New York, NY 10004                         1099 New York Avenue, NW
T: 212-549-2660                            Suite 900
lgelernt@aclu.org                          Washington, DC 20001
ojadwat@aclu.org                           T: 202-639-6000
                                           lharrison@jenner.com
                                           zschauf@jenner.com
Simon A. de Carvalho*                      lwren@jenner.com
Jenner & Block LLP                         mspurgin@jenner.com
353 N. Clark St.
Chicago, IL 60654
353 N Clark St, Chicago, IL 60654          Keren Zwick (D.D.C. Bar. No. IL0055)
T: 312-222-9350                            Richard Caldarone (D.C. Bar No. 989575)*
sdecarvalho@jenner.com                     Mary Georgevich*
                                           National Immigrant Justice Center
                                           111 W. Jackson Blvd., Suite 800
Morgan Russell*                            Chicago, IL 60604
Katrina Eiland*                            T: 312-660-1370
Cody Wofsy (D.D.C. Bar No. CA00103)        kzwick@immigrantjustice.org
Spencer Amdur*                             rcaldarone@immigrantjustice.org
American Civil Liberties Union Foundation  mgeorgevich@immigrantjustice.org
Immigrants' Rights Project
425 California Street, Suite 700
San Francisco, CA 94104                    Melissa Crow (D.C. Bar. No. 453487)
T: 415-343-0770                            Center for Gender & Refugee Studies
mrussell@aclu.org                          1121 14th Street, NW, Suite 200
keiland@aclu.org                           Washington, D.C. 20005

31

cwofsy@aclu.org
samdur@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
aspitzer@acludc.org
smichelman@acludc.org

Ashley Alcantara Harris*
David A. Donatti*
ACLU Foundation of Texas
P.O. Box 8306
Houston, TX 77288
TEL: (713) 942-8146
FAX: (713) 942-8966
aharris@aclutx.org
ddonatti@aclutx.org

Robert Pauw*
Center for Gender & Refugee Studies
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: 206-682-1080
rpauw@ghp-law.net

T: 202-355-4471
crowmelissa@uclawsf.edu

Tamara Goodlette (D.C. Bar. No.
TX24117561)
Texas Civil Rights Project
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 207
tami@texascivilrightsproject.org

Edith Sangueza*
Center for Gender & Refugee Studies
26 Broadway, 3rd Floor
New York, NY 10004
T: 415-581-8835
sanguezaedith@uclawsf.edu

*Attorneys for Plaintiffs*

*\*Certificate of pro bono representation or pro hac vice forthcoming*