BRETT A. SHUMATE
*Acting Assistant Attorney General*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
AUGUST FLENTJE
*Acting Director*
EREZ REUVENI
*Assistant Director*
PATRICK GLEN
ALEXANDER HALASKA
DAVID KIM
KATHERINE J. SHINNERS
BRIAN C. WARD
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-9121
Email: brian.c.ward@usdoj.gov
ELISSA FUDIM
*Trial Attorney*

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ ) | Civil Action No. 1:25-cv-00306 |
| Refugee and Immigrant Center for ) | |
| Education and Legal Services, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| Kristi Noem, Secretary, U.S. Department ) | |
| of Homeland Security, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## MOTION TO DISMISS

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

LEGAL AND PROCEDURAL BACKGROUND.........................................................................3

STANDARD........................................................................................................................7

ARGUMENT ......................................................................................................................8

    I.   The Plaintiff Organizations lack standing............................................................8

        A.  Plaintiffs have not pleaded a cognizable injury to their Organizations ........................8

        B.  Plaintiffs have not alleged associational or third-party standing .................................14

        C.  Plaintiffs lack standing for their claims against the President .....................................15

    II.  This Court lacks jurisdiction to entertain Plaintiffs' claims ...............................17

        A.   Section 1252 bars Plaintiffs' attempt to enforce provisions of the expedited removal statute ..............................................................................................................17

        B.  Plaintiffs' non-constitutional challenges to the Proclamation are not justiciable ........18

        C.  Plaintiffs' claims are not reviewable under the APA....................................................20

    III.  Plaintiffs lack a valid cause of action for their claims because they are outside the zone of interests and have not identified any final agency action .....................................21

        A.   Plaintiffs are outside the zone of interests of the statutes they invoke ......................21

        B.  Plaintiffs cannot raise a claim under the APA where the President is not an agency and Plaintiffs have not identified any final agency action..............................24

CONCLUSION....................................................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Abourezk v. Reagan*,
    785 F.2d 1043 (D.C. Cir. 1986) .......................................................................... 19, 26

*AILA v. Reno*,
    199 F.3d 1352 (D.C. Cir. 2000) .......................................................................... 15, 18

*Allen v. Milas*,
    896 F.3d 1094 (9th Cir. 2018) .................................................................................. 25

*Animal Legal Def. Fund, Inc. v. Vilsack*,
    111 F.4th 1219 (D.C. Cir. 2024) ............................................................................... 14

*Arizona All. for Retired Americans v. Mayes*,
    117 F.4th 1165 (9th Cir. 2024) ................................................................................. 13

*Armstrong v. Bush*,
    924 F.2d 282 (D.C. Cir. 1991) .................................................................................. 24

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) .................................................................................... 12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..................................................................................................... 7

*Ayuda, Inc. v. Reno*,
    7 F.3d 246 (D.C. Cir. 1993) ...................................................................................... 21

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................................... 7

*Block v. Community Nutrition Institute*,
    467 U.S. 340 (1984) ............................................................................................. 21, 23

*California v. Texas*,
    593 U.S. 659 (2021) .................................................................................................. 16

*Chai v. Carroll*,
    48 F.3d 1331 (4th Cir. 1995) .................................................................................... 26

*Clapper v. Amnesty Int'l*,
    568 U.S. 398 (2013) .................................................................................................. 12

*Clarke v. Secs. Indus. Ass'n*,
  479 U.S. 388 (1987) ........................................................................... 21

*Ctr. for Responsible Science v. Gottlieb*,
  346 F Supp. 3d 29 (D.D.C. 2018) ....................................................... 13

*Dalton v. Specter*,
  511 U.S. 462 (1994) ........................................................................... 26

*Dep't of Homeland Sec. v. Thuraissigiam*,
  591 U.S. 103 (2020) ............................................................................. 9

*Doe 2 v. Trump*,
  319 F. Supp. 3d 539 (D.D.C. 2018) ..................................................... 16

*E. Bay Sanctuary Covenant v. Trump*,
  932 F.3d 742 (9th Cir. 2018) ............................................................... 24

*FDA v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) ........................................................... 9, 10, 12, 13

*Fed'n for Am. Immigration Reform, Inc. (FAIR) v. Reno*,
  93 F.3d 897 (D.C. Cir. 1996) .............................................................. 22

*Feds for Med. Freedom v. Biden*,
  581 F. Supp. 3d 826 (S.D. Tex.) .......................................................... 24

*Fiallo v. Bell*,
  430 U.S. 787 (1977) ............................................................. 2, 9, 18, 20

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ...................................................... 11, 14

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ...................................................................... 16, 24

*Gill v. Whitford*,
  585 U.S. 48 (2018) ............................................................................... 8

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952) ................................................................. 4, 18, 19

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ........................................................................... 10

*Hunt v. Washington State Apple Advertising Comm'n*,
    432 U.S. 333 (1977) ................................................................. 14

*Immigrant Rights Project v. USCIS*,
    325 F.R.D. 671 (W.D. Wash. 2016) ........................................ 22

*INS v. Legalization Assistance Project of L.A. Cty.*,
    510 U.S. 1301 (1993) ............................................................... 22

*Int'l Academy of Oral Medicine & Toxicology*,
    195 F. Supp. 3d 243 (D.D.C. 2016) ........................................ 14

*Kerry v. Din*,
    576 U.S. 86 (2015) ................................................................... 19

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ................................................................. 15

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*,
    507 U.S. 163 (1993) ................................................................... 7

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973) ................................................................... 9

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555, (1992) ...................................................... 7, 8, 12

*Macharia v. United States*,
    334 F.3d 61 (D.C. Cir. 2003) ..................................................... 7

*Make the Road v. Wolf*,
    962 F.3d 612 (D.C. Cir. 2020) ........................................... 17, 18

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1867) ................................................... 16

*Motions Sys. Corp. v. Bush*,
    437 F.3d 1356 (Fed. Cir. 2006) ............................................... 24

*Mountain States Legal Found. v. Glickman*,
    92 F.3d 1228 (D.C. Cir. 1996) ................................................. 21

*Nat'l Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 1995) ................................................. 14

*Nat'l Treasury Emps. Union v. United States*,
 101 F.3d 1423 (D.C. Cir. 1996) ........................................................................ 11

*Newdow v. Roberts*,
 603 F.3d 1002 (D.C. Cir. 2010) ........................................................................ 16

*Nixon v. Fitzgerald*,
 457 U.S. 731 (1982) ........................................................................................... 16

*O.A. v. Trump*,
 404 F. Supp. 3d 109 (D.D.C. 2019) ............................................................. 14, 23

*Patchak v. Zinke*,
 138 S. Ct. 897 (2018) .......................................................................................... 17

*PETA v. USDA*,
 797 F.3d 1087 (D.C. Cir. 2015) ........................................................................ 11

*Saavedra Bruno v. Albright*,
 197 F.3d 1153 (D.C. Cir. 1999) ............................................................. 23, 24, 25

