## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

REFUGEE AND IMMIGRANT CENTER FOR
EDUCATION AND LEGAL SERVICES, 131
Interpark Blvd. San Antonio, TX 78216;

LAS AMERICAS IMMIGRANT ADVOCACY
CENTER, 1500 E. Yandell Dr., El Paso, TX 79902;

FLORENCE IMMIGRANT & REFUGEE RIGHTS
PROJECT, P.O. Box 86299, Tucson, AZ 85754;

A.M.,* Z.A.,* and their minor children T.A.* and
A.T.*
c/o National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604;

N.S.*
c/o National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604;

D.G.*
c/o National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604;

B.R.*
c/o National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604;

M.A.*
c/o National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604;

G.A.*
c/o National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604;

F.A.* and her minor children K.A.* and Y.A.*
c/o National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604; and

E.G.*
c/o National Immigrant Justice Center

</td><td>

Civil Action No. 1:25-cv-
00306


**AMENDED COMPLAINT**

</td></tr>
</table>

111 W. Jackson Blvd., Suite 800
Chicago, IL 60604,

*Plaintiffs*,

v.

KRISTI NOEM, Secretary of the U.S. Department of
Homeland Security, in her official capacity, 245
Murray Lane SW, Washington, DC 20528;

U.S. DEPARTMENT OF HOMELAND SECURITY,
245 Murray Lane SW, Washington, DC 20528;

PETE R. FLORES, Senior Official Performing the
Duties of the Commissioner for U.S. Customs and
Border Protection, in his official capacity, U.S.
Customs and Border Protection, 1300 Pennsylvania
Ave. NW, Washington, DC 20229;

MICHAEL BANKS, Chief of U.S. Border Patrol, in
his official capacity, 1300 Pennsylvania Ave. NW,
Washington, DC 20229;

DIANE SABATINO, Acting Executive Assistant
Commissioner, CBP Office of Field Operations, in
her official capacity, 1300 Pennsylvania Ave. NW,
Washington, DC 20229;

U.S. CUSTOMS AND BORDER PROTECTION,
1300 Pennsylvania Ave. NW, Washington, DC
20229;

CALEB VITELLO, Acting Director of U.S.
Immigration and Customs Enforcement, in his
official capacity, 500 12th St., SW, Washington, DC
20536;

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, 500 12th St. SW, Washington,
DC 20536;

KIKA SCOTT, Acting Director of U.S. Citizenship
and Immigration Services, in her official capacity,
5900 Capital Gateway Dr., Mail Stop 2120, Camp
Springs, MD 20588;

U.S. CITIZENSHIP AND IMMIGRATION
SERVICES, 5900 Capital Gateway Dr., Mail Stop
2120, Camp Springs, MD 20588;

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

MARCO RUBIO, Secretary of the U.S. Department
of State, in his official capacity, 2201C St. NW,
Washington, DC 20520;                              )
                                                   )
                                                   )
U.S. DEPARTMENT OF STATE, 2201C St. NW,            )
Washington, DC 20520;                              )
                                                   )
PAMELA BONDI, Attorney General of the United       )
States, in her official capacity, 950 Pennsylvania Ave. )
NW, Washington, DC, 20530;                         )
                                                   )
U.S. DEPARTMENT OF JUSTICE, 950                    )
Pennsylvania Ave. NW, Washington, DC, 20530;       )
                                                   )
DONALD J. TRUMP, President of the United States,   )
in his official capacity, 1600 Pennsylvania Ave. NW, )
Washington, DC 20220;                              )
                                                   )
*Defendants.*                                      )
                                                   )
                                                   )
                                                   )
                                                   )

\* Motion for these Individual Plaintiffs to proceed under pseudonym has been concurrently filed
with this amended complaint.

# INTRODUCTION

1.      In the Immigration and Nationality Act ("INA"), Congress has created a comprehensive statutory system allowing noncitizens fleeing persecution or torture to seek protection in the United States. Congress has given these individuals statutory rights to apply for asylum and other protections. And it has prohibited the government from returning these individuals to places where they face persecution or torture. Congress has also enacted an exclusive set of procedures for removing noncitizens from the United States and adjudicating their claims for protection. In doing all this, Congress struck a careful balance between the interest in quickly removing those who cannot qualify for protection and the need to ensure that people are not wrongfully placed at risk of persecution or torture in another country.

2.      This suit concerns the Executive Branch's attempt to wipe away these statutes by fiat. On January 20, 2025, the President issued a proclamation that purports to prohibit noncitizens "from invoking [these] provisions of the INA … , including" the asylum statute, on the basis of a supposed "invasion." Proclamation No. 10888, § 2, 90 Fed. Reg. 8333 (Jan. 20, 2025) ("Proclamation"). And under the Proclamation, the government is doing just what Congress by statute decreed that the United States must *not* do. It is returning asylum seekers—not just single adults, but families too—to countries where they face persecution or torture, without allowing them to invoke the protections Congress has provided. Indeed, the Proclamation does not even exempt unaccompanied children, despite the specific protections such children receive by statute.

3.      The Proclamation is both unlawful and unprecedented. Principally, it invokes Section 212(f) of the INA, 8 U.S.C. § 1182(f), which authorizes the President to "suspend the entry" of "all [noncitizens] or any class of [noncitizens]" "as immigrants or nonimmigrants" when their entry "would be detrimental to the interests of the United States." But this authority to

"suspend entry" on its face does not empower the President to *summarily remove* noncitizens already physically present in the United States, much less to do so in violation of the protections and procedures Congress provided in the INA. That is why the Executive Branch for four decades has, without exception and across administrations, concluded that Section 212(f) does not authorize the President to displace rights to seek asylum or other statutory protections. That solid wall of authority includes a 1984 opinion from then-Assistant Attorney General of the Office of Legal Counsel Theodore B. Olson; a 2018 regulation promulgated by the Departments of Justice and Homeland Security of then-President Trump; and a 2024 regulation promulgated by the same Departments under then-President Biden. Nor does the other statutory provision that the Proclamation invokes, INA § 215(a)(1), 8 U.S.C. § 1185(a)(1), provide the President with authority to unilaterally override the protections Congress has afforded those fleeing danger.

4.    Insofar as the Proclamation suggests that the President has constitutional authority to declare an "invasion" and thereby displace Congress's statutes, this case presents an even more extreme example of presidential overreach than the one the Supreme Court struck down in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952). Whatever the outer limits of the President's constitutional authorities, they do not confer a *preclusive* power that permits the President to dispense with the statutes relevant here. And the presence of people seeking protection from persecution is—even at elevated levels—not an "invasion."

5.    "[T]his wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). If the Proclamation may lawfully abrogate the statutory protections at issue here, then every future President may sweep away at whim the protections that Congress provided in the INA. Our separation of powers rebels at that idea.

## JURISDICTION AND VENUE

6.      This case arises under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*;

the INA, 8 U.S.C. § 1101 *et seq.*, and its implementing regulations; the Foreign Affairs Reform

and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, Title XXII, § 2242, 112 Stat.

2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231), and its implementing regulations;

the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 8 U.S.C. § 1232; and the

United States Constitution.

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. *See also* 8

U.S.C. § 1252(e)(3). Because this suit seeks relief other than money damages and instead

challenges Defendants' unlawful actions, the United States has waived sovereign immunity from

this suit. 5 U.S.C. § 702.

8.      Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are officers of

the United States acting in their official capacity and agencies of the United States, Defendants

reside in this District, and a substantial part of the events or omissions giving rise to the claim

occurred in this District. *See also* 8 U.S.C. § 1252(e)(3).

## PARTIES

**I.     Plaintiffs**

    **A.  Organizational Plaintiffs**

9.      Plaintiff Refugee and Immigrant Center for Education and Legal Services

("RAICES") is a nonprofit, non-partisan organization headquartered in San Antonio, Texas.

RAICES' mission is to defend the rights of immigrants and refugees; empower individuals,

families, and communities of immigrants and refugees; and advocate for liberty and justice.

RAICES provides free and low-cost immigration legal services to underserved immigrants—

including adults, families, and unaccompanied noncitizen children seeking asylum and related protections—and is the largest immigration legal services provider in Texas. A central aspect of RAICES' work is providing legal services to migrants seeking asylum and other statutory protections upon crossing the border. The summary removal of migrants under the Proclamation without access to asylum or other statutory protections significantly impedes RAICES' core work.

