## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity, *et al.*, <br><br> *Defendants*. | No. 1:25-cv-00306 (APM) |

## MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65(a) and Civil Local Rule 65.1(c), Plaintiffs Refugee and Immigrant Center for Education and Legal Services, Las Americas Immigrant Advocacy Center, Florence Immigrant & Refugee Rights Project (collectively, the "Organizational Plaintiffs"), and A.M., Z.A., T.A., A.T., N.S., D.G., B.R., M.A., G.A., F.A., K.A., Y.A., and E.G. (collectively, the "Individual Plaintiffs") hereby move the Court to issue a classwide preliminary injunction (1) prohibiting Defendants from implementing or enforcing Presidential Proclamation No. 10888, 90 Fed. Reg. 8333 (Jan. 20, 2025), to restrict statutory protections that Congress provided to noncitizens who are physically present in the United States; and (2) prohibiting Defendants from relying on any removal orders issued to noncitizens pursuant to the Proclamation. In support of this motion, Plaintiffs rely upon the attached memorandum of points and authorities and accompanying declarations as well as the declarations attached to the concurrently filed Sealed

Motion for Leave to Proceed Under Pseudonyms and to File Supporting Exhibits Under Seal. A proposed order is attached. Oral argument is requested.

Pursuant to Local Civil Rule 7(m), Plaintiffs' counsel conferred with Defendants' counsel, who indicated that Defendants oppose the relief requested in this motion.

Dated: February 19, 2025                    Respectfully submitted,

Keren Zwick (D.D.C. Bar. No. IL0055)         /s/ Lee Gelernt
Richard Caldarone (D.C. Bar No. 989575)*     Lee Gelernt (D.D.C. Bar No. NY0408)
Mary Georgevich*                             Omar C. Jadwat*
National Immigrant Justice Center            American Civil Liberties Union Foundation
111 W. Jackson Blvd.,                        Immigrants' Rights Project
  Suite 800                                  125 Broad Street, 18th Floor
Chicago, IL 60604                            New York, NY 10004
T: 312-660-1370                              T: 212-549-2660
kzwick@immigrantjustice.org                  lgelernt@aclu.org
rcaldarone@immigrantjustice.org              ojadwat@aclu.org
mgeorgevich@immigrantjustice.org
                                             Morgan Russell*
Melissa Crow (D.C. Bar. No. 453487)          Katrina Eiland*
Center for Gender & Refugee Studies          Cody Wofsy (D.D.C. Bar No. CA00103)
1121 14th Street, NW, Suite 200              Spencer Amdur*
Washington, D.C. 20005                       American Civil Liberties Union Foundation
T: 202-355-4471                              Immigrants' Rights Project
crowmelissa@uclawsf.edu                      425 California Street, Suite 700
                                             San Francisco, CA 94104
                                             T: 415-343-0770
Edith Sangueza*                              mrussell@aclu.org
Center for Gender & Refugee Studies          keiland@aclu.org
26 Broadway, 3rd Floor                       cwofsy@aclu.org
New York, NY 10004                           samdur@aclu.org
T: 415-581-8835
sanguezaedith@uclawsf.edu
                                             Arthur B. Spitzer (D.C. Bar No. 235960)
                                             Scott Michelman (D.C. Bar No. 1006945)
Robert Pauw*                                 American Civil Liberties Union Foundation
Center for Gender & Refugee Studies          of the District of Columbia
c/o Gibbs Houston Pauw                       529 14th Street, NW, Suite 722
1000 Second Avenue, Suite 1600               Washington, D.C. 20045
Seattle, WA 98104                            T: 202-457-0800
T: 206-682-1080                              aspitzer@acludc.org

rpauw@ghp-law.net

Tamara Goodlette (D.C. Bar. No.
TX24117561)
Texas Civil Rights Project
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 207
tami@texascivilrightsproject.org

smichelman@acludc.org

Ashley Alcantara Harris*
David A. Donatti*
ACLU Foundation of Texas
P.O. Box 8306
Houston, TX 77288
TEL: (713) 942-8146
FAX: (713) 942-8966
aharris@aclutx.org
ddonatti@aclutx.org

*Attorneys for Plaintiffs*

*Certificate of pro bono representation or pro
hac vice forthcoming*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

REFUGEE AND IMMIGRANT CENTER FOR
EDUCATION AND LEGAL SERVICES, *et al.*,

       *Plaintiffs*,

   v.

KRISTI NOEM, Secretary of the U.S.
Department of Homeland Security,
in her official capacity, *et al.*,

       *Defendants*.

No. 1:25-cv-00306 (APM)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

i

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 9

LEGAL AND FACTUAL BACKGROUND ...................................................................... 11

    I.    Congress Has Comprehensively Regulated Entry And Removal. ...................... 11

        A.    Congress Has Determined Who May Lawfully Enter The United States, While Authorizing The President To Impose Certain Additional Limitations. ........................................................................................... 12

        B.    Congress Has Enacted Protections For Noncitizens In The United States, Without Authorizing The President To Abrogate Those Protections. ...... 13

        C.    For Decades, The Executive Branch Has Understood That The President Has No Authority To Displace The Protections Congress Has Enacted. . 17

    II.    The Proclamation Shatters The Executive Branch's Decades-Long Understanding By Claiming Authority To Wipe Away Asylum And Other Forms Of Protection. ................................................................................................................. 19

    III.    Defendants' Enforcement Of The Proclamation Is Harming Plaintiffs. .............. 22

ARGUMENT ...................................................................................................................... 25

    I.    Plaintiffs Are Likely To Succeed On The Merits Of Their Claims. .................... 25

        A.    Congress Has Not Authorized The Proclamation's Violations Of The INA. ........................................................................................................... 26

        B.    The Constitution Does Not Authorize The President To Abrogate The Relevant Provisions Of The INA. ........................................................... 32

    II.    Plaintiffs Satisfy The Other Requirements For A Preliminary Injunction. .......... 34

CONCLUSION ................................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B.-B. v. Morgan,*
  548 F. Supp. 3d 209 (D.D.C. 2020) ........................................................ 25, 27

*Al Otro Lado v. Exec. Off. for Immigr. Rev.,*
  120 F.4th 606 (9th Cir. 2024) ..................................................................... 3

*Arizona v. United States,*
  567 U.S. 387 (2012) .................................................................................. 23

*Bond v. United States*
  564 U.S. 211 (2011) .................................................................................. 26

*Brown v. GSA,*
  425 U.S. 820 (1976) .................................................................................. 20

*\*E. Bay Sanctuary Covenant v. Biden,*
  993 F.3d 640 (9th Cir. 2021) ......................................................... 5, 6, 10, 26

*FTC v. Bunte Brothers, Inc.,*
  312 U.S. 349 (1941) .................................................................................. 21

*Galvan v. Press,*
  347 U.S. 522 (1954) .................................................................................. 23

*Grace v. Barr,*
  965 F.3d 883 (D.C. Cir. 2020) .................................................................... 9

*Grace v. Whitaker,*
  344 F. Supp. 3d 96 (D.D.C. 2018), *rev'd in part on other grounds,* 965 F.3d
  883 (D.C. Cir. 2020) ............................................................................ 26, 27

*Hanson v. District of Columbia,*
  120 F.4th 223 (D.C. Cir. 2024) .............................................................. 16, 25

*Hicks v. Bush,*
  397 F. Supp. 3d 36 (D.D.C. 2005) ............................................................. 26

*INS v. Cardoza-Fonseca,*
  480 U.S. 421 (1987) ................................................................................. 7, 27

*INS v. Stevic,*
  467 U.S. 407 (1984) .................................................................................... 7

*Kiakombua v. Wolf*,
  498 F. Supp. 3d 1 (D.D.C. 2020) ................................................................. 25, 27

*United States ex rel. Knauff v. Shaughnessy*,
  338 U.S. 537 (1950) ........................................................................................ 24

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ........................................................................... 26

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................................................................ 26

*Make the Road N.Y. v. Wolf*,
  962 F.3d 612 (D.C. Cir. 2020) .......................................................................... 8

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................................ 27

*\*O.A. v. Trump*,
  404 F. Supp. 3d 109 (D.D.C. 2019) ........................................................*passim*

