# DECLARATION OF JENNIFER BABAIE
## LAS AMERICAS IMMIGRANT ADVOCACY CENTER

I, Jennifer Babaie, make the following statement on behalf of Las Americas Immigrant Advocacy Center. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully.

2. I am an attorney licensed to practice law in California and focused on immigration practice. Since January 2023, I have been the Advocacy and Legal Services Director at Las Americas Immigrant Advocacy Center (Las Americas). Prior to joining Las Americas, I worked in various related positions. Starting in 2018, I worked as a supervising attorney and program director at the International Refugee Assistance Project, where I represented refugees, asylum seekers, and others seeking humanitarian assistance and family reunification, and I ran a cross-border program focused on providing direct legal services to persons in Ciudad Juarez seeking access to safety and family reunification in the United States.

3. Las Americas is a nonprofit legal services organization based in El Paso, Texas. Our mission is to provide high-quality legal services to low-income immigrants, and to advocate for human rights. We provide immigration counseling and representation to immigrants seeking asylum and other forms of humanitarian relief, including by representing individuals facing expedited removal who are referred for credible fear interviews ("CFIs"). We principally represent people detained by the U.S. government in and around West Texas and New Mexico. Our goal is to ensure that individuals have a fair opportunity to establish their eligibility for protection and are not wrongfully removed to persecution or torture.

## Las Americas' Mission & Programs

4. Las Americas has served people in our community from over 80 countries since 1987. We are dedicated to serving the legal and informational needs of low-income asylum seekers and other noncitizens in West Texas, New Mexico, and Ciudad Juárez, Mexico. We assist individuals who express a desire to seek protection in the United States by providing legal information, legal screenings, and translation and referral support, which helps these individuals understand eligibility for asylum and other humanitarian pathways, as well as the rules applicable to them. We also provide legal information presentations centered on clarifying the purpose and consequences of documents received upon or after crossing the border.

5. Our goal is to ensure that all asylum seekers have a fair opportunity to establish their eligibility for protection and that they are not wrongfully removed to persecution or torture in violation of U.S. immigration law. It is essential to our mission that all asylum seekers have a meaningful chance to fully develop and present their claims, as well as a meaningful

1

opportunity to consult with an immigration attorney during the pendency of their proceedings. To advance this mission, we serve asylum seekers with our limited resources using various forms of legal assistance.

6. We are one of the only organizations providing *pro bono* representation to immigrants, asylum seekers, and other persons migrating to, or in removal proceedings in, West Texas and New Mexico. We receive a significant number of referrals from and play a critical role in local migrant communities. Whenever we are suddenly forced to significantly limit or change our services, which has been necessary to respond to the Proclamation, it has a palpable and adverse impact on our ability to serve these communities. In order to fulfill our mission, we also require up-to-date, complete information about government procedures, including those of the Executive Office for Immigration Review and the Department of Homeland Security, which are currently being withheld from us and the rest of the public.

7. Las Americas' total budget in the fiscal year ending 2024 was about $1.7 million.[1] The grants we receive make up approximately 85% of our revenues, and some of those grants have requirements regarding the number of people we serve as well as caveats on the geography and types of services provided. For example, one grant requires us to serve 650 persons per year while another requires us to provide direct representation to 60 persons and pro se support to an additional 120 persons in ICE custody in New Mexico. "Low bono" client fees and other individual contributions make up the remainder of our income sources, but all of our detention-related services, including CFI services, and our services in Mexico are provided at no cost to the individual.

8. Las Americas' U.S. staff consists of 18 people, including attorneys, accredited representatives, and paralegals. Two additional staff members work in Mexico. In addition, we have one full-time volunteer attorney specializing in immigrant survivors of crime, and a cohort of student and community volunteers. We have several programmatic areas; those most relevant to the Proclamation are detailed here.

9. Las Americas' asylum work straddles the U.S.-Mexico border as well as west Texas and southern New Mexico. Our legal programs cover individuals and families who have entered the United States, migrant families residing in the U.S. for several years, as well as people who are or have been stranded in Mexico due to U.S. policies.

10. Our Detained Program serves migrants in the El Paso Processing Center, Otero Service Center, and the Torrance and Cibola detention facilities, in New Mexico. The central purpose of our Detained Program is helping individuals in expedited removal proceedings through the credible fear process and then seeking their release from detention.

