# DECLARATION OF LAURA ST. JOHN FOR THE
# FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT

I, Laura St. John, make the following statement on behalf of the Florence Immigrant & Refugee Rights Project. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1. My name is Laura St. John. I am a licensed attorney and a member in good standing in the California bar. I am currently employed as Legal Director of the Florence Immigrant & Refugee Rights Project ("Florence Project" or "FIRRP"). I joined the Florence Project in March 2011 and have served in my current role since 2015. Before I assumed my current position, I previously served as Managing Attorney of the Adult Program and as a staff attorney with the Florence Project's Adult Program serving adults detained in Immigration and Customs Enforcement ("ICE") custody in Arizona. During my time at the Florence Project, I have personally provided free legal services, both direct representation and pro se orientation services, to hundreds of individuals in custody in the various ICE detention facilities in Arizona, many of whom were people seeking asylum or other fear-based claims for relief. Additionally, as Managing Attorney and Legal Director I have supervised attorneys, legal assistants, and social workers providing free legal services, both direct representation and pro se services, to thousands of individuals detained in ICE custody in Arizona.

## Florence Project's Mission and Scope

2. Founded in 1989, the Florence Project is a 501(c)(3) non-profit legal services organization with offices in Tucson, Phoenix, and Florence, Arizona. The Florence Project's mission is to provide free legal and social services to detained adults and children facing immigration removal proceedings in Arizona. On any given day, there are thousands of people detained in ICE custody in rural detention centers in Eloy and Florence, Arizona. With no public defender structure in immigration removal proceedings, the vast majority of people who are detained in ICE custody and facing removal are forced to go unrepresented in immigration court due to poverty or lack of access to counsel. The Florence Project strives to address this inequality through direct services through our legal and social service programs as well as through both local and national advocacy and outreach efforts, which are led by our advocacy program, informed by our direct services work, and done in partnerships with the broader immigrant rights community. The Florence Project's vision is to ensure that all immigrants facing removal have access to counsel, understand their rights under the law, and are treated fairly and humanely.

3. The Florence Project is the sole 501(c)(3) non-profit organization dedicated to providing free legal services to unaccompanied children in Arizona and adults in immigration detention in Eloy and Florence, Arizona. Through our attorneys, accredited representative, legal assistants, and network of pro bono attorneys, the Florence Project provides free legal education and high quality free immigration representation to thousands of people who are detained in immigration custody and face removal in Arizona.

4. The Florence Project provides free legal services in all three ICE detention centers currently in operation in Arizona: the Eloy Detention Center, the Florence Detention Center, and the Central Arizona Florence Correctional Complex. Together these facilities have bedspace to house more than 2,000 people on any given day. In those facilities, we provide detailed legal orientation and technical support to thousands of detained *pro se* respondents each year, including group orientations and workshops that enable people to represent themselves in bond and removal proceedings. Florence Project attorneys also represent hundreds of adult clients before the asylum office, immigration courts, and the Board of Immigration Appeals ("BIA") each year, including many who are seeking humanitarian relief, such as asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Florence Project attorneys also serve as appointed counsel for individuals deemed mentally incompetent to represent themselves in removal proceedings and, working with support from our legal assistants and social workers, maintain a caseload of approximately one hundred such clients throughout Arizona under the National Qualified Representative Program ("NQRP") and pursuant to court order in *Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG DTBX, 2013 WL 8115423, at *1 (C.D. Cal. Apr. 23, 2013). In our experience, a significant number of clients appointed under the NQRP and *Franco-Gonzalez* passed through or were otherwise amenable to expedited removal at the outset of their cases and the majority of clients appointed under the NQRP and *Franco-Gonzalez* have fear-based claims for relief from removal.

5. The Florence Project also provides high quality immigration legal services and education to the thousands of unaccompanied children ("UC") who come into Office of Refugee Resettlement ("ORR") custody in Arizona in any given year. This includes providing age-appropriate "Know Your Rights" presentations to children in ORR shelters to help them understand what is happening to them and their legal process, as required by law under the Trafficking Victims Protection Reauthorization Act ("TVPRA"). We also ensure that no unaccompanied child in ORR custody in Arizona goes to court alone, providing friend of court support and representation in hundreds of cases to children seeking humanitarian protection and other relief in Immigration Court or before the United States Citizenship and Immigration Service ("USCIS").

