YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

AUGUST FLENTJE
*Acting Director*

EREZ REUVENI
*Acting Deputy Director*

BRIAN C. WARD
*Acting Assistant Director*

PATRICK GLEN
DAVID KIM
KATHERINE J. SHINNERS
*Senior Litigation Counsel*

ELISSA FUDIM
JOSEPH A. DARROW
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-9121
Email: brian.c.ward@usdoj.gov
*Trial Attorneys*

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) <br> Refugee and Immigrant Center for ) <br> Education and Legal Services, *et al.*, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> Kristi Noem, Secretary, U.S. Department ) <br> of Homeland Security, *et al.*, ) <br> ) <br> Defendants. ) <br> ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | Civil Action No. 1:25-cv-00306 |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

LEGAL AND PROCEDURAL BACKGROUND.......................................................................4

ARGUMENT ................................................................................................................10

    I.   Various Threshold Issues Bar Plaintiffs' Claims..............................................................11

        A.  The individual Plaintiffs lack standing to obtain the requested injunction.................11

        B.  The Plaintiff Organizations lack standing to obtain the requested injunction .............13

        C.  Section 1252 bars the Organizations' attempt to enforce provisions of the
            expedited removal statute .......................................................................................22

        D.  The Organizations are not within the zone of interests.................................................23

        E.  Plaintiffs cannot raise a claim under the APA where the President is not an agency
            and Plaintiffs have not identified any reviewable final agency action ........................25

        F.  Plaintiffs' demands for relief against the President must be dismissed .......................28

        G.  There is no source of law under which Plaintiffs can maintain their claims ..............29

        H.  The determination that the United States is facing an invasion is an
            unreviewable political question .................................................................................33

    II.  Plaintiffs' Claims Fail on the Merits...................................................................................36

        A.  Suspension on entry must necessarily encompass ability to expel those who
            enter unlawfully where the reason for the suspension is invasion through
            unlawful entry ..........................................................................................................36

        B.  The Proclamation is adequately supported by the President's finding that the
            entry of aliens who are engaged in an invasion across the southern border
            would be detrimental to the interests of the United States...........................................41

        C.  The Proclamation does not violate the provisions of the INA that Plaintiffs
            identify in their first and second claims (Claims 1 & 2)..............................................43

        D.  The Proclamation is consistent with FARRA (Claim 3)..............................................49

        E.  The Proclamation is consistent with the TVPRA (Claim 4) .......................................50

F.  The Proclamation is consistent with Section 1225(b) (Claim 5) ................................50

G.  The Proclamation does not exceed the President's authority under
Article II (Claim 9) ...............................................................................................51

H.  The Proclamation does not violate separation of powers (Claim 10).........................51

III.  Any Relief Must be Sharply Limited...................................................................................52

A.  Relief must be narrowly tailored to address only cognizable harms of Plaintiffs
properly before the Court........................................................................................52

B.  Section 1252(f)(1) limits the relief this Court may issue...........................................54

C.  An injunction is not warranted because the Proclamation's enforcement is necessary
to mitigate severe, ongoing harms to the public from illegal immigration.................58

CONCLUSION.................................................................................................................63

## <u>TABLE OF AUTHORITIES</u>

*Aberdeen & Rockfish R.R. v. Students Challenging Regulatory Agency Procedures (SCRAP),*
    422 U.S. 289 (1975) ............................................................................................................ 56

*Abourezk v. Reagan,*
    785 F.2d 1043 (D.C. Cir. 1986) ............................................................................ 28, 38, 47

*Abramski v. United States,*
    573 U.S. 169 (2014) ............................................................................................................ 36

*Adams v. Vance,*
    570 F.2d 950 (D.C. Cir. 1978) .......................................................................................... 29

*AILA v. Reno,*
    199 F.3d 1352 (D.C. Cir. 2000) .................................................................................. 22, 23

*Al Otro Lado v. Mayorkas,*
    619 F. Supp. 3d 1029 (S.D. Cal. 2022) ...................................................................... 56, 57

*Allen v. Milas,*
    896 F.3d 1094 (9th Cir. 2018) .......................................................................................... 28

*Allende v. Shultz,*
    845 F.2d 1111 (1st Cir. 1988) .......................................................................................... 32

*Am. Ins. Ass'n v. Garamendi,*
    539 U.S. 396 (2003) ............................................................................................................ 32

*Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.,*
    738 F.3d 387 (D.C. Cir. 2013) .......................................................................................... 27

*Animal Legal Def. Fund, Inc. v. Vilsack,*
    111 F.4th 1219 (D.C. Cir. 2024) ...................................................................................... 21

*Armstrong v. Bush,*
    924 F.2d 282 (D.C. Cir. 1991) .......................................................................................... 26

*Baker v. Carr,*
    369 U.S. 186 (1962) ............................................................................................................ 34

*Block v. Community Nutrition Inst.,*
    467 U.S. 340 (1984) ............................................................................................................ 25

*California v. Texas,*
    593 U.S. 659 (2021) ............................................................................................................ 17

*California v. United States,*
   104 F.3d 1086 (9th Cir. 1997) ............................................................34

*Chai v. Carroll,*
   48 F.3d 1331 (4th Cir. 1995) ............................................................ 30

*Chiles v. U.S.,*
   69 F.3d 1094 (11th Cir. 1995) ............................................................ 51

*Chiles v. United States,*
   874 F. Supp. 1334 (S.D. Fl. 1994) ............................................................ 35

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993) ............................................................ 41

*Citizens for Resp. & Ethics in Washington v. U.S. Off. of Special Couns.,*
   480 F. Supp. 3d 118 (D.D.C. 2020) ............................................................18

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ............................................................ 12, 19

*Clarke v. Secs. Indus. Ass'n,*
   479 U.S. 388 (1987) ............................................................ 23

*County of Maui v. Hawaii Wildlife Fund,*
   140 S. Ct. 1462 (2020) ............................................................ 36

*Ctr. for Responsible Science v. Gottlieb,*
   346 F Supp. 3d 29 (D.D.C. 2018) ............................................................ 20

*DaimlerChrysler v. Cuno,*
   547 U.S. 332 (2006) ............................................................ 11, 53

*Dalton v. Specter,*
   511 U.S. 462 (1994) ............................................................ 52

*Dep't of Homeland Sec. v. Thuraissigiam,*
   591 U.S. 103 (2020) ............................................................ 15

*Direct Mktg. Ass'n v. Brohl,*
   575 U.S. 1 (2015) ............................................................ 56

*Doe #1 v. Trump,*
   944 F.3d. 1222 (9th Cir. 2019) ............................................................ 61

*Doe #2 v. Trump,*
    319 F. Supp. 3d 539 (D.D.C. 2018) ......................................................................29

*eBay Inc. v. MercExchange, LLC,*
    547 U.S. 388 (2006) .......................................................................................... 59

*E. Bay Sanctuary Covenant v. Trump,*
    932 F.3d 742 (9th Cir. 2018) ............................................................................ 26

*Elec. Priv. Info. Ctr. V. United States Dep't of Com.,*
    928 F.3d 95 (D.C. Cir. 2019) .............................................................................17

*El-Shifa Pharmaceutical Industries Co. v. United States,*
    607 F.3d 836 (D.C. Cir. 2010) .......................................................................... 35

*FDA v. Alliance for Hippocratic Medicine,*
    602 U.S. 367 (2024) ............................................................................... 14, passim

*Fed'n for Am. Immigration Reform, Inc. (FAIR) v. Reno,*
    93 F.3d 897 (D.C. Cir. 1996) ............................................................................ 24

*Feds for Med. Freedom v. Biden,*
    581 F. Supp. 3d 826 (S.D. Tex.) ....................................................................... 26

*Fiallo v. Bell,*
    430 U.S. 787 (1977) ............................................................................ 3, 15, 32, 33

*Fong Yue Ting v. United States,*
    149 U.S. 698 (1893) .......................................................................................... 39

*Food & Water Watch, Inc. v. Vilsack,*
    808 F.3d 905 (D.C. Cir. 2015) .................................................................... 18, 21

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ................................................................... 2, 25, 28, 29

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.,*
    528 U.S. 167 (2000) .......................................................................................... 11

*Garland v. Aleman Gonzalez,*
    596 U.S. 543 (2022) .................................................................................... 54, 55

*Gill v. Whitford,*
    585 U.S. 48 (2018) ..................................................................................... 14, 52

*Haig v. Agee,*
    453 U.S. 280 (1981) .......................................................................................... 32

*Hamama v. Adducci*,
   912 F.3d 869 (6th Cir. 2018) ................................................................. 56

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952) ................................................................. 4, 35

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ................................................................. 15

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) ................................................................. 61

*Huisha-Huisha v. Mayorkas*,
   27 F.4th 718 (D.C. Cir. 2022) ................................................................. 3, passim

*Hunt v. Washington State Apple Advertising Comm'n*,
   432 U.S. 333 (1977) ................................................................. 21

*Indep. Equip. Dealers Ass'n v. E.P.A.*,
   372 F.3d 420 (D.C. Cir. 2004) ................................................................. 26

*INS v. Legalization Assistance Project of L.A. Cty.*,
   510 U.S. 1301 (1993) ................................................................. 24

*Int'l Academy of Oral Medicine & Toxicology*,
   195 F. Supp. 3d 243 (D.D.C. 2016) ................................................................. 21

*Johnson v. D.C.*,
   248 F.R.D. 46 (D.D.C. 2008) ................................................................. 12

*Kerry v. Din*,
   576 U.S. 86 (2015) ................................................................. 33

*Kiyemba v. Obama*,
   555 F.3d 1022 (D.C. Cir. 2009), *vacated*, 559 U.S. 131 (2010), *reinstated after vacatur*, 605
   F.3d 1046 (D.C. Cir. 2010) ................................................................. 13

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) ................................................................. 22

*Lewis v. Casey*,
   518 U.S. 343 (1996) ................................................................. 18, 53

*Linda R.S. v. Richard D.*,
   410 U.S. 614 (1973) ................................................................. 14

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................ 14, 18, 19

*Make the Road v. Wolf*,
    962 F.3d 612 (D.C. Cir. 2020) ................................................................ 22, 23

*Mathews v. Diaz*,
    426 U.S. 67 (1976) ..................................................................... 35, 52, 62

*Mississippi v. Johnson*,
    71 U.S. 475 (1867) ..................................................................... 2, 28, 29

*Moreno Galvez v. Jaddou*,
    52 F. 4th 821 (9th Cir. 2022) ................................................................... 55

*Motions Sys. Corp. v. Bush*,
    437 F.3d 1356 (Fed. Cir. 2006) ................................................................. 26

*Mountain States Legal Found. v. Glickman*,
    92 F.3d 1228 (D.C. Cir. 1996) .................................................................. 23

*Nat'l Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 1995) .................................................................. 21

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996) ................................................................. 18

*Nebraska Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*,
    435 F.3d 326 (D.C. Cir. 2006) ............................................................... 53, 54

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
    434 U.S. 1345 (1977) .......................................................................... 61

*Newdow v. Roberts*,
    603 F.3d 1002 (D.C. Cir. 2010) ............................................................... 2, 29

*Nishimura Ekiu v. United States*,
    142 U.S. 651 (1892) ........................................................................... 39

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ....................................................................... 28, 29

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................... 59

*Norton v. Southwestern Utah Wilderness Alliance*,
    542 U.S. 55 (2004) .................................................................................. 12

*Nw. Immigrant Rights Project v. USCIS*,
    325 F.R.D. 671 (W.D. Wash. 2016) ...................................................... 24

*O.A. v. Trump*,
    404 F. Supp. 3d 109 (D.D.C. 2019) ........................................................ 25

*O'Shea v. Littleton*,
    414 U.S. 488, (1974) ............................................................................... 12

*Patchak v. Zinke*,
    583 U.S. 244 (2018) ................................................................................ 22

*Pennsylvania Dept. of Corrections v. Yeskey*,
    524 U.S. 206 (1998) .......................................................................... 39, 47

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ................................................................................ 55

*Saavedra Bruno v. Albright*,
    197 F.3d 1153 (D.C. Cir. 1999) .............................................................. 28

*Sagarwala v. Cissna*,
    No 18-cv-2860 (RC), 2019 WL 1649943 (D.D.C. Apr. 16, 2019) .......... 62

*Sale v. Haitian Centers Council, Inc.*,
    509 U.S. 155 (1993) .................................................................. 3, passim

*Schneider v. Kissinger*,
    412 F.3d 190 (D.C. Cir. 2005) ................................................................ 34

*Sessions v. Morales-Santana*,
    582 U.S. 47 (2017) .................................................................................. 22

*State of California v. United States*,
    104 F.3d 1086 (9th Cir. 1997) ...................................................... 3, 34, 35

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) .................................................................................. 11

*Sure-Tan, Inc. v. N.L.R.B.*,
    467 U.S. 883 (1984) ................................................................................ 25

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) .................................................................. 29

*Swanson Grp. Mfg. LLC v. Jewell,*
    790 F.3d 235 (D.C. Cir. 2015) .................................................................. 19

*Texas v. Biden,*
    20 F.4th 928 (5th Cir. 2021) .................................................................... 27

*Texas v. Biden,*
    597 U.S. 785 (2022) ................................................................................ 27

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.,*
    450 U.S. 707 (1981) ................................................................................ 41

*Thompson v. North Am. Stainless, LP,*
    562 U.S. 170 (2011) ........................................................................... 25, 30

*Town of Chester, N.Y. v. Laroe Ests., Inc.,*
    581 U.S. 433 (2017) ........................................................................... 17, 18

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ...................................................................... 1, passim

*Tulare Cnty. v. Bush,*
    185 F. Supp. 2d 18 (D.D.C. 2001) ........................................................... 26

*U.S. ex rel. Knauff v. Shaughnessy,*
    338 U.S. 537 (1950) ...................................................................... 4, passim

*United States ex rel. Accardi v. Shaughnessy,*
    347 U.S. 260 (1954) ................................................................................ 30

*United States v. Curtiss-Wright Exp. Corp.,*
    299 U.S. 304 (1936) ........................................................................... 4, 39

*United States v. Texas,*
    599 U.S. 670 (2023) ............................................................. 13, 14, 15, 25

*Webster v. Doe,*
    486 U.S. 592 (1998) ................................................................................ 28

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .............................................................................. 58, 59

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ..................................................................... 5, 40, 41

*Zhong v. U.S. Dep't of Justice*,
   480 F.3d 104 (2d Cir. 2007) ............................................................. 45

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
   135 S. Ct. 2076 (2015) ...................................................................... 5

## <u>ADMINISTRATIVE DECISIONS</u>

Matter of E-R-M-,
   25 I. & N. Dec. 520 (BIA 2011) ........................................................ 54

## <u>STATUTES</u>

5 U.S.C. § 551(4) ................................................................................. 27

5 U.S.C. § 701(a)(2) ............................................................................ 28

5 U.S.C. § 702 ............................................................................... 23, 30

5 U.S.C. § 702(1) ................................................................................. 27

5 U.S.C. § 704 ..................................................................................... 26

5 U.S.C. § 706(1) ................................................................................. 12

8 U.S.C. § 1101 .............................................................................. 5, 10

8 U.S.C. § 1101(a) ............................................................................... 62

8 U.S.C. § 1101(a)(15) .......................................................................... 43

8 U.S.C. § 1158 ................................................................................ 6, 7

8 U.S.C. § 1158(a)(1) ........................................................................... 10

8 U.S.C. § 1158(d)(7) ........................................................................... 24

8 U.S.C. § 1182(a)(1)-(3) ............................................................... 5, 6, 7, 9

8 U.S.C. § 1182(a)(1) ......................................................................... 6, 7

8 U.S.C. § 1182(a)(2) ......................................................................... 5, 6

8 U.S.C. § 1182(f) ..................................................................... 1, passim

8 U.S.C. § 1185(a) ............................................................................................ 1, 6, 29

8 U.S.C. § 1185(a)(1) ....................................................................................... 5, 28, 32

8 U.S.C. § 1225 .................................................................................................. 54, 55

