# Exhibit E

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Refugee and Immigrant Center for Education and Legal Services, *et al.*, | Civil Action No. 1:25-cv-00306 |
| Plaintiffs, | |
| v. | |
| Kristi Noem, Secretary, U.S. Department of Homeland Security, *et al.*, | |
| Defendants. | |

**DECLARATION OF IHSAN GUNDUZ**

I, Ihsan Gunduz, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1.      I am the Acting Deputy Assistant Secretary for Border and Immigration Policy for the U.S. Department of Homeland Security ("DHS") and have served in this role since February 16, 2025.  Prior to this acting role, I served as the Director for Border Policy for DHS since December 4, 2023.  I previously served as Senior Policy Analyst for Border and Immigration Policy from April 12, 2021 to December 3, 2023.  I also served as Policy Analyst for Border and Immigration Policy from June 9, 2019 to April 11, 2021. Prior to my roles at DHS the Office of Strategy, Policy, and Plans, I served as an Asylum Officer at the U. S. Citizenship and Immigration Services from November 26, 2017 to June 8, 2019.

1

I.    **The Necessity of the Proclamation**

2.    Over the last four years, at least 8 million illegal aliens were encountered along the southern border of the United States and countless millions more evaded detection and illegally entered the United States.  Proclamation 10888, *Guaranteeing the States Protection Against Invasion*, 90 FR 8333 (Jan. 20, 2025) (the "Proclamation").  The sheer number of aliens entering the United States has overwhelmed Congress's complex scheme, the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, to protect United States sovereignty and prevent entry of aliens who pose threats to public health, safety, or national security.  *Id.*  As a result, millions of aliens who potentially pose significant threats to health, safety, and national security have moved into communities nationwide, placing substantial costs and constraints on the States.  *Id.*

3.    In response to this unprecedented influx of aliens, on January 20, 2025, the President issued a Proclamation finding that "the entry . . . of aliens engaged in the invasion across the southern border is detrimental to the interests of the United States."  Proclamation 10888, 90 FR at 8334–35.  The Proclamation suspends entry of aliens involved in the invasion and directs that such aliens be "restricted from invoking provisions of the INA that would permit their continued presence in the United States," including but not limited to the provisions governing asylum at section 208 of the INA, 8 U.S.C. § 1158.  *Id.* at 8335.  The Proclamation also suspends the entry of all aliens, regardless of where or how they enter the United States, who fail to provide "sufficient medical information or reliable criminal history and background information to enable fulfillment of the requirements of sections 212(a)(1)–(3) of the INA."  *Id.*

4.    In the first 39 days after it was issued, the Proclamation has had a significant impact on illegal border crossings and restoring operational control at the southern border.  Encounters by the U.S. Border Patrol ("USBP") at the southern border decreased by 80 percent, to the lowest level they have been since the 1960s.  The success of the Proclamation is further demonstrated by

the removal or return of more than 24,000 aliens encountered at the southwest border (SWB). The number of SWB enforcement actions resulting in releases has dropped from over 1,500 per day to fewer than one per day.  If enjoined for any period of time, however, DHS anticipates that circumstances at the southern border would quickly deteriorate to pre-Proclamation conditions or worse, exacerbating the threats to national security and public safety that the federal government is obligated to guard against.[1]

## II.    **The Problem of the Influx of Illegal Aliens Crossing the Southern Border.**

5.    In routine circumstances, the provisions of the INA work to prevent the admission of aliens who do not serve the national interest, such as those who pose threats to public health, INA § 212(a)(1), 8 U.S.C. § 1182(a)(1); safety, § 212(a)(2) (8 U.S.C. § 1182(a)(2)); and national security, § 212(a)(3) (8 U.S.C. § 1182(a)(3)).  *See* Proclamation, 90 FR 8333.  But in circumstances where the volume of illegal entries into the United States overwhelms the system, and access to necessary screening information is limited for aliens who have traveled from around the world to enter the United States illegally, these provisions may be rendered wholly ineffective.  *Id.*

6.    The sheer number of aliens who have entered the country between ports of entry (POEs) at the southern border and who have been released into the United States over the last four years have created exactly these circumstances.  As detailed below, these conditions demonstrate that the Proclamation's provisions—suspending and restricting entry, making asylum protections unavailable to certain aliens, and requiring medical and criminal history documentation—are critical to national security and public safety.

7.    In fiscal year ("FY") 2021, encounters at the SWB reached levels not seen since the early 2000s, with USBP making over 1.6 million encounters.  In FY 2022, the Department of

---

[1] OHSS analysis of February 2025 OHSS Persist Dataset based on data provided by CBP and ICE.

