**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

REFUGEE AND IMMIGRANT CENTER
FOR EDUCATION AND LEGAL
SERVICES, *et al.*,
     *Plaintiffs*,

v.

KRISTIE NOEM, SECRETARY, U.S.
DEPARTMENT OF HOMELAND
SECURITY, *et al.*,
     *Defendants*

Civil Action No. 1:25-cv-00306

**BRIEF OF AMICUS CURIAE THE STATE OF TEXAS IN SUPPORT OF
DEFENDANTS**

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ......................................................................................... iii

INTEREST OF AMICUS CURIAE .............................................................................. 1

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 4

      I.    There is an Invasion at the Southern Border. ........................................ 4

      II.   The Guarantee Clause of the Constitution Imposes an Unconditional Duty on the President to Protect Texas and Other States from Invasion. ..................................... 10

      III.  President Trump Upholds his Constitutional Duty to Protect the States from Invasion by Issuing the Proclamation. ........................................................................ 13

ARGUMENT ............................................................................................................... 13

      I.    The Proclamation Significantly Reduces the Injury Inflicted on Texas by Curbing the Unrelenting Flow of Illegal Aliens Through the Southern Border and Removing Those Here Illegally. .................................................................................................................. 13

      II.   Whether an Invasion is Occurring is a Nonjusticiable Political Question for the Political Branches, not the Courts, to Decide. At any rate, the Situation at the Southern Border Constitutes an "Invasion" as That Term was Originally Understood at the Founding. .......... 15

      A.    The determination of whether there is an invasion under the Guarantee Clause is a nonjusticiable political question. ........................................................................... 15

      B.    The crisis at the southern border meets the definition of an "invasion" as that term was originally understood by the Framers. .............................................................. 16

CONCLUSION ............................................................................................................ 22

## TABLE OF AUTHORITIES

**Cases**

*Arizona v. United States*,
    567 U.S. 387 (2012) ............................................................................................ 13, 22

*California v. United States*,
    104 F.3d 1086 ............................................................................................................. 15

*Calvin's Case (1608) 77 Eng. Rep. 377, 7 Co. Rep. 1* ............................................................ 11

*Chiles v. United States*,
    69 F.3d 1094 (11th Cir. 1995) ............................................................................... 15

*Ex parte Quirin*,
    317 U.S. 1 (1942) ............................................................................................... 19, 20

*Luther v. Borden*,
    48 U.S. 1 (1849) ........................................................................................................ 15

*O'Hair v. White*,
    675 F.2d 680 (5th Cir. 1982) ................................................................................ 15

*Pac. States Tel. & Tel. Co. v. State of Oregon*,
    223 U.S. 118 (1912) ................................................................................................. 15

*Padavan v. United States*,
    82 F.3d 23  (2d Cir. 1996*)* .................................................................................... 15

*Plyler v. Doe*,
    457 U.S. 202 (1982) ................................................................................................. 14

*SBC Commc'ns, Inc. v. FCC*,
    154 F.3d 226 n.17 (5th Cir. 1998) ....................................................................... 17

*Sessions v. Dimaya*,
    584 U.S. 148 ............................................................................................................... 4

*State of Texas v. U.S. Dep't of Homeland Sec.*,
    No. DR-23-CV-00055-AM, 2023 WL 8285223 (W.D. Tex. Nov. 29, 2023) ................... 8, 10

*Sterling v. Constantin*,
    287 U.S. 378 (1932) ................................................................................................. 16

*Texas v. Biden*,
    589 F. Supp. 3d 595 (N.D. Tex. 2022) ............................................................... 14

*Texas v. Department of Homeland Security*,
    88 F.4th 1127 (5th Cir. 2023) ................................................................................. 3

*Texas v. U.S. Dept. of Homeland Sec.*,
 No. 6:24-CV-00306, 2024 WL 4711951 (E.D. Tex. Nov. 7, 2024)........................................14

*Texas v. United States (DACA),* 50 F.4th 498–20 (5th Cir. 2022) ................................................14

*The Prize Cases*,
 67 U.S. 635 (1862).......................................................................................................................1

*TikTok Inc. v. Garland*,
 145 S. Ct. 57 (2025).....................................................................................................................1

*Trump v. Hawaii*,
 585 U.S. 667 (2018)........................................................................................... 1, 2, 3, 10

*U.S. ex rel. Knauff v. Shaughnessy*,
 338 U.S. 537 ........................................................................................................................ 4

*U.S. v. Abbott*,
 110 F.4th 700 (5th Cir. 2024) .................................................................................................1, 2

*United States v. Abbott*,
 No. 1:23-CV-853-DAE, 2023 WL 5740596 (W.D. Tex. Sept. 6, 2023)..................................3

*United States v. Brig Malek Adhel*,
 43 U.S. (2 How.) 210, 11 L.Ed. 239 (1844) ....................................................................... 20

**Constitutional Provisions & Statutes**

U.S. Const. art. I, § 8, cl. 11 ...............................................................................................17

U.S. Const. art. I, § 10, cl. 3 ................................................................................................. 2

U.S. Const. art. IV, § 4 ........................................................................................... passim

8 U.S.C. § 1182(f) & 1185(a) ...............................................................................................13

TEX. ADMIN. CODE § 21.24(a) & (d)(4) ...........................................................................14

**Rules & Regulations**

42 C.F.R. § 435.406(b) .......................................................................................................14

86 Fed. Reg. 42,828, 42,835 (Aug. 5, 2021).......................................................................14

90 Fed. Reg. 8333 ................................................................................................................. 2

90 Fed. Reg. 8333 (Jan. 20, 2025).......................................................................................13

90 Fed. Reg. 8439 (Jan. 20, 2025)........................................................................................ 9

iv

## INTEREST OF AMICUS CURIAE

Amicus curiae is the State of Texas, a sovereign state located on the frontline of the invasion at the southern border of the United States. The President has the duty "to resist" this invasion. *The Prize Cases*, 67 U.S. 635, 668 (1862). He wields "broad discretion to suspend the entry of aliens into the United States." *Trump v. Hawaii*, 585 U.S. 667 (2018). But during the past four years of the Biden-Harris Administration, the federal government abdicated its constitutional duty to protect the nation's borders and prevent illegal immigration. This dereliction of duty allowed millions of mostly military-aged men, including unusually high numbers from China,[1] "a designated foreign adversary," *TikTok Inc. v. Garland*, 145 S. Ct. 57, 69 (2025), to unlawfully enter the United States across the border with Mexico. The United Nations has declared the U.S.-Mexico border to be the deadliest land crossing in the world.[2] As a border state, Texas is disproportionately harmed by this unprecedented influx of illegal immigration. In addition to significant costs incurred by state agencies, Texas's citizens suffer injury to their persons and property when the federal government abandons its obligation to secure the border. Texas therefore has a substantial interest in the federal government fulfilling its constitutional duty to protect the states against invasion.

