**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, *et al.*, | ) ) ) |
|  | ) |
| *Plaintiffs*, | ) |
|  | )  No. 1:25-cv-00306 |
| v. | ) |
|  | ) |
| KRISTI NOEM, Secretary of Homeland Security, in her official capacity, *et al.*, | ) ) |
|  | ) |
| *Defendants*. | ) |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 1

I.    THE PROCLAMATION AND GUIDANCE ARE UNLAWFUL. ................................. 1

A. Congress Has Not Authorized The President To Abrogate The INA. ......................... 2

1.    Section 1182(f) Does Not Authorize Removals Or Repatriations. ............ 2

2.    Section 1182(f) Does Not Allow The President To Override The INA. ..... 6

B. The Constitution Does Not Authorize The President To Abrogate The INA. ............. 15

II.   DEFENDANTS' THRESHOLD ARGUMENTS LACK MERIT. ................................ 16

A. Plaintiffs Have Standing ....................................................................................... 16

1.    Individual Plaintiffs Have Standing. .................................................... 16

2.    Organizational Plaintiffs Have Standing. ............................................. 19

B. Plaintiffs Have A Cause Of Action. ...................................................................... 23

1.    Plaintiffs Have An Equitable Cause Of Action To Challenge The Proclamation's Enforcement. ............................................................... 23

2.    Plaintiffs Can Challenge The Guidance Under The APA. ..................... 24

C. Plaintiffs' Claims Are Justiciable. ......................................................................... 28

D. Section 1252 Does Not Bar Plaintiffs' Claims. ...................................................... 30

III.  THE COURT SHOULD GRANT THE NATIONWIDE RELIEF NECESSARY TO REMEDY THE GOVERNMENT'S UNLAWFUL ACTIONS. ................................................. 32

A. The Unlawful Conduct Shown Here Requires Nationwide Relief. ............................ 33

B. 8 U.S.C. § 1252(f)(1) Does Not Bar Relief. ........................................................... 36

1.    Section 1252(f)(1) Does Not Bar A Classwide Injunction Prohibiting Defendants From Enforcing The Proclamation. ..................................... 36

2.    Section 1252(f)(1) Does Not Bar Vacatur Of The Guidance. ................. 41

C. Plaintiffs Satisfy The Equitable Requirements For A Permanent Injunction. ............. 42

CONCLUSION ............................................................................................................. 45

## TABLE OF AUTHORITIES

**Cases**

*Aberdeen & Rockfish R.R. Co. v. SCRAP*,
    422 U.S. 289 (1975)..................................................................................................41

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015)..................................................................................................23

*Aziz v. Trump*,
    234 F. Supp. 3d 724 (E.D. Va. 2017)......................................................................30

*\*Baker v. Carr*,
    369 U.S. 186 (1962)..................................................................................................28

*Bare v. Barr*,
    975 F.3d 952 (9th Cir. 2020)......................................................................................8

*Barnhart v. Sigmon Coal Co.*,
    534 U.S. 438 (2002)...............................................................................................2, 9

*Barrick Goldstrike Mines Inc. v. Browner*,
    215 F.3d 45 (D.C. Cir. 2000)....................................................................................26

*Biden v. Texas*,
    597 U.S. 785 (2022).................................................................................26, 40, 41

*Bridgeport Hosp. v. Becerra*,
    108 F.4th 882 (D.C. Cir. 2024)................................................................................34

*California v. Arizona*,
    452 U.S. 431 (1981)..................................................................................................42

*California v. United States*,
    104 F.3d 1086 (9th Cir. 1997) ...........................................................................29, 30

*Capital Area Immigrants Rights' Coal. v. Trump*,
    471 F. Supp. 3d 25 (D.D.C. 2020)............................................................................25

*\*Chamber of Comm. of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996).................................................................23, 27, 34

*Chiles v. United States*,
    69 F.3d 1094 (11th Cir. 1995) ..................................................................................30

*Chiles v. United States*,
    874 F. Supp. 1334 (S.D. Fla. 1994).........................................................................30

*Cnty. of Maui v. Haw. Wildlife Fund*,
    590 U.S. 165 (2020)....................................................................................................4

*Cohens v. Virginia*,
    19 U.S. 264 (1821)....................................................................................................28

*Colo. River Water Conservation Dist. v. United States*,
    424 U.S. 800 (1976) ................................................................................................ 28

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
    603 U.S. 799 (2024) ................................................................................................ 26

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ................................................................................................ 34

*Dennis v. INS*,
    No. CIV.A. 301CV279SRU, 2002 WL 295100 (D. Conn. Feb. 19, 2002) ....................... 36

*Dep't of Comm. v. New York*,
    588 U.S. 752 (2019) ................................................................................................ 28

*Direct Marketing Ass'n v. Brohl*,
    575 U.S. 1 (2015) .................................................................................................... 41

*Doctors for Am. v. Office of Personnel Mgmt.*,
    __ F. Supp. 3d __, No. 1:25-cv-00322, 2025 WL 452707 (D.D.C. Feb. 11, 2025) ........... 23

*East Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ................................................................................... 21

*East Bay Sanctuary Covenant v. Garland*,
    994 F.3d 962 (9th Cir. 2020) .................................................................. 13, 21, 22, 34

*El-Shifa Pharm. Indus. Co. v. United States*,
    607 F.3d 836 (D.C. Cir. 2010) ................................................................................. 30

*FDA v. Alliance for Hippocratic Med.*,
    602 U.S. 367 (2024) .......................................................................................... 19, 20

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
    897 F. Supp. 595 (D.D.C. 1995) .............................................................................. 29

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
    93 F.3d 897 (D.C. Cir. 1996) ................................................................................... 25

*Fiallo v. Bell*,
    430 U.S. 787 (1977) .......................................................................................... 24, 29

*Fong v. Ashcroft*, No. 03 Civ. 7261,
    2004 WL 1348994 (S.D.N.Y. June 15, 2004) ............................................................. 36

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) .......................................................................................... 23, 27

*Garland v. Aleman Gonzalez*,
    596 U.S. 543, 550 (2022) .............................................................................. 37, 39, 41

*Gomez v. Biden*,
    No. 20-cv-01419, 2021 WL 1037866 (D.D.C. Feb. 19, 2021) ....................................... 27

*Gomez v. Trump*,
   485 F. Supp. 3d 145 (D.D.C. 2020)...............................................27, 34

*Gonzales v. DHS*,
   508 F.3d 1227 (9th Cir. 2007)........................................................39, 40

*Grace v. Whitaker*,
   965 F.3d 883 (D.C. Cir. 2020)........................................................17, 35

*Grace v. Whitaker*,
   344 F. Supp. 3d 96 (D.D.C. 2018)..................................................17, 35

*Haig v. Agee*,
   453 U.S. 280 (1981)................................................................................24

*Harris v. Bessent*,
   No. 25-cv-412 (RC), ___ F. Supp. 3d ___, 2025 WL 679303 (D.D.C. Mar. 4, 2025)........35

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)................................................................19, 20, 22

*Heckler v. Chaney*,
   470 U.S. 821 (1985)................................................................................28

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010)....................................................................................44

*Huisha-Huisha v. Mayorkas*,
   27 F.4th 718 (D.C. Cir. 2022)........................3, 4, 11, 12, 13, 15, 18

*INS v. Legalization Assistance Project of Los Angeles Cnty. Fed'n of Labor*,
   510 U.S. 1301 (1993)............................................................................25

*INS v. Stevic*,
   467 U.S. 407 (1984)..................................................................................9

*J.G.G. v. Trump*,
   2025 WL 914682 (D.C. Cir. Mar. 26, 2025)......................16, 29, 30

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
   478 U.S. 221 (1986)................................................................................29

*Kendall v. U.S. ex rel. Stokes*,
   37 U.S. 524 (1838)..................................................................................42

*Kiakombua v. Wolf*,
   498 F. Supp. 3d 1 (D.D.C. 2020) .............................................18, 34, 36

*L.M.-M. v. Cuccinelli*,
   442 F. Supp. 3d 1 (D.D.C. 2020) .........................................................17

*Las Americas Immigrant Advocacy Ctr. v. Wolf*,
   507 F. Supp. 3d 1 (D.D.C. 2020) .........................................................26

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) .......................................................................................... 24, 25

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ................................................................................................ 28

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973) ........................................................................................ 22, 26

*Loper Bright Enterprises v. Raimondo*,
  603 U.S. 369 (2024) ................................................................................................. 1

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) ................................................................................................. 2

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................................................................ 18, 22

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ............................................................................................... 24

*Make the Road N.Y. v. Wolf*,
  962 F.3d 612 (D.C. Cir. 2020) ........................................................................ 31, 42

*Marbury v. Madison*,
  5 U.S. 137 (1803) .................................................................................................... 1

*Matter of V-X-*,
  26 I&N Dec. 147 (2013) ........................................................................................... 8

*McCray v. Biden*,
  574 F. Supp. 3d 1 (D.D.C. 2021) .......................................................................... 17

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ............................................................................. 17

*Ms. L v. ICE*,
  403 F. Supp. 3d 853 (S.D. Cal. 2019) ................................................................... 36

*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*,
  522 U.S. 479 (1998) ............................................................................................... 25

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998) ............................................................................. 33

*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) ............................................................................... 20

*Nat'l TPS Alliance v. Noem*,
  No. 25-cv-01766, 2025 WL 957677 (N.D. Cal. Mar. 31, 2025) ............................ 41

*Nat'l Treasury Emps. Union v. Nixon*,
  492 F.2d 587 (D.C. Cir. 1974) ............................................................................... 35

v

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996) ...................................................................... 22

*Nixon v. United States*,
    506 U.S. 224 (1993) ....................................................................................... 29

*\*Nw. Immigrant Rights Project v. U.S. Citizenship & Immigr. Servs.*,
    496 F. Supp. 3d 31 (D.D.C. 2020) ............................................................ 22, 25

*\*O.A. v. Trump*,
    404 F. Supp. 3d 109 (D.D.C. 2019) ........................... 1, 2, 9, 13, 14, 20, 25, 34, 39, 40, 42

*P.J.E.S. v. Wolf*,
    502 F. Supp. 3d 492 (D.D.C. 2020) ................................................................ 45

*People for the Ethical Treatment of Animals v. USDA*,
    797 F.3d 1087 (D.C. Cir. 2015) ...................................................................... 19

*Perry Capital LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) ........................................................................ 34

*Pub. Citizen v. U.S. Trade Representative*,
    5 F.3d 549 (D.C. Cir. 1993) ............................................................................ 27

*Rantesalu v. Cangemi*,
    No. CIV.04-1375(JRT/SRN), 2004 WL 898584 (D. Minn. Apr. 23, 2004) ...... 36

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ....................................................................................... 41

*Sale v. Haitian Centers Council, Inc.*,
    509 U.S. 155 (1993) ................................................................................ 4, 5, 14

*Scenic Am., Inc. v. U.S. Dep't of Transp.*,
    836 F.3d 42 (D.C. Cir. 2016) .......................................................................... 26

*SEC v. Jarkesy*,
    603 U.S. 109 (2024) ....................................................................................... 15

*Simms v. District of Columbia*,
    872 F. Supp. 2d 90 (D.D.C. 2012) .................................................................. 45

*Singh v. Waters*,
    87 F.3d 346 (9th Cir. 1996) ............................................................................ 36

*Starr Int'l Co., Inc. v. United States*,
    910 F.3d 527 (D.C. Cir. 2018) ........................................................................ 28

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) .......................................................................... 41

*Texas v. United States*,
    787 F.3d 733 (5th Cir. 2015) .......................................................................... 34

*Trump v. Hawaii*,
  585 U.S. 667 (2018)....................................................5, 7, 8, 11, 13, 24, 28, 44

*United States ex rel. Accardi v. Shaughnessy*,
  347 U.S. 260 (1954).................................................................................14

*United States ex rel. Knauff v. Shaughnessy*,
  338 U.S. 537 (1950).................................................................................24

*United States v. Texas*,
  599 U.S. 670 (2023).............................................................17, 22, 25, 26

*Viasat, Inc. v. FCC*,
  No. 21-1123, 2022 WL 15524743 (D.C. Cir. Oct. 21, 2022) ...........................21

*Viasat, Inc. v. FCC*,
  47 F.4th 769 (D.C. Cir. 2022)...................................................................21

*West Virginia v. EPA*,
  597 U.S. 697 (2022).................................................................................10

*Walters v. Reno*,
  145 F.3d 1032 (9th Cir. 1998)..................................................................36

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*,
  485 F. Supp. 3d 1 (D.D.C. 2020) ...............................................................34

*Wilcox v. Trump*,
  No. 25-cv-334 (BAH) ___ F. Supp. 3d ___, 2025 WL 720914 (D.D.C. Mar. 6, 2025)......34

*Ying Fong v. Ashcroft*,
  317 F. Supp. 2d 398 (S.D.N.Y. 2004) ........................................................36

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952)...........................................................................15, 30

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
  566 U.S. 189 (2012)...............................................................................28

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  576 U.S. 1 (2015)....................................................................................30

**Statutes**

5 U.S.C. § 701(a)(2) ......................................................................24, 27

5 U.S.C. § 702................................................................................24

8 U.S.C. § 1101(a)(14)........................................................................7

8 U.S.C. § 1101(a)(15)........................................................................7

8 U.S.C. § 1101(a)(16)......................................................................40

8 U.S.C. § 1103(a)(3)........................................................................40

*8 U.S.C. § 1158(a)(1) ........................................................................................... 3, 7

8 U.S.C. § 1158(b)(2)(C) ............................................................................................. 9

8 U.S.C. § 1158(d)(4)(A)-(B) .................................................................................... 25

8 U.S.C. § 1159(b) ....................................................................................................... 8

