No. 24A1153

# In the Supreme Court of the United States

————————

U.S. DEPARTMENT OF HOMELAND SECURITY, ET AL., APPLICANTS

*v.*

D.V.D., ET AL.,

————————

**REPLY IN SUPPORT OF APPLICATION
FOR A STAY OF THE INJUNCTION
ISSUED BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
AND REQUEST FOR AN IMMEDIATE ADMINISTRATIVE STAY**

————————

D. JOHN SAUER
  *Solicitor General*
    *Counsel of Record*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

## TABLE OF CONTENTS

I.  The Government Is Likely To Succeed On The Merits ................................... 4

  A.  The district court lacked jurisdiction ......................................................... 4

  B.  Respondents' due-process claims are meritless .................................... 11

II. The Other Factors Support Relief ................................................................. 17

# In the Supreme Court of the United States

———————

No. 24A1153

U.S. DEPARTMENT OF HOMELAND SECURITY, ET AL., APPLICANTS

*v.*

D.V.D., ET AL.,

———————

**REPLY IN SUPPORT OF APPLICATION
FOR A STAY OF THE INJUNCTION
ISSUED BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
AND REQUEST FOR AN IMMEDIATE ADMINISTRATIVE STAY**

———————

The district court's extraordinary injunction prevents the Department of Homeland Security (DHS) from exercising its undisputed statutory authority to remove the worst of the worst illegal aliens, those convicted of heinous crimes, to any third country not specified in their final removal orders, unless DHS complies with an onerous set of procedures invented by the court to assess any potential claim under the Convention Against Torture (CAT), no matter how implausible. That injunction lacks a plausible basis in law and jeopardizes this country's foreign-policy and national-security interests. It obstructs immigration officials from using a critical means for effectuating long-overdue removals of a class of aliens that includes some of the most heinous criminals. And it subjects third-country removals to judicial superintendence under a moving set of goalposts. As a result, the Executive Branch has recently been forced to establish a makeshift detention facility for dangerous criminals at a military base in Djibouti. At that facility, a small number of ICE personnel are currently guarding dangerous criminals around the clock in a converted

2

conference room, under threat of rocket attacks and other security and health hazards—disrupting the base's operations, consuming critical resources intended for service members, and harming national security.  D. Ct. Doc. 151, at 2-5 (June 5, 2025).

Respondents fail to justify the injunction's inequitable effects, and they offer no legitimate defense on the merits.  Respondents disregard the plain text of three separate sets of jurisdictional bars.  They fail to establish that the procedures already provided by DHS are inadequate.  And they provide no legal basis for the additional procedures that the court spun out of whole cloth for a class that includes many aliens who have no due-process rights to any particular procedures beyond those that the political branches have provided.

To begin, respondents merely reprise the district court's atextual arguments for evading the jurisdictional bars that the injunction violates.  Most egregiously, even though the injunction indisputably "restrain[s] the operation" of third-country removals under 8 U.S.C. 1231(b) on a behalf of a nationwide class, 8 U.S.C. 1252(f)(1), respondents insist that Section 1252(f)(1) does not apply because the injunction only restrains DHS from implementing a covered provision (Section 1231(b)) in order to enforce a non-covered provision (FARRA).  But every Justice in *Garland* v. *Aleman Gonzalez*, 596 U.S. 543 (2022), rejected that reading of Section 1252(f)(1).  And respondents fare no better in arguing that the injunction does not run afoul of the INA and FARRA's other jurisdictional bars—those that specifically strip district courts of jurisdiction to review claims challenging the government's implementation of CAT, and generally strip them of jurisdiction to adjudicate freestanding suits arising from actions taken to execute removals.  At every turn, respondents insist that Congress must have intended to allow judicial review of their claims in this posture, while ignoring the statutory text making crystal clear that Congress required such claims to

be brought in petitions for review of final removal orders—or not at all.