*Sale v. Haitian Ctrs. Council, Inc.*,
 509 U.S. 155 (1993) ........................................................................................... 26

*Sessions v. Morales-Santana*,
 582 U.S. 47 (2017) ............................................................................................. 15

*Shaughnessy v. United States ex rel. Mezei*,
 345 U.S. 206 (1953) ........................................................................................... 18

*State of California v. United States*,
 104 F.3d 1086 (9th Cir. 1997) ........................................................................... 20

*Sure-Tan, Inc. v. N.L.R.B.*,
 467 U.S. 883 (1984) ........................................................................................... 23

*Swan v. Clinton*,
 100 F.3d 973 (D.C. Cir. 1996) ........................................................................... 16

*Texas v. Biden*,
 597 U.S. 785 (2022) ........................................................................................... 25

*Thompson v. North Am. Stainless, LP*,
 562 U.S. 170 (2011) ........................................................................................... 23

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ........................................................................................ 15

*Trump v. Hawaii,*
   585 U.S. 667 (2018) ................................................................................. passim

*U.S. ex rel. Knauff v. Shaughnessy,*
   338 U.S. 537 (1950) ..................................................................... 3, 4, 19, 20

*United States ex rel. Accardi v. Shaughnessy,*
   347 U.S. 260 (1954) ........................................................................................ 26

*United States v. Curtiss-Wright Exp. Corp.,*
   299 U.S. 304 (1936) .......................................................................................... 4

*United States v. Texas,*
   599 U.S. 670 (2023) ............................................................................. 9, 15, 23

*Washington v. U.S. Off. of Special Couns.,*
   480 F. Supp. 3d 118 (D.D.C. 2020) ............................................................ 11

*Webster v. Doe,*
   486 U.S. 592 (1998) ........................................................................................ 25

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) .......................................................................................... 4

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
   135 S. Ct. 2076 (2015) ..................................................................................... 4

**Statutes**

5 U.S.C. § 701(a)(1) .............................................................................................. 20

5 U.S.C. § 701(a)(2) .............................................................................................. 25

5 U.S.C. § 702 ......................................................................................................... 21

5 U.S.C. § 702(1) .................................................................................................... 25

5 U.S.C. § 704 ......................................................................................................... 25

8 U.S.C. § 1101 ................................................................................................... 4, 7

8 U.S.C. § 1158 ....................................................................................................... 6

8 U.S.C. § 1158(a)(1) ............................................................................................. 6

8 U.S.C. § 1158(d)(7) ......................................................................................... 22

8 U.S.C. § 1182 ....................................................................................... 1, 5, 20

8 U.S.C. § 1182(a)(1) ................................................................................ 5, 6, 24

8 U.S.C. § 1182(a)(2) ..................................................................................... 4, 5

8 U.S.C. § 1182(f) ...................................................................................... passim

8 U.S.C. § 1185(a)(1) ........................................................................................ 3

8 U.S.C. § 1225(b) .......................................................................................... 17

8 U.S.C. § 1231 ................................................................................................ 7

8 U.S.C. § 1231(b)(3) ........................................................................................ 6

8 U.S.C. § 1232(a)(5)(D) ................................................................................... 7

8 U.S.C. § 1252 ......................................................................................... 2, 24

8 U.S.C. § 1252(a)(2)(A) ................................................................................. 17

8 U.S.C. § 1252(e) .......................................................................................... 17

8 U.S.C. § 1252(a)(5) ................................................................................ 20, 22

28 U.S.C. § 1331 ............................................................................................. 17

**Rules**

Fed. R. Civ. P. 12(b)(1) ...................................................................................... 7

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 7

## INTRODUCTION

After years of unprecedented levels of illegal border crossings into the United States, the President issued Proclamation 10888, *Guaranteeing the States Protection Against Invasion*, 90 Fed. Reg. 8333. (Jan. 20, 2025), explaining that "[t]he sheer number of aliens entering the United States has overwhelmed the system and rendered many [Immigration and Nationality Act (INA)] provisions ineffective, including those … intended to prevent aliens posing threats to public health, safety, and national security from entering the United States." *Id*. The President emphasized that, "[a]s a result, millions of aliens who potentially pose significant threats to health, safety, and national security have moved into communities nationwide." *Id*.

The President thus invoked his statutory authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1) to proclaim that the unlawful "entry into the United States" by aliens across the southern border "is detrimental to the interests of the United States," and to direct that such entry "be suspended" and aliens attempting such entry be "restricted from invoking provisions of the INA that would permit their continued presence in the United States." Proclamation §§ 1, 2, 90 Fed. Reg. at 8335; *see* 8 U.S.C. § 1182(f) (authorizing the President to "suspend the entry of all aliens or any class of aliens" and "impose on the entry of aliens any restrictions he may deem to be appropriate" "[w]henever the President finds that the entry of [such] aliens into the United States would be detrimental to the interests of the United States"); *Trump v. Hawaii*, 585 U.S. 667, 684 (2018). The President additionally made the same finding and imposed the same restrictions on entry with respect to any alien (not just at the southern border) who fails "to provide Federal officials with sufficient medical information and reliable criminal history and background information." Proclamation § 3, 90 Fed. Reg. at 8335. In addition, the President invoked his "express and inherent powers in Article II of the Constitution of the United States," as well as his

responsibility to "effectuate the guarantee of protection [to the States] against invasion required by Article IV, Section 4," of the Constitution. Proclamation § 4, 90 Fed. Reg. at 8335.

Plaintiffs—three organizations that provide legal services to aliens—ask this Court to disregard this authority and override the President's judgment. Setting aside the numerous reasons that Plaintiffs' claims lack merit—which the government intends to raise at a later time and does not waive—the claims should be dismissed at the outset on several independent jurisdictional and threshold grounds.

*First,* Plaintiffs lack standing in their own right to challenge the Proclamation. They are third-party organizations who are not directly affected by the Proclamation and claim injury based on downstream indirect effects on aliens. And the complaint alleges no factual basis to support associational or third-party standing. Plaintiffs also lack standing to seek injunctive or declaratory relief against the President.

*Second*, the Court lacks jurisdiction to entertain Plaintiffs' claims for several independent reasons. The INA strips courts of jurisdiction to entertain Plaintiffs' claims seeking to enforce statutory provisions that apply only to aliens. *See* 8 U.S.C. § 1252. Plaintiffs' non-constitutional challenges to the Proclamation are non-justiciable because "the power to … exclude aliens" is "a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (citation omitted). And Plaintiffs cannot evade those restrictions on judicial review by purporting to bring their claims under the Administrative Procedure Act (APA).

*Third*, Plaintiffs lack a valid cause of action for their claims because they are outside the zone of interests of all the statutes on which they base their claims, and because the complaint does

not identify any final agency action, given that the President is not an agency and Plaintiffs have not identified any separate final agency action to support an APA claim.