10.     Plaintiff Las Americas Immigrant Advocacy Center ("Las Americas") is a nonprofit legal services organization based in El Paso, Texas, dedicated to serving the legal needs of low-income immigrants, including asylum seekers, in Texas and in New Mexico. An essential part of Las Americas' work is providing pro se and limited forms of legal assistance to adult immigrants detained in the Immigration and Customs Enforcement ("ICE") El Paso jurisdiction, including immigration counseling and legal services to asylum seekers. This work includes assisting asylum seekers in preparing for asylum fear interviews and representing them both during those interviews and throughout the subsequent review process. In 2024, Las Americas staff and volunteers provided approximately 197 credible fear interview orientations. Las Americas also provides direct representation to people seeking asylum and other forms of protection in immigration court. The summary removal of asylum seekers under the Proclamation without access to asylum or other statutory protections significantly impedes Las Americas' core work.

11.     Plaintiff Florence Immigrant & Refugee Rights Project ("Florence Project") is a nonprofit organization headquartered in Tucson, Arizona, with additional offices in Phoenix and Florence, Arizona. The Florence Project provides free legal and social services to detained adults and unaccompanied children facing removal proceedings in Arizona. The Florence Project provides direct representation to people seeking asylum and other forms of protection and also provides "Know Your Rights" trainings and other forms of pro se assistance to immigrants

detained in Arizona. In recent years, the Florence Project has served over 10,000 detained adults and children annually, many of whom are seeking asylum and other forms of protection. The summary removal of asylum seekers under the Proclamation without access to asylum or other statutory protections significantly impedes the Florence Project's core work.

### B. Individual Plaintiffs

12.     Plaintiffs A.M., Z.A., T.A., and A.T. fled Afghanistan after the Taliban retook control following threats arising from A.M.'s work with a nonprofit civil society organization. A.M. also fears that he and his family will be persecuted because of their perceived support for the United States and because they believe girls and women should receive education. A.M. and his family arrived in Mexico around October 2024 and began trying to secure a CBP One appointment. They received an appointment for January 20, 2025, but it was canceled following the change in administration. On February 3, 2025, A.M. and his family crossed into the United States and told CBP agents that they wanted to seek asylum. Neither A.M. nor any of his family members has received a credible fear interview.

13.     Plaintiff N.S. is a woman from Ecuador who was repeatedly raped, assaulted, and called anti-indigenous slurs by her former partner, an Ecuadorian police officer. The officer also held N.S. captive in an apartment and threatened to kill her if she left. N.S. escaped and fled to the United States. N.S. entered the United States on or about January 26, 2025, turned herself in to immigration officials, and asked for asylum. She remains in DHS custody and has not received a credible fear interview.

14.     Plaintiff D.G. is a Cuban man who opposes the country's ruling regime. After D.G. participated in protests against the government, he was repeatedly arrested on false charges. Following his most recent arrest, D.G. was held for four months in solitary confinement in a high-

security prison where he was deprived of adequate food and water. D.G. fled Cuba and arrived in Mexico in March or April 2024. He tried to secure a CBP One appointment but was not able to do so before the appointments were canceled. While in Mexico, D.G. was kidnapped and held for ransom twice and was also robbed. D.G. entered the United States on or about January 21, 2025, and pleaded with immigration officers to allow him to apply for asylum, telling them about his fear of return to both Cuba and Mexico. D.G. was instead charged with illegal entry and then deported back to Mexico without a credible fear interview.

15.    Plaintiff B.R. is a woman from Ecuador who was kidnapped, raped, and tortured by a drug cartel on two separate occasions. While waiting for a CBP One appointment that would, prior to January 20, 2025, have allowed her to present at a U.S. port of entry to seek asylum, B.R. was kidnapped and beaten by a Mexican cartel. B.R. entered the United States on January 26, 2025, and is currently detained by DHS in Texas. She has told immigration officers that she wishes to seek asylum, but she has not received a credible fear interview.

16.    Plaintiff M.A. is an Egyptian man who was jailed and tortured for years because he supports democracy and opposes the ruling dictatorship. M.A. and his wife spent months in Mexico—where they were repeatedly threatened and robbed—trying to obtain a CBP One appointment. M.A. and his pregnant wife crossed the border into the United States on or about January 25, 2025, waited for U.S. immigration officers, and asked them for asylum. After they were taken to a CBP facility, M.A. and his wife were separated; M.A. has not seen her since. M.A. has repeatedly told immigration officers that he fears return to Egypt and wants a credible fear interview, and a lawyer made the same request on his behalf. M.A. remains in DHS custody and has not received a credible fear interview.

6

17.    Plaintiff G.A. is a Brazilian woman fleeing severe physical and psychological abuse and death threats against her and her children, by a former partner who has continued searching for her since she fled. G.A. was extorted and kidnapped while waiting in Mexico before entering the United States. G.A. entered the United States on or about February 1, 2025. She was charged with and convicted of illegal entry and is now being held in immigration detention, where she has repeatedly stated that she is afraid of returning to Brazil and wants to seek asylum. On information and belief, though G.A. may have been interviewed on or around February 17, 2025, she is not being considered for asylum.

18.    Plaintiff F.A. and her minor children K.A. and Y.A. are from Turkey. F.A. and her husband, who is in the United States seeking asylum, joined the Gülen, or Hizmet, movement in Turkey for religious reasons and in an effort to foster non-violence. As a result, F.A. and her family faced persistent harassment, and her husband left Turkey after a warrant was issued for his arrest because of his involvement with the movement. F.A., K.A., and Y.A. fled after continued harassment, reports of women and children being tortured, and the disappearance of one of K.A. and Y.A.'s teachers. F.A. and her children entered the United States on or about February 3, 2025, and repeatedly told immigration officials that they had come to seek asylum and that F.A.'s husband was in the United States seeking asylum for the same reasons. After nine days in detention, F.A. and her children were deported on a military plane to Panama, where they are being forced to stay inside their rooms a hotel pending relocation to a detention camp and/or deportation to Turkey. F.A. and her children were never given a credible fear interview.

19.    Plaintiff E.G. fled from Peru after being raped by two men, and then persistently threatened with death, because he is bisexual. E.G. entered the United States on or about February 1, 2025, and was immediately detained. He repeatedly told immigration officials that he wished to

seek asylum and was scared of returning to Peru, but on or about February 13, 2025, he was removed to Peru by plane. E.G. was never given a credible fear interview.

## II.    Defendants

20.    Defendant Kristi Noem is the Secretary of the Department of Homeland Security ("DHS"). Defendant Noem is sued in her official capacity. In that capacity, Defendant Noem is responsible for overseeing enforcement and implementation of the Proclamation by all DHS personnel.

21.    Defendant DHS is a cabinet-level Department of the federal government. DHS and its components, Immigration and Customs Enforcement ("ICE"), Customs and Border Protection ("CBP"), and United States Citizenship and Immigration Services ("USCIS"), are the agencies of the federal government principally charged with implementing and enforcing the Proclamation.

22.    Defendant Pete R. Flores is the Acting Commissioner of CBP. Defendant Flores is sued in his official capacity. In that capacity, Defendant Flores is responsible for overseeing CBP personnel implementing and enforcing the Proclamation.

23.    Defendant Michael Banks is the Chief of U.S. Border Patrol. The Border Patrol is responsible for border security between ports of entry. Defendant Banks is sued in his official capacity. In that capacity, Defendant Banks is responsible for implementing and enforcing the Proclamation between ports of entry.

24.    Defendant Diane Sabatino is the Acting Executive Assistant Commissioner of the CBP Office of Field Operations ("OFO"). OFO is the largest component of CBP and is responsible for border security, including immigration and travel through U.S. ports of entry. Defendant Sabatino is sued in her official capacity. In that capacity, Defendant Sabatino is responsible for implementing and enforcing the Proclamation at ports of entry.

25.    Defendant CBP is the DHS component responsible for the initial processing and detention of noncitizens who are apprehended at or between U.S. ports of entry.

26.    Defendant Caleb Vitello is the Acting Director of ICE. Defendant Vitello is sued in his official capacity. In that capacity, Defendant Vitello is responsible for ICE's implementation and enforcement of the Proclamation.