*P.J.E.S. v. Wolf*,
  502 F. Supp. 3d 492 (D.D.C. 2020) ............................................................ 26, 27

*Proposed Interdiction of Haitian Flag Vessels*,
  5 Op. O.L.C. 242 (1981) .................................................................................... 3

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012) ........................................................................................ 20

*Russello v. United States*,
  464 U.S. 16 (1983) .......................................................................................... 17

*SEC v. Jarkesy*,
  603 U.S. 109 (2024) .................................................................................... 3, 23

*Tesfamichael v. Gonzales*,
  411 F.3d 169 (5th Cir. 2005) .......................................................................... 27

*Texas v. White*,
  74 U.S. 700 (1868), *overruled on other grounds by Morgan v. United States*,
  113 U.S. 476 (1885) ........................................................................................ 24

*Torres v. Tex. Dep't of Pub. Safety*,
  597 U.S. 580 (2022) ........................................................................................ 24

*\*Trump v. Hawaii*,
  585 U.S. 667 (2018) .................................................................................. 4, 19, 22

*United States v. Texas*,
    719 F. Supp. 3d 640 (W.D. Tex. 2024) ............................................................ 24

*West Virginia v. EPA*,
    597 U.S. 697 (2022).......................................................................................... 21

*Winter v. Nat'l Res. Def. Council*,
    555 U.S. 7 (2008) .............................................................................................. 16

*\*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952).............................................................................. 2, 3, 23

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ......................................................................................... 23, 24

**Statutes**

8 U.S.C. § 1101 ................................................................................................................ 3

8 U.S.C. § 1101(a)(42)..................................................................................................... 6

8 U.S.C. § 1151 ................................................................................................................ 4

*8 U.S.C. § 1158 .......................................................................................... 6, 12, 18, 21

*8 U.S.C. § 1158(a)(1).......................................................................... 2, 3, 6, 18, 21, 22, 25

8 U.S.C. § 1158(a)(2) ...................................................................................................... 6

8 U.S.C. § 1158(b)(1)(A) ................................................................................................ 6

8 U.S.C. § 1158(b)(2)(A)(v)............................................................................................ 6

*8 U.S.C. § 1158(b)(2)(C) ......................................................................... 2, 6, 10, 20

8 U.S.C. § 1181 ............................................................................................................... 4

8 U.S.C. § 1181(b).......................................................................................................... 19

8 U.S.C. § 1182 .............................................................................................................. 19

8 U.S.C. § 1182(a) ........................................................................................................... 4

8 U.S.C. § 1182(a)(1) ............................................................................................... 12, 22

8 U.S.C. § 1182(d)(3)(B)(i)............................................................................................ 19

*8 U.S.C. § 1182(f) .............................................................. 1, 5, 11, 17, 19, 21, 22

*8 U.S.C. § 1185(a) ......................................................................................... 5, 11, 12

*8 U.S.C. § 1185(a)(1) ....................................................................... 5, 12, 17, 18, 21, 22

8 U.S.C. § 1202(a) ....................................................................................................... 22

8 U.S.C. § 1225(a) ......................................................................................................... 3

*8 U.S.C. § 1225(b)(1) ................................................................................................... 8

8 U.S.C. § 1225(b)(1)(A) ............................................................................................... 8

8 U.S.C. § 1225(b)(1)(A)(i) ......................................................................................... 17

8 U.S.C. § 1225(b)(1)(A)(ii) .......................................................................................... 8

8 U.S.C. § 1225(b)(1)(B)(i) ........................................................................................... 8

8 U.S.C. § 1225(b)(1)(B)(iii) ....................................................................................... 17

8 U.S.C. § 1225(b)(1)(B)(iii)(III) .................................................................................. 8

8 U.S.C. § 1225(b)(1)(B)(iv) .......................................................................................... 8

8 U.S.C. § 1225(b)(1)(B)(v) ........................................................................................... 8

*8 U.S.C. § 1229a ........................................................................................................... 7

8 U.S.C. § 1229a(5) ....................................................................................................... 8

8 U.S.C. § 1229a(a)(3) ......................................................................................... 7, 8, 18

8 U.S.C. § 1229a(b)(4)(A) .............................................................................................. 8

8 U.S.C. § 1231 ............................................................................................................... 7

8 U.S.C. § 1231(a)(1)(A) .............................................................................................. 17

8 U.S.C. § 1231(b)(3)(A) ................................................................................................ 7

8 U.S.C. § 1252(a)(1) ..................................................................................................... 8

8 U.S.C. § 1361 ............................................................................................................. 22

8 U.S.C. § 1521 ............................................................................................................. 27

Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, §
  2242, 112 Stat. 2681 (1998) ....................................................................................... 7

Pub L. No. 104-208, § 604(a), 110 Stat. 3009-690 (1996) ............................................ 5

Refugee Act of 1980, Pub. L. No. 96-212, § 203(e), 94 Stat. 102 (1980)............................ 6, 27

**Other Authorities**

8 C.F.R. § 208.13 .................................................................................................. 6

8 C.F.R. § 208.16(c) .............................................................................................. 7

8 C.F.R. § 208.18(a)(2) ......................................................................................... 7

8 C.F.R. § 208.30 .................................................................................................. 8

8 C.F.R. § 208.30(e)(2) ......................................................................................... 9

8 C.F.R. § 1208.13 ................................................................................................ 6

8 C.F.R. § 1208.16(c) ............................................................................................ 7

8 C.F.R. § 1208.30(g)(2)(iv) ................................................................................. 9

8 C.F.R. § 1208.30(g)(2)(iv)(B) ........................................................................... 8

46 Fed. Reg. 48107 ............................................................................................... 9

83 Fed. Reg. 55934 ............................................................................................... 10

83 Fed. Reg. 57661 ........................................................................................ 10, 18, 22

83 Fed. Reg. 57663 ............................................................................................... 18

*89 Fed. Reg. 81156 ........................................................................................... 1, 9

*90 Fed. Reg. 8333 ............................................................................................. 1, 21

*90 Fed. Reg. 8335 ......................................................................... 1, 11, 12, 13, 17, 21, 22

*90 Fed. Reg. 8336 ......................................................................................... 13, 23

142 Cong. Rec. 25,347 .......................................................................................... 9

CBP, *CBP Releases December 2024 Monthly Update*, https://www.
    cbp.gov/newsroom/national-media-release/cbp-releases-december-2024-
    monthly-update (Jan. 14, 2025) ...................................................................... 11

S. Rep. No. 96-256 (1979), *reprinted in* 1980 U.S.C.C.A.N. 141 ............................ 27

*Summarily Deport Migrants Without Granting Asylum Hearings Under Trump
    Edict*, CBS News (Jan. 22, 2025), https://www.cbsnews.com/news/trump-
    deportations-migrants-border-asylum-hearings/ ............................................... 13

*U.S. Const. art. II.............................................................................................. 2, 12, 23

*U.S. Const. art. IV, § 4.................................................................................... 24, 25

## INTRODUCTION

This suit is about the President's attempt to wipe away by fiat the statutes that Congress enacted to protect noncitizens fleeing persecution and torture. In the Immigration and Nationality Act ("INA"), Congress gave noncitizens in the United States statutory rights to apply for asylum and other protections from removal. The President nonetheless issued a Proclamation barring noncitizens "from invoking provisions of the INA that would permit their continued presence in the United States, including" the asylum statute and other removal protections. Proclamation 10888, §§ 2-3, 90 Fed. Reg. 8333 (Jan. 20, 2025) ("Proclamation"). But the President has no such power. Plaintiffs seek a preliminary injunction preventing Defendants from implementing or enforcing the Proclamation to eliminate the rights that Congress has guaranteed by statute.

The merits question here is neither difficult nor close. The Proclamation primarily relies on Section 212(f) of the INA, 8 U.S.C. § 1182(f), which authorizes the President to "suspend the entry" of "all [noncitizens] or any class of [noncitizens]" when their entry "would be detrimental to the interests of the United States." But this authority to "suspend entry" does not empower the President to *summarily remove* noncitizens already physically present in the United States, much less to do so in violation of the protections from persecution and torture Congress set out in the INA. That is why the Executive Branch for more than four decades concluded that Section 212(f) does not confer the authority to displace rights to seek asylum or other statutory forms of protection. This includes a 1984 opinion from then–Assistant Attorney General of the Office of Legal Counsel Theodore B. Olson; a 2018 regulation issued by the Department of Justice ("DOJ") and Department of Homeland Security ("DHS") in conjunction with a proclamation issued by President Trump; and a 2024 regulation promulgated by the same Departments under President Biden. *See* 89 Fed. Reg. 81156, 81163 & n.53 (Oct. 7, 2024).