---

[1] As of the time of filing this declaration, this number had not been finalized and is therefore approximate.

11. For individuals who can clear the CFI hurdle, our detained team helps with subsequent stages of the immigration process when capacity allows, including asylum applications, evidence gathering, appeals, bond and parole requests, mental health screenings, competency evaluations, and more. Where resources allow, we provide these services as part of full representation in immigration court and before the Board of Immigration Appeals. In other cases, we offer these services as *pro se* assistance. For *pro se* individuals, we also provide assistance with document preparation and translation.

12. In early 2019, Las Americas created the Las Americas Mexico Program (LAMX). LAMX was created as a temporary measure to assist noncitizens who were subject to the Migrant Protection Protocols (MPP) or "Remain in Mexico" Program and thus required to wait in Mexico for their immigration court hearings. As U.S. immigration policy has changed, we have adapted LAMX's services and formalized LAMX as an incorporated entity in Mexico. While Title 42 was in place and prevented asylum seekers from presenting at the ports of entry to seek asylum, we helped people seeking exemptions to that policy as well as parole. LAMX also assists individuals who are awaiting a CBP One appointment in Mexico with preparing for CFIs. Now, LAMX provides *pro se* asylum support and Know Your Rights presentations in shelters and other community spaces. In these presentations, we teach people about the CFI process, advise them about what to expect in the expedited removal process, and field questions from people who are trying to understand how to navigate these processes.

13. In 2024, Las Americas served approximately 5,500 people. We helped over 1,500 people navigate the CBP One application in order to make an appointment to request asylum at a port of entry. We also served about 200 individuals in Immigration and Customs Enforcement (ICE) custody. This work occurred alongside our casework on behalf of people seeking immigration benefits from USCIS or the immigration courts. Across programs, we opened more than 800 new cases in 2024. More than half of the people that Las Americas serves are asylum seekers, and at present, we have about 166 open cases in our Detained Program.[2] Additionally, we serve hundreds of people each month (on average) with Know Your Rights presentations in shelters, both in El Paso and in Mexico.

14. For several years now, Las Americas has been focused on helping people on both sides of the U.S.-Mexico border prepare for CFIs. From May 12, 2023, to September 20, 2023, our cross-border program assisted more than 2,500 people in this manner and over 400 in the first half of 2024.

15. As set forth in more detail below, however, because of Proclamation 10888 and its enforcement, that work is now immensely more complex and time consuming. For example, our team in Mexico must now educate people on ways in which Proclamation

---

[2] We collected information for 2024 calendar year data on in early February 2025. Please note that due to the tight capacity of the organization and the general difficulty of allocating sufficient resources to administrative and technological support, all data reported should be taken as estimates reflecting current case data to the best of my knowledge.

3

10888 impedes access to asylum and other protection. Additionally, we must expend resources to determine whether and how CAT screening is taking place and to differentiate between torture and persecution while advising noncitizens.

## **Proclamation 10888 and Its Implementation**

16. Proclamation 10888, Fed. Reg. 8143, issued by the President on January 20, 2025 ("Proclamation"), explicitly restricts access to asylum and other forms of protection. Among other things, the Proclamation purports to suspend the entry of all noncitizens across the U.S.-Mexico border and calls on the Department of Homeland Security to remove noncitizens without regard to the asylum statute or other protections in the INA.

17. Pursuant to the Proclamation, Defendants are now summarily expelling noncitizens who enter the United States without allowing them an opportunity to seek asylum or other protections from removal.

18. Asylum seekers are systematically being expelled from the United States without being permitted to seek asylum or other forms of protection from removal—the absolute minimum that the law requires to ensure that people subjected to expedited removal are not returned to persecution or torture. We know this first because of the text of the Proclamation itself.

19. Accordingly, we have not received calls for CFI consultation from anyone who entered the country on or after January 20, 2025. I have also received first-hand reports from contacts in Ciudad Juarez that individuals removed at the ports of entry are placed on buses immediately after being forced to cross the bridge into Mexico and driven to southern parts of the country, including Mexico City and Tapachula, Mexico. These removals happen so quickly that the noncitizens never receive access to CFIs.