6. In addition to our free in-house representation, Florence Project also has a robust *pro bono* program that receives case referrals from teams providing education and legal screenings and then connect unrepresented noncitizens, both adults and unaccompanied children, with *pro bono* counsel from law firms or *pro bono* private immigration practitioners. Each year, our *pro bono* program places dozens of new cases with volunteer attorneys before the immigration court, USCIS, BIA, and the Ninth Circuit Court of Appeals and provides mentorship and technical support on those cases.

7. Finally, since 2017 FIRRP has provided legal orientation and community education services as well as limited accompaniment and representation to asylum seekers and other migrants at the U.S.-Mexico border in Heroica Nogales, Sonora, Mexico. Florence Project staff at the border assist thousands of people seeking safety every year understand their rights and the processes at the border and they have witnessed firsthand the harmful effects of restrictive asylum policies.

**Florence Project's Services To People Seeking Protection in the United States**

8. Since its founding, serving asylum seekers has been at the heart of the Florence Project's work. Indeed, Florence Project was originally known as the Florence Asylum Project. The Florence Asylum Project started after Immigration Judge John McCarrick made a call to action to the Phoenix legal community expressing concern about how immigration proceedings for people detained in Florence, Arizona—the vast majority of whom were Central American asylum seekers—violated due process.

9. The Florence Project's core work is providing free legal services, including both legal education and information about asylum and other forms of humanitarian protection from removal, among other forms of relief, to thousands of people each year. Florence Project staff routinely provide individualized legal education and direct representation to noncitizens who are seeking asylum and/or other fear-based humanitarian protection, such as withholding of removal or protection under the CAT. The Florence Project's work also spans various types of removal procedures: we represent and advise people seeking protection both in regular removal proceedings under 8 U.S.C. § 1229a and in expedited removal proceedings under 8 U.S.C. § 1225(b)(1), which include the credible fear process before USCIS asylum officers and review hearings before immigration judges. Our Children's Program represents unaccompanied children in regular removal proceedings under 8 U.S.C. § 1229a as well as in affirmative asylum applications before USCIS and the asylum officer under the TVPRA. We also represent and advise individuals in bond hearings before the Immigration Courts, and in release requests to ICE. Our border team, meanwhile, routinely encounters people who are likely to be subjected to expedited removal and the credible fear process and help explain those processes to them. In 2023, Florence Project staff provided individualized legal support to at least one thousand adults in ICE custody who specifically were seeking some fear-based form of protection.

10. In total, the Florence Project currently has a staff of 208 people. Just over 75% of all Florence Project employees, 157 people, work in some form of direct services routinely serving people who are seeking asylum or other fear-based protections. The Florence Project operates two large direct legal service programs, one serving unaccompanied children, and one serving primarily detained adults, and a smaller advocacy program, which directly serves both adults and children in other federal court advocacy. Florence Project's Border Action Team operates as part of the larger Adult Legal Program. Across these two large legal programs and the smaller advocacy program, the Florence Project employs 72 attorneys and law graduates, 4 BIA accredited representatives, 66 legal assistants, and 15 social workers, who are integrated to our legal teams through our integrated social services program. All of these programs and, thus, all of these staff routinely serve asylum seekers and people pursuing fear-based protections under United States and international law. As such, the changes in law created by the Proclamation undermines the efforts of nearly all of our staff to engage in our core work of serving people seeking asylum or other humanitarian claims for protection.

## Issuance and Immediate Impact of the Proclamation

11. On January 20, 2025, President Trump signed a sweeping proclamation alleging an "invasion" at the southern border and asserting broad executive power to functionally close

the border to all asylum seekers. The proclamation eliminated individuals' ability to invoke provisions of U.S. law regarding asylum and other forms of protection that Congress specifically provided by statute. The proclamation also created new requirements for asylum seekers to submit information regarding criminal and medical background prior to entry, without creating any mechanism for doing so.