8 U.S.C. § 1225(b)(1) .......................................................................................... 9, 22

8 U.S.C. § 1225(b)(1)(A) ......................................................................................... 49

8 U.S.C. § 1225(b)(1)(A)(ii) .................................................................................... 55

8 U.S.C. § 1229 ....................................................................................................... 45

8 U.S.C. § 1229a ...................................................................................... 45, 54, 55

8 U.S.C. § 1231 ........................................................................................ 10, 49, 55

8 U.S.C. § 1231(b)(3) ............................................................................................ 7, 10

8 U.S.C. § 1231(b)(3)(A) .......................................................................................... 54

8 U.S.C. § 1231(h) ................................................................................................... 46

8 U.S.C. § 1232(a)(5)(D) ................................................................................ 10, 50

8 U.S.C. § 1252(a)(2)(A) .................................................................................. 2, 22

8 U.S.C. § 1252(a)(2)(A)(i) ...................................................................................... 22

8 U.S.C. § 1252(a)(2)(A)(ii) ..................................................................................... 22

8 U.S.C. § 1252(a)(2)(A)(iv) .................................................................................... 22

8 U.S.C. § 1252(a)(5) ............................................................................................... 46

8 U.S.C. § 1252(b)(9) .............................................................................................. 46

8 U.S.C. § 1252(e) ........................................................................................... 22, 24

8 U.S.C. § 1252(f)(1) ..................................................................................... 2, passim

28 U.S.C. § 1331 ...................................................................................................... 22

42 U.S.C. § 265 ....................................................................................................... 44

# REGULATIONS

8 C.F.R. § 208.16(c) ........................................................................................ 62

8 C.F.R. § 208.16(c)(2) .................................................................................... 49

8 C.F.R. § 208.18(a)(1) .................................................................................... 63

8 C.F.R. § 208.30(d) ........................................................................................ 49

8 C.F.R. § 208.30(e)(i) ..................................................................................... 49

8 C.F.R. § 208.30(f) ......................................................................................... 49

8 C.F.R. § 1208.16(c)(2) .................................................................................. 49

8 C.F.R. § 208.33(b)(2) .................................................................................... 49

8 C.F.R. § 208.35(b)(2) .................................................................................... 49

28 C.F.R. § 200.1 ............................................................................................. 62

# FEDERAL RULES OF CIVIL PROCEDURES

Fed. R. Civ. P. 65(c) ........................................................................................ 63

# FEDERAL REGISTER

83 Fed. Reg. 55,934 (Nov. 9, 2018) ................................................................ 48

89 Fed. Reg. 81 (Oct. 7, 2024) ........................................................................ 48

90 Fed. Reg. 8333 (Jan 20, 2025) ............................................................... 1, 2, 5

90 Fed. Reg. 8334 .............................................................................................. 6

## INTRODUCTION

After years of unprecedented levels of illegal border crossings into the United States, on January 20, 2025, the President issued Proclamation 10888, *Guaranteeing the States Protection Against Invasion*, 90 Fed. Reg. 8333. (Jan. 20, 2025), explaining that "[t]he sheer number of aliens entering the United States has overwhelmed the system and rendered many [Immigration and Nationality Act (INA)] provisions ineffective, including those … intended to prevent aliens posing threats to public health, safety, and national security from entering the United States." *Id*. The President emphasized that, "[a]s a result, millions of aliens who potentially pose significant threats to health, safety, and national security have moved into communities nationwide." *Id*.

The President thus invoked his statutory authority under 8 U.S.C. §§ 1182(f) and 1185(a) to proclaim that the unlawful "entry into the United States" by aliens across the southern border "is detrimental to the interests of the United States," and to direct that such entry "be suspended" and aliens attempting such entry be "restricted from invoking provisions of the INA that would permit their continued presence in the United States." Proclamation §§ 1, 2, 90 Fed. Reg. at 8335; *see* 8 U.S.C. § 1182(f) (authorizing the President to "suspend the entry of all aliens or any class of aliens" and "impose on the entry of aliens any restrictions he may deem to be appropriate" "[w]henever the President finds that the entry of [such] aliens into the United States would be detrimental to the interests of the United States"); *Trump v. Hawaii*, 585 U.S. 667, 684 (2018). The President additionally made the same finding and imposed the same restrictions on entry at all borders and ports of entry as to any alien who fails "to provide Federal officials with sufficient medical information and reliable criminal history and background information." Proclamation § 3, 90 Fed. Reg. at 8335. In addition, the President invoked his "express and inherent powers in Article II of the Constitution of the United States," as well as his responsibility to "effectuate the guarantee

1

of protection [to the States] against invasion required by Article IV, Section 4," of the Constitution. Proclamation § 4, 90 Fed. Reg. at 8335.

Plaintiffs ask this Court to disregard this authority and override the President's judgment. The Court should dismiss these claims at the outset on several independent jurisdictional and threshold grounds, or alternatively, grant judgment to Defendants on the merits.

*First*, Plaintiffs lack standing. The individual Plaintiffs who have been repatriated have not identified any way in which they will be subject to the Proclamation in the future and therefore have failed to identify any basis for seeking the prospective relief they identify in their complaint. And their request for the government to implement certain statutory provisions in the manner they may have been implemented absent the Proclamation is squarely foreclosed by 8 U.S.C. § 1252(f)(1). The organizational Plaintiffs also lack standing. They are third-party organizations who are not directly affected by the Proclamation and claim injury based on downstream indirect effects on aliens, which are insufficient to satisfy Article III. And their attempt to enforce the expedited removal provisions of the INA is squarely foreclosed by 8 U.S.C. § 1252(a)(2)(A), while the remainder of their statutory claims fail at the threshold because they are not in the zone of interests of any of the statutory provisions on which those claims depend.

*Second*, there is no basis for any Plaintiff to seek relief against the President. The President is not an agency, and his actions are not subject to APA review. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). Nor is there any basis to seek an injunction of the President's actions, *Mississippi v. Johnson*, 71 U.S. 475, 501 (1867), or any declaratory relief with respect to those actions, *Newdow v. Roberts*, 603 F.3d 1002, 1012–13 (D.C. Cir. 2010). Plaintiffs' non-constitutional challenges to the Proclamation are thus non-justiciable because "the power to … exclude aliens" is "a fundamental sovereign attribute exercised by the Government's political

2

departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (citation omitted). And the President's determination that the United States is facing an invasion is similarly a non-justiciable political question. *See*, *e.g.*, *State of California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (collecting cases).

*Third*, Plaintiffs' claims fail on the merits. Section 1182(f)'s express authorization to suspend entry of classes of aliens necessarily encompasses the ability to repatriate those who enter in violation of the suspension on entry, and the Executive's inherent Article II powers similarly cannot leave the President helpless to take swift action against those who violate a bar to entry the President has put in place for national security or foreign policy reasons. *See Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 187 (1993); *cf. Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 729 (D.C. Cir. 2022). The Proclamation is adequately supported by the President's finding that the entry of aliens who are engaged in an invasion across the southern border would be detrimental to the interests of the United States, raising grave threats to public health, safety, and national security. Section 1182(f) requires no more. *Hawaii*, 585 U.S. at 686, 704. Plaintiffs' arguments premised on statutory provisions that apply to aliens who enter the United States are thus without merit.

*Finally*, even if relief were warranted here, the relief Plaintiffs seek is grossly overbroad, improper, and violates settled constitutional principles. And their request for a permanent injunction is barred by Section 1252(f)(1), and inappropriate in any event because the equities tip sharply in the government's favor.

The Court should deny Plaintiffs' requested relief and grant judgment to Defendants on their claims.

## LEGAL AND PROCEDURAL BACKGROUND

Legal Background. "The exclusion of aliens is a fundamental act of sovereignty," and "[t]he right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950)). Consistent with that principle, Congress has accorded the President broad authority to suspend or restrict the entry of aliens. Section 1182(f) of Title 8 provides in relevant part:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). "By its terms, § 1182(f) exudes deference to the President in every clause," and "entrusts to the President the decisions whether and when to suspend entry ...; whose entry to suspend ...; for how long ...; and on what conditions ...." *Hawaii*, 585 U.S. at 684. Section 1185(a)(1) of Title 8 further grants the President broad authority to adopt "reasonable rules, regulations, and orders" governing the entry of aliens, and the President may make entry "subject to such limitations and exceptions as [he] may prescribe." 8 U.S.C. § 1185(a)(1).

Although "normally Congress supplies the conditions of the privilege of entry into the United States," "because the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power" without raising delegation concerns. *Knauff*, 338 U.S. at 543. As the Supreme Court has repeatedly held, Article II confers upon the President expansive authority over foreign affairs, national security, and immigration. *See Harisiades v. Shaughnessy,* 342 U.S. 580, 588 (1952); *Knauff*, 338 U.S. at 542; *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936). Thus, where, as here, "the President acts pursuant to an express or implied authorization of

Congress," *i.e.* 8 U.S.C. §§ 1182(f) and 1185(a)(1), coupled with the President's own Article II powers over foreign affairs and national security, "his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083-84 (2015) (similar).

The Proclamation. On January 20, 2025, President Trump issued Proclamation 10888, *Guaranteeing the States Protection Against Invasion*, 90 Fed. Reg. 8333. The President noted that Congress has created a complex scheme in the INA, 8 U.S.C. § 1101 *et seq.*, to control entry across the border of the United States that, in routine circumstances, protects United States sovereignty and prevents entry of aliens who pose threats to public health or national security. 90 Fed. Reg. at 8333. But the INA's screening provisions "can be wholly ineffective in the border environment, where access to necessary information is limited for aliens who have traveled from countries around the world to enter the United States illegally, or when the system is overwhelmed, leading to the unauthorized entry of innumerable illegal aliens into the United States." *Id*.

"Due to significant information gaps—particularly in the border environment—and processing times, Federal officials do not have the ability to verify with certainty the criminal record or national-security risks associated with the illegal entry of every alien at the southern border, as required by" 8 U.S.C. § 1182(a)(2)–(3). 90 Fed. Reg. at 8333. "Nor do aliens who illegally cross the southern border readily provide comprehensive background information from their home countries to Federal law enforcement officials." *Id*. "The public safety and national security risks in such an environment are heightened by the presence of, and control of territory by, international cartels and other transnational criminal organizations on the other side of the

southern border, as well as terrorists and other malign actors who intend to harm the United States and the American people." *Id.*

The Federal Government also "currently lacks an effective operational capability to screen all illegal aliens crossing the southern border for communicable diseases of public-health concern, as required by" 8 U.S.C. § 1182(a)(1). 90 Fed. Reg. at 8334. "As a result, innumerable aliens potentially carrying communicable diseases of public health significance illegally cross the southern border and enter communities across the United States." *Id.* "Over the last 4 years, at least 8 million illegal aliens were encountered along the southern border of the United States, and countless millions more evaded detection and illegally entered the United States." *Id.* "The sheer number of aliens entering the United States has overwhelmed the system and rendered many of the INA's provisions ineffective, including those … intended to prevent aliens posing threats to public health, safety, and national security from entering the United States." *Id.* "As a result, millions of aliens who potentially pose significant threats to health, safety, and national security have moved into communities nationwide." *Id.*

The President thus determined that "the current situation at the southern border qualifies as an invasion." 90 Fed. Reg. at 8335. Accordingly, to address this situation, the President invoked his authority under 8 U.S.C. §§ 1182(f) and 1185(a) and found "that the entry into the United States … of aliens engaged in the invasion across the southern border is detrimental to the interests of the United States," and thus suspended the "entry into the United States of such aliens" until "a finding that the invasion at the southern border has ceased." Proclamation § 1. The Proclamation further restricts "aliens engaged in the invasion across the southern border" from "invoking the provisions of the INA that would permit their continued presence in the United States, including, but not limited to" 8 U.S.C. § 1158, until the President issues "a finding that the invasion at the

6

southern border has ceased." Proclamation § 2. Additionally, the President determined "that the entry into the United States … of any alien who fails, before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of" 8 U.S.C. § 1182(a)(1)–(3), "is detrimental to the interests of the United States"; he therefore suspended "entry into the United States of such aliens" and "restrict[ed] their access to provisions of the INA that would permit their continued presence in the United States, including, but not limited to" 8 U.S.C. § 1158. Proclamation § 3. Finally, the President invoked his "express and inherent powers in Article II of the Constitution of the United States," including "control over foreign affairs," to suspend "the physical entry of any alien engaged in the invasion across the southern border of the United States" until the President issues "a finding that the invasion at the southern border has ceased." Proclamation § 4.

Implementation of the Proclamation. Components of U.S. Customs and Border Protection (CBP) have issued guidance to instruct their agents and officers how to implement the Proclamation's terms, including how to process aliens who cross the border despite the Proclamation's suspensions on entry.

In accordance with the Proclamation, aliens who cross the southern land border between ports of entry are subject to the Proclamation's suspension and restrictions on entry. Aliens who fall into this category (other than unaccompanied alien children (UACs)), and are encountered and apprehended by U.S. Border Patrol (USBP) agents, may be processed for expedited removal or for direct repatriation under Section 1182(f). *See* Ex. A, Updated Field Guidance for Southern Border (Feb. 4, 2025); Ex. B, Updated 212F Third Country (Feb. 19, 2025). Such aliens are not permitted to apply for asylum under 8 U.S.C. § 1158 or statutory withholding of removal under 8 U.S.C.

§ 1231(b)(3), as these are "provisions of the INA that would permit their continued presence in the United States." Proclamation § 2. Aliens who manifest a fear related to the country to which CBP intends to return or remove them, however, will be referred to U.S. Citizenship and Immigration Services (USCIS) for an assessment to determine if it is more likely than not that the alien will be tortured in the designated country of return or removal, in accordance with the Convention Against Torture (CAT). Ex. B, Updated 212F Third Country (Feb. 19, 2025); Ex. A, Updated Field Guidance for Southern Border (Feb. 4, 2025); USCIS CAT Assessment Instructions and Implementation Guidance (Jan. 31, 2025). USCIS provides the referring entity (CBP or U.S. Immigration and Customs Enforcement (ICE)) with the results of the CAT assessment. Ex. C, CAT Assessment Instructions and Implementation Guidance for Alien(s) Whose Entry Has Been Suspended and/or Restricted Pursuant to INA §§ 212(f) and 215(a) (Jan. 31, 2025). If there is a positive CAT assessment, the alien may be served with a Notice to Appear for further consideration of the request for CAT protection, or another country may be designated for return or removal. Ex. A, Updated Field Guidance for Southern Border (Feb. 4, 2025); Ex. B, Updated 212F Third Country (Feb. 19, 2025). If an alien subject to the Proclamation does not manifest fear of return to the designated country of return, or if the CAT assessment is negative, CBP may proceed with return or removal to the alien's home country, Mexico, or a third country. Ex. A, Updated Field Guidance for Southern Border (Feb. 4, 2025); Ex. B, Updated 212F Third Country (Feb. 19, 2025).

Thus, under the USBP implementing procedures, some aliens who are apprehended after entering illegally between ports of entry are processed under the Proclamation for repatriation to their home country, Mexico or to a third country. Others are processed, pursuant to the authority in the Proclamation, including Section 1182(f) (INA § 212(f)), for expedited removal and receive expedited removal orders under 8 U.S.C. § 1225(b)(1). *See* Ex. A, Updated Field Guidance for

Southern Border (Feb. 4, 2025) (setting forth the different processing requirements for direct repatriation to Mexico and for expedited removal); Ex. B, Updated 212F Third Country (Feb. 19, 2025) (setting forth the processing requirements for direct repatriation to a third country).