Homeland Security ("DHS") reached a record high number of encounters at the SWB, with total USBP encounters at the SWB exceeding 2.2 million. And in FY 2023, DHS yet again reached another record year of encounters, totaling over 2 million encounters between SWB POEs. In FY 2024 through June 4, 2024, there were approximately 1.3 million USBP encounters at the SWB. From June 5, 2024 to January 20, 2025, despite the proclamations and rules instituted by the prior administration in June 2024 and October 2024, there were over 408,000 USBP encounters at the SWB.[2]

8.      Through the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Public Law 104–208, div. C, 110 Stat. 3009, 3009-546, Congress created an expedited removal system for removing certain inadmissible aliens arriving in the United States and certain aliens who entered illegally and were apprehended within two years of their entry. Those procedures were aimed at facilitating the swift removal of inadmissible aliens while also expeditiously resolving any asylum claims.

9.      When it was first implemented approximately three decades ago, expedited removal worked well, but its utility has been diminished by the substantial increase in aliens crossing the southern border and the increased rates at which they claim fear, invoking the credible fear process. Additionally, in recent years, a significant percentage of aliens who are amenable to expedited removal but are not processed through expedited removal due to resource constraints, are instead released into the United States and placed into removal proceedings under INA § 240,

---

[2] OHSS analysis of February 2025 OHSS Persist.

8 U.S.C. § 1229a ("section 240 removal proceedings"), without any pre-screening to determine a potential eligibility for asylum or related protection.

10.    Specifically, over 1.5 million aliens were encountered by USBP at the SWB between POEs in FY 2024, and about 378,900 were processed for expedited removal, just 25 percent of aliens encountered during that year.[3]  Instead, DHS released the majority of these aliens into the United States with notices to appear ("NTAs") for removal proceedings pursuant to section 240 removal proceedings[4]—a process that in some cases can take years to resolve.

11.    While challenges to fully utilizing expedited removal are not new, the problem has worsened dramatically over the last four years.  During FY 2014 through FY 2019, DHS released only 10 percent of aliens apprehended by USBP at the SWB into the United States pending section 240 removal proceedings.[5]  In contrast, from March 20, 2021, through May 11, 2023, DHS released 30 percent of aliens apprehended by USBP into the United States, and the percentage of encounters resulting in such releases increased to 64 percent between May 12, 2023, and June 4, 2024.[6]  The vast majority of these releases involved aliens who were amenable to expedited

---

[3] OHSS, analysis of December 2024 OHSS Persist and data downloaded from UIP Jan. 27, 2025.  Most remaining encounters were released with NTAs (924,900, 60 percent of the total), with an additional 140,800 (9 percent) voluntary returning to Mexico and 84,500 (6 percent) subject to reinstatement of a removal order.

[4] OHSS, analysis of December 2024 OHSS Persist and data downloaded from UIP Jan. 27, 2025.

[5] OHSS, Analysis of July 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, "SWB Encounter Book-Outs," *https://ohss.dhs.gov/topics/immigration/immigration-enforcement/immigration-enforcement-and-legal-processes-monthly* (last updated Jan. 16, 2025) (select "SWB Book-Outs" and then select "Between Ports of Entry – U.S. Border Patrol (USBP)").

[6] OHSS analysis of CBP data downloaded from the U.S. Customs and Border Protection Unified Immigration Portal ("UIP") on Sept. 3, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, *https://ohss.dhs.gov/topics/immigration/immigration-enforcement/immigration-enforcement-and-legal-processes-monthly* (last updated Jan. 16, 2025) (select "SWB Book-Outs" and then select "Between Ports of Entry – U.S. Border Patrol (USBP)").

removal but were instead placed directly into section 240 removal proceedings and released into the United States.

12.     Moreover, aliens encountered at the SWB between POEs who were processed for expedited removal have been more likely to indicate an intent to apply for asylum or some other form of protection in recent years, which prevents their immediate removal.[7]  From FY 2014 to FY 2024, the overall percentage of aliens encountered at the SWB between POEs and processed for expedited removal who indicated an intention to apply for asylum, or expressed a fear of persecution or torture, or a fear of return to their country, and were referred for a credible fear interview increased from approximately 21 percent to 45 percent; similarly, the total number of credible fear referrals for interviews increased from about 41,000 in FY 2014 to about 153,000 in FY 2024.[8]

13.     DHS's inability to process most inadmissible aliens through expedited removal in recent years due to the sheer number of aliens who have entered the United States unlawfully, combined with the increase in the number of aliens in expedited removal making fear claims and being referred to section 240 removal proceedings, has had serious consequences for immigration enforcement and adjudication, border security, and communities across the country.

14.     Such large-scale releases have created further incentives for aliens to cross illegally into the United States with the belief that, even if initially apprehended and detained, they will ultimately be released to live and work in the United States during their removal proceedings,

---

[7] Fifty percent of aliens encountered at the SWB processed for expedited removal in the post-title 42 period (after the end of implementation of the Center for Disease Control and Prevention's public health Order pursuant to Title 42 of the U.S. Code on May 11, 2023) through the end of FY 2024 made fear claims, up from thirty-four percent in the pre-pandemic period from FY 2014 through FY 2019.  OHSS, analysis of December 2024 OHSS Enforcement Lifecycle Dataset.