## INTRODUCTION

"A sovereign isn't a sovereign if it can't defend itself against invasion." *U.S. v. Abbott*, 110 F.4th 700, 725 (5th Cir. 2024) (Ho, J., Concurring). The southern border of the United States is under attack. The crisis is so bad that both the President of the United States and the Governor of

---

[1] Cecilia Vega, *Chinese Migrants Are Fastest-Growing Group Crossing from Mexico into U.S.,* CBS NEWS (Feb. 4, 2024), https://www.cbsnews.com/news/chinese-migrants-fastest-growing-group-us-mexico-border-60-minutes-transcript/;Tom Ozimek, *Alarming Rise in Military-Aged Chinese Men Entering US Illegally, Border Patrol Union Chief Warns*, THE EPOCH TIMES (Feb. 20, 2024), https://tinyurl.com/462f384s.

[2] *US-Mexico Border World's Deadliest Migration Land Route*, IOM-UN MIGRATION (Sep. 12, 2023), https://www.iom.int/news/us-mexico-border-worlds-deadliest-migration-land-route.

Texas agree that the situation amounts to an invasion.[3] Judges on the Fifth Circuit have acknowledged that an invasion is taking place across Texas's border.[4] At least 53 Texas counties had formally declared that the State is suffering an invasion.[5]

The Constitution imposes an unequivocal duty on the federal government to protect each state against invasion. U.S. Const. art. IV, § 4. And the Supreme Court has recognized the President's broad power to suspend the entry of aliens into the country. *Trump v. Hawaii*, 585 U.S. 667 (2018). But despite this clear allocation of authority and responsibility, the Biden-Harris Administration spent four years systematically failing to secure the border or enforce the Nation's immigration laws. And Americans have paid the price.

With the federal government missing in action, Texas used its sovereign powers reserved under the Constitution[6] to shield its citizens from the escalating border crisis, only to face relentless

---

[3] *See Guaranteeing the States Protection Against Invasion*, Proclamation 10888, 90 Fed. Reg. 8333 (Proclamation) (Jan. 20, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/01/guaranteeing-the-states-protection-against-invasion/; *Statement of Governor Greg Abbott*, Jan. 24, 2024, available at https://gov.texas.gov/uploads/files/press/Border_Statement_1.24.2024.pdf; *Letter from Greg Abbott, Governor of Texas to Joseph Robinette Biden, President of the United States* (Nov. 16, 2022), available at https://tinyurl.com/447uxkhx.

[4] *See United States v. Abbott*, 110 F.4th 700, 726–27 (5th Cir. 2024) (Ho, J., concurring).

[5] Bethany Blankley, *53 Texas Counties Have Now Declared an Invasion at Southern Border*, THE CENTER SQUARE (Feb. 21, 2024), https://www.thecentersquare.com/texas/article_2818d0d6-d115-11ee-b4bc-6b11aece3112.html.

[6] The federal guarantee of protection against invasion is accompanied in the Constitution with an affirmative acknowledgment of the power retained by every state to repel invasions themselves. U.S. Const. art. I, § 10, cl. 3.

2

opposition from the Biden-Harris Administration.[7] President Trump's Proclamation finally takes much-needed steps to combat the invasion, after years of the prior Administration surrendering U.S. sovereignty, ignoring threats to national security, and forsaking the safety of its citizens.

During the Biden-Harris Administration, border crossings skyrocketed, overwhelming Border Patrol's ability to apprehend illegal entrants. Criminal aliens and suspected terrorists entered the country unimpeded. Deadly fentanyl flowed across the border in record amounts, fueling the opioid epidemic. And horrific human trafficking occurred. These dire conditions cry out for the tough border security measures implemented by President Trump's Proclamation, which mark a welcome shift in policy after years of neglect by an Biden-Harris Administration that not only abdicated its constitutional duties, but actively facilitated the invasion,[8] undermining the Nation's security.

The Proclamation is lawful. The President's duty to protect the States against invasion, firmly rooted in the Guarantee Clause of Article IV, Section 4 of the Constitution, stands separate and apart from any statutory grant of authority to the Executive by Congress. Section 1182(f) of the Immigration and Nationality Act (INA), while reflecting the President's inherent constitutional power in this area and "exud[ing] deference to the President in every clause," *Trump v. Hawaii*, 585

---

[7] The Biden-Harris Administration's attempts to hinder Texas from safeguarding its citizens are well-documented. *See generally Texas v. Department of Homeland Security*, 88 F.4th 1127 (5th Cir. 2023). Texas is a key entry point for illegal aliens. *Id.* at 1130. To secure its border and assist the U.S. Border Patrol, Texas deployed concertina wire at high-traffic illegal border crossings. *Id.* at 1130. The Biden-Harris Administration not only opposed this measure, but destroyed Texas's property—cutting the wire down. *Id.* at 1131. Even after the district court granted Texas a temporary restraining order, Border Patrol agents cut holes in the wire and provided a climbing rope for aliens, seemingly to facilitate further inland crossings. *Id.* Texas also placed buoys in the Rio Grande to deter illegal crossings. *See United States v. Abbott*, No. 1:23-CV-853-DAE, 2023 WL 5740596, at *1 (W.D. Tex. Sept. 6, 2023), aff'd, 87 F.4th 616 (5th Cir. 2023), reh'g en banc granted, opinion vacated, 90 F.4th 870 (5th Cir. 2024). The Biden-Harris Administration sued Texas to stop it from constructing or maintaining these barriers. *Id.* at *2.

[8] *Candidate Biden Calls On Illegal Immigrants to Surge the Border*, YOUTUBE (Apr. 5, 2021), https://www.youtube.com/watch?v=rYwLYMPLYbo; *see also* H. Res. 863, 118th Cong., 2d Sess. (2024) (articles of impeachment against former Secretary of Homeland Security Alejandro Mayorkas for "willfully and systematically" refusing to comply with Federal immigration laws").

U.S. 667, 684 (2018), does not—and cannot, displace or limit the President's independent Article IV obligation to take all necessary actions to defend the States and safeguard the Nation's borders. After all, Congress need not delegate to the President a power he already has under Article II. *Accord Sessions v. Dimaya*, 584 U.S. 148, 217–219 (2018) (Thomas, J., dissenting). Indeed, the authority to exclude aliens "stems not alone from legislative power but is *inherent in the executive* power to control the foreign affairs of the nation." *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542–543 (1950) (emphasis added). So when, as here, the statutes enacted by Congress fail to adequately address the crisis, the President has the constitutional authority and duty to take all necessary actions to protect the states and safeguard the Nation's sovereignty.