8 U.S.C. § 1181 ............................................................................................................ 7

8 U.S.C. § 1182(a)(6)(A)(i) ......................................................................................... 3

8 U.S.C. § 1182(a)(7) ................................................................................................... 7

*8 U.S.C. § 1182(f) ............................................................................................ passim

8 U.S.C. § 1184 ............................................................................................................ 7

*8 U.S.C. § 1185(a) ...................................................................................................... 5

*8 U.S.C. § 1225(b)(1) ............................................................................................ 2, 36

8 U.S.C. § 1225(b)(1)(B)(iv) ..................................................................................... 25

8 U.S.C. § 1225(b)(2)(C) ............................................................................................. 2

8 U.S.C. § 1227(a)(1)(B) ............................................................................................. 3

8 U.S.C. § 1227(a)(2)(D)(iv) ....................................................................................... 5

*8 U.S.C. § 1229a ................................................................................................... 2, 36

8 U.S.C. § 1229a(a)(3) ....................................................................................... 2, 6, 15

8 U.S.C. § 1229(b)(2) ................................................................................................. 25

8 U.S.C. § 1231 ............................................................................................... 14, 15, 36

8 U.S.C. § 1252(a)(2)(A)(i) ....................................................................................... 31

8 U.S.C. § 1252(a)(2)(A)(ii) ...................................................................................... 31

8 U.S.C. § 1252(a)(2)(A)(iv) ..................................................................................... 31

8 U.S.C. § 1252(f)(1) ............................................................................................ 36, 37

8 U.S.C. § 1255 .......................................................................................................... 40

8 U.S.C. § 1255(a) ....................................................................................................... 8

8 U.S.C. § 1256(a) ...................................................................................................... 40

8 U.S.C. §§ 1421-1427 .............................................................................................. 40

8 U.S.C. § 1443(h) ..................................................................................................... 25

42 U.S.C. §§ 264-272 .................................................................................................. 4

42 U.S.C. § 265 .......................................................................................................... 11

## Other Authorities

Alex Nowsrateh & Krit Chanwong, *Diseased Illegal Immigrants Aren't "Invading" the United States* (Jan. 21, 2025)...................................................................................45

Alex Nowsrateh, *Terrorism and Immigration: A Risk Analysis*, 1975-2022 (Aug. 22, 2023).....44

BBC, *Marco Rubio Says US Revoked At Least 300 Foreign Students' Visas* (Mar. 27, 2025)...38

Bryan A. Garner, Garner's Dictionary of Legal Usage 295-96 (3d ed. 2011)...........................42

CBP, *Frontline Against Fentanyl* (last updated Apr. 4, 2025)...................................................45

CBP, Southwest Land Border Encounters.................................................................................44

Exec. Order No. 12,172 (1979) .................................................................................................5

Exec. Order No. 12,807 (1992) .................................................................................................5

Gerald L. Neuman, *The Afterlife of "Title 42": Autopsy and Reformation* 50-51 (Aug. 20, 2024), Harvard Public Law Working Paper ...................................................................................4

H.R. Rep. No. 104-469 (1996) .................................................................................................42

ICE, *Weapons Trafficking,* https://www.ice.gov/about-ice/hsi/investigate/weapons-trafficking.45

Joel Rose, *Who Is Sneaking Fentanyl Across The Border? Hint: It's Not The Migrants* (Aug. 9, 2023).....................................................................................................................................45

Julie Turkewitz, et al., *Locked in a Jungle Camp, Migrants Deported to Panama Face Uncertain Future,* N.Y. Times (Feb. 28, 2025).....................................................................................6

## Regulations

8 C.F.R. § 208.30(e)(3).............................................................................................................14

8 C.F.R. § 208.31 .....................................................................................................................14

87 Fed. Reg. 19941...................................................................................................................13

85 Fed. Reg. 56424...................................................................................................................12

89 Fed. Reg. 81156.....................................................................................................................9

90 Fed. Reg. 8333..............................................................................................................17, 27

## INTRODUCTION

Defendants' response lays bare the remarkable assertion of executive power at the heart of this case. They claim that Section 1182(f) gives the President limitless power to create an extra-statutory "repatriation" authority and to override the rest of the Immigration and Nationality Act ("INA"). And they contend that the President's power is so broad no court can even review it.

Defendants are wrong on both counts. As the Executive Branch itself has maintained for decades, and as this Court agreed in *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019), Section 1182(f) does not allow the President to violate other provisions of the INA. And what has been true since *Marbury v. Madison* remains so today: It is "emphatically the province and duty of the judicial department to say what the law is." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 385 (2024) (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803)).

## ARGUMENT

## I.    THE PROCLAMATION AND GUIDANCE ARE UNLAWFUL.

Neither the INA nor the Constitution confers the remarkable authority the President claims: to create by fiat a new "repatriation" system and to abrogate with the stroke of a pen the detailed protections Congress set forth in the INA, including the asylum statute. ECF 14 at 29-37. When Congress authorized the President to "suspend entry" in Section 1182(f), it did not empower him to *summarily expel* noncitizens already physically present in the United States outside the INA's removal scheme, much less to do so without giving them the chance to seek the protections that Congress mandated. Defendants have no answer to the text, structure, and history compelling that conclusion. And they do not even address this Court's decision in *O.A.*, which recognized that Section 1182(f) is "neither sufficient to override a statutory mandate permitting all [noncitizens] present in the United States to apply for asylum," regardless of their manner of entry; nor to "shift the congressional assignment of authority . . . from [DOJ and DHS] to the President." 404 F. Supp.

1

3d at 151. Meanwhile, Defendants cannot hide from the implications of their position: that the President can eliminate the INA's protections at whim. The authorities they invoke—*Sale*, *Hawaii*, and *Huisha-Huisha*—undermine rather than support that breathtaking assertion of authority.

### A.    Congress Has Not Authorized The President To Abrogate The INA.

Section 1182(f) does not authorize removals or repatriations. And it certainly does not authorize Defendants to remove noncitizens in contravention of other statutory protections.

#### 1.    Section 1182(f) Does Not Authorize Removals Or Repatriations.

Statutory interpretation begins with the text, and nothing in Section 1182(f) conveys removal or "repatriation" authority. The provision never mentions either term or any other word for deportation or return. Defendants admit as much, arguing instead that "[n]othing in Section 1182(f) *forecloses* repatriation." ECF 44 at 49 (emphasis added). But that is no argument at all; Defendants must identify a *grant* of authority. *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986). Moreover, when Congress wanted to provide such authority in the INA, "it did so explicitly." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002). Congress expressly granted authority to remove noncitizens permanently from the United States, conditioned on compliance with detailed procedures and protections. *E.g.*, 8 U.S.C. §§ 1225(b)(1), 1229a. Congress also created a narrow authority for interim returns short of permanent removal. *Id.* § 1225(b)(2)(C).

Congress conferred no similar authority in Section 1182(f). When "one statutory section includes particular language that is omitted in another section," it is "presumed that Congress acts intentionally and purposely." *Barnhart*, 534 U.S. at 452. And here, Congress eliminated any doubt by providing that the removal procedures "specified in" the INA are "the sole and exclusive procedure[s]" to be used for determining whether [a noncitizen] may be . . . removed from the United States." 8 U.S.C. § 1229a(a)(3). Nor is it any answer to say that "removal" is a "term of

2

art." ECF 44 at 58. Defendants cannot evade the INA's requirements by rebranding their actions with terms that lack any statutory basis—as, indeed, the D.C. Circuit has held. *Infra* at 11-12.

With no foothold in the statute, Defendants insist that Section 1182(f) "must necessarily" grant the President "authority to remove or repatriate illegal entrants." ECF 44 at 49. But there is nothing necessary about that conclusion. When a person enters the country without permission, the INA specifies both the penalties as well as remedies that are available notwithstanding that entry—including as is critical here, the right to seek asylum "whether or not" the person entered "at a designated port of arrival." 8 U.S.C. § 1158(a)(1); *see also, e.g.*, *id.* § 1182(a)(6)(A)(i) (entry "without being admitted or paroled" is a waivable ground of inadmissibility).

Nor does *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022), which arose at the height of the COVID-19 pandemic, support Defendants' argument. There, the D.C. Circuit upheld in part a preliminary injunction against the "Title 42" policy in which the government summarily "expelled" noncitizens under 42 U.S.C. § 265. Defendants misread *Huisha-Huisha* as interpreting Section 265—which provides "power to prohibit . . . the introduction of persons" during a communicable-disease emergency but is silent as to removal—to convey removal authority. ECF 44 at 50-51. In fact, the D.C. Circuit held that *the INA* provided that removal authority. The court interpreted Section 265 to give the government authority to "*render illegal* the presence of [noncitizens] who pose a public-health risk during a public-health emergency." 27 F.4th at 725 (emphasis added). The court, however, did not locate the authority to *remove* those noncitizens in Section 265. Instead, it reasoned that the noncitizens' violation of the public health order "brings into play [a] second statute"—the INA—that meant "the Executive can expel [noncitizens] who are here illegally." *Id.* at 729 (citing 8 U.S.C. § 1227(a)(1)(B), one of the INA's removability provisions); *see id.* at 725 (citing the same INA provision for the point that "[t]he Executive can

expel those [noncitizens]").[1] And critically, as discussed below, the INA-based removal authority identified in *Huisha-Huisha* was subject to the "statutory protections" for noncitizens "on U.S. soil." *Id.* at 729, 731-32. Just as the D.C. Circuit did not read Section 265's reference to suspending "introduction of persons" to grant removal authority independent of the INA, this Court should reject the claim that such authority inheres in Section 1182(f).

The statutory scheme at issue in *Huisha-Huisha* was also different in a key respect. Unlike the INA, nothing in the set of public health statutes containing Section 265 included any removal authority. *See* 42 U.S.C. §§ 264-272. The D.C. Circuit reasoned that the government had to be able to draw on the INA's removal power so that Section 265 was not "rendered largely nugatory." *Huisha-Huisha*, 27 F.4th at 729. Here, by contrast, Section 1182(f) is part of the INA itself. There is no need to cast around in search of the government's authority to remove people on U.S. soil in violation of a Section 1182(f) proclamation: Congress explicitly crafted the "sole and exclusive" mechanisms for doing so. Because the INA clearly sets out that recourse, rejecting Defendants' baseless interpretation of Section 1182(f) will not create a statutory loophole, as they suggest. ECF 44 at 49-51 (citing *Cnty. of Maui v. Haw. Wildlife Fund*, 590 U.S. 165, 178-79 (2020)).

Defendants fare no better with *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), which addressed Coast Guard interdiction of migrants on the high seas. *See* ECF 44 at 50. *Sale* stated in dicta that Section 1182(f) "grants the President ample power to establish a naval blockade that would simply deny illegal Haitian migrants the ability to disembark on our shores." 509 U.S.

---

[1] Section 1227(a)(1)(B) "was probably the wrong provision of the immigration laws to invoke" in *Huisha-Huisha* because Section 1227 concerns noncitizens who have already "been 'admitted' to the United States"; instead, the inadmissibility grounds at 8 USC §1182(a) apply to those not yet admitted, and are enforceable through both regular and expedited removal proceedings. Gerald L. Neuman, *The Afterlife of "Title 42": Autopsy and Reformation* 50-51 (Aug. 20, 2024), Harvard Public Law Working Paper 24-23, https://ssrn.com/abstract=4992409. But for present purposes, the critical point is that the D.C. Circuit understood that it needed to find express authority.

at 187. But that dicta in no way suggests that Section 1182(f) must give the President the different power to "repatriate" noncitizens who *do* reach U.S. soil. The whole point of the interdiction program in *Sale* was that it "prevented Haitians . . . from reaching our shores and invoking [the INA's] protections." *Id.* at 160. *Sale* thus affirms that noncitizens who *do* reach U.S. soil can only be removed pursuant to the INA. *See id.* at 159-60. And Plaintiffs seek relief only on behalf of noncitizens who have reached U.S. soil. ECF 13 at 2; ECF 14 at 28.

Section 1185(a)(1) likewise does not mention removals or repatriations—much less authorize the President to direct DHS to conduct them without compliance with the INA. 8 U.S.C. § 1185(a); *see* ECF 14 at 34. In response, Defendants simply assert that Section 1185(a)(1) provides "broad discretion." ECF 44 at 44-45. They make no textual or interpretive argument, and such an argument would fail in any event because Section 1185(a)(1) "'substantially overlap[s]' with" Section 1182(f). *Trump v. Hawaii*, 585 U.S. 667, 683 n.1 (2018) (alteration in original). The authority that Section 1185(a)(1) does confer—making it "unlawful" to "enter or attempt to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe"—is not naturally read to confer removal authority. When a noncitizen enters "unlawful[ly]," the recourse is to apply the INA's removal authorities. Indeed, the INA specifically provides that "a violation of section 1185" renders a noncitizen "deportable." 8 U.S.C. § 1227(a)(2)(D)(iv).[2]

---

[2] Nor have Defendants identified any historical precedent supporting their interpretation of Section 1185(a)(1). Indeed, in every example Defendants cite in which a President invoked the provision, the President acted solely to restrict the entry of a class of noncitizens, not to summarily expel noncitizens already in the United States. *See* ECF 44 at 46 (citing *Hawaii*, 585 U.S. at 683 (addressing a challenge to a Proclamation barring entry by certain noncitizens)); ECF 44 at 55 (citing Exec. Order No. 12,172, § 1-101 (Nov. 26, 1979) ("prescrib[ing] limitations and exceptions on the rules and regulations governing the entry of [Iranian nationals] into the United States")); ECF 44 at 55 (citing Exec. Order No. 12,807 (1992) (establishing rules for the interdiction of vessels "only beyond the territorial sea of the United States")).