In addition, respondents fail to rehabilitate the district court's merits analysis. Indeed, they barely try to defend the court's due-process holding, offering instead their own view that the injunction below is justified by FARRA and its implementing regulations. In all events, respondents identify no source of law—constitutional, statutory, or regulatory—that authorized the district court to "second-guess" the Executive Branch's approach to using country-wide assurances in the March Guidance. *Munaf* v. *Geren*, 553 U.S. 674, 702 (2008). They similarly offer little besides policy arguments—citing the district court's "moral sense," Opp. 26, and *their* own sense of "fairness," Opp. 1—to justify the district court's rewriting of the March Guidance to provide longer time periods and elaborate additional procedures. Moreover, respondents are unable to defend the premise that the entire class here has due-process rights to *any* more procedures in opposing their removal beyond what the political branches have chosen to provide. They misconstrue this Court's precedents as extending due-process removal protections to all aliens who have managed to get into the country, lawfully or not, when a century's worth of precedent makes clear that aliens who have not been admitted must be treated as if they are at the border seeking entry.

Finally, respondents cannot resort to the equities to excuse the injunction below. The district court's order has imposed significant harms on American sovereignty, foreign policy, and national security. Third-country removals are an essential tool for removing aliens who cannot be removed to the countries designated in their final removal order—especially criminal aliens whose home countries will not take them back. Yet the cumbersome process imposed by the order, and the court's unpredictable enforcement of its new scheme, has brought such removals to a stand-still. Respondents try to downplay these harms as somehow consequences of the govern-

4

ment's own creation.  That charge is baseless.  The government is presently laboring under an unlawful and unworkable injunction that intrudes on sensitive policy areas that the Constitution assigns to the political branches.  The harms to the public interest are the fault of the order below.  They will persist so long as it stands.

## I.    THE GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS

### A.    The District Court Lacked Jurisdiction

1.    Under 8 U.S.C. 1252(f)(1), lower federal courts are barred from issuing classwide injunctive relief that "enjoin[s] or restrain[s] the operation" of a covered statutory provision.  Yet the injunction below prohibits the government from "removing any alien to a third country" pursuant to 8 U.S.C. 1231(b)—which all agree is a covered provision—unless DHS follows certain procedures.  App. App'x 51a-52a.  Respondents fail to reconcile the injunction with Section 1252(f)(1).

Echoing the district court, respondents primarily argue (at 17-18) that Section 1252(f)(1) does not apply because FARRA is not included within the "provisions" specified in Section 1252(f)(1) whose operation cannot be "restrain[ed]" by classwide relief.  8 U.S.C. 1252(f)(1).  But that conflates the question of what provisions the injunction is *enforcing* with the question of what provisions the injunction is *restraining*.  Section 1252(f)(1) does not address *why* an injunction may issue; it addresses *what* that injunction may run against.  So long as the injunction orders "federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions"—one of which is Section 1231(b)'s authorization of third-country removals—it falls squarely within the ambit of Section 1252(f)(1).  *Garland* v. *Aleman Gonzalez*, 596 U.S. 543, 550 (2022).

Indeed, respondents' contrary view—that Section 1252(f)(1) does not apply to an injunction that restrains the operation of a specified provision in order to enforce

a non-specified provision—was rejected by every Justice in *Aleman Gonzalez*. While members of the Court disagreed over whether Section 1252(f)(1) reaches injunctions correcting the government's misapplication of a covered provision itself, the full Court agreed that Section 1252(f)(1) would forbid an injunction premised on the government's application of a covered provision violating some *external* legal limit. See 596 U.S. at 553-554 and n.4. In other words, while members of the Court disagreed about whether Section 1252(f)(1) reached claims *internal* to a covered provision, all Justices agreed that, at minimum, it would "prohibit injunctive relief" against the operation of a covered provision based on "claims that arise from any statutes external to the covered INA provisions (for example, a claim that a covered provision violates [RFRA])." *Id.* at 567 (Sotomayor, J., concurring in the judgment in part and dissenting in part). As the Court's opinion noted, even the respondents in that case agreed that Section 1252(f)(1) would bar "injunctive relief against the enforcement of one of the covered immigration provisions" for violating some "statute not specified in § 1252(f)(1)." *Id.* at 553 n.4. *That* is the precise situation here.

Changing gears, respondents argue that the injunction does not in fact restrain the operation of Section 1231(b). They again reprise (at 18) the district court's reasoning—namely, that the injunction only has a "collateral" effect on Section 1231(b)—while failing to respond to the obvious flaw that the government identified: The injunction below directly enjoins the government from using its authority under Section 1231(b) until it follows certain procedures crafted by the district court. That is as direct as it gets; its effects are not "collateral" in any sense of the word. App. 22.