Irrespective of the merits, therefore, the Court should dismiss the complaint on one or more of these jurisdictional and threshold grounds.

## LEGAL AND PROCEDURAL BACKGROUND

Legal Background. "The exclusion of aliens is a fundamental act of sovereignty," and "[t]he right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950)). Consistent with that principle, Congress has accorded the President broad authority to suspend or restrict the entry of aliens. Section 1182(f) of Title 8 provides in relevant part:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). "By its terms, § 1182(f) exudes deference to the President in every clause," and "entrusts to the President the decisions whether and when to suspend entry ...; whose entry to suspend ...; for how long ...; and on what conditions ...." *Hawaii*, 585 U.S. at 684. Section 1185(a)(1) of Title 8 further grants the President broad authority to adopt "reasonable rules, regulations, and orders" governing the entry of aliens, and the President may make entry "subject to such limitations and exceptions as [he] may prescribe." 8 U.S.C. § 1185(a)(1).

Although "normally Congress supplies the conditions of the privilege of entry into the United States," "because the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power" without raising delegation concerns. *Knauff*, 338 U.S. at 543. As the Supreme Court has

3

repeatedly held, Article II confers upon the President expansive authority over foreign affairs, national security, and immigration. *See Harisiades v. Shaughnessy,* 342 U.S. 580, 588 (1952); *Knauff*, 338 U.S. at 542; *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936). Thus, where, as here, "the President acts pursuant to an express or implied authorization of Congress," *i.e.* 8 U.S.C. §§ 1182(f) and 1185(a)(1), coupled with the President's own Article II powers over foreign affairs and national security, "his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083-84 (2015) (similar).

The Proclamation. On January 20, 2025, President Trump issued Proclamation 10888, *Guaranteeing the States Protection Against Invasion*, 90 Fed. Reg. 8333. The President noted that Congress has created a complex scheme in the INA, 8 U.S.C. § 1101 *et seq.*, to control entry across the border of the United States that, in routine circumstances, protects United States sovereignty and prevents entry of aliens who pose threats to public health or national security. 90 Fed. Reg. at 8333. But the INA's screening provisions "can be wholly ineffective in the border environment, where access to necessary information is limited for aliens who have traveled from countries around the world to enter the United States illegally, or when the system is overwhelmed, leading to the unauthorized entry of innumerable illegal aliens into the United States." *Id.*

"Due to significant information gaps—particularly in the border environment—and processing times, Federal officials do not have the ability to verify with certainty the criminal record or national-security risks associated with the illegal entry of every alien at the southern border, as required by" 8 U.S.C. § 1182(a)(2)–(3). 90 Fed. Reg. at 8333. "Nor do aliens who illegally cross the southern border readily provide comprehensive background information from

their home countries to Federal law enforcement officials." *Id.* "The public safety and national security risks in such an environment are heightened by the presence of, and control of territory by, international cartels and other transnational criminal organizations on the other side of the southern border, as well as terrorists and other malign actors who intend to harm the United States and the American people." *Id.*

The Federal Government also "currently lacks an effective operational capability to screen all illegal aliens crossing the southern border for communicable diseases of public-health concern, as required by" 8 U.S.C. § 1182(a)(1). 90 Fed. Reg. at 8334. "As a result, innumerable aliens potentially carrying communicable diseases of public health significance illegally cross the southern border and enter communities across the United States." *Id.* "Over the last 4 years, at least 8 million illegal aliens were encountered along the southern border of the United States, and countless millions more evaded detection and illegally entered the United States." *Id.* "The sheer number of aliens entering the United States has overwhelmed the system and rendered many of the INA's provisions ineffective, including those … intended to prevent aliens posing threats to public health, safety, and national security from entering the United States." *Id.* "As a result, millions of aliens who potentially pose significant threats to health, safety, and national security have moved into communities nationwide." *Id.*

The President thus determined that "the current situation at the southern border qualifies as an invasion." 90 Fed. Reg. at 8335. Accordingly, to address this situation, the President invoked his authority under 8 U.S.C. §§ 1182(f) and 1185(a) and found "that the entry into the United States … of aliens engaged in the invasion across the southern border is detrimental to the interests of the United States," and thus suspended the "entry into the United States of such aliens" until "a finding that the invasion at the southern border has ceased." Proclamation § 1. The Proclamation

further restricts "aliens engaged in the invasion across the southern border" from "invoking the provisions of the INA that would permit their continued presence in the United States, including, but not limited to" 8 U.S.C. § 1158, until the President issues "a finding that the invasion at the southern border has ceased." Proclamation § 2. Additionally, the President determined "that the entry into the United States … of any alien who fails, before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of" 8 U.S.C. § 1182(a)(1)–(3), "is detrimental to the interests of the United States"; he therefore suspended "entry into the United States of such aliens" and "restrict[ed] their access to provisions of the INA that would permit their continued presence in the United States, including, but not limited to" 8 U.S.C. § 1158. Proclamation § 3. Finally, the President invoked his "express and inherent powers in Article II of the Constitution of the United States," including "control over foreign affairs," to suspend "the physical entry of any alien engaged in the invasion across the southern border of the United States" until the President issues "a finding that the invasion at the southern border has ceased." Proclamation § 4.

Procedural History. On February 3, 2025, three organizations that provide services to immigrants, Refugee and Immigrant Center for Education and Legal Services, Las Americas Immigrant Advocacy Center, and the Florence Immigrant & Refugee Rights Project, filed this suit challenging the Proclamation. ECF No. 1. The Plaintiffs allege the Proclamation will impede their core work and activities, lead them to choose to divert resources in response, and may cause them to lose funding. Compl. ¶¶ 73-85. Plaintiffs argue the Proclamation violates the asylum statute, 8 U.S.C. § 1158(a)(1), Compl. ¶¶ 86-89 (Claim I); the withholding of removal statute, 8 U.S.C. § 1231(b)(3), Compl. ¶¶ 90-93 (Claim II); the Foreign Affairs Reform and Restructuring Act of

1998, 8 U.S.C. § 1231 note, Compl. ¶¶ 94-97 (Claim III); the Trafficking Victims Protection

Reauthorization Act of 2008, 8 U.S.C. § 1232(a)(5)(D), Compl. ¶¶ 98-101 (Claim IV); the INA, 8

U.S.C. § 1101, *et seq.*, Compl. ¶¶ 102-06 (Claim V); is contrary to law and arbitrary and capricious

under the APA, Compl. ¶¶ 107-112 (Claim VI); failed to comply with the APA's rulemaking

requirements, Compl. ¶¶ 113-116 (Claim VII); and violates separation-of-powers principles,

Compl. ¶¶ 117-19 (Claim VIII).