27.    Defendant ICE is the DHS component responsible for carrying out removal orders and overseeing immigration detention.

28.    Defendant Kika Scott is the Acting Director of USCIS. Defendant Scott is sued in her official capacity. In that capacity, Defendant Scott is responsible for overseeing the asylum officers who are charged by statute with carrying out credible fear interviews.

29.    Defendant USCIS is the DHS component that oversees the asylum officers who are charged by statute with carrying out credible fear interviews.

30.    Defendant Marco Rubio is the Secretary of State. He is sued in his official capacity. In that capacity, Defendant Rubio is responsible for working alongside Defendant Noem to implement and enforce the Proclamation.

31.    Defendant United States Department of State ("State Department" or "State") is a cabinet-level Department of the federal government. The State Department is charged with assisting DHS in implementing and enforcing the Proclamation.

32.    Defendant Pamela Bondi is the Attorney General of the United States, the principal officer in charge of DOJ. She is sued in her official capacity. In that capacity, Defendant Bondi is charged with assisting DHS in implementing and enforcing the Proclamation.

33.    Defendant United States Department of Justice ("DOJ") is a cabinet-level Department of the federal government. DOJ is charged with assisting DHS in implementing and

enforce the Proclamation.

34.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity. In that capacity, he issued the Proclamation challenged in this lawsuit and oversees its implementation and enforcement.

35.     The Defendants other than President Trump are referred to as the Non-President Defendants.

## FACTS

### I. Legal Background

36.     The United States has long sheltered refugees seeking a haven from persecution, and the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, enshrined that national commitment in the general asylum statute. The Refugee Act, as modified over time, reflects "one of the oldest themes in America's history—welcoming homeless refugees to our shores," and it "gives statutory meaning to our national commitment to human rights and humanitarian concerns…." S. Rep. No. 96-256, at 1 (1979), *reprinted in* 1980 U.S.C.C.A.N. 141. One of Congress's "primary purposes" was "to bring United States refugee law into conformance" with international refugee treaties and the bedrock principle that individuals may not be returned to countries where they face persecution or torture. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987).

### A.     Congress's Three Forms of Protection for Individuals Fleeing Persecution or Torture.

37.     Federal law provides three primary forms of protection for individuals fleeing persecution or torture: asylum under 8 U.S.C. § 1158; withholding of removal under 8 U.S.C. § 1231(b)(3); and protection under the Convention Against Torture ("CAT"), *see* 8 U.S.C. § 1231 note. All three forms of protection are available to noncitizens who are inadmissible under the INA. Indeed, withholding of removal and CAT protection are available *only* to individuals who

10

receive orders of removal—and they are mandatory for individuals who qualify.

38.    *First*, "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival … ), irrespective of such [noncitizen's] status," may apply for asylum. 8 U.S.C. § 1158(a)(1). Both DHS and DOJ have promulgated regulations implementing this provision. *See, e.g.*, 8 C.F.R. § 208.13 (DHS); 8 C.F.R. § 1208.13 (DOJ). To qualify for asylum, a noncitizen must show a "well-founded fear of persecution" on account of "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42).

39.    Section 1158 contains a handful of narrow bars to asylum eligibility. *See* 8 U.S.C. § 1158(a)(2), (b)(2)(A). The Secretary of Homeland Security and the Attorney General "may by regulation establish additional limitations and conditions" on asylum eligibility, but only if those limitations and conditions are "consistent with" the asylum statute. *Id.* § 1158(b)(2)(C); *see id.* § 1158(d)(5)(B) (the Secretary and the Attorney General "may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter"); Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (transferring many functions relating to federal immigration law to the Secretary of Homeland Security).

40.    *Second*, via the withholding of removal statute, Congress has prohibited the government from removing a noncitizen "to a country if … the [noncitizen's] life or freedom would be threatened in that country because of the [noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). This form of relief requires the applicant to meet a higher burden on the likelihood of harm—showing that it is more likely than not to occur. *INS v. Stevic*, 467 U.S. 407, 429-30 (1984). But where the applicant makes this showing, protection is mandatory. This mandatory protection is required by

treaty obligations under the 1951 Refugee Convention and the 1967 Protocol relating to the Status of Refugees. *See Cardoza-Fonseca*, 480 U.S. at 429, 432-35, 436-38.

41.    *Third*, the CAT, implemented by FARRA, prohibits the government from returning a noncitizen "to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." 8 U.S.C. § 1231 note. Both DHS and DOJ have promulgated implementing regulations under which applicants carry their burden to show an entitlement to relief if they establish "that it is more likely than not that [they] … would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c) (DHS); *see* 8 C.F.R. § 1208.16(c) (DOJ); *see also* 8 C.F.R. § 208.18(a)(2) (defining "torture" for purposes of the CAT).

## B.    Congress's Procedures For Removing Noncitizens.

42.    Congress has also carefully specified the procedures by which noncitizens may be removed from the United States. These procedures are designed to ensure that noncitizens have a fair chance to present claims for asylum, withholding of removal, and CAT protection.

43.    "Unless otherwise specified" in the INA, a removal proceeding before an immigration judge ("IJ") under 8 U.S.C. § 1229a is "the sole and exclusive procedure" by which the government may determine whether to remove an individual. 8 U.S.C. § 1229a(a)(3). Noncitizens in these proceedings receive full hearings in immigration court and have a host of procedural rights, including the right to adversarial hearings before immigration judges and the right to retain and be represented by counsel. Noncitizens can contest the factual and legal allegations against them and apply for relief from removal. They also receive the opportunity for appellate review before the Board of Immigration Appeals and a federal court of appeals. 8 U.S.C. §§ 1229a, 1252(a) *et seq.*

44.    In 1996, Congress established expedited removal to "substantially shorten and speed up the removal process" for certain noncitizens arriving without immigration documents.

*Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020); *see* 8 U.S.C. § 1225(b)(1). Expedited removal by statute applies only to a limited class of noncitizens who are inadmissible because they lack valid entry documents (such as visas) or attempt to enter by fraud or misrepresentation. 8 U.S.C. § 1225(b)(1)(A); *id*. § 1182(a)(6)(C), (a)(7). Historically, these expedited removal procedures have been applied to certain noncitizens who arrive at a port of entry or are apprehended near the border after entering without inspection.

45.    When Congress created the expedited removal system, it balanced its desire to facilitate "efficient removal" against "a second, equally important goal: ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020). Thus, Congress took care to safeguard access to asylum by ensuring that noncitizens were screened to determine whether they had a "credible fear" of returning to their country of origin. Specifically, if a noncitizen expresses the intention to seek asylum or a fear of removal, they are entitled to an interview with an asylum officer, the outcome of which is subject to review by an immigration judge. Additionally, the statute requires the Attorney General to "provide information concerning the asylum interview described in this subparagraph to [noncitizens] who may be eligible." 8 U.S.C. § 1225(b)(1)(B)(iv). And a noncitizen "who is eligible for such interview may consult with a person or persons of the [noncitizen]'s choosing prior to the interview or any review thereof." *Id*. The purpose of the interview is to screen fear claims. Noncitizens pass the screening standard if they establish a "credible fear" of returning to their country of origin, defined by statute as a "significant possibility" that the individual "could establish eligibility for asylum" in removal proceedings. *Id*. § 1225(b)(1)(A)(ii), (b)(1)(B)(v). Once the noncitizen shows a credible fear—a "low screening standard," 142 Cong. Rec. 25,347 (1996)—they are entitled to a full removal hearing (with

administrative and judicial review) in which to attempt to make out their asylum claim.

46.     By contrast, if the asylum officer finds no credible fear, the noncitizen can request review of that decision by an immigration judge. If the IJ disagrees with the asylum officer and finds a credible fear, the noncitizen is then placed in regular removal proceedings under 8 U.S.C. § 1229a. 8 C.F.R. § 1208.30(g)(2)(iv)(B). If, however, the IJ affirms the asylum officer's adverse finding, the applicant is subject to removal "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i), (B)(iii); *see id.* § 1252(a)(2)(A), (e).