9

This Court's decision in *O.A. v. Trump* supports the same conclusion. 404 F. Supp. 3d 109 (D.D.C. 2019), *appeal dismissed sub nom, O.A. v. Biden*, No 19-5272, 2023 WL 7228024 (D.C. Cir. Nov. 1, 2023). There, President Trump invoked Section 212(f) to deny "entry" to noncitizens who crossed the southern border between ports of entry. Then, DOJ and DHS—recognizing that Section 212(f) on its own could not render these noncitizens ineligible for asylum—separately invoked their rulemaking authority to establish certain "additional limitations and conditions" on asylum eligibility, 8 U.S.C. § 1158(b)(2)(C), to issue an interim final rule barring from asylum noncitizens who entered in violation of the proclamation. This Court held that the rule violated the INA's requirement that any such limitation must be "consistent with" the asylum statute. *O.A.*, 404 F. Supp. 3d at 147-50. And when DOJ and DHS nonetheless pointed to the President's proclamation as bolstering their authority, this Court rejected that argument. *Id.* at 150-51. This Court reasoned that the President's proclamation under Section 212(f) "was not sufficient to override a statutory mandate permitting all [noncitizens] present in the United States to apply for asylum," regardless of their manner of entry; or to "shift the congressional assignment of authority … from [DOJ and DHS] to the President." *Id.* at 151 (citing 8 U.S.C. § 1158(a)(1) and *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)). So, too, here.

The Proclamation also gestures at the President's powers under Article II and the federal government's duty to protect States from invasion under Article IV. U.S. Const. art. II; *id.* art. IV, § 4. It is unclear whether the Proclamation purports to rely on these powers to displace the INA's statutory provisions protecting noncitizens in the United States. But if the Proclamation did so, it would be an even more extreme example of presidential overreach than the one the Supreme Court struck down in *Youngstown*. Whatever the outer limits of the President's constitutional authorities, the President lacks "conclusive and preclusive" powers that would permit him to wipe away the

10

immigration statutes protecting noncitizens in the United States. *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring).

The Court should grant a nationwide preliminary injunction to Plaintiffs—including the proposed class that the Individual Plaintiffs seek to represent—prohibiting Defendants from implementing or enforcing the Proclamation to limit statutory protections for noncitizens who are or have been physically present in the United States. Plaintiffs' motion does not seek relief against the Proclamation's implementation to prevent noncitizens from ever physically reaching U.S. territory. *Cf. Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606, 614-21 (9th Cir. 2024) (holding that the government violated 8 U.S.C. §§ 1158(a)(1) and 1225(a) by implementing a "metering" policy that resulted in turning back noncitizens approaching U.S. border ports of entry).

## LEGAL AND FACTUAL BACKGROUND

### I.     Congress Has Comprehensively Regulated Entry And Removal.

The Constitution vests in Congress "plenary power over immigration." *SEC v. Jarkesy*, 603 U.S. 109, 129 (2024). Congress's power in this sphere extends not only to "mak[ing] rules for the admission of [noncitizens]," but also "to exclud[ing] those who possess those characteristics which Congress has forbidden.'" *Id.* (quoting *Boutilier v. INS*, 387 U.S. 118, 123 (1967)). The Executive Branch has long recognized that "[w]here Congress has acted, the regulation of immigration is an area in which Congress exercises plenary power." Theodore B. Olson, *Proposed Interdiction of Haitian Flag Vessels*, 5 Op. O.L.C. 242, 244 (1981).

In the INA, Congress has exercised this power to craft a comprehensive scheme of laws governing the entry and removal of noncitizens. 8 U.S.C. § 1101, *et seq.* Here, two aspects of those laws are particularly relevant: (1) the laws governing which noncitizens may lawfully enter the

United States, and (2) the laws governing the removal of noncitizens in the United States and the avenues for relief from removal available to those noncitizens.

**A.    Congress Has Determined Who May Lawfully Enter The United States, While Authorizing The President To Impose Certain Additional Limitations.**

Congress has prescribed detailed procedures governing which noncitizens may lawfully enter the United States and the procedures they must follow to do so—setting forth a system specifying which noncitizens may be issued visas and admitted to the United States as immigrants and nonimmigrants. *See* 8 U.S.C. §§ 1151-57, 1181-82. In particular, via Section 212 of the INA, entitled "Inadmissible [noncitizens]," Congress has established which noncitizens may and may not be admitted to the United States. As the Supreme Court has explained, Section 212 as a whole "defines the universe of [noncitizens] who are admissible into the United States (and therefore eligible to receive a visa)." *Trump v. Hawaii*, 585 U.S. 667, 695 (2018). For example, Section 212(a) identifies categories of noncitizens who "are ineligible to receive visas and ineligible to be admitted to the United States," including based on health, criminal, and security related grounds. 8 U.S.C. § 1182(a). Section 212(b) then requires notice of a determination of inadmissibility. And Section 212(d) allows for the temporary admission of some noncitizens who are otherwise inadmissible. The remainder of Section 212 includes all manner of provisions governing admissibility. *See, e.g.*, *id.* § 1182(a) (health-related inadmissibility grounds); *id.* § 1182(a)(7)(A) (inadmissibility grounds for noncitizens who lack valid visas or other entry documents); *id.* § 1182(b) (providing for written notice of denial of a visa); *id.* § 1182(d) (authorizing the Attorney General to temporarily waive a noncitizen's inadmissibility if doing so is in the national interest); *id.* § 1182(j) (providing additional requirements for noncitizens coming to the United States to

receive graduate medical education); *id.* § 1182(m) (setting out requirements for admission for nonimmigrant nurses).

The sixth of Section 212's twenty subsections, Section 212(f), authorizes the President to impose certain additional limitations. It states that, when the President determines that the entry of certain noncitizens "would be detrimental to the interests of the United States, [the President] may by proclamation, and for such period as he shall deem necessary suspend the entry of all [noncitizens] or any class of" noncitizens or "impose on the entry of [noncitizens] any restrictions [the President] may deem to be appropriate." 8 U.S.C. § 1182(f).

The Proclamation also relies on Section 215(a) of the INA, 8 U.S.C. § 1185(a). In Section 215, Congress has enacted a set of provisions concerning "Travel control." *Id.* § 1185. Section 215(a)(1) provides that "[u]nless otherwise ordered by the President, it shall be unlawful … for any [noncitizen] to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1). Congress also prohibited the use of false or fraudulent means of entry. *See id.* § 1185(a)(2)-(7).

### B.     Congress Has Enacted Protections For Noncitizens In The United States, Without Authorizing The President To Abrogate Those Protections.

Inevitably, many noncitizens—including many asylum seekers—arrive in the United States even though they are inadmissible. Some present at ports of entry; others "enter between ports of entry out of necessity" because they "have no choice but to cross into a safe country irregularly prior to making an asylum claim." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 673 (9th Cir. 2021) (citation omitted).  And via a separate set of INA provisions, Congress has enacted a comprehensive system providing noncitizens who are physically present in the United

13

States, regardless of how they came to be here, with assurances that they will have an opportunity to seek asylum in the United States and that they will not be removed to a country in which they are likely to suffer persecution or torture.

The asylum statute—which was amended to its current form in 1996, *see* Pub L. No. 104-208, § 604(a), 110 Stat. 3009-690 (1996)—provides that "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival … ), irrespective of such [noncitizen's] status," "may apply" for asylum. 8 U.S.C. § 1158(a)(1). To qualify for asylum, a noncitizen must show a "well-founded fear of persecution" on account of "race, religion, nationality, membership in a particular social group, or political opinion," *id.* § 1101(a)(42) and must not be subject to any of the exceptions or bars to asylum, *see id.* § 1158(a)(2), (b)(2)(A). Congress has authorized DHS and DOJ to promulgate regulations implementing this provision, *see id.* § 1158(b)(1)(A), and both agencies have done so, *see, e.g.*, 8 C.F.R. § 208.13 (DHS); 8 C.F.R. § 1208.13 (DOJ).