20. Nor are we seeing anyone in our visits to ICE facilities who entered on or after January 20, 2025. On the U.S. side of the border, our team has continued to make regular visits to detention centers. In the past we would routinely encounter people who had entered one or two weeks before our visit. Now, however, with one exception, we have not seen anyone who entered after January 20, 2025. And both before January 20 and now, we lack access to people while they are in CBP custody. This change means that, unlike before the Proclamation took effect, we do not have access to asylum seekers in U.S. detention centers who are in need of our support but likely to be harmed by the Proclamation.

21. The experience of a Honduran man who got in contact with us only after having been removed to Mexico and then transferred to Villahermosa in southern Mexico is consistent with what I understand to be happening: that people who are expelled from the United States into Mexico are not remaining at the border and are not being permitted speak to us or other organizations like us at the U.S.-Mexico border and are instead being immediately transferred to the interior of Mexico or onward.

22. Because of the Proclamation, Defendants also appear to be denying migrants at the southern border a meaningful opportunity to apply for protection from being returned to countries other than their home countries where they face likely persecution or torture.

23. The lack of transparency regarding new procedures implemented by immigration enforcement agencies since the release of the Proclamation has caused mass confusion and fear and directly undermines our ability to provide adequate, up-to-date information on legal processes in the U.S. Several family members and advocates for people seeking asylum at the border have contacted our office seeking information on how to find their loved ones and how to help them seek protection from return to their country of origin, which they fear. Despite our mission requiring us to provide accurate information to these individuals, we cannot do so under the current border situation created by the Proclamation.

### The Proclamation Harms Las Americas' Representation of Noncitizens

24. In response to the enforcement of the Proclamation, it is fair to say that *all* of Las Americas' work has been forced to change.

25. All of these aspects of the Proclamation are significantly interfering with Las Americas' work and are requiring us to spend significant amounts of time and resources in attempting to counteract that harm. At the same time, while we scramble to find means of learning what is actually taking place once individuals cross the border, our asylum program—which allows us to provide pro se, limited, and full representation to individuals seeking asylum in a defensive posture—has faltered because we are unable to make contact with noncitizens who, but for the Proclamation, would have the statutory right to pursue claims for protection.

26. Though nearly a month has passed since January 20, 2025, we still are not seeing people in ICE custody who have arrived since that date, and we continue to have no access whatsoever to anyone in CBP custody. This is a steep decline from the previous six-month period, and it is at odds with the number of asylum seekers whom we have interviewed in Ciudad Juarez and other parts of Mexico. There is simply no means of reaching and educating asylum seekers at the border under this new regime.

27. For example, asylum seekers who previously had CBP One appointments that were canceled—as well as others who were waiting for appointments—remain trapped in Mexico. They are looking for information about how they can seek safety, but they are terrified that if they attempt to present themselves now to state their claims, they will be held in prolonged detention and summarily deported to their countries of origin.

28. Additionally, our staff has needed to call partners nearly daily to determine whether anyone has been able to ascertain what process CBP is implementing at the border. We have also been attempting port observations and shelter and detention visits on both sides of the border. This has taken staff time away from case work and interfered with our ability to provide accurate legal information to asylum seekers still in Mexico who are trapped and do not know how to seek safety. All we can tell them is that, based on what little we know,

they are unlikely to have a fair opportunity to claim fear and have their asylum claims heard.

29. We have also seen a significant drop in attendance at our Know Your Rights events since the issuance of the Proclamation, especially in El Paso, limiting our ability to fulfill our educational mission.

30. Since noncitizens cannot access asylum or other statutory protections, we cannot carry out much of our core work. We will have to shift our work in a way that counteracts the changes imposed by the Proclamation in this new expedited removal landscape.

### The Proclamation Threatens Las Americas' Funding and Resources

31. The Proclamation has forced us to divert limited resources away from individual representation to continue to meet the most urgent needs of the community, which currently means attempting various means of contacting DHS agencies to obtain information, contacting immigration authorities in Mexico to see if they have information to share, and assisting families trying to find the location of loved ones who attempted to seek protection at the border. In an effort to locate such individuals, we are currently spending an inordinate amount of time visiting detention facilities, checking in on a daily basis with U.S. and Mexican partners, and trying to arrange meetings with local ICE and CBP representatives—all of which have been cancelled.