12. Immediately upon issuance of the Proclamation, the Florence Project had to divert experienced attorney resources to break down the Proclamation for staff and, specifically, to help our Border Action Team study the Proclamation and ascertain the likely impacts for migrants in Mexico who had been waiting for their opportunity to present to seek asylum. We had to amend and create new educational materials and plain language informational packets for people who were at the border and seeking asylum. Given the significant confusion and uncertainty within the community, our team also had to divert resources to conduct a "town hall" style presentation, which is much larger than our normal know your rights presentations, for migrants who were seeking to understand their options given the Proclamation. On January 23, 2025, Florence Project staff gave a town hall presentation to over 170 people, many of whom had been waiting in Mexico for an opportunity to apply for asylum for weeks or months, but now were left with no access to asylum whatsoever under the Proclamation.

13. In the context of our work with detained adults, this Proclamation impedes Florence Project's core work in a number of crucial ways. First and most importantly, by providing for summary removal of non-citizens without any ability to raise or pursue claims for asylum or other protection, this Proclamation has effectively eliminated Florence Project's ability to serve individuals who are in the United States and seeking their statutory right to asylum or other fear-based humanitarian protection. This frustrates our mission of providing legal services to people facing removal in Arizona and eliminates our ability to ensure that noncitizens facing removal have access to counsel, understand their rights, and are treated fairly and humanely. And it essentially eliminates our core practice of representing asylum seekers in seeking this protection. Indeed, in sharp contrast to years of experience and migration and detention trends, as of February 18, 2025, Florence Project has still not been able to identify or meet with any asylum seekers in ICE custody who entered the United States, whether by entering without inspection or presenting at a port of entry, after the Proclamation took effect on January 20, 2025. Communication with partner legal and humanitarian service organizations throughout the border region confirm a similar pattern and inform my understanding that the reason we have not seen asylum seekers in our facilities since January 20, 2025 is because people are being expelled to Mexico or other countries under the Proclamation without being given the opportunity to seek protection.

14. The Proclamation also substantially interferes with another core aspect of the Florence Project's work, connecting individuals with fear-based claims for relief with *pro bono* legal representation. Florence Project has yet to be able to identify any potential pro bono placements who were processed to seek asylum or other forms of humanitarian protection since January 20, 2025. The Proclamation eliminates Florence Project's ability to identify for *pro bono* representation newly arriving noncitizens with protection needs.

15. Florence Project staff have also had to divert resources to trying to understand how systems that used to be well-understood and relatively clear are now functioning under

the Proclamation. This includes both outreach to partner organizations across the border and to legal service providers in detention centers across the country to learn whether people anywhere have been able to seek asylum or other protection at the border, either after presenting at a port-of-entry or after entering without inspection and, if so, what the procedure was for gaining that access. Historically, Florence Project staff would often learn about processing patterns from government partners or from migrants themselves. However, since the Proclamation, very little information has been forthcoming from government stakeholders and Florence Project staff at the border have struggled to contact individuals who have been expelled under the Proclamation. Indeed, Florence Project staff have observed a notable shift in longstanding past patterns and practices since the Proclamation with regard to recently deported individuals. In the past many people who were recently deported or expelled through Nogales would be released at or near the port of entry and make their way to the shelter where the Florence Project provides legal services or another of several shelters in the area to receive education and humanitarian support. By contrast, since the Proclamation the shelter where the Florence Project works has received essentially no recently removed individuals, and upon information and belief, neither have the other shelters that have historically housed such individuals. This shift in pattern is so notable that Florence Project staff have attempted to communicate with both United States and Mexican government officials in an attempt to better understand how removals under the Proclamation are currently occurring, where people are being removed to, and what countries are currently subject to rapid expulsion and/or removal under the new policies. Having access to accurate information on these topics is necessary for Florence Project to be able to provide meaningful legal education services. Yet, while we have been able to confirm through the Mexican Consulate that removals are still occurring through Nogales, we have not gotten any further clarity or explanation about processing that explains the significant change in longstanding patterns involving shelter and humanitarian needs for recently deported individuals.