The Proclamation also prevents the entry of aliens who have not provided sufficient medical information and reliable criminal history and background information to enable fulfillment of the requirements of 8 U.S.C. §§ 1182(a)(1)-(3). Proclamation § 3. CBP's Office of Field Operations' (OFO) implementing procedures provide that, at ports of entry, CBP Officers will generally not permit aliens (other than UACs)[1] who lack lawful permanent resident status or valid entry documents or authorizations to cross the international boundary to enter the United States. *See* Ex. D, Muster, Update: Implementation of Active Executive Orders – February 28, 2025 (Feb. 28, 2025), at 3. If an alien subject to Section 3 of the Proclamation nonetheless evades boundary-line operations or otherwise crosses the boundary line at a port of entry, that alien will generally be processed for removal. *See id.* In accordance with Section 3, these aliens are not provided the opportunity to seek asylum or statutory withholding of removal. *See id.* If the alien manifests fear, OFO officers will refer him to USCIS for a CAT screening. *Id.* Based on the outcome of the CAT assessment, CBP officers will further process the alien for removal, immigration proceedings, or further detention, as appropriate.

Procedural History. On February 3, 2025, three organizations that provide services to immigrants, Refugee and Immigrant Center for Education and Legal Services, Las Americas Immigrant Advocacy Center, and the Florence Immigrant & Refugee Rights Project, filed this suit challenging the Proclamation. ECF No. 1. On February 19, 2025, Plaintiffs amended their

---

[1] The Proclamation does not change existing policies on the identification and processing of UACs. Ex. D, Muster, Update: Implementation of Active Executive Orders – February 28, 2025 (Feb. 28, 2025), at 5.

complaint, adding 13 individual Plaintiffs. ECF No. 11. The organizational Plaintiffs allege the Proclamation will impede their core work and activities, lead them to choose to divert resources in response, and may cause them to lose funding. Am. Compl. ¶¶ 93-105. The individual Plaintiffs argue they will be harmed if the Proclamation prevents them from seeking asylum or other protection in the United States. *Id*. ¶¶ 106-110. Plaintiffs argue the Proclamation violates the asylum statute, 8 U.S.C. § 1158(a)(1), Am. Compl. ¶¶ 111-12 (Claim I); the withholding of removal statute, 8 U.S.C. § 1231(b)(3), Am. Compl. ¶¶ 115-18 (Claim II); the Foreign Affairs Reform and Restructuring Act of 1998, 8 U.S.C. § 1231 note, Am. Compl. ¶¶ 119-22 (Claim III); and the Trafficking Victims Protection Reauthorization Act of 2008, 8 U.S.C. § 1232(a)(5)(D), Am. Compl. ¶¶ 123-26 (Claim IV); the INA, 8 U.S.C. § 1101, *et seq.*, Am. Compl. ¶¶ 127-31 (Claim V). Plaintiffs further argue the Proclamation is contrary to law and arbitrary and capricious under the APA, Am. Compl. ¶¶ 132-38 (Claim VI); failed to comply with the APA's rulemaking requirements, Am. Compl. ¶¶ 139-143 (Claim VII); is ultra vires because it is not authorized by statute, Am. Compl. ¶¶ 144-52 (Claim VIII), or authorized by the Constitution, *id.* ¶¶ 153-57 (Claim IX); and violates separation-of-powers principles, Am. Compl. ¶¶ 158-60 (Claim X).

On February 19, 2025, Plaintiffs moved for a preliminary injunction on some of their claims, *see* ECF No. 14, and subsequently agreed to treat that motion as a motion for summary judgment and consolidate the hearing on the motion for preliminary injunction with the merits under Rule 65(a)(2), *see* ECF No. 24; Minute Order (Feb. 26, 2025).

## ARGUMENT

The Court should deny Plaintiffs' motion for summary judgment and grant judgment to Defendants on all claims. The individual Plaintiffs lack standing to seek prospective relief, and there is no jurisdiction for their claims seeking an order that DHS implement the INA in a particular

manner. The organizational Plaintiffs lack standing, lack jurisdiction to enforce the provisions of the expedited removal statute, and are not in the zone of interests of any of the statutes on which they base their claims. And all Plaintiffs lack a cause of action under the APA and any basis to seek relief against the President.

The President has broad discretion under the INA and Article II to suspend entry of classes of aliens, and the President's determination that such a suspension on entry is necessary to address an invasion is an unreviewable political question. This broad authority to suspend and place conditions on entry must extend to limiting the ability of aliens who enter in violation of a suspension on entry to access provisions of the INA that might apply had their entry not been barred based on serious national security, public health, and foreign policy concerns. And even if some relief were permitted here, settled constitutional and statutory principles dictate that any relief must be sharply limited.

I.    **Various Threshold Issues Bar Plaintiffs' Claims.**

A.    **The individual Plaintiffs lack standing to obtain the requested injunction.**

Plaintiffs must establish standing for each claim and each form of relief they seek. *DaimlerChrysler v. Cuno*, 547 U.S. 332, 352 (2006) ("[A] plaintiff must demonstrate standing for each claim he seeks to press"); *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought."). For each particular form of relief, a Plaintiff must show that the requested relief will redress his or her injury. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). Plaintiffs ask the Court to declare the Proclamation and implementing guidance unlawful, issue an injunction preventing Defendants from implementing the Proclamation and guidance or relying on any removal orders issued pursuant to the Proclamation, and to vacate all agency

guidance implementing the Proclamation. Am. Compl. at 39 (Prayer for Relief). Plaintiffs do not explain how this relief would benefit individual Plaintiffs who have already been repatriated and have not identified any way in which they will be subject to the Proclamation in the future. Plaintiffs D.G., F.A., K.A., Y.A., E.G., and N.S. are no longer in the United States and so this requested relief will not redress their alleged injuries. *See* Am. Compl. ¶¶ 14, 18-19; ECF No. 23 at 2 n.1. "Plaintiffs cannot simply rely on past injury to show standing," rather they "must show a likelihood that they will be injured in the future." *Johnson v. D.C.*, 248 F.R.D. 46, 56 (D.D.C. 2008) (citing *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). It is highly speculative that any of these Plaintiffs would be subject to the Proclamation in the imminent future, and indeed, none of them assert any intent to again illegally cross the border into the United States. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (injury must be "certainly impending" to satisfy Article III standing).

In their Amended Complaint, these Plaintiffs who are outside the country ask the Court to order Defendants to facilitate their return, *see* Am. Compl. at 39 (Prayer for Relief), but they do not seek this relief in their motion, *see* ECF 14 at 36. And, in any event, Plaintiffs do not identify any basis for an affirmative injunction requiring the government to return these Plaintiffs to the United States. To obtain an order compelling an agency to take a specific action—whether under the APA, 5 U.S.C. § 706(1), or under traditional equitable principles—a court must first conclude that "an agency failed to take a discrete agency action that it is required to take." *Norton v. Southwestern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004). Under traditional mandamus principles that have been carried forward into the APA, such an affirmative injunctive remedy is "normally limited to enforcement of a specific, unequivocal command"—that is, "the ordering of a precise, definite act about which an official has no discretion whatever." *Id.* at 53 (quotation and

alterations omitted). Plaintiffs do not identify any statute that creates a specific, unequivocal duty requiring the government to take affirmative steps to return individuals—even those removed pursuant to a process later held unlawful—to the United States. *See Kiyemba v. Obama*, 555 F.3d 1022, 1028-29 (D.C. Cir. 2009), *vacated*, 559 U.S. 131 (2010), *reinstated after vacatur*, 605 F.3d 1046 (D.C. Cir. 2010). Nor do Plaintiffs identify any specific remedial statute permitting the affirmative injunction they seek, even in the absence of a specific duty that could support the requested relief under the APA or traditional equitable practice. These Plaintiffs have thus failed to establish that their requested relief would redress their injuries, and they have failed to establish standing to challenge the Proclamation and implementing guidance as a result.

And all individual Plaintiffs, including those still in the United States, face additional barriers to establishing redressability. First, Plaintiffs' request for broad coercive relief requiring the government to implement various INA provisions in a particular manner—e.g., in the manner they were implemented prior to the Proclamation—is foreclosed by 8 U.S.C. § 1252(f)(1). *See infra* § III(B). Nor can Plaintiffs show that the relief they seek against guidance implementing the Proclamation would redress their injuries. Here, all legal consequences flow from the Proclamation itself, which consummates the President's decision to suspend and restrict entry. Agency officials are bound by and required to carry out the provisions of a Presidential Proclamation even if an agency issues no guidance, or if the guidance is vacated or enjoined. As a result, any such vacatur or injunction could not redress Plaintiffs injuries. *See United States v. Texas*, 599 U.S. 670, 691 (2023) (Gorsuch, J., concurring in the judgment, joined by Thomas and Barrett, JJ.) (explaining that vacating or enjoining agency guidance will not redress a plaintiff's injury if agency retains the same authority from some other source even in the absence of the guidance).

**B.      The Plaintiff Organizations lack standing to obtain the requested injunction.**

Regardless of whether the individual Plaintiffs have standing to pursue relief individually, they cannot obtain relief on behalf of the proposed class for the reasons stated in the government's concurrent opposition to class certification. That leaves the three organizational Plaintiffs (the "Organizations"), which seek to enjoin the Proclamation as to all covered aliens, without any limitation. *See* Am. Compl. at p. 39. But the Organizations lack standing to obtain such relief because the Proclamation does not directly regulate or impede their legally protected interests. At most, the Organizations—which provide legal assistance and representation to aliens located in the United States and Mexico who intend to seek asylum or other forms of protection in the U.S.—claim an indirect impact from the Proclamation's effect on aliens who would otherwise be their clients but for the Proclamation, or to whom the Organizations provide guidance. *See, e.g.*, ECF 14-2, Babaie Decl. ¶ 25. This is not the type of "invasion of a legally protected interest" sufficient to support Article III standing. *Gill v. Whitford*, 585 U.S. 48, 65 (2018); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992). The Proclamation directs government officials how to exercise their discretion to return or remove (or not return or remove) aliens, and it is well established that a plaintiff—organizational or otherwise—generally "lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). Two recent Supreme Court cases make particularly clear that the Organizations lack standing to challenge the President's discretionary decision to suspend the entry of the influx of aliens seeking to cross the southern border without authorization: *United States v. Texas*, 599 U.S. 670 (2023), and *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024).

In *Texas*, the Supreme Court held that States lacked standing to challenge immigration enforcement guidelines because, among other things, discretionary immigration enforcement

decisions relating to third parties involve no exercise of coercive power over the plaintiff; challenges to those decisions implicate Article II and foreign-policy concerns; and courts lack "meaningful standards" to assess such decisions. 599 U.S. at 678–81. Each of those reasons applies with even stronger force to the Proclamation's suspension on entry and any enforcement actions taken to affect that suspension. Courts have long recognized that the exclusion of aliens is committed to the sound discretion of the political branches, with extremely limited judicial involvement. *See infra* § I(G); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977); *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020). Here, Congress afforded the President broad discretion to exclude individual aliens or classes of aliens or impose restrictions on their entry, in statutory terms that "exude[] deference to the President in every clause," *Hawaii*, 585 U.S. at 684. *See, e.g.*, *infra* §§ I(E), (G). Accordingly, just like the plaintiff States in *Texas* lacked a judicially cognizable interest in discretionary decisions over immigration enforcement, the Organizations here lack any judicially cognizable interest arising from the Executive Branch's exercise of its sound discretion to exclude aliens who are engaged in an invasion across the southern border. *Texas*, 599 U.S. at 678.

The Supreme Court's decision in *Alliance* confirms that the Organizations lack standing here. *Alliance* held that an organization lacked standing to challenge the FDA's approval of an abortion-inducing drug. 602 U.S. at 393-394. The Court explained that organizations "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Id.* (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). To allege a concrete injury, an unregulated organizational plaintiff must allege "far more than simply a setback to the organization's abstract social interests." *Havens*, 455 U.S. at 379. As *Alliance* made clear, it is not enough that "an organization diverts its resources in response to defendant's actions" even if it will

"expend considerable time, energy, and resources" in response to a policy change. 602 U.S. at 394-95. An unregulated organization must show that the challenged action "perceptibly impair[s]" or "interferes with" its activities by imposing an affirmative "impediment" to performing those activities. *See id.* Plaintiffs' proffered evidence does not satisfy this standard.

The Organizations primarily claim that the Proclamation "eliminates" their ability to provide legal services to aliens who are undergoing expedited removal proceedings and seek protection in the United States or who are placed in non-expedited removal proceedings. *E.g.*, Am. Compl. ¶¶ 94–95, 98–99, 102–103; ECF 14-3, St. John Decl. ¶ 13; ECF 14-1, Hidalgo Decl. ¶ 14. "Like an individual, an organization may not establish standing simply based on the intensity of the litigant's interest, no matter how longstanding the interest and no matter how qualified the organization." *Alliance*, 602 U.S. at 394 (cleaned up). Yet, at base, this is all the Organizations have shown—a setback to their interest in asylum-seekers obtaining protection in the United States. *See, e.g.*, ECF 14-1, Hidalgo Decl. ¶¶ 3, 14; ECF 14-2, Babaie Decl. ¶¶ 30, 36, 39; ECF 14-3, St. John Decl. ¶¶ 8, 10, 13, 16. Plaintiffs' theory is essentially that, because the Proclamation has resulted in fewer aliens being processed for credible fear interviews or placed in non-expedited removal proceedings, the demand for certain of the Organizations' core services has been reduced or eliminated. *See* ECF 14-1, Hildago Decl. ¶¶ 14–16; ECF 14-2, Babaie Decl. ¶¶ 19, 25; ECF 14-3, St. John Decl. ¶¶ 13–14. But Plaintiffs do not explain how fewer aliens needing their services *impairs* or *interferes with* the Organizations' existing activities; it only makes those activities less necessary. Nor does a *less* demanding case load constitute injury to the Organizations' ability to carry out their activities. The Organizations claim that immigration officials are expelling and removing people without the opportunity to seek forms of protection, but they do not provide evidence that this aspect of the Proclamation itself interferes with their ability to provide services

16

to those who *are* in the expedited removal credible fear process or in removal proceedings. Nor do they claim the Proclamation itself interferes with their ability to provide other forms of immigration-related guidance to aliens in Mexico or the United States.

To the extent certain Organizations claim any hindrance to their provision of services, those alleged impacts arise not from the Proclamation's directive itself, but from separate concerns. For example, a claimed deficiency in the government's provision of information about how the Proclamation is being implemented—and any claimed corresponding impact on the Organizations' provision of legal services to aliens—cannot establish standing to challenge the Proclamation itself, which says nothing about information-sharing. *See* ECF No. 14-2, Babaie Decl. ¶¶ 6, 23, 28, 38 (asserting concerns about "lack of transparency regarding new procedures implemented by immigration enforcement agencies since the release of the Proclamation"); ECF No. 14-3, St. John Decl. ¶¶ 17–18 (asserting harms because the "government has not yet made public any information about how the Proclamation is being implemented"); *cf. California v. Texas*, 593 U.S. 659, 679–80 (2021) (holding that plaintiffs cannot use alleged injuries from one statutory provision to challenge the legality of a separate provision). The Organizations do not assert any claim expressly challenging an alleged informational deficiency, nor do they allege a specific statutory or regulatory right to such information. *See Elec. Priv. Info. Ctr. v. United States Dep't of Com.*, 928 F.3d 95, 103 (D.C. Cir. 2019). And the relief they seek is not aimed at redressing this alleged informational deficiency but instead at simply ending enforcement of the Proclamation or, at minimum, requiring processes to assess claims to asylum or other forms of protection of those subject to the Proclamation. *See* Am. Compl. (ECF 11) at p.39; Pls.' Mot. for Summ. J. (ECF 14) at 1. Because "standing is not dispensed in gross," *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017); *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), injury from a purported lack

of informational transparency does not confer standing to challenge or obtain relief from the Proclamation's substantive restrictions on asylum or other forms of protection from removal.