[8] OHSS, analysis of December 2024 OHSS Enforcement Lifecycle Dataset. *See also* USCIS, *Semi-Monthly Credible Fear and Reasonable Fear Receipts and Decisions, https://www.uscis.gov/tools/reports-and-studies/semi-monthly-credible-fear-and-reasonable-fear-receipts-and-decisions.*

which, as exacerbated by the drastic increases in initial case receipts of aliens who are subject to but unable to be processed via expedited removal, may take years to resolve. *See Securing the Border*, 89 FR 81156, 81158 (Oct. 7, 2024). This period of time, in addition to the length of time it can take before a removal occurs after a removal order is final, creates a strong incentive for some number of aliens without potentially meritorious claims to make the dangerous journey to the southern border to claim fear in order to take their chances on being allowed to remain in the United States for a lengthy period. *Id.* at 81182.

15.    As a result of these circumstances, screening for public health, safety, and national security has been compromised—further worsening the costs to and constraints on the States and communities absorbing these large-scale releases of illegal aliens.

16.    Notably, DHS lacks an effective operational capability to screen all illegal aliens crossing the southern border for communicable diseases of public-health concern, as required by INA § 212(a)(1), 8 U.S.C. § 1182(a)(1). Proclamation, 90 FR at 8333. And effectively no aliens who illegally enter the United States provide Federal officials at the southern border with their comprehensive health information, as aliens who are admitted lawfully would. *Id.* As a result, innumerable aliens potentially carrying communicable diseases of public health significance illegally cross the southern border and enter communities across the United States. *Id.*

17.    Moreover, due to significant information gaps—particularly in the border environment—and processing times, Federal officials do not have the ability to verify with certainty the criminal record or national-security risks associated with the illegal entry of every alien at the southern border, as required by INA § 212(a)(2)–(3), 8 U.S.C. § 1182(a)(2)–(3). *Id.*

Nor do aliens who illegally cross the southern border readily provide comprehensive background information from their home countries to Federal law enforcement officials.  *Id.*

18.    The public safety and national security risks in such an environment are heightened by the presence of, and control of territory by, international cartels and other Transnational Criminal Organizations (TCOs) on the other side of the southern border, as well as terrorists and other malign actors who intend to harm the United States and the American people.  *Id.*  And the risks associated with these issues are greatly exacerbated when the number of aliens illegally crossing the southern border increases to levels that prevent actual operational control of the border.  *Id.*

19.    Critically, not only have overall encounters at the SWB increased over the last four years, but so have encounters with aliens that pose threats to national security and public safety. USBP encountered 385 aliens on the terrorist watchlist from FY 2021 to FY 2024 between POEs at the SWB, a 3,400 percent increase from the previous years (FY 2017 through FY 2020).[9] Further, in FY 23 and FY 24, respectively, there were 639 and 523 USBP encounters with individuals with known gang affiliations between the POEs, compared to 363 in FY 20 and 348 in FY 21.[10]

20.    TCOs and Foreign Terrorist Organizations (FTOs) have capitalized on the invasion at the SWB.  When USBP agents are pulled away from their patrol duties along the borders to detention-related activities, and to the processing of individualized large groups that characterize the heavy migration flow through the borders, TCOs and FTOs take advantage, utilizing

---

[9] *See* CBP, *CBP Enforcement Statistics*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited on Feb. 12, 2025) ("CBP TSDS Encounters at and Between Land Ports of Entry" table); *see,* CBP, *Terrorist Screening Data Set Encounters*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited on March 22, 2025).

[10] *See* CBP, *Gang Affiliated Enforcement*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited on March 22, 2025).

diversionary tactics to circumvent USBP deployment posture and technologies to move illicit contraband and criminal aliens into the interior of the United States. Cartels, for example, operate with substantial financial resources that support their use of scouts who operate advanced technology including drones, night vision equipment, and radios to track and monitor USBP presence in efforts to exploit certain vulnerabilities, as well as arms and ammunition that empower their sophisticated guerilla warfighting.

21.    TCOs and FTOs have also taken advantage of the influx of crossing at the southern border to illegally enter the United States between POEs or fraudulently through parole at POEs. In 2023 and 2024, for example, eight individuals from Tajikistan entered the United States through various means, including at and between POEs. Some of these individuals claimed asylum after making an appointment on the now-terminated CBP One application. At the time of entry or encounter, none of the individuals were determined to have any information in their background that impacted their ability to be paroled into the United States; however, after entry, they were arrested and suspected of having ties to the Islamic State (ISIS) group, according to public news sources.[11] Separately, as reported by the Department of Justice, on February 26, 2025, another Tajik national who was illegally present in the United States was arrested after facilitating the payment of tens of thousands of dollars to ISIS-linked extremists overseas, possessing assault rifles, and declaring himself "ready" in a video sent to such individuals. The Tajik national traveled to the United States in June 2016 on a non-immigrant tourist visa, overstayed his visa,