## BACKGROUND

## I.    There is an Invasion at the Southern Border.

"[A]n invasion of the homeland. . . is unfolding now,"[9] and Texas is ground zero. During the Biden-Harris Administration, there were more than 11 million encounters nationwide[10] and more than 9 million encounters at the Southwest Border.[11] Southwest border encounters exceeded 96,000 in December.[12] And in Fiscal Year (FY) 2024 alone there were 2,135,005 encounters the Southwest border.[13] For comparison, Customs and Border Patrol (CBP) recorded *fewer* total

---

[9] Kevin R. Brock et al., *Letter to The Honorable Mike Johnson, Speaker of the House, et al.* (Jan. 17, 2024) available at https://tinyurl.com/5n75zpb2.

[10] U.S. Customs and Border Prot., *Nationwide Encounters*, https://www.cbp.gov/newsroom/stats/nationwide-encounters (last visited Mar. 25, 2025).

[11] U.S. Customs and Border Prot., *Southwest Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Mar. 25, 2025).

[12] U.S. Customs and Border Prot., *Southwest Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Mar. 25, 2025).

[13] U.S. Customs and Border Prot., *Southwest Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Mar. 25, 2025).

encounters (1,952,638) at the Southwest border from FY 2017-2020 *combined*.[14]

*Crime.* This influx of illegal aliens brings crime. Since FY 2021, CBP agents have recorded over 58,000 arrests of aliens with criminal convictions or outstanding warrants nationwide.[15] In that same time, Border Patrol has apprehended over 2,000 gang members and encountered 400 individuals on the terrorist watchlist.[16] From FY 2021 to now, CBP has arrested 189 illegal aliens who were convicted of murder; 5,000 who were convicted of assault, battery, or domestic violence; and 1,426 who were convicted of sexual offenses.[17] Recent reporting reveals that one in every ten inmates in Houston, Texas have an ICE hold.[18]

These stark numbers don't tell the full story. According to the Texas Department of Public Safety (DPS), between June 1, 2011, and January 31, 2025: 321,000 illegal aliens were charged with more than 561,000 criminal offenses which included arrests for 1,039 homicide charges; 72,597 assault charges; 10,044 burglary charges; 65,602 drug charges; 1,361 kidnapping charges; 28,447 theft charges; 43,832 obstructing police charges; 3,205 robbery charges; 7,128 sexual assault charges; 8,140 sexual offense charges; and 6,987 weapon charges.[19]

---

[14] U.S. Dep't of Homeland Sec., *Border Security Metrics Report: 2021* (Apr. 2022), at 23, Table 4a, https://tinyurl.com/43hr79fc (last visited Mar. 25, 2025).

[15] U.S. Customs and Border Prot., CPB Enforcement Statistics, *Arrests of Individuals with Criminal Convictions or Those Wanted by Law Enforcement*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited Mar. 25, 2025).

[16] U.S. Customs and Border Prot., CPB Enforcement Statistics, *Gang Affiliated Enforcement,* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited Mar. 25, 2025); U.S. Customs and Border Prot., CPB Enforcement Statistics, *Terrorist Screening Data Set Encounters,* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited Mar. 25, 2025).

[17] U.S. Customs and Border Prot., Criminal Noncitizen Statistics, *Total Criminal Convictions by Type*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/criminal-noncitizen-statistics (last visited Mar. 25, 2025).

[18] Brooke Taylor (@Brooketaylortv), X Post, Oct. 28, 2024, available at https://x.com/Brooketaylortv/status/1850901531358327129.

[19] Texas Department of Public Safety, *Texas Criminal Illegal Alien Data*, https://www.dps.texas.gov/section/crime-records/texas-criminal-illegal-alien-data (last visited Mar. 25, 2025).

These numbers have names. Indeed, while the Biden-Harris Administration was fighting tooth and nail to prevent Texas from securing its border, several illegal aliens came into this country and committed brutal acts of violence against Texans and other Americans. Just a few months ago, two illegal aliens were charged with capital murder for strangling and raping twelve-year-old girl Jocelyn Nungaray, before dumping her body into a creek. Both men had been taken into CBP custody near El Paso and released on their own recognizance the same day they were apprehended.[20] Twenty-two-year-old nursing student Laken Riley was strangled to death by Jose Antonio Ibarra. Ibarra is an illegal alien from Venezuela who illegally crossed into the United States through El Paso, Texas in 2022 and was released into the U.S. on parole.[21] Last July, Jorge Chacon-Gutierrez shot and critically injured a San Antonio police officer responding to a domestic violence call. Chacon-Gutierrez entered the U.S. illegally through Eagle Pass, Texas in November 2023 and was released with an April 2026 court date.[22] Recently, Guatemalan national Sebastian Zapeta-Calil was arrest for lighting a sleeping woman on fire in Coney Island, New York.[23] Zapeta-Calil is in the U.S. illegally after being deported by the Trump Administration in 2018. He entered the U.S. again as a "gotaway" at an unknown time.

In all these cases the perpetrators had two things in common: (1) They were illegal aliens, and (2) they had been arrested and released because of the Biden-Harris Administration's refusal to protect its citizens.

---

[20] Courtney Carpenter & Jonathan Mejia, *Jocelyn Nungaray Murder: Grand Jury Indicts 2 Men on Capital Murder Charges in Death of 12-Year-Old Houston Girl,* KHOU 11 (June 21, 2024), https://www.khou.com/article/news/local/12-year-old-jocelyn-nungaray-capital-murder-illegal-immigrants/285-25f895ca-b2c0-455a-840b-0b1e72823379.

[21] Michael Dorgan, *Laken Riley Murder Suspect Jose Ibarra Pleads Not Guilty, Mother Sobs in Court*, Fox News (May 31, 2024), https://www.foxnews.com/us/laken-riley-murder-suspect-jose-ibarra-pleads-not-guilty.

[22] Mariah Medina, *Man who shot San Antonio police offer with rifle was in US illegally, sources say*, News4SA (July 28, 2024), https://news4sanantonio.com/news/local/gunman-who-shot-san-antonio-officer-had-previous-border-apprehension-sources-say.

[23] Bill Melugin (@BillMelugin_), X Post, Dec. 23, 2024, available at https://x.com/BillMelugin_/status/1871234826667200759.