For these reasons, Defendants' core theory—that Sections 1182(f) and 1185(a) "must" grant the President independent removal authority—makes a mockery of Congress's express mandate that the procedures "specified in" the INA "shall be the sole and exclusive procedure[s]" for ordering the removal of noncitizens. 8 U.S.C. § 1229a(a)(3). Neither provision, nor any other in the INA, contemplates the "direct repatriation" procedure that Defendants have invented. Among other harms, that process has resulted in the removal of Plaintiff F.A. and her children, as well as hundreds of proposed class members of various nationalities, to Panama and Costa Rica. *See, e.g.*, ECF 44 at 20; ECF 44-1 at 2-3; ECF 44-2 at 3. Noncitizens "repatriated" to those countries have been obstructed from contacting the outside world or legal assistance and have frequently been pressured to accept return to the very countries they fled.[3] Endorsing this claimed authority would be dangerous indeed. On Defendants' view, the President can make up his own deportation procedures and send people to any country in the world. Nothing would stop the President from deciding that *any* class of noncitizens should be processed, not under the INA, but under new mechanisms of his own devising. That is not, and must not become, the law.

### 2.    Section 1182(f) Does Not Allow The President To Override The INA.

Even if the President could remove or repatriate people from U.S. soil under Section 1182(f), nothing in the statute allows him to override other INA provisions, including the asylum statute.[4] The text does not convey such authority, and unlike other INA provisions, it contains nothing resembling a "notwithstanding" clause—Congress's typical way to indicate that

---

[3] Julie Turkewitz, et al., *Locked in a Jungle Camp, Migrants Deported to Panama Face Uncertain Future,* N.Y. TIMES (Feb. 28, 2025), https://www.nytimes.com/2025/02/28/world/americas/panama-migrants-deportees.html.

[4] Defendants do not even try to argue that Section 1185(a)(1) confers the abrogation authority that Section 1182(f) does not. *See* ECF 44 at 56-62. Indeed, just as with Section 1182(f), the Executive has expressly disavowed the notion that Section 1185(a)(1) empowers the President to "impose [a] condition and limitation on asylum eligibility." 89 Fed. Reg. 81156, 81164 n.56 (Oct. 7, 2024).

one statute can override others. ECF 14 at 30-31. Defendants note that Section 1182(f) authorizes the President to "suspend the entry of all [noncitizens] or any class of [noncitizens] *as immigrants or nonimmigrants*," and that the term "immigrant" means "*every* [noncitizen]" who is not a nonimmigrant, including potential asylees. ECF 44 at 56 (quoting 8 U.S.C. §§ 1182(f), 1101(a)(15)) (initial emphasis added). But including "immigrants" within Section 1182(f)'s scope says nothing about whether Section 1182(f) *confers power* to override protections Congress specifically provided elsewhere in the INA. If anything, the reference to suspending entry "as immigrants or nonimmigrants" reinforces that provision's focus on authorizing the President to render noncitizens inadmissible: The INA's two flavors of lawful admissions are "immigrant" and "nonimmigrant" admissions. 8 U.S.C. §§ 1181, 1182(a)(7), 1184; *see also id*. § 1101(a)(14).

Alternatively, Defendants suggest that if a noncitizen's "entry" is suspended under Section 1182(f), the noncitizen is no longer entitled to apply for asylum. ECF 44 at 56. But again, Section 1182(f) says no such thing; it never mentions asylum or the ability to apply for relief from removal at all. And where Congress did address the right to apply for asylum, it provided that this right extends to noncitizens "physically present in the United States," "*irrespective of [their] status*." 8 U.S.C. § 1158(a)(1) (emphasis added). So, when noncitizens are physically present in the United States, they can apply for asylum—whether or not they are admissible or the President has suspended their entry under Section 1182(f). *See Hawaii*, 585 U.S. at 695 n.4 ("[C]oncepts of entry and admission … are used interchangeably in the INA.").

Defendants also suggest that allowing noncitizens whose entry is suspended to seek asylum would allow them to be "admitted to the United States" and supposedly "run contrary to Section 1182(f)'s allowance for a total suspension of entry." ECF 44 at 57. But again, this flies in the face of statutory text: "[N]othing in the language of the [INA] support[s] [the] contention that

7

Congress understood a grant of asylum to be a form of 'admission' into the United States." *Matter of V-X-*, 26 I&N Dec. 147, 150 (2013); *accord Bare v. Barr*, 975 F.3d 952, 973 (9th Cir. 2020); *compare, e.g.*, 8 U.S.C. § 1255(a) (general authority for "admitted" noncitizens to adjust status to lawful permanent residence), *with id.* § 1159(b) (separate adjustment of status authority for those "granted asylum"). Section 1182(f)'s authority to suspend noncitizens' entry thus in no way implies authority to abrogate the statutory right of noncitizens on U.S. soil to apply for asylum.

Statutory structure and context confirm that Section 1182(f) does not allow the President to override the rest of the INA. ECF 14 at 31. Section 1182 is entitled "Inadmissible [noncitizens]," and Section 1182(f) is one of twenty subsections that together "define[] the universe of [noncitizens] who are admissible into the United States." *Hawaii*, 585 U.S. at 695. By contrast, the provisions governing asylum and withholding of removal are in separate chapters of the INA. Section 1182(f) and those provisions "thus operate in different spheres." *Id.* By giving the President broad power in the first sphere, Congress did not authorize him to abrogate statutes in the second. Defendants protest that a statute's title alone does not overcome the "plain meaning" of its text. ECF 44 at 60. But that truism does not aid Defendants: They have pointed to nothing in Section 1182(f)'s plain text conveying the abrogation authority they claim, and Section 1182(f)'s title is just one piece of structural evidence contradicting their position.

Defendants also argue that the specific-over-general canon cuts in their favor because Section 1182(f) "provides a very narrow, specific exception to the more general availability of asylum." ECF 44 at 59-60. But Defendants' limitless view of Section 1182(f) is anything but "very narrow." Nor does Section 1182(f)'s text make it more specific: As explained, the provision never mentions asylum, much less authority to restrict access to asylum. By contrast, Congress elsewhere in the INA has carefully restricted the Executive's ability to impose bars to asylum "by regulation."

8 U.S.C. § 1158(b)(2)(C). As this Court explained in *O.A.*, Section 1182(f) does not permit the Executive to "sidestep" that "statutory restriction." 404 F. Supp. 3d at 151; *see also, e.g.*, *Barnhart*, 534 U.S. at 452 (Congress is presumed to act intentionally when it "includes particular language in one section of a statute but omits it in another section of the same Act") (cleaned up).

Defendants also have no answer to the history that forecloses their position. They cite legislative history from the original 1952 INA generally indicating that Section 1182(f) conferred "broad" authority. ECF 44 at 44. But Defendants omit critical facts: The INA in 1952 did not contain today's guarantees of the right to apply for asylum or the mandatory conferral of withholding of removal to those likely to face persecution. Instead, the 1952 predecessor to withholding was a permissive and discretionary power. *See INS v. Stevic*, 467 U.S. 407, 414-16 & n.6 (1984). Defendants' position requires believing that Congress in Section 1182(f) intended to confer a power that was unnecessary then, on the chance that it might prove useful later.

Defendants' position also ignores the subsequent history. When Congress later created the INA's mandatory procedures and substantive rights providing protections from persecution and torture, it did not enact a general presidential authority to override those protections. It instead enacted a far more limited authority for the Attorney General and DHS Secretary to create regulatory bars to asylum that are "consistent with" the asylum statute. 8 U.S.C. § 1158(b)(2)(C). Nor did Congress amend Section 1182(f) to provide a presidential override.

Moreover, when the Executive Branch has considered the interactions among these statutes, administrations of both parties—including this President's first administration—came to the same conclusion that Assistant Attorney General Theodore Olson reached in 1984: Section 1182(f) does not authorize the President to "eliminate the asylum rights of noncitizens." 89 Fed. Reg. 81156, 81163 n.53 (Oct. 7, 2024). While Defendants assert without support that this unbroken

understanding can be dismissed, ECF 44 at 61, the Supreme Court has said otherwise: "[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *West Virginia v. EPA*, 597 U.S. 697, 725 (2022) (citation omitted). That maxim applies with special force here, since Congress repeatedly amended the INA in the decades since 1984—including to create an expedited removal procedure with a curtailed screening process for asylum and withholding—without disturbing the Executive Branch's settled view.

Defendants likewise offer no support for their assertion that "[t]he text and structure of the INA" allow the President to override the withholding of removal statute. ECF 44 at 58. Defendants claim that withholding applies only to "*removal*, a legal principle not relevant to the parameters of a Proclamation" under Section 1182(f), which they say confers distinct "repatriation" authority. *Id.* at 45. But again, that "repatriation" regime is unlawful, and Congress never imagined—let alone enacted—it. *Supra* Part I.A. The Executive cannot invent an extra-statutory procedure and then claim that it is exempt from the constraints that Congress imposed on the only procedures it *did* authorize.[5]

---

[5] As explained in Plaintiffs' Motion for a Preliminary Injunction, the President's findings in the Proclamation are also inadequate. First, they fail to identify a specific "class" of noncitizens whose entry is supposedly detrimental to the interests of the United States. ECF 14 at 33. The Guidance proves the point: It is only the Guidance, not the Proclamation, that identifies who is supposedly "engaged in the invasion": people who cross between ports of entry. ECF 44-1 at 2. But Section 1182(f) vests power in the President, not DHS. Defendants ignore this defect. Second, however broad the deference to the President's findings under *Hawaii*, the findings here conflict with the INA. ECF 14 at 33-34. Defendants respond that a Section 1182(f) proclamation need not satisfy strict scrutiny or narrow tailoring. ECF 44 at 54. True, but irrelevant: While the Court need not scrutinize the "detail[]" of the President's findings, *cf. id.* at 55, a Section 1182(f) proclamation cannot be based on findings that conflict with Congress's judgments elsewhere.

Having again failed to identify anything in the statutory text, structure, or history to support their view, Defendants instead argue that Section 1182(f) must allow the President to abrogate other provisions of the INA because any other result would "undermine[]" the President's "vast powers." ECF 44 at 56. But vast powers are not unlimited powers. The power the Supreme Court recognized in *Hawaii*—to render classes of noncitizens inadmissible based on a determination that their admission would be "detrimental to the interests of the United States"—is vast by any measure. It will remain so even if the President cannot use Section 1182(f) to ignore the rest of the INA. Indeed, in language that Defendants elsewhere invoke, the Court acknowledged that Section 1182(f) conveyed "broad" power even while "assum[ing] that § 1182(f) does not allow the President to expressly override particular provisions of the INA." 585 U.S. at 689.

The D.C. Circuit's preliminary-injunction decision in *Huisha-Huisha*, on which Defendants again rely so heavily, affirmatively rejects their position on withholding of removal. As mentioned, the court located removal authority in the INA, noted that it was subject to "any exceptions Congress creates," and concluded that noncitizens "on U.S. soil" are "entitled to certain statutory protections." 27 F.4th at 729. The court then held that the public health law allowing the government to suspend the "introduction of persons," 42 U.S.C. § 265, did not permit the government to override the withholding statute (or CAT protections) and that Title 42 did not permit the government to expel noncitizens to places "where they will likely be persecuted." 27 F.4th at 732. Moreover, the fact that the government labeled the removals there public health "expulsions" was immaterial: The court held that the INA "provides [noncitizens] with procedural and substantive rights to resist *expulsion*." *Id.* at 724 (emphasis added). So too here. Section 1182(f) "says nothing about where the Executive may expel [noncitizens]" and therefore does not "create[] an exception to" the withholding statute. *Id.* at 731-32. Indeed, Defendants do not even

try to explain how a power to "suspend entry" could displace a statute that confers mandatory protection to prevent a noncitizen's removal to *a particular country*. And as in *Huisha-Huisha*, Defendants' "repatriation" label does not allow them to circumvent the INA's protections.

Nor does *Huisha-Huisha* support Defendants' argument that because asylum is "discretionary," the President can use Section 1182(f) to "foreclose relief." ECF 44 at 57. Making a preliminary assessment of what it indicated was "the closest question in the case," the *Huisha-Huisha* court held that the plaintiffs had not "shown they [were] likely to succeed" on the claim that noncitizens had to be permitted to seek asylum before being removed under 42 U.S.C. § 265— while emphasizing that this "argument deserves attention from the District Court when it considers the merits." 27 F.4th at 730-31. And whether or not the court would have reached the same conclusion at the merits stage with fuller consideration, Section 265 is unlike Section 1182(f) in critical respects. First, the text differs: Section 265 authorizes the government to suspend not just the "introduction" of persons but "*the right* to introduce such persons." *Id.* at 731 (emphasis added). The court tentatively agreed that this language could "perhaps" "allude[] to the suspension of [asylum] procedures." *Id.* Indeed, that language was key to the government's argument. *See* Br. for Appellants 53, *Huisha-Huisha v. Mayorkas*, No. 21-5200 (D.C. Cir. Oct. 1, 2021) (Gov't *Huisha-Huisha* Br.) (arguing that Congress's use of "'right to introduce'—rather than just 'introduce'"—granted "authority to temporarily suspend the effect" of other laws) (quoting 85 Fed. Reg. 56,424, 56,426 (Sept. 11, 2020)). Section 1182(f) contains nothing similar.