Respondents also emphasize (at 18-19) that the injunction does not completely "*prevent*" the government from exercising its third-country removal authority under Section 1231(b). But that is immaterial, because Section 1252(f)(1) bars classwide

6

injunctions that "restrain the operation" of a covered provision, even if they do not bar the provision's operation entirely. 8 U.S.C. 1252(f)(1). As this Court stated, Section 1252(f)(1) prohibits classwide injunctions that order officials "to refrain from taking" *any* "action[] to * * * carry out the specified statutory provisions." *Aleman Gonzalez*, 596 U.S. at 550. Indeed, respondents' position is irreconcilable with the facts of *Aleman Gonzalez* itself. There, the district court's injunction did not categorically prohibit the government from using its authority under a covered provision; it merely restricted the government from using it (to detain aliens) until certain procedures were followed (a bond hearing). *Id.* at 547. So too here: Even though the injunction below does not bar the government from using Section 1231(b) forever, it forces officials to "take actions that (in the Government's view) are not required by [Section 1231(b)] and to refrain from actions that (again in the Government's view) are allowed by [Section 1231(b)]." *Id.* at 551.[1]

        2.    The injunction also violates the CAT-specific jurisdictional bars included in the INA and FARRA. Those bars—taken together—strictly confine judicial review over claims related to CAT, limiting the federal courts to reviewing such claims only if brought as part of a petition for review of a final order of removal. That is the "sole and exclusive" means for the review of "any" CAT-related claim. 8 U.S.C. 1252(a)(4); see Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, § 2242(d), 112 Stat. 2681-822. Respondents try to circumvent these bars in a couple ways. None works.

---

        [1]  Respondents alternatively suggest that this Court should issue classwide injunctive relief itself since Section 1252(f)(1) does not apply to it. See Opp. 19 n.6. That would be improper. Respondents have not moved in this Court for an injunction; nor does this Court have jurisdiction to enter one in this posture, as granting such an injunction would not be "in aid of" its jurisdiction *over the government's appeal* of the district court's injunction. See 28 U.S.C. 1651(a).

7

To start, respondents try to style their claims less as "CAT claims," and more as claims challenging the "policies" for reviewing such claims. Opp. 23-24. This does not matter. FARRA strips judicial review not just over "claims raised under" CAT, but also over "any other determination made with respect to the application of the policy set forth in" CAT. § 2242(d), 112 Stat. 2681-822. When the Executive sets the procedures for complying with CAT, it has made a "determination" with "respect to the application of the policy set forth in" CAT. *Ibid.* And when a litigant challenges that determination, his suit runs headlong into FARRA's jurisdictional bar. So too Section 1252(a)(4), which reaches "any cause or claim under" CAT—not just how CAT is applied in a discrete instance. And, as even the district court accepted, respondents' claims are "based on" FARRA. App. App'x 29a-30a.

Like the district court, respondents barely engage with the text of FARRA. Instead, they cite two cases interpreting different statutes. See Opp. 23 (citing *McNary* v. *Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 491-493 (1991) and *Reno* v. *Catholic Social Serv., Inc.*, 509 U.S. 43, 63-64 (1993)). But insofar as those cases are relevant, they hurt respondents' position. The statutes at issue in those cases barred review over "determination[s] respecting * * * application[s] for adjustment of status." 8 U.S.C. 1255a(f)(1); see 8 U.S.C. 1160(e)(1) (similar). This Court held that this sort of provision did not reach more programmatic challenges, because it described "a single act" (the adjustment of status). *McNary*, 498 U.S. at 492. But FARRA does the opposite: It describes "a group of decisions or a practice or procedure employed in making decisions," *ibid.*—indeed, it covers *every* "determination made with respect to the application of the policy set forth in" CAT. That Congress knows how to use narrower language when it wishes to limit the scope of a provision like this one only underscores that FARRA should be given its natural reading here.

Turning to Section 1252(a)(4), respondents argue that it cannot apply to CAT claims that arise after a final order of removal is issued. Opp. 22. But again, that is not what the statute says. Section 1252(a)(4) provides that the "sole and exclusive" means for judicial review of "any" CAT claim must be a "petition for review" of a final order. 28 U.S.C. 1252(a)(4). Where that is not available, the district court cannot conjure an independent fount of jurisdiction; the result is that judicial review is not available. Congress has provided the Executive with the final say.