## STANDARD

Dismissal is appropriate under Rule 12(b)(1) when the district court lacks subject matter

jurisdiction over the claim. *See* Fed. R. Civ. P. 12(b)(1). Because Rule 12(b)(1) concerns a court's

ability to hear a claim, the court must scrutinize the plaintiff's allegations more closely when

considering a motion to dismiss pursuant to Rule 12(b)(1) than it would under a motion to dismiss

for failure to state a claim pursuant to Rule 12(b)(6). *Macharia v. United States*, 334 F.3d 61, 64,

69 (D.C. Cir. 2003). A plaintiff invoking the jurisdiction of a federal court bears the burden of

establishing that the court has jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561,

(1992)*.* While a court must accept as true the plaintiff's factual allegations when reviewing a

motion to dismiss under Rule 12(b)(1), *see Leatherman v. Tarrant Cty. Narcotics Intelligence &*

*Coordination Unit*, 507 U.S. 163, 164 (1993), that tenet is inapplicable to legal conclusions,

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Dismissal under Rule 12(b)(6) is appropriate where a party fails to set forth "a claim upon

which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive, a complaint must contain

sufficient factual allegations that, if accepted as true, state a claim to relief that "is plausible on its

face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 552 (2007).

**ARGUMENT**

The Court should dismiss this case for lack of jurisdiction and lack of a cause of action.

*First*, Plaintiffs lack standing to challenge the Proclamation or seek injunctive or other relief restraining the President's authority. *Second*, the INA strips courts of jurisdiction to entertain Plaintiffs' claims seeking to enforce statutory provisions that apply only to aliens; Plaintiffs' statutory challenges to the Proclamation and the President's determinations are non-justiciable; review of their claims under the APA is precluded by the INA; and Plaintiffs are outside the zone of interests of all the relevant statutory provisions. *Finally*, Plaintiffs lack a cause of action under the APA.[1]

**I.     The Plaintiff Organizations lack standing.**

**A.     Plaintiffs have not pleaded a cognizable injury to their Organizations.**

The only Plaintiffs in this case are three organizations that provide legal assistance and representation to aliens who claim asylum or other forms of protection from removal. But nothing in the Proclamation directly regulates the Organizations or implicates their legally protected interests in any way. At most, Plaintiffs claim an indirect impact from the Proclamation's effect on aliens who would otherwise be their clients but for the Proclamation, or to whom Plaintiffs provide information and guidance. That is not the type of "invasion of a legally protected interest" sufficient to support Article III standing. *Gill v. Whitford*, 585 U.S. 48, 65 (2018); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992). At most, the Proclamation directs government officials how to exercise their discretion to remove (or not remove) aliens, and it is well established that a plaintiff—organizational or otherwise—generally "lacks a judicially cognizable interest in

---

[1] Plaintiffs' claims also fail on the merits. In this motion Defendants raise only jurisdictional and other threshold arguments for why this case cannot proceed, but do not waive merits arguments Defendants intend to present at a later time should this case continue.

the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).

Two recent Supreme Court cases make particularly clear that Plaintiffs lack standing to challenge

the President's discretionary decision to suspend the entry of the influx of aliens seeking to cross

the border illegally: *United States v. Texas*, 599 U.S. 670 (2023), and *FDA v. Alliance for

Hippocratic Medicine*, 602 U.S. 367 (2024).

In *Texas*, the Supreme Court held that States lacked standing to challenge immigration

enforcement guidelines because, among other things, discretionary immigration enforcement

decisions relating to third parties involve no exercise of coercive power over the plaintiff;

challenges to those decisions implicate Article II and foreign-policy concerns; and courts lack

"meaningful standards" to assess such decisions. 599 U.S. at 678–81. Each of those reasons applies

with even stronger force to the Proclamation's suspension on entry and any enforcement actions

taken to effect that suspension. Courts have long recognized that the exclusion of aliens is

committed to the sound discretion of the political branches, with extremely limited judicial

involvement. *See infra* § II(B); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977); *Dep't of Homeland Sec.

v. Thuraissigiam*, 591 U.S. 103, 139 (2020). Here, Congress afforded the President broad

discretion to exclude individual aliens or classes of aliens or impose restrictions on their entry, in

statutory terms that "exude[] deference to the President in every clause," *Hawaii*, 585 U.S. at 684.

*See infra* § II(B). Accordingly, just like the plaintiff States in *Texas* lacked a judicially cognizable

interest in discretionary decisions over immigration enforcement, the Plaintiff Organizations here

lack any judicially cognizable interest arising from the Executive Branch's exercise of its sound

discretion to exclude aliens who are engaged in an invasion across the border. *Texas*, 599 U.S. at

678.

The Supreme Court's decision in *Alliance* confirms that Plaintiffs lack standing here. *Alliance* held that an organization lacked standing to challenge the FDA's approval of an abortion-inducing drug. 602 U.S. at 393-394. The Court explained that organizations "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Id.* (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). To allege a concrete injury, an unregulated organizational plaintiff must allege "far more than simply a setback to the organization's abstract social interests." *Havens*, 455 U.S. at 379. As *Alliance* made clear, it is not enough that "an organization diverts its resources in response to defendant's actions" even if it will "expend considerable time, energy, and resources" in response to a policy change. 602 U.S. at 394-95. An unregulated organization must allege sufficient facts to show that the challenged action "perceptibly impair[s]" or "interferes with" its activities by imposing an affirmative "impediment" to performing those activities. *See id.* Plaintiffs' allegations do not satisfy this standard.

Plaintiffs primarily claim that the Proclamation "eliminates" their ability to provide direct legal services to aliens who are undergoing the credible fear process or who are placed in non-expedited removal proceedings. Compl. ¶¶ 75, 78, 82. "Like an individual, an organization may not establish standing simply based on the intensity of the litigant's interest, no matter how longstanding the interest and no matter how qualified the organization." *Alliance*, 602 U.S. at 394 (cleaned up). Yet, at base, this is all the Plaintiff Organizations have alleged—an injury to their interest in asylum-seekers obtaining protection in the United States. Plaintiffs' theory is that, because the Proclamation will result in fewer aliens being processed for credible fear interviews or placed in non-expedited removal proceedings, the demand for certain of Plaintiffs' core services will be reduced or eliminated. *See* Compl. ¶¶ 75, 78, 82. But Plaintiffs do not explain how fewer aliens' needing their services *impairs* or *interferes with* their existing activities; it only makes those

activities less necessary. Nor does a *less* demanding case load constitute injury to Plaintiffs' ability to carry out their activities. There is no allegation that the Proclamation causes an "inhibition of [Plaintiffs'] daily operations." *PETA v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015). Plaintiffs do not claim that the Proclamation interferes with their ability to provide services to those who *are* in credible fear processing or removal proceedings. Nor do they claim it interferes with their ability to provide other forms of immigration-related guidance to aliens in Mexico or the United States. At its core, Plaintiffs' complaint is that the Proclamation makes it more difficult for aliens to obtain asylum or other forms of protection in the United States by eliminating immigration processing for certain aliens. This boils down to an abstract disagreement with the Presidential action, not an impairment of Plaintiffs' ability to provide services. Even if the Proclamation has the incidental effect of temporarily frustrating Plaintiffs' organizational missions of helping aliens obtain asylum in the United States, such "frustration of an organization's objective" alone cannot constitute a cognizable Article III injury. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015); *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) ("[T]he presence of a direct conflict between the defendant's conduct and the organization's mission is ... not alone sufficient ... to establish standing."); *Citizens for Resp. & Ethics in Washington v. U.S. Off. of Special Couns.*, 480 F. Supp. 3d 118, 128 (D.D.C. 2020) ("[A]n organization seeking to bring a case in its own right must first allege that the challenged conduct perceptibly impairs its activities, as opposed to merely frustrating its mission.").