47.     The credible fear interview is also used to screen claims for withholding of removal and CAT relief.

48.     Unaccompanied noncitizen children, whom the Proclamation does not exempt, have special statutory protections under the INA and the TVPRA. Under those laws, unaccompanied noncitizen children, except those from Mexico and Canada, may not be placed into expedited removal proceedings and instead "shall" be placed in full removal proceedings in immigration court where they may seek various forms of relief, including protection from persecution or torture. 8 U.S.C. § 1232(a)(5)(D).

49.     Over the past decade, the federal government has repeatedly sought to limit eligibility for asylum and to limit the procedural protections for individuals seeking asylum and other forms of protection, invoking the statutory authority of the DHS Secretary and the Attorney General to create additional limitations and conditions on asylum and applications for asylum. Overwhelmingly, courts have invalidated those attempts. *See, e.g.*, *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669-70 (9th Cir. 2021). And none of those attempts have gone nearly as far as the Proclamation.

50.     In 2024, a bipartisan group of lawmakers crafted legislation that would have

provided "border emergency authority" to limit access to asylum and streamline removal procedures when encounters at the southern border exceeded certain thresholds. *See* Border Act of 2024, S. 118-4361 (May 16, 2024). That legislation never became law.

**C.    Sections 212(f) and 215(a)(1) of the Immigration and Nationality Act.**

51.    The Proclamation relies principally on Section 212(f) of the INA. That section provides as follows: "Whenever the President finds that the entry of any [noncitizens] or of any class of [noncitizens] into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all [noncitizens] or any class of [noncitizens] as immigrants or nonimmigrants, or impose on the entry of [noncitizens] any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f).

52.    Congress first enacted Section 212(f) in the Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 212(e), 66 Stat. 163, 188 ("1952 Act"). The 1952 Act long predates Congress's creation of the comprehensive set of protections from removal that exist today.

53.    Section 212(f) does not empower the President to remove noncitizens from the United States, much less to do so in a manner that contradicts the specific restrictions on the removal of noncitizens that Congress imposed elsewhere in the INA, including the asylum statute, the withholding of removal statute, FARRA, the TVPRA, and the expedited removal statute.

54.    Noncitizens who are "physically present" or "arrive[] in" the United States have a statutory right to apply for asylum. 8 U.S.C. § 1158(a)(1). So while Section 212(f) authorizes the President to suspend "entry," it does not authorize the President to override the asylum rights of noncitizens who are already physically present in the United States. Likewise, even if the President can suspend the entry of certain noncitizens, Section 212(f) does not authorize the removal of noncitizens in contravention of Congress's direction that the government "may not remove [a

noncitizen] to a country if … [their] life or freedom would be threatened in that country" on protected grounds, 8 U.S.C. § 1231(b)(3)(A), or to a country in which "it is more likely than not that he or she would be tortured" upon removal, 8 C.F.R. § 208.16(c)(2).

55.    Not until 1981 did a President invoke Section 212(f). *See* Kelsy Y. Santamaria et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)*, at 22 (2024) ("CRS Report"). Ever since, Presidents have invoked Section 212(f) to render noncitizens inadmissible. *See id.* at 4-22. Never has a President invoked Section 212(f) to remove individuals who are already physically present in the United States or to bar such individuals from seeking relief from removal.

56.    Since 1981, the Executive Branch has expressly and repeatedly recognized that Section 212(f) does not permit the President to alter the asylum rights and procedures that Congress enacted elsewhere in the INA.

57.    In 1984, then-Assistant Attorney General for the Office of Legal Counsel, Theodore B. Olson, considered whether Section 212(f) permitted the President to "eliminate the asylum rights of noncitizens who had hijacked a plane and, as a condition of the plane's release, been flown to the United States."  89 Fed. Reg. 81156, 81163 n.53 (Oct. 7, 2024). In 1984, the 1980 Refugee Act provided only that the "Attorney General shall establish a procedure for [noncitizens] physically present in the United States or at a land border or port of entry, irrespective of such [noncitizen's] status, to apply for asylum." Pub. L. No. 96-212, § 208(a), 94 Stat. 102, 105 (1980). Even so, Assistant Attorney General Olson determined that Section 212(f) did not permit the President to displace the asylum statute. 89 Fed. Reg. at 81163 n.53.

58.    Congress subsequently amended the asylum statute to its present form, expressly providing that "[a]ny [noncitizen] who is physically present in the United States or who arrives in

the United States (whether or not at a designated port of arrival and including a [noncitizen] who is brought to the United States after having been interdicted in international or United States waters), irrespective of such [noncitizen's] status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) [of this title]." Act of 1996, Pub L. No. 104-208, Div. C, Title VI, § 604(a), 110 Stat. 3009-690 (1996). In 1996, Congress comprehensively overhauled the immigration laws, including by creating the expedited removal system. Congress never, however, amended Section 212(f) to permit the President to abrogate the rights Congress had provided via the asylum statute and other forms of protection.

59.    "Although Presidents have invoked section 212(f) at least 90 times since 1981 … none of those proclamations were understood to affect the right of noncitizens to apply for, or noncitizens' statutory eligibility to receive, asylum." 89 Fed. Reg. at 81163 n.53 (*Securing the Border* rule discussing the history of presidential invocations of Section 212(f)).

60.    In 2018, during President Trump's first term, his Administration recognized that a proclamation under Section 212(f) did not affect asylum rights. President Trump had issued a Section 212(f) proclamation suspending the entry of noncitizens between southern border ports of entry. Proclamation 9822, *Addressing Mass Migration Through the Southern Border of the United States*, 83 Fed. Reg. 57661, 57663 (Nov. 9, 2018). DHS and DOJ, however, conceded that a noncitizen "whose entry is suspended or restricted under … a [Section 212(f)] proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the [noncitizen] should not be in the United States, would remain subject to various procedures under immigration laws[,]'' including ''expedited-removal proceedings'' in which they could "raise any claims for protection[.]" *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55934, 55940 (Nov. 9, 2018). The Departments

17

therefore invoked separate regulatory authority under the asylum statute itself to promulgate regulations that purported to deem ineligible for asylum noncitizens who entered in violation of the proclamation. *Id.* at 55952 (codified at 8 C.F.R. § 208.13(c)(3) (DHS) and 8 C.F.R. § 1208.13(c)(3) (DOJ)). Those regulations were enjoined and ultimately vacated as violating Congress's directive that any "additional limitations and conditions" on asylum eligibility must be "consistent with" the remainder of the asylum statute. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 771-73 (9th Cir. 2018) (affirming injunction of regulations); *see OA v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) (vacating regulations).

61.    In 2024, DHS and DOJ reaffirmed what had "been the Executive Branch's consistent position for four decades" and recognized that a proclamation under Section 212(f) "cannot affect noncitizens' right to apply for asylum, their eligibility for asylum, or asylum procedures." 89 Fed. Reg. at 81163. This "longstanding understanding," the government explained, "follow[ed] from the text and structure of the governing statutes." *Id.*

62.    In *Trump v. Hawaii*, 585 U.S. 667 (2018), the Supreme Court considered a proclamation that imposed a "travel ban" on noncitizens from certain countries, issued pursuant to Section 212(f). That proclamation rendered the impacted noncitizens inadmissible but did not override their right to seek asylum or other forms of protection that Congress has protected by statute. And while the Supreme Court, in upholding that proclamation, noted the "broad discretion" that Section 212(f) conferred, the Court "assume[d]"—consistent with the Executive Branch's longstanding position—that Section 212(f) "does not allow the President to expressly override particular provisions of the INA." 585 U.S. at 689.

63.    The other provision on which the Proclamation relies, INA Section 215(a)(1), 8 U.S.C § 1185(a)(1), likewise does not authorize the President to abrogate the protections that the

INA provides to noncitizens present in the United States. Section 215(a)(1) provides that, "[u]nless otherwise ordered by the President, it shall be unlawful … for any [noncitizen] to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1).

64.     As with Section 212(f), the authority under Section 215(a)(1) to condition entry on "such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe" does not authorize the President to abrogate limitations that Congress elsewhere provided in the INA. This provision has typically been invoked in conjunction with Section 212(f). And consistent with the Executive Branch's recognition that "this provision 'substantially overlap[s]' with" Section 212(f), *Hawaii*, 585 U.S. at 683 n.1 (quoting Brief for Petitioners 32-33), the Executive Branch has never before claimed—and indeed has expressly disavowed—that it empowers the President to "impose [a] condition and limitation on asylum eligibility." 89 Fed. Reg. at 81164 n.56.