Congress has barred certain noncitizens from applying for or receiving asylum. 8 U.S.C. § 1158(a)(2), (b)(2)(A). Congress also granted DHS and DOJ authority to "establish additional limitations and conditions … under which a [noncitizen] shall be ineligible for asylum," but only if those limitations are "consistent with [this section]." 8 U.S.C. § 1158(b)(2)(C); *see also id.* § 1158(d)(5)(B) (stating that "[t]he Attorney General my provide by regulation for any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter"). With the exception of certain specific inadmissibility grounds expressly listed as bars to asylum in Section 1158, *see* 8 U.S.C. § 1158(b)(2)(A)(v), noncitizens can qualify for asylum even if they are otherwise inadmissible. *See, e.g.*, *E. Bay Sanctuary Covenant*, 993 F.3d at 671-74.

14

In addition to asylum, the INA provides noncitizens additional forms of nondiscretionary humanitarian protection. Congress has, via two statutes, expressly prohibited the government from removing noncitizens to countries in which they would likely face persecution or torture. First, the withholding of removal statute, enacted in its modern form as part of the Refugee Act of 1980, Pub. L. No. 96-212, § 203(e), 94 Stat. 102, 107, states that a noncitizen may not be removed to a country in which her "life or freedom would be threatened … because of [her] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). If an applicant demonstrates that such harm is more likely than not to occur, *see INS v. Stevic*, 467 U.S. 407, 429-30 (1984), withholding of removal is mandatory. The Supreme Court has recognized that this provision was adopted in light of the United States' treaty obligations under the 1967 United Nations Protocol Relating to the Status of Refugees. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 432-35, 436-38 (1987).

Second, Congress has prohibited the government from returning a noncitizen "to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." 8 U.S.C. § 1231 note. This prohibition stems from the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231), which Congress enacted to implement the United Nations Convention Against Torture ("CAT"). Under DHS and DOJ regulations, to qualify for CAT protection, noncitizens must establish "that it is more likely than not that [they] … would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c) (DHS); *see* 8 C.F.R. § 1208.16(c) (DOJ); *see also* 8 C.F.R. § 208.18(a)(2) (defining "torture" for purposes of the CAT).

Congress has also enacted comprehensive procedures that govern removal proceedings and ensure that noncitizens have a fair chance to present valid claims for asylum, withholding of removal, and CAT protection. "Unless otherwise specified" elsewhere in the INA, a removal proceeding under Section 240 of the INA, 8 U.S.C. § 1229a, is "the sole and exclusive procedure" by which the government may determine whether to remove an individual. 8 U.S.C. § 1229a(a)(3). In Section 240 proceedings, noncitizens receive full adversarial hearings in immigration court before immigration judges ("IJs"), along with a host of attendant procedural rights. For example, noncitizens have the right to contest the factual and legal allegations, the right to present evidence in their defense, the right to retain and be represented by counsel, and the right to apply for relief from removal, including under the asylum and withholding of removal statutes and the CAT. *See* 8 U.S.C. § 1229a(b)(4)(A)-(B). Should the IJ render an adverse decision, the noncitizen also has a right to seek appellate review before the Board of Immigration Appeals, a federal court of appeals, and the Supreme Court. *See* 8 U.S.C. §§ 1229a(5), 1252(a)(1); 8 C.F.R. § 1003.1(b)(3).

One procedure "otherwise specified" in the INA, 8 U.S.C. § 1229a(a)(3), is an expedited removal proceeding under 8 U.S.C. § 1225(b)(1). Enacted in 1996 to "substantially shorten and speed up the removal process" for a limited class of noncitizens who arrive without immigration documents or attempt to enter by fraud, *Make the Road N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020); *see* 8 U.S.C. § 1225(b)(1)(A); *id* § 1182(a)(6)(C), (a)(7), expedited removal proceedings nevertheless contain their own carefully crafted procedural protections.

Noncitizens subject to expedited removal who indicate a fear of persecution or an intention to seek asylum must be screened to determine whether they have a "credible fear of persecution," meaning a "significant possibility" that they "could establish eligibility for asylum" in removal proceedings. 8 U.S.C. § 1225(b)(1)(A)(ii), (b)(1)(B)(v). These credible fear interviews are

16

conducted by asylum officers and are subject to review by an immigration judge. *See* 8 U.S.C. § 1225(b)(1)(B)(i), (b)(1)(B)(iii)(III); 8 C.F.R. § 208.30. Moreover, the statute requires the Attorney General to "provide information concerning the asylum interview … to [noncitizens] who may be eligible," and states that such noncitizens "may consult with a person or persons of [their] choosing prior to the interview or any review thereof." 8 U.S.C. § 1225(b)(1)(B)(iv). If the asylum officer determines that an applicant does not satisfy the "low screening standard" of the credible fear interview, 142 Cong. Rec. 25,347 (1996), and the IJ affirms that determination, the applicant may be removed "without further hearing or review." *Id.* § 1225(b)(1)(A)(i), (B)(iii); *see id.* § 1252(a)(2)(A), (e). But a noncitizen who *does* meet that screening standard is placed in a full removal proceeding under Section 240, with all the procedural trappings, administrative review, and judicial review that go along with it. *See* 8 C.F.R. § 1208.30(g)(2)(iv)(B).

Taken together, Section 240 and expedited removal proceedings help balance Congress's desire to facilitate "efficient removal" against "a second, equally important goal: ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020). During the credible fear process, asylum officers also screen applicants for potential eligibility for withholding of removal and CAT protection. 8 C.F.R. § 208.30(e)(2)-(3) (DHS); 8 C.F.R. § 1208.30(g)(2)(iv) (DOJ).

## C.    For Decades, The Executive Branch Has Understood That The President Has No Authority To Displace The Protections Congress Has Enacted.

No previous administration has ever claimed that Section 212(f) gives the President the power to displace the asylum statute or other forms of protection. The first proclamation invoking Section 212(f), issued by President Reagan in 1981, did not claim any authority to override the asylum statute or other immigration laws. Proclamation No. 4865, 46 Fed. Reg. 48107 (Sept. 29,

1981). Three years later, in 1984, Assistant Attorney General for the Office of Legal Counsel Theodore B. Olson confronted the question whether Section 212(f) permitted the President to "eliminate the asylum rights of noncitizens who had hijacked a plane and, as a condition of the plane's release, been flown to the United States," and concluded that it did not. *See* 89 Fed. Reg. 81156, 81163 n.53 (Oct. 7, 2024). Since then, it has been "the Executive Branch's consistent position for four decades" that "section 212(f) does not affect the right to pursue a claim for asylum"—a "longstanding understanding [that] follows from the text and structure of the governing statutes." *Id.* at 81163. Until the current Proclamation, "[a]lthough Presidents ha[d] invoked section 212(f) at least 90 times since 1981 … none of those proclamations were understood to affect the right of noncitizens on U.S. soil to apply for, or noncitizens' statutory eligibility to receive, asylum." *Id.* at 81163 n.53.

President Trump's first administration shared that consistent understanding. In 2018, President Trump invoked Section 212(f) to deny "entry" to noncitizens who entered across the southern border outside ports of entry. *See* Proclamation No. 9822, 83 Fed. Reg. 57661 (Nov. 9, 2018) (the "2018 Proclamation"). But as noted, the 2018 Proclamation did not claim that Section 212(f) also authorized the President to prevent noncitizens physically present in the United States from seeking asylum, withholding of removal, or CAT protection. And when DHS and DOJ promulgated a regulation implementing the 2018 Proclamation, the agencies affirmed the Executive Branch's longstanding position that a noncitizen "whose entry is suspended or restricted under … a [Section 212(f)] proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the [noncitizen] should not be in the United States, would remain subject to various procedures under immigration laws[,]" including the right "to raise any claims for protection" pursuant to the asylum and credible fear statutes. 83 Fed. Reg. 55934, 55940

18

(Nov. 9, 2018). DOJ and DHS therefore separately invoked their own rulemaking authority under 8 U.S.C. § 1158(b)(2)(C) to issue a rule that would make noncitizens who entered in violation of the proclamation ineligible for asylum.