32. I am also concerned about our ability to maintain grant awards going into our next fiscal year, which begins in July 2025. We receive only private funding, and most awards are heavily metrics based. We are having to spend time to account for this by communicating with donors as to the legal updates, including those who are in the midst of their renewal and/or new applicant cycles.

33. The combined impact of the Proclamation's changes have functionally cut off access to asylum at the U.S-Mexico border. As policy has shifted and immigration legal services work has become more difficult, Las Americas needs to hire more attorneys and coordinators to try to meet the demands of our community inside and outside of detention. While we strive to increase *pro bono* representation and provide high quality legal representation, we are not publicly funded, and none of our grants are guaranteed beyond two or three years. Moreover, it is difficult to secure funding for legal services, even in areas such as El Paso with clear needs and broad gaps in *pro bono* services, especially because we do not have a law school in this region. The number of hours, months, or years it takes to complete a full asylum proceeding scares away the majority of potential pro bono partners. Many I've spoken to are afraid to work on an asylum case because they believe the law changes too often and without enough transparency for them to feel confident that they could meet all their ethical obligations to zealously represent the client and take steps in their best interests.

34. Additionally, our programs rely on volunteers. We already spend significant resources to coordinate, manage, and train volunteers. These changes undermine our ability to rely on

6

volunteers because the pace and complexity of the issues presented at the border continue to increase. The result is that many people on staff, myself included, have to devote resources to volunteer training and management, to the detriment of other work.

35. Additionally, many funders are interested in funding work that reaches the greatest number of people possible. Because the Proclamation cuts off access to asylum and access to individuals attempting to seek asylum who are in federal immigration custody, we risk losing out on grants that expect the reach of our work to maintain a growth trajectory in terms of the number of different people served. This Proclamation has the opposite effect on our work.

**The Proclamation Frustrates Las Americas' Mission and General Operations**

36. Because our mission is premised on ensuring access to asylum for people who are coming to the United States, the Proclamation fundamentally frustrates our organization's purpose by cutting off the right to seek asylum and other forms of protection in the United States.

37. Las Americas has already diverted, and will continue to have to divert, significant resources to understanding the Proclamation and its impact on the communities we serve, training staff and volunteers, and advising our clients, prospective clients, and immigrant communities. In addition, we will need to continue to spend resources developing educational materials, including internal training materials, external training materials, and pro se materials designed to help impacted communities. We also need to reroute resources to give our non-legal partners on both sides of the border a better understanding of access to asylum in the United States, so that they are able to appropriately direct individuals for referrals.

38. In essence, the Proclamation and related border policies force Las Americas into full-time triage mode. The lack of information from the government means that week by week, we have to utilize staff capacity to investigate where recent arrivals are being placed, whether they are in custody, how long they've been there, and whether we can utilize our limited resources to attempt to reach them before they are ordered removed. It also means we risk providing less than accurate information about the current state of access to asylum as a pathway.

39. Finally, Las Americas' staff has experienced a mental and physical toll as a result of the Proclamation and the harm to Las Americas' mission. Living and working on the border, our staff are closely connected to the communities we serve. We witness firsthand the harmful effects of asylum bans and related enforcement-focused policies. Attempting to lead a team that is already inundated with work through more tumult is having a serious, detrimental impact. Since the Proclamation went into effect, I have observed many staff members foregoing their paid leave because of the volume of work. And because so much of our time is spent on the front end of the expedited removal process, staff are feeling less satisfied by the work because we do not have resources to provide longer-term services with the same frequency. The sense that people cannot put their energy into work that

meaningfully advances Las Americas' mission has already generated a sense of frustration and burnout. These harms will persist as time goes on.

## Conclusion

40. It is difficult for me to overstate the detrimental impact that this Proclamation has had, and will continue to have, on Las Americas' operations, mission, clients, and staff. These changes will do nothing to improve the functioning of our immigration courts and will instead strain our resources, force us to cut back on our services, impose insurmountable obstacles on people with legitimate asylum claims seeking refuge from persecution and torture, and deprive our clients of their right to seek asylum.

_____
Jennifer Babaie
Director of Advocacy and Legal Services
Las Americas Immigrant Advocacy Center

Executed this 19th day of February 2025 in El Paso, Texas.