16. Florence Project staff themselves also are not immune to the sense of chaos and confusion created by the Proclamation and its incompatibility with the language of relevant immigration statutes on asylum and other protections. Senior Florence Project staff and managers have had to divert significant time towards developing legal explainers and guidance to support staff and *pro bono* attorney understanding of the impact of the Proclamation among other changes in law. This is a task made more difficult at this moment given that, at this stage, there is very little clarity regarding which version of the law, the Proclamation or the INA, should be followed or what that practice will look like on the ground. As such, Florence Project managers and senior staff attorneys have also diverted resources to develop new systems to update staff regarding the myriad changes to immigration law done via Executive Order since January 20, 2025 as well as share out potential legal arguments to counter-act anti-asylum measures like the Proclamation, should we begin to encounter clients in this situation. Moreover, while this particular change in law is still new, we at the Florence Project know that the stress caused by the uncertainty and chaos regarding asylum access wears down staff, undermines morale, and contributes to burn-out and turn over, which has significant financial and brain-drain impacts on the Florence Project as an organization. Like many non-profits, our staff are deeply dedicated and personally connected to our organizational mission and vision; they are motivated by their desire to help people in need. The fact that we are unable to even find and speak to asylum seekers whose rights are very likely

being violated by new practices under the Proclamation is emotionally disturbing and undermines morale for Florence Project staff.

17. Additionally, the Proclamation is significantly hampering Florence Project's core work of explaining and educating immigrants as to their legal rights under U.S. immigration law. The language of the Proclamation is at odds with the text of immigration laws regarding asylum, withholding, and CAT in that the Proclamation claims to unilaterally suspend any and all rights guaranteed under those sections without exception. As a result, Florence Project staff—including those working at the border and in ICE detention centers—must try to explain legal provisions that are inherently in conflict. We can explain what the immigration law says, as well as what the Proclamation says and what is actually happening on the ground, but because the Proclamation is inconsistent with rights protected under law, it creates a great deal of confusion and angst for the people we serve. This, in turn, impedes our ability to effectively help people understand their rights and legal situation. This level of uncertainty is also likely to adversely impact trust that we develop with clients and community stakeholders. That is because we are currently forced to explain a situation that is at odds with what the law says and with the experiences of many clients' family members who entered the United States and sought asylum before the Proclamation was issued. Also, the government has not yet made public any information about how the Proclamation is being implemented, which both undermines our ability as a legal service provider to give clear and accurate information while also making it much more difficult for us to gain the trust of the clients we serve, who are often survivors of acute trauma and inherently distrustful.

18. The uncertainty with respect to how the Proclamation is being applied is also harming our efforts to serve unaccompanied children at the border. The Proclamation does not expressly exempt unaccompanied children from the suspension of legal processing at the southern border. While we have seen some children who it seems may have entered the United States since the Proclamation has been in effect, children often do not know or remember the precise date or manner of entry, and it can be challenging to confirm the alleged date of entry. As such, we continue to be concerned that border officers may wrongly be denying unaccompanied children access to asylum and processing under the TVPRA based on the Proclamation. We are expending time and resources in an effort to understand the application of the Proclamation to this particularly vulnerable population and, particularly, how unaccompanied children are being treated at ports of entry. We need this information both to provide accurate information in our educational outreach, as well as to plan and prepare for the impact on our program providing services to this vulnerable population.

19. Financially speaking, the Proclamation could well have serious long-term financial consequences for the Florence Project given the ways in which it fundamentally prevents us from being able to access or assist people seeking asylum or other humanitarian protection, which is and has long been central to our organizational mission. If the proclamation remains in effect for any substantial period of time, then the number of people who can be helped with asylum and related forms of relief will inevitably decrease and, so too will our ability to be paid to do that mission-driven work.

20. In the nearer term, the Proclamation is likely to undermine the Florence Project's funding in at least one significant way. As noted above, Florence Project staff serve as appointed

legal counsel under the NQRP and *Franco-Gonzalez* for individuals who are deemed to be mentally incompetent to represent themselves in removal proceedings while detained in ICE custody. The Florence Project receives funding through the NQRP prime contractor on a flat rate based on the number of cases we have open and the number of net new cases we agree to accept in a given option year. Historically, a significant portion of our NQRP/*Franco-Gonzalez* clients initially entered proceedings after either seeking asylum at the border or being otherwise placed into the expedited removal process wherein they were identified as individuals experiencing serious mental health conditions and referred to full removal proceedings. A random sampling suggests that at least 5% and perhaps nearly 25% of our current NQRP cases fit this profile. Under the Proclamation, because people are summarily removed without any fear screening or opportunity to be identified as seriously mentally ill, the Florence Project stands to lose tens, if not hundreds of thousands of dollars in funding to represent individuals seeking protection who are also suffering from serious mental health conditions because such vulnerable individuals will simply never make it into full removal proceedings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of February, 2025 in Flagstaff, Arizona.

Laura St. John