Moreover, any claimed impediments generally relate to the Organizations' provision of services to aliens who are seeking protection in the United States, where those forms of protection are largely unavailable under the Proclamation. Thus, at its core, the Organizations' complaint is that the Proclamation makes it more difficult for aliens to obtain asylum or other forms of protection in the United States by eliminating immigration processing for certain aliens. *See, e.g.*, ECF 14-1, Hidalgo Decl. ¶ 21; ECF 14-2, Babaie Decl. ¶ 36. This boils down to an abstract disagreement with the Presidential action, not an impairment of the Organizations' ability to provide services. Even if the Proclamation has the incidental effect of temporarily frustrating the Organizations' missions of helping aliens obtain asylum in the United States, such "frustration of an organization's objective" alone cannot constitute a cognizable Article III injury. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015); *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) ("[T]he presence of a direct conflict between the defendant's conduct and the organization's mission is ... not alone sufficient ... to establish standing."); *Citizens for Resp. & Ethics in Washington v. U.S. Off. of Special Couns.*, 480 F. Supp. 3d 118, 128 (D.D.C. 2020) ("[A]n organization seeking to bring a case in its own right must first allege that the challenged conduct perceptibly impairs its activities, as opposed to merely frustrating its mission.").

The fact that the Organizations claim a potential future loss of funding from a potential future diminishment of a particular client base, Am. Compl. ¶ 105, does not alter this analysis. *First*, the Organizations have not substantiated any such prospective injury, as required at the summary-judgment stage. *See Lujan,* 504 U.S. at 561; Fed. R. Civ. P. 56(c). Because they seek

injunctive relief or its equivalent (universal vacatur), the Organizations must show "a substantial probability of injury." *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015). They have not done so. The Organizations have largely failed to identify any specific funding stream they claim is at risk or its parameters. At most, two of the Organizations speculate that the Proclamation *may* have some future impact on their funding sources, because it is unclear how long the Proclamation will be in place. *See* ECF 14-2, Babaie Decl. ¶ 32 (asserting vague "concern[s]" about ability to maintain unspecified grant awards); ECF 14-3, St. John Decl. ¶¶ 19-20; *see also* Am. Compl. ¶ 105.[2] But injury must be "actual or imminent" at the time Plaintiffs filed suit. *See Lujan*, 504 U.S. at 560, 571 n.4. Injury that is still speculative and remote is insufficient to satisfy Article III's standing requirements, particularly at the summary-judgment stage and where the Plaintiffs seek injunctive relief. *See Clapper*, 568 U.S. at 416; *Swanson Grp. Mfg. LLC*, 790 F.3d at 240; *see also Alliance*, 602 U.S. at 383 ("distant (even if predictable) ripple effects" of government action "cannot establish Article III standing").

*Second*, the Organizations' claim of injury from alleged future loss of funding due to a diminishment of their client base is circular. They claim certain funding they receive is tied directly to the provision of certain services to asylum-seekers, and therefore if the Proclamation results in fewer asylum-seekers, their funding will be proportionally reduced. Am. Compl. ¶ 105; ECF 14-3, St. John Decl. ¶ 20. That claim incorrectly assumes the conclusion that a reduction in asylum-

---

[2] The Florence Project identifies a funding stream that it claims may be at risk from the decrease in aliens in credible fear proceedings, but its claim to loss of this funding is extremely speculative. *See* ECF 14-3, St. John Decl. ¶ 20. It speculates that its referrals to serve as appointed counsel for *Franco-Gonzalez* class members in removal proceedings will decrease, and that its funding to handle such cases will correspondingly decrease, but it acknowledges that the majority of its referrals are from a population other than aliens subject to the Proclamation. *See id.*

seekers is a cognizable injury in the first place; if it is not, then the Organizations cannot claim any cognizable injury from not receiving funding for services they are no longer providing.

The Organizations also assert that the Proclamation has caused them to "divert resources" to learning and obtaining information about the Proclamation, training staff, and revising "know your rights" materials or otherwise educating aliens and relevant communities. *E.g.*, ECF 14-1, Hidalgo Decl. ¶¶ 11, 17–20; ECF 14-2, Babaie Decl. ¶¶ 31, 37; ECF 14-3, St. John Decl. ¶ 15. But these actions and related expenditures are ones the Organizations have chosen to undertake in response to the Proclamation as a continuation of their core activities of providing services to those who intend to seek protection in the United States. They do not represent any separate impairment of the Organizations' pre-existing activities. An organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Alliance*, 602 U.S. at 394. "[S]omething about the challenged action itself—rather than the organization's response to it—[must] make[] the organization's task more difficult." *Ctr. for Responsible Science v. Gottlieb*, 346 F Supp. 3d 29, 41 (D.D.C. 2018).

This rule is not limited to pure issue-advocacy organizations, but applies equally to direct services organizations who spend money *in response* to the policy. As the Supreme Court's reasoning in *Alliance* made clear, courts should not allow an organization to demonstrate standing any time it shifts resources in response to a policy from one set of direct-service activities to another set of similar activities in support of its mission. Instead, the organization must show that the new policy directly harms its already-existing core activities. To hold otherwise would impermissibly allow organizations to manufacture standing to challenge any policy that touches on their mission. *See Alliance*, 602 U.S. at 394. As the Supreme Court explained, its prior decision in *Havens Realty*—an "unusual case"—did not establish such a broad standing rule. *Id.* at 395–96.

To the extent that any D.C. Circuit or district court authority suggests that it would be enough for an organization to plead a frustration of mission and some action taken in response to that frustration—without any showing of an impairment to its pre-existing activities—such precedent cannot be reconciled with *Alliance*.

Moreover, the Organizations' resource expenditures on educational efforts are insufficient to allege standing, even under pre-*Alliance* precedent. "An organization does **not** suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects to the organization to 'operational costs beyond those normally expended." *Food & Water Watch*, 808 F.3d at 920 (emphasis in original) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)); *see also Int'l Academy of Oral Medicine & Toxicology*, 195 F. Supp. 3d 243, 258 (D.D.C. 2016). Here, the Organizations have not specifically asserted any actual or projected overall increase in expenditures due to the Proclamation, or any added operational costs. Instead, the research and educational activities that the Organizations claim as injury represent a "continuation" of the "core set of activities" (providing guidance to asylum-seekers) that the Organizations were already conducting in furtherance of their mission. *See Int'l Academy of Oral Medicine & Toxicology*, 195 F. Supp. 3d 243, 258 (D.D.C. 2016).

The Organizations thus lack standing.[3]

---

[3] Nor do the Organizations plead or assert any facts that could support alternate theories of standing. The Organizations have not alleged or asserted that they are membership organizations or identified a single member who has suffered, or will imminently suffer, a concrete injury from the Proclamation as required to show associational standing. Am. Compl. ¶¶ 9–11; *see Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977) ("[A]n association has standing to bring suit on behalf of its members when ... its members would otherwise have standing to sue in their own right[.]"); *Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219, 1225 (D.C. Cir. 2024) (same). The Organizations likewise do not purport to—and cannot—assert third-party standing to bring suit on behalf of unidentified aliens covered by the Proclamation. "Ordinarily, a party must assert his own legal rights and cannot rest his claim to relief on the legal rights of third

### C.    Section 1252 bars the Organizations' attempt to enforce provisions of the expedited removal statute.

Plaintiffs challenge the Proclamation for failing to follow the requirements of the expedited removal statute, 8 U.S.C. § 1225(b)(1), *see, e.g.*, Am. Compl. ¶¶ 129-30, but the INA bars the Organizations' claim. Although 28 U.S.C. § 1331 generally supplies jurisdiction over federal questions, 8 U.S.C. § 1252(a)(2)(A) eliminates jurisdiction for claims related to the decision to invoke the provisions of the expedited removal statute unless expressly permitted by 8 U.S.C. § 1252(e). *See Make the Road v. Wolf*, 962 F.3d 612, 626 (D.C. Cir. 2020). Section 1252(a)(2)(A), titled "Matters not subject to judicial review," provides that "[n]otwithstanding any other provision of law ... no court shall have jurisdiction to review ... except as provided in subsection (e)," "a decision ... to invoke the provisions of such section," or "procedures and policies adopted ... to implement" § 1225(b)(1). 8 U.S.C. § 1252(a)(2)(A)(i), (ii), (iv). Section 1252(a)(2)(A) thus removes from federal courts any jurisdiction to review issues "relating to section 1225(b)(1)," *i.e.*, expedited removal proceedings or credible fear determinations, other than as permitted by § 1252(e). *See Patchak v. Zinke*, 583 U.S. 244, 248–49 (2018) ("notwithstanding any other provision of law" in jurisdictional provision encompasses 28 U.S.C. § 1331).

Although Plaintiffs cite Section 1252(e)(3) as a basis for jurisdiction over their claims, *see* Am. Compl. ¶¶ 7-8, the Organizations cannot bring claims under this section. The D.C. Circuit has twice held that claims brought by organizations under Section 1252(e)(3) are limited to claims

---

parties." *Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017) (cleaned up). Generally, courts will not recognize standing to assert others' rights unless the third-party plaintiff has "a close relationship with the person who possesses the right [and] there is a hindrance to the possessor's ability to protect his own interests." *Id.* (alteration in original); *see also Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004); *AILA v. Reno*, 199 F.3d 1352, 1364 (D.C. Cir. 2000). The Organizations have not identified any covered alien on behalf of whom they are bringing their claims, and there are individual Plaintiffs in this action who are bringing their own claims to assert any purported rights to apply for asylum or other forms of protection within the United States.

advanced on behalf of *individuals* subject to the expedited removal provisions under a theory of associational standing. *See Make the Road*, 962 F.3d at 627-28. Through § 1252(e)(3), "Congress meant to allow actions *only by aliens* who have been subjected to the summary procedures contained in § 1225(b) and its implementing regulations." *AILA*, 199 F.3d at 1359 (emphasis added); *see also id.* ("Congress … contemplated that lawsuits challenging [actions]" through Section 1252(e)(3) "would be brought, if at all, by individual aliens who … were aggrieved by the statute's implementation"); *id.* at 1364 (noting in particular "the bar on class actions" in Section 1252(e)(1)(B), as an indication of congressional intent that only individual aliens raise claims under Section 1252(e)(3)); *Make the Road*, 962 F.3d at 627. The Court lacks jurisdiction under Section 1252(e)(3) to hear claims based on alleged injuries to organizations rather than to individual aliens.

### D.    The Organizations are not within the zone of interests.

The Organizations' claims are similarly outside the zone of interests of the statutes on which they base their claims. The APA does not "allow suit by every person suffering injury in fact." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987). Instead, it provides a cause of action only to one "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. For a plaintiff to be "aggrieved," "the interest sought to be protected" must "be arguably within the zone of interests to be protected or regulated by the statute ... in question." *Clarke*, 479 U.S. at 396 (modifications omitted). "[O]n any given claim the injury that supplies constitutional standing must be the same as the injury within the requisite 'zone of interests.'" *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996). The organizational Plaintiffs invoke no such interest here.

Nothing in the asylum or removal provisions of the INA protects the interests of nonprofit organizations providing legal services to aliens. Sections 1158, 1225, and 1231 do not evince any concern with organizations or their interest in representing asylum seekers. *See* 8 U.S.C. § 1158(d)(7) ("Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies..."); *id.* § 1231(h) ("Nothing in [Section 1231] shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers."); *id.* § 1252(a)(2)(A). These provisions do not regulate the organizational Plaintiffs' conduct or create any benefits for which these organizations themselves might be eligible. And courts have routinely concluded that immigration statutes are directed at aliens, not organizations advocating for them.

When confronted with a similar challenge brought by "organizations that provide legal help to immigrants," Justice O'Connor concluded that the Immigration Reform and Control Act "was clearly meant to protect the interests of undocumented aliens, not the interests of [such] organizations," and the fact that a "regulation may affect the way an organization allocates its resources ... does not give standing to an entity which is not within the zone of interests the statute meant to protect." *INS v. Legalization Assistance Project of L.A. Cty.*, 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers). The D.C. Circuit and other courts have thus held that immigrant advocacy organizations are outside the immigration statutes' zone of interests. *See, e.g.*, *Fed'n for Am. Immigration Reform, Inc. (FAIR) v. Reno*, 93 F.3d 897, 900-04 (D.C. Cir. 1996).

That reasoning fully applies here. The Organizations are not seeking asylum or contesting removal; they seek to help others do so. Nothing in "the relevant provisions [can] be fairly read to implicate [Plaintiffs'] interest in the efficient use of resources." *Nw. Immigrant Rights Project v.*

*USCIS*, 325 F.R.D. 671, 688 (W.D. Wash. 2016). Because the organizations are outside the statutory scheme, the alleged effects on their resources are outside the statutory zone of interests.

Defendants acknowledge that courts, including this Court, have sometimes held that the zone-of-interests test should be applied permissively and found organizations to satisfy it even in the context of the INA. *See, e.g.*, *O.A. v. Trump*, 404 F. Supp. 3d 109, 144 (D.D.C. 2019). This more lenient version of the test no longer survives the Supreme Court's more recent decision in *United States v. Texas*, 599 U.S. 670 (2023). The Supreme Court has clarified—relying on principles that inform not only the scope of Article III but also the scope of the APA's cause of action—that third parties like Plaintiffs have no cognizable interest in the way the Executive enforces the immigration laws against others. 599 U.S. at 674, 677; *see also Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 897 (1984) ("private persons such as petitioners have no judicially cognizable interest in procuring enforcement of the immigration laws"). The APA's cause of action exists only for "persons adversely affected or aggrieved by agency action within the meaning of the relevant statute," *Block v. Community Nutrition Inst.*, 467 U.S. 340, 345 (1984) (citation and quotation marks omitted)—*i.e.*, persons to whom Congress intended to accord privately enforceable rights. *See Thompson v. North Am. Stainless, LP*, 562 U.S. 170, 177-178 (2011). None of the statutes Plaintiffs invoke confers on any third party in the United States a judicially cognizable interest in the entry of aliens. Sections 1182(f) and 1185(a)(1) confer discretion on the President, not rights on private parties. And the removal and asylum provisions Plaintiffs cite address aliens, not organizations or other entities in the United States. The Organizations are thus outside the relevant zone of interests.

> **E.    Plaintiffs cannot raise a claim under the APA where the President is not an agency and Plaintiffs have not identified any reviewable final agency action.**

The APA does not provide a cause of action for judicial review of a Presidential

Proclamation. The President is not an agency, and his actions are not subject to APA review. *See Franklin*, 505 U.S. at 801 (holding that the Presidents' "actions are not subject to [the APA's] requirements" and are thus not reviewable under the APA). Plaintiffs' request to enjoin the Proclamation thus cannot be based in the APA or its standards. *See E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018). As the Ninth Circuit has explained, "[t]he scope of our review [under the APA] ... is limited to 'agency action,' and the President is not an 'agency.'" *Id.* at 770. "Accordingly, the President's 'actions are not subject to [APA] requirements," and this Court "do[es] not have any authority under § 706 of the APA to review" a Presidential Proclamation issued under 8 U.S.C. § 1182(f). *Id.*; *see also Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991) (refusing to hold that the President is an "agency" within the meaning of the APA); *Feds for Med. Freedom v. Biden*, 581 F. Supp. 3d 826, 835 (S.D. Tex.), *aff'd on reh'g en banc,* 63 F.4th 366 (5th Cir. 2023) (declining to consider the plaintiffs' APA claims challenging a vaccine mandate, stating "there is nothing for the court to review under the APA" because "executive orders are not reviewable under the APA."); *Motions Sys. Corp. v. Bush*, 437 F.3d 1356, 1359 (Fed. Cir. 2006) ("Motion Systems acknowledges that it cannot challenge the President's actions under the APA because the President is not an 'agency.'").