---

[11] *See* CNN, *Feds arrested 8 Tajik nationals on immigration charges after probe found potential ties to terrorism, sources say* (last updated June 12, 2024), https://www.cnn.com/2024/06/11/us/tajik-nationals-arrested-terror-ties-probe/index.html (last visited on March 22, 2025).

then attempted to enter into a sham marriage to an American citizen, which was never recognized.[12]

III.    **The Impact and Limitations of the Securing the Border Proclamations and Rule.**

22.    On June 3, 2024, in response to circumstances at the southern border and a projected increase in illegal immigration absent policy charges, President Biden issued Presidential Proclamation 10773, 89 FR 48487 (June 3, 2024) ("June STB Proclamation"),[13] invoking INA §§ 212(f) and 215(a)(1), 8 U.S.C. §§ 1182(f) and 1185(a)(1), finding that the entry into the United States of certain aliens during emergency border circumstances would be detrimental to the interests of the United States, and suspending and limiting the entry of those aliens. *Id.* at 48491. The June STB Proclamation established thresholds based on the number of encounters between POEs for when the suspension and limitation on entry would be discontinued, continued, or reactivated. *Id.* It also directed DHS and DOJ ("Departments") to promptly consider issuing regulations addressing the circumstances at the southern border, including any warranted limitations and conditions on asylum eligibility. *Id.* at 48492.

23.    Shortly thereafter, the Departments issued a corresponding IFR, Securing the Border, 89 FR 48710 (June 7, 2024) ("STB IFR"). The STB IFR effectuated three key changes to the process for those aliens described in the June STB Proclamation who are encountered at the

---

[12]*See* United States Attorney's Office, Eastern District of New York, *Tajik National Arrested in Brooklyn for Conspiring to Provide Material Support to ISIS* (last updated Feb. 26, 2025), https://www.justice.gov/usao-edny/pr/tajik-national-arrested-brooklyn-conspiring-provide-material-support-isis (last visited on March 22, 2025).
[13]On September 27, 2024, President Biden issued a proclamation amending the June STB Proclamation. *See* Presidential Proclamation 10817, 89 FR 80351 (Oct. 7, 2024). That proclamation amended the June STB Proclamation in two ways to change the way that southern border encounters are calculated for purposes of discontinuing or reactivating the June STB Proclamation's suspension and limitation on entry of certain aliens at the southern border. First, previously the suspension and limitation on entry would be discontinued 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of fewer than 1,500 encounters. *See* 89 FR at 48491. Under the revised Proclamation, the 7-consecutive-calendar-day average must remain below 1,500 encounters for 28 consecutive calendar days before the 14-day waiting period is triggered. *See* 89 FR at 80353. Second, the revised Proclamation now counts encounters of unaccompanied alien children from non-contiguous countries as encounters factored into the aforementioned calculation. *See id.*

southern border during the emergency border circumstances giving rise to the suspension and limitation on entry under the June STB Proclamation: (1) adding a limitation on asylum eligibility, subject to an exception for exceptionally compelling circumstances; (2) rather than asking specific questions of every alien encountered and processed for expedited removal, providing general notice on credible fear and referring an alien for a credible fear interview only if the alien manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to his or her country or the country of removal; and (3) for those found not to have a credible fear of persecution for asylum purposes because of the STB IFR's limitation on asylum eligibility, screening for potential eligibility for statutory withholding of removal and protection under the CAT regulations under a "reasonable probability" standard, defined as "substantially more than a 'reasonable possibility' but somewhat less than more likely than not."  STB IFR, 89 FR at 48718; *see also* 8 C.F.R.  §§ 208.35(b)(2)(i), (iii).

24.    Following the June STB Proclamation, STB IFR, and later final rule, Securing the Border, 89 FR 81156 (Oct. 7, 2024) ("STB final rule"), encounter numbers between POEs decreased from an average of 4,910 per day in the six months prior to the rule to an average of 1,880 per day between June and December 2024.[14]  However, the STB Proclamations and rules did not go far enough to ensure that the immigration system operates in the manner intended by Congress and with the rigor directed by the President via his presidential authority.  Critically, the

---

[14] OHSS, analysis of December 2024 OHHS Persist Dataset.

STB Proclamations and rule contain exceptions and thresholds for deactivation that prevent them from fully achieving these goals.