*Unaccompanied Minors and human trafficking.* Lax border policies have hit the most vulnerable. Since 2021, unaccompanied children at the southern border have "remained at record-high levels."[24] The number of unaccompanied minors skyrocketed from 15,381 in 2020 to 118,938 in 2023[25]—a 673% increase in just three years. In FY 2022–2024, CBP encountered 390,330 unaccompanied children.[26] Indeed, in just the span of three days last November, over 140 UACs from ages two to 17 were smuggled across the Southwest Border.[27] Unfortunately, human smuggling has grown into a "multi-billion-dollar international business." Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. Times (July 25, 2022), https://tinyurl.com/487kykkh. Cartels "have increasingly acquired a transnational dimension," and may now be Mexico's fifth-largest employer. Rafael Prieto-Curiel et al., *Reducing Cartel Recruitment Is the Only Way to Lower Violence in Mexico*, 381 Science 1312 (2023). In a House Homeland Security joint subcommittee hearing last November, Department of Health and Human Services whistleblower Tara Rodas confirmed as much, when she testified that the agency's unaccompanied alien children (UAC) sponsor placement program is being used by transnational criminal organizations as a "white-glove delivery service of children."[28]

*Drugs*. Cartels exploit the infrastructure built for human smuggling to ship drugs, notably fentanyl. "Lethal in small doses, fentanyl is a leading cause of death for young Americans and is

---

[24] *Increase Numbers of Unaccompanied Children at the Southwest Border*, Cong. Research Serv. (June 28, 2023) https://crsreports.congress.gov/product/pdf/IN/IN11638.

[25] U.S. Dep't of Health & Hum. Servs., Unaccompanied Children Bureau, Fact Sheet, *Admin. for Child. & Fams.* (July 5, 2024), https://www.acf.hhs.gov/orr/fact-sheet/programs/uc/fact-sheet.

[26] U.S. Customs and Border Prot., *Southwest Land Border Encounters*, *UC/Single Minors* https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Mar. 25, 2025).

[27] Chris Olivarez (@LtChrisOlivarez), X Post, Nov. 27, 2024, available at https://x.com/LtChrisOlivarez/status/1861880589760319580.

[28] *Trafficked, Exploited, and Missing: Migrant Children Victims of the Biden-Harris Administration*, YOUTUBE (Nov. 19, 2024) https://www.youtube.com/live/MnGYhqs1DZA?t=4795s at 1:18:00–1:22:54.

frequently encountered in vast quantities at the border." *State of Texas v. U.S. Dep't of Homeland Sec.*, No. DR-23-CV-00055-AM, 2023 WL 8285223, at *3 (W.D. Tex. Nov. 29, 2023). Because fentanyl is a highly addictive opioid, smuggling it into "the United States has become an incredibly lucrative enterprise for the major Mexican drug cartels." *Id.* In FY 2023, CBP seized 240,000 pounds of drugs at the southwest border[29]—including an estimated 1.1 billion doses of fentanyl.[30] Forty-four percent of total drug seizures and 99 percent of fentanyl seizures occurred at the southwest border.[31]

*National Security*. These cartels are not just smugglers—they are organized, violent criminals and terrorists. Jordan, *supra*. They "have become potent paramilitary forces, with heavily armed mobile units able to stand their ground against the Mexican military." William Barr, *The U.S. Must Defeat Mexico's Drug Cartels*, Wall St. J. (Mar. 2, 2023), https://tinyurl.com/drxcdnmv. One former U.S. Attorney General has thus stated that the cartels pose threats that look "more like ISIS than like the American mafia." *Id.* They were able to overwhelm Mexico's military with "700 cartel paramilitary fighters with armored cars, rocket launchers and heavy machine guns." *Id.* During his time as FBI Director, Christopher Wray testified before Congress that "some of the overseas facilitators of the smuggling network have ISIS ties that we're very concerned about." Katie Pavlich, *FBI Director Confirms Prison Gangs and Islamic Terrorists Are Exploiting the Border*, Townhall (Mar. 11, 2024), https://tinyurl.com/mry282bu. And the Annual Threat Assessment issued by the U.S. Director of National Intelligence contains a sobering discussion of these "[t]ransnational criminal organizations." OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE,

---

[29] *Drug Seizure Statistics*, U.S. Customs & Border Prot., https://www.cbp.gov/newsroom/stats/drug-seizure-statistics (last visited Mar. 25, 2025).

[30] *Drug Dosage, Value, and Weight Statistics*, U.S. Customs & Border Prot., https://www.cbp.gov/newsroom/stats/cbp-drugs-dosage-value-and-weight (last visited Mar. 25, 2025).

[31] Per CBP data, in FY 2023, out of 549,000 pounds of drugs seized, 240,000 pounds were seized at the southwest land border; out of 27,000 pounds of fentanyl seized, 26,700 pounds were seized at the southwest land border. *Drug Seizure Statistics*, U.S. Customs & Border Prot., https://www.cbp.gov/newsroom/stats/drug-seizure-statistics (last visited Mar. 25, 2025).

*Annual Threat Assessment of the U.S. Intelligence Community* at 36–40 (Feb. 5, 2024), https://tinyurl.com/59h8nf5z. Recognizing the threat these cartels pose to the Country; the President has rightfully designated them as foreign terrorist organizations.[32]

Beyond the transnational criminal cartels, it is well understood that "[f]orced migration is a stimulant for the mobilization of insurgents across boundaries, can destabilize volatile territories, and create conflicts in [neighboring] States." Kenneth Chan, *State Failure and the Changing Face of the* Jus ad Bellum, 18 J. Conflict & Security L. 395, 418 (2013). Indeed, over 60,000 Chinese nationals have been apprehended illegally crossing the Southwest border since FY 2021.[33] Our adversaries can use these migrants and refugees as "instruments of warfare and military strategy." Aaron R. Petty, Aaron R. Petty, *Migrants As A Weapons System*, 13 J. Nat'l Security L. & Pol'y 113, 130 (2022). For example, in January 2024 Immigration and Customs Enforcement (ICE) arrested an illegal alien in Minnesota who belonged to the Somali terrorist group al-Shabaab.[34] The individual had lived freely in the country for nearly a year after being caught and released by Border Patrol crossing the border in San Ysidro, California, in March 2023. And recently, an illegal alien from Lebanon, who was apprehended between ports of entry in March 2024, admitted to belonging to the Iranian-backed terrorist group Hezbollah during an interview with the Border Patrol.[35] Basel Bassel Ebbadi told agents he wanted to travel to New York and make a bomb. And

---

[32] *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, Exec. Order No. 14,157, 90 Fed. Reg. 8439 (Jan. 20, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/01/designating-cartels-and-other-organizations-as-foreign-terrorist-organizations-and-specially-designated-global-terrorists/.