Second, the structure differs: The court viewed Section 265 and the asylum statute as "touching on the same topic" and thought "the discretionary nature of asylum" the best way to

"reconcil[e]" them. 27 F.4th at 730.[6] But as explained above, Section 1182(f) and the asylum statute do *not* address the same subject and so need no reconciliation; they simply "operate in different spheres" of the INA. *See Hawaii*, 585 U.S. at 695; *see also id.* at 689 ("We may assume that § 1182(f) does not allow the President to expressly override particular provisions of the INA."). And the court's reasoning in *Huisha-Huisha* concerning the COVID-19 pandemic did not give the government *carte blanche* to turn off the asylum system at will—which is exactly the power Defendants claim here. *See Huisha-Huisha*, 27 F.4th at 734-35 (expressing skepticism that the Title 42 order remained necessary); 87 Fed. Reg. 19941, 19955 (Apr. 6, 2022) (rescinding the order weeks later, noting that Section 265's authority extends only so long as "necessary to avert the serious danger" posed by a communicable disease); Gov't *Huisha-Huisha* Br. at 52 (emphasizing that Section 265 is "applicable only under emergency conditions").

Moreover, when it comes to the INA, courts—including this Court in *O.A.*—have rejected the argument that the agencies' ultimate discretion to *grant* asylum permits the government to contravene Section 1158(a)(1)'s guarantee of the right to apply for asylum. *O.A.* 404 F. Supp. 3d at 151; *see East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 975 (9th Cir. 2020). Indeed, this case goes much farther than the regulation in *O.A.* In that case, the government "agree[d]" that barring noncitizens who entered outside of ports "from *applying* for asylum would be 'inconsistent with' § 1158(a)(1) and, thus, *ultra vires*," but argued that the regulation there merely rendered noncitizens "*ineligible*" for asylum. 404 F. Supp. 3d at 148. As this Court explained, a

---

[6] As with *Huisha-Huisha*'s mistaken invocation of Section 1227, *supra* at 4 n.1, the court's discussion was at best imprecise: It referred to "[t]he Executive's" discretionary power to grant asylum and to "the Executive's" decision to exercise its discretion "by foreclosing asylum" via Section 265. 27 F.4th at 730-31. But the Executive Branch is not an undifferentiated whole; Congress vests authorities in offices, and those powers must be exercised by the "Officers of the United States" who are appointed to fill those distinct offices. U.S. Const. art. II, § 2, cl. 2.

proclamation under Section 1182(f) is not "sufficient to override" Section 1158(a)(1)'s "statutory mandate," and the President may not "sidestep [Section 1158(b)(2)(C)'s] statutory restriction on [his agencies'] authority by invoking a presidential proclamation that is not premised on any authority to alter or supplant the rules that Congress specified in § 1158." 404 F. Supp. 3d at 151.

Here, too, *Sale* does not support the notion that Section 1182(f) grants the President authority to abrogate the INA. *Sale* held that the President's directive to interdict Haitian migrants at sea did not violate the withholding statute only because the statute did not apply "on the high seas." 509 U.S. at 158-59. It was common ground that noncitizens who "reach[] our shores" could "invok[e] [the INA's] protections." *Id.* at 159-60.

Finally, as to CAT protection, Defendants state that it "is not provided by the INA and so not subject to the Proclamation's limitation on invoking provisions of the INA." ECF 44 at 62. But the Guidance's changes to CAT implementation are nonetheless unlawful. The FARRA requires that "the heads of the appropriate agencies" must implement the CAT by "prescrib[ing] regulations." 8 U.S.C. § 1231 note. Those implementing regulations require that noncitizens must at minimum be afforded credible fear or reasonable fear screenings that, along with other safeguards, do not require them to meet the ultimate standard for protection at that initial stage. 8 C.F.R. §§ 208.30(e)(3), 208.31. The Guidance's changes to CAT implementation are therefore unlawful for two reasons. First, Defendants cannot depart from their binding CAT regulations based on a President's Section 1182(f) authority, which says nothing about CAT relief. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). Second, the CAT "assessments" contemplated in the Guidance apply the ultimate merits standard. Ex. 1 (Guidance) at 34-35, 42. Applying that standard in an initial interview—when noncitizens may have no ability to prepare, to consult with advisors, or to gather evidence—violates Congress's command "not to expel"

14

noncitizens" to places where they will likely "be[] subjected to torture." 8 U.S.C. § 1231 note. The Guidance thus violates the FARRA and its regulations. *Huisha-Huisha*, 27 F.4th at 732.[7]

### B.    The Constitution Does Not Authorize The President To Abrogate The INA.

The Constitution does not provide the President relevant authority that Section 1182(f) does not. First, Article II does not authorize the President to displace the INA. Defendants might not even argue otherwise, though their briefing is unclear: They refer to "inherent" executive powers, which they suggest would support the Proclamation "[e]ven without" Section 1182(f). ECF 44 at 52. But a broad claim of *inherent* authority is not the same as identifying specific "conclusive and preclusive" constitutional authority. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1952) (Jackson, J., concurring). Regardless, Defendants have no answer to Plaintiffs' demonstration that the President has no such exclusive and preclusive authority here. ECF 14 at 35-36. It is Congress and not the Executive that has "plenary power over immigration." *E.g.*, *SEC v. Jarkesy*, 603 U.S. 109, 129 (2024). And Congress has legislated the "sole and exclusive" procedures to remove noncitizens. 8 U.S.C. § 1229a(a)(3). In jettisoning that legislation, the President's "power is at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

---

[7] With respect to Plaintiffs' claims concerning the TVPRA (providing protections to unaccompanied children), Defendants concede that "CAT protection is not provided by the INA and so not subject to the Proclamation's limitation on invoking provisions of the INA," ECF 44 at 62, and that "the Proclamation does not apply to [unaccompanied children] and does not displace the procedures . . . established by the TVPRA," *id.* at 63. Given those representations to this Court, also reflected in the Guidance, Plaintiffs are not currently pursuing their claim that the Proclamation and Guidance are contrary to the TVPRA. *See* ECF 11 at 36. However, Plaintiffs reserve the right to raise arguments concerning Defendants' implementation of the TVPRA's protections, which would require production of the administrative record. *See id.* at 38-39 (Claim Six ¶¶ 132-36, 138) (held in abeyance).

The Invasion Clause likewise confers no such exclusive authority and Defendants have forfeited any argument to the contrary. ECF 44 at 64. Defendants say only that Plaintiffs have not shown that "the President has *no role* in Article IV, Section 4's guarantee" to protect States from invasion. *Id.* (emphasis added). But even if the President has some shared role, it is not the *exclusive* and *preclusive* role it must be for Defendants to prevail. ECF 14 at 36; *see J.G.G. v. Trump*, 2025 WL 914682, at *26 (D.C. Cir. Mar. 26, 2025) (Millett, J., concurring in denial of stay) ("[N]othing in the Constitution assigns [the] responsibility [to repel invasion] exclusively to the President."), *vacated on other grounds*, 604 U.S. ____ (2025).

Defendants otherwise rely solely on the claim that the political question doctrine prevents the Court from conducting the *Youngstown* analysis, ECF 44 at 47-49, 64—an argument that fails for the reasons explained below. *Infra* at 28-30. Regardless, immigration is not an "invasion" within the meaning of the Constitution. ECF 14 at 36-37; *accord J.G.G.*, 2025 WL 914682, at *8-9 (Henderson, J., concurring in denial of stay) (explaining that "[t]he term 'invasion'" is used "throughout the Constitution" and "*in every instance*, it is used in a military sense").

## II.    DEFENDANTS' THRESHOLD ARGUMENTS LACK MERIT.

The Court can reach the merits of Defendants' unlawful actions. Individual Plaintiffs have standing because they face ongoing harm from the Proclamation and Guidance, and Organizational Plaintiffs have standing because the Proclamation and Guidance prevent them from carrying out core activities. Plaintiffs have causes of action in equity and under the Administrative Procedure Act ("APA"). And their claims are not political questions. Nor does 8 U.S.C. § 1252 bar suit.

### A.    Plaintiffs Have Standing

#### 1.    Individual Plaintiffs Have Standing.

Although Defendants argue that Individual Plaintiffs lack standing, ECF 44 at 24-26, they largely ignore those who are in the United States—A.M., Z.A., T.A., A.T., B.R., M.A., and G.A.

They have been detained by Defendants, and the Defendants' implementation of the Proclamation has prevented them from seeking asylum, withholding of removal, and CAT protection. ECF 43-3 at 3-4 (¶¶ 4, 7-9).[8] They have thus been indisputably harmed by the Proclamation and Guidance. As to these Plaintiffs, Defendants' only argument is redressability: Defendants contend there is no remedy this Court could provide because the Plaintiffs' injuries stem "from the Proclamation itself, which consummates the President's decision to suspend and restrict entry." ECF 44 at 26. But that argument ignores a "critical lesson": courts can "enjoin a member of the executive branch from carrying out" unlawful presidential directives. *McCray v. Biden*, 574 F. Supp. 3d 1, 11 (D.D.C. 2021); *see infra* at 23.[9] The Court can also vacate the Guidance and declare the Proclamation, Guidance, and removal orders issued to Individual Plaintiffs pursuant thereto unlawful.

Because "[t]o establish jurisdiction, the court need only find one plaintiff who has standing," *Mendoza v. Perez,* 754 F.3d 1002, 1010 (D.C. Cir. 2014); *see L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 15-16 (D.D.C. 2020), the Court need not engage with Defendants' remaining standing arguments. In any event, those arguments lack merit. Defendants claim that Individual Plaintiffs removed under the Proclamation identify no redressable injury. ECF 44 at 24-25. But all Individual Plaintiffs, irrespective of location, suffered the same injury: the Proclamation and

---

[8] After Defendants agreed to refrain from removing Individual Plaintiffs pursuant to the Proclamation, Defendants decided to process A.M. and his family under the procedures in place prior before January 20, 2025. *See* ECF 33-3 ¶ 4. Because "standing is assessed upon the facts as they exist at the time the complaint is filed," *Grace v. Whitaker*, 344 F. Supp. 3d 96, 116 (D.D.C. 2018), *rev'd in part on other grounds*, 965 F.3d 883 (D.C. Cir. 2020) (citation omitted), Defendants rightly do not rely on this change in posture.

[9] Contrary to Defendants' argument, ECF 44 at 26, Justice Gorsuch's concurrence in *United States v. Texas*, 599 U.S. 670, 691 (2023), which addressed redressability in the context of prosecutorial discretion, did nothing to upend that rule. The Proclamation's directive that it "shall be implemented consistent with applicable law" would require that agency officials implementing it follow the law, including as ordered by this Court. 90 Fed. Reg. 8333 at 8336.

Guidance barred them from vindicating their rights to seek asylum, withholding, and CAT protection. A plaintiff suffers injury-in-fact where an agency fails to fulfill a "requirement that was 'designed to protect some threatened concrete interest' of the plaintiff." *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 24-25 (D.D.C. 2020) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 n.8 (1992)). That rule applies here. The asylum and withholding statutes and CAT regulations protect against violations of Plaintiffs' substantive rights not to be removed to persecution or torture.

Nor have the removed Plaintiffs suffered only a "past injury." ECF 44 at 25. Because of the Proclamation and Guidance, those Plaintiffs are now in harm's way. For example, E.G. came to the United States after he was kidnapped, drugged, raped, and threatened with death in Peru because of his sexual orientation—yet Defendants returned him to Peru. *See* ECF 12-8 at ¶¶ 3-8; *Huisha-Huisha*, 27 F.4th at 733-34 (noting that risk of severe harm can be an irreparable injury). And Defendants "repatriated" F.A. and her children to Panama, a country where they do not speak the language and have no connections. *See* ECF 12-7 at ¶¶ 12-14. Once there, they were told they would be sent to a detention camp in the jungle with no ability to communicate with the outside world. As a result, F.A. and her children had no choice but to accede to pressure to return to Turkey, where they now live in fear for their lives. Individual Plaintiffs fled to the United States to escape serious harm, and they have articulated an ongoing desire to pursue protection in the United States. *See, e.g.*, ECF 12-8 at ¶ 15 (describing removal under the Proclamation as "unfair" and expressing an ongoing interest in seeking asylum).

Against that backdrop, it is anything but "speculative" to say that they would be subjected to the Proclamation in the future. ECF 44 at 25. Seeking protection in this country should not require "illegally cross[ing] the border into the United States." *Id*. But Defendants admit that they would enforce the Proclamation and Guidance by preventing Individual Plaintiffs or class

members from reaching ports of entry to seek redress for their unlawful removals or repatriations. ECF 44-4 at 4 (CBP Guidance for ports of entry stating that noncitizens "subject to the Proclamation shall not be permitted to cross the international boundary"). It is therefore likely that, absent judicial intervention, their only option will be to cross between ports of entry. As discussed below, Plaintiffs have asked the Court to facilitate the return of removed and repatriated Individual Plaintiffs.[10] They also ask that the Court, at minimum, preclude enforcement of the Proclamation and Guidance that would prevent them from reaching the United States. *See infra* at 33.[11] These remedies suffice to show redressability.

### 2.    Organizational Plaintiffs Have Standing.

Contrary to Defendants' arguments, ECF 44 at 27-34, Organizational Plaintiffs show injury-in-fact because the Proclamation and Guidance "directly affect[] and interfere[] with [their] core business activities" by "perceptibly impair[ing] [their] ability to provide counseling" and other services to noncitizens. *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 395 (2024) ("*Alliance*") (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) ("*PETA*") (standing satisfied where agency action "perceptibly impaired" organization's interest, and organization used its resources to counteract that harm). Indeed, this Court previously determined

---

[10] Defendants contend that, because Plaintiffs did not seek return of removed individuals in their request for a preliminary injunction, this remedy is not before the court. ECF 44 at 25. But that motion has since been converted to a motion for summary judgment, and Plaintiffs do seek that remedy at summary judgment. *See* Am. Compl, ECF 11, at 43; Proposed Order.