Respondents resist this point, urging that "judicial review must be provided" for nearly every assertion of CAT. Opp. 30. But that is not the law. Indeed, the immigration laws regularly entrust the Executive Branch with making final determinations regarding the liberty of aliens—including those who have raised CAT (or similar) claims. See, *e.g.*, *DHS* v. *Thuraissigiam*, 591 U.S. 103, 112 (2020) (noting that in the expedited removal context, "courts may not review the determination that an alien lacks a credible fear of persecution") (citation omitted); accord *Reno* v. *American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 486-487 (1999) (*AADC*).

It is thus neither unusual nor inappropriate for Congress to have stripped judicial review over CAT claims like those here. Again, as the government explained (at 27-28), the aliens here have already undergone removal proceedings, and they already have had the opportunity to seek CAT protection—including from those countries where the alien has stronger connections. After those proceedings, which are accompanied by judicial review, the Executive Branch retains broad discretion to carry out removal orders by sending aliens to available third countries, if necessary. Cf., *e.g.*, 8 C.F.R. 208.16(f) ("Nothing in this section  * * *  shall prevent [DHS] from removing an alien to a third country other than the country to which removal has been withheld or deferred."). Rather than imposing another round of judicial super-

intendence, Congress at that point entrusted the Executive with carrying out that discretion exclusively—just as Congress entrusted the Executive with exclusively designing the procedures to implement CAT in the first place.  See 8 U.S.C. 1231 note. Indeed, such discretion is especially appropriate here, given the risk of torture needed to receive CAT protection—which requires the concurrence of a foreign government— is highly unlikely where an alien is being sent to a country where he has little or no preexisting connection.  App. 40; see also 8 C.F.R. 208.18(a)(1) and (2).[2]

3.    The INA also includes a number of general provisions that, alone and in combination, strip the federal district courts of jurisdiction over certain stages of the immigration process—and in particular, the execution of removal orders.  The injunction below runs through these bars many times over.  Respondents fail to salvage it.

Start with Section 1252(g).  Nowhere do respondents try to explain how a suit challenging the removal of aliens to third countries is not one "arising from" the government's "action" to "execute removal orders against an[] alien."  8 U.S.C. 1252(g). Like the district court, respondents' answer (at 24) is that Section 1252(g) is somehow limited to "discretionary decisions" only—and thus is not applicable here because the government does not have the discretion to purportedly break the law.  But as multiple courts of appeals have rightly recognized, "the distinction between DHS's 'discretionary decisions' and its 'legal authority' to execute removal orders is illusory," with no basis in the statutory text.  *E.F.L.* v. *Prim*, 986 F.3d 959, 965 (7th Cir. 2021); see also, *e.g.*, *Rauda* v. *Jennings*, 55 F.4th 773, 778 (9th Cir. 2022).

Respondents are wrong (at 24-25) to try to root their atextual gloss in *AADC*. There, this Court held that Section 1252(g) was "narrower" than some courts had

---

[2]  Respondents repeatedly elide the distinction between the risk of torture, *i.e.*, violence at the hands of or with the acquiescence of government officials, and the risk of mistreatment purely by private parties, which CAT does not protect against.

read it—to broadly cover the waterfront of immigration enforcement—and instead was limited to the three discrete acts that the provision expressly enumerates. 525 U.S. at 482. In describing Section 1252(g), the Court explained that it made sense for Congress to single out these three acts, because they typically involved instances of executive "discretion." *Id.* at 483-484. But at no point did this Court suggest that Section 1252(g) does not apply to these three discrete acts if challenged on non-discretionary grounds. Nor do respondents cite a single case reading Section 1252(g) that way. Moreover, respondents ignore that Congress *elsewhere* in the INA *did* limit a judicial-review bar to the discretionary aspect of certain actions. App. 25-26.