The fact that Plaintiffs claim a potential future loss of funding from a potential future diminishment of a particular client base, Compl. ¶ 85, does not alter this analysis. *First*, the Complaint does not contain sufficient factual matter to support this allegation, as it does not identify the parameters of any particular funding sources or the particular projected impact of the

Proclamation on Plaintiffs' ability to receive that funding. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) ("[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim of standing that is plausible on its face.") (cleaned up). Accordingly, this alleged loss of funding is too vague, speculative, and distant to support standing. At most, Plaintiffs speculate that the Proclamation may have some future "influence" on their funding sources, because Plaintiffs do not know how long the Proclamation will be in place. *See* Compl. ¶ 85. But injury must be "actual or imminent" at the time Plaintiffs filed suit. *See Lujan*, 504 U.S. at 560, 571 n.4. Plaintiffs' speculation that at some point in the future they may suffer a reduction in funding is insufficient to satisfy Article III's standing requirements. *See Clapper v. Amnesty Int'l*, 568 U.S. 398, 416 (2013); *see also Alliance*, 602 U.S. at 383 ("distant (even if predictable) ripple effects" of government action "cannot establish Article III standing"). *Second*, Plaintiffs' claim of injury from alleged future loss of funding due to a diminishment of their client base is circular. They claim the funding they receive is tied directly to the provisions of certain services to asylum-seekers, and therefore if the Proclamation results in fewer asylum-seekers, their funding will be proportionally reduced. Compl. ¶ 85. That claim incorrectly assumes the conclusion that a reduction in asylum-seekers is a cognizable injury in the first place; if it is not, then Plaintiffs cannot claim any cognizable injury from not receiving funding for services they are no longer providing.

Plaintiffs also assert that the Proclamation has caused them to "divert resources" to learning about the Proclamation, training staff, and revising "know your rights" materials or otherwise educating aliens and relevant communities. Compl. ¶¶ 76, 80, 84. But these alleged actions and related expenditures are ones Plaintiffs have chosen to undertake in response to the Proclamation as a continuation of Plaintiffs' core activities. They do not represent any separate impairment of

Plaintiffs' pre-existing activities. An organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Alliance*, 602 U.S. at 394. "[S]omething about the challenged action itself—rather than the organization's response to it—[must] make[] the organization's task more difficult." *Ctr. for Responsible Science v. Gottlieb*, 346 F Supp. 3d 29, 41 (D.D.C. 2018). Merely shifting resources "from one set of pre-existing activities in support of their overall mission to another, new set of such activities" is insufficient to establish organizational injury under this rule. *Arizona All. for Retired Americans v. Mayes*, 117 F.4th 1165, 1180 (9th Cir. 2024). This rule is not limited to pure issue-advocacy organizations, but applies equally to direct services organizations who spend money *in response* to the policy. As the Supreme Court's reasoning in *Alliance* made clear, courts may "not allow the diversion of resources *in response* to a policy to confer standing—instead, the organization must show that the new policy directly harms its *already-existing* core activities." *Arizona All.*, 117 F.4th at 1177 (explaining impact of *Alliance* on Ninth Circuit precedent concerning the diversion-of-resources theory). To hold otherwise would impermissibly allow organizations to manufacture standing to challenge any policy that touches on their mission. *See Alliance*, 602 U.S. at 394. As the Supreme Court explained, its prior decision in *Havens Realty*—an "unusual case"—did not establish such a broad standing rule. *Id.* at 395–96. To the extent that any D.C. Circuit or district court authority suggests that it would be enough for an organization to plead a frustration of mission and some action taken in response to that frustration—without any showing of an impairment to its pre-existing activities—such precedent conflicts with *Alliance*.

Moreover, Plaintiffs' alleged resource expenditures on educational efforts are insufficient to allege standing, even under pre-*Alliance* precedent. "An organization does **not** suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects

to the organization to 'operational costs beyond those normally expended." *Food & Water Watch*, 808 F.3d at 920 (emphasis in original) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)); *see also Int'l Academy of Oral Medicine & Toxicology*, 195 F. Supp. 3d 243, 258 (D.D.C. 2016); *O.A. v. Trump*, 404 F. Supp. 3d 109, 142–143 (D.D.C. 2019) (Moss, J.) (finding organizational injury where challenged rule imposed "additional demands" on the organizational plaintiff that made it more difficult to serve its client base). Here, Plaintiffs have not alleged an actual or projected overall increase in expenditures due to the Proclamation or any added operational costs.[2] Instead, the research and educational activities Plaintiffs claim represent a "continuation" of the "core set of activities" (providing guidance to asylum-seekers) that the organizations were already conducting in furtherance of their mission. *See Int'l Academy of Oral Medicine & Toxicology*, 195 F. Supp. 3d 243, 258 (D.D.C. 2016); Compl. ¶¶ 73, 77, 81.

> **B.    Plaintiffs have not alleged associational or third-party standing.**

Nor does the complaint provide any factual basis to support other theories of standing. Although an organization may be able to demonstrate associational standing to sue on behalf of its members, Plaintiffs have not even alleged that they are membership organizations, let alone identified a single member who has suffered, or will imminently suffer, a concrete injury from the Proclamation. Compl. ¶¶ 9–11; *see Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977) ("[A]n association has standing to bring suit on behalf of its members when ... its members would otherwise have standing to sue in their own right[.]"); *Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219, 1225 (D.C. Cir. 2024) (same).

---

[2] To the contrary, a fair reading of their allegations is that they have fewer costs because they have fewer clients. *See* Compl. ¶¶ 75, 78, 82.

Plaintiffs likewise do not purport to—and cannot—assert third-party standing to bring suit on behalf of unidentified aliens covered by the Proclamation. "Ordinarily, a party must assert his own legal rights and cannot rest his claim to relief on the legal rights of third parties." *Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017) (cleaned up). Generally, courts will not recognize standing to assert others' rights unless the third-party plaintiff has "a close relationship with the person who possesses the right [and] there is a hindrance to the possessor's ability to protect his own interests." *Id.* (alteration in original); *see also Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004); *AILA v. Reno*, 199 F.3d 1352, 1364 (D.C. Cir. 2000). Plaintiffs have not identified any covered alien on behalf of whom they are bringing their claims, and thus they cannot possibly show the requisite close relationship. Nor have Plaintiffs alleged any hindrance to any alien's ability to bring his or her own claim to assert any purported rights to apply for asylum or other forms of protection within the United States. *See AILA*, 199 F.3d at 1364 (rejecting organizational standing "to raise claims [challenging expedited removal procedures], whether statutory or constitutional, on behalf of aliens").