**D.     The President's Constitutional Authority.**

65.     The Proclamation also invokes Article II and Article IV, Section 4 of the U.S. Constitution.

66.     Article II vests in the President "[t]he executive Power," U.S. Const. art. II, § 1, and requires the President to "take Care that the Laws be faithfully executed," *id.* § 34.

67.     Article IV, Section 4 states that the United States "shall guarantee to every State in this Union a Republican Form of Government" and "shall protect each of them against Invasion."

68.     Whatever the outer limits of these authorities, they do not authorize a preclusive power that permits the President to abrogate Congress's exclusive procedures for removing

noncitizens, *see* 8 U.S.C. §§ 1229a, 1225(b), or the statutory protections that Congress has granted to noncitizens in the United States, *see* 8 U.S.C. § 1158(a)(1) (asylum); 8 U.S.C. § 1231(b)(3) (withholding of removal); 8 U.S.C. § 1231 note (CAT protection).

69.    The presence of people seeking protection from persecution, even at heightened levels, does not constitute an "invasion" within the meaning of Article IV, Section 4 or any other part of the Constitution.

**II.  The Proclamation and Its Implementation.**

70.    In November and December 2024, encounters at the Southwest border—including both at and in between ports of entry—fell to the "lowest level since August 2020 and lower than the monthly average for 2019." CBP, *CBP Releases December 2024 Monthly Update*, https://www.cbp.gov/newsroom/national-media-release/cbp-releases-december-2024-monthly-update (Jan. 14, 2025).

71.    Nonetheless, on January 20, 2025, the President issued the Proclamation. 90 Fed. Reg. 8333. This Proclamation marks the first time that any President has asserted that 8 U.S.C. §§ 1182(f) or 1185(a)(1), or the Constitution, permits the Executive Branch to unilaterally override the immigration laws Congress enacted for the protection of people who face persecution or torture if removed from the United States.

72.    The preamble states that the President "ha[s] determined that the current situation at the southern border qualifies as an invasion under Article IV, Section 4 of the Constitution of the United States."

73.    The preamble states that "[t]he INA provides the President with certain emergency tools"—specifically, 8 U.S.C. §§ 1182(f) and 1185(a)(1). The preamble recognizes that, "[h]istorically, Presidents have used these statutory authorities [only] to deny entry of designated classes and categories of [noncitizens] into the United States through ports of entry." But the

preamble asserts, without citation to authority, that "if the President has the power to deny entry of any [noncitizen] into the United States, and to impose any restrictions as he may deem appropriate, this authority necessarily includes the right to deny the physical entry of [noncitizens] into the United States and impose restrictions on access to portions of the immigration system." And the preamble further asserts that, notwithstanding the INA, "[t]he President's inherent powers to control the borders of the United States, including those deriving from his authority to control the foreign affairs of the United States, necessarily include the ability to prevent the physical entry of [noncitizens] involved in an invasion into the United States, and to rapidly repatriate them to an alternative location."

74.    Section 1 of the Proclamation states that, pursuant to 8 U.S.C. §§ 1182(f) and 1185(a), "the entry into the United States" of noncitizens engaged in the purported "invasion across the southern border is detrimental to the interests of the United States" and that entry into the United States "shall be suspended" until the President issues a "finding that the invasion at the border has ceased." Section 2 states that these same noncitizens "are restricted from invoking provisions of the INA that would permit their continued presence in the United States, including, but not limited to, [the asylum statute], 8 U.S.C. 1158, until [the President] issue[s] a finding that the invasion at the southern border has ceased."

75.    Neither Section 1 nor Section 2 defines the class of noncitizens it covers, stating only that the provisions apply to noncitizens engaged in the purported "invasion across the southern border." Sections 1 and 2 do not distinguish between individuals who cross between ports of entry and those who present at ports of entry and, accordingly, appear to cover both groups.

76.    Section 3, also issued pursuant to 8 U.S.C. §§ 1182(f) and 1185(a), asserts that the entry of noncitizens who do not provide federal officials "with sufficient medical information and

reliable criminal history and background information as to enable fulfillment of the requirements of … 8 U.S.C. 1182(a)(1)-(3)[] is detrimental to the United States." These provisions of the INA set forth grounds of inadmissibility related to health, crimes, and national security. Section 3 of the Proclamation then suspends entry of noncitizens who do not provide such information and restricts their access to the asylum and other INA provisions "that would permit their continued presence in the United States." The Proclamation does not acknowledge that the INA makes those protections available to noncitizens who are inadmissible on these or other grounds.

77.     Section 4 of the Proclamation, relying on purported "authorities provided to the [President] under Article II of the Constitution" and "the guarantee of protection against invasion required by Article IV," "suspend[s] the physical entry of any [noncitizen] engaged in the invasion across the southern border of the United States." Section 4 further directs the DHS Secretary "to take appropriate actions … to achieve the objectives of this proclamation." Section 4 does not expressly state whether the President has invoked these constitutional powers only to prevent noncitizens from physically entering the United States, as opposed to removing them from the United States. Nor, unlike Sections 2 and 3, does Section 4 state that it restricts access to statutory protections under the immigration laws concerning the removal of noncitizens already within the United States. The preamble, however, asserts that the President's constitutional powers include the ability "to rapidly repatriate [noncitizens] to an alternative location."

78.     Section 5 of the Proclamation directs the DHS Secretary, "in coordination with the Secretary of State and the Attorney General," to "take all appropriate action to repel, repatriate, or remove" all noncitizens engaged in the purported "invasion across the southern border" until the President "issue[s] a finding that the invasion at the southern border has ceased." The Proclamation does not explain why current levels of border encounters constitute an "invasion," identify the

point at which encounter levels would no longer constitute an invasion, or provide a timetable for that review.

79.    The Non-President Defendants have made a final decision to enforce the Proclamation.

80.    On information and belief, the Non-President Defendants have issued written guidance documents to implement the Proclamation.

81.    Pursuant to the Proclamation and implementing guidance, Defendants are summarily removing noncitizens who are physically present in the United States without allowing them an opportunity to seek asylum or withholding of removal and without complying with the procedures required for regular removal proceedings under 8 U.S.C. § 1229a or expedited removal proceedings under Section 1225(b). On information and belief, people are being removed not only to their home countries, but to third countries as well, including Mexico and Asylum seekers are also being systematically removed from the United States without even being provided credible fear interviews—the absolute minimum that Congress required to ensure that people subjected to expedited removal would not be returned to persecution or torture.

82.    On information and belief, Defendants are also relying upon the Proclamation to deny migrants at the Southern border a meaningful opportunity to apply for CAT protection.

83.    None of the sources of law on which the Proclamation relies—Section 212(f), Section 215(a)(1), or the Constitution—applies here or can lawfully displace the protections set out in the asylum statute, the withholding of removal statute, FARRA, TVPRA, the expedited removal statute, or the other provisions of the INA.

84.    Even under the standards articulated in *Trump v. Hawaii*, the Proclamation does not satisfy the predicate requirements for invoking Section 212(f). First, the Proclamation fails to

define the "class of [noncitizens]" whose entry is suspended, as Section 212(f) requires, insofar as it purports to apply to noncitizens "engaged in the invasion across the southern border" without further defining which noncitizens it covers. Second, the Proclamation does not satisfy Section 212(f)'s predicate requirement that the President must adequately "find" that the entries it restricts "would be detrimental to the interests of the United States." Third, insofar as the Proclamation rests on a finding that it would be detrimental to the interests of the United States to apply Congress's statutes providing access to asylum and other forms of protection to individuals covered by the Proclamation, this finding cannot sustain the Proclamation. Congress via statute has determined that noncitizens must be able to access asylum and other forms of protection.

## CLASS ACTION ALLEGATIONS

85.    Individual Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and a class of all other persons similarly situated.

86.    Individual Plaintiffs seek to represent the following Proposed Class: All noncitizens who were, are, or will be subject to the Proclamation and/or its implementation within the United States.

87.    The proposed class satisfies the requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable. Thousands of asylum seekers are already being subjected to summary removal under the Proclamation and its implementation by Defendants. The proposed class also includes numerous future noncitizens who will enter the United States and will be subjected to the Proclamation.