This Court held that rule invalid, concluding that it violated the requirement that additional limitations or conditions must be "consistent with" the asylum statute. *O.A.*, 404 F. Supp. 3d at 147-50; *accord E. Bay Sanctuary Covenant*, 993 F.3d 640. In particular, because Congress determined that noncitizens may seek asylum "whether or not" they entered "at a designated port of arrival," the government may not exclude noncitizens from asylum simply because they crossed between ports of entry. *O.A.*, 404 F. Supp. 3d at 147-50. And when the government took the position in litigation that the rule was nonetheless valid because it was meant to enforce a proclamation issued pursuant to Section 212(f)—despite the acknowledgment in the rule itself that Section 212(f) did not give the President authority to override the asylum statute—this Court explicitly rejected that argument. *See id.* at 150-51.

## II.    The Proclamation Shatters The Executive Branch's Decades-Long Understanding By Claiming Authority To Wipe Away Asylum And Other Forms Of Protection.

The Proclamation at issue here goes much further than the 2018 rule this Court invalidated. It is substantively more extreme in multiple respects: It applies not just to people who cross between ports of entry but also to those who present at ports of entry, and it limits access not just to asylum but also to other forms of protection. The Proclamation, moreover, is a vastly more aggressive assertion of Presidential power, claiming the authority to wipe away the protection scheme enacted by Congress.

In November and December 2024, encounters at the border with Mexico—both at and between ports of entry—fell to the "lowest level since August 2020 and lower than the monthly

19

average for 2019." CBP, *CBP Releases December 2024 Monthly Update*, https://www.cbp.gov/newsroom/national-media-release/cbp-releases-december-2024-monthly-update (Jan. 14, 2025). The Proclamation's preamble nonetheless states that the President "ha[s] determined that the current situation at the southern border qualifies as an invasion under Article IV, Section 4 of the Constitution of the United States." Proclamation, Preamble, 90 Fed. Reg. at 8335; *see* U.S. Const., art. IV, § 4.

In response to this purported "invasion," Section 1 of the Proclamation invokes "[s]ections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a)" to "direct[] that entry into the United States" of noncitizens engaged in the supposed "invasion ... be suspended until [the President] issue[s] a finding that the invasion … has ceased." Proclamation, § 1, 90 Fed. Reg. at 8335. That directive is based on the President's assertion "that the entry into the United States … of [noncitizens] engaged in the invasion across the southern border is detrimental to the interests of the United States." *Id.*

Section 2, also relying upon Sections 212(f) and 215(a), directs that noncitizens "engaged in the" supposed "invasion across the southern border … are restricted from invoking provisions of the INA that would permit their continued presence in the United States, including, but not limited to, [the asylum statute], 8 U.S.C. 1158." Proclamation, § 2, 90 Fed. Reg. at 8335 (citing statutory authority).

Section 3 invokes Sections 212(f) and 215(a) to suspend both "entry" and "access to provisions of the INA that would permit … continued presence in the United States" for any noncitizen "who fails, before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable

fulfillment of the requirements of sections 212(a)(1)-(3) of the INA, 8 U.S.C. 1182(a)(1)-(3)." *Id.* This provision is apparently not limited to noncitizens deemed to be participating in an "invasion."

Section 4—entitled "Constitutional Suspension of Physical Entry"—invokes "Article II of the Constitution of the United States, including [the President's] control over foreign affairs" and "the guarantee of protection against invasion required by Article IV, Section 4." Section 4 relies on this constitutional authority to "suspend the physical entry" of noncitizens at the southern border, and it directs DHS (in coordination with DOJ and the State Department) "to take appropriate actions as may be necessary to achieve the objectives of this proclamation." *Id.* § 4, 90 Fed. Reg. at 8335-36.

It is unclear whether Section 4 purports to apply to noncitizens who are already physically present in the United States or is instead solely a directive intended to prevent noncitizens from physically reaching the United States in the first place. And if Section 4 is intended to apply to noncitizens within the United States, it is unclear whether Section 4 asserts that the Constitution allows the President to displace the asylum statute and other statutory protections: Unlike Section 2, Section 4 does not mention the asylum statute or restricting access to INA provisions. The Proclamation's preamble, however, asserts that "the President's inherent powers to control the borders of the United States … necessarily include the ability [both] to prevent the physical entry of aliens involved in an invasion in the United States, *and to rapidly repatriate them* to an alternative location." *Id.*, Preamble, 90 Fed. Reg. at 8335 (emphasis added).

Section 5 directs the DHS Secretary "in coordination with the Secretary of State and the Attorney General, [to] take all appropriate action to repel, repatriate, or remove" all noncitizens engaged in the "invasion across the southern border" until the President "issue[s] a finding that the invasion at the southern border has ceased." *Id.* § 5, 90 Fed. Reg. at 8336.

21

**III.    Defendants' Enforcement Of The Proclamation Is Harming Plaintiffs.**

Defendants have enforced the Proclamation's directives according to its terms, including by precluding access to asylum and other forms of protection in violation of Congress's statutes—and, in so doing, have inflicted grave harms on Plaintiffs.

The Individual Plaintiffs came to the United States to seek asylum from persecution or torture in their countries of origin. Customs and Border Protection, however, released internal guidance that, pursuant to the Proclamation, "migrants will not be allowed to see an immigration judge or asylum officer." Camillo Montoya-Galvez, *U.S. Border Agents Told to Summarily Deport Migrants Without Granting Asylum Hearings Under Trump Edict*, CBS News (Jan. 22, 2025), https://www.cbsnews.com/news/trump-deportations-migrants-border-asylum-hearings/    ("Two Customs and Border Protection officials, who requested anonymity to discuss internal guidance, said migrants will not be allowed to see an immigration judge or asylum officer under Mr. Trump's edict, which effectively suspends U.S. obligations under domestic and international law to ensure people fleeing persecution are not returned to danger."). As such, the Individual Plaintiffs have not been able to pursue their legal right to seek asylum or other forms of protection in the United States.

Individual Plaintiffs A.M., Z.A., T.A., A.T., M.A., N.S., B.R., and G.A. all crossed the southern border after the Proclamation took effect and are currently detained by DHS in the United States. Under the Proclamation, they are subject to imminent removal without being able to seek protection. By a separate concurrently filed motion, these Individual Plaintiffs currently in the United States seek a stay of their removal pending the resolution of this case.

Plaintiffs A.M. and Z.A. fled Afghanistan with their two young children, Plaintiffs T.A. and A.T. A.M. Decl. ¶¶ 1-2.[1] They fear persecution by the Taliban because of their social views and perceived support for the United States. *Id.* ¶¶ 2-4, 9, 16. Plaintiff M.A. was repeatedly jailed and tortured in Egypt by the ruling dictatorship because of his pro-democracy views. M.A. Decl. ¶¶ 2-3, 11. Plaintiff N.S. fled Ecuador to escape horrific violence and kidnapping by her former partner, a police officer who called her anti-indigenous slurs while raping her, beating her, and holding his gun to her head. N.S. Decl. ¶¶ 4-5, 11-12. Plaintiff B.R. survived kidnapping, rape, and torture by a cartel in Ecuador that targeted her because of her ethnicity and family ties; she fears the cartel will kill her if she is removed. B.R. Decl. ¶¶ 1-4, 15. Plaintiff G.A. fled severe domestic violence that she was unable to escape in Brazil despite numerous attempts to rely on the government there for help. G.A. Decl. ¶¶ 1-10.

Individual Plaintiffs D.G, F.A., K.A., Y.A., and E.G. also fled persecution and torture in their countries of origin and crossed the southern border after the Proclamation took effect—but because of the Proclamation they have already been removed without being able to seek protection.