Plaintiffs also cannot pursue an APA claim against DHS because they have not identified any final agency action distinct from the Proclamation. *See* 5 U.S.C. § 704. Plaintiffs cannot seek APA review merely by generally alleging that "the Non-President Defendants have issued written guidance" that "announce[s]" the provisions of the Proclamation. Am. Compl. ¶ 135. *See, e.g., Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 427 (D.C. Cir. 2004) (holding that agency guidance that "restated" legal requirements contained in other sources and thus was "purely informational in nature" was not a reviewable agency action); *Tulare Cnty. v. Bush*, 185 F. Supp.

2d 18, 28–29 (D.D.C. 2001), *aff'd,* 306 F.3d 1138 (D.C. Cir. 2002) (holding APA review does not extend to agency action "merely carrying out directives of the President" for the same reasons "APA does not apply to presidential action," since "the action in question is an extension of the President's action"); *Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 395 (D.C. Cir. 2013) (recognizing that "interpretative rules or statements of policy generally do not qualify" as final agency action and are not subject to judicial review under the APA "because they are not finally determinative of … issues or rights"). The Supreme Court has held that Courts cannot "postulat[e] the existence of an agency decision wholly apart from any 'agency statement of general or particular applicability ... designed to implement' that decision." *Texas v. Biden*, 597 U.S. 785, 809 (2022) (quoting 5 U.S.C. § 551(4)).

   *Texas* concerned the Secretary of Homeland Security's termination of the Migrant Protection Protocols ("MPP") via a June 1, 2021 memorandum, and later in an October 29, 2021 memorandum. The Fifth Circuit had affirmed the district court's decision related to the June memorandum even though that memorandum had been replaced by the October memorandum by the time the court issued its decision because it viewed both memoranda as merely evidence of the Secretary's separate, freestanding, policy decision to terminate MPP. *Texas v. Biden*, 20 F.4th 928, 951, 950-58 (5th Cir. 2021). The Supreme Court reversed, holding that APA review is not available if plaintiffs have not identified a particular operative agency action with legal effect. 597 U.S. at 809 ("To the extent that the Court of Appeals understood itself to be reviewing an abstract decision apart from specific agency action, as defined in the APA, that was error."). Similarly, here, the Proclamation—and its directive to the Secretary, the Attorney General and the Department of State to act—is the only legally relevant document Plaintiffs have identified.

Even if APA review were generally available for Presidential actions, it still would be precluded here. The APA's cause of action expressly leaves intact "other limitations on judicial review," 5 U.S.C. § 702(1), which includes the longstanding limitation on review of Executive decisions to deny entry to aliens, *see supra* § I; *Allen v. Milas*, 896 F.3d 1094, 1107 (9th Cir. 2018); *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1160 (D.C. Cir. 1999). The APA also does not permit review of actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). A Proclamation under 8 U.S.C. §§ 1182(f) and 1185(a)(1) is just such a discretionary action because these statutory provisions provide broad discretionary authority to the President to suspend by proclamation the entry of any class of aliens whenever he finds their entry would be detrimental to the United States. *See infra* § II. Indeed, "[b]y its terms, § 1182(f) exudes deference to the President." *Hawaii*, 585 U.S. at 684; *see also Webster v. Doe*, 486 U.S. 592, 600 (1998) (holding that similar statutory language that "exudes deference" to the Executive cannot be reviewed under the APA because it "foreclose[s] the application of any meaningful judicial standard of review"); *Sale*, 509 U.S. at 187 (discussing broad authority under § 1182(f)); *Abourezk v. Reagan*, 785 F.2d 1043, 1049, n.2 (D.C. Cir. 1986) (describing the President's "sweeping proclamation power").

### F.    Plaintiffs' demands for relief against the President must be dismissed.

Plaintiffs ask this Court to enjoin the President from implementing the Proclamation and to declare the Proclamation unlawful in its entirety. Am. Compl. at 39 (Prayer for Relief). As the Supreme Court has long recognized, however, federal courts cannot issue an injunction purporting to supervise the President's performance of his duties. *Mississippi*, 71 U.S. at 501 ("[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties."); *see Franklin*, 505 U.S. 802 (plurality opinion) (noting that "grant of injunctive relief against the President [ ] is extraordinary, and should have raised judicial eyebrows"). This limitation reflects

the respect due to the President's "unique position in the constitutional scheme." *See Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27, 749–50 (1982) (declining to assume that implied damages "cause[s] of action run[] against the President"). Plaintiffs may contend that their injunctive claim fits within a narrow exception that the Supreme Court might have allowed for injunctive claims seeking to direct the President to perform "ministerial" functions." *See Franklin*, 505 U.S. at 802–03 (noting that *Mississippi* "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial duty'"); *see also Mississippi*, 71 U.S. at 500 (defining "ministerial duty" as "one in respect to which nothing is left to discretion"). But that possible exception has no application here, where the Proclamation was issued pursuant to the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a), which accord enormous discretion to the President to suspend entry and impose restrictions on any and all aliens.

As for Plaintiffs' request for declaratory relief, the D.C. Circuit, following *Franklin*, has squarely held that "declaratory relief" against the President for his non-ministerial conduct "is unavailable" too. *Newdow v. Roberts*, 603 F.3d 1002, 1012–13 (D.C. Cir. 2010). That is because "a court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions." *Id.* at 1012 (citing *Mississippi*, 71 U.S. at 499); *see also Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) ("Sound separation-of-power principles counsel the Court against granting [injunctive and declaratory] relief against the President directly."). In sum, "similar considerations regarding a court's power to issue [injunctive] relief against the President himself apply to [a] request for a declaratory judgment." *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). And contrary to Plaintiffs' tenth claim for relief, respect for separation of powers would in fact counsel *against* any judicial attempt to supervise or otherwise interfere with the President's execution of his core, non-ministerial duties. *See Adams v. Vance*, 570 F.2d 950, 954–56 (D.C.

Cir. 1978) (holding that a "request for an order directing action by the [Executive] in foreign affairs plainly constitutes" an "intru[sion] into the core concerns of the executive branch," and that "[c]ourts are not in a position to exercise a judgment that is fully sensitive to" the diverse concerns that underlie foreign affairs (quotation marks omitted)).

G.    There is no source of law under which Plaintiffs can maintain their claims.

Plaintiffs have no cause of action under either the APA or the Proclamation. First, the APA applies only to those "adversely affected or aggrieved by agency action within the meaning of a relevant *statute*"—*i.e.*, persons to whom Congress intended to afford privately enforceable rights. 5 U.S.C. § 702 (emphasis added); *see Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177–78 (2011). But Plaintiffs have no privately enforceable rights in this context. As explained in detail below, *infra* § II(B), the INA permits the President to suspend entry of aliens entirely and to impose restrictions based on his determination of the interests of the United States. Plaintiffs thus cannot allege that Defendants have violated the INA or any other statute; their claims are limited to purported violations of the Proclamation itself—which they are unable to show.

The Proclamation unambiguously forecloses judicial review. This is consistent with the general principle that "there is no private right of action to enforce obligations imposed on executive branch officials by executive orders." *See Chai v. Carroll*, 48 F.3d 1331, 1338 (4th Cir. 1995) (quotations and citation omitted). Unlike statutes and regulations, which carry "the force and effect of law," proclamations are management tools for implementing the President's policies, not legally binding documents that may be enforced against the Executive Branch. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265 (1954). And the only statutes that the Proclamation does invoke are 8 U.S.C. § 1182(f) and § 1185(a), which "vest[] the President with

ample power to impose entry restrictions" and "exude[] deference to the President in every clause."

*Hawaii*, 585 U.S. at 684 (quotation marks omitted).

Section 1182(f), in relevant part, provides the following:

Whenever the President finds that the entry of any aliens or any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). By its terms, this provision grants the President broad authority over the administration of the immigration system, confirming his discretion at every turn. That far-reaching scope of the President's Section 1182(f) power was recognized from the outset: when the Immigration and Nationality Act of 1952 was being drafted, legislators characterized the provision as an exceedingly broad one that would allow "the President the power to suspend all immigration whenever he feels it is the national interest to do so." 98 Cong. Rec. 4249 (1952) (letter from Rhoads Murphey, Friends Comm. on National Legislation); *id.* at 4304–05, 4423, 5114 (statements of Reps. Celler and Multer and Sen. Lehman); *see also* S. Rep. No. 137, 82d Cong., 2d Sess. Pt. 2, at 4 (1952) (minority views); *see generally* S. Rep. No. 1137, 82d Cong., 2d Sess., at 14 (1952); H. Rep. No. 1365, 82d Cong., 2d Sess., at 53 (1952). Thus, the President's reliance on Section 1182(f) to impose "restrictions on entry for aliens invading the United States" is in keeping with the expansive understanding of executive powers that consistently has attached to the provision. *See* Proclamation § 2; *see, e.g.*, *Sale*, 509 U.S. at 187 ("It is perfectly clear that 8 U.S.C. § 1182(f) ... grants the President ample power to establish a naval blockade that would simply deny illegal Haitian migrants the ability to disembark on our shores.").

Section 1185(a) likewise confirms the breadth of the President's authority:

Unless otherwise ordered by the President, it shall be unlawful . . . for any alien to depart from or enter or attempt to depart from or enter the United States except under such

31

> reasonable rules, regulations, and orders, and subject to such limitations and exceptions as
> the President may prescribe[.]

8 U.S.C. § 1185(a)(1). That statute does not require any predicate findings at all, but simply gives
the President the authority to restrict entry to the United States according to "such limitations and
exceptions as the President may prescribe." *Id.*; *see Haig v. Agee*, 453 U.S. 280, 297 (1981)
(construing similar language in § 1185(b)—which governs United States citizens—as "le[aving]
the power to make exceptions exclusively in the hands of the Executive"); *Allende v. Shultz*, 845
F.2d 1111, 1118 & n.13 (1st Cir. 1988). As with Section 1182(f), the history of Section 1185(a)
confirms the broad discretion accorded to the President over immigration matters: the statute was
originally enacted in 1918 as a wartime measure authorizing restrictions if the President found that
"the public safety require[d]" them. 40 Stat. 559 (1918). In 1978, Congress broadened the statute
even further by removing not only the wartime requirement but also the requirement for *any*
predicate finding for restrictions the President might order. *See* Pub. L. No. 95-426, sec. 707(a),
92 Stat. 963, 992–93 (1978).

In short, based on their plain text, these statutes provide no basis for judicial second-
guessing of the President's determinations about what restrictions to "prescribe" or what
restrictions are necessary to avoid "detriment[] to the interests of the United States." Congress
specifically entrusted those matters to the President, and 'the power to *expel* or exclude aliens as a
fundamental sovereign attribute exercised" by the political branches remains "largely immune
from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (emphasis added). In fact, "[t]he
right to do so stems not alone from legislative power but is *inherent* in the executive power to
control the foreign affairs of the nation." *Knauff*, 338 U.S. at 542 (emphasis added); *see Am. Ins.
Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (holding that the "historical gloss on the executive

Power vested in Article II of the Constitution has recognized the President's vast share of responsibility for the conduct of our foreign relations" (internal quotation marks omitted)).

While Plaintiffs attempt to cabin the reach of these broadly worded statutes by claiming that they only authorize the President "to suspend 'entry,'" Compl. ¶ 43, that reading fails to account for the "long-established rule"—which undergirds both Sections 1182(f) and 1185(a)—that "*the power over aliens* is of a political character and therefore subject only to narrow judicial review." *See Fiallo*, 430 U.S. at 792 (emphasis added) (quotation marks omitted); *see also Hawaii*, 585 U.S. at 686, 704 (holding that "plaintiffs' request for a searching inquiry into the persuasiveness of the President's justifications [was] inconsistent with the broad statutory text and the deference traditionally accorded the President in th[e] sphere" of immigration, which "overlap[s] with the area of national security," among others (quotation marks omitted)). Here, the restrictions introduced by the President under Sections 1182(f) and 1185(a) are inextricably linked to his "broad power over the creation and administration of the immigration system," which necessarily includes the regulation of such discretionary benefits as asylum. *Kerry v. Din*, 576 U.S. 86, 106 (2015) (Kennedy, J., concurring in judgment). Thus, in addition to the clear statutory basis on which the Proclamation rests, the President's decision to impose restrictions in the national interest is a fundamental act of sovereignty and consistent with his Executive duty to maintain effective control over the immigration system as a whole. *Knauff*, 338 U.S. at 542–43.

The Proclamation is a valid exercise of the President's authority under Sections 1182(f) and 1185(a), and is not subject to review. *Cf. Hawaii*, 585 U.S. at 683 (assuming without deciding that plaintiffs' statutory claims were reviewable). And all of Plaintiffs' claims that the President's actions exceeded his statutory authority—including their eighth claim of an *ultra vires* statutory violation—should be dismissed.

**H.     The determination that the United States is facing an invasion is an unreviewable political question.**

Plaintiffs argue that the influx of illegal immigrants does not constitute an invasion under Article IV, § 4 of the Constitution and that the President does not have the authority to invoke the Invasion Clause, *see* ECF 14 at 30, 33-34, but the federal courts have consistently held that the determination by the Executive of whether an "invasion" is occurring so as to trigger this clause presents a nonjusticiable political question. *See*, *e.g.*, *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (collecting cases). Plaintiffs' challenge to the Proclamation on Article IV, § 4 grounds should accordingly be dismissed.

As noted by the Supreme Court, the gravamen of any political question is "essentially a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 217 (1962). To guide courts in determining when such a question is raised, the Supreme Court identified six "formulations" that indicate a question has been committed to the political branches:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* "To find a political question, [the court] need only conclude that one [of these] factor[s] is present, not all." *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005). Plaintiffs' second-guessing of the Executive's management of immigration policy in this context implicates several of these factors.

First, the determination that the influx of illegal immigrants constitutes an "invasion" sits at the intersection of two issues textually committed to the political branches of the government: (1) foreign affairs, *see California*, 104 F.3d at 1091 ("the issue of protection of the States from invasion implicates foreign policy concerns which have been constitutionally committed to the political branches."); *see also El-Shifa Pharmaceutical Industries Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) ("The political question doctrine bars our review of claims that, regardless of how they are styled, call into question the prudence of the political branches in matters of foreign policy or national security constitutionally committed to their discretion."); and (2) immigration policy, *see Mathews v. Diaz*, 426 U.S. 67, 81 (1976) ("the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government."). As observed by the Supreme Court, "any policy towards aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952).

Second, even without the clear textual commitment to the Executive of the constitutional responsibilities undergirding issuance of the Proclamation, there are no manageable standards that would permit a court to assess "whether or when an influx of illegal immigrants should be said to constitute an invasion." *California*, 104 F.3d at 1091; *see Chiles v. United States*, 874 F. Supp. 1334, 1344 (S.D. Fl. 1994) ("the Court is unable to identify[] a manageable standard for determining when the migration, as well as the costs associated with such migration, reaches the point at which it invades the State of Florida's state sovereignty"). The Constitution simply fails

to provide any basis for determining when an influx of illegal immigrants may qualify as an "invasion," and thus no basis for second-guessing the policy determination made by the Executive in this case that such an "invasion" is occurring. For these reasons, Plaintiffs' *ultra vires/* constitutional claim (Claim 9) also fails.

## II.    Plaintiffs' Claims Fail on the Merits.

### A.    Suspension on entry must necessarily encompass ability to expel those who enter unlawfully where the reason for the suspension is invasion through unlawful entry.

Plaintiffs argue that neither Section 1182(f) nor the Executive's inherent Article II powers provide authority to remove or repatriate illegal entrants who have gained physical entry to the United States. *See* ECF 14 at 26-28, 31-32 & n.2. That contention is in tension with prior constructions of Section 1182(f), unduly cabins the President's inherent constitutional authority, and is illogical on its face.