25.    Most prominently, the STB Proclamations contain exceptions to accommodate the Biden Administration's use of the CBP One mobile application[15] ("CBP One app") for aliens who sought appointments to be processed at a POE.  Almost all aliens who used the application were then issued NTAs for section 240 removal proceedings and released into the United States rather than being placed in expedited removal.  In FY 23 and FY 24, there were 266,840 and 505,720 NTA releases, respectively, for aliens using the application.  In FY 25 through January 20, 2025, there were 153,570.[16]

26.    Further, the STB rule itself also contained an exception for exceptionally compelling circumstances.  8 C.F.R. § 208.35(a)(2)(i), 8 C.F.R. § 1208.35(a)(2)(i).  Over 7,800 aliens who were apprehended by USBP between the POEs at the southern border between June 5, 2024, and January 20, 2025, were able to establish this exception to the STB rule's asylum eligibility limitation during their credible fear screening, and USCIS returned positive fear determinations in about 5,900 (83 percent) of these cases, despite these aliens having entered in contravention of the STB Proclamations' suspension and limitation on entry.[17]  In comparison, for the approximately 55,000 aliens who were found to be subject to the STB rule's asylum eligibility

---

[15] In January 2023, the Biden administration announced a new functionality for the CBP One app, which was originally intended to provide a wide variety of services to legitimate travelers and the trade community.  *See* CBP, CBP/DHS/PIA-068, *Privacy Impact Assessment for the CBP One™*, at 1, July 25, 2024), https://www.dhs.gov/publication/dhscbppia-068-cbp-one-mobile-application.  Aliens scheduled about 978,000 appointments through the CBP One app from the scheduling functionality's release through January 2024.  *See* OHSS analysis of data provided by CBP Passenger Systems Program Directorate Jan. 22, 2025. Each appointment represents an alien or traveling group who scheduled an appointment, showed proof of the appointment to a U.S. official at the physical boundary between the United States and Mexico, and was permitted to enter a POE for inspection and processing.

[16] Fiscal Years 2019 to January 31, 2025 data from Office of Homeland Security Statistics January 2025 Persist Dataset. February 2025 data from OHSS analysis of CBP data downloaded from UIP on March 5, 2025.

[17] OHSS analysis of data downloaded from UIP Jan. 21, 2025.

limitation during their credible fear screening and therefore screened at the "reasonable probability" standard, USCIS returned positive fear determinations in 28,400 cases, or just 52 percent of the time.[18]

27.     Therefore, although the STB Proclamations and rules were aimed at deterring aliens from illegally entering the United States and delivering timely consequences to those who do, the CBP One app exception and the rule's exceptionally compelling circumstances exception instead failed to fully secure the border by allowing a large number of aliens to be released into the United States.

28.     The impact of STB was also undercut by other prior administration's policies that granted parole into the United States to large numbers of aliens, including for certain Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) nationals and their immediate family members.  In FY 23 and FY 24, approximately 532,000 Cuban, Haitian, Nicaraguan, and Venezuelan aliens and their immediate family members were processed and released into the United States pursuant to CHNV parole processes.[19]

## IV.    <u>The Proclamation is Critical to Address the Influx of Illegal Migration at the Southern Border.</u>

29.     As detailed above, the public health and national security risks posed by the influx of innumerable aliens into the United States, and the insufficient actions of the prior administration, requires the federal government to take measures to uphold its obligations to the States.  Accordingly, the President proclaimed, pursuant to INA §§ 212(f) and 215(a)(1), 8 U.S.C. §§ 1182(f) and 1185(a)(1), that the entry into the United States on or after January 20, 2025, of

---

[18] OHSS analysis of data downloaded from UIP Jan. 21, 2025.
[19] OHSS analysis of February 2025 OHSS Persist Dataset.

aliens engaged in the invasion across the southern border is detrimental to the interests of the United States.  *See* Proclamation, 90 FR 8333.  The President took and directed a range of actions in the Proclamation, including:

- Directing that entry of aliens engaged in the invasion across the southern border into the United States is suspended until the President issues a finding that the invasion at the southern border has ceased, *see* 90 FR at 8335, (§ 1);

- Proclaiming, pursuant to sections 212(f) and 215(a)(1) of the INA, 8 U.S.C. §§ 1182(f) and 1185(a)(1), that aliens engaged in the invasion across the southern border of the United States on or after January 20, 2025, are restricted from invoking provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. § 1158, until the President issues a finding that the invasion at the southern border has ceased, *see* 90 FR at 8335, (§ 2);

- Proclaiming, pursuant to sections 212(f) and 215(a)(1) of the INA, 8 U.S.C. §§ 1182(f) and 1185(a)(1), that the entry into the United States, on or after January 20, 2025, of any alien who fails, before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of sections 212(a)(1)–(3) of the INA, 8 U.S.C. §§ 1182(a)(1)–(3), is detrimental to the interests of the United States, and directing that entry into the United States of such aliens be suspended and restricting their access to provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. § 1158, *see* 90 FR 8335, (§ 3);

- Invoking the authorities provided to the President under Article II of the Constitution

14

of the United States, including the President's control over foreign affairs, and to effectuate the guarantee of protection against invasion required by Article IV, Section 4 of the Constitution, to suspend the physical entry of any alien engaged in the invasion across the southern border of the United States, and directing the Secretary, in coordination with the Secretary of State and the Attorney General, to take appropriate actions as may be necessary to achieve the objectives of the Proclamation, until the President issues a finding that the invasion at the southern border has ceased, *see* 90 FR at 8335–36, (§ 4); and

- Directing the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, to take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion across the southern border of the United States on or after January 20, 2025, whether as an exercise of the suspension power in section 212(f) and 215(a)(1) of the INA, 8 U.S.C. §§ 1182(f) and 1185(a)(1), or as an exercise of the President's delegated authority under the Constitution of the United States, until the President issues a finding that the invasion at the southern border has ceased, *see* 90 at FR 8336 (§ 5).