[33] U.S. Customs and Border Prot., *Southwest Land Border Encounters*, *Peoples Republic of China*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Mar. 25, 2025).

[34] Jorge Ventura, *Exclusive: Terrorist Caught Illegally Crossing Border Allowed to Roam Free for Nearly a Year, Memo Says*, DAILY CALLER (Jan. 29, 2024), https://dailycaller.com/2024/01/29/exclusive-terrorist-caught-illegally-crossing-border-allowed-roam-free-nearly-year-memo-says/.

[35] Jennie Taer, *Illegal Migrant from Lebanon Admitted Terror Ties*, N.Y. POST (Mar. 17, 2024), https://nypost.com/2024/03/17/us-news/illegal-migrant-from-lebanon-admitted-terror-ties/?utm_source=twitter&utm_medium=social&utm_campaign=nypost.

in just June of this year, ICE arrested eight men from Tajikistan with potential ties to ISIS in Philadelphia, New York, and Los Angeles.[36] Just in December, Texas DPS troopers encountered a group of 176 individuals crossing the border illegally, with eleven of those apprehended being Special Interest Aliens (SIA) from Afghanistan.[37] According to DHS, an SIA is a "non-U.S. person who, based on an analysis of travel patterns, potentially poses a national security risk to the United States or its interests." U.S. Dep't of Homeland Sec., *Myth/Fact: Known and Suspected Terrorists/Special Interest Aliens*, DHS (Jan. 7, 2019), https://tinyurl.com/bde3ycd6. And that "[o]ften such individuals or groups are employing travel patterns known or evaluated to possibly have a nexus to terrorism." *Id.* There is no telling how many of these individuals are currently in the country today, as recent reports indicate the Biden-Harris Administration granted nearly 7,000 exemptions to foreign nationals who otherwise would have been ineligible for entry due to terrorism-related backgrounds.[38]

## II.  The Guarantee Clause of the Constitution Imposes an Unconditional Duty on the President to Protect Texas and Other States from Invasion.

Like the "President has inherent authority to exclude aliens from the country," *Trump*, 585 U.S. at 712 (Thomas. J., concurring), the President holds an inherent constitutional duty to deny entry to invaders and ensure their removal. This duty arises under Article IV, Section 4 of the Constitution, which states:

> "The United States shall guarantee to every state in this union a republican form of government, ***and shall protect each of them against invasion***; ***and*** on application of the legislature, or of the executive (when the legislature cannot be convened) against domestic violence."

U.S. Const. art. IV, § 4 (emphasis added).

---

[36] *ICE Arrests 8 Men with Possible Ties to ISIS in Philly, NY, LA*, NBC PHILADELPHIA (June 12, 2024), https://www.nbcphiladelphia.com/news/local/ice-arrests-8-men-with-possible-ties-to-isis-in-philly-ny-la/3883126/.

[37] Chris Olivarez (@LtChrisOlivarez), X Post, Dec. 2, 2024, available at https://x.com/LtChrisOlivarez/status/1863680637254738212.

[38] Adam Shaw, *Biden DHS Exempted Thousands of Immigrants from Terror-Related Entry Restrictions in FY 2024*, FOX NEWS (Jan. 14, 2025), https://www.foxnews.com/politics/biden-dhs-exempted-thousands-immigrants-from-terror-related-entry-restrictions-fy-2024.

From this provision comes the part of the Guarantee Clause commonly referred to as the "Invasion Clause." It provides that the United States "shall protect each [of the states]… against invasion." *Id*. Separated by the word "and," each obligation listed within the Guarantee Clause stands independently of the others, imposing distinct duties upon the federal government. *See* ANTONIN SCALIA & BRYAN A. GARNER, READLING LAW: THE INTERPRETATION OF LEGAL TEXTS 116 (2012) ("With the conjunctive list, all. . . things are required"). Thus, while protecting a state from invasion might incidentally aid in preserving a republican form of government or preventing domestic violence, the duty to safeguard against invasion is distinct. *See Conjunctive/disjunctive canon*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("[I]n a legal instrument, and joins a conjunctive list to combine items, while or joins a disjunctive list to create alternatives.").

Under this constitutional guarantee, the federal government must act whenever a state is invaded or faces a credible threat of invasion. This duty is mandatory, applying equally to every state, ensuring against "the possibility of an undue partiality in the federal government in affording it's [] protection to one part of the union in preference to another." St. George Tucker, *Blackstone's Commentaries: With Notes of Reference to the Constitution and Laws of the Federal Government of the United States*, Vol. 4, at 366 (Philadelphia, 1803).

The Founders viewed this guarantee as a cornerstone of the social contract between the government and the governed. Indeed, the "right to protection has deep roots in the English legal tradition." Steven J. Heyman, *The First Duty of Government: Protection, Liberty and the Fourteenth Amendment*, 41 Duke L.J. 507, 513 (1991). For centuries, legal theorists like Sir Edward Coke articulated a reciprocal relationship between sovereign and subject. At its core, this principle rested on a simple bargain: obedience of the law in return for protection. Those under the sovereign's rule, bound by his laws, were entitled to his shield. *See generally* Philip Hamburger, *Beyond Protection*, 109 Colum. L. Rev. 1823 (2009). Protection and allegiance were a "*duplex et reciprocum ligamen*," a dual and reciprocal bond. *Calvin's Case* (1608) 77 Eng. Rep. 377, 382, 7 Co. Rep. 1 a, 5 a; *see also id*. at

382, 7 Co. Rep. at 4 b (stating that "as the subject oweth to the King his true and faithful ligeance and obedience, so the Sovereign is to govern and protect his subjects"). John Locke's social contract theory refined this idea, arguing that individuals consent to government authority for the purpose of securing their natural rights 41 Duke L.J., at 513–16. In the words of Blackstone, "[a]llegiance is the tie, or ligamen, which binds the subject to the king, in return for that protection which the king affords the subject." 1 William Blackstone, Commentaries *354; *see also* 109 Colum. L. Rev., at 1838–40.

By the 18th century, these principles shaped English constitutional thought and profoundly influenced the American colonists. The Declaration of Independence famously underscored the importance of protection, listing among King George III's many grievances his abdication of government by "*declaring us out of his Protection* and waging War against us." *The Declaration of Independence* (U.S. 1776), available at https://tinyurl.com/27bc28rv. (emphasis added). After achieving independence, state constitutions were framed around the notion that government exists mainly to protect natural rights. Several early state constitutions explicitly declared that government "is, or ought to be, instituted for the common benefit, *protection, and security of the people*." Steven J. Heyman, *supra* at 523 (emphasis added) n. 85 (collecting sources). The Framers of the Federal Constitution embraced this same vision. James Madison emphasized that the "protection" of "the faculties of men," including the rights of property, was "the first object of government."    THE    FEDERALIST    No.    10    (James    Madison),    available    at https://tinyurl.com/8tdhr5jm. It follows that U.S. Const. art. IV, § 4, which obligates the federal government to protect each state from invasion, reflects this fundamental understanding.