[11] Moreover, Plaintiffs N.S. and E.G., who were removed with "212(f) expedited removal" orders, would, on their return to the United States, be subject to the reinstatement of those orders and barred from seeking asylum under 8 U.S.C. § 1231(a)(5). This Court can redress that injury by enjoining Defendants from relying on those removal orders issued via the Proclamation, as Plaintiffs requested in their complaint and motion for preliminary injunction. *See* ECF 11 at 43; ECF 14 at 1.

that Plaintiff RAICES had standing to challenge regulations rendering certain noncitizens ineligible for asylum. *See O.A.*, 404 F. Supp. at 142-43.

The Supreme Court's decision in *Alliance* reaffirmed *Havens* in relevant part. The Court rejected the standing of certain "issue-advocacy" organizations "based on their incurring costs to oppose [agency] actions" and held that organizations "cannot manufacture" standing "simply by expending money to gather information and advocate against the defendant's action." 602 U.S. at 394-95. That is consistent with D.C. Circuit precedent. *E.g. Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (organization cannot "manufacture [an] injury" by directing resources to litigation). But Organizational Plaintiffs have not manufactured their injuries. Rather, they are similarly situated to the organization with standing in *Havens*. "Critically," the Supreme Court explained, the plaintiff in *Havens* "not only was an issue-advocacy organization, but also operated a housing counseling service." *Alliance*, 602 U.S. at 395 (citing *Havens*, 455 U.S. at 368). It had standing because the defendants' actions "directly affected and interfered with" the plaintiff's "core business activities" of providing those services. *Id.*

Organizational Plaintiffs' core business activities include providing legal assistance, counseling, and representation to ensure that people who cross the southern border to seek asylum or other protection have a meaningful opportunity to present their claims. *See* ECF 14-3 at ¶¶ 2-4, 6, 9; ECF 14-1 at ¶¶ 3-4, 6-7; ECF 14-2 at ¶¶ 3, 5-6, 11. The Proclamation and Guidance seriously impede this work because they result in the summary removal of Organizational Plaintiffs' would-be clients before they can seek legal assistance, retain counsel, or pursue asylum or other relief—in violation of their statutory rights.[12] All three organizations have had to divert staff time away

---

[12] *See, e.g.*, ECF 14-1 at ¶¶ 13-16 (in first month after Proclamation took effect, RAICES had been unable to represent *any* asylum seekers who crossed the border on or after January 20 because

from individual representation to conduct outreach to understand how the Proclamation is being implemented and explain its implications to staff, community members, and other stakeholders. ECF 14-3 at ¶¶ 12, 15, 18; ECF 14-2 at ¶¶ 15, 28, 31-38; ECF 14-1 at ¶¶ 11, 17. They have also had to develop new educational and training materials. ECF 14-3 at ¶¶ 12, 16; ECF 14-2 at ¶ 37; ECF 14-1 at ¶¶ 17, 19-20. In addition, RAICES has had to search for new ways to advocate with ICE and USCIS to try to ensure that detained noncitizens have access to the asylum system. *See East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663-64 (9th Cir. 2021); *East Bay Sanctuary Covenant*, 994 F.3d at 974-75 (9th Cir. 2020); *see also Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022), *rehearing en banc. denied*, No. 21-1123, 2022 WL 15524743 (D.C. Cir. Oct. 21, 2022) (citing *PETA*, 797 F.3d at 1093).

The Florence Project and Las Americas also risk losing funding due to the Proclamation and Guidance. ECF 14-3 at ¶¶ 19-20 (describing anticipated loss of 5 to 25% of funding from the Florence Project's program for representation of clients who suffer from serious mental health conditions due to the Proclamation);[13] ECF 14-2 at ¶¶ 32-33, 35 (Las Americas's funding threatened because it receives only private funding largely based on the number of individuals served). Because the Proclamation and Guidance prevent the Florence Project and Las Americas from serving as many people, the policies "[j]eopardize their ability to receive funding." That establishes injury-in-fact. *East Bay Sanctuary Covenant*, 993 F.3d at 663-64; *East Bay Sanctuary*

---

none were allowed to seek protection); ECF 14-2 at ¶¶ 18-20, 22, 25-26, 29 (in first month Las Americas had not received calls from or met with *any* detained individuals who came to the United States on or after January 20; attendance at their "Know Your Rights" events also dropped significantly); ECF 14-3 at ¶¶ 13-14 (Florence Project had been unable to identify or meet with *any* asylum seekers in ICE custody who crossed the border after January 20).

[13] Defendants cite an alleged concession by the Florence Project "that the majority of its referrals are from a population other than [noncitizens] subject to the Proclamation," ECF 44 at 32 n.2, but the declaration they cite does not support that assertion. *See* ECF 14-3.

*Covenant*, 994 F.3d at 974; *see Nw. Immigrant Rights Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 47-48 (D.D.C. 2020) (regulation that would cause legal services organizations to serve fewer clients and thereby lose revenue established injury-in-fact for organizations).

Defendants get no help from *United States v. Texas*, 599 U.S. 670 (2023). That case rejected attenuated allegations of standing by Texas and Louisiana to challenge DHS's enforcement priorities based on assertions that the policy "imposes costs on the States." 599 U.S. at 674-75. The Court held that the States lacked standing because there was "no precedent" for a lawsuit aimed at forcing "the Executive Branch to alter its arrest policies so as to make more arrests."[14] *Id.* at 686. Such "indirect effects" on state coffers are too attenuated because States can always allege downstream costs from federal policies. *Id.* at 680 & n.3 (collecting cases).

Defendants also argue that Organizational Plaintiffs have merely demonstrated a reduced need for their services. ECF 44 at 29. That is a mischaracterization. Defendants' implementation of the Proclamation and Guidance have effectively deprived Organizational Plaintiffs of the ability to carry out their core activities. That is an even greater injury than sufficed to confer standing in *Havens*, where the plaintiff had to "devote significant resources to identify and counteract the defendant's racially discriminatory steering practices." 455 U.S. at 379.[15]

---

[14] For the same reason, *Linda R.S. v. Richard D.,* 410 U.S. 614 (1973), which found that mother lacked standing to challenge the state's failure to prosecute her child's father, is inapplicable. *Id.* at 619. Nor does *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996), help Defendants. When that case found a "direct conflict between the defendant's conduct and [an] organization's mission" insufficient, it was addressing attempts to manufacture standing to vindicate "abstract social interests" by (for example) "incorporating, drafting a mission statement, and then suing." *Id.* at 1429. Organizational Plaintiffs' claims are nothing like that.

[15] Organizational Plaintiffs meet the other requirements for standing: causation and redressability. *See Lujan*, 504 U.S. at 560-61. Defendants do not contest causation. They do contest redressability, citing 8 U.S.C. § 1252(f)(1), but that provision does not bar relief. *See infra*, Part II.B.

### B.    Plaintiffs Have A Cause Of Action.

Defendants are wrong that Plaintiffs "have no cause of action." ECF 44 at 43. In fact, Plaintiffs have two: one in equity and another under the APA.

### 1.    Plaintiffs Have An Equitable Cause Of Action To Challenge The Proclamation's Enforcement.

Longstanding equitable principles give aggrieved parties the ability to sue to enjoin "violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). It is "well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Chamber of Comm. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring in part and in the judgment) (alteration in original)); *see, e.g.*, *Doctors for Am. v. Office of Personnel Mgmt.*, __ F. Supp. 3d __, No. 1:25-cv-00322, 2025 WL 452707, at *10 (D.D.C. Feb. 11, 2025) (TRO barring agencies from modifying health-related websites pursuant to an executive order); *Jones v. Trump*, No. 1:25-cv-00401 (D.D.C.), ECF 28 (Feb. 24, 2025) (TRO preventing government from implementing an executive order regarding transgender inmates); *Doe v. McHenry*, 1:25-cv-00286 (D.D.C.), ECF 44 (Feb. 18, 2025) (preliminary injunction of same executive order).

Defendants' argument that "Plaintiffs have no cause of action under . . . the Proclamation," ECF 44 at 43, is thus a red herring. Plaintiffs need not assert that the Proclamation *itself* creates a cause of action. There is likewise nothing to Defendants' claim that, because the Proclamation is (in their view) "a valid exercise of the President's authority under Sections 1182(f) and 1185(a)," it is "not subject to review." ECF 44 at 46; *see also id.* at 43-46. That simply conflates the merits with the existence of a cause of action.

Nor do Defendants' cited authorities support their cramped view of the Proclamation's reviewability. Several of them deal with the substantive scope of the President's authority, not reviewability. *See, e.g.*, *Hawaii*, 585 U.S. at 683 (addressing whether a Proclamation was "a valid exercise of the President's authority under the INA"); *Haig v. Agee*, 453 U.S. 280, 289-90 (1981) (addressing "whether the statute authorize[d] the action of" an agency official). Defendants get no help from *Fiallo v. Bell*, which involved a "congressional policy choice" to prioritize admission of certain migrants and not, as here, a decision by the President to disregard the congressional mandate allowing "any" noncitizen present in the United States to seek asylum. 430 U.S. 787, 793 (1977). And *United States ex rel. Knauff* v. *Shaughnessy*, 338 U.S. 537 (1950), simply recognized that Congress *can* delegate individual exclusion decisions to the President in broad terms. *Id.* at 543. It does not suggest that courts cannot review whether Congress actually *has* delegated such authority to the President, let alone whether the President's actions conflict with other statutes.

## 2.    Plaintiffs Can Challenge The Guidance Under The APA.

Plaintiffs also satisfy the requirements for suing under the APA. They are "aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, the Guidance constitutes "final agency action," *id.* § 704, and implementation of the Proclamation is not "committed to agency discretion by law," *id.* § 701(a)(2).

***Zone of interests.*** A person satisfies the aggrievement requirement if his injury "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990). The zone-of-interests test is "not especially demanding;" it bars only actions where "a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in a statute that it cannot reasonably be assumed that' Congress authorized that plaintiff to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (citations omitted).

24

Individual Plaintiffs easily meet that standard: They are seeking asylum and other forms of relief authorized by the INA. Defendants do not argue otherwise. Organizational Plaintiffs, as nonprofits serving noncitizens seeking asylum and other protection, also easily fall within the zone of interests of the INA, which contemplates that nonprofit organizations will provide legal services to noncitizens.[16] Moreover, as discussed above, all three Organizational Plaintiffs have shown how the Proclamation and Guidance have impeded their ability to provide legal services. *See supra* Part I.A.2. And this Court has previously found that nonprofit legal service organizations, including RAICES, meet this standard because their work "furthers the purposes of the INA" to provide legal representation to asylum seekers. *O.A.*, 404 F. Supp. 3d at 144; *see also Nw. Immigrant Rights Project*, 496 F. Supp. 3d at 52; *Capital Area Immigrants Rights' Coal. v. Trump*, 471 F. Supp. 3d 25, 43 (D.D.C. 2020) ("*CAIR*").[17]

Defendants argue that *United States v. Texas*, 599 U.S. 670 (2023), displaced the zone-of-interests standard. ECF 44 at 38. But that decision relied on an entirely separate line of cases holding that States and private plaintiffs "lack[] standing to contest the policies of [a] prosecuting

---

[16] *See, e.g.*, 8 U.S.C. § 1225(b)(1)(B)(iv) (providing noncitizens with the right to "consult" before a credible fear interview); *id.* § 1229(b)(2) (requiring noncitizens in removal proceedings to be provided a list of pro bono attorneys); *id.* § 1443(h) (requiring the Attorney General to work with "relevant organizations" to "broadly distribute information concerning" the immigration process); *id.* § 1158(d)(4)(A)-(B) (requiring list of services providers to be distributed to asylum seekers with advisal about the right to counsel).

[17] Defendants' reliance on Justice O'Connor's opinion in *INS v. Legalization Assistance Project of Los Angeles Cnty. Fed'n of Labor*, 510 U.S. 1301, 1302 (1993) (O'Connor, J., in chambers), is misplaced. That non-precedential opinion expressed the view "of only a single Justice" about "a statute other than the INA." *CAIR*, 471 F. Supp. 3d at 43. And *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897 (D.C. Cir. 1996), which involved an anti-immigration organization, is also inapposite. Moreover, since then, the Supreme Court has consistently made clear that the test is less demanding. *See, e.g., Lexmark*, 572 U.S. 118; *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 492 (1998).

authority when [they themselves are] neither prosecuted nor threatened with prosecution." 599

U.S. at 674 (quoting *Linda R.S.*, 410 U.S. at 619).

    ***Final agency action.*** Defendants incorrectly claim Plaintiffs "have not identified any final

agency action distinct from the Proclamation." ECF 44 at 39-40. Plaintiffs challenge the Guidance,

which "mark[s] the consummation of the [Defendants'] decisionmaking process," and has created

"legal consequences" for noncitizens. *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,

603 U.S. 799, 808 (2024) (cleaned up). The Guidance is "a definitive conclusion" as to how the

Proclamation will be implemented. *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 56 (D.C.

Cir. 2016); *see Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000)

("issuance of a guideline or guidance may constitute final agency action"). The Guidance also

prevents Individual Plaintiffs from invoking their statutory rights, resulting in removal to possible

persecution. There is "no question" that the Guidance has "directly affect[ed] the parties." *Las

Americas Immigrant Advocacy Ctr. v. Wolf*, 507 F. Supp. 3d 1, 35 (D.D.C. 2020) (citation omitted).