Respondents' remaining points fare no better. As noted, the INA bars the federal district courts from reviewing any suit "arising from an[] action taken or proceeding brought to remove an alien," 8 U.S.C. 1252(b)(9)—instead providing that the "sole and exclusive" forum for such a claim must be an appellate court, considering a petition for review of a final order of removal, 8 U.S.C. 1252(a)(5). Respondents insist that their claims fall outside this bar, but never address the actual text. At most, drawing on Section 1252's titles, they insist (at 20) that these provisions are limited to actions or proceedings *culminating* in final orders of removal. But again, that is not what the text of the provisions themselves say.[3]

Relatedly, respondents assert (at 21-22) that aliens do not have a way to raise through the administrative process CAT claims that arise after a final order of removal is issued. Not so. Congress has provided aliens with a motion-to-reopen pro-

---

[3] Nothing in *Jennings* v. *Rodriguez*, 583 U.S. 281 (2018), is to the contrary. As the government explained (at 26), *Jennings* read Section 1252(b)(9) not to cover certain categories of claims that were either orthogonal to removal, or could never be reviewable in any form. Respondents make no effort to explain how *Jennings* excuses a suit that exclusively targets "an[] action taken  * * *  to remove an alien from the United States." 8 U.S.C. 1252(b)(9).

cess, should CAT concerns arise at any point during the pendency of removal. See, *e.g.*, *Hamama* v. *Adduci*, 912 F.3d 869, 876 (6th Cir. 2018), cert. denied, 141 S. Ct. 188 (2020). To be sure, respondents may wish that these procedures were more robust. But that is a policy objection to the scheme that Congress designed.

> **B.    Respondents' Due-Process Claims Are Meritless**

1.    While respondents repeat much of the district court's jurisdictional analysis, they are far less inclined to endorse its reasoning on the merits. Respondents maintain the injunction below is justified under CAT, FARRA, and their implementing regulations—and indeed, rely primarily on those sources throughout their opposition. See, *e.g.*, Opp. 25-27. But the district court based its injunction on the Due Process Clause, and that Clause alone. App. App'x 42a-43a (finding likelihood of success on the merits for plaintiffs' "procedural due process" challenge only).

Respondents' pivot is telling, but mistaken. None of the additional authorities it invokes comes close to supporting the injunction. The CAT treaty itself cannot do so, because it is not self-executing. See *Medellin* v. *Texas*, 552 U.S. 491, 520, 522 n.12 (2008). Nor does FARRA compel the district court's chosen policy, because FARRA does not compel any procedures at all—instead, it delegates that responsibility entirely to the Executive Branch. See 8 U.S.C. 1231 note (providing the "heads of the appropriate agencies shall prescribe regulations to implement" CAT). And as for those implementing regulations, discussed below, nothing requires the specific terms imposed by the district court's injunction (or later "clarification"), which is why respondents never quote any regulation expressly articulating those terms. Even on the added grounds raised by respondents, the injunction below cannot stand.

2.    The March Guidance says that where a third country provides a "diplomatic assurance[] that aliens removed from the United States will not be persecuted

12

or tortured" there, and "the Department of State believes those assurances to be cred-ible," the alien "may be removed without the need for further procedures." App. App'x 54a-55a. Respondents contend this process is unlawful. They are wrong.

Respondents primarily argue (at 28) that CAT's implementing regulations re-quire an "individualized assessment" about whether a particular alien will be tor-tured in a given country. Of course, that has no bearing on what the *Constitution* might compel. Regardless, respondents are mistaken. They broadly cite all of the provisions that apply to CAT, reasoning that because each one is phrased to apply to "an alien," every CAT-related determination must be particularized. See *ibid.* That does not follow. As the government explained (at 30 n.8), while decisions about CAT protection are ultimately about an individual alien, nothing in the CAT regulations compels that every component of that determination be individualized. By the same token, nothing in the CAT regulations prevents the government from concluding that an *individual* alien will not be tortured at the behest of a particular country, based on the view that *no alien* will be tortured at the behest of that country given the strength and reliability of its assurances. And while respondents object to the *sub-stantive* validity of such a finding, that sort of objection does not sound in *procedural* due process at all. App. 30. Respondents have no answer to this.