## C.    Plaintiffs lack standing for their claims against the President.

At a minimum, the President should be dismissed as a defendant because Plaintiffs lack standing to seek any relief against him. Plaintiffs ask this Court to enjoin the President from implementing the Proclamation and to declare the Proclamation unlawful in its entirety. Compl. at 31 (Prayer for Relief). But neither form of relief is available against the President for his official non-ministerial duties, and Plaintiffs' claims are thus unredressable by a court. *See Texas*, 599 U.S. at 690 (Gorsuch, J., concurring in the judgment) (explaining that plaintiffs' injuries are not redressable, and the plaintiffs thus lack Article III standing, if the requested relief "is not available to them" by law); *TransUnion LLC* v. *Ramirez*, 594 U.S. 413, 436 (2021) ("[A] plaintiff must

'demonstrate standing separately for each form of relief sought.'") (citation omitted); *cf. California v. Texas*, 593 U.S. 659, 671-673 (2021).

As the Supreme Court has long recognized, federal courts cannot issue an injunction purporting to supervise the President's performance of his official duties. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) ("[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties."); *see Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality opinion); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27, 749–50 (1982). And although the Supreme Court has posited (but left undecided) a potential exception for purely ministerial functions, *see Franklin*, 505 U.S. at 802–03; *Mississippi*, 71 U.S. at 500, that possible exception has no application here, where the Proclamation was issued pursuant to the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a), which accord enormous and unreviewable discretion to the President to suspend entry and impose restrictions on any and all aliens, *see Hawaii*, 585 U.S. at 684.

As for Plaintiffs' request for declaratory relief, the D.C. Circuit, following *Franklin*, has held that "declaratory relief" against the President for his non-ministerial conduct "is unavailable." *Newdow v. Roberts*, 603 F.3d 1002, 1012–13 (D.C. Cir. 2010). That is because "a court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions." *Id.* at 1012 (citing *Mississippi*, 71 U.S. at 499); *see also Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) ("Sound separation-of-power principles counsel the Court against granting [injunctive and declaratory] relief against the President directly."). In sum, "similar considerations regarding a court's power to issue [injunctive] relief against the President himself apply to [a] request for a declaratory judgment." *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996).

## II.    This Court lacks jurisdiction to entertain Plaintiffs' claims.

### A.    Section 1252 bars Plaintiffs' attempt to enforce provisions of the expedited removal statute.

Much of Plaintiffs' complaint is framed as an attempt to argue that the President cannot suspend or restrict the entry of aliens who arrive at ports of entry or attempt to enter between ports of entry without following the provisions of the expedited removal statute, 8 U.S.C. § 1225(b)(1). *See, e.g.*, Compl. ¶ 42 ("Section 212(f) does not empower the President to expel noncitizens from the United States … in a manner that contradicts … the expedited removal statute"); *id.* ¶¶ 104-105. Federal courts, however, lack jurisdiction to hear claims by organizations seeking to enforce the expedited removal statute.

Although 28 U.S.C. § 1331 generally supplies jurisdiction over federal questions, 8 U.S.C. § 1252(a)(2)(A) eliminates jurisdiction for claims related to the decision to invoke the provisions of the expedited removal statute unless expressly permitted by 8 U.S.C. § 1252(e). *See Make the Road v. Wolf*, 962 F.3d 612, 626 (D.C. Cir. 2020). Section 1252(a)(2)(A), titled "Matters not subject to judicial review," provides that "[n]otwithstanding any other provision of law ... no court shall have jurisdiction to review ... except as provided in subsection (e)," "a decision ... to invoke the provisions of such section," or "procedures and policies adopted ... to implement" § 1225(b)(1). 8 U.S.C. § 1252(a)(2)(A)(i), (ii), (iv). Section 1252(a)(2)(A) thus removes from federal courts any jurisdiction to review issues "relating to section 1225(b)(1)," *i.e.*, expedited removal proceedings or credible fear determinations, other than as permitted by § 1252(e). *See Patchak v. Zinke*, 138 S. Ct. 897, 905 (2018) ("notwithstanding any other provision of law" in jurisdictional provision encompasses 28 U.S.C. § 1331).

Organizational Plaintiffs cannot bring claims under § 1252(e)(3). Although Plaintiffs cite § 1252(e)(3) as a basis for jurisdiction over their claims, *see* Compl. ¶¶ 7-8, the D.C. Circuit has

twice held that claims brought by organizations under § 1252(e)(3) are limited to claims advanced on behalf of *individuals* subject to the expedited removal provisions under a theory of associational standing. *See Make the Road*, 962 F.3d at 627-28. Through § 1252(e)(3), "Congress meant to allow actions *only by aliens* who have been subjected to the summary procedures contained in § 1225(b) and its implementing regulations." *AILA*, 199 F.3d at 1359 (emphasis added); *see also id.* ("Congress … contemplated that lawsuits challenging [actions]" through § 1252(e)(3) "would be brought, if at all, by individual aliens who … were aggrieved by the statute's implementation"); *id.* at 1364 (noting in particular "the bar on class actions" in § 1252(e)(1)(B), as an indication of congressional intent that only individual aliens can raise claims under § 1252(e)(3)); *Make the Road*, 962 F.3d at 627. The organizations have advanced theories of injury premised only on harms to their organizations—*not* individuals. Section 1252(a)(2)(A) thus bars jurisdiction over Plaintiffs' claims.

### B. Plaintiffs' non-constitutional challenges to the Proclamation are not justiciable.

The Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 210 (1953)); *see Harisiades,* 342 U.S. at 588-589 ("Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."). In particular, the Supreme Court has held that "[t]he conditions of entry for every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based" are "wholly outside the power of this Court to control." *Fiallo,* 430 U.S. at 796 (citation omitted).

Because the authority to regulate the entry of aliens is "inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power ... for the bests interests of the country during a time of national emergency." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950). That is what Congress did in enacting 8 U.S.C. §§ 1182(f) and 1185(a)—conferring a "sweeping proclamation power" to not only suspend entry of aliens but also impose restrictions wholly in the President's discretion. *See Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (R.B. Ginsburg, J.), *aff'd by an equally divided Court*, 484 U.S. 1 (1987) (per curiam). Because the President has issued the Proclamation pursuant to that expansive inherent authority, Plaintiffs' non-constitutional claims are not justiciable. *See Knauff*, 338 U.S. at 542.