88.    The class meets the commonality requirements of Rule 23(a)(2). The members of the class are subject to a common practice: summary removal under the Proclamation contrary to the statutory protections Congress has enacted. The suit also raises questions of law common to

members of the proposed class, including whether the Proclamation and its implementation violate statutory protections for asylum seekers and whether Section 212(f), Section 215(a)(1), or the Constitution authorize the President to abrogate the statutory protections.

89.     The proposed class meets the typicality requirements of Rule 23(a)(3), because the claims of the representative Individual Plaintiffs are typical of the claims of the class. Each proposed class member, including the proposed class representatives, has experienced or faces the same principal injury (unlawful removal without an opportunity to pursue protection from removal), based on the same government practice (the Proclamation and its implementation), which is unlawful as to the entire class because it violates the immigration laws, the APA, and the separation of powers.

90.     The proposed class meets the adequacy requirements of Rule 23(a)(4). The representative Individual Plaintiffs seek the same relief as the other members of the class—among other things, an order declaring the Proclamation and Defendants' implementing guidance documents unlawful and an injunction preventing enforcement of the Proclamation and the implementing guidance. In defending their rights, Individual Plaintiffs will defend the rights of all proposed class members fairly and adequately.

91.     The proposed class is represented by experienced attorneys from the American Civil Liberties Union Foundation Immigrants' Rights Project, the National Immigrant Justice Center, the Center for Gender and Refugee Studies, the Texas Civil Rights Project, the American Civil Liberties Foundation of the District of Columbia, and the American Civil Liberties Foundation of Texas. Proposed Class Counsel have extensive experience litigating class action lawsuits and other complex systemic cases in federal court on behalf of noncitizens.

92.     The proposed class also satisfies Rule 23(b)(2). Defendants have acted (or will act) on grounds generally applicable to the class by subjecting them to summary removal under the Proclamation and its implementing guidance rather than affording them the protections of the immigration laws. Injunctive and declaratory relief is therefore appropriate with respect to the class as a whole.

## HARMS TO PLAINTIFFS

93.     RAICES' core work includes representing noncitizens—including adults, children, and families—in regular removal proceedings under 8 U.S.C. § 1229a and in bond proceedings before the immigration courts and the Board of Immigration Appeals. In regular removal proceedings RAICES represents people seeking asylum, withholding of removal, and protection under CAT, among other forms of relief. RAICES is also one of the very few organizations that provides telephonic counseling to individuals detained in CBP custody. Representing noncitizens in accessing and navigating the credible fear process is a central component of RAICES' work.

94.     The Proclamation seriously impedes RAICES' core work and activities. The Proclamation provides for the summary removal of noncitizens without the ability to raise claims for asylum, withholding of removal, and CAT protection pursuant to the credible fear process and the other safeguards of the immigration statutes. As a result, the Proclamation effectively eliminates RAICES' ability to engage in its core work of representing noncitizens with protection needs in expedited removal proceedings going forward. With the Proclamation in effect, RAICES has stopped receiving calls from individuals and families in CBP custody seeking assistance with the credible fear process.

95.     In addition, the Proclamation prevents noncitizens from passing credible fear interviews and being referred to regular removal proceedings, or otherwise being placed in regular

removal proceedings, where they would have the chance to have full hearings on the merits of their claims for protection. The Proclamation therefore eliminates RAICES' ability to represent noncitizens with protection needs both in regular removal proceedings as well. The Proclamation therefore seriously impairs RAICES' ability to carry out its core work and organizational activities.

96.     RAICES is being required to divert resources to respond to the Proclamation's impact on its operations. Among other things, RAICES must expend resources studying the Proclamation and attempting to ascertain its full scope and impact, about which Defendants have provided no public guidance; searching for alternate ways to contact detained individuals and families to provide information and legal services; updating "know your rights" materials; and training staff on the Proclamation and these other operational changes.

97.     Las Americas' core work includes representing asylum seekers and noncitizens detained by the U.S. government in both expedited removal proceedings under 8 U.S.C. § 1225(b) and regular removal proceedings under 8 U.S.C. § 1229a. In regular removal proceedings, Las Americas represents detained people seeking asylum, withholding of removal, and protection under the CAT, among other forms of relief from removal. In expedited removal proceedings, Las Americas provides consultation and legal representation to asylum seekers throughout the credible fear interview process, including assistance in seeking immigration judge review of negative credible fear determinations by asylum officers. In addition, Las Americas provides services on the Mexico side of the border, educating people who intend to seek asylum about the process that they will face.

98.     The Proclamation seriously impedes Las Americas' core work and activities. The Proclamation provides for the summary removal of noncitizens without the ability to raise claims for asylum, withholding of removal, and CAT protection pursuant to the credible fear process and

the other safeguards of the immigration statutes. As a result, the Proclamation effectively eliminates Las Americas' ability to engage in its core work of representing noncitizens with protection needs in expedited removal proceedings going forward.

99.    In addition, the Proclamation prevents noncitizens from passing credible fear interviews and being referred to regular removal proceedings, or otherwise being placed in regular removal proceedings, where they would have the chance to have full hearings on the merits of their claims for protection. The Proclamation therefore effectively eliminates Las Americas' ability to represent noncitizens with protection needs in regular removal proceedings as well. The Proclamation therefore seriously impairs Las Americas' ability to carry out its core work and organizational activities.

100.    Las Americas is being required to divert resources to respond to the Proclamation's impact on its operations. Among other things, it must expend resources studying the Proclamation and seeking to ascertain its full scope, about which Defendants have provided no public guidance, in order to provide appropriate counsel to noncitizens; divert resources to respond to questions about the Proclamation and present emergency "know your rights" sessions; and revise the materials its staff use to provide guidance to people in Mexico planning to seek protection in the United States.

101.    The Florence Project's core work includes providing free legal services to detained adults and unaccompanied children throughout Arizona. This includes providing services to people seeking asylum, withholding of removal, and CAT protection, in both expedited removal proceedings under 8 U.S.C. § 1225(b) and regular removal proceedings under 8 U.S.C. § 1229a. In addition, the Florence Project provides services on the Mexico side of the border, educating people who intend to seek asylum about the process that they will face.

102.    The Proclamation seriously impedes the Florence Project's core work and activities. The Proclamation provides for the summary removal of noncitizens without the ability to raise claims for asylum, withholding of removal, and CAT protection pursuant to the credible fear process and the other safeguards of the immigration statutes. As a result, the Proclamation effectively eliminates the Florence Project's ability to engage in its core work of representing noncitizens with protection needs in expedited removal proceedings going forward.

103.    In addition, the Proclamation prevents noncitizens from passing credible fear interviews and being referred to regular removal proceedings, or otherwise being placed in regular removal proceedings, where they would have the chance to have full hearings on the merits of their claims for protection. The Proclamation therefore eliminates the Florence Project's ability to represent newly arriving noncitizens with protection needs in regular removal proceedings as well as in the credible fear process. The Proclamation therefore seriously impairs the Florence Project's ability to carry out its core work and organizational activities. The Florence Project has not been able to serve a single noncitizen who entered the United States since the Proclamation took effect and it has been denied access to detention facilities where these noncitizens are being held.

104.    The Florence Project is being required to divert resources to respond to the Proclamation's impact on its operations. Among other things, it has had to quickly update materials explaining asylum law and the procedures to seek asylum; spend additional time educating the community on these changes, including at a single event that had more than 100 participants; add hotline hours; change signage for posting in jails; and expend time and resources seeking to identify new ways to try to provide people with information about their rights.

105.    In addition, the Organizational Plaintiffs face a risk of lost funding. Because these organizations receive funding that is meant, in large part, to be spent serving asylum seekers and

people who have recently arrived in the United States, the indefinite block on access to the U.S. immigration system is likely to reduce each organization's asylum-seeking client base, which will in turn influence funding that is based on the number of individuals served.

106.    Absent relief, the Individual Plaintiffs will also be severely and irreparably harmed by the Proclamation and its implementation. Individual Plaintiffs are all asylum seekers. A.M. and his family, Z.A., T.A, and A.T. face persecution by the Taliban because of their political opinions. M.A. and D.G. were imprisoned in Egypt and Cuba respectively, and have asylum claims based on their political opinions. N.S. and G.A. suffered severe domestic violence in Ecuador and Brazil respectively and were unable to receive protection from police despite multiple attempts. B.R. fears harm based on her Indigenous background and her family membership, and E.G. fled Peru after being raped and threatened based on his sexual orientation. F.A. and her children K.A. and Y.A. fled Turkey after enduring political oppression at the hands of the government there for their membership in a group that is perceived to be in opposition to the government. But because of the Proclamation, these Individual Plaintiffs are being barred from seeking asylum or other protection.