Plaintiff D.G. fled Cuba after being repeatedly jailed because of his opposition to the ruling dictatorship, and he crossed into the United States after being kidnapped and held for ransom two different times in Mexico. D.G. Decl. ¶¶ 1-10, 13. He was removed to Mexico under the Proclamation without being able to apply for asylum or other protection. *Id.* ¶ 12. Plaintiff F.A. and her two minor children K.A. and Y.A. fled Turkey because of persecution due to their family's involvement with a political movement that has been targeted by the Turkish government. F.A. Dec. ¶¶ 1-9, 14. F.A. Decl. Her husband—the children's father—fled Turkey last fall and is

---

[1] Declarations of the Individual Plaintiffs are attached as exhibits to the concurrently filed Sealed Motion for Leave to Proceed Under Pseudonyms and to File Supporting Exhibits Under Seal and incorporated by reference here.

currently in the United States pursuing an asylum application. *Id.* ¶¶ 6-7. But F.A. and her children were removed to Panama under the Proclamation without the chance to seek protection, and now face deportation back to Turkey. *Id.* ¶¶ 10-13. Plaintiff E.G. experienced brutal persecution and torture in Peru—including multiple rapes and death threats—on account of his sexual orientation but was removed to Peru under the Proclamation without being able to seek protection. E.G. Decl. ¶¶ 1-14.

The Proclamation has also directly harmed the Organizational Plaintiffs—the Refugee and Immigrant Center for Education and Legal Services ("RAICES"), Las Americas Immigrant Advocacy Center ("Las Americas"), and Florence Immigrant & Refugee Rights Project ("FIRRP"). The core day-to-day work and mission of all three Organizational Plaintiffs involves representing noncitizens who cross the southern border fleeing persecution and torture to seek asylum and other protection in the United States. St. John Decl. ¶¶ 2-4, Hidalgo Decl. ¶¶ 3, 7; Babaie Decl. ¶¶ 6, 11. By effectively eliminating asylum for noncitizens who cross the Southern border, the Proclamation seriously impedes this work. The Proclamation also frustrates the Organizational Plaintiffs' core work of educating noncitizens about their rights under U.S. immigration law, because of the uncertainty about how the Proclamation conflicts with the statutes regarding asylum, withholding, and CAT. St. John Decl. ¶ 17; Hidalgo Decl. ¶ 17; Babaie Decl. ¶ 15. The Organizational Plaintiffs have had to divert resources to understand the Proclamation and its impact on access to asylum and to create new educational resources for asylum seekers to understand the process and their rights. St. John Decl. ¶ 12; Hidalgo Decl. ¶¶ 11-12; Babaie Decl. ¶ 37. Finally, both Las Americas and the Florence Project face lost funding because the Proclamation means that they will be able to represent fewer asylum seekers going forward. St. John Decl. ¶ 20; Babaie Decl. ¶¶ 32-35.

24

## ARGUMENT

This Court should grant Plaintiffs' request for a preliminary injunction preventing Defendants from implementing or enforcing the Proclamation's directive to limit the statutory protections that Congress provided in the Immigration and Nationality Act to noncitizens who are physically present in the United States. To obtain a preliminary injunction, "the movant must show: (1) 'he is likely to succeed on the merits,' (2) 'he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in his favor,' and (4) issuing 'an injunction is in the public interest.'" *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20 (2008)).

Each factor supports a preliminary injunction here. The Proclamation plainly violates federal law, and none of the sources of law upon which the Proclamation relies—Section 212(f), Section 215(a)(1), or the Constitution—justify the Executive Branch's attempts to override Congress's statutes. Indeed, this Court's decision in *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019), correctly observed that the President lacks the authority that the Proclamation claims. Absent an injunction, Defendants' actions in implementing and enforcing the Proclamation will cause Plaintiffs irreparable harm. And both the balance of equities and the public interest favor the issuance of preliminary relief.

## I.  Plaintiffs Are Likely To Succeed On The Merits Of Their Claims.

Plaintiffs are likely to succeed in showing that the Proclamation and Defendants' implementation of it are unlawful. The Proclamation expressly "restrict[s]" noncitizens "from invoking the provisions of the INA that would permit their continued presence in the United States," including the asylum statute. Proclamation, §§ 2-3, 90 Fed. Reg. at 8335-36. It therefore violates multiple critical statutory protections described above. *See* pp. 13-17, *supra*. So the only

25

question is: Does the President have the power to wipe away these statutory protections with the stroke of a pen? The answer is no.

### A.  Congress Has Not Authorized The Proclamation's Violations Of The INA.

To begin, Section 212(f) does not authorize removal *at all*. While the provision authorizes the President to "suspend" or "restrict[]" the "entry" of noncitizens into the United States, 8 U.S.C. § 1182(f), it does not mention removal from the United States. Other INA provisions that authorize removals do so explicitly. *See, e.g.*, 8 U.S.C. § 1225(b)(1)(A)(i), (b)(1)(B)(iii) (authorizing removal "without further hearing or review" in certain circumstances); *see also id.* § 1231(a)(1)(A) (providing for execution of removal "when a [noncitizen] is ordered removed"). The authority to suspend or restrict "entry" is different from the power to remove noncitizens who are already physically present. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted).

Here, moreover, the Court need not rely only on a presumption. Congress has expressly said as much: "Unless otherwise specified" in the INA, Section 240 removal proceedings are "the sole and exclusive procedure" by which the government may order a noncitizen removed. 8 U.S.C. § 1229a(a)(3). Because no removal procedure is "specified in" Section 212(f), that provision cannot give the President the authority to bypass the exclusive procedures that Congress *has* specified. Yet, that is precisely what Defendants have done.

Section 212(f) certainly does not provide authority to remove noncitizens physically present in the United States *in violation of* the statutory protections from such removals enacted by Congress in the INA, as this Court correctly recognized in *O.A.* There, the Court rightly noted

26

that the 2018 Proclamation—which was issued pursuant to Sections 212(f) and 215(a)(1), *see* 83 Fed. Reg. at 57663—was "not premised on any authority to alter or supplant the rules that Congress specified in § 1158." *O.A.*, 404 F. Supp. 3d at 151. The statutory text, the INA's structure, and bedrock principles of statutory construction all confirm that Congress did not grant the President authority to override the INA's statutory protections from removals.

First, on its face, Section 212(f)'s authority to "suspend" or "restrict[] … entry" does not authorize the President to abrogate laws that protect noncitizens from removal regardless of the lawfulness of their entry. For example, noncitizens have the right to apply for asylum so long as they are "physically present in the United States." 8 U.S.C. § 1158(a)(1). It is of no moment *how* they came to be physically present, that they might have done so in violation of a Section 212(f) proclamation, or that such a proclamation rendered them inadmissible; the right to apply for asylum exists "irrespective of [the noncitizen's] status." *Id.*; *see O.A.*, 404 F. Supp. 3d at 117. Hence, the authority that Section 212(f) confers does not eliminate the predicates for seeking protections under other provisions of the INA.

Indeed, had Congress intended Section 212(f) to authorize the President to override the asylum statute or other statutory protections, it would have said so explicitly. The INA is replete with provisions—including in Section 212 itself and neighboring sections—that permit or require certain actions "notwithstanding" other statutes. *See, e.g.,* 8 U.S.C. § 1182(d)(3)(B)(i) (specifying judicial review procedure "[n]otwithstanding any other provision of law"); *id.* § 1182(n)(5)(D)(iii) (same); *id.* § 1181(b) (permitting the Attorney General to readmit returning resident immigrants without otherwise-required documentation, "[n]otwithstanding the provisions of section 1182(a)(7)(A)"); § 1182e(a) (prohibiting visa issuance and admission to foreign nationals who have enforced coercive population control policies, "[n]otwithstanding any other provision of

law"); *id.* § 1182f(a) (requiring denial of visas to organ traffickers, "[n]otwithstanding any other provision of law"). But in Section 212(f), Congress conferred no authority to remove noncitizens in violation of protections provided elsewhere in the INA.

Second, Section 212(f)'s location within Section 212 confirms that it that it does not provide such authority. The provision appears amid a host of others in the INA section governing "Inadmissible [noncitizens]." *See* 8 U.S.C. § 1182. As the Supreme Court recognized in *Hawaii*, those provisions together "define[] the universe of [noncitizens] who are admissible into the United States (and therefore eligible to receive a visa)." 585 U.S. at 695. Section 212(f) "operate[s]" within that "sphere[]," *id.*, to authorize the President to make additional classes of persons—beyond those Congress identified in Section 212's other subsections—ineligible to lawfully enter the country "as immigrants or nonimmigrants." 8 U.S.C. § 1182(f). It thus makes perfect sense to read Section 212(f) as empowering the President to impose certain additional limits on lawful entry into the United States. But it makes no sense to read that section as *sub silentio* authorizing the President to displace the statutes that Congress carefully crafted to address other issues—such as asylum—in separate portions of the INA.