Nothing in Section 1182(f) forecloses repatriation of illegal immigrants who manage to gain physical entry to the United States notwithstanding a Proclamation barring such entry. The language of the statute is focused on the point of entry, which contemplates a suspension of physical entry at the border (or, if abroad, a determination of inadmissibility before a consular officer). But it would render the statute's authority to prohibit physical entry ineffective if that authority did not also permit the President to "take action against a covered alien who disregarded the prohibition and managed to set foot on U.S. soil." *See Huisha-Huisha*, 27 F.4th at 729. And courts should avoid interpretations of statutes that would allow for such evasion of the statute's primary purpose. *See Abramski v. United States*, 573 U.S. 169 (2014) (interpreting provisions of Gun Control Act regulating firearms sales to treat the real buyer, rather than the straw purchase, as the "transferee" so as not to "undermine . . . the gun law's core provisions"); *County of Maui v.*

*Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1473 (2020) (rejecting an interpretation of a statute that would allow a polluter to avoid a permit requirement simply by moving its pipe so that it was not discharging directly into the sea).

Indeed, the Supreme Court has already interpreted Section 1182(f) in a far more expansive fashion. In *Sale v. Haitian Centers Council, Inc.*, the Supreme Court concluded that Section 1182(f) would authorize a naval blockade outside the territorial waters of the United States that would "deny illegal Haitian migrants the ability to disembark on our shores." 509 U.S. at 187. Rather than hold to a crabbed view of the statute as permitting the government to bar entry at the border alone or simply to conclude that an intending immigrant is inadmissible, the Supreme Court reasonably held that the government could take action pursuant to Section 1182(f) to pretermit an alien's ability to reach the border in the first place.

The exercise of authority in this case is simply the other side of the *Sale* coin; rather than taking preventative action to ensure that aliens subject to the Proclamation do not reach the border, the instant Proclamation seeks to ensure that aliens who physically enter the United States *despite* the suspension of entry can be repatriated. If anything, the exercise of authority in this case is more compelling than in *Sale*. In *Sale*, the Executive sought only to proactively enforce the suspension of entry via interdiction. Here, in contrast, the mechanism of expulsion is necessary to ensure the utility of the Proclamation itself. That Proclamation is concerned with the ongoing influx of illegal immigrants into the United States.

This interpretation is consistent with the anti-circumvention principle that the D.C. Circuit applied in the related context of expulsions under Title 42. *See Huisha-Huisha*, 27 F.4th 718. In that case, as here, the Court was interpreting a statutory provision that ostensibly only barred entry or "introduction." *See* 42 U.S.C. § 265 (titled "Suspension of entries and imports," and providing

"the power to prohibit, whole or in part, the introduction of persons . . ."). Yet the Court rejected the contention that this statute did not extend to the *expulsion* of aliens who entered in violation of a Title 42 suspension. Rather, in holding that the government could expel aliens under the authority of Title 42, the Court reasoned that the authority to suspend entry would "be rendered largely nugatory if the Executive could not take any action against a[n otherwise] covered alien who disregarded the prohibition and managed to set foot on U.S. soil." *See Huisha-Huisha*, 27 F.4th at 729. That same reasoning applies to this case; absent the repatriation authority contained in the Proclamation, the status quo pre-Proclamation would prevail, any physical entrant would be processed through some form of Title 8 removal proceedings, and the entire purpose of the Proclamation would be vitiated.

Plaintiffs contend that authority under Section 1182(f) is, effectively, limited to imposing new requirements or limitations on admissibility, *i.e.*, the terms under which an alien may seek lawful entry into the United States. *See* ECF 14 at 28. The President's authority under Section 1182(f) unquestionably encompasses the authority to "impose additional limitations on entry beyond the grounds for exclusion set forth in the INA." *Hawaii*, 585 U.S. at 691; *accord Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986). Yet the decision in *Sale* points to a more expansive construction of the provision as permitting actions to ensure aliens cannot gain entry during a period of suspension, which logically extends to permissible action to summarily remove or repatriate those who *do* gain entry *despite* the suspension. Moreover, there is no *textual* limitation in the statute that would bar removal or repatriation of aliens who entered the United States during a period where entry had been suspended by proclamation, *see generally* 8 U.S.C. § 1182(f), and the statute otherwise "exudes deference to the President in every clause," *Hawaii*, 585 U.S. at 684. That deference encompasses the Proclamation, suspending entry *and* providing

for the expulsion of aliens who unlawfully enter the United States during periods where entry has been suspended. Nor can the placement of Section 1182(f) within the INA's inadmissibility provision otherwise limit the breadth of the authority therein granted. *Cf. Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998) ("[T]he title of a statute ... cannot limit the plain meaning of the text.").

Even without the extraordinarily deferential language of Section 1182(f), the President's action here would be supported by the inherent authority of the Executive over admissions decisions. Since the advent of federal immigration law in the 1880s, the Supreme Court has recognized that the power of excluding aliens from U.S. territory is an inherent attribute of sovereignty exercised by the political branches of the government. *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936) ("It results that the investment of the federal government with the powers of external sovereignty did not depend upon the affirmative grants of the Constitution."); *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892) ("It is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe."). Thus, "[w]hen Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an *inherent executive power*." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) (emphasis added).

This inherent authority to *exclude* also extends to repatriation in the narrow context of this case. "The right of a nation to expel or deport foreigners who have not been naturalized or taken any steps towards becoming citizens of the country, rests upon the same grounds, and is as absolute and unqualified, as the right to prohibit and prevent their entrance into the country." *Fong Yue*

*Ting v. United States*, 149 U.S. 698, 707 (1893). Although the Executive's inherent authority over expulsion is not likely as broad as its authority over exclusion, *cf. Knauff*, 338 U.S. at 543, the circumstances of this case support a residual authority to repatriate aliens who enter when a Presidential Proclamation has suspended entry pursuant to Section 1182(f). As the Supreme Court opined in *Knauff*, "because the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power ... [and] Executive officers may be entrusted with the duty of specifying the procedures for carrying out the congressional intent." *Id*. Here, mandating the repatriation of aliens whose entry was barred at the time they entered the United States on account of a Presidential Proclamation under Section 1182(f) is a permissible Executive Branch exercise of inherent authority, that is also consistent with the broad parameters Congress utilized to implement the inherently sovereign function of regulating entry of aliens into the United States. The Executive's inherent authority in the context of expulsion may be more circumscribed than in that of exclusion, but it is broad enough to encompass the policy embodied in the instant Proclamation.

Plaintiffs nonetheless contend (ECF 14 at 32) that Executive authority in this context is at its "lowest ebb" because the Proclamation is "incompatible with the expressed or implied will of Congress." *Id.* (quoting *Youngstown Sheet*, 343 U.S. at 638 (Jackson, J. concurring)). Plaintiffs' argument is incorrect; a Presidential Proclamation issued pursuant to his constitutional authority over national security and foreign affairs, coupled with an express delegation of authority from Congress to suspend or restrict entry, is a quintessential exercise of the President's power at its peak. *Id.* at 635-37; *see also Hawaii*, 585 U.S. at 712 (Thomas, J., concurring) (noting "Section 1182(f) does not set forth any judicially enforceable limits that constrain the President ... [n]or could it, since the President has *inherent* authority to exclude aliens from the country."). In

circumstances such as those presented by this case, where the President "acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co.*, 343 U.S. at 635 (Jackson, J. concurring).

Accordingly, the Court should deny, and grant judgment to the government on, Plaintiffs' claims premised on statutory provisions that apply to aliens who are permitted to enter the United States, including claims one through five, as well as claim six to the extent that claim is based on an argument that guidance implementing the Proclamation is contrary to statute.[4]

**B.    The Proclamation is adequately supported by the President's finding that the entry of aliens who are engaged in an invasion across the southern border would be detrimental to the interests of the United States.**

This expansive understanding of the President's authority reinforced by Section 1182(f) extends even to any findings that might underlay a restriction on entry. All Section 1182(f) requires is that the President find the entry of a class of aliens would be detrimental "to the interests of the United States." 8 U.S.C. § 1182(f). There is no requirement that a restriction imposed under Section 1182(f) satisfy more stringent standards found elsewhere in the law, such as in the free exercise context. *See, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (finding, in the free exercise context, that a "law burdening religious practice ... must undergo the *most rigorous* of scrutiny ... and must be *narrowly tailored* in pursuit of [compelling] state interests." (emphases added)); *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981) (narrow tailoring requires state to demonstrate any "inroad on religious liberty" is "the *least restrictive* means of achieving" its objective (emphasis added)). Indeed, Section 1182(f) does not even demand any finding that a restriction would safeguard national

---

[4] The Court has stayed the remainder of claim six and all of claim seven.

security—only that the entry of the class of aliens identified by the President is detrimental to the general "interests" of the country. 8 U.S.C. § 1182(f).

It is no surprise, then, that for decades Presidents have imposed restrictions pursuant to Sections 1182(f) and 1185(a)—which does not even require any predicate findings at all—without detailed public justifications or findings. *See, e.g.*, Proclamation 8,015, 71 Fed. Reg. 28,541 (May 12, 2006) (barring entry of members of the Belarussian government based on the importance of "fostering democratic institutions in Belarus"); Exec. Order No. 12,172, § 1-101 (Nov. 26, 1979) (President Carter invoking § 1185(a)(1) to restrict Iranian nationals without any findings, and delegating authority to prescribe restrictions to lower Executive Branch officials). In fact, Executive Order No. 12,807—the presidential action at issue in *Sale*—contained only a *single sentence* justifying its measures. Exec. Order No. 12,807, pmbl. pt. 4 (1992) ("There continues to be a serious problem of persons attempting to come to the United States by sea without necessary documentation and otherwise illegally."). Yet the Supreme Court expressed no concerns about the sufficiency of that finding, and instead remarked on the "ample power" given to the President, declaring that "[w]hether the President's chosen method" made sense from a policy perspective was "irrelevant to the scope of his authority" under the statute. *Sale*, 509 U.S. at 187–88. Against this background, there is no basis to conclude that the exceedingly broad terms of Section 1182(f) should instead be read so narrowly as to prevent the President from meaningfully exercising his power over the entry of aliens. Thus, along with the rest of the Complaint, Plaintiffs' eighth claim of an *ultra vires* statutory violation for exceeding the President's authority under Section 1182(f) should be denied, and the Court should grant judgment to Defendants.

**C.    The Proclamation does not violate the provisions of the INA that Plaintiffs identify in their first and second claims.**

The Proclamation permissibly bars entry for all aliens covered by its provisions, a proposition Plaintiffs do not contest on its own terms. Likewise, for reasons already noted, the Proclamation permissibly extends to the repatriation of aliens who, although covered by the Proclamation and thus barred from entering, manage to effectuate a physical entry in violation of the law. Part and parcel with these provisions is the Proclamation's limitation on consideration for asylum, a discretionary form of relief under the INA, and statutory withholding of removal. That limitation on relief and protection follows directly from the plain language of the statute, which extends to—and, accordingly, bars—entry of aliens as refugees, and is supported by the common-sense proposition that the government need not engage in futile consideration of an application for relief or protection that cannot result in an actual grant of relief or entry into the United States.

As an initial matter, the language of Section 1182(f) naturally extends to pretermission of asylum eligibility during a period where a suspension of entry is in effect. That provision allows the President to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants," specified classes that include asylees. *See* 8 U.S.C. § 1101(a)(15) ("The term 'immigrant' means *every alien* except an alien who is within one of the following classes of nonimmigrant aliens--...") (emphasis added). The Supreme Court has recognized that broad deference is due even to "the President's chosen method of preventing" an influx of illegal immigrants into the United States, holding that the relative "risk of harm" associated with repatriating an alien under § 1182(f) is "irrelevant to the scope of [the President's] authority to take action" that the statute does not "clearly prohibit[]." *Sale*, 509 U.S. at 187–88. As discussed above, *supra* § II.A, the President's vast powers to suspend entry would be severely undermined if he "could not take any action" or impose certain restrictions to discourage aliens from simply

43

"disregard[ing] the prohibition" and illegally entering the United States to pursue (and potentially qualify for) benefits even after having flouted the law. *See Huisha-Huisha*, 27 F.4th at 729. Allowing aliens who are covered by a Proclamation to seek asylum and thereby be admitted to the United States would run contrary to Section 1182(f)'s allowance for a total suspension of entry.

Moreover, asylum is a discretionary form of relief that is permissibly precluded by the suspension authority of Section 1182(f), especially in the context of this case where consideration of the application cannot result in relief. As the D.C. Circuit opined in considering a claim that the COVID expulsion order pursuant to 42 U.S.C. § 265 could not override the asylum statute:

> The best reconciliation of the two statutes is based on the discretionary nature of asylum. The Executive "may grant asylum." Or it may not. It is a matter of executive "discretion." And here, for public-health reasons, the Executive has shown an intent to exercise his "discretion" by foreclosing asylum for the specific subset of border crossers covered by its § 265 Order. It's true that the § 265 Order forecloses more than just a grant of asylum; it also forecloses the statutorily mandated procedures that aliens use to apply for asylum. But if the asylum decision has already been made – by the § 265 Order – then those procedures would be futile.

*Huisha-Huisha*, 27 F.4th at 730-31. The same rationale controls in the context of Section 1182(f). To the extent that the Proclamation extends to intending-asylum seekers, the Executive has exercised its discretion to foreclose relief to that class of aliens. And although the Proclamation additionally "forecloses the statutorily mandated procedures that aliens use to apply for asylum," *Id.* at 731, there can be no harm in that foreclosure where the end result is preordained: the Proclamation bars entry, including as an asylee, and thus no favorable decision on an application is possible. Processing precluded applications is a paper-pushing exercise that would serve no purpose.

The text and structure of the INA similarly support the Proclamation's prohibition on considering applications for withholding of removal. First, Section 1231(b)(3)(A) is concerned solely with *removal*, a legal principle not relevant to the parameters of a Proclamation issued pursuant to Section 1182(f), which instead relates to the suspension of *entry* of certain aliens or their repatriation following unlawful entry. *See* 8 U.S.C. § 1229a (setting out the rules and procedures governing "removal proceedings," including that an "immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien"); 8 U.S.C. § 1229 (providing that removal proceedings under § 1229a are initiated by issuance of a written notice (or "notice to appear")); *see also Zhong v. U.S. Dep't of Justice*, 480 F.3d 104, 108 n.3 (2d Cir. 2007) (discussing the replacement of "'deportation' with 'removal' as the *term of art* used to refer to the denial or revocation of admittance to this country" (emphasis added)).

The Proclamation does not speak to removal proceedings, and thus any constraint Section 1231(b)(3)(A) would impose in *removal* proceedings is not implicated here. Second, Section 1231(b)(3)(A), which applies to actions taken by the Attorney General, is not a legal constraint on the authority the President may exercise under Section 1182(f). *See Sale*, 509 U.S. at 172-73 (recognizing the distinct grants of authority under the INA to, *inter alia*, the President and the Attorney General as it relates to suspending consideration of withholding of removal). And that is the case even if the Attorney General or Secretary of Homeland Security otherwise implements guidance or conducts enforcement pursuant to the Proclamation; in such circumstances, those actors are "carrying out an executive, rather than a legislative, command, and therefore would not necessarily [be] bound" by Section 1231(b)(3)(A). *Id.* at 172 n.28; *cf. Knauff*, 338 U.S. at 542 ("[B]ecause the power or exclusion of aliens is also *inherent* in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power, [as the

government contends § 1182(f) does here], for the best interests of the country during a time of national emergency." (emphasis added)).[5]

Plaintiffs' contrary arguments misapprehend the scope of authority under Section 1182(f) and ultimately lack merit.