30.    USBP implements the Proclamation on the southern border in two ways.  First, certain aliens may be processed for INA § 212(f) repatriation.  Second, aliens who cannot be directly repatriated under INA § 212(f) are generally processed for expedited removal.  Aliens subject to the Proclamation—either INA § 212(f) repatriation or expedited removal—who manifest a fear are referred to USCIS for an assessment under the CAT.

31.    At the northern and coastal borders, USBP implements Section 3 of the Proclamation only.  This means that an alien encountered between POEs on the northern or coastal

borders is only subject to the Proclamation if he or she lacks sufficient documentation showing medical, criminal history, and background information.

32.    The Proclamation does not impact USBP's processing of unaccompanied alien children (UACs), who continue to be processed consistent with the requirements of the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) and the *Flores* Settlement Agreement.

33.    In any case, if an alien cannot be removed or repatriated directly to his or her country of citizenship—which is mostly applicable to countries that DHS has deemed "hard to remove"—USBP will notify the alien of the country to which he or she will be transferred and will provide the alien with a tear sheet identifying the destination country. Aliens, who manifest a fear of the country to which USBP intends to transport them to, will be referred for a CAT assessment to USCIS, which interviews the aliens and makes a determination. If the determination is negative, USBP continues to transport the alien to the designated country. If the determination is positive, USBP may designate another third country for removal or repatriation or USBP may place the alien into proceedings with the Executive Office for Immigration Review (EOIR).

34.    Aliens subject to the Proclamation whom CBP does not directly remove or repatriate to a designated country are taken into ICE custody. Aliens who manifest fear while in ICE custody are referred to USCIS for a CAT assessment. If the CAT assessment is negative, ICE will effectuate removal or repatriation. If the CAT assessment is positive, another country may be designated.

35.    CBP Office of Field Operations ("OFO") implements Section 3 of Proclamation at the land border ports of entry and at air and seaports. At land border ports of entry on both the southern and northern border, aliens who lack valid entry documents or who otherwise fail to provide sufficient medical information or reliable criminal history and background information are

prevented from entering the United States at the physical border. Similarly, an alien who arrives at an air or seaport who is determined to be subject to Section 3 of the Proclamation is generally processed for an expedited removal or a withdrawal of their application for admission.

V.    **The Proclamation is Working and is Critical to National Security and Public Safety.**

36.    The Proclamation, which complemented other executive orders and actions, has been highly effective thus far.  SWB encounters between POEs fell from an average of about 1,170 aliens per day in the two-week period ending on January 20, 2025, to an average of about 240 per day in the two-week period from February 15 to February 28, 2025.[20]  SWB releases from USBP custody fell from an average of about 130 per day to an average of less than 1 per day in the same two time periods.  Further, illegal aliens encountered since the Proclamation was implemented generally have been quickly repatriated or removed.[21]

37.    By reducing the number of encounters and the number of aliens in custody, the Proclamation has freed up CBP resources to address national security and public safety threats and to secure the border.  The immediate savings on facilities alone are significant.  In mid-March, in response to the lower encounter numbers, CBP began reducing the number of soft-sided facilities along the southwest land border, which will save between $5 and $30 million per month for each facility.  But facilities are only one component of the substantial costs of illegal border crossings. Processing aliens at the border is also resource- and personnel-intensive—and as the number of aliens apprehended and in custody increases, USBP must assign additional agents to processing duties.  But any reassignment of agents to processing duties takes them away from other activities, including law enforcement priorities like addressing criminal activity at the border.  For example,

---

[20] OHSS analysis of CBP data downloaded from UIP on Feb. 5, 2025.

[21] OHSS analysis of February 2025 OHSS Persist Dataset based on data provided by CBP and ICE.

based on data pulled by USBP on March 21, 2025, as of that day, approximately 6 percent of agents along the SWB were assigned to processing tasks, down from approximately 9 percent on January 30, 2025, 16 percent on December 1, 2024, and nearly 14 percent on June 3, 2024.

38.    Criminal activity at the border is a persistent problem during both periods of high and low encounters.  But when border encounters are lower, CBP is better positioned to focus its resources on addressing and responding to criminal activity.  In February 2025, USBP and OFO encountered 393 criminal aliens; OFO made 645 criminal arrests; USBP had 12 gang apprehensions; USBP referred 169 smuggling events for prosecution; and OFO referred 110 events for criminal prosecution.  Officers and agents also seized 104 firearms and 13,822 rounds of ammunition, as well as $1,535,228,67 in currency.  If encounters increase again, criminal activity also can be expected to increase, while CBP's available resources to respond to criminal activity would, once again, be diminished.