The Guarantee Clause thus imposes a clear and unconditional duty upon the President and the federal government to protect Texas and other states from invasion. This obligation is rooted not only in the text of the Constitution but also woven into the fabric of how the Founders viewed the social contract between a government and its people.

III.    **President Trump Upholds his Constitutional Duty to Protect the States from Invasion by Issuing the Proclamation.**

"The United States is in the midst of the worst border security crisis in the Nation's history." H.R. Res. 957, 118th Cong. (2024). Acting under his constitutional charge to defend the Nation from invasion, President Trump on January 20, 2025, issued Proclamation 10888—titled *Guaranteeing the States Protection Against Invasion*, 90 Fed. Reg. 8333 (Jan. 20, 2025), available at https://tinyurl.com/yc57uzxx. Drawing on both the Guarantee Clause, U.S. Const. art. IV, § 4, and the broad powers Congress vested in him under 8 U.S.C. §§ 1182(f) and 1185(a), the President determined that the extraordinary influx of illegal crossers at the southern border is an "invasion." *Id.*

The Proclamation suspends entry for these aliens, bars them from manipulating asylum laws, and directs that any alien engaged in the invasion at the southern border be reppeled, repatriated, or removed. *Id.* The Proclamation fulfills the Constitution's core commitment that each State "shall" be protected. It restores a vital measure of order and security at the border, so that no single state is forced to bear the burden of an invasion the Framers expressly charged the Nation to repel.

## ARGUMENT

I.    **The Proclamation Significantly Reduces the Injury Inflicted on Texas by Curbing the Unrelenting Flow of Illegal Aliens Through the Southern Border and Removing Those Here Illegally.**

States typically "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). Texas is closer to the invasion than most. Indeed, border states like Texas pay a particularly high price when the federal government fails to faithfully execute our country's immigration laws. As the border towns become overrun, it impacts all levels of Texas's infrastructure, including housing, education, health care, criminal justice system costs,

welfare expenditures, and more.[39] *See Texas v. Biden*, 589 F. Supp. 3d 595, 607 (N.D. Tex. 2022) ("[T]he flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both.") (quoting *Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists*, 86 Fed. Reg. 42,828, 42,835 (Aug. 5, 2021)). If the Proclamation is found unlawful, Texas will continue to incur costs associated with providing services to illegal aliens who reside in the State but would otherwise be kept out of the Country under the Proclamation. That is because states have a mandated duty to provide some government resources to aliens, regardless of lawful status. *See, e.g.*, 42 C.F.R. § 435.406(b) (emergency Medicaid); *Plyler v. Doe*, 457 U.S. 202, 230 (1982); *Texas v. United States (DACA)*, 50 F.4th 498, 517–20 (5th Cir. 2022).

For example, Texas law defines residents "entitled to pay resident tuition at all institutions of higher learning" to include illegal aliens. *See* 19 TEX. ADMIN. CODE § 21.24(a) and (d)(4). At the University of Texas at Austin, the distinction costs the State-funded university approximately $30,000–$35,000 per academic year, per student.[40] Texas also faces serious injuries from the crime and associated costs of illegal immigration. Criminal activity by aliens that would not occur had they not been present in the State imposes a significant cost on Texans, not only because of the irreparable harm resulting from criminal activity, but also because of the significant financial cost of the criminal justice system. Beyond that, there are at least four categories of Texas-funded health care provided to unlawfully present aliens: "(1) Texas Emergency Medicaid; (2) Texas Family Violence Program; (3) CHIP Perinatal Coverage; and (4) uncompensated medical care from Texas public hospitals. *Texas v. U.S. Dept. of Homeland Sec.*, No. 6:24-CV-00306, 2024

---

[39] Urial J. Garcia, *Gov. Greg Abbott Calls for Federal Help as Thousands of Migrants Cross Border in Eagle Pass*, Tex. Trib. (Sept. 21, 2023), https://www.texastribune.org/2023/09/21/texas-migrants-border-eagle-pass/.

[40] *Cost of Attendance*, UNIVERSITY OF TEXAS AT AUSTIN, https://perma.cc/7NG3-TUYU (last accessed Mar. 25, 2025).

WL 4711951, at *32 (E.D. Tex. Nov. 7, 2024). Since these healthcare programs and services do not depend on immigration status, the total costs to Texas of providing them increases with an increasing alien population.

Simply put, the Proclamation reduces these harms to Texas by reducing the number of aliens flowing into and residing in the State.

## II.    Whether an Invasion is Occurring is a Nonjusticiable Political Question for the Political Branches, not the Courts, to Decide. At any rate, the Situation at the Southern Border Constitutes an "Invasion" as That Term was Originally Understood at the Founding.

### A.    The determination of whether there is an invasion under the Guarantee Clause is a nonjusticiable political question.

"[S]uits arising under the guarantee clause clearly present nonjusticiable political questions." *O'Hair v. White*, 675 F.2d 680, 684 (5th Cir. 1982) (citing *Luther v. Borden*, 48 U.S. 1 (1849) and *Pac. States Tel. & Tel. Co. v. State of Oregon*, 223 U.S. 118, 142 (1912)). That includes claims under the invasion clause. *See California v. United States*, 104 F.3d 1086,1090–91 (9th Cir. 1997) (addressing whether a state had been "invaded" for constitutional purposes would require making "non-judicial policy decision[s]"); *Padavan v. United States*, 82 F.3d 23 28 (2d Cir. 1996*)* ("[T]he plaintiffs' Invasion Clause claim is nonjusticiable. The protection of the states from 'invasion' involves matters of foreign policy and defense, which are issues that the courts have been reluctant to consider."); *Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995) ("[W]hether the level of illegal immigration is an 'invasion' of Florida and whether this level violates the guarantee of a republican form of government present nonjusticiable political questions."); *see also* Josh Blackman, *Four Questions and Few Answers About the Invasion Clause*, CIVITAS INST. (Feb. 13, 2025), https://www.civitasinstitute.org/research/four-questions-and-few-answers-about-the-invasion-clause (collecting research and concluding that "[t]he Constitution affords Congress, the president, and the states the power to declare an invasion—*every branch except the judiciary*.") (emphasis added).