    Defendants also argue that Plaintiffs have not identified any agency action at all. ECF 44

at 39-40. That is puzzling, as Defendants rely on the Guidance in their filings and have *removed*

some Individual Plaintiffs pursuant to that Guidance. Unlike in *Biden v. Texas*, Plaintiffs do not

"postulat[e] the existence" of "an abstract decision." 597 U.S. 785, 809 (2022).[18]

    Defendants further suggest that Plaintiffs cannot bring APA claims because the Guidance

carries out a presidential directive. ECF 44 at 40. But while APA review may be unavailable where

"the President has final constitutional or statutory responsibility for the *final step* necessary for the

agency action directly to affect the parties," *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549,

---

[18] Defendants have already filed several Guidance documents. *See* ECF 43-1, 43-4, 43-5, 43-6, 44-1, 44-2, 44-3, 44-4. For completeness, Plaintiffs submit the entire redacted version of the Guidance that Defendants produced as Exhibit 1 to this brief.

552 (D.C. Cir. 1993) (discussing *Franklin*, 505 U.S. at 797), that is not the case here. The Proclamation directed DHS to "take all appropriate actions" to implement the Proclamation. 90 Fed. Reg. at 8335-36. In response, DHS issued the Guidance "to instruct [its] agents and officers *how to implement the Proclamation's terms*." ECF 44 at 20 (emphasis added). Without the Guidance, we would not even know who is subject to the Proclamation. It is the Guidance that specifies that the Proclamation applies to noncitizens who enter "between the ports of entry at the southern land border" and that it excludes unaccompanied children. *E.g.*, ECF 44-1 at 2. And it is the Guidance that creates the "212(f) Direct Repatriation" and "212(f) Expedited Removal" procedures Defendants have used to deport Plaintiffs and proposed class members. *E.g.*, Ex. 1 (Guidance) at 14-15; *see also, e.g.*, ECF 44 at 21. Hence, the Guidance—not the Proclamation— constitutes the "'the *final step* necessary for the agency action directly to affect the parties.'" *Chamber of Comm.*, 74 F.3d at 1326-27; *accord Gomez v. Trump*, 485 F. Supp. 3d 145, 177 (D.D.C. 2020), *amended in part*, 486 F. Supp. 3d 445 (D.D.C. 2020), *and amended in part sub. nom., Gomez v. Biden*, No. 20-cv-01419, 2021 WL 1037866 (D.D.C. Feb. 19, 2021) (holding that courts can review "agency implementation of [Section 1182(f)] Proclamations under the APA").

**Committed to agency discretion by law**. Finally, Defendants assert that the Proclamation is unreviewable because the applicable statutory provisions "provide broad discretionary authority to the President." ECF 44 at 41; *see id.* at 43-46. Defendants seem to suggest that the APA therefore bars review because the agency actions here were "committed to agency discretion by law." *Id.* at 41 (quoting 5 U.S.C. § 701(a)(2)). That argument fails twice over.

First, because Plaintiffs' APA claims challenge only the Guidance—not the Proclamation itself—the relevant question is whether the *agency's* actions were "committed to *agency* discretion by law." 5 U.S.C. § 701(a)(2) (emphasis added). Defendants cannot make this showing. There is

no statute that commits implementation of the Proclamation to the discretion of any agency, and Defendants in fact disclaim agency discretion by arguing that all their actions are compelled by the Proclamation itself. *Cf. Lincoln v. Vigil,* 508 U.S. 182, 191 (1993) (a decision is committed to agency discretion by law only where "the *relevant statute* 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion'" (emphasis added) (quoting *Heckler v. Chaney,* 470 U.S. 821, 830 (1985))).

Even if the scope of the President's authority were relevant, the result would be the same. The exception for action committed to agency discretion is read "quite narrowly." *Dep't of Comm. v. New York*, 588 U.S. 752, 772 (2019). This is not a "rare circumstance[]" where it applies. *Id.* The President's authority under Sections 1182(f) and 1185(a) is not "unbounded." *Id.* As explained, those provisions do not confer on the President authority to override the rest of the INA, much less commit such a decision to unreviewable discretion. *See supra* Part I.A.2. Moreover, the President's invocation of those authorities is "not one of those areas traditionally committed to agency discretion." *Dep't of Comm.*, 588 U.S. at 772. Quite the opposite: The Supreme Court itself has entertained challenges to the President's exercise of authority under Sections 1182(f) and 1185(a). *See, e.g.*, *Hawaii*, 585 U.S. at 699-710.

**C.    Plaintiffs' Claims Are Justiciable.**

Federal courts possess a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976); *accord Cohens v. Virginia*, 19 U.S. 264, 404 (1821) (Marshall, C.J.). The political question doctrine is a "limited and narrow exception." *Starr Int'l Co., Inc. v. United States*, 910 F.3d 527, 533 (D.C. Cir. 2018). It does not apply simply because a case presents issues that "have political implications," *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (citation omitted), or "touches foreign relations," *Baker v. Carr*, 369 U.S. 186, 217 (1962). It applies only where there

is a "textually demonstrable constitutional commitment of the issue to a coordinate political department" or "a lack of judicially discoverable and manageable standards for resolving it." *Nixon v. United States*, 506 U.S. 224, 228 (1993); *see also, e.g., J.G.G.*, 2025 WL 914682, at *6 (Henderson, J., concurring in denial of stay) ("Questions of interpretation and constitutionality—the heartland of the judicial ken—are subject to judicial review." (citing *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)). The same is true here.

**Statutory claims**. Plaintiffs' statutory claims ask the Court to do what courts do every day: interpret statutes. "[O]ne of the Judiciary's characteristic roles is to interpret statutes, and [it] cannot shirk this responsibility merely because [a] decision may have significant political overtones," even where "foreign relations" are implicated. *Japan Whaling Ass'n.*, 478 U.S. at 230; *see Fed'n for Am. Immigration Reform, Inc. v. Reno*, 897 F. Supp. 595, 603 (D.D.C. 1995). Indeed, Plaintiffs are not aware of any statutory case where the Supreme Court has held the political question doctrine applicable. Defendants' only authority consists of cases that, at most, express some deference to the political branches when litigants challenged actions expressly authorized by Congress on constitutional grounds. ECF 44 at 45-46 (citing *Fiallo*, 430 U.S. at 792). That is not the challenge here. And the "judiciary, not the Executive, has the ultimate constitutional responsibility and capacity for saying what statutes and statutory terms mean." *J.G.G.*, 2025 WL 914682, at *23 (Millett, J., concurring in denial of stay).

**Constitutional claims**. Defendants argue that whether an "influx of illegal immigrants … constitute[s] an invasion" is a "nonjusticiable political question." ECF 44 at 47 (citing *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997)). But to begin, the Court likely does not need to resolve that question: Defendants do not seem to argue that the Invasion Clause would permit the President to displace the provisions of the INA at issue here, or that it confers authority to

create a new direct repatriation regime outside the INA's removal provisions. Nor do they assert that such arguments would present political questions.[19]

In all events, a stay panel of the D.C. Circuit recently explained why the cases Defendants cite do not support its non-justiciability argument: Each rejected a State's request that the court itself make a *finding* in the first instance that immigration levels amounted to an "invasion" where neither Congress nor the Executive Branch had done so. *J.G.G.*, 2025 WL 914682, at *7 (Henderson, J., concurring in denial of stay) (citing *California*, 104 F.3d 1086); *see also Chiles v. United States*, 874 F. Supp. 1334, 1342-44 (S.D. Fla. 1994), *aff'd*, 69 F.3d 1094 (11th Cir. 1995) (cited at ECF 44 at 48, 64). Hence, the cases cited by Defendants do not stand for the proposition that invocation of an "invasion" renders an issue categorically nonjusticiable. *J.G.G.*, 2025 WL 914682, at *7 (Henderson, J., concurring in denial of stay); *see also id.* at *9 ("The term 'invasion' . . . echoes throughout the Constitution . . . . And *in every instance*, it is used in a military sense.").

### D.    Section 1252 Does Not Bar Plaintiffs' Claims.

Defendants do not argue that the Individual Plaintiffs' claims are barred by 8 U.S.C. § 1252(a)(2)(A), which concerns judicial review of expedited removal under Section 1225(b)(1). ECF 44 at 35. Properly so: As Defendants put it, Plaintiffs' claim that the Proclamation and Guidance violate Section 1225(b)(1) is "really a challenge to the Proclamation's bar to invoking asylum under Section 1158(a)(1)." *Id.* at 65. Plaintiffs therefore do not raise the sort of "challenges

---

[19] Any such argument would be meritless. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring); *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015); *Aziz v. Trump*, 234 F. Supp. 3d 724, 732 (E.D. Va. 2017) (challenge to executive order requiring judicial interpretation of the executive order, the INA, and the Constitution was justiciable). As noted by then-Judge Kavanaugh, when a court is faced with such a question, it has a constitutional duty to "confront[ it] directly" so that "backdoor use of the political question doctrine" does not "*sub silentio* expand executive power." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 857 (D.C. Cir. 2010) (Kavanaugh, J., concurring in the judgment).

to the expedited removal scheme" itself that are subject to Section 1252(a)(2)(A)'s jurisdiction-stripping provisions. *See Make the Road N.Y. v. Wolf*, 962 F.3d 612, 636 (D.C. Cir. 2020); *see also* Pls. Class Cert. Reply Part I.A.

Defendants nevertheless argue that several provisions of Section 1252(a)(2)(A) bar the *Organizational* Plaintiffs' claims to the extent they challenge the Proclamation's enforcement in expedited removal proceedings. ECF 44 at 35. But that argument fails for the same reasons just explained. Just like Individual Plaintiffs, none of the Organizational Plaintiffs' claims fall within Section 1252(a)(2)(A)'s scope *at all*. They do not challenge any "decision . . . to invoke the provisions of [Section 1225(b)(1)]" as to any particular noncitizen, 8 U.S.C. § 1252(a)(2)(A)(ii); or "the implementation or operation of an order of removal pursuant to section 1225(b)(1)," *id.* § 1252(a)(2)(A)(i); or any "procedures and policies adopted . . . to implement the provisions of section 1225(b)(1)," *id.* § 1252(a)(2)(A)(iv). Instead, as Defendants concede, "[h]ere, all legal consequences flow from the Proclamation itself," ECF 44 at 26, and the Guidance "implement[s] the Proclamation's terms," not the expedited removal statute, *id.* at 20. And Plaintiffs challenge only the Proclamation and Guidance. Section 1252(a)(2)(A) does not divest this Court of jurisdiction to hear those claims.

For the same reason, this Court need not decide whether 8 U.S.C. § 1252(e)(3) supports jurisdiction over the Organizational Plaintiffs' claims. That provision creates an exception to the jurisdiction-stripping provisions contained in Section 1252(a)(2)(A). But because Defendants do not argue that Section 1252(a)(2)(A) bars any of the Individual Plaintiffs' claims, and because—

as explained—the same is true of the Organizational Plaintiffs' claims, this Court has federal-question jurisdiction over all those claims under 28 U.S.C. § 1331.[20]

## III.    THE COURT SHOULD GRANT THE NATIONWIDE RELIEF NECESSARY TO REMEDY THE GOVERNMENT'S UNLAWFUL ACTIONS.

Defendants' challenges to Plaintiffs' requested relief lack merit. Because Plaintiffs filed their Amended Complaint before receiving the Guidance, and because the parties agreed to treat Plaintiffs' Motion for a Preliminary Injunction as an opening summary judgment brief (while reserving certain claims), Plaintiffs now clarify the relief they seek at summary judgment, also reflected in their concurrently filed proposed order. They ask the Court to:

1. Enjoin Defendants from implementing or enforcing the Proclamation to restrict Individual Plaintiffs or proposed class members from invoking statutory protections that Congress has provided for noncitizens physically present in the United States; from relying on the Proclamation to engage in "repatriations" or removals outside of the authorities Congress enacted in the INA; and from relying on the Proclamation to depart from the CAT screening standards set forth in the CAT implementing regulations.

2. Enjoin Defendants from relying on any removal orders issued to Individual Plaintiffs or proposed class members pursuant to the Proclamation.

3. Declare that Defendants (a) cannot lawfully implement or enforce the Proclamation or the Guidance to restrict Individual Plaintiffs or proposed class members from invoking statutory protections that Congress has provided for noncitizens who are physically present in the United

_____

[20] As explained in Plaintiffs' class certification reply, if the Court were to conclude that the Guidance is in part subject to Section 1252(e)(3)'s class bar, the Individual Plaintiffs would withdraw their class claims, and proceed only on their own behalf, as to those aspects of the Guidance. Pls. Class Cert. Reply Part I.A. Even under Defendants' theory that the Guidance implicates Section 1252(a)(2)(A), they appear to concede that the Individual Plaintiffs in their own rights would be able to challenge the Guidance pursuant to Section 1252(e)(3).

States; (b) cannot rely on removal orders issued to Individual Plaintiffs or class members pursuant to the Proclamation; (c) cannot rely on the Proclamation or Guidance to "repatriate" or remove Individual Plaintiffs or class members outside of the removal authorities in the INA; and (d) cannot rely on the Proclamation or Guidance to depart from the CAT screening standards set forth in the CAT implementing regulations.

4. Vacate the Guidance insofar as it permits Defendants to take any of the actions described in the three paragraphs above.

5. Order Defendants to facilitate the return to the United States of the Individual Plaintiffs who were removed or "repatriated" under the Proclamation and Guidance, at no expense to Plaintiffs.