More fundamentally, respondents invite an inquiry that the federal courts have neither the authority nor institutional competence to perform. The "Judiciary is not suited to second-guess" the Executive Branch's "determinations" about how an alien will be treated in a foreign land. *Munaf* v. *Geren*, 553 U.S. 674, 702 (2008). Respondents try to distinguish *Munaf* on the ground it involved individual assur-ances. Opp. 29. But nothing in *Munaf* turned on the scope of the decision; it turned on the substance. The federal courts are ill-equipped to "pass judgment on foreign

justice systems" and consider for themselves the "sensitive foreign policy issues" bound up in this space. *Munaf*, 553 U.S. at 702. That is the constitutional responsibility of the Executive. The federal courts thus do not have a freestanding power, at least absent specific statutory authorization, to "question the Government's determination that a potential recipient country is not likely to torture a detainee." *Kiyemba* v. *Obama*, 561 F.3d 509, 514 (D.C. Cir. 2009), cert. denied, 559 U.S. 1005 (2010). And here, nothing in the Due Process Clause or any statute gives the federal district courts the power to dictate to the Executive *how* it makes such a determination, any more than it gives them the power to second-guess *what* the Executive decides.[4]

Finally, respondents contend (at 30) that the March Guidance's rule for assurances is unlawful because "a path to judicial review must be provided." But respondents cite nothing for this proposition besides the district court's own citation to *Marbury*. Nor could they. As the government explained (at 30-31), the immigration laws are replete with examples where the Executive Branch's decisions are conclusive and unreviewable. See also p. 8, *supra*. Indeed, the square holding of *Munaf* is that there are certain decisions in this context where the Executive provides the last word. Nowhere do respondents even attempt to explain why judicial review *must* be available here, but is permissibly absent for many other provisions of the INA.

3.    For aliens being removed to a third country not covered by an adequate assurance, the March Guidance provides that DHS will first provide the alien notice of that country, and an opportunity to affirmatively state he fears removal there—

---

[4] Respondents suggest that the March Guidance runs afoul of the CAT regulations because it places the ultimate credibility determination with the Secretary of State. See Opp. 30-31. But the March Guidance only states that an alien "may" be removed once the Secretary has deemed an assurance credible. App. App'x 55a. It does not foreclose the appropriate officials under the cited regulation from affirming that determination, before the alien is removed to an approved third country.

along with administrative proceedings to follow, if he does so.  App. App'x 55a.  Federal law requires nothing more.  Respondents' arguments to the contrary are wrong.

First, the bulk of respondents' arguments are based in policy, not law.  See Opp. 31-32.  These assertions are both misplaced and misguided.  Respondents insist that aliens must affirmatively be asked whether they fear removal, versus simply given the opportunity to express a fear.  Opp. 32.  But DHS adopted this policy because affirmatively asking about fear of removal has been shown to result in a large number of false answers.  App. App'x 55a.  The Due Process Clause does not require the Executive to invite fraud—especially since the class of aliens here all have final removal orders and thus should be aware from those prior proceedings of their ability to raise CAT claims.  Respondents similarly declare that having a "more likely than not" standard is too high.  See Opp. 32.  But CAT regulations have elsewhere required aliens to establish a "prima facie case" for protection.  8 C.F.R. 208.18(b)(2)(ii) (establishing rules for aliens whose removal orders became final before regulations took effect); cf. 8 C.F.R. 245a.1(n) (defining "prima facie" as evidence sufficient to establish eligibility "in the absence of rebuttal").  That is similar to what the March Guidance requires—where aliens in a screening must make an initial showing that they are "more likely than not" to face torture, in order to warrant further process.  App. App'x 55a.  The Due Process Clause does not compel something different.[5]

Even on policy grounds, respondents' defense is lacking.  As the government

---

[5] Respondents contend that the notice is "provided only in English."  Opp. 14.  On the contrary, this Office has been informed that DHS's ordinary and universal practice is to provide translators to explain such notices to non-English-speaking aliens.  Respondents also suggest the CAT regulations require further notice to an alien's counsel, Opp. 31, but that obligation is only triggered where a "person is required" by the *regulations themselves* "to give or be given notice," 8 C.F.R. 1292.5(a); see 8 C.F.R 292.5(a).  Respondents have not identified any such provision here.  And once more, none of this bears on what the *Constitution* might require as to any notice.

15

detailed (at 32-33), a chief defect with the injunction below is that it mandates almost 25-days' worth of process for *every* CAT claim, no matter how meritless. Nowhere do respondents explain how this arrangement—where aliens have 10 days to merely voice a CAT claim, and another 15 to move to reopen after *any* adverse finding—is somehow constitutionally compelled. And while respondents endorse these built-in delays, they do not seriously contest that they are far from necessary in order to provide aliens with a sufficient opportunity to raise a CAT claim.