Plaintiffs contend that §§ 1182(f) and 1185(a) only authorize the President "to suspend 'entry,'" Compl. ¶ 43, but that narrow reading cannot be squared with *Hawaii*, 585 U.S. at 683-688, and in any event the Proclamation additionally invokes the "President's inherent powers to control the borders of the United States, including those deriving from his authority to control the foreign affairs of the United States." Proclamation, 90 Fed. Reg. at 8334. As the Supreme Court has univocally held, "any policy *toward aliens* is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades*, 342 U.S. at 588–89 (emphasis added); *see also Thuraissigiam*, 591 U.S. at 139 ("This rule would be meaningless if it became inoperative as soon as an arriving alien set foot on U.S. soil."). And the restrictions that the Proclamation imposes are inextricably tied to the President's "broad power over the creation and administration of the immigration system," which necessarily includes the regulation of such discretionary benefits as asylum. *Kerry v. Din*, 576 U.S. 86, 106 (2015) (Kennedy, J., concurring

in judgment). In short, despite Plaintiffs' constrained understanding of the President's authority under § 1182(f)—which "exudes deference to the President in every clause," *Hawaii*, 585 U.S. at 684[3]—the Proclamation is unreviewable (at least with respect to non-constitutional claims, which are all that Plaintiffs raise) as "a fundamental act of sovereignty ... implementing an inherent executive power." *Knauff*, 338 U.S. at 542; *see Fiallo*, 430 U.S. at 792 (reiterating the "long-established rule" that "the power over aliens is of a political character and therefore subject only to narrow judicial review") (internal quotation marks omitted).

Plaintiffs also argue that the influx of illegal immigrants does not constitute an invasion under Article IV, § 4 of the Constitution, *see* Compl. ¶¶ 4, 58, but the federal courts have consistently held that the determination by the Executive of whether an "invasion" is occurring so as to trigger this clause presents a nonjusticiable political question. *See*, *e.g.*, *State of California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (collecting cases). Moreover, nothing much turns on the constitutional definition of "invasion," as the Proclamation simply uses that term to delineate the "class of aliens" (8 U.S.C. § 1182(f)) to whom the entry restrictions apply, *see* Proclamation §§ 1, 2, 4. As § 1182(f) plainly states, the President is authorized to suspend the entry of "any class of aliens"—indeed, "all aliens"—whenever he finds that their entry would be detrimental to the interests of the United States. 8 U.S.C. § 1182(f).

### C.    Plaintiffs' claims are not reviewable under the APA.

Plaintiffs' claims are not reviewable under the APA because the INA precludes judicial review by third parties, including advocacy organizations. *See* 5 U.S.C. § 701(a)(1). The INA

---

[3] In *Hawaii*, the Supreme Court was able to assume without deciding that the plaintiffs' non-constitutional claims were reviewable only because it ultimately held that the President lawfully exercised his "broad discretion to suspend the entry of aliens" under § 1182(f). 585 U.S. at 682–84. This Court could take the same approach here.

where it provides for judicial review, it does so only for the alien affected, and even then only in certain specified circumstances and subject to specified limitations and prerequisites. *See, e.g.*, 8 U.S.C. § 1252(a)(5), (b)(9), (e)(3); *supra at* § II(A); *see also Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (concluding that where statutory scheme "only" provides for a cause of action for "individual aliens after the INS' statutory interpretation is applied to them ... and they are subject to deportation orders" "[i]t follows then, that an organizational plaintiff could not undermine the statutory scheme by suing to challenge 'generic' INS policies or statutory interpretations" that impact aliens). The existence of that reticulated scheme limited only to the aliens to whom a particular administrative action necessarily precludes judicial review at the behest of third parties. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984).

## III. Plaintiffs lack a valid cause of action for their claims because they are outside the zone of interests and have not identified any final agency action.

### A. Plaintiffs are outside the zone of interests of the statutes they invoke.

Even if the INA did not preclude judicial review under the APA, Plaintiffs would lack a valid cause of action because their claims are outside the zone of interests of the particular statutes on which they base those claims. The APA does not "allow suit by every person suffering injury in fact." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987). It provides a cause of action only to one "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. For a plaintiff to be "aggrieved," "the interest sought to be protected" must "be arguably within the zone of interests to be protected or regulated by the statute ... in question." *Clarke*, 479 U.S. at 396 (modifications omitted). "[O]n any given claim the injury that supplies constitutional standing must be the same as the injury within the requisite 'zone of interests.'" *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996). The

organizational Plaintiffs do not argue that they are in the zone of interests of the INA's removal provisions and they invoke no such interest here.

Nothing in the asylum or removal provisions of the INA protects the interests of nonprofit organizations providing legal services to aliens. Neither § 1158 nor § 1225 evinces any concern with organizations or their interest in representing asylum seekers. *See* 8 U.S.C. § 1158(d)(7) ("Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies..."); *id.* § 1252(a)(2)(A). These provisions do not regulate the organizational Plaintiffs' conduct or create any benefits for which these Organizations themselves might be eligible. And courts have routinely concluded that immigration statutes are directed at aliens, not organizations advocating for them.

When confronted with a similar challenge brought by "organizations that provide legal help to immigrants," Justice O'Connor concluded that the Immigration Reform and Control Act of 1986 "was clearly meant to protect the interests of undocumented aliens, not the interests of [such] organizations," and the fact that a "regulation may affect the way an organization allocates its resources ... does not give standing to an entity which is not within the zone of interests the statute meant to protect." *INS v. Legalization Assistance Project of L.A. Cty.*, 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers). The D.C. Circuit and other courts have thus held that immigrant advocacy organizations are outside the immigration statutes' zone of interests. *See, e.g.*, *Fed'n for Am. Immigration Reform, Inc. (FAIR) v. Reno*, 93 F.3d 897, 900-04 (D.C. Cir. 1996). That reasoning fully applies here. The Plaintiff Organizations are not seeking asylum or contesting removal; they seek to help others do so. Nothing in "the relevant provisions [can] be fairly read to implicate [Plaintiffs'] interest in the efficient use of resources." *Nw. Immigrant Rights Project v. USCIS*, 325 F.R.D. 671, 688 (W.D. Wash. 2016). Because the Organizations are outside the

statutory scheme, the alleged effects on their resources are outside the statutory zone of interests.

Defendants acknowledge that courts, including this Court, have sometimes held that the zone-of-interests test should be applied permissively and found organizations to satisfy it even in the context of the INA. *See, e.g.*, *O.A. v. Trump*, 404 F. Supp. 3d 109, 144 (D.D.C. 2019). This more lenient version of the test no longer survives the Supreme Court's more recent decision in *United States v. Texas*, 599 U.S. 670 (2023). The Supreme Court has clarified—relying on principles that inform not only the scope of Article III but also the scope of the APA's cause of action—that third parties like Plaintiffs have no cognizable interest in the way the Executive enforces the immigration laws against others. 599 U.S. at 674, 677; *see also Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 897 (1984) ("[P]rivate persons such as petitioners have no judicially cognizable interest in procuring enforcement of the immigration laws").