107.    Many Individual Plaintiffs are presently detained by Defendants and face irreparable harm if they are removed to their home countries or to a third country. This group includes A.M., Z.A., T.A., A.T., N.S., B.R., M.A., and G.A. Having crossed the southern border after the Proclamation went into effect on January 20, 2025, they face summary removal without being permitted to raise their protection claims.

108.    Other Individual Plaintiffs are experiencing ongoing harm because they have already been removed due to the Proclamation. Individual Plaintiff D.G. fled Cuba, his country of origin, but has been unlawfully removed to Mexico—a country where he was kidnapped twice while waiting to enter the United States—without an opportunity to raise his protection claims.

There can be no question that D.G. remains in danger in Mexico; as DHS has acknowledged, nearly 13,500 instances of kidnapping, rape, torture, murder, and other violent attacks on asylum seekers expelled from the United States to Mexico were documented in 2021 and 2022.

109.    Plaintiff E.G. fled Peru because of his sexual orientation but after being detained for nine days, he was unlawfully removed to Peru without the opportunity to raise his protection claims.

110.    And Plaintiffs F.A., K.A., and Y.A. fled political persecution in Turkey, crossed into the United States on or about February 3, 2025, and were unlawfully removed to Panama without the opportunity to raise their protection claims. F.A., K.A., and Y.A. are detained in Panama pending their removal to Turkey.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (VIOLATION OF THE ASYLUM STATUTE, 8 U.S.C. § 1158(a)(1))

111.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

112.    The INA provides that, with certain exceptions not applicable here, "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival … ), irrespective of such [noncitizen's] status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C.] § 1225(b)." 8 U.S.C. § 1158(a)(1). Both DHS and DOJ have promulgated regulations implementing the asylum statute. *See, e.g.*, 8 C.F.R. § 208.13 (DHS); 8 C.F.R. § 1208.13 (DOJ).

113.    The Proclamation and Defendants' actions to implement and enforce the Proclamation violate 8 U.S.C. § 1158(a)(1) and its implementing regulations by barring noncitizens in the United States from applying for or receiving asylum.

114.    None of the sources of law on which the Proclamation relies—Section 1182(f), Section 1185(a)(1), or the Constitution—applies here or can lawfully displace the protections set out in Section 1158(a)(1) and its implementing regulations.

**SECOND CLAIM FOR RELIEF**
**(VIOLATION OF THE WITHHOLDING OF REMOVAL STATUTE,**
**8 U.S.C. § 1231(b)(3))**

115.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

116.    The withholding of removal statute, 8 U.S.C. § 1231(b)(3), precludes the removal of noncitizens to countries where it is more likely than not that their "life or freedom would be threatened … because of [their] race, religion, nationality, membership in a particular social group, or political opinion." Both DHS and DOJ have promulgated regulations implementing this provision. *See* 8 C.F.R. § 208.16(b) (DHS); 8 C.F.R. § 1208.16(b) (DOJ).

117.    The Proclamation and Defendants' actions to implement and enforce the Proclamation violate 8 U.S.C. § 1231(b)(3) and its implementing regulations by barring withholding of removal for noncitizens in the United States.

118.    None of the sources of law on which the Proclamation relies—Section 1182(f), Section 1185(a)(1), or the Constitution—applies here or can lawfully displace the protections set out in Section 1231(b)(3) and its implementing regulations.

**THIRD CLAIM FOR RELIEF**
**(VIOLATION OF THE FOREIGN AFFAIRS REFORM AND RESTRUCTURING ACT**
**OF 1998, CODIFIED AT 8 U.S.C. § 1231 NOTE)**

119.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

120.    FARRA, 8 U.S.C. § 1231 note, and applicable DHS and DOJ regulations implement the CAT and prohibit the government from returning a noncitizen to a country in which

"it is more likely than not that he or she would be tortured." 8 C.F.R. § 208.16(c)(2) (DHS); 8 C.F.R. § 1208.16(c)(2) (DOJ)

121.    The Proclamation and Defendants' actions to implement and enforce the Proclamation violate FARRA and its implementing regulations by depriving noncitizens of a meaningful opportunity to present CAT claims.

122.    None of the sources of law on which the Proclamation relies—Section 1182(f), Section 1185(a)(1), or the Constitution—applies here or can lawfully displace or undermine the protections set out in the Convention Against Torture and FARRA.

**FOURTH CLAIM FOR RELIEF**
**(VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION**
**REAUTHORIZATION ACT, 8 U.S.C. § 1232(a)(5)(D))**

123.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

124.    The TVPRA, 8 U.S.C. § 1232(a)(5)(D), mandates that "[a]ny unaccompanied [noncitizen] child sought to be removed by [DHS]," except certain unaccompanied children from Canada or Mexico, "shall be … placed in [regular] removal proceedings" in immigration court under 8 U.S.C. § 1229a.

125.    Insofar as the Proclamation and implementation deprive unaccompanied children from non-contiguous countries of the right to a hearing in regular removal proceedings, or to seek asylum, withholding or CAT protection, they violate the TVPRA.

126.    None of the sources of law on which the Proclamation relies—Section 1182(f), Section 1185(a)(1), or the Constitution—applies here or can lawfully displace or undermine the protections set out in the TVPRA.

**FIFTH CLAIM FOR RELIEF**
**(VIOLATION OF THE IMMIGRATION AND NATIONALITY ACT,**
**8 U.S.C. § 1101, *ET SEQ.*)**

127.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

128.    The INA, 8 U.S.C. § 1101, *et seq.*, sets out the sole mechanisms established by Congress for the removal of noncitizens.

129.    The INA provides that removal proceedings before an immigration judge under 8 U.S.C. § 1229a are "the sole and exclusive procedure" by which the government may determine whether to remove an individual, "[u]nless otherwise specified" in the INA. 8 U.S.C. § 1229a(a)(3). One mechanism otherwise specified in the INA is the expedited removal system, including its credible fear screening process. *Id.* § 1225(b)(1). The expedited removal statute states that if a noncitizen "indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the [noncitizen] for an interview by an asylum officer," and the noncitizen may not be removed pending that interview and, if requested, review by an immigration judge. *Id.* § 1225(b)(1)(A)(i)-(ii). The expedited removal statute further provides that a noncitizen "who may be eligible" for "the asylum interview [just] described" has a right to be provided "information concerning the asylum interview" and to "consult with a person or persons of the [noncitizen]'s choosing prior to the interview." *Id.* § 1225(b)(1)(B)(iv). And the expedited removal statute provides that the government "shall provide by regulation and upon the [noncitizen's] request for prompt review by an immigration judge of a determination … that the [noncitizen] does not have a credible fear of persecution," including "an opportunity for the [noncitizen] to be heard and questioned by the immigration judge, either in person or by telephonic or video connection." *Id.* § 1225(b)(1)(B)(iii)(III).

130.    The Proclamation and Defendants' actions to implement and enforce the

34

Proclamation are unlawful because they result in removals without compliance with the procedures required by the INA and its implementing regulations, including the requirements to refer for credible fear interviews noncitizens who indicate an intention to apply for asylum or a fear of persecution; to provide information about credible fear interviews to noncitizens who may be eligible; and to provide for review of adverse credible fear determinations by immigration judges.

131.    None of the sources of law on which the Proclamation relies—Section 1182(f), Section 1185(a)(1), or the Constitution—applies here or can lawfully displace the procedures required by the INA and its implementing regulations.

**SIXTH CLAIM FOR RELIEF**
**(SUBSTANTIVE VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,**
**5 U.S.C. § 706(2)(A))**

**(Applicable to the Non-President Defendants)**

132.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

133.    The APA requires courts to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

134.    The Departments of Homeland Security, State, and Justice and DHS's components and subcomponents including ICE, CBP, USCIS, U.S. Border Patrol, and OFO are "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

135.    The Non-President Defendants have made a final decision to enforce the Proclamation. In addition, the Non-President Defendants have issued written guidance documents to implement the Proclamation. These actions implementing the Proclamation mark the consummation of the non-President Defendants' decision-making processes because they announce the non-President Defendants' decision to immediately implement a policy cutting off

access to asylum, withholding of removal, CAT protection, and other provisions of the INA.