Third, it "is a commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (internal quotation marks omitted). Indeed, "[t]hat is particularly true where … Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions," via provisions that are "parts of [the same statutory scheme]." *Id.* (internal quotation marks omitted). Section 212(f) mentions restrictions on "entry" generally but nothing at all about removal or humanitarian protection. By contrast, Congress has spoken clearly and explicitly regarding protections for those who fear persecution or torture in "precisely drawn, detailed statute[s]" that are part of the same

statutory scheme—the INA. *See Brown v. GSA*, 425 U.S. 820, 834 (1976). Those protections, not Section 212(f), govern here.

Fourth, the Proclamation's boundless view of Section 212(f) would render nonsensical the specific limits that Congress imposed on the Executive Branch's power to restrict asylum. Congress authorized DHS and DOJ to establish new limitations on asylum eligibility—but only "by regulation," and only "consistent with" the asylum statute. 8 U.S.C. § 1158(b)(2)(C). But according to the Proclamation, so long as the President acts directly via Section 212(f), rather than indirectly through the DHS Secretary and the Attorney General, he need not go through notice-and-comment and may create even new asylum limits that violate the asylum statute itself—thus "sidestep[ping] the statutory restriction[s] on [his agencies'] authority." *See O.A.*, 404 F. Supp. 3d at 151. Nothing in the INA suggests that Congress intended that unlikely result here.

Fifth, this conclusion is reinforced by the Executive Branch's consistent view for more than four decades that Section 212(f) does not permit the President to override the asylum statute. *See* pp. 9-11, *supra*. "[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *West Virginia v. EPA*, 597 U.S. 697, 725 (2022) (internal quotation marks omitted) (quoting *FTC v. Bunte Brothers, Inc.*, 312 U.S. 349, 352 (1941)). If Section 212(f) permitted the President to switch off the asylum laws and other removal protections at will, previous presidents surely would have been "alert to exercise" that power. And in fact, the executive branch since 1984 has expressly considered whether Section 212(f) conferred such authority—and concluded that it does not. That confirms that the authority does not exist.

Independently, the Proclamation does not even satisfy the predicates for invoking Section 212(f). That provision requires the President to identify "any [noncitizens]" or a "class of [noncitizens]" whose entry "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). The Proclamation's amorphous reference to an "invasion" and noncitizens who are "engaged in the invasion," *see, e.g.*, Proclamation, §§ 1-2, 90 Fed. Reg. at 8335, is not sufficient. Nor does the Proclamation's amorphous reference to an invasion identify a cognizable "interest[]" of the United States" that the relevant provisions of the Proclamation further. Indeed, under the Proclamation the "detriment[]" to the national interest is apparently the mere fact that a substantial numbers of migrants have come to the border without documents and applied for asylum under 8 U.S.C. § 1158. 90 Fed. Reg. at 8333-34. But again, Congress has expressly determined that noncitizens who are physically present in the United States "may apply for asylum," "whether or not" they enter "at a designated port of arrival" and "irrespective of such [noncitizen's] status," 8 U.S.C. § 1158(a)(1)—without limiting that right to only certain circumstances or certain encounter numbers. And the President cannot permissibly invoke, as a supposed "detriment[]," the invocation of rights that Congress has expressly protected (even putting aside that asylum seekers fleeing danger virtually never have documents permitting their entry, and that the number of migrants at the border was at low levels when the Proclamation was issued).

The same is true of Section 3's purported concern that noncitizens do not provide the government in advance with background information relevant to determining their admissibility under 8 U.S.C. § 1182(a)(1) through 1182(a)(3). *See* Proclamation, 90 Fed. Reg. at 8335. To be sure, noncitizens requesting visas must provide that information with their applications. *See* 8 U.S.C. §§ 1202(a)-(c), 1361; *see also Hawaii*, 585 U.S. at 689 (discussing visa application process). But again, Congress established a different rule for asylum seekers: It guaranteed that

30

"any [noncitizen] who is physically present in the United States or who arrives in the United States," "irrespective of [their] status," has the right to "apply for asylum." 8 U.S.C. § 1158(a)(1). And as just explained, Section 212(f) does not permit the President to override Congress's determination.

For similar reasons, the other statute that the Proclamation invokes—Section 215(a)(1) of the INA, 8 U.S.C. § 1185(a)(1)—cannot provide the authority that Section 212(f) does not. That provision is typically invoked in conjunction with Section 1182(f), as in the 2018 Proclamation that yielded the *O.A.* case. *See* 2018 Proclamation, Preamble, 83 Fed. Reg. at 67753. And as the Supreme Court and the government have recognized, Section 215(a)(1) "'substantially overlap[s]' with [Section 212(f)].'" *Hawaii*, 585 U.S. at 683 n.1 (quoting Brief for Petitioners 32-33). So just as with Section 212(f), nothing about Section 215(a)(1)—which renders it "unlawful" to "enter or attempt to … enter" the United States "except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe"—authorizes the President to abrogate other INA provisions providing protections against removal. 8 U.S.C. § 1185(a)(1). After all, those provisions equally protect those who entered "unlawful[ly]," whether that entry was unlawful due to Section 212(f), Section 215(a)(1), or some other reason. Consistent with that straightforward conclusion, the Executive Branch has never before claimed—and has expressly disavowed—that Section 215(a)(1) empowers the President to "impose [a] condition and limitation on asylum eligibility." 89 Fed. Reg. at 81164 n.56.[2]

---

[2] Section 5 of the Proclamation directs DHS "to repel, repatriate, or remove" noncitizens engaged in the supposed "invasion" across the southern border. Proclamation, § 5, 90 Fed. Reg. at 8336. To the extent the Proclamation purports to authorize Defendants to physically expel noncitizens from the United States using some label other than "removal," it is unlawful for all the same reasons discussed above.

**B.      The Constitution Does Not Authorize The President To Abrogate The Relevant Provisions Of The INA.**

As explained above, *see* pp. 12-13, *supra*, it is unclear whether the Proclamation purports to rely on the President's constitutional powers to remove noncitizens who are physically present in the United States in violation of the statutes that otherwise preclude the government from doing so. To the extent the Proclamation does so, however, it is unlawful. Neither Article II nor the Invasion Clause in Article IV, Section 4 provides such authority.

Where, as here, "'the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.'" *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring). "To succeed in [*Youngstown*'s] third category, the President's asserted power must be both 'exclusive' and 'conclusive' on the issue." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). "[W]hen a Presidential power is 'exclusive,' it 'disabl[es] the Congress from acting upon the subject.'" *Id.* at 29-30 (quoting *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring)).

But just the opposite is true here. The Supreme Court has recently emphasized that the Constitution vests in Congress "plenary power over immigration." *Jarkesy*, 603 U.S. at 129. And that is just the latest in a long line of cases recognizing that the constitutional authority to formulate "[p]olicies pertaining to the entry of [noncitizens] and their right to remain" in the United States "is entrusted *exclusively to Congress*." *Galvan v. Press*, 347 U.S. 522, 531 (1954) (emphasis added). Pursuant to that authority, "Congress has specified which [noncitizens] may be removed from the United States and the procedures for doing so." *Arizona v. United States*, 567 U.S. 387,

396 (2012). Because Congress indisputably has the authority to enact laws governing the removal of noncitizens—and so is not "disabl[ed] . . . from acting upon the subject"—the President's power concerning such removals is not "exclusive." *See Zivotofsky*, 576 U.S. at 10. Nor is there anything to the contrary in *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950), from which the Proclamation wrenches out-of-context quotations. The Court there held that because the exclusion of noncitizens also implicates aspects of executive power, Congress can permissibly delegate certain determinations to the President. *Id*. That provides no support for an argument that the President can disregard the specific limits Congress has imposed.

As for Article IV's Invasion Clause, it does not even mention the President, much less grant the President any exclusive authority. It instead sets forth an *obligation* that applies to the *entire federal government*—that "[t]he United States … shall protect each [State] against Invasion." U.S. Const. art. IV, § 4; *see Torres v. Tex. Dep't of Pub. Safety*, 597 U.S. 580, 590 (2022) ("the Federal Government is charged with 'protect[ing] each' State 'against Invasion'"). Further, while the Clause refers to the federal government at large, the Supreme Court has long held "the power to carry into effect the clause of guaranty is primarily a legislative power, and resides in Congress." *See, e.g.*, *Texas v. White*, 74 U.S. 700, 701 (1868), *overruled on other grounds by Morgan v. United States*, 113 U.S. 476 (1885). The Invasion Clause's promise does not empower the President to displace the laws that Congress has enacted for the "United States."