*First*, Plaintiffs contend (ECF 14 at 27-28) that, because inadmissible aliens are generally permitted to apply for asylum once they are in the United States whether or not they have legally entered the country, Section 1182(f) cannot restrict an alien's ability to seek such relief. Had Congress desired such a result, Plaintiffs argue, it would have made that decision explicit in the statute. *Id.* But Congress *did* make that determination explicit. By permitting the President to suspend the entry of all or any discrete class of aliens, which includes intending asylees and refugees under the plain language of the statute, Congress did contemplate a suspension of entry extending to such aliens. Having enacted a provision that contemplates barring entry to asylees and refugees, Plaintiffs' contention that the invocation of Section 1182(f) in this case violates the INA lacks merit.

Plaintiffs further appeal to the principle of statutory construction that "the specific governs the general," ECF 14 at 28 (citation omitted), is similarly misguided and reverses the relevant provisions. The asylum statute provides a general rule that aliens who arrive in the United States may usually apply for asylum, while Section 1182(f) provides a specific condition applicable depending on the terms of any Proclamation issued under that authority. Again, Congress clearly contemplated asylees and refugees falling within the scope of the language used in Section 1182(f),

---

[5] Moreover, the statute makes clear that "[n]othing in [Section 1231] shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers." 8 U.S.C. § 1231(h); *see also* 8 U.S.C. § 1252(a)(5), (b)(9) (narrowly circumscribing the circumstances in which an alien can raise a protection claim).

and thus it is that section that provides a very narrow, specific exception to the more general availability of asylum and related protection for aliens who arrive in the United States.

*Second*, Plaintiffs argue that Section 1182(f) cannot be used to foreclose asylum or withholding of removal, because that provision is concerned only with questions of admissibility, visa eligibility, or other limitations on lawful entry to the United States. *See* ECF 14 at 28. The President's authority under Section 1182(f) unquestionably encompasses the authority to "impose additional limitations on entry beyond the grounds for exclusion set forth in the INA." *Hawaii*, 585 U.S. at 691; *accord Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986). Yet the decision in *Sale* points to a more expansive construction of that provision as permitting actions to ensure aliens cannot gain entry during a period of suspension, which logically extends to permissible action to summarily repatriate those who *do* gain entry *despite* the suspension. Moreover, there is no *textual* limitation in the statute that would bar expulsion or limit the scope of authority granted by Section 1182(f), and that provision otherwise "exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684. Nor can the placement of Section 1182(f) within the INA's admissibility provision otherwise limit the breadth of the authority therein granted. *Cf. Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998) ("[T]he title of a statute ... cannot limit the plain meaning of the text.").

*Third*, Plaintiffs contend that if Section 1182(f) is interpreted to preclude asylum and related protection, it "would render nonsensical the specific limits that Congress imposed on the Executive Branch's power to restrict asylum." ECF 14 at 29. This argument misses the fact that any Proclamation issued under Section 1182(f), and thus any limitation on asylum potentially implemented by such a Proclamation, is time-limited. *See Hawaii*, 585 U.S. at 687 ("the Proclamation makes clear that its 'conditional restrictions' will remain in force only so long as

necessary to 'address' the identified 'inadequacies and risks'"). In this case, for instance, the Proclamation and its limitations on asylum and withholding of removal last only until the President "determine[s] that the invasion has concluded." Proclamation Preamble; *see Hawaii*, 585 U.S. at 687 ("when a President suspends entry in response to a diplomatic dispute or policy concern, he may link the duration of those restrictions, implicitly or explicitly, to the resolution of the triggering condition."). To implement a lasting limitation on asylum eligibility, the Executive would still have to proceed through notice and comment rulemaking under Section 1158(b)(2)(C). The authority under Section 1182(f) is thus not a negation of the statutory limits Congress imposed, but rather a time-limited mechanism, fully contemplated by Congress, for limiting or suspending entry of aliens, including those who intend to seek asylum.

*Finally*, Plaintiffs contend that the Proclamation's limitation on asylum and related protection is contrary to past practice of the Executive Branch and has never been contemplated in the exercise of authority under Section 1182(f). ECF 14 at 29. Concededly, prior uses of the authority under Section 1182(f) have not limited eligibility for asylum, and where that result *is* intended a Presidential Proclamation has been coupled with a regulation implemented under Section 1158(b)(2)(C). *See*, *e.g.*, *Securing the Border*, 89 Fed. Reg. 81,156 (Oct. 7, 2024); *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55,934 (Nov. 9, 2018). Yet there is no *textual* reason to "confine expansive language in light of its past applications" in the fashion Plaintiffs are arguing. *Cf. Hawaii*, 585 U.S. at 693. Having assessed the language of the statute and its interaction with the relief provisions of the INA, as well as the interpretation of Section 1182(f) in *Sale* and the D.C. Circuit's construction of the federal government's authority under Title 42, the government has determined that a Proclamation under Section 1182(f) may permissibly limit an alien's access to asylum or

withholding of removal in the United States. It is the merits of *that* determination the Court should assess, not the consistency of that determination with prior instances of Proclamations which failed to fully grapple with the relevant legal authorities.

Accordingly, Plaintiffs' first and second claims fail on the merits.

### D.    The Proclamation is consistent with FARRA (Claim 3).

In their third claim, Am. Compl. ¶¶ 119-122, Plaintiffs contend that the Proclamation violates the Foreign Affairs Reform and Restructuring Act of 1998, 8 U.S.C. § 1231 note, which implements the CAT prohibition on returning an alien to a country where he or she more likely than not would be tortured, *see* 8 C.F.R. § 208.16(c)(2); 8 C.F.R. § 1208.16(c)(2), "by depriving noncitizens of a meaningful opportunity to present CAT claims." Plaintiffs are incorrect.

CAT protection is not provided by the INA and so is not subject to the Proclamation's limitation on invoking provisions of the INA. If there were any doubt on that point, the agency guidance makes clear that Defendants are assessing aliens covered by the Proclamation for CAT protection. Ex. C. CBP officers and agents are directed to refer any alien who manifests fear of return to their country of nationality (or any third country to which they are being repatriated) to USCIS for a screening for eligibility for CAT relief. Exs. A, B, C. Aliens with positive CAT assessments may be placed into removal proceedings pursuant to 8 U.S.C. § 1229a or potentially returned or removed to another country. *Id.*; Ex. D at 3-5. This is similar to the screening for CAT protection aliens attempting to enter the country unlawfully would receive absent the Proclamation. *See* 8 U.S.C. 1225(b)(1)(A); 8 C.F.R. § 208.30(d), (e)(1), (f); *see also* 8 C.F.R. §§ 208.33(b)(2), 208.35(b)(2). The Proclamation thus renders ineligible for asylum or withholding of removal those aliens who are subject to the Proclamation by virtue of entering the United States

unlawfully between ports of entry or seeking to enter at ports of entry without the required documentation, but it does not bar those individuals from CAT protection.

E. **The Proclamation is consistent with the TVPRA (Claim 4).**

In their fourth claim, Am. Compl. ¶¶ 123-26, Plaintiffs allege that the Proclamation violates the provision of the Trafficking Victims Protection Reauthorization Act, 8 U.S.C. § 1232(a)(5)(D), generally requiring that the government place any UACs it seeks to remove in removal proceedings pursuant to 8 U.S.C. § 1229a.

As an initial matter, none of the Plaintiffs is a UAC and so Plaintiffs lack standing to raise this claim. In any event, this claim is also indisputably defeated by the agency guidance, which makes clear that the Proclamation does not apply to UACs and does not displace the procedures for UACs established by the TVPRA. "The Proclamation does not change existing policies on the identification and processing of UAC[s]." Ex. D at 5. Agency guidance directs that, "[i]n accordance with [the] TVPRA," DHS officers are to "continue to process Unaccompanied Alien Children (UAC) under normal processing procedures." Ex. A at 1. Plaintiffs point to nothing suggesting otherwise.

F. **The Proclamation is consistent with Section 1225(b) (Claim 5).**

Even assuming Plaintiffs could assert a claim that the Proclamation violates Section 1225(b)(1)—and they cannot for the reasons noted above, *see supra* at § I(C)—their fifth claim, *see* Am. Compl. ¶¶ 129-30, would still fail. As the guidance indicates, Section 1225(b)(1) procedures are available to certain aliens subject to the Proclamation. Plaintiffs' dispute with the adequacy of those procedures is limited to the argument that aliens subject to the Proclamation are not permitted to pursue asylum and withholding of removal under Section 1225(b)(1)'s procedures for raising and handling such claims because that relief is foreclosed by the Proclamation. *See* Am.

Compl. ¶¶ 129-30; ECF 14 at 16-17. Because this claim is really a challenge to the Proclamation's bar to invoking asylum under Section 1158(a)(1)—which sets out the general authority to apply for asylum either under that section "or, where applicable, section 1225(b)"—or other provisions of the INA such as withholding of removal, this claim fails for the same reasons as their first and second claims. *See supra* at § II(C).

**G.    The Proclamation does not exceed the President's authority under Article II (Claim 9).**

Plaintiffs' ninth claim for relief argues that the Proclamation exceeds the President's constitutional authority because there is, in their view, no invasion. Am. Compl. ¶¶ 154-57. This request to review the President's determination that the United States is facing an invasion fails for the reasons already noted, *see supra* at § I(H), and since this is the only basis for this claim, it must fail on the merits. Plaintiffs argue the Invasion Clause refers "to the *entire federal government*," and argue the Guarantee Clause "is primarily a legislative power," ECF 14 at 33, but they cite no authority holding the President has no role in Article IV, Section 4's guarantee that the United States "shall protect each" State "against Invasion." Plaintiffs also argue that immigration cannot constitute an invasion, ECF 14 at 33-34, but courts have similarly held that this argument raises an unreviewable political question, *see Chiles v. U.S.*, 69 F.3d 1094, 1097 (11th Cir. 1995) (holding that "whether the level of illegal immigration is an 'invasion'" presents a "nonjusticiable political question[ ]").

**H.    The Proclamation does not violate separation of powers (Claim 10).**

Plaintiffs argue the Proclamation violates separation-of-powers principles and is thus unconstitutional because it "override[s] Congress's careful and longstanding decisions to provide" certain protections to aliens by statute. Am. Compl. ¶¶ 154-57. This is not a separate constitutional claim but rather a simple repackaging of Plaintiffs' statutory claims and thus fails for the same

51

reasons set forth above, particularly where the President is acting not only under his Article II powers but also under the broad authority Congress delegated him under the INA in Section 1182(f). *See Dalton v. Specter*, 511 U.S. 462, 471-73 (1994) (holding that claims that a President acted in excess of statutory authority are unreviewable statutory claims, not constitutional claims, even when framed in terms of separation of powers); *see also id.* at 474 (noting that, even assuming "claims that the President has violated a statutory mandate are judicially reviewable … longstanding authority holds that such review is not available when the statute in question commits the decision to the discretion of the President"); *cf. Hawaii*, 585 U.S. at 704 ("The upshot of our cases in this context is clear: 'Any rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,' and our inquiry into matters of entry and national security is highly constrained.'" (quoting *Mathews,* 426 U.S. at 81-82)).

The whole purpose of Section 1182(f) is to permit the President to restrict entry of aliens who otherwise might be able to enter the United States and seek certain relief under the other provisions of the INA if not for Section 1182(f). And it expressly authorizes him to "impose ... *any* restrictions he may deem appropriate" on aliens' entry. 8 U.S.C. § 1182(f) (emphasis added). The President's suspension and conditions on entry under this broad authority does not violate separation of powers. *See also supra* at § I(F) (discussing limits on jurisdiction to order relief related to the President's non-ministerial duties).

## III.    Any Relief Must be Sharply Limited.

### A.  Relief must be narrowly tailored to address only cognizable harms of Plaintiffs properly before the Court.

Under settled constitutional and equitable principles, the Court may not issue relief that is broader than necessary to remedy actual harm shown by specific Plaintiffs. *Gill*, 585 U.S. at 73

("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."). "[S]tanding is not dispensed in gross," *Lewis*, 518 U.S. at 358 n.5, and Plaintiffs bear the burden to "demonstrate standing separately for each form of relief sought" and "each claim [they] seek[] to press." *DaimlerChrysler Corp. v Cuno*, 547 U.S. 332, 352 (2006). As discussed above, the Organizations lack standing to obtain relief concerning the Proclamation or its implementation. *See supra* §§ I(B)–(D). Likewise, the individual Plaintiffs who are no longer in the United States lack standing to pursue prospective relief on behalf of others, and facilitation of their return to the United States is not an available remedy. *See supra* § I(A); Defs.' Opp. to Mot. for Class Certification (filed concurrently) § I. And, as argued concurrently, no class of aliens subject to the Proclamation should be certified. *See* Defs.' Opp. to Mot. for Class Certification (filed concurrently). Accordingly, even if the remaining individual Plaintiffs were to prevail on the merits of any of their challenges to the Proclamation—which, as discussed above, they cannot— the only relief that could possibly be warranted is that which has already provided by agreement to the remaining individual Plaintiffs: relief from the application of the Proclamation, or aspects thereof, to specific Plaintiffs.

But even if the Court could entertain issuing relief that goes broader than relief to certain individual Plaintiffs, equitable considerations preclude the sweeping relief Plaintiffs seek. Injunctions, or relief that operates like an injunction, must be "narrowly tailored to remedy the specific harm shown." *Nebraska Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006). Plaintiffs ask this Court to declare the Proclamation and all implementing documents or actions unlawful, to vacate all of those implementing documents and actions, and to enjoin Defendants from implementing all aspects of the Proclamation, nationwide. Am. Compl. at 39, Prayer for Relief. This relief goes far beyond Plaintiffs' claims, which challenge

and assert harm arising from only those aspects of the Proclamation that restrict aliens' invocation of protection from removal once in the United States, and which do not claim harm arising from the use of the Proclamation to prevent physical entry into United States territory. *See, e.g.*, Am. Compl. ¶¶ 112-13, 143; ECF 14 at 11 (stating that Plaintiffs' motion for preliminary injunction "does not seek relief against the Proclamation's implementation to prevent noncitizens from ever physically reaching U.S. territory"). Accordingly, any relief *at minimum* must be tailored to address only those aspects of the Proclamation's implementation that Plaintiffs claim are unlawful. *See Nebraska Dep't of Health & Hum. Servs.*, 435 F.3d at 330 (holding that district court abused discretion in vacating agency actions that were not directly challenged in any of Plaintiffs' claims). But other statutory and equitable limitations further curtail the availability of relief.

### B.  Section 1252(f)(1) limits the relief this Court may issue.

The Court likewise lacks authority to issue an injunction against the implementation of the Proclamation because that injunction seeks to require Defendants to provide certain "statutory protections for noncitizens who are or have been physically present in the United States." ECF 14 at 11. The "protections" Plaintiffs seek to enforce through this relief include withholding of removal under 8 U.S.C. § 1231(b)(3)(A), *see* ECF 14 at 15, and access to removal proceedings under 8 U.S.C. § 1229a or to certain expedited removal procedures under 8 U.S.C. § 1225,[6] where aliens may raise various claims for relief or protection from removal, including asylum or CAT protection, *see* ECF 14 at 15–17. *See also* Am. Compl. ¶¶ 42–50, 70–84.

Congress has prohibited the lower courts from entering such classwide relief. The INA provides:

---

[6] DHS has discretion whether to place an alien in expedited removal or full removal proceedings. *See Matter of E-R-M-*, 25 I. & N. Dec. 520, 521–24 (BIA 2011).

> Regardless of the nature of the action or claim or of the identity of the party or
> parties bringing the action, no court (other than the Supreme Court) shall have
> jurisdiction or authority to enjoin or restrain the operation of the provisions of part
> IV of this subchapter, as amended by the Illegal Immigration Reform and
> Immigrant Responsibility Act of 1996,[7] other than with respect to the application
> of such provisions to an individual alien against whom proceedings under such part
> have been initiated.