39.    For the same reasons, lower border encounters allow CBP to allocate more resources to national security.  For example, in late January 2025, at POEs, OFO commenced enhanced inspections of flights, private aircraft, and cargo to and from Colombia.  CBP denied boarding to flagged visa holders and, in coordination with the Department of State, enforced the travel ban on Colombian officials.[22]  In late February 2025, Tucson Sector Border Patrol agents

---

[22] *See* CBP, *CBP is taking decisive measures under President Trump's orders in response to Colombia* (last updated Jan. 27, 2025), https://www.cbp.gov/newsroom/announcements/cbp-taking-decisive-measures-under-president-trumps-orders-response (last visited on March 22, 2025).

arrested three suspected cartel scouts, and one foot guide associated with the Los Memos transnational criminal organization, a faction of the Cártel de Sinaloa, in southern Arizona.[23]

40.     TCOs have also felt the effects of the Proclamation, most notably in reduced income streams from migrant and drug smuggling.  From December 2024 (FY 25) to January 2025, there was 61.9 percent reduction in fentanyl dosages seized by CBP.[24]  Between mid-January and the end of February, CBP participated in strategic enforcement operations in California, Arizona, and the Pacific Northwest alongside its federal, state, local, tribal, territorial (FSLTT) and international partners.  The operations focused on illicit fentanyl, its analogues, precursor chemicals, and other synthetics like methamphetamine, in addition to other emerging threats like xylazine and nitazenes.  During these operations, CBP seized over 10,900 pounds of drugs, consisting of 2,584 pounds of cocaine, 1,266 pounds of fentanyl, 5,683 pounds of methamphetamine, 135 pounds of heroin, 664 pounds of marijuana, and 640 pounds of other illicit substances such as amphetamine, ecstasy, ketamine, hashish, steroids, and xylazine.  Additionally, CBP intercepted 140 weapons and seized over $1.3 million in illicit U.S. currency.  In total, these joint efforts with FSLTT partners resulted in the cumulative seizure of over 13,348 pounds of illegal drugs, over $1.97 million in illicit U.S. currency, over 180 weapons, and CBP arrests of 317 individuals affiliated with and/or connected to those with direct ties to TCOs.  Through strategic intelligence, collaborative operations, and relentless vigilance, CBP continues to disrupt and

---

[23]  *See* CBP, *Cartel Scouts, Foot Guide Arrested in Arizona* (last updated March 4, 2025), https://www.cbp.gov/newsroom/local-media-release/cartel-scouts-foot-guide-arrested-arizona (last visited on March 22, 2025).
[24]  *See* CBP, *CBP Drug Dosage Value and Weight*, https://www.cbp.gov/newsroom/stats/cbp-drugs-dosage-value-and-weight (last visited on March 22, 2025).

dismantle cartels that threaten public safety and national security.[25]  Cartels are reportedly selling property and firing personnel to account for loss in fentanyl income[26] that supports their operations.

41.    Additionally, even while encounter numbers were lower than average in February 2025, risks to officers and agents and others who operate near the U.S. borders are always present. In February 2025 alone, CBP records indicate that 30 CBP officers/agents were assaulted.  In late January 2025, a U.S. citizen and a Canadian citizen were robbed and attacked by armed suspected Mexican cartel terrorists in the Jacumba Wilderness in southern California. CBP agents tracked the assailants back to the border where they returned to Mexico.[27]  If border crossing numbers increase again, CBP resources will likely be diverted and these risks to CBP personnel and others on the border will likewise increase.

## VI.    If the Proclamation is Enjoined, DHS's Operational Capabilities will be Severely Taxed and Large-Scale Releases of Illegal Aliens will Resume.

42.    As detailed above, the Proclamation is necessary and is working.  Any injunction against the Proclamation would likely undo these effects, imperiling operational control of the border and subjecting the States to further large-scale releases of illegal aliens.

43.    In addition to removing the most effective tool for managing the emergency at the southern border, news of an injunction against implementation of the Proclamation would likely

---

[25]  *See* CBP, *CBP Releases February 2025 Monthly Update* (last updated March 12, 2025), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2025-monthly-update (last visited on March 22, 2025).
[26]  *See* New York Times, *Trumps Threats and Mexico's Crackdown Hit Mexican Cartel*, https://www.nytimes.com/2025/03/02/world/americas/mexico-cartel-fentanyl-trump-tariffs.html.
[27]  *See* CBP, *American citizen shot in Jacumba Wilderness north of the U.S.-Mexico Border* (last updated January 23, 2025), https://www.cbp.gov/newsroom/local-media-release/american-citizen-shot-jacumba-wilderness-north-us-mexico-border (last visited on March 22, 2025).

lead to a surge of aliens seeking to cross at and between POEs, as has happened after other court orders.