The only recognized constraint on the Executive's authority to declare an invasion are that it must be made in "good faith." *Sterling v. Constantin*, 287 U.S. 378, 400 (1932). Given the gravity of the harms happening because of illegal immigration, coupled with the consensus[41] among several states, counties, and the federal government that there is an invasion happening at the southern border—there is no question the Proclamation is within the Executive's "permitted range of honest judgment as to the measures to be taken in" repelling such an invasion. *Sterling*, 287 U.S. at 399–400.

**B. The crisis at the southern border meets the definition of an "invasion" as that term was originally understood by the Framers.**

Even assuming this Court could weigh in on what qualifies as an invasion, the ongoing crisis at the southern border, characterized by the mass entry of unauthorized individuals facilitated by transnational criminal organizations, meets every plausible definition of an invasion as understood by the Framers.

The Constitution's text and the history of this Country counsel against a cramped reading of what qualifies as an "invasion." Indeed, each show that "invasion" was intended to encompass far more than formal military campaigns by foreign governments. As James Madison emphasized in Federalist No. 10, the term "invasion" included the government's ability to secure each state "not only against foreign hostility, but against ambitious or vindictive enterprizes [sic] of its more powerful neighbours." THE FEDERALIST No. 10 (James Madison), available at https://tinyurl.com/2n9h9x9c. This understanding reflects a concern for any incursion—whether

---

[41] According to the most recent Rasmussen Reports poll on the topic, nearly two-thirds of American voters surveyed say there is an invasion at the southern border. *Yes, It's an Invasion, Voters Say of Border Crisis*, RASMUSSEN REPORTS (Apr. 10, 2024), https://www.rasmussenreports.com/public_content/politics/biden_administration/yes_it_s_an_invasion_voters_say_of_border_crisis. In a separate poll, over half of Americans believe it is true that the "U.S is experiencing historic levels of migration, with immigrants flooding southern border towns like never before." *Ipsos*, *NPR Immigration Topline* (Feb. 2025) at 13 available at https://tinyurl.com/mryunzjm.

foreign or domestic, organized or ad hoc—that disrupts the stability and security of the states. By its plain text, the Constitution's use of the term "invasion" encompasses any unauthorized and uninvited crossing of a boundary—no matter its size—that either yields or threatens harm beyond the mere fact of entry. This broad definition naturally extends to instances of illegal immigration where the scope, scale, or organizational sophistication poses a risk of meaningful injury. *See* Robert G. Natelson & Andrew T. Hyman, *The Constitution, Invasion, Immigration, and the War Powers of States*, 13 BRIT. J. AM. LEGAL STUD. 1, 41.

It makes sense, then, for the Framers to have authorized Congress to issue letters of marque and reprisal, a power specifically designed to combat non-state actors such as pirates and brigands. U.S. Const. art. I, § 8, cl. 11. The Framers understood that threats to public order often came not from traditional armies but from irregular forces, rogue actors, and unauthorized groups whose actions imperil the public good. Robert G. Natelson & Andrew T. Hyman, *supra*, at 23. A historical practice of American governments engaging with non-state actors continued from the founding until now. Joseph Story conceived of the Whiskey Rebellion—an uprising of nonstate actors in Pennsylvania between 1791 and 1794—as an insurrection. 3 Story, *supra*, § 1808; *see also SBC Commc'ns, Inc. v. FCC*, 154 F.3d 226, 236 n.17 (5th Cir. 1998) (quoting 4 Annals of Cong. 788 (1794)) (same). In 1916, the US sent forces into Mexico to pursue a band of non-state actors because the Mexican government "was incapable of policing" its own border and tracking down Pancho Villa. John S.D. Eisenhower, *Intervention! The United States and the Mexican Revolution* 1913–1917, at 227–50 (1993). After the terrorist attacks of September 11, 2001, Congress authorized the use of military force against not only responsible "nations" but also "organizations" and "persons." Authorization for the Use of Military Force, Pub. L. 107–40, § 2(a), 115 Stat. 224 (Sept. 18, 2001). The Obama Administration rightly observed that "[t]he inherent right of self-defense is not restricted to threats posed by States." Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force 9 (2016).

Nor does the Constitution's definition of "invasion" hinge on whether the invading force is armed when entering the Country. For example, during the Founding era, unarmed Connecticut settlers who were seemingly migrating peacefully into Pennsylvania were labeled as "invaders" because they attempted to buy land that the Pennsylvania government did not recognize as legally belonging to them. Robert G. Natelson & Andrew T. Hyman, *supra*, at 24. In fact, Benjamin Franklin wrote a plan "to divert the Connecticut Emigrants from their design of *Invading* this province [Pennsylvania] and to induce them to go where they would be less injurious and more useful." *Letter from Benjamin Franklin to Peter Collinson*, Jun. 26, 1755, https://tinyurl.com/h4652zna (emphasis added) (last visited Mar. 25, 2025).

 In the same way, the Founders understood that unarmed individuals who enter unlawfully may later acquire the means to defend their position, commit violence, or otherwise amplify the harm caused by their incursion. Indeed, there seems to have been no resort to arms when the Connecticut "invasion" crossed the Pennsylvania border until the unlawful "Connecticut settlers sought to defend themselves" from the Pennsylvania authorities. Robert G. Natelson & Andrew T. Hyman, *supra*, at 24.

This principle is shown by the September 11, 2001, terrorist attacks. The 9/11 terrorists entered the United States unarmed, and acquired the means to inflict catastrophic harm after their arrival.[42] They hijacked commercial aircraft and used them to kill thousands of Americans in what is still the worst terrorist attack in this Nation's history. By any reasonable, historical understanding of the term, the 9/11 terrorists would have been seen as invaders by the Founders even though they were unarmed non-state actors.

---

[42] Five of the terrorists had overstayed their visas and were in the United States illegally. *ICE Brings into Custody Czech Woman Who Exploited Non-Immigrant Visa System; Caused More Than $15 Million in Lost Wages to U.S. Workers* (Sept. 16, 2015), https://www.ice.gov/news/releases/ice-brings-custody-czech-woman-who-exploited-non-immigrant-visa-system-caused.