6. Order that same relief for proposed class members—or, at minimum, order that Defendants may not rely on the Proclamation or Guidance to prevent class members' physical entry into the United States if they return to the border.[21]

## A.    The Unlawful Conduct Shown Here Requires Nationwide Relief.

This Court has "broad discretion in awarding injunctive relief," which includes the authority to issue "nationwide injunction[s]." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408 (D.C. Cir. 1998). Here, nationwide relief is required on two independent grounds. By contrast, "relief from the application of the Proclamation . . . to specific Plaintiffs," as Defendants urge, would fail to remedy the harm Plaintiffs have shown. ECF 44 at 66.

First, the proposed class—if certified—requires nationwide relief to redress the harm the class suffers. The government does not argue otherwise.

---

[21] As requested in the Amended Complaint, the Court should also order Defendants to pay Plaintiffs reasonable attorneys' fees and costs and grant any other and further relief that this Court may deem just and proper.

Second, the "scope of injunctive relief is dictated by the extent of the violation established" and is not limited to the listed plaintiffs. *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, 485 F. Supp. 3d 1, 62 (D.D.C. 2020) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Here, to begin, the harm to the missions of the Organizational Plaintiffs arises from the implementation of the Proclamation and the Guidance generally; relief limited to particular individuals would do nothing to redress those harms. Moreover, such limited relief would undermine the Nation's strong interest in the "uniform application of immigration law and policy." *Gomez*, 485 F. Supp. 3d. at 203 (citation omitted); *accord, e.g.*, *East Bay Sanctuary Covenant*, 994 F.3d at 987; *Texas v. United States*, 787 F.3d 733, 769 (5th Cir. 2015).[22]

The same goes for vacating the Guidance. The D.C. Circuit has consistently held that under the APA, "[w]hen an agency's action is unlawful, 'vacatur is the normal remedy.'" *E.g., Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (citation omitted); *O.A.*, 404 F. Supp. 3d at 152 (noting that the "APA and controlling D.C. Circuit precedent dictate the proper remedy" of vacatur). Accordingly, this Court and others in this District have refused to limit vacatur in immigration cases to individual plaintiffs, describing such a position as "both at odds with settled precedent and difficult to comprehend." *O.A.*, 404 F. Supp. 3d at 153; *see also Kiakombua*, 498 F. Supp. 3d at 52.

Plaintiffs are entitled to declaratory relief as well. The APA permits declaratory relief concerning the legality of agency policies. *See, e.g.*, *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 618 (D.C. Cir. 2017); ECF 11 at 42 (requesting declaratory relief). Plaintiffs may also obtain

---

[22] Contrary to Defendants' arguments, ECF 44 at 41-42, Plaintiffs do not seek to enjoin the President. They seek to enjoin the other Defendants from enforcing the Proclamation and Guidance. *See, e.g.*, *Chamber of Comm.*, 74 F.3d at 1328; *Wilcox v. Trump*, No. 25-cv-334 (BAH) ___ F. Supp. 3d ___, 2025 WL 720914, at *16 (D.D.C. Mar. 6, 2025).

declaratory relief against the President. *See, e.g.*, *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (court had jurisdiction to issue writ of mandamus against President but "opt[ed] instead" to issue declaration); *Harris v. Bessent*, No. 25-cv-412 (RC), ___ F. Supp. 3d ___, 2025 WL 679303, at *9 (D.D.C. Mar. 4, 2025) ("[A]ppellate courts have previously affirmed the issuance of declaratory relief involving the President.").

Defendants are only partly correct in stating that Plaintiffs "do not claim harm arising from the use of the Proclamation to prevent physical entry into United States territory." ECF 44 at 67. Plaintiffs do not seek to enjoin enforcement of the Proclamation against noncitizens who have not previously had it applied to them while physically present in the United States—and who therefore are not members of the proposed class. But the Individual Plaintiffs and proposed class members who have been wrongfully removed under the Proclamation are at ongoing risk of persecution in their countries of origin, *see* ECF 12-8 at ¶¶ 3-8; ECF 12-7 at ¶¶ 12-14, and Plaintiffs request relief sufficient to allow them to return to the United States. *See supra* at 32-33; Pls. Proposed Summary Judgment Order. Plaintiffs are entitled to relief that prevents Defendants from relying on the Proclamation and Guidance to preclude them from doing so, including by preventing their physical entry into the United States at ports of entry. Indeed, Defendants can assert no sound interest in avoiding that relief: The alternative would force people to cross between ports of entry in order to redress the harms they have suffered, which is not in the interests of any party.

Finally, this Court may order Defendants to facilitate the return of the Individual Plaintiffs and proposed class members unlawfully removed or repatriated under the Proclamation, as other courts in this District have done to remedy removals pursuant to unlawful policies. *Grace v. Whitaker*, 344 F. Supp. 3d 96, 144-45 (D.D.C. 2018) (explaining authority to order return), *aff'd in relevant part*, 965 F.3d 883, 909 (D.C. Cir. 2020); Order, *Grace v. Whitaker*, No. 18-cv-01853,

ECF 105, at 3 (Dec. 19, 2018) (ordering "defendants to bring back into the United States, at no expense to plaintiffs, any plaintiff who has been removed pursuant to an expedited removal order prior to this Order"); *accord Kiakombua*, 498 F. Supp. at 1, 57-59 (D.D.C. 2020) (citing *Grace* in ordering the government "to facilitate the return of [two plaintiffs who were previously removed] back to the United States, at no cost to [the plaintiffs]").[23]

## B.    8 U.S.C. § 1252(f)(1) Does Not Bar Relief.

### 1.    Section 1252(f)(1) Does Not Bar A Classwide Injunction Prohibiting Defendants From Enforcing The Proclamation.

Section 1252(f)(1) does not bar the classwide injunctive relief Plaintiffs seek. That provision prohibits classwide injunctive relief that "enjoin[s] or restrain[s] the operation of the provisions of" title II, chapter 4 of the INA. 8 U.S.C. § 1252(f)(1); *see* ECF 44 at 68 n.7. Chapter 4 includes the statutes governing expedited and regular removal proceedings and removal itself. *See* 8 U.S.C. §§ 1225(b)(1), 1229a, 1231. But Chapter 4 does not include Section 1182(f) or Section 1185(a)(1), nor does it include the asylum statute. And because Plaintiffs seek relief against the Proclamation and Guidance issued under these authorities, and do not seek relief that would enjoin or restrain the operation of any of the provisions of Chapter 4, Section 1252(f)(1) is thus irrelevant.

---

[23] Numerous cases confirm courts' authority to remedy unlawful removals. *See, e.g.*, *Walters v. Reno*, 145 F.3d 1032, 1050-51 (9th Cir. 1998) (requiring parole into country or other arrangement for hearing attendance for class of noncitizens); *Singh v. Waters*, 87 F.3d 346, 350 (9th Cir. 1996) (ordering government to permit return for immigration hearing regarding whether favorable exercise of discretion in his case was warranted, following unlawful removal); *Ms. L v. ICE*, 403 F. Supp. 3d 853, 860 (S.D. Cal. 2019) (finding the court has remedial authority to bring back parents who were wrongfully deported and therefore unlawfully separated from their children); *Rantesalu v. Cangemi*, No. CIV.04-1375(JRT/SRN), 2004 WL 898584, at *8 (D. Minn. Apr. 23, 2004) (ordering government to "permit petitioner to re-enter the United States" after unlawful removal); *Ying Fong v. Ashcroft*, 317 F. Supp. 2d 398, 408 (S.D.N.Y. 2004), *amended on reconsideration in part, sub nom, Fong v. Ashcroft*, No. 03 Civ. 7261, 2004 WL 1348994 (S.D.N.Y. June 15, 2004) (ordering noncitizen "be returned" after unlawful removal); *Dennis v. INS*, No. CIV.A. 301CV279SRU, 2002 WL 295100, at *4 (D. Conn. Feb. 19, 2002) (same).

*Garland v. Aleman Gonzalez* is fully consistent with that conclusion. There, the Supreme Court explained that when Section 1252(f)(1) speaks of "the operation of" the covered statutes, it "refer[s] to the Government's efforts to enforce or implement them." 596 U.S. 543, 550 (2022). As Defendants admit, "all legal consequences [in this case] flow from the Proclamation itself," ECF 44 at 26, and it is the Proclamation that Defendants seek to enjoin on a classwide basis. The Proclamation, however, does not "enforce or implement" Section 1225(b)(1), Section 1229a, or any other provision of INA title II, chapter 4. *Aleman Gonzalez*, 596 U.S. at 550. Rather, as Defendants acknowledge, "the only statutes that the Proclamation does invoke are 8 U.S.C. § 1182(f) and § 1185(a)." ECF 44 at 43. And Congress excluded both those provisions from Section 1252(f)(1)'s scope. Section 1252(f)(1) therefore does not bar an injunction prohibiting Defendants from enforcing the Proclamation.

Defendants are wrong that Section 1252(f)(1) applies because enjoining the Proclamation "would compel DHS to provide [noncitizens] with credible fear interviews under Section 1225 or removal proceedings under 1229a." ECF 44 at 68-69. This relief would not compel the government to do anything in particular under Chapter 4. Defendants' real argument—that Section 1252(f)(1) applies whenever an injunction might indirectly affect how the government proceeds under Chapter 4—would rewrite the statute, yield untenable results, and contradict settled law.[24]

Section 1252(f)(1) cannot apply because, per Defendants, "the *entire purpose* of the Proclamation" is to create new authority *outside of* Chapter 4. ECF 44 at 51. Defendants urge that the Proclamation creates a non-statutory "repatriation authority" that does not depend on any "form

---

[24] Defendants do not argue that Section 1252(f)(1) bars the Court from ordering Defendants to facilitate the return of Individual Plaintiffs D.G., F.A., K.A., Y.A., and E.G. For good reason: Such relief would fall into Section 1252(f)(1)'s exception for injunctions concerning "individual [noncitizens] against whom [removal] proceedings . . . have been initiated." 8 U.S.C. § 1252(f)(1).

of Title 8 removal proceedings." *Id.* Section 1252(f)(1) does not preclude injunctive relief against those assertions of non-Chapter 4 authority. And it is that displacement of the INA *by the Proclamation* that Plaintiffs seek to enjoin, not the "operation" of covered INA provisions.

A hypothetical underscores why Section 1252(f)(1) cannot apply to such relief. Suppose the President issued an executive order directing DHS to "repatriate" without Title 8 removal proceedings green card holders who express views the Administration disfavors[25]—based solely on an assertion of inherent Article II authority. Even though the hypothetical order implements no INA provision at all, the government could make the same argument it makes here: that Section 1252(f)(1) would bar an injunction because the result would be that DHS must revert to processing people "through some form of Title 8 removal proceedings." ECF 44 at 51. That cannot be right—yet Defendants' argument here would compel that result.

In addition, enjoining Defendants from enforcing the Proclamation would not compel them to implement Sections 1225(b)(1) or 1229a in any "specific manner." ECF 44 at 69, 71. It would merely prohibit them from applying *the Proclamation* to noncitizens physically present in the United States. *See* ECF 14 at 39. As Defendants admit, "[t]he Proclamation does not speak to removal proceedings." ECF 44 at 58. Indeed, in Defendants' view, "removal [is] a legal principle not relevant to the parameters of a Proclamation issued pursuant to Section 1182(f)." *Id.* (emphasis removed). Enjoining the Proclamation would simply restore the pre-January 20 status quo, under which "DHS has discretion whether to place [a noncitizen] in expedited removal or full removal proceedings." ECF 44 at 67.

---

[25] *Cf.* BBC, *Marco Rubio Says US Revoked At Least 300 Foreign Students' Visas*, https://www.bbc.com/news/articles/c75720q9d7lo.

Finally, even to the extent enjoining the Proclamation may have downstream effects in removal proceedings, such "collateral consequences" do not trigger Section 1252(f)(1). *See O.A.*, 404 F. Supp. 3d at 158 (quoting *Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007)). In *O.A.*, this Court held that enjoining the asylum bar regulation "would not enjoin the operation of removal proceedings," even though "asylum officers [were] charged with implementing the Rule in expedited removal proceedings." *Id.* at 158-59. The Court explained that Section 1252(f)(1) does not bar an injunction that "directly implicates" only non-covered provisions—including the asylum statute—just because such an injunction might also have "collateral consequence[s]" in removal proceedings. *Id.* at 158 (quoting *Gonzales*, 508 F.3d at 1233). Here, as in *O.A.*, to the extent Defendants purport to "implement[] the [Proclamation] in expedited removal proceedings," enjoining enforcement of *the Proclamation* "would not enjoin the operation of removal proceedings." *O.A.*, 404 F. Supp. 3d at 158-59. Indeed, even under so-called "212(f) Expedited Removal" processing, the government acknowledges that it is *the Proclamation* that prevents noncitizens from raising asylum claims—not any separate policy implementing the expedited removal statute. *See, e.g.*, Ex. 1 (Guidance) at 16, 20 ("In accordance with Presidential Proclamation 10888, the alien will not be asked fear questions.").