To the extent respondents' objections sound in due process at all, they ring especially hollow in light of the established procedures for expedited removal. See App. 31-32. Respondents try to dismiss expedited removal (at 32) on the ground that "individuals with expedited removal orders are not class members," but that is a red herring. Regardless, the procedures for expedited removal refute respondents' position about what due process demands when applying CAT in the context of third-country removals. Respondents are simply wrong (at 33) that the issue does not arise in the expedited-removal context because aliens are removed only to their "own country of origin." Because the expedited-removal statute does not limit the countries to which an alien can be removed under Section 1231(b), an alien in expedited removal can be removed to countries with which they have no familiarity. App. 32. And even then, the expedited-removal statute requires aliens to affirmatively raise fears in a matter of hours, and limits administrative review to a matter of days. *Id.* at 31-32.

4.    As with the district court, respondents' attempt to augment the March Guidance with its own preferred policy is especially misguided because, for much of the class, the Due Process Clause does not require anything more than what the political branches provide. App. 33-36. In trying to expand the due-process rights of removable aliens in this country, respondents misapprehend this Court's cases.

16

Respondents argue (at 33-34) that once an alien "effects an entry" into the country, he is entitled to the same due-process protections as any other person here. But "entry" in this context does not mean mere physical presence within the country's borders. The Due Process Clause does not provide favored treatment to those who evade detection in breaking our laws, versus those who either lawfully present themselves at the border or are immediately captured in its vicinity. Instead, for removal purposes, the entry that may cause an alien's "constitutional status [to] change[]" is only when he "gains *admission* to our country." *Landon* v. *Plasencia*, 459 U.S. 21, 32 (1982) (emphasis added). Where an alien has *never* been admitted by immigration officers, the Due Process Clause treats him the same way he should have been treated—as someone applying for admission at the border. See *Thuraissigiam*, 591 U.S. at 138-140; 8 U.S.C. 1225(a)(1).

Respondents argue (at 34-35) that this Court has held the Due Process Clause applies to aliens within this country. The question, however, is not *whether* due process applies, but *what* it requires. For aliens never admitted into the country, "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, *are* due process of law." *Nishimura Ekiu* v. *United States*, 142 U.S. 651, 660 (1892) (emphasis added); accord *Thuraissigiam*, 591 U.S. at 138-140.

On this point, respondents are again mistaken in claiming (at 33) that "all the injunction does *is* ensure an individual receives what Congress has provided." Opp. 33. As discussed, the INA is silent as to any specific process that aliens must be afforded under CAT before they are removed to a third country, and FARRA delegates that decision to the Executive Branch. See App. 35-36. The March Guidance—not a stray comment of an Assistant U.S. Attorney wrenched out of context from oral argument, see Opp. 33—constitutes the political branches' determination about what

17

process is due in this context.  For many of the class-member aliens, that determination is constitutionally dispositive.[6]

Finally, respondents overread this Court's recent decisions on the Alien Enemies Act (AEA), ch. 66, 1 Stat. 577.  See Opp. 35-36 (citing *Trump* v. *J.G.G.*, 145 S. Ct. 1003 (2025) (per curiam) and *A.A.R.P.* v. *Trump*, 145 S. Ct. 1364 (2025) (per curiam)).  There, under existing precedent and the government's own acknowledgement, Congress *had* in fact provided procedures for aliens to challenge their designations, through the AEA and the habeas-corpus statute.  See App. 35 n.10.  But here, despite respondents' insistence, FARRA does not contemplate *any* specific procedures, and Congress *barred* review of CAT claims except through a petition for review.  Nor did *J.G.G.* and *A.A.R.P.* purport to create universal due-process conditions applicable across all immigration contexts.  Instead, they reaffirmed that due process must be tailored to the "nature of the case." *J.G.G.*, 145 S. Ct. at 1006 (citation omitted).  And here, the nature of the claims at issue are far more analogous to the expedited-removal context than the AEA, given that they turn, at bottom, on aliens simply raising a fear of removal under CAT.

## II.   THE OTHER FACTORS SUPPORT RELIEF

1.    Respondents do not dispute that if the First Circuit were to uphold the district court's injunction, certiorari would be warranted.  Nor could they:  The injunction obstructs the implementation of an important Executive Order, in an area that Congress and the Constitution have entrusted to the Executive Branch, under circumstances that raise sensitive diplomatic and foreign-policy concerns.  This is precisely the sort of circumstance that merits this Court's review.  See App. 36-37.