The APA's cause of action exists only for "persons adversely affected or aggrieved by agency action within the meaning of the relevant statute," *Block*, 467 U.S. at 345 (citation and quotation marks omitted)—*i.e.*, persons to whom Congress intended to accord privately enforceable rights. *See Thompson v. North Am. Stainless, LP*, 562 U.S. 170, 177-178 (2011). None of the statutes Plaintiffs invoke confers on any third party in the United States a judicially cognizable interest in the entry of aliens. Sections 1182(f) and 1185(a)(1) confer discretionary authority on the President, not rights on private parties. And the removal and asylum provisions Plaintiffs cite address aliens, not organizations or other entities in the United States. Even in circumstances where the INA permits a U.S. person to petition for classification of an alien abroad as eligible for an immigrant visa, any interest he has "terminate[s]" "[w]hen [his] petition [i]s granted." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1164 (D.C. Cir. 1999). Nothing in the INA permits the U.S. person to challenge the separate decision to deny entry to the United States. *A*

*fortiori*, persons or entities that the INA does not entitle even to petition for classification of aliens lack any general cause of action under the APA to enforce any rights those aliens might have under the INA, "and have no right of review under the APA." *Id*. That Congress generally provides for judicial review only at the behest of the alien affected, and only under certain circumstances, 8 U.S.C. § 1252, forecloses review by third parties.

> **B.    Plaintiffs cannot raise a claim under the APA where the President is not an agency and Plaintiffs have not identified any final agency action.**

The APA does not provide a cause of action for judicial review of the President's Proclamation. The President is not an agency, and his actions are not subject to APA review. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (holding that Congress did not expressly allow for review of the President's actions in the APA so "his actions are not subject to its requirements"). Plaintiffs' request to enjoin the Proclamation thus cannot be based in the APA or its standards. *See E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018). As the Ninth Circuit has explained, "[t]he scope of our review [under the APA] ... is limited to 'agency action,' and the President is not an 'agency.'" *Id.* at 770. "Accordingly, the President's 'actions are not subject to [APA] requirements," and this Court "do[es] not have any authority under § 706 of the APA to review" a Presidential Proclamation issued under 8 U.S.C. § 1182(f). *Id.*; *see also Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991) (refusing to hold that the President is an "agency" within the meaning of the APA); *Feds for Med. Freedom v. Biden*, 581 F. Supp. 3d 826, 835 (S.D. Tex.), *vacated and remanded*, 30 F.4th 503 (5th Cir. 2022), *reh'g en banc granted, opinion vacated*, 37 F.4th 1093 (5th Cir. 2022), *on reh'g en banc*, 63 F.4th 366 (5th Cir. 2023), and *aff'd*, 63 F.4th 366 (5th Cir. 2023) (Declining to consider the plaintiffs' APA claims challenging a vaccine mandate, stating "there is nothing for the court to review under the APA" because "executive orders are not reviewable under the APA."); *Motions Sys. Corp. v. Bush*, 437

F.3d 1356, 1359 (Fed. Cir. 2006) ("Motion Systems acknowledges that it cannot challenge the President's actions under the APA because the President is not an 'agency.'").

Plaintiffs also cannot pursue an APA claim against DHS or any of the other agency Defendants because they have not identified any final agency action distinct from the proclamation. *See* 5 U.S.C. § 704. Indeed, Plaintiffs have not identified an "agency action" at all, much less a final one. The Supreme Court has held that Courts cannot "postulat[e] the existence of an agency decision wholly apart from any 'agency statement of general or particular applicability ... designed to implement' that decision." *Texas v. Biden*, 597 U.S. 785, 809 (2022) (quoting 5 U.S.C. § 551(4)).

Even if APA review were generally available for Presidential actions, it still would not be available here. The APA's cause of action expressly leaves intact "other limitations on judicial review," 5 U.S.C. § 702(1), which includes the longstanding limitation on review of Executive decisions to deny entry to aliens, *see supra* § I; *Allen v. Milas*, 896 F.3d 1094, 1107 (9th Cir. 2018); *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1160 (D.C. Cir. 1999). The APA also does not permit review of actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). If a Proclamation under 8 U.S.C. § 1182(f) and § 1185(a)(1) were an agency action it would still be an unreviewable discretionary action because these statutory provisions provide broad discretionary authority to the President to suspend by proclamation the entry of any class of aliens whenever he finds their entry would be detrimental to the United States. *See supra* § II(B). By their terms, these provisions "exude[] deference to the President," *Hawaii*, 585 U.S. at 2408, and "foreclose the application of any meaningful judicial standard of review," *Webster v. Doe*, 486 U.S. 592, 600 (1998) (holding that similar statutory language that "exudes deference" to the Executive cannot be reviewed under the APA because it "foreclose[s] the application of any meaningful judicial standard of review");

*Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187 (1993) (discussing broad authority under § 1182(f)); *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (describing the President's "sweeping proclamation power"). Any contrary conclusion would eviscerate the "longstanding" rule that "[h]ow the President chooses to exercise the discretion Congress has granted him"—here in 8 U.S.C. §§ 1182(f) and 1185(a)(1)—"is not a matter for [ judicial] review." *Dalton v. Specter*, 511 U.S. 462, 474, 476 (1994).

The Proclamation is the only relevant source of law in this case, foreclosing judicial review. "[T]here is no private right of action to enforce obligations imposed on executive branch officials by executive orders." *Chai v. Carroll*, 48 F.3d 1331, 1338 (4th Cir. 1995) (internal quotations and citation omitted). Unlike statutes and regulations, which carry "the force and effect of law," proclamations are management tools for implementing the President's policies, not documents that may be enforced against the Executive Branch. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265 (1954). And the only statutes the Proclamation invokes are 8 U.S.C. § 1182(f) and § 1185(a), which provide the President with ample power and discretion to impose entry restrictions. *Hawaii*, 585 U.S. at 684.

## CONCLUSION

For these reasons, the Court should dismiss this case.

Dated: February 11, 2025                          Respectfully submitted,

BRETT A. SHUMATE
*Acting Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

AUGUST FLENTJE
*Acting Director*

EREZ REUVENI
*Assistant Director*

PATRICK GLEN
ALEXANDER HALASKA
DAVID KIM
KATHERINE J. SHINNERS
*Senior Litigation Counsel*

ELISSA FUDIM
*Trial Attorney*

By: /s/ *Brian C. Ward*
     BRIAN C. WARD
     *Senior Litigation Counsel*
     U.S. Department of Justice, Civil Division
     Office of Immigration Litigation
     P.O. Box 868, Ben Franklin Station
     Washington, DC 20044
     Tel: (202) 616-9121
     Email: brian.c.ward@usdoj.gov

     *Counsel for Defendants*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 11, 2025, I electronically filed this motion with the Clerk of the Court for the United States Court of for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: *<u>/s/ Brian C. Ward</u>*
  BRIAN C. WARD
  Senior Litigation Counsel
  United States Department of Justice