136.    In taking final action to implement the Proclamation, as set out above, the non-President Defendants have acted contrary to 8 U.S.C. §§ 1158, 1225, 1229a, 1231(b)(3), 1231 note, and 1232(a)(5)(D), as well as their implementing regulations.

137.    None of the sources of law on which the Proclamation relies—Section 1182(f), Section 1185(a)(1), or the Constitution—applies here or can lawfully displace the provisions of law described in the prior paragraph.

138.    Further, in taking final action to implement and enforce the Proclamation, the non-President Defendants have acted arbitrarily and capriciously. Among other arbitrary actions and omissions, the non-President Defendants have failed to provide reasoned explanations for their actions; failed to consider relevant factors; relied on factors Congress did not intend to be considered; and departed from past practices and policies without reasoned explanations for doing so.

## SEVENTH CLAIM FOR RELIEF
### (PROCEDURAL VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(D))

### (Applicable to the Non-President Defendants)

139.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

140.    The APA requires courts to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

141.    The Departments of Homeland Security, State, and Justice are "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

142.    The Non-President Defendants have made a final decision to enforce the Proclamation. In addition, the Non-President Defendants have issued written guidance documents

to implement the Proclamation. These actions implementing the Proclamation mark the consummation of the non-President Defendants' decision-making processes because they announce the non-President Defendants' decision to immediately implement a policy cutting off access to asylum, withholding of removal, CAT protection, and other provisions of the INA.

143.    In taking final action to implement and enforce the Proclamation, the Non-President Defendants have changed the substantive rights of noncitizens physically present within the United States to seek asylum, withholding of removal, and protection under the CAT, and to invoke other provisions of the INA, and have departed from the procedural and substantive standards set forth in their regulations implementing the INA, without following the rulemaking procedures required by the APA, *see* 5 U.S.C. § 553.

**EIGHTH CLAIM FOR RELIEF**
**(ULTRA VIRES: ACTION UNAUTHORIZED BY STATUTE,**
**8 U.S.C. §§ 1182(f) and 1185(a))**

144.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

145.    The INA gives the President the authority to suspend the entry of "all [noncitizens] or any class of [noncitizens] as immigrants or nonimmigrants" when the President has found that such entry "would be detrimental to the interests of the United States." INA § 212(f), 8 U.S.C. § 1182(f).

146.    The Proclamation exceeds the President's authority under INA Section 212(f), 8 U.S.C. § 1182(f), and Defendants' actions in implementing the Proclamation are unauthorized by Section 212(f).

147.    Among other defects, the Proclamation fails to define the noncitizens or "class of [noncitizens]" whose entry is suspended, as Section 212(f) requires, insofar as it purports to apply to noncitizens "engaged in the invasion across the southern border."

148.    The Proclamation also fails to make adequate findings as to why the entry of the noncitizens whose entry it restricts "would be detrimental to the interests of the United States."

149.    Insofar as the Proclamation rests on a finding that it would be detrimental to the interests of the United States to apply Congress's statutes providing access to asylum and other forms of protection, this finding cannot sustain the Proclamation. Congress via statute has determined that noncitizens must be able to access asylum and other forms of protection.

150.    Accordingly, the predicate conditions for exercise of the President's authority under Section 212(f) have not been met.

151.    The INA makes it unlawful for noncitizens "to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1).

152.    The Proclamation exceeds the President's authority under 8 U.S.C. § 1185(a)(1), and Defendants' actions in implementing the Proclamation are unauthorized by 8 U.S.C. § 1185(a)(1).

## NINTH CLAIM FOR RELIEF
### (ULTRA VIRES: ACTION UNAUTHORIZED BY THE UNITED STATES CONSTITUTION)

153.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

154.    The Proclamation exceeds the President's authority under Article II of the United States Constitution.

155.    Article IV, Section 4 of the Constitution provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the

Legislature cannot be convened) against domestic Violence."

156.    The Proclamation exceeds the President's constitutional authority under Article IV, Section 4 of the Constitution because, among other reasons, there is no "[i]nvasion" within the meaning of that section.

157.    Accordingly, the measures directed by the Proclamation are unauthorized by the United States Constitution.

### TENTH CLAIM FOR RELIEF
### (VIOLATION OF SEPARATION OF POWERS)

158.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

159.    Under fundamental separation-of-powers principles, the President cannot ignore or override Congress's careful and longstanding decisions to provide protections for noncitizens fleeing danger.

160.    The Proclamation and Defendants' actions to implement the Proclamation violate these separation-of-power principles and exceed the President's constitutional authority.

### PRAYER FOR RELIEF

WHEREFORE Plaintiffs request that the Court grant the following relief:

a.    Declare that the Proclamation and all implementing agency guidance documents and other agency actions implementing the Proclamation are unlawful in their entirety;

b.    Enjoin Defendants from (1) implementing or enforcing the Proclamation and all agency guidance documents and other agency actions issued to implement the Proclamation; and (2) relying on removal orders issued pursuant to the Proclamation;

c.    Vacate all agency guidance documents and other agency actions implementing the Proclamation;

39

d.      For any Individual Plaintiffs who have been removed from the United States, an order requiring Defendants to facilitate those Individual Plaintiffs' return to the United States at no expense to Plaintiffs;

e.      Require Defendants to pay Plaintiffs reasonable attorneys' fees and costs;

f.      Grant any other and further relief that this Court may deem just and proper.

Dated: February 19, 2025                    Respectfully submitted,

/s/ Lee Gelernt
Lee Gelernt (D.D.C. Bar No. NY0408)
Omar C. Jadwat*
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
lgelernt@aclu.org
ojadwat@aclu.org

Simon A. de Carvalho*
Jenner & Block LLP
353 N. Clark St.
Chicago, IL 60654
353 N Clark St, Chicago, IL 60654
T: 312-222-9350
sdecarvalho@jenner.com

Morgan Russell*
Katrina Eiland*
Cody Wofsy (D.D.C. Bar No. CA00103)
Spencer Amdur*
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, Suite 700
San Francisco, CA 94104
T: 415-343-0770
mrussell@aclu.org
keiland@aclu.org
cwofsy@aclu.org
samdur@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)

/s/ Lindsay C. Harrison
Lindsay C. Harrison (D.C. Bar #977407)
Zachary C. Schauf (D.C. Bar #1021638)
Logan C. Wren (D.C. Bar #1780385)*
Mary-Claire Spurgin (D.C. Bar #90029537)*
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
T: 202-639-6000
lharrison@jenner.com
zschauf@jenner.com
lwren@jenner.com
mspurgin@jenner.com

Keren Zwick (D.D.C. Bar. No. IL0055)
Richard Caldarone (D.C. Bar No. 989575)*
Mary Georgevich*
National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
T: 312-660-1370
kzwick@immigrantjustice.org
rcaldarone@immigrantjustice.org
mgeorgevich@immigrantjustice.org

Melissa Crow (D.C. Bar. No. 453487)
Center for Gender & Refugee Studies
1121 14th Street, NW, Suite 200
Washington, D.C. 20005
T: 202-355-4471
crowmelissa@uclawsf.edu

Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
aspitzer@acludc.org
smichelman@acludc.org

Ashley Alcantara Harris*
David A. Donatti*
ACLU Foundation of Texas
P.O. Box 8306
Houston, TX 77288
TEL: (713) 942-8146
FAX: (713) 942-8966
aharris@aclutx.org
ddonatti@aclutx.org

Robert Pauw*
Center for Gender & Refugee Studies
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: 206-682-1080
rpauw@ghp-law.net

Tamara Goodlette (D.C. Bar. No.
TX24117561)
Texas Civil Rights Project
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 207
tami@texascivilrightsproject.org

Edith Sangueza*
Center for Gender & Refugee Studies
26 Broadway, 3rd Floor
New York, NY 10004
T: 415-581-8835
sanguezaedith@uclawsf.edu


*Attorneys for Plaintiffs*

*Certificate of pro bono representation or pro hac vice forthcoming*