Any reliance on the Invasion Clause would fail for another, independent reason: No text, history, or precedent supports the claim that immigration can constitute an "invasion." *See United States v. Texas*, 719 F. Supp. 3d 640, 679-89 (W.D. Tex. 2024) (cataloging relevant constitutional provisions, Founding-era dictionaries, references in Federalist Papers, legislation by early Congresses, and other contemporaneous sources confirming that the word "invasion" as used in

33

the Constitution refers to military invasion and does not encompass immigration). The notion that asylum seekers fleeing persecution and torture could constitute an "invasion" under the Clause is particularly absurd. As just explained, any power conferred by the Invasion Clause resides with Congress. And Congress has explicitly granted noncitizens "who arrive[] in the United States" with the statutory right to apply for asylum "whether or not at a designated port of arrival." 8 U.S.C. § 1158(a)(1). Noncitizens' exercise of that statutory right—granted pursuant to Congress's Article I power over immigration—is not an "invasion" within the meaning of Article IV.

## II.    Plaintiffs Satisfy The Other Requirements For A Preliminary Injunction.

The remaining three preliminary-injunction factors—whether Plaintiffs are likely to suffer irreparable harm, the balance of equities, and the public interest, *see Hanson*, 120 F.4th at 231—all support the entry of Plaintiffs' requested injunction.

*Irreparable Harm.* Without an injunction preventing Defendants from continuing to implement and enforce the Proclamation, Plaintiffs will suffer irreparable harm. The Individual Plaintiffs are noncitizens fleeing persecution and torture who face imminent danger if removed. *See* A.M. Decl. ¶¶ 1-4, 9, 16; M.A. Decl. ¶¶ 2-3, 11; N.S. Decl. ¶¶ 4-5, 11-12, 15; B.R. Decl. ¶ 1-4, 15; G.A. Decl. ¶¶ 1-10.  Yet under the Proclamation, the Individual Plaintiffs and the class they seek to represent can be removed to these dangers notwithstanding the protections Congress has provided.

If Defendants are permitted to summarily remove Individual Plaintiffs and members of the proposed class without allowing them to invoke the statutory protections Congress has provided, they will suffer irreparable harm. Courts in this District have repeatedly held that the threat of removal in violation of these protections constitutes irreparable injury. *See, e.g.*, *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 57 (D.D.C. 2020); *A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 221 (D.D.C.

2020); *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 545-46 (D.D.C. 2020); *Grace v. Whitaker*, 344 F. Supp. 3d 96, 146 (D.D.C. 2018), *rev'd in part on other grounds*, 965 F.3d 883 (D.C. Cir. 2020).

The Organizational Plaintiffs will likewise suffer irreparable harm absent an injunction. Defendants' actions to summarily remove noncitizens without providing them access to the substantive and procedural protections required under the INA will cause Organizational Plaintiffs irreparable harm in the form of significant disruption to their missions and core work, diversion of resources, and loss of funding. *See* pp. 15-16, *supra*; St. John Decl. ¶¶ 12-20; Hidalgo Decl. ¶¶ 11-20; Babaie Decl. ¶¶ 19-23, 25-39; *see E. Bay Sanctuary Covenant*, 993 F.3d at 677-78.

***Balance of the Equities and the Public Interest.*** The balance of the equities and the public interest likewise strongly support a preliminary injunction. As just explained, Plaintiffs face irreparable harm in the form of summary removal and potential subjection to torture and persecution.

Meanwhile, Defendants will suffer no harm whatsoever from complying with the INA. Defendants' actions flagrantly violate federal statutes and depend on an unprecedented claim of authority that imperils the separation of powers. In those circumstances, the public interest weighs strongly in favor of the government abiding by federal law, *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016), and protecting "the separation of powers [that is] fundamental to the fabric of our democracy," *Hicks v. Bush*, 397 F. Supp. 3d 36, 43 (D.D.C. 2005); *cf. Bond v. United States* 564 U.S. 211 (2011) ("The structural principles secured by the separation of powers protect the individual as well."); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 576 (1992) (discussing "the public interest in Government observance of the Constitution and laws").

The public interest in proper application of federal law is particularly powerful here, because "the public has an interest in 'preventing [noncitizens] from being wrongfully removed,

particularly to countries where they are likely to face substantial harm.'" *A.B.-B.*, 548 F. Supp. 3d at 222 (quoting *Nken v. Holder*, 556 U.S. 418, 436 (2009)); *accord, e.g.*, *Kiakombua*, 498 F. Supp. 3d at 57; *P.J.E.S.*, 502 F. Supp. 3d at 546-47; *Grace*, 344 F. Supp. at 146; *see also, e.g.*, *Tesfamichael v. Gonzales*, 411 F.3d 169, 178 (5th Cir. 2005) (The "public interest [favors] having the immigration laws applied correctly and evenhandedly."). Moreover, under the unlawful Proclamation, the United States is currently acting in contravention of its statutory and treaty obligations to protect people fleeing persecution and torture. *See, e.g.*, *Cardoza-Fonseca*, 480 U.S. at, 436 (stating that the Refugee Act was meant "to bring United States refugee law into conformance" with international refugee treaties). Again, "it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands." 8 U.S.C. § 1521 note. That longstanding policy reflects "one of the oldest themes in America's history—welcoming homeless refugees to our shores," and it "gives statutory meaning to our national commitment to human rights and humanitarian concerns." S. Rep. No. 96-256, at 1 (1979), *reprinted in* 1980 U.S.C.C.A.N. 141.

## CONCLUSION

For the foregoing reasons, this Court should grant a classwide preliminary injunction (1) prohibiting Defendants from implementing or enforcing the Proclamation to restrict statutory protections that Congress has provided for noncitizens who are physically present in the United States; and (2) prohibiting Defendants from relying on any removal orders issued to noncitizens pursuant to the Proclamation.

Dated: February 19, 2025                          Respectfully submitted,

                                                  /s/ Lee Gelernt

36

Keren Zwick (D.D.C. Bar. No. IL0055)
Richard Caldarone (D.C. Bar No. 989575)*
Mary Georgevich*
National Immigrant Justice Center
111 W. Jackson Blvd.,
  Suite 800
Chicago, IL 60604
T: 312-660-1370
kzwick@immigrantjustice.org
rcaldarone@immigrantjustice.org
mgeorgevich@immigrantjustice.org

Melissa Crow (D.C. Bar. No. 453487)
Center for Gender & Refugee Studies
1121 14th Street, NW, Suite 200
Washington, D.C. 20005
T: 202-355-4471
crowmelissa@uclawsf.edu

Edith Sangueza*
Center for Gender & Refugee Studies
26 Broadway, 3rd Floor
New York, NY 10004
T: 415-581-8835
sanguezaedith@uclawsf.edu

Robert Pauw*
Center for Gender & Refugee Studies
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: 206-682-1080
rpauw@ghp-law.net

Tamara Goodlette (D.C. Bar. No.
TX24117561)
Texas Civil Rights Project
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 207
tami@texascivilrightsproject.org

Lee Gelernt (D.D.C. Bar No. NY0408)
Omar C. Jadwat*
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
lgelernt@aclu.org
ojadwat@aclu.org

Morgan Russell*
Katrina Eiland*
Cody Wofsy (D.D.C. Bar No. CA00103)
Spencer Amdur*
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, Suite 700
San Francisco, CA 94104
T: 415-343-0770
mrussell@aclu.org
keiland@aclu.org
cwofsy@aclu.org
samdur@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
aspitzer@acludc.org
smichelman@acludc.org

Ashley Alcantara Harris*
David A. Donatti*
ACLU Foundation of Texas
P.O. Box 8306
Houston, TX 77288
TEL: (713) 942-8146
FAX: (713) 942-8966
aharris@aclutx.org
ddonatti@aclutx.org

*Attorneys for Plaintiffs*

*Certificate of pro bono representation or pro hac vice forthcoming*