8 U.S.C. § 1252(f)(1). Section 1252(f)(1) "generally prohibits lower courts from entering

injunctions that order federal officials to take or to refrain from taking actions to enforce,

implement, or otherwise carry out the specified statutory provisions," *Garland v. Aleman

Gonzalez*, 596 U.S. 543, 550 (2022), except in "individual cases" of aliens already in immigration

proceedings, *Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*, 525 U.S. 471, 481–82

(1999).

   Prohibiting the wholesale implementation or enforcement of the Proclamation—whether

through injunctive relief or vacatur of implementing guidance or actions—would violate Section

1252(f)(1) because it would compel DHS to provide aliens with credible fear interviews under

Section 1225 or removal proceedings under Section 1229a (both of which provisions are covered

by Section 1252(f)(1)). Specifically, such a blanket injunction would compel immigration officers

to "refer ... alien[s]" in expedited removal "for an interview by an asylum officer." 8 U.S.C.

§ 1225(b)(1)(A)(ii). It would compel asylum officers to "conduct interviews of aliens," *id.*

§ 1225(b)(1)(B)(i), and if the aliens are determined to have a credible fear, to "detain[]" them "for

further consideration of the application for asylum" in proceedings before an immigration judge,

---

[7] This reference to "the provisions of part IV of this subchapter, as amended by [IIRIRA]" is often
cited as referring to 8 U.S.C. §§ 1221-1232. *See, e.g.*, *Garland v. Aleman Gonzalez*, 596 U.S. 543,
549 (2022). However, the text of the statute as enacted referred to "chapter 4 of title II" of the INA,
which is not completely coextensive with "part IV of this subchapter" as set forth in the codified
version of the statute. *See Moreno Galvez v. Jaddou,* 52 F. 4th 821, 830 (9th Cir. 2022)). The
statutory provisions at issue here—8 U.S.C. §§ 1225, 1229a and 1231 (INA §§ 235, 240, and
241)—are all contained in "chapter 4 of title II" of the INA and thus covered by § 1252.

*id.* § 1225(b)(1)(B)(ii). Or, it would compel DHS to place aliens in full removal proceedings, where the aliens may attempt to satisfy their "burden of proof to establish" they warrant relief from removal. *Id.* § 1229a(c)(4)(A). Compelling immigration officers to operate these provisions in such a manner—or any specific manner—is precisely what Congress prohibited. *See Aleman Gonzalez*, 596 U.S. at 550 (Section 1252(f)(1)'s prohibition applies "not just to the statute itself but to the way that it is being carried out").

Thus, it does not matter that Plaintiffs claim that their requested relief would remedy a *violation of* covered statutes. The Supreme Court in *Aleman Gonzalez* "poured cold water on [that] premise." *Al Otro Lado v. Mayorkas*, 619 F. Supp. 3d 1029, 1042 (S.D. Cal. 2022). The Supreme Court concluded "even injunctions that 'enjoin or restrain' the 'unlawful' or 'improper operation,' *i.e.*, violations, of § 1252(f)(1)'s covered provisions clash with that statute's remedy bar." *Id.*; *see also Hamama v. Adducci*, 912 F.3d 869, 879-80 (6th Cir. 2018) (rejecting as "implausible on its face" the argument that that Section 1252(f)(1) permits injunctions which seek to "ensure [the covered provisions] are correctly enforced").

It also does not matter for purposes of Section 1252(f)(1) whether Plaintiffs seek vacatur or an injunction, or both. Like an injunction, vacatur "restrict[s] or stop[s] official action," *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015), by prohibiting officials from relying on the agency action under review. A vacatur of the implementing guidance is thus the practical equivalent of an injunction compelling Defendants to stop implementing the Proclamation. Consistent with that functional approach, the Supreme Court has repeatedly given a broad interpretation to terms such as "injunction" in other statutes. For example, the Court interpreted a statute conferring jurisdiction over appeals from "injunction[s] in certain civil actions to apply to orders with a "coercive" effect. *Aberdeen & Rockfish R.R. v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 422

U.S. 289, 307 (1975). The Court commented that it had "repeatedly exercised jurisdiction under [the provision] over appeals from orders" that were "not cast in injunctive language but which by their terms simply 'set aside' or declined to 'set aside' orders of the [agency]." *Id.* at 308 n.11 (quotation omitted). Here, too, vacatur of implementing guidance qualifies as an injunction barred by § 1252(f)(1) because it would coerce and restrain the agency's operation of covered statutes.

In any event, the plain language of Section 1252(f)(1) does not limit itself to injunctions. Instead, it prohibits lower-court orders that "enjoin *or restrain*" the Executive Branch's operation of the covered provisions. 8 U.S.C. § 1252(f)(1) (emphasis added). The common denominator of those terms is that they involve coercion. *See* Black's Law Dictionary 529 (6th ed. 1990) ("[e]njoin" means to "require," "command," or "positively direct" (emphasis omitted)); *id.* at 1314 ("[r]estrain" means to "limit" or "put compulsion upon" (emphasis omitted)). Together, they indicate that a court may not impose coercive relief that "interfere[s] with the Government's efforts to operate" the covered provisions in a particular way. *Aleman Gonzalez*, 596 U.S. at 551. That meaning easily encompasses judicial vacatur. Indeed, it is precisely what Congress intended in codifying Section 1252(f) and limiting such remedial authority to the Supreme Court. *See* H.R. Rep. No. 104-469, pt. 1, at 161 (Conference Report) ("These limitations do not preclude challenges to the new procedures, but the procedures will remain in force while such lawsuits are pending.").

Plaintiffs may argue their requested relief is permissible despite Section 1252(f)(1) because an injunction against the Proclamation is not an injunction against the covered INA provisions. That argument has already been considered and persuasively rejected by a district judge in the Southern District of California. In the *Al Otro Lado* litigation, a district court considered whether to enjoin, as a remedy for asserted violations of Sections 1158 and 1225, CBP's practice of regulating the pace at which undocumented aliens entered the ports of entry along the U.S.-Mexico

border. *See, e.g., Al Otro Lado*, 619 F. Supp. 3d at 1034–35. Although the court held CBP's

practice unlawful, it nevertheless concluded it could not enjoin the practice because such an order

would compel the government to discharge its obligations under Section 1225. The court reasoned:

> Although § 1158 and § 1225 in no uncertain terms impose upon [DHS and CBP] a
> mandatory ministerial duty to inspect and refer asylum seekers in the process of
> arriving at Class A POEs, *Aleman Gonzalez* appears to suggest that Defendants
> have *carte blanche* to refuse to do so, as long as they present to a lower court a
> *claimed* ground for their refusal, even if a federal court ultimately finds that basis
> meritless.

*Id.* at 1044.

So too here. Although Plaintiffs seek a blanket injunction against the implementation or

enforcement of the Proclamation, that relief would compel the government to operate multiple

covered INA provisions in a specific manner, and it would do so as to an entire class—meaning,

as to more than "an individual alien against whom proceedings ... have been initiated." 8 U.S.C.

§ 1252(f)(1). Indeed, this is precisely the relief Plaintiffs desire. *See* ECF 14 at 36 (seeking an

order prohibiting Defendants from "restrict[ing] statutory protections ... for noncitizens who are

physically present in the United States"); *see also, e.g.*, Am. Compl. ¶¶ 42–50, 70–84 (providing

an overview of the statutory procedures for immigration proceedings and arguing the

implementation of the Proclamation deprives Plaintiffs of access to those proceedings).

Consequently, Section 1252(f)(1) prohibits relief that would enjoin the implementation or

enforcement of the Proclamation as to anyone beyond the individual Plaintiffs.

### C. An injunction is not warranted because the Proclamation's enforcement is necessary to mitigate severe, ongoing harms to the public from illegal immigration.

Even if a permanent injunction were an available remedy, Plaintiffs have not shown that

such relief is warranted here. "An injunction is a matter of equitable discretion; it does not follow

from success on the merits as a matter of course." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S.

7, 32 (2008). Permanent injunctive relief may only be granted where the plaintiff succeeds on the merits and demonstrates: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *Winter*, 555 U.S. at 32. Where the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, the balance of the equities weighs heavily against the issuance of injunctive relief. Given the extreme, sustained surge of illegal migration across the southern border—straining DHS's ability to deliver swift immigration consequences, which in turn has fueled further migration, Ex. E ¶¶ 9–14—the President deemed it necessary to suspend the entry of those aliens who seek to cross the border illegally and without any screening for public safety or national security risks. Ex. E, Declaration of Ihsan Gunduz, Acting Deputy Assistant Secretary for Border and Immigration Policy for DHS; 90 Fed. Reg. 8333. Since its inception, the Proclamation has served as a key tool to reduce southern border encounters, assist in restoring operational control over the border, and prevent the entry or release into the interior of aliens who present risks to national security, public safety, or public health. The public interest would be greatly disserved if Defendants were enjoined from implementing the Proclamation.

Over the past four years, at least 8 million illegal aliens have been encountered along the southern border of the United States, and countless millions more evaded detection after entering the United States illegally. Ex. E ¶¶ 2, 7; 90 Fed. Reg. 8333. This migration has placed substantial costs and burdens on border communities and strained DHS resources. The sheer numbers of aliens

crossing the southern border and the increase in the number of such aliens claiming fear meant that DHS could not make full use of expedited removal. *See* Ex. E ¶¶ 9–13. DHS further could not adequately screen for public health concerns. Ex. E ¶ 16. And there were increased encounters with aliens that pose threats to national security and public safety, although it is very difficult to verify with certainty the criminal record or national-security risks associated with those who enter across the border due to significant information gaps and processing times. Ex. E ¶¶ 17, 19. The sheer number of aliens crossing the border also opens up law enforcement gaps of which terrorist and criminal organizations are able to take advantage. Ex. E ¶¶ 20–21.

The Proclamation is critical to addressing these concerns, which prior efforts have proven unsuccessful at fully mitigating. Ex. E ¶¶ 2-49. Since the Proclamation's implementation, southwest-border encounters between POEs have decreased by almost half, releases from U.S. Border Patrol custody have decreased by 80%, and there have been substantial indicators of decreased drug trafficking activity. Ex. E ¶¶ 36-37, 40. If Defendants were enjoined from implementing the Proclamation, this would risk a loss of operational control over the southern border. And DHS's experience with similar past injunctions indicates that an injunction of the Proclamation would incentivize aliens to unlawfully enter the United States, leading again to large-scale releases of aliens who may present public-safety or health risks into communities nationwide, and the weakening of the government's defenses against transnational criminal organizations (TCOs). Ex. E ¶¶ 39–48. These transnational criminal organizations—and, in particular, Mexico-based TCOs—endanger the health and safety of millions of Americans through drug trafficking, and engage in other illegal activities, including weapons trafficking and human trafficking, that challenge U.S. national security. Ex. F, Decl. of Tulsi Gabbard, Director of National Intelligence ¶¶ 5–12. Large flows of illegal migrants across borders likewise make screening and vetting of

foreign nationals more difficult, even as foreign nationals with potential terrorist connections continue to attempt to enter the United States. *Id.* ¶¶ 12–20.

Thus, Plaintiffs' contention that Defendants and the public "will suffer no harm whatsoever" from an injunction, ECF 14 at 36, is flatly wrong. Moreover, even assuming the public has an interest in preventing removal of those who are eligible for asylum or other forms of protection, *see* ECF 14 at 36–37, it is the broken asylum and expedited removal system that has exacerbated the surge in migration levels and contributed to the need for the Proclamation's suspension on entry. The sheer number of people seeking to enter illegally has made it nearly impossible to expeditiously assess the large number of aliens with no valid claim for such protection; instead, such aliens have been often placed in removal proceedings and remain in the country for years, further incentivizing aliens without meritorious claims to take advantage of the system.

The requested injunction is also contrary to the public interest because it impinges upon the President's application of an important Act of Congress, 8 U.S.C. § 1182(f), that gives him the authority and flexibility to adopt restrictions on entry beyond the existing statutory grounds whenever he identifies a detriment to the national interest that Congress has not sufficiently addressed in existing provisions. *See Doe #1 v. Trump*, 944 F.3d. 1222, 1228 (9th Cir. 2019) (Bress, J., dissenting); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) (noting that "any time a State is enjoined from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury").

The injunction would also undermine the President's authority at the core of his power under Article II to protect the United States from harms from abroad. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-35 (2010) (stating that the Executive Branch's protection of these interests,

including "sensitive and weighty interests of national security and foreign affairs," warrants the utmost deference.); *cf. Hawaii*, 585 U.S. at 704 (noting that "'[a]ny rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,'" and thus a court's "inquiry into matters of entry" is "highly constrained" (quoting *Mathews*, 426 U.S. at 81-82)). The President's legitimate interest in regulating entry to protect the country from harms from abroad weighs in favor of denying injunctive relief.

These substantial, significant harms to the public interest that would result from the sought injunction outweigh the claim of harms to the Plaintiffs. The Plaintiff Organizations lack any judicially cognizable injury arising from the Proclamation's implementation, *supra* § I(B), as required to show irreparable injury, *see Sagarwala v. Cissna*, No 18-cv-2860 (RC), 2019 WL 1649943, at *3 (D.D.C. Apr. 16, 2019). The alleged injury of Plaintiffs' and the putative class is likewise not cognizable. Plaintiffs argue that "summary removal" without receiving statutory protections constitutes irreparable harm. ECF 14 at 34. However, as explained *supra*, the claim that the repatriation or removal of aliens subject to the Proclamation would violate any statutory rights is an inaccurate reading of the INA. Congress expressly provided the President authority to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants," 8 U.S.C. § 1182(f), and "class[es] of aliens" can include the group of aliens seeking asylum or withholding of removal, 8 U.S.C. § 1101(a). The statute vests no rights in aliens to avoid the effect of a Section 1182(f) suspension based on the contours of their "class."

Further, Plaintiffs' assertions of harm from the alleged loss of the ability to seek protection from torture is not supported by the record. *See* ECF 14 at 34. Aliens subject to the Proclamation are being assessed for and are still potentially eligible for protection from removal based on CAT,

which precludes the removal of aliens to places where they will likely be tortured. *Id.* § 1231 note; 8 C.F.R. § 208.16(c); 28 C.F.R. § 200.1. Thus, to the extent that Plaintiffs claim they or members of the proposed class would face "severe pain or suffering" if transferred to their home country by a governmental actor or someone acting with the acquiescence of the government there for one of the listed purposes, 8 C.F.R. § 208.18(a)(1), those individuals who manifest fear are eligible for an assessment for CAT protection.

In sum, the balance of hardships thus strongly favors denying injunctive relief. If this Court issues any injunctive relief, however, it should impose a bond requirement. *See* Fed. R. Civ. P. 65(c).

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion and grant summary judgment to Defendants.

Dated: March 24, 2025                    Respectfully submitted,


                                         YAAKOV M. ROTH
                                         *Principal Deputy Assistant Attorney General*

                                         DREW C. ENSIGN
                                         *Deputy Assistant Attorney General*

                                         AUGUST FLENTJE
                                         *Acting Director*

                                         EREZ REUVENI
                                         *Acting Deputy Director*

                                         BRIAN C. WARD
                                         *Acting Assistant Director*

                                         PATRICK GLEN
                                         DAVID KIM
                                         KATHERINE J. SHINNERS
                                         *Senior Litigation Counsel*

                         By:             /s/ *Joseph A. Darrow*
                                         JOSEPH A. DARROW
                                         ELISSA P. FUDIM
                                         *Trial Attorneys*
                                         U.S. Department of Justice, Civil Division
                                         Office of Immigration Litigation
                                         P.O. Box 868, Ben Franklin Station
                                         Washington, DC 20044
                                         Tel: (202) 598-7537
                                         Email: joseph.a.darrow@usdoj.gov

                                         *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 24, 2025, I electronically filed the foregoing motion and response with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Joseph A. Darrow*
JOSEPH A. DARROW
United States Department of Justice

65