44.    On February 28, 2020, the Ninth Circuit lifted a stay of a nationwide injunction of the Migrant Protection Protocols ("MPP"), a programmatic implementation of the Secretary of Homeland Security's contiguous return authority under section 235(b)(2)(C) of the INA, 8 U.S.C. § 1225(b)(2)(C).  STB final rule, 89 FR at 48764–65.  Almost immediately, hundreds of aliens began massing at POEs across the southern border and attempting to immediately enter the United States, creating a severe safety hazard that forced CBP to temporarily close POEs in whole or in part.  *Id.* at 48765.  Many others requested immediate entry into the country through their counsel, while others attempted to illegally cross the southern border between the POEs.  *Id.*  Absent immediate and resource-intensive action taken by CBP, the number of aliens gathered at the border, whether at or between the POEs, could have increased dramatically, especially considering there were approximately 25,000 aliens who were in section 240 removal proceedings and had been returned to Mexico under MPP without scheduled court appearances, as well as others in Mexico who could have become aware of CBP's operational limitations and sought to exploit them.  *Id.*  And while CBP officers took action to resolve the sudden influx of migrants at multiple POEs and prevent further deterioration of the situation at the border, in doing so, they diverted resources away from other critical responsibilities of protecting national security, detecting and confiscating illicit materials, and guarding efficient trade and travel.  *Id.*

45.    This same phenomenon occurred in the days leading up to the end of the Title 42 public health Order on May 12, 2023, when DHS saw a historic surge in migration as smugglers falsely advertised that aliens, who arrived before the Order ended and the Circumvention of Lawful Pathways rule took effect, would be allowed to remain in the United States.  *Id.* at 48765.  This

21

surge culminated with what were then the highest recorded USBP encounter levels in U.S. history over the days immediately preceding May 12, which placed significant strain on DHS's operational capacity at the border. *Id.* Encounters between POEs (which excludes arrival of inadmissible aliens with scheduled appointments through the CBP One app who appeared at POEs) almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 daily encounters immediately preceding the termination of the public health Order (from May 8 to May 11). *Id.* The sharp increase in USBP encounters during the 30 days preceding May 12 represented the largest month-over-month increase in almost two decades—since January 2004.

46.     If the Proclamation is enjoined for any amount of time, the result will likely be similar: substantial numbers of illegal aliens will be incentivized to unlawfully enter the United States between POEs and DHS will be without the most effective tool for managing the emergency at the southern border.

47.     Since the Proclamation has been in place (through February 28, 2025), USBP encountered on average 183 aliens per day between POEs and OFO has encountered on average 67 at POEs, who were generally quickly repatriated or removed based on section 212(f).[28] Without this ability to quickly repatriate or remove them, DHS must instead rely on less efficient procedures, such as section 240 removal proceedings, INA § 235(b)(2)(A), 8 U.S.C. § 1225(b)(2)(A). In the absence of the Proclamation, DHS does not have the resources to ensure that all aliens who enter illegally between POEs are detained and processed for expeditious removal from the United States. As described above, when more aliens enter between POEs than

---

[28] OHSS analysis of February 2025 OHSS Persist Dataset based on data provided by CBP and ICE.

DHS has resources to process and detain, DHS may be forced to release aliens into the United States to await section 240 removal proceedings, which may in some cases take years to conclude, further straining local, State, and Federal resources that have been strained for years.

48.    The damages caused by a reversion to pre-Proclamation conditions at the southern border, and another, ongoing large-scale release of illegal aliens into communities nationwide, would be far-reaching.  As set forth in the Proclamation, the States "have collectively spent billions of dollars in providing medical care and related human services and have spent considerable amounts on increased law enforcement costs associated with the presence of these illegal aliens within their boundaries."  Proclamation, 90 FR at 8334.  And this is to say nothing of the boon to TCOs and smugglers that would result by the lifting of the suspension and restrictions at the southern border or the dire consequences of releasing illegal aliens who may pose a threat to national security, public safety, or health.

## VII.    <u>Conclusion.</u>

49.    The Proclamation is an appropriate and necessary response to the unprecedented influx of illegal immigration over the last four years.  During times of historically high levels of encounters that adversely impact operational control of the border and result in the large-scale release of aliens, the President has authorized extraordinary measures in order to reduce unlawful migration.  The measures are designed to address the invasion at the border, the challenges those conditions pose for screening for security and safety, and the impact on communities strained by the influx of aliens over the last four years.  Should the Court prevent DHS from implementing the Proclamation, DHS anticipates that encounters will increase sharply—placing even more stress on our operations at the border, and on communities throughout the country.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed on this 24th day of March, 2025.

IHSAN
GUNDUZ

Digitally signed by
IHSAN GUNDUZ
Date: 2025.03.24
18:46:42 -04'00'

Ihsan Gunduz
Acting Deputy Assistant Secretary for Border and Immigration Policy
U.S. Department of Homeland Security

24