Nor does an "invasion" hinge on the number of invaders. After all, there were only nineteen 9/11 hijackers. And in *Ex parte Quirin*, 317 U.S. 1 (1942), eight Nazi saboteurs were labeled invaders. That this notion was understood at the founding is shown in the Constitutional debates by a prominent Massachusetts opponent to the Constitution writing under the pseudonym "John DeWitt." DeWitt complained that "should an insurrection or an invasion, *however small*, take place, in Georgia" then habeas corpus could be suspended in Massachusetts. *See* De Christopher A. Chrisman, *Article III Goes to War: A Case for A Separate Federal Circuit for Enemy Combatant Habeas Cases*, 21 J.L. & Pol. 31, 40–41 (2005) (citing "John DeWitt," Essay II (Oct. 27, 1787), in the Anti-Federalist Papers and the Constitutional Convention Debates 197–98) (emphasis added)). That attempt to distinguish between large and small invasions did not make it into the Constitution, likely because there was broad consensus that any invasion, no matter its scale, had to be dealt with swiftly and decisively before it could take root.[43]

Even setting aside that there is no brightline numerical threshold of intruders before something is called an "invasion" what is happening now would no doubt qualify. At the time of the founding, the total population of the United States was less than 4,000,000.[44] Even the conservative estimate in the Proclamation has the number of unauthorized immigrants in this Country as 8 million, more double the entire population of the United States at the Founding. A nation of fewer than four million would have had no difficulty recognizing such an unregulated mass entry as an invasion.

This lack of a limitation to state actors is consistent with the use of the word "invasion" near the founding. Webster's 1806 dictionary—the first American English dictionary—defines "invade" broadly, as meaning "to enter or seize in hostile manner." Noah Webster, A

---

[43] Andrew Hyman, *What the Constitution's Framers Really Meant by 'Invasion'*, DAILY CALLER (Jan. 30, 2024, 3:22 PM ET), https://dailycaller.com/2024/01/30/hyman-constitution-invasion-founding-fathers-james-madison/.

[44] C. Wright & W. Hunt, *The History and Growth of the United States Census* 17 (1900), available at https://tinyurl.com/mrxa5ftt.

compendious Dictionary of the English Language 164 (1806). Webster's 1828 dictionary also defines "invade" broadly, to include not just the entrance of a foreign army into a country, but also "1 … to enter as an enemy, with a view to conquest or plunder; to attack"; "2. To attack; to assail; to assault"; "3. To attack; to infringe; to encroach on; to violate."1 Noah Webster, American Dictionary of the English Language 113 (1828). Dictionary definitions at the time defined "invade" as simply "to enter in a hostile manner." Samuel Johnson, [Johnson's] Dictionary (reprint, Boston 1828). An "invasion" was a "hostile entrance" or "an attack." *Id.* Importantly, "hostile" in the 18th century often meant "adverse" or "unauthorized," not necessarily violent Robert G. Natelson & Andrew T. Hyman, *supra*, at 21 n.125 (collecting definitions from thirteen Founding-era English dictionaries). Further, "hostile" is not defined to include only state actors. *Id.* ("HO'STILE. adj. [hostilis, Latin.] Adverse;    opposite;    suitable    to    an    enemy."), (E'nemy. n.s. [ennemi, French; inimicus, Latin.] 1. A publick foe …. 2. A private opponent; an antagonist … 3. Any one who regards another with malevolence; not a friend….").

In any event, at minimum, the transnational criminal cartels are part of an invasion. Under Founding-era international law, certain non-state actors, such as pirates, were classified as *hostes humani generis*—enemies of the human race. *See* Robert G. Natelson & Andrew T. Hyman, *supra*, at 10. These actors were treated as invaders "[b]ecause he commits hostilities upon the subjects and property of any or all nations, without any regard to right or duty, or any pretense of public authority." *United States v. Brig Malek Adhel*, 43 U.S. (2 How.) 210, 232, 11 L.Ed. 239 (1844). Today's transnational cartels, which orchestrate the trafficking of violence, fentanyl, human beings, and other contraband, are the modern equivalent of these pirates. Their systematic and hostile incursions across the southern border undermine public safety, strain state resources, and destabilize communities. Thus, "all nations [may punish] all persons, whether natives or foreigners, who have committed this offence against any persons whatsoever, with whom they are in amity." *United States v. Smith*, 18 (5 Wheat.) U.S. 153, 161 (1820).

The crisis at the southern border exemplifies the kind of invasion that demands federal action under Article IV. Thousands of individuals cross illegally every day, facilitated by cartels that profit from human misery. This ongoing influx imposes enormous economic, social, and security burdens on the states, overwhelming healthcare systems, straining law enforcement, and endangering public safety. The fact that many of these individuals may be unarmed at the border does not negate the hostile and disruptive nature of their entry. Once inside, they may acquire the means to resist removal, engage in criminal activity, or otherwise harm local communities. The Guarantee Clause obligates the federal government to act. The Framers crafted the Constitution to ensure that states would not be left defenseless against invasions of any form.

More than that, the power to protect the states against invasion is meaningless if it stops at the border's edge. Invasions do not end the moment an intruder sets foot on sovereign territory; they become ongoing threats to the State's security. Thus, the authority to "protect" necessarily includes removing those who entered without authorization or under hostile circumstances. Without that ability, the government could not fulfill its constitutional duty to protect its people from the harm of an invasion once it has begun.

In the end, to dismiss the current crisis as something other than an invasion is to disregard the historical understanding of the term, and the plain text of the Constitution. The Guarantee Clause creates a duty. Preventing the federal government from addressing the southern border crisis forces it to violate its constitutional duty and leaves the states vulnerable to precisely the type of threat the Framers anticipated. Instead, this Court should allow the federal government to uphold its obligation under U.S. Const. art. IV, § 4 to secure the border, repel this ongoing invasion, and protect the states from further harm. Anything less undermines the Constitution and the very purpose of the Guarantee Clause.

## CONCLUSION

The Constitution imposes a clear duty on the federal government to protect each State against invasion, and the power to control who enters sovereign territory is the defining characteristic of sovereignty itself. *Arizona v. United States*, 567 U.S. 387, 417 (2012) (Scalia, J., dissenting). The Framers expected the federal government to defend against invasions of all kinds, not just standing armies. The Proclamation discharges that weighty obligation. Faced with an extraordinary influx of unlawful entries, facilitated by transnational criminal networks and exposing border states like Texas to alarming harms, the President has invoked his authority to suspend entry into this Country and remove those with no right to be here. In doing so, the Proclamation vindicates the Guarantee Clause's purpose and reaffirms core principles of sovereignty.

Thus, Texas asks the Court to uphold the Proclamation and ensure faithful execution of the federal government's duty to protect Texas and all other states against invasion.

Date: March 26, 2025

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**RYAN D. WALTERS**
Deputy Attorney General for Legal Strategy

**RYAN G. KERCHER**
Chief, Special Litigation Division

*/s/Garrett Greene*
**GARRETT GREENE**
Special Counsel
Texas Bar No. 24096217
Garrett.Greene@oag.texas.gov

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410

**COUNSEL FOR AMICUS CURIAE**

23

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on March 31, 2025 and that all counsel of record were served by CM/ECF.

*/s/ Garrett Greene*
GARRETT GREENE