That principle survives *Aleman Gonzalez*, which did not disturb the "proposition that a court may enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision." 596 U.S. at 553 n.4 (citing *Gonzales v. DHS*, 508 F.3d at 1233).[26] The principle also aligns with the text of Section 1252(f)(1). Congress "constructed a carefully worded provision depriving the lower courts

---

[26] *Aleman Gonzalez* did disapprove of a separate rationale in *O.A.*: that where an injunction would "merely enjoin conduct that allegedly violates [a covered] provision, § 1252(f)(1) poses no bar to relief." 404 F. Supp. 3d at 159; *see Aleman Gonzalez*, 596 U.S. at 552-54.

of power to 'enjoin or restrain the operation of' *certain sections* of the statute." *Texas*, 597 U.S. at 800 (emphasis added). Under the government's boundless theory, by contrast, a policy implementing virtually any INA provision—regardless of its location in the Act—could be covered by Section 1252(f)(1) because of knock-on effects the policy has in removal proceedings. *See, e.g.*, 8 U.S.C. § 1255 (adjustment of status); *id.* §§ 1421-1427 (naturalization). If Congress had meant Section 1252(f)(1) to sweep that broadly, it would have referred to injunctions that "enjoin or restrain the operation of the provisions ~~of title II, chapter 4~~ *of this Act*"; indeed, multiple other sections of the INA refer to "the provisions of this Act." *See, e.g.*, 8 U.S.C. §§ 1101(a)(16), 1103(a)(3), 1256(a).

For largely the same reasons, the Court can "prohibit[] Defendants from relying on any removal orders issued to noncitizens pursuant to the Proclamation" consistent with Section 1252(f)(1). ECF 14 at 39; Proposed Order Granting Plaintiffs' Motion for Summary Judgment and Permanent Injunctive Relief ("Proposed Order"). That injunction would prevent Defendants from reinstating such removal orders under 8 U.S.C. § 1231(a)(5) or imposing the bars on admissibility that attach to people ordered removed under 8 U.S.C. § 1182(a)(9). And although Section 1231(a)(5) is an INA provision covered by Section 1252(f)(1), Plaintiffs again are not seeking relief directly against that provision but rather against the Proclamation and the harms it has caused. Although barring reinstatement might be a "collateral consequence" of remedying the harm to class members subjected to the Proclamation, that does not trigger Section 1252(f)(1). *O.A.*, 404 F. Supp. 3d at 158 (quoting *Gonzales v. DHS*, 508 F.3d at 1233).

*Gonzales v. DHS* addressed an analogous situation. The district court there enjoined the government from giving "legal effect" to denials of adjustment of status issued under a particular DHS policy. 508 F.3d at 1232-33. The government argued that Section 1252(f)(1) barred the

injunction because "the 'legal effect' of such a denial is the commencement of reinstatement proceedings under § 1231(a)(5)." *Id.* The Ninth Circuit rejected that view, explaining that the injunction only "directly implicat[ed] the adjustment of status provision"—which is not covered by Section 1252(f)(1)—and that reinstatement "was a collateral effect of the unlawful practice of denying adjustment of status." *Id.* at 1233. The same is true here.[27]

### 2. Section 1252(f)(1) Does Not Bar Vacatur Of The Guidance.

Section 1252(f)(1) does not apply to vacatur under the APA. "By its plain terms," Section 1252(f)(1) "is nothing more or less than a limit on injunctive relief." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999). Its text nowhere mentions vacatur. It is titled "Limit on injunctive relief," without reference to vacatur. *See Texas*, 597 U.S. at 798 (Section 1252(f)'s title "makes clear the narrowness of its scope"). Thus, where it applies, Section 1252(f)(1) simply "prohibits lower courts from *entering injunctions*." *Aleman Gonzalez*, 596 U.S. at 550 (emphasis added). It is thus unsurprising that "all courts that have addressed the issue"—including after *Aleman Gonzalez*—"have rejected the government's construction." *Nat'l TPS Alliance v. Noem*, No. 25-cv-01766, 2025 WL 957677, at *12 (N.D. Cal. Mar. 31, 2025); *e.g.*, *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022).

Defendants' contrary arguments fail. *See* ECF 44 at 67-71. First, the decision in *Direct Marketing Ass'n v. Brohl* nowhere addressed vacatur. 575 U.S. 1 (2015). Second, *Aberdeen & Rockfish R.R. Co. v. SCRAP*, likewise addressed not vacatur but an injunctive order "direct[ing] the [agency] to perform certain acts." 422 U.S. 289, 307 (1975). Third, the term "restrain" in Section 1252(f)(1) does not do the work Defendants claim. Rather, "restrain and enjoin" is a

---

[27] Should the Court decline to enjoin Defendants from relying on removal orders issued pursuant to the Proclamation, it should at least issue declaratory relief stating that such removal orders are unlawful. *See* Proposed Order.

"common doublet" referring to the canonical forms of injunctive relief: injunctions and restraining orders. BRYAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE 295-96 (3d ed. 2011); *see, e.g.*, *California v. Arizona*, 452 U.S. 431, 432 (1981) (using "enjoined and restrained" to describe an injunction). Fourth, the legislative history Defendants cite cuts strongly against them: It refers only to "injunctive relief." H.R. Rep. No. 104-469, pt. 1, at 161 (1996).

Because this Court can vacate the Guidance, it need not assess whether Section 1252(f)(1) would apply to an injunction prohibiting Defendants from enforcing the Guidance; and Plaintiffs clarify that they do not seek that relief. *See O.A.*, 404 F. Supp. 3d at 153-54.[28]

### C.    Plaintiffs Satisfy The Equitable Requirements For A Permanent Injunction.

Plaintiffs meet all remaining requirements for permanent injunctive relief. As to irreparable harm, Defendants do not dispute that Individual Plaintiffs and proposed class members risk persecution if removed. ECF 14 at 37. Their recycled contentions concerning standing and the merits, ECF 44 at 63, are wrong for the reasons given above, *see supra* Part I, Part II.A.

Indeed, Defendants' argument is utterly inconsistent with the rule of law: They claim that even if the Proclamation and Guidance are patently unlawful, the "public interest" precludes injunctive relief because the "asylum and expedited removal system"—the system that Congress created to fulfill the United States' treaty obligations—is (in the Administration's view) "broken." ECF 44 at 74. But the answer to that policy view is for *Congress* to amend the *statute*. The President has no "dispensing power, which has no countenance for its support in any part of the constitution." *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 525 (1838).

---

[28] Section 1252(f)(1) also "does not bar declaratory relief." *Make the Road*, 962 F.3d at 635; *accord O.A.*, 404 F. Supp. 3d at 159. Defendants do not argue otherwise in their summary judgment brief. ECF 44 at 67-71. To the extent they do so in opposing class certification, ECF 43 at 40-41, they ignore the holdings of this Court and the D.C. Circuit.

Defendants' remaining contentions fare no better. Defendants claim that the Individual Plaintiffs and proposed class members are not at risk of torture because the Guidance provides "for an assessment for CAT protection." ECF 44 at 75-76. But to begin, those assessments do not even purport to address harm from non-torture forms of persecution. That alone is reason to reject Defendants' unfounded claim that Plaintiffs face no harm. And even as to CAT protection, Defendants' makeshift procedures utterly fail to guard against sending people to torture. They require noncitizens to satisfy the ultimate standard for CAT protection—that they will more likely than not be tortured—with "no consultation period or right to counsel," no documentary evidence, and no time to gather knowledge of the relevant law. Ex. 1 (Guidance) at 4 (emphasis removed). Moreover, asylum seekers coming to the United States in need of protection will get only get CAT assessments if they spontaneously "manifest" fear of removal. *See, e.g.*, *id.* at 16, 20. And record evidence shows that Defendants have ignored manifestations of fears even when various Individual Plaintiffs repeatedly mentioned their fears once in DHS custody. *Compare* ECF 33-3 ¶ 4 (claiming that A.M., who fled the Taliban in Afghanistan with his family did not manifest fear)*, with* ECF 12-1 ¶¶ 12, 14 (describing affirmative efforts to manifest a fear); *compare* ECF 33-3 ¶ 8 (claiming that M.A., who was arrested and held incommunicado for years in Egypt did not manifest a fear) *with* M.A. Decl., ECF 12-5 ¶ 11 ("I have asked for a credible fear interview, and I have said that I fear being tortured or even killed in Egypt. I have an immigration lawyer who has also been making the same requests for me.").

Defendants also contend that an injunction would "impinge[] upon the President's application of an important Act of Congress." ECF 44 at 74. But that argument piggybacks on— and so falls with—Defendants' mistaken arguments on the merits. The related contention that an injunction would "undermine the President's authority at the core of his power under Article II to

protect the country from harms from abroad," *id.* at 74, ignores the Supreme Court's numerous opinions making clear that *Congress*, not the President, has primary authority over immigration. ECF 14 at 32-33. Moreover, Defendants' attempt to circumvent those cases wrongly recasts the *removal* of people physically present in the United States as either a restriction on entry or a matter of foreign affairs rather than a question of domestic immigration law. ECF 44 at 74-75 (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-35 (2010), and *Hawaii*, 585 U.S. at 704). And Defendants assume, without explanation or evidence, that people seeking to exercise their right to apply for asylum somehow inflict "harm[]" on the United States. *Id.*

Defendants' factual claims are equally meritless. Contrary to Defendants' implication, ECF 44 at 72-73, the number of Border Patrol apprehensions between southern border ports of entry was lower in November and December 2024 (the last two full months before the Proclamation took effect) than at any time since August 2020.[29] And the daily average of such apprehensions fell even lower "in the two-week period ending on January 20, 2025." ECF 43-2 at 18. Despite Defendants' insinuations to the contrary, ECF 44 at 72-73, "the annual chance of being murdered" in a terrorist attack "committed by an [undocumented] immigrant is zero": it has never happened. Alex Nowsrateh, *Terrorism and Immigration: A Risk Analysis*, 1975-2022 (Aug. 22, 2023).[30] Similarly, Defendants' own data shows that the vast majority of illegal drugs interdicted at the border, including "[m]ore than 90% of interdicted fentanyl," are seized at ports of entry from "vehicles driven by U.S. citizens." CBP, *Frontline Against Fentanyl* (last updated Mar. 14,

---

[29] CBP, Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters; CBP, Southwest Land Border Encounters FY22, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters-fy22.

[30] https://www.cato.org/policy-analysis/terrorism-immigration.

2025).[31] Meanwhile, "[v]irtually none is seized from [people] seeking asylum." Joel Rose, *Who Is Sneaking Fentanyl Across The Border? Hint: It's Not The Migrants* (Aug. 9, 2023).[32] And most weapons trafficking occurs from the United States into Mexico, *not* vice-versa.[33] There is likewise no evidence that people seeking asylum pose a significant risk of engaging in human trafficking. Finally, "the claims of [undocumented] immigrants spreading disease are just as untrue as claims of them spreading crime or terrorism." Alex Nowsrateh & Krit Chanwong, *Diseased Illegal Immigrants Aren't "Invading" the United States* (Jan. 21, 2025) (analyzing CDC and Census Bureau data).[34] The equities therefore decisively favor Plaintiffs.[35]

## CONCLUSION

For the foregoing reasons and those set forth in Plaintiffs' converted preliminary injunction motion, the Court should grant summary judgment to Plaintiffs and order the relief described at page 32-33 above and in the proposed order submitted with this brief.

---

[31]    https://www.cbp.gov/border-security/frontline-against-fentanyl. Permanently linked at https://perma.cc/E3LD-SFSS (captured Apr. 4, 2025).

[32]    https://www.npr.org/2023/08/09/1191638114/fentanyl-smuggling-migrants-mexico-border-drugs.

[33]    *See* ICE, *Weapons Trafficking,* https://www.ice.gov/about-ice/hsi/investigate/weapons-trafficking.

[34]    https://www.cato.org/blog/disease-not-good-reason-close-border-2025/.

[35]    Defendants also briefly assert that the Court should require Plaintiffs to post an injunction bond under Fed. R. Civ. P. 65(c). ECF 44 at 76. But that provision authorizes a bond only for "a preliminary injunction or a temporary restraining order" and so does not apply here. And even where the rule applies, courts have "broad discretion" to "require no bond at all," *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (cleaned up), and have declined to do so in cases like this one, *e.g.*, *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020).

Dated: April 7, 2025

Respectfully submitted,

/s/ Lee Gelernt
Lee Gelernt (D.D.C. Bar No. NY0408)
Omar C. Jadwat*
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
lgelernt@aclu.org
ojadwat@aclu.org

Morgan Russell*
Cody Wofsy (D.D.C. Bar No. CA00103)
Spencer Amdur*
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, Suite 700
San Francisco, CA 94104
T: 415-343-0770
mrussell@aclu.org
cwofsy@aclu.org
samdur@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
aspitzer@acludc.org
smichelman@acludc.org

Ashley Alcantara Harris*
David A. Donatti*
ACLU Foundation of Texas
P.O. Box 8306
Houston, TX 77288
TEL: (713) 942-8146
FAX: (713) 942-8966
aharris@aclutx.org
ddonatti@aclutx.org

*Attorneys for Plaintiffs*

Keren Zwick (D.D.C. Bar. No. IL0055)
Richard Caldarone (D.C. Bar No. 989575)*
Mary Georgevich*
National Immigrant Justice Center
111 W. Jackson Blvd.,
  Suite 800
Chicago, IL 60604
T: 312-660-1370
kzwick@immigrantjustice.org
rcaldarone@immigrantjustice.org
mgeorgevich@immigrantjustice.org

Melissa Crow (D.C. Bar No. 453487)
Center for Gender & Refugee Studies
1121 14th Street, NW, Suite 200
Washington, D.C. 20005
T: 202-355-4471
crowmelissa@uclawsf.edu

Edith Sangueza*
Center for Gender & Refugee Studies
26 Broadway, 3rd Floor
New York, NY 10004
T: 415-581-8835
sanguezaedith@uclawsf.edu

Robert Pauw*
Center for Gender & Refugee Studies
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: 206-682-1080
rpauw@ghp-law.net

Daniel Hatoum*
Texas Civil Rights Project
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 208
daniel@texascivilrightsproject.org

*Admitted pro hac vice.*