---

[6] Respondents effectively concede that the class contains unlawful entrants who were never admitted and thus fall under *Thuraissigiam*; they contend only that "many" or "[s]ome" class members "were lawfully admitted."  Opp. 2, 14 n.4.

2.    The equities likewise favor a stay here.  The injunction creates an unwise and unworkable scheme that materially impairs the ability of the government to enforce the immigration laws—including against those in most need of enforcement.  As explained, among other things, the injunction below injects a 25-day delay into the proceedings for every alien being removed to a third country who decides to voice a fear of removal under CAT—regardless of how frivolous his claim.  See App. 37-38.  That causes massive operational disruption.  Removing aliens to third countries often involves tight timing and sensitive diplomatic coordination.  *Id.* at 38.  The district court's tool for delay gives aliens the ability to upend this delicate process, and force DHS to effectively start anew.  *Ibid.*  The result, right now, is that criminal aliens are remaining within our homeland—and perhaps must even be released once again—while several of the worst must be detained on a military base in Djibouti to avoid bringing them back to our shores.  *Ibid.*

Respondents do not grapple with much of this.  They do not explain, for instance, why even frivolous CAT claims should be able to delay removal for (at minimum) nearly a month.  Nor why the public interest is served by such an arrangement.  Nor why their sense of the injunction's foreign policy consequences is better than Secretary Rubio's.  Instead, respondents offer a few justifications for keeping in place the injunction.  None excuses the intolerable incursion into core executive functions.

To start, respondents note (at 2) that the March Guidance is not limited to criminal aliens.  True enough, but it is hard to see why the presence of *additional* aliens who have been able to escape execution of their final removal orders is a point *in favor* of the injunction.  Regardless, aliens with severe criminal histories are the most likely to require third-country removals, because their home countries are often unwilling to take them back.  The injunction will disproportionately disrupt the re-

moval of such criminal aliens, and thus it will be particularly harmful.

Next, respondents cast (at 38-40) many of the government's injuries as self-imposed. But that blinks reality. The government was forced to detain criminal aliens at a military base in Djibouti only *after* the district court implausibly "clarified" the terms of its injunction *while the aliens were in the process of being removed—* rewriting a "meaningful opportunity" to require 10 days merely to assert a fear, going well beyond the timelines applicable in the similar expedited-removal context. That put the government to the Hobson's choice of keeping the aliens abroad, or bringing the aliens convicted of heinous crimes back to America. See App. 3-4. That is not a "self-inflicted" harm by any mark. Opp. 38.

Respondents also stress (at 37) that the government has considered sending aliens to countries like "Libya and South Sudan." But while respondents make much of those countries' conditions relative to the United States, they do not explain why any class member faces a realistic risk of *torture* in those countries—which again, requires not just private violence, but the concurrence of a foreign government in the person's severe mistreatment. See App. 40. Moreover, the fact that it is difficult to find countries willing to take certain aliens only speaks to the dangerousness and undesirability of these individuals—and the serious need for the Executive to finally ensure they are removed from this country.

Finally, respondents go so far as to say that the government is suffering "no" comparable harm, because the injunction below just forces it to "follow the law." Opp. 36. But as explained, the injunction goes well beyond that: It creates an intrusive and unworkable policy that impairs a core prerogative of the Executive Branch. Contrary to respondents' passing assertions, the government did not consent to any such relief in prior oral arguments. See *id.* at 9. Then as now, the policy of the Executive

Branch is to give an alien "notice" of the third country to which he may be removed, and an "opportunity" to express a fear as removal. *Ibid*. The March Guidance does just that. It clarifies how the Executive Branch is now implementing that policy— providing an adequate amount of notice to merely raise a fear of torture where a country-specific assurance does not moot the issue, and allowing for removal after a reasonable opportunity to persuade the Executive that any asserted fear is well-founded. That Guidance is plainly lawful, and exceedingly overdue. Nothing in the public interest is served by the district court's injunction. By contrast, the public interest will suffer so long as the Executive is forced to labor under the injunction's revised policy, and immigration enforcement is hampered under that court's super-intendence.

\* \* \* \* \*

For the foregoing reasons and those stated in the government's application, this Court should stay the district court's injunction.

Respectfully submitted.

D. JOHN SAUER
*Solicitor General*

JUNE 2025