**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

REFUGEE AND IMMIGRANT CENTER
FOR EDUCATION AND LEGAL
SERVICES, *et al.*,

        *Plaintiffs*,

   v.

KRISTI NOEM, *Secretary of Homeland
Security, in her official capacity*, *et al.*,

        *Defendants*.

Civil Action No. 25-306 (RDM)

## <u>MEMORANDUM OPINION</u>

On January 20, 2025, the President issued a proclamation declaring that "the current situation at the southern border qualifies as an invasion" because "the sheer number of aliens entering the United States has overwhelmed the system" and is "prevent[ing] the Federal Government from obtaining operational control of the border."  Proclamation 10888, Guaranteeing the States Protection Against Invasion, 90 Fed. Reg. 8333, 8334–35 (Jan. 20, 2025) (the "Proclamation").  The Proclamation, in effect, prevents anyone who crosses the southern border of the United States at any place other than a designated port of entry, as well as anyone who enters anywhere else (including at a designated port of entry) without a visa or without extensive medical information, criminal history records, and other background records, from applying for asylum or withholding of removal.  On Defendants' telling, this dramatic step was necessary to restore order to an immigration system that has become overrun by those who enter the United States without authorization and then seek to stay here by applying for asylum or withholding of removal.  On Plaintiffs' telling, in contrast, the Proclamation and

implementing guidance ignore the governing statutes and regulations and purport to rely on statutory and constitutional provisions that neither contemplate nor permit such a wholesale rewriting of the Nation's immigration laws.

The Proclamation contains five operative sections, all of which—along with the Department of Homeland Security's implementing guidance—are at issue in this case:

The first and second sections operate together. The first "direct[s] that entry into the United States" on or after January 20, 2025, of "aliens engaged in the invasion across the southern border" is "suspended until [the President] issue[s] a finding that the invasion . . . has ceased." Proclamation, § 1. The implementing guidance clarifies that this group includes aliens who enter the United States "between the ports of entry on the southern land border." Dkt. 52-1 at 5. The second, in turn, restricts those individuals from invoking any provision of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*, "that would permit their continued presence in the United States, including but not limited to" the asylum statute, 8 U.S.C. § 1158. Proclamation, § 2. Sections 1 and 2 of the Proclamation are premised on two statutory sources of authority: 8 U.S.C. § 1182(f), which authorizes the President to suspend or to restrict entry into the United States of any class of aliens if he finds that their entry "would be detrimental to the interests of the United States," and 8 U.S.C. § 1185(a), which makes it "unlawful . . . for any alien to . . . enter the United States, except under such reasonable rules, regulations, and orders and subject to such limitations and exceptions as the President may prescribe."

The third section relies on the same two sources of statutory authority but cuts a broader geographic swath. It applies regardless of the point of entry, and it suspends "entry into the United States of" any alien who, after January 20, 2025, "fails, before entering the United States,

to provide Federal officials with sufficient medical information and reliable criminal history and background information" to permit the government to determine, among other things, whether the alien has "received vaccination against vaccine-preventable diseases," has a communicable disease or dangerous physical or mental disorder, is a drug abuser, has a disqualifying conviction, or poses a threat to national security or public safety, *see* 8 U.S.C. § 1182(a). Proclamation, § 3.  Like Section 2, Section 3 also directs immigration authorities to "restrict" these aliens from obtaining "access to provisions of the INA that would permit their continued presence in the United States, including, but not limited to," the right to apply for asylum.  *Id.*

The fourth section does not rely on any statutory authority but, rather, invokes Article II and Article IV, Section 4 of the Constitution.  Proclamation, § 4.  As relevant here, Article II vests "[t]he Executive Power" of the United States in the President, while Article IV, Section 4 guarantees that "[t]he United States . . . shall protect each [State in the Union] against Invasion." Relying on these constitutional provisions, the Proclamation "suspend[s] physical entry of any alien engaged in the invasion across the southern border of the United States" and "direct[s] the Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, to take appropriate actions . . . to achieve the objectives of" the Proclamation. Proclamation, § 4.

Finally, the fifth section directs "[t]he Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, [to] take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion across the southern border" after January 20, 2025.  Proclamation, § 5.  That provision relies on both the statutory and the constitutional authorities invoked in support of the preceding sections, and "delegate[s]" the President's

3

relevant constitutional authority to the Secretaries of Homeland Security and State and the Attorney General for purposes of effectuating the Proclamation. *Id.*

Plaintiffs are thirteen individuals—A.M., Z.A., T.A., A.T., N.S., D.G., B.R., M.A., G.A., F.A., K.A., Y.A., and E.G—and three nonprofit organizations—Refugee and Immigrant Center for Education and Legal Services ("RAICES"), Las Americas Immigrant Advocacy Center ("Las Americas"), and the Florence Immigrant & Refugee Rights Project ("Florence Project"). The thirteen individual plaintiffs, all of whom are or were subject to the Proclamation, have allegedly "suffered past persecution and/or fear future persecution on account of their race, religion, nationality, membership in a particular social group, or political opinion[s]," or have allegedly "suffered or fear torture." Dkt. 12 at 1. They allege that they have fled persecution in Afghanistan, Ecuador, Cuba, Egypt, Brazil, Turkey, and Peru. Dkt. 11 at 9–10 (Am. Compl. ¶¶ 12–19). Some of the individual plaintiffs (N.S., D.G., F.A., K.A., Y.A., and E.G.) have already been removed from the United States—or, as Defendants sometimes call it, "repatriated"—pursuant to the Proclamation, either to their own country or to third countries like Panama. *See* Dkt. 43-3 at 4–5 (Hollinder Decl. ¶¶ 6, 10); Dkt. 43-7 at 4, 6 (Huettl Decl. ¶¶ 8, 21). Other individual plaintiffs (A.M., Z.A., T.A., A.T., B.R., M.A., and G.A.) are still in the United States. *See* Dkt. 43-3 at 3 (Hollinder Decl. ¶ 4); Dkt. 43-7 at 4–5 (Huettl Decl. ¶¶ 10, 14, 16). The individual plaintiffs seek to proceed both individually and on behalf of a putative class of all others who "were, are, or will be subject to" the Proclamation. *Id.* at 27 (Am. Compl. ¶ 86). The three organizational plaintiffs provide legal services to individuals seeking asylum in the United States and other forms of relief from immigration proceedings. *Id.* at 6–8 (Am. Compl. ¶¶ 9–11).

The fifteen defendants include President Trump, along with three cabinet-level Departments (the Departments of Homeland Security, State, and Justice); three components of the Department of Homeland Security (Customs and Border Patrol ("CBP"), Immigration and Customs Enforcement ("ICE"), and United States Citizenship and Immigration Services ("USCIS")); and multiple agency officials sued in their official capacities (collectively, the "Agency Defendants").  Dkt. 11 at 11–13 (Am. Compl. ¶¶ 20–35).

Plaintiffs allege that the Proclamation and its implementation are unlawful and mark a dramatic break with decades of Executive Branch precedent.  Dkt. 11 at 4 (Am. Compl. ¶ 3). Among other things, they allege that the Proclamation and its implementation supplant the INA with a non-statutory immigration regime, which violates (1) the asylum statute, which gives aliens "physically present in the United States" the right to apply for asylum, "irrespective of such alien's status," 8 U.S.C. § 1158(a)(1); (2) the withholding of removal statute, which prohibits the Secretary of Homeland Security from "remov[ing] an alien to a country if the Attorney General [or the Secretary] decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1231(b)(3); (3) the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), which implements the United Nations Convention against Torture and Other Curel, Inhuman, or Degrading Treatment or Punishment ("Convention Against Torture" or "CAT"), 8 U.S.C. § 1231 note, and the Department of Justice and Department of Homeland Security regulations implementing FARRA, *see* 8 C.F.R. §§ 208.16, 1208.16, which require immigration officials to process applications for protection under CAT in a prescribed manner; and (4) the INA generally, which establishes the exclusive procedures for

determining whether and how to remove an alien from the United States.[1]  Dkt. 11 at 34–38 (Am. Compl. ¶¶ 128–31).

Most fundamentally, Plaintiffs posit that the authorities that Defendants invoke in support of the Proclamation and implementing guidance do not authorize Defendants' actions.  They challenge Defendants' reliance on 8 U.S.C. § 1182(f), which permits the President to "suspend" or "restrict[]" entry into the United States, and 8 U.S.C. § 1185(a), which makes it unlawful for aliens to enter the United States "except under such reasonable rules . . . as the President may prescribe," to justify the denial of "access to asylum and other forms of protection," Dkt. 11 at 41 (Am. Compl. ¶ 149).  They also allege that the Proclamation exceeds the President's authority under Article II of the Constitution and his authority, if any, under Article IV, Section 4.  *Id.* at 41–42 (Am. Compl. ¶¶ 155–56).  And they allege that the Proclamation and implementing guidance violate "fundamental separation-of-powers principles" by purporting to "override Congress's careful and longstanding decisions to provide protections for noncitizens fleeing danger."  *Id.* at 42 (Am. Compl. ¶¶ 158–60).

Finally, Plaintiffs assert a series of claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*., against the Agency Defendants, alleging that the implementing guidance is contrary to law, 5 U.S.C. § 706(2)(A).  Dkt. 11 at 38–39 (Am. Compl. ¶¶ 132–37).  Plaintiffs have also raised three APA claims that rely on the administrative record: two arbitrary-and-capricious claims and a claim that the guidance was adopted without observance of procedures required by law in violation of 5 U.S.C. § 706(2)(D).  *Id.* at 38–40

---

[1] The Amended Complaint also alleged that the Proclamation violates the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 8 U.S.C. § 1232(a)(5)(D), which provides specific protection to unaccompanied minors.  Relying on Defendants' representations that they are not applying the Proclamation to unaccompanied minors, however, Plaintiffs are not currently pursuing that claim.  Dkt. 52 at 25 n.7.

(Am. Compl. ¶¶ 132–43).  At the joint request of the parties, the Court is holding those claims in abeyance.  Min. Entry (Feb. 26, 2025).  But the Court, nonetheless, required Defendants to produce the complete administrative record, *see* Min. Entry (May 13, 2025), which they did on June 3, 2025, *see* Dkt. 68.

Before the Court are Plaintiffs' motion to certify a class, Dkt. 13; Plaintiffs' motion for a preliminary injunction, Dkt. 14; Plaintiffs' motion for summary judgment, Dkt. 51, which the Court consolidated with the motion for preliminary relief, *see* Min. Order (Feb. 26, 2025); and Defendants' cross-motion for summary judgment, Dkt. 44.  Given the time-sensitive nature of Plaintiffs' challenges to impending "repatriations" and removals, and given the difficult questions posed by Plaintiffs' request that the Court grant relief to those who have already been removed from the United States, the Court will address the claims of those Plaintiffs and putative class members who are currently in the United States in this decision and will, after providing an opportunity for further briefing, address the claims of those who have already been removed in a subsequent decision.

For the reasons that follow, the Court concludes that neither the INA nor the Constitution grants the President or the Agency Defendants authority to replace the comprehensive rules and procedures set forth in the INA and the governing regulations with an extra-statutory, extra-regulatory regime for repatriating or removing individuals from the United States, without an opportunity to apply for asylum or withholding of removal and without complying with the regulations governing CAT protection.  The Court recognizes that the Executive Branch faces enormous challenges in preventing and deterring unlawful entry into the United States and in adjudicating the overwhelming backlog of asylum claims of those who have entered the country. But the INA, by its terms, provides the sole and exclusive means for removing people already

present in the country, and, as the Department of Justice correctly concluded less than nine months ago, neither § 1182(f) nor § 1185(a) provides the President with the unilateral authority to limit the rights of aliens present in the United States to apply for asylum.  Nor can Article II's Vesting Clause or Article IV's Invasion Clause be read to grant the President or his delegees authority to adopt an alternative immigration system, which supplants the statutes that Congress has enacted and the regulations that the responsible agencies have promulgated.  As the Framers understood, "every breach of the fundamental laws," even when "dictated by necessity," undermines respect for the rule of law and "forms a precedent for other breaches where the same plea of necessity does not exist at all, or is less urgent or palpable."  *The Federalist No. 25*, at 167 (Alexander Hamilton) (Clinton Rossiter ed., 1961).  Here, nothing in the INA or the Constitution grants the President or his delegees the sweeping authority asserted in the Proclamation and implementing guidance.  An appeal to necessity cannot fill that void.

The Court will, accordingly, **GRANT** in part Plaintiffs' motion for summary judgment, Dkt. 51; will **GRANT** in part Plaintiffs' motion to certify a class, Dkt. 13, and will **DEFER** ruling on the remaining portions of the parties' cross-motions.  The Court will also **DIRECT** that the parties submit a joint status report proposing a schedule for further briefing on whether the Court can and should grant relief to those Plaintiffs and putative class members who are no longer present in the United States.

**TABLE OF CONTENTS**

I. BACKGROUND ............................................................................................................. 10

  A.  Statutory and Regulatory Background .................................................................. 10

    1.  Admissibility and Inadmissibility ................................................................. 10

    2.  Statutory Protections: Asylum, Withholding of Removal, and CAT Protection .......... 12

    3.  Formal and Expedited Removal Procedures ................................................. 16

  B.  Prior Administrative Actions ................................................................................ 19

  C.  Challenged Actions .............................................................................................. 26

    1.  The Proclamation ........................................................................................... 27

    2.  Implementing Guidance ................................................................................. 28

II. LEGAL STANDARD ................................................................................................... 37

III. ANALYSIS .................................................................................................................. 38

  A.  Threshold Issues ................................................................................................... 38

    1.  Article III Standing ........................................................................................ 38

    2.  Statutory Jurisdiction .................................................................................... 56

    3.  Causes of Action ............................................................................................ 61

  B.  Merits .................................................................................................................... 70

    1.  "212(f) Direct Repatriation" and "212(f) Expedited Removal" .................... 72

    2.  Suspension of Asylum ................................................................................... 89

    3.  Suspension of Withholding of Removal ....................................................... 98

    4.  Extra-Regulatory CAT Protection Procedures ............................................. 100

  C.  Class Certification ................................................................................................ 103

    1.  Rule 23(a) ...................................................................................................... 105

    2.  Rule 23(b)(2) ................................................................................................. 112

  D.  Remedy ................................................................................................................. 113

    1.  Vacatur .......................................................................................................... 114

    2.  Declaratory Judgment ................................................................................... 117

    3.  Injunction ...................................................................................................... 117

  E.  Request for Stay Pending Appeal ........................................................................ 125

CONCLUSION ................................................................................................................. 128

# I. BACKGROUND

## A.    Statutory and Regulatory Background

The INA sets out a comprehensive scheme that governs entry and removal of aliens from the United States.  Among other things, it specifies which aliens may lawfully enter the United States, *see, e.g.*, 8 U.S.C. §§ 1181, 1184; which aliens are inadmissible, *see, e.g.*, *id.* § 1182; which previously admitted aliens are subject to removal, *see, e.g.*, *id.* § 1227; what protections aliens can claim, *see, e.g.*, *id.* §§ 1158, 1231; and the procedures for removing aliens, *see, e.g.*, *id.* §§ 1225(b)(1), 1229a.

### 1.    *Admissibility and Inadmissibility*

The INA sets forth criteria for determining whether an alien seeking admission is admissible or inadmissible.  Under the INA, no "immigrant"—other than a refugee admitted at the discretion of the Attorney General and certain returning resident immigrants, *see* 8 U.S.C. § 1181(c)—may be admitted into the United States "unless at the time of application for admission he" or she "has a valid unexpired immigrant visa."  *Id.* § 1181(a).  Congress has also specified "[c]lasses of aliens" who are "inadmissible"—*i.e.*, those who are ineligible to receive a visa and ineligible for admission into the United States.  *Id.* § 1182.  An alien is inadmissible, for example, if he or she is "determined . . . to have a communicable disease of public health significance" or fails "to present documentation of having received" specified vaccinations, *id.* § 1182(a)(1) ("Health-Related Grounds"); if he or she has been convicted of "a crime involving moral turpitude," has been convicted of two or more non-political offenses with an aggregate sentence of five years or more, or has "been an illicit trafficker in any controlled substance," *id.* § 1182(a)(2) ("Criminal and Related Grounds"); or if a consular officer has reasonable grounds to believe that he or she is entering the United States to engage in espionage or sabotage or terrorist activity, or "the Secretary of State has reasonable ground[s] to believe" permitting his or

her entry "would have potentially serious adverse foreign policy consequences for the United

States," *id.* § 1182(a)(3) ("Security and Related Grounds").  "An alien present in the United

States without being admitted or paroled, or who arrives in the United States at any time or place

other than as designated by the Attorney General" is also "inadmissible," *id.* § 1182(a)(6), but is

deemed "an applicant for admission," *id.* § 1225(a).

Aliens are also inadmissible if they were previously ordered removed or if they were

previously unlawfully present in the United States for an extended period.  With certain

exceptions, an alien who has previously been ordered removed is inadmissible for five years

after the date of removal if he or she was removed upon arrival or by means of expedited

removal, or ten years after removal otherwise.  *Id.* § 1182(a)(9)(A).  If an alien has been ordered

removed twice or has been convicted of an aggravated felony, that bar increases to 20 years.  *Id.*

Moreover, even if an alien voluntarily departs from the United States, he or she is deemed

"inadmissible" for three years if he or she was "unlawfully present . . . for a period of more than

180 days but less than 1 year," and he or she is deemed inadmissible for ten years if he or she

was unlawfully present for a year or longer.  *Id.* § 1182(a)(9)(B)(i).  But, notably, "[n]o period of

time in which an alien has a bona fide application for asylum pending under section 1158 . . .

shall be taken into account in determining the period of unlawful presence in the United States"

for purposes of this latter provision.  *Id.* § 1182(a)(9)(B)(iii).

In addition to the statutory limitations, "Congress has also delegated to the President

authority to suspend or restrict the entry of aliens in certain circumstances."  *Trump v. Hawaii*,

585 U.S. 667, 683 (2018).  "The principal source of that authority, § 1182(f), enables the

President to 'suspend the entry of all aliens or any class of aliens' whenever he 'finds' that their

entry 'would be detrimental to the interests of the United States.'"  *Id.* (quoting 8 U.S.C.

§ 1182(f)). This provision "entrusts to the President the decisions whether and when to suspend entry . . . and on what conditions." *Id.* at 684. A second source of that authority, § 1185(a)(1), "'substantially overlaps' with § 1182(f)." *Id.* at 683 n.1 (alteration omitted). It provides that, "[u]nless otherwise ordered by the President, it shall be unlawful . . . for any alien to . . . enter . . . the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1).

Inevitably, some aliens gain entry to the United States without being lawfully admitted. Aliens who enter without being admitted are usually "remov[able]" upon the order of "an immigration officer," *id.* § 1225(b)(1)(A), or an immigration judge, *id.* § 1229a. Several statutory provisions, however, allow otherwise removable aliens to remain in the United States or restrict the countries to which those aliens may be removed. Three of these types of relief are relevant for present purposes: asylum, withholding of removal, and Convention Against Torture—or CAT—protection.

2.    *Statutory Protections*: *Asylum, Withholding of Removal, and CAT Protection*

Asylum is the most protective of these types of relief. The INA authorizes the Attorney General and Secretary of Homeland Security ("Secretary") to grant asylum to any "alien who has applied for asylum in accordance with the requirements and procedures established by the" Attorney General or Secretary if "such alien is a refugee within the meaning of" the INA. 8 U.S.C. § 1158(b)(1)(A); *see also id.* § 1103(a)(1) & (3). An alien qualifies as a "refugee" for purposes of the INA if he or she is "unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of" his or her country of nationality (or, in the case of a person with no nationality, his or her most recent country of residence) "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42). Asylum creates a path to lawful

permanent resident status and citizenship and confers other benefits, including the right to work in the United States and to receive certain forms of financial assistance from the federal government. *See id.* § 1158(c); *see also* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934, 55936 (Nov. 9, 2018).

Asylum applications are governed by the INA and its implementing regulations. Under the INA, any alien "physically present" or "who arrives in the United States" "may apply for asylum," regardless of "whether or not" the alien arrived "at a designated port of arrival" and "irrespective of such alien's status." 8 U.S.C. § 1158(a). There are, however, exceptions to this "general" rule. *Id.* An alien may not apply for asylum, for example, (1) "if the Attorney General [or Secretary] determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality . . .) in which the alien's life or freedom would not be threatened," *id.* § 1158(a)(2)(A); (2) if the alien cannot "demonstrate[] by clear and convincing evidence" that he or she filed his or her asylum application within one year after arriving in the United States, subject to certain exceptions, *id.* § 1158(a)(2)(B); or (3) if the alien, again subject to certain exceptions, "previously applied for asylum and had such application denied," *id.* § 1158(a)(2)(C). The INA requires the Attorney General and the Secretary to "establish a procedure for consideration of asylum applications" and requires immigration officials to "advise the alien of the privilege of being represented by counsel and of the consequences . . . of knowingly filing a frivolous asylum application." *Id.* § 1158(d)(1) & (4); *see also id.* § 1103(a)(3). Aliens may apply for asylum affirmatively or defensively. Aliens who are not in any kind of removal proceeding may file an affirmative application for asylum. *See id.* § 1158(a)(1); 8 C.F.R. § 208.1(a)(1). In contrast, aliens who are

subject to regular removal proceedings under 8 U.S.C. § 1229a or expedited removal

proceedings under 8 U.S.C. § 1225(b)(1) may file an asylum application as a defense to removal,

*see* 8 U.S.C. § 1229a(c)(4); 8 C.F.R. § 208.2(b); 8 U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R.

§ 208.30(f).

The Attorney General and the Secretary are tasked with determining whether an alien

qualifies for asylum, and their authority to grant or to deny asylum is, for the most part,

discretionary.  *See* 8 U.S.C. § 1158(b)(1)(A).  There are, however, certain statutory limitations

on their discretion to grant asylum.  *See id.* § 1158(b)(2).  Neither the Attorney General nor the

Secretary may, for example, grant asylum to an alien who "participated in the persecution of any

person," who has "been convicted by a final judgment of a particularly serious crime," or who

poses "a danger to the security of the United States."  *Id*. § 1158(b)(2)(A)(i)–(ii), (iv).  In

addition to those statutory limitations, the INA authorizes the Attorney General and Secretary to

issue regulations "establish[ing] additional limitations and conditions, consistent with [8 U.S.C.

§ 1158,] under which an alien shall be ineligible for asylum."  *Id.* § 1158(b)(2)(C); *see also id*.

§ 1103(a)(3); 6 U.S.C. § 202.  The existing regulatory limitations are set forth at 8 C.F.R.

§§ 208.13(c) and 208.35(a).

An alien who is ineligible for asylum or who is denied asylum may still apply for

withholding of removal and CAT protection.  An alien is eligible for withholding of removal if

he or she can show "that it is more likely than not that he or she would be persecuted on account

of" a protected ground if removed from the United States.  8 C.F.R. § 1208.16(b)(2); *see also* 8

U.S.C. § 1231(b)(3).  Withholding of removal, accordingly, requires a more substantial showing

than the "well-founded fear of persecution" standard applicable in asylum cases.  *See Kouljinski*

*v. Keisler*, 505 F.3d 534, 544 (6th Cir. 2007).  Unlike asylum, however, withholding of removal

is not discretionary; the INA "*requires* the Attorney General [or the Secretary of Homeland Security] to withhold deportation of an alien who demonstrates that his 'life or freedom would be threatened' on account of one of [a list of factors] if he is deported." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987) (emphasis added); *see also* 8 U.S.C. § 1231(b)(3) ("[T]he Attorney General *may not* remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.") (emphasis added).  Although withholding is thus mandatory, the relief that it provides is more circumscribed than asylum; withholding does not preclude the government from removing the alien to a third country where the alien would not face persecution, does not establish a pathway to lawful permanent resident status and citizenship, and does not afford derivative protection for the alien's family members. *See* 83 Fed. Reg. at 55939.

The Convention Against Torture, as implemented in the United States, provides another avenue of protection for aliens facing removal.  It is the "policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States."  8 U.S.C. § 1231 note (United States Policy with Respect to Involuntary Return of Persons in Danger of Subjection to Torture).  Congress has implemented this policy by instructing "the heads of the appropriate agencies" to prescribe regulations to effectuate Article 3 of the United Nations Convention Against Torture.  *See id.*  Under the existing implementing regulations, an alien may establish entitlement to CAT protection by demonstrating "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R.

§ 208.16(c)(2).  Like withholding of removal, CAT protection does not preclude the government

from removing the alien to a third country where he or she would not be tortured.

       3.     *Formal and Expedited Removal Procedures*

      Before 1996, "an individual in the United States without proper documentation could be

considered 'deportable,' 8 U.S.C. § 1251(a) (1995), if, among other things, that person had

'entered the United States without inspection or at any time or place other than as designated by

the Attorney General[,]' *see id*. § 1251(a)(1)(B) (1995)."  *Make The Road New York v. Wolf*, 962

F.3d 612, 618 (D.C. Cir. 2020).  Deportation proceedings involved "a hearing before a special

inquiry officer [at] which the individual had the right to be represented, to examine the

government's evidence, and to present evidence on his or her behalf," and "[a]n officer's

determination that an individual was deportable was subject to judicial review."  *Id.*  Since

enactment of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"),

Pub. L. No. 104-208, 110 Stat. 3009-546 (1996), in 1996, however, removal proceedings have

followed two alternative routes, the second of which requires far less process.

      Under the first route, which follows the pre-IIRIRA approach, "formal" or "regular"

removal proceedings are conducted before an immigration judge within the Department of

Justice's Executive Office of Immigration Review ("EOIR").  *See* 8 U.S.C. § 1229a.  Under this

route, the alien is entitled to various procedural guarantees, including the rights to written notice

of the charge of removability, to counsel of the alien's choice (at no expense to the government),

to appear at a hearing before an immigration judge and to examine and to present evidence, to

appeal an adverse decision to the Board of Immigration Appeals ("BIA"), and to seek judicial

review.  *Id.* §§ 1229(a)(1), 1229a(b)(4), 1229a(c)(5), 1252(a); 8 C.F.R. §§ 1003.1(b),

1240.11(a)(2), 1240.15.  An alien placed in formal removal proceedings may avoid removal by

establishing, through this adversarial process, that he or she is eligible for asylum, withholding of removal, CAT protection, or some other form of relief. *See* 8 U.S.C. § 1229a(c)(4).

The second type of proceedings, known as "expedited removal," affords considerably less process to a subset of aliens. The INA mandates the use of expedited removal for aliens who are arriving in the United States without valid entry documents. *See id.* § 1225(b)(1)(A)(i). It also authorizes the use of expedited removal for aliens who have "not been admitted or paroled into the United States, and who ha[ve] not affirmatively shown, to the satisfaction of an immigration officer, that [they have] been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." *Id.* § 1225(b)(1)(A)(iii). With respect to the second category, however, the Secretary has "sole and unreviewable discretion" to apply expedited removal to some, none, or all of the aliens in that group. *Id.* Initially, the Secretary only applied expedited removal to aliens "arriving" at a point of entry or "'interdicted in international or United States waters and brought into the United States.'" *Make The Road New York*, 962 F.3d at 619–20 (citation omitted). Currently, however, the Secretary uses expedited removal to the maximum extent permitted by the statute—that is, for anyone who was not admitted or paroled into the United States and who cannot satisfy the two-year physical presence requirement, regardless of whether that person is found at the border or anywhere else in the United States.[2]

---

[2]  In 2002, the Commissioner of the Immigration and Naturalization Service ("INS") expanded the subclass of those eligible for expedited removal to include "all aliens who arrive in the United States by sea, either by boat or other means, who are not admitted or paroled, and who have not been physically present in the United States continuously for the two-year period prior to a determination of inadmissibility by a[n] [INS] officer." Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924, 68925 (Nov. 13, 2002). In 2004, the Secretary of Homeland Security expanded the subclass once again, this time reaching inadmissible aliens "who [were] physically

Under expedited removal procedures, the Secretary may remove an alien from the United States "without further hearing or review[,] unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution" supporting a claim to withholding of removal or CAT protection. 8 U.S.C. § 1225(b)(1)(A)(i). If "the alien indicates either an intention to apply for asylum . . . or a fear of persecution, the [immigration] officer [is required to] refer the alien for an interview by an asylum officer," who must determine whether the alien has a credible "fear of persecution." *Id.* § 1225(b)(1)(A)(ii). For purposes of the asylum officer's assessment, a credible fear of persecution means "that there is a significant possibility . . . that the alien could establish eligibility for asylum." *Id.* § 1225(b)(1)(B)(v).[3] If the asylum

───────────────

present in the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, who are encountered by an immigration officer within 100 air miles of any U.S. international land border, and who ha[d] not established to the satisfaction of an immigration officer that they ha[d] been physically present in the U.S. continuously for the 14-day period immediately prior to the date of encounter." Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877, 48880 (Aug. 11, 2004).

That designation applied until 2019, when the Secretary expressed his intent to "exercise the full remaining scope of its statutory authority" to apply expedited removal procedures to all aliens determined inadmissible under 8 U.S.C. § 1182(a)(6)(C) or 8 U.S.C. § 1182(a)(7). *See* Designating Aliens for Expedited Removal, 84 Fed. Reg. 35409, 35409 (Jul. 23, 2019). That designation remained in place until March 2022, when the Secretary returned to the pre-2019 designation. *See* Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 Fed. Reg. 16022 (Mar. 21, 2022). Finally, on January 24, 2025, the Acting Secretary rescinded the rescission to again "apply expedited removal to the fullest extent authorized by statute." Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025).

[3] The standard for establishing a "credible fear" is lower than the standard for obtaining asylum itself. The Supreme Court has indicated that to prevail on an asylum claim, applicants must establish that there is roughly a 10% chance that they will be persecuted on account of a protected ground if they are returned to their country of origin. *See Cardoza-Fonseca*, 480 U.S. at 431–32, 440. In contrast, to prevail at the initial credible fear interview, applicants usually need only show "a significant possibility" that they could establish eligibility for asylum, withholding of removal, or CAT protection. 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30(e)(2). There is one exception: a 2024 rule created a separate credible fear regime for most aliens who enter the southern border during periods when border crossings are high, which

officer determines that the alien has a credible fear, "the alien [is] detained for further

consideration of the application for asylum," *id.* § 1225(b)(1)(B)(ii), and is typically placed in

formal removal proceedings.  If, on the other hand, the asylum officer determines that the alien

does not have a credible fear of persecution, "the officer shall order the alien removed from the

United States without further hearing or review."  *Id.* § 1225(b)(1)(B)(iii)(I).

## B.  Prior Administrative Actions

The Proclamation at issue in this case is not the first executive action adopted to restrict

access to asylum for those crossing the southern border, although the two most analogous actions

differ from the present approach in important respects.

In 2018, President Trump issued a proclamation that, like the Proclamation at issue here,

relied on § 1182(f) and § 1185(a) to declare that "[t]he entry of any alien into the United States

across the international boundary between the United States and Mexico," at any point other than

a designated port of entry, "is hereby suspended and limited" for a period of ninety days or until

"an agreement permits the United States to remove aliens to Mexico" pursuant to 8 U.S.C.

§ 1158(a)(2)(A).[4]  Proclamation 9822, Addressing Mass Migration Through the Southern Border

of the United States, 83 Fed. Reg. 57661, 57663 (Nov. 15, 2018) ("2018 Proclamation").  The

2018 Proclamation was unlike the Proclamation at issue today, however, in two respects.  First, it

expressly reserved the right of any alien to be "considered for withholding of removal."  *Id.*

---

requires aliens to demonstrate a "reasonable probability" that they will be persecuted.  *See* Securing the Border, 89 Fed. Reg. 81156, 81168 (Oct. 7, 2024); *see also infra* at 22–26.  That component of the rule was recently upheld.  *See Las Americas Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec.*, ___ F. Supp. 3d ___, 2025 WL 1403811, at *19 (D.D.C. May 9, 2025).

[4] 8 U.S.C. § 1158(a)(2)(A) provides that an alien may not apply for asylum in the United States "if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality . . .) in which the alien's life or freedom would not be threatened."

Second, it did not purport to have any stand-alone effect.  It was, of course, already unlawful to enter the United States outside of a designated port of entry, and so the suspension of entry alone had no separate legal effect on the status of any of the aliens it covered.  8 U.S.C. § 1325(a).  The 2018 Proclamation was given teeth only through an interim final rule promulgated by the Attorney General and the Secretary the same day the President issued the proclamation.

Relying on their authority under 8 U.S.C. § 1158(b)(2)(C) to "establish additional limitations and conditions, consistent with [8 U.S.C. § 1158], under which an alien shall be ineligible for asylum," the Attorney General and Secretary amended the governing regulations to add the following:

> *Additional limitation on eligibility for asylum*.  For applications filed after November 9, 2018, an alien shall be ineligible for asylum if the alien is subject to a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico that is issued pursuant to subsection 212(f) or 215(a)(1) of the Act on or after November 9, 2018 and the alien enters the United States after the effective date of the proclamation or order contrary to the terms of the proclamation or order.  This limitation on eligibility does not apply if the proclamation or order expressly provides that it does not affect eligibility for asylum, or expressly provides for a waiver or exception that makes the suspension or limitation inapplicable to the alien.

8 C.F.R. § 208.13(c)(3) (2018); *see also* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934, 55935 (Nov. 9, 2018) (the "2018 Rule").  The 2018 Rule also amended the regulation governing credible fear determinations in expedited removal proceedings, 8 C.F.R. § 208.30, by directing asylum officers to make a "negative credible fear determination" if the alien was in the class of aliens that the rule rendered ineligible for asylum.  *Id*. § 208.30(e)(5) (2018).  Thus, operating in conjunction, the 2018 Proclamation and the joint Department of Justice–Department of Homeland Security rule barred anyone who unlawfully entered the United States across the

20

southern border after November 9, 2018, from obtaining asylum, but continued to allow qualified applicants to obtain withholding of removal.

The 2018 Rule was short lived.  Ten days after the rule was promulgated, a district court issued a temporary restraining order barring its implementation, *see E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838 (N.D. Cal. 2018); that court subsequently issued a preliminary injunction further barring implementation, *see E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094 (N.D. Cal. 2018); and the Court of Appeals for the Ninth Circuit affirmed that decision, *see E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242 (9th Cir. 2020), as modified by *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021).

While the Ninth Circuit litigation addressed the plaintiffs' motion for preliminary relief, this Court considered the lawfulness of the 2018 Rule on the merits in *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019).  After extensive briefing and oral argument, the Court concluded that the interim final rule was unlawful, and it, accordingly, vacated the rule.  *Id.* at 147–54.  As the Court explained, § 1158(b)(2)(C) permits the Attorney General and Secretary to "establish additional limitations and conditions" of eligibility for asylum, but only to the extent those limitations are "consistent with" § 1158.  *Id.* at 148.  Section 1158, in turn, provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .), irrespective of such alien's status, *may apply* for asylum."  8 U.S.C. § 1158(a)(1) (emphasis added).  The parties agreed, moreover, "that a regulation barring all aliens who enter the United States from Mexico outside a designated port of entry from *applying* for asylum would be 'inconsistent with' § 1158(a)(1) and, thus, *ultra vires*."  404 F. Supp. 3d at 148.  The only question, then, was whether the rule could survive scrutiny merely because it made all aliens entering from Mexico outside a port of entry *ineligible*

for asylum, rather than barring those individuals from *applying*.  As the Court explained,
common usage, the manner in which asylum claims are considered, and other immigration
regulations made clear that, at least in the relevant context, there was no meaningful difference
between a rule barring the covered aliens from applying for asylum and a rule treating them as
ineligible.  *Id.* at 148–50.  Finally, the Court observed:

> Even assuming that the phrases "may not apply" and "are ineligible" reflect
> some subtle distinction in meaning, the relevant question is not whether the Rule
> uses the exact same words as in the statutory prohibition.  The question, instead,
> is whether the Rule is "consistent with," 8 U.S.C. § 1158(b)(2)(C), the statutory
> mandate that any alien present in the United States "may apply for asylum,"
> regardless of "whether or not" the alien entered the United States "at a
> designated port of arrival," 8 U.S.C. § 1158(a)(1).  Defendants do not even
> attempt to satisfy that test, nor could they.

*Id.* at 149.  Although Defendants initially appealed the Court's decision in *O.A.*, the parties later
agreed to dismiss the appeal.  *See O.A. v. Biden*, 2023 WL 7228024 (D.C. Cir. Nov. 1, 2023).

That is how things stood until June 2024, when President Biden issued a proclamation,
which, like the 2018 Proclamation, invoked § 1182(f) and § 1185(a) to suspend and limit entry of
certain aliens across the southern border.  Proclamation 10773, Securing the Border, 89 Fed.
Reg. 48487 (June 7, 2024) (the "2024 Proclamation").  Unlike the 2018 Proclamation, however,
this proclamation was keyed to the average number of aliens (over a period of 7 consecutive
calendar days, which was later extended to 28 consecutive days) who were either physically
apprehended by U.S. immigration authorities at or near the border within 14 days of their entry
between ports of entry or determined to be inadmissible at a southwest border of entry.  2024
Proclamation, 89 Fed. Reg. at 48491–92, §§ 2, 4; *see also* Proclamation 10817, Amending
Proclamation 10773, 89 Fed. Reg. 80351, 80352 (Oct. 2, 2024).  When the number of
"encounters" fell below a designated number, the suspension was discontinued after a 14-day

waiting period, but it would be reinstated if the 7-consecutive-day average reached a designated number.  2024 Proclamation, 89 Fed. Reg. at 48491, § 2.

Like the 2018 Proclamation, the 2024 Proclamation was given operative effect through an interim final—and, later, a final—rule promulgated by the Attorney General and the Secretary.  And like the 2018 Rule, the 2024 interim final rule, *see* Securing the Border, 89 Fed. Reg. 48710 (June 7, 2024), and the 2024 final rule, *see* Securing the Border, 89 Fed. Reg. 81156 (Oct. 7, 2024) (together, "2024 Rule"), were premised on the Attorney General and Secretary's authority to promulgate regulations "establish[ing] additional limitations and conditions, consistent with [8 U.S.C. § 1158], under which an alien shall be ineligible for asylum," 8 U.S.C. § 1158(b)(2)(C).  Under both versions of the 2024 Rule, when a suspension of entry is in effect—referred to as "emergency border circumstances"—a covered alien who enters the United States across the southern border is ineligible for asylum, except under "exceptionally compelling circumstances."  8 C.F.R. § 208.35(a); 2024 Rule, 89 Fed. Reg. at 81164; *see also* 2024 Proclamation, § 3(b) (defining covered aliens and excluding, for example, visa holders, members of the U.S. Armed Forces, and permanent resident aliens).  "Exceptionally compelling circumstances," include, for example, those facing "an acute medical emergency," facing "an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder," or who satisfy the definition of a "victim of a severe form of trafficking in persons" under 8 U.S.C. § 214.201.  8 C.F.R. § 208.35(a)(2).  Beyond this change in asylum eligibility, the 2024 Rule made a host of additional changes that would apply during "emergency border circumstances."  Asylum officers would no longer ask specific fear questions to elicit whether an alien might have a credible fear and, instead, would refer aliens for a credible fear interview only if they affirmatively manifested fear.  89 Fed. Reg. at 81168, 81232–45.  In

addition, the screening standard in credible-fear interviews was increased from "significant possibility" to "reasonable probability."  *Id.* at 81245–50.

In adopting this rule, the Attorney General and Secretary acknowledged certain limitations contained in the relevant statutory authorities.  First and foremost, they observed that "the [2024] Proclamation itself does not and cannot affect noncitizens' right to apply for asylum, their eligibility for asylum, or asylum procedures."  *Id.* at 81163.  As they explained, this "recognition that" 8 U.S.C. § 1182(f) does not authorize the President to "affect the right to pursue a claim for asylum has been the Executive Branch's consistent position for four decades." *Id.*  Rather, as the Attorney General and Secretary further explained, although the President's authority under § 1182(f) is broad, it operates only "within its 'sphere,'" *id.* (quoting *Trump v. Hawaii*, 585 U.S. at 683–84), and it "does not authorize the President to override the asylum statute," *id.*  That is because § 1182(f) delegates authority to the President to "'supplement the other grounds of inadmissibility in the INA,'" *id.* (quoting *Trump v. Hawaii*, 585 U.S. at 684)— that is, to specify who may "enter" the United States.  In contrast, "[t]he right to apply for asylum" contained in 8 U.S.C. § 1158(a) "turns on whether a noncitizen is 'physically present' or has 'arrive[d] in the United States," *id.* at 81164 (quoting 8 U.S.C. § 1158(a)(1)).  "As a result, the power under [§ 1182(f)] to suspend 'entry' does not authorize the President to override the asylum rights of noncitizens who have already physically entered the United States."  *Id.*

Second, the Attorney General and Secretary recognized that their statutory authority to set "additional limitations and conditions" on eligibility for asylum pursuant to § 1158(b)(2)(C) does not extend to withholding of removal (or CAT protection).  Although the 2024 Rule modified certain procedures relating to withholding of removal, the Attorney General and Secretary stressed that the "rule's limitation on asylum eligibility does not affect a noncitizen's

ultimate eligibility for statutory withholding of removal" under § 1231(b)(3).  89 Fed. Reg. at

81253.

Finally, while reserving their objections to the decision, the Attorney General and

Secretary recognized that the Ninth Circuit had concluded that the 2018 Rule was invalid

because any regulation adding limitations to asylum eligibility that do not appear in the statute

must be "consistent with" the statute, 8 U.S.C. § 1158(b)(2)(C), and the statute permits "[a]ny

alien who is physically present in the United States" to apply for asylum, "whether or not" the

alien entered at "a designated port of arrival" and "irrespective of such alien's status," 8 U.S.C.

§ 1158(a)(1).  *See* 89 Fed. Reg. at 48735 (citing *E. Bay*, 993 F.3d. at 670).  The 2024 Rule sought

to distinguish *East Bay* on the ground that the 2024 Proclamation and 2024 Rule "differ

significantly from the prior categorical bar on 'manner of entry' because they do not treat the

manner of entry as dispositive in determining eligibility."  *Id.*  Rather, the limitation contained in

the 2024 Rule applied only "during emergency border circumstances" and, even then, the rule

provided asylum officers and immigration judges with authority "to except noncitizens from the

rule's asylum limitation where the noncitizens establish that an exceptionally compelling

circumstance exists."  *Id.*  As a result, the Attorney General and Secretary took the position that:

> The [2024 Rule] is within the scope of the Departments' authority and does not
> conflict with the statutory requirement that noncitizens "physically present in
> the United States" be permitted to apply for asylum because it adds a limitation
> on asylum eligibility as permitted under . . . 8 U.S.C. 1158(b)(2)(C) and
> (d)(5)(B).  The limitation is not a sweeping categorical bar that would preclude
> a grant of asylum solely based on manner of entry, which some courts have
> found to conflict with . . . 8 U.S.C. 1158(a)(1).  *E.g.*, *East Bay Sanctuary
> Covenant v. Biden* (*East Bay III*), 993 F.3d 640, 669–70 (9th Cir. 2021)
> (concluding that a prior regulation that enacted a bar on asylum eligibility for
> those who entered the United States between designated POEs was "effectively
> a categorical ban" on migrants based on their method of entering the United
> States, in conflict with . . . 8 U.S.C. 1158(a)(1)).

89 Fed. Reg. at 81169–70.

In May 2025, this Court (Contreras, J.) struck down portions of the 2024 Rule.  *See Las Americas Immigrant Advoc. Center v. U.S. Dep't of Homeland Sec.*, __ F. Supp. 3d __, 2025 WL 1403811 (D.D.C. May 9, 2025).  First, the Court held that the rule's "limitation on asylum eligibility" for aliens who arrive in the United States outside a port of entry "exceed[ed] the authority that Congress conferred on the Secretary of Homeland Security to 'establish additional limitations and conditions' on asylum that are 'consistent with' section 1158 of the INA" because "place-of-entry-based bans" are inconsistent with § 1158's instruction that "asylum is available 'whether or not' a noncitizen arrives 'at a designated port of entry.'"  *Id.* at *14–15 (quoting 8 U.S.C. § 1158).  Second, the Court held that the Secretary's decision to no longer ask specific fear questions and, instead, to refer aliens for a credible fear interview only if they manifested fear was arbitrary and capricious because it "risk[ed] different results for identically situated" aliens.  *Id.* at *15.  It therefore struck down that portion of the regulation as well.  The Court, however, upheld the 2024 Rule's change to the screening standard in credible-fear interviews—the shift from a "significant possibility" to a "reasonable probability" standard—because the Secretary had "reasonably explained why changed circumstances" justified the heightened standard.  *Id.* at *18.

## C.    Challenged Actions

The challenged actions in this case differ from the 2018 and 2024 Proclamations and Rules in several significant respects.  Most notably, unlike the 2018 and 2024 Rules, which relied on the statutory delegation to the Attorney General and the Secretary of authority to establish, "by regulation," "additional limitations and conditions" on *eligibility for asylum*, 8 U.S.C. § 1158(b)(2)(C), the Proclamation at issue here relies exclusively on the President's statutory authority to suspend or restrict *entry into the United States*, 8 U.S.C. §§ 1182(f), 1185(a)(1), and his constitutional authority.  Moreover, rather than engage in a rulemaking, the

Secretary has implemented the Proclamation at issue here through informal guidance, consisting primarily of purely internal email communications with agency personnel.

      1.    *The Proclamation*

After describing the difficulties posed by the "ongoing influx" of millions of aliens across the southern border of the United States," the Proclamation contains five operative sections. Proclamation, 90 Fed. Reg. 8333–36. The first two sections apply to aliens who are "engaged in the invasion across the southern border." Proclamation, §§ 1–2. The first, entitled "Suspension of Entry," proclaims that "the entry into the United States on or after the date of this order of aliens engaged in the invasion across the southern border is detrimental to the interest of the United States" and invokes § 1182(f) to "direct that entry into the United States of such aliens be suspended" until the President issues an order declaring the invasion over. Proclamation, § 1. The second section then directs that "aliens engaged in the invasion . . . are restricted from invoking provisions of the INA that would permit their continued presence in the United States," including the right to apply for asylum under 8 U.S.C. § 1158(a). Proclamation, § 2.

The third section imposes similar restrictions for "any alien who fails, before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements" in 8 U.S.C. § 1182(a)(1)–(3), which, as described above, impose a series of limitations on admissibility on "health-related grounds," "criminal and related grounds," and "security and related grounds." Proclamation, § 3; *see also* 8 U.S.C. § 1182(a) & (1)–(3). The Proclamation declares that entry of these individuals into the United States "is detrimental to the interests of the United States" and, once again invoking § 1182(f) and § 1185(a), it "direct[s] that entry into the United States of such aliens be suspended." Proclamation, § 3. Those who fall into this category, like those "engaged in the invasion," are also precluded from invoking "provisions of

the INA that would permit their continued presence in the United States," including the right to apply for asylum under 8 U.S.C. § 1158(a).  Proclamation, § 3.

The fourth section take a different approach to the same problem.  It also suspends the entry of those "engaged in the invasion across the southern border," but rather than rely on any statutory authority to do so, this section relies on "the authorities provided to [the President] under Article II of the Constitution of the United States, including [the President's] control over foreign affairs, and [his authority] to effectuate the guarantee of protection against invasion required by Article IV, Section 4."  Proclamation, § 4.  The fourth section also "direct[s] the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, to take appropriate actions as may be necessary to achieve the objectives of [the Proclamation], until [the President] issue[s] a finding that the invasion at the southern border has ceased."  Proclamation, § 4.

Finally, the fifth section directs the Secretary of Homeland Security, acting in coordination with the Secretary of State and the Attorney General, to "take all appropriate actions to repel, repatriate, or remove any alien engaged in the invasion across the southern border of the United States on or after the date of this order."  Proclamation, § 5.  Combining the sources of authority invoked in support of the preceding sections, this section relies on § 1182(f) and § 1185(a), as well as a "delegat[ion]" of the President's constitutional authority.  *Id.*

2.    *Implementing Guidance*

In response to the directive that the Secretary "take all appropriate action" to implement the Proclamation, *id.* § 5, the Department of Homeland Security has issued implementing guidance regarding the procedures to follow with respect to "alien[s] subject to the Proclamation," Dkt. 52-1 at 13.  That guidance includes emails sent to U.S. Border Patrol ("USBP") personnel explaining how to process aliens subject to the Proclamation; an Office of

28

Field Operations memorandum describing how to implement active executive orders, including the Proclamation; and USCIS training materials instructing asylum officers on how to conduct credible fear interviews for aliens subject to the Proclamation.

a. U.S. Border Patrol Emails

The administrative record includes three emails containing USBP guidance. The first email has the subject line "Update Field Guidance for Southern Border RE: 212(F) Presidential Proclamation Guaranteeing the States Protection Against Invasion" and was sent on February 4, 2025, for "disseminat[ion] . . . to all Southwest Border Sectors." Dkt. 52-1 at 5. As one might expect from guidance directed at border agents on the southern border, it is concerned primarily with the first category of aliens identified in the Proclamation: those "engaged in the invasion across the southern border." *See* Dkt. 52-1 at 5; *see also* Proclamation, § 2. For purposes of implementing the 2025 Proclamation, the guidance defines an "illegal alien invading the United States" to mean "an alien who crosses between the ports of entry on the southern land border." *Id.* The guidance directs that "aliens invading the United States"—*i.e.*, those subject to the Proclamation—"are **not permitted to apply for asylum**." *Id.* (emphasis in original).

The second email, also sent on February 4, 2025, has the subject line "Field Guidance for Northern and Coastal Borders RE: 212(F) Presidential Proclamation Guaranteeing the States Protection Against Invasion" and was sent "to all Northern and Coastal Border Sectors." Dkt. 52-1 at 13. This guidance, in contrast, focuses on the second category of aliens identified in the Proclamation: those "who fail[], before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information," Proclamation, § 3. *See* Dkt. 52-1 at 13. The guidance provides that "the entry of aliens who [have] failed to provide such information is suspended, and they are restricted from invoking provisions of the INA, **including asylum**, that would permit their continued presence." *Id.*

(emphasis in original).  The guidance also provides that aliens with valid travel documents have "[p]resumptively" provided sufficient information such that they do not fall within the Proclamation's ambit.  *Id.*

Both February 4 emails then describe the procedures to be used when processing individuals subject to the Proclamation.  Those subject to the Proclamation "may be processed" in one of two ways: "as a 212(f) Direct Repatriation" or by "212(f) Expedited Removal" (which is sometimes referred to as "Expedited Removal – Per 212(F)").  *Id.* at 5–6, 13–14.  According to Defendants, the difference between the two pathways is that "[a]liens subject to expedited removal procedures are served with a Notice to Alien Ordered Removed and issued an Expedited Removal Order (Form I-860)," while "[a]liens processed for repatriation are not issued a removal order."  Dkt. 59 at 7.  Beyond the issuance of a notice and order, however, Defendants fail to identify any difference between the two "212(f)" procedures.  According to Defendants, issuance of a removal order matters only because "repatriations do not carry the same immigration or criminal consequences as expedited removal."  *Id.* at 8; *see also* 8 U.S.C. § 1182(a)(9)(A) (aliens "ordered removed" in expedited removal or formal removal proceedings initiated upon the alien's arrival are inadmissible for periods of at least five years); *id.* § 1231(a)(5) (aliens with prior orders of removal can have those orders reinstated if they again enter illegally); *id.* § 1326 (aliens who are removed while "an order of . . . removal is outstanding" and later reenter are subject to criminal penalties).  The February 4 emails instruct that the "appropriate processing pathway for a particular alien should be determined based on the totality of the circumstances," Dkt. 52-1 at 5, 13, subject to the constraint that only aliens "able to be repatriated to their country of last transit" (or, in the case of the Southwest border, to Mexico, *see* Dkt. 52-1 at 5) could be processed by means of a "212(f) Direct Repatriation," *id.*

The February 4 emails also instruct officers to omit several steps from the INA's § 1225(b)(1) expedited removal procedure, regardless of which pathway is followed. Under Department of Homeland Security regulations, immigration officers overseeing a § 1225(b)(1) expedited removal are required to follow precise procedures: First, the immigration officer "read[s] (or ha[s] read) to the alien all information contained on Form I-867A," which among other things, informs the alien that "U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country" and instructs the alien to tell the officer about any "fear" or "concern" about "being removed from the United States or about being sent home." *See* 8 C.F.R. § 235.3(b)(2)(i); *see also* Form I-867A (*available in* 9 Charles Gordon, *et al.*, Immigration Law and Procedure, App'x B, Ex. 16K (2024)). Second, the immigration officer uses Form I-867B to ask the alien specific questions designed to elicit whether the alien fears persecution or return to their home country and records the answers to those questions on the form.[5] *See* 8 C.F.R. § 235.3(b)(2)(i); *see also* Form I-867B (*available in* 9 Charles Gordon, *et al.*, Immigration Law and Procedure, App'x B, Ex. 16L (2024)). Then, "[i]f an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country," the officer refers the alien for an interview by an asylum officer and "provide[s] the alien with a written disclosure on Form M-444," which provides aliens with information about the credible fear interview process and informs them of their rights to consult with someone prior to the interview and the right to request review by an immigration judge of an officer's determination.

---

[5] Form I-867B questions include: (1) "Why did you leave your home country or country of last residence?" (2) "Do you have any fear or concern about being returned to your home country or being removed from the United States?" and (3) "Would you be harmed if you are returned to your home country or country of last residence?"

*Id.* § 235.3(b)(4)(i).  The February 4 emails, however, direct that immigration officers processing aliens subject to the Proclamation "should not use" Form I-867A, Form I-867B, or Form M-444 and should not "ask specific fear questions" at all.  Dkt. 52-1 at 5, 13.  If, however, an alien spontaneously "manifests fear" regarding the country where USBP intends to return him or her to, the immigration officer is instructed to "refer [the] alien" to USCIS for a "Convention against Torture (CAT) screening."  Dkt. 52-1 at 5–6; 13–14.  If the screening comes back negative, meaning that USCIS determined that the alien had not shown it was more likely than not that he or she would be tortured in the relevant country, "USBP should continue with the process of repatriation or removal."  *Id.* at 9.  If it comes back positive, the individual is reprocessed and detained.  *Id.*

The final email included in the administrative record was sent on February 19, 2025, seemingly to all border sectors, to provide them with the "update" that aliens could now be sent to "several Central American countries" with which the United States "has enacted agreements" pursuant to which those countries have agreed "to receive third country nationals who have illegally entered" the United States.  Dkt. 52-1 at 20.  To take advantage of those agreements, the February 19 email advises immigration officers that individuals subject to the Proclamation can be removed by means of "212(f) Direct Repatriations to Third Countr[ies]."  *Id.* at 21.  Before removal, CBP "will notify" anyone who is not being transferred to his or her country of nationality of the "country [to which he or she] will be sent" by giving that person a "212(f) Tear Sheet."  *Id.* at 20, 25.  Aliens "who manifest a fear of the country to which CBP intends to [remove] them" will be referred for CAT screening with respect to that country.  *Id.* at 20.  If the CAT screening is negative, CBP will "continue with transfer of the alien to the designated country."  *Id.*  If the CAT screening is positive, CBP can either "designate another third country

for removal" or place the person into full EOIR proceedings for adjudication of his or her CAT claim. *Id.* If another third country is designated, and "the alien manifests a fear for the newly designated country, CBP will again refer the case to USCIS for another CAT screening relative to the newly designated country," and the process starts again. *Id.*

      b.  Office of Field Operations memorandum

The administrative record also includes a February 28, 2025 memorandum sent to various officials in the Office of Field Operations from Ray Provencio, the Acting Executive Director of Admissibility and Passenger Programs in the Office of Field Operations. Dkt. 52-1 at 26. According to the memorandum, the Proclamation "leverage[s] INA 212(f) authorities" to "provide[] the ability for U.S. Customs and Border Protection . . . personnel to immediately and efficiently repatriate undocumented aliens that are not excepted at all U.S. ports of entry." *Id.* It also includes a "Muster" with "[u]pdates regarding certain non-arriving aliens" that reiterates many of the instructions in the emails discussed above and affirms that CAT screening will remain available for those who affirmatively manifest a fear to the immigration officer. *See, e.g.*, *id.* at 28 ("CBP officers will not provide Forms I-867A and I-867B and will not provide individualized advisals on asylum."); *id.* ("CBP officers will refer any alien who manifests fear to [USCIS] for a [CAT] screening."). The Muster further directs that a covered "alien[] who claims or manifests a fear at the international boundary line to CBP personnel is not excepted from the Proclamation." *Id.*

      c.  USCIS training materials

The administrative record also contains training materials provided to USCIS personnel, instructing them on the new procedures for CAT assessments. *See* Dkt. 52-1 at 38–74. Those documents contain details about specific CAT screening procedures—including which forms to use and how to fill them out. Essentially, the guidance instructs USCIS asylum officers to use a

much higher screening standard for CAT claims, which departs from the standard set forth in the governing regulations.

Under the governing regulations, asylum officers conduct a credible fear screening, at which the standard of proof asks whether there is "a significant possibility" that it is more likely than not that the individual will be tortured.  8 C.F.R. § 208.30(e)(3).  If the alien can carry that burden, he receives notice and moves on to the next stage of the process, where he can be represented by counsel and present witnesses and evidence, and where he must show that it is "more likely than not" that he would be tortured if removed to the proposed country.  *Id.* §§ 208.9(b), 208.16(c)(2).  The guidance instructs asylum officers to perform CAT "assessments" rather than credible fear screenings.  According to the guidance, CBP or ICE will refer an individual who claims a fear of torture to USCIS "for CAT assessment."  Dkt. 52-1 at 43.  An asylum officer will then conduct a "CAT-Only assessment," *id.* at 44, at which the applicant "must show that it is more likely than not that [the applicant] will be tortured in the country to which [the applicant] may be returned," *id.* at 46.  Aliens in CAT-Only assessments are "not entitled to a consultant, legal representative, or a consultation period."  *Id.* at 45.  In essence, the new procedures require that an alien carry his burden at the initial hearing without the benefit of counsel or consultation.  The guidance also makes clear that the assessment is CAT-Only—that is, the applicant is not considered for asylum or withholding of removal.

## D.    Procedural History

The organizational plaintiffs filed this action on February 3, 2025, *see* Dkt. 1, and promptly amended their complaint to add the individual plaintiffs, *see* Dkt. 11.  Plaintiffs also promptly filed a motion for class certification, Dkt. 13; a motion for a preliminary injunction,

Dkt. 14; and an emergency motion to stay the removal of the individual plaintiffs who still remained in the United States, Dkt. 15.

The Court scheduled a hearing for the next day, February 20, 2025.  Min. Entry (Feb. 20, 2025).  At the hearing, the parties informed the Court that "it appear[ed]" that one of the individual plaintiffs—N.S.—had likely been removed from the United States that morning.  Dkt. 19 at 15 (Feb. 20, 2025 Hrg. Tr. 15:5–6).  To "preserve the Court's jurisdiction" while the parties briefed the emergency motion, the Court entered an administrative stay prohibiting the government from removing any individual plaintiffs still in the United States pending a hearing on the emergency motion.  *Id.* (Feb. 20, 2025 Hrg. Tr. 13:14–19).  Defendants subsequently filed a response representing that they will not remove any of the individual plaintiffs pursuant to the Proclamation during the pendency of this case, *see* Dkt. 21 at 2, and the Court, relying on that representation, denied Plaintiffs' emergency motion as moot, Dkt. 23 at 2.  The Court also ordered Defendants to "provide the Court and Plaintiffs' counsel with at least seven days' notice before removing any of the individual plaintiffs from the United States during the pendency of this action" to "permit the parties to have the opportunity to be heard, if necessary" before removal.  *Id.* at 3.  Finally, the Court ordered the parties to file a joint status report addressing "whether the Court should consolidate the hearing on Plaintiffs' Motion for a Preliminary Injunction with the merits, pursuant to Fed. R. Civ. P. 65(a)(2)."  *Id.*

The parties agreed to consolidation under Rule 65(a)(2), Dkt. 24, and the Court, accordingly, consolidated the hearing on the preliminary injunction motion with the merits, Min. Entry (Feb. 26, 2025).  The parties also proposed that "the Court hold in abeyance any claims based on the administrative record, namely portions of the Sixth Claim for Relief raising arbitrary-and-capricious arguments under the Administrative Procedure Act" to "avoid the need

to set aside additional time in the schedule for Defendants to assemble, review, certify, and produce the administrative record." Dkt. 24 at 2. In lieu of an administrative record, Defendants "agree[d] to provide the relevant guidance documents." *Id.* The Court adopted the parties' proposal and set a briefing schedule for the motion for class certification and for cross-motions for summary judgment. Min. Entry (Feb. 26, 2025).

The Court held a hearing on those motions on April 29, 2025. *See* Min. Entry. At the hearing, the Court ordered supplemental briefing from Defendants on two issues: first, whether an alien subject to the Proclamation could file an affirmative asylum application outside the context of any removal proceedings and whether doing so would prevent his or her removal or repatriation, and, second, what the differences were between expedited removal under the Proclamation ("212(f) Expedited Removal") and repatriation under the Proclamation ("212(f) Direct Repatriation"). *See* Dkt. 59. The Court also, at Plaintiffs' request, granted leave to file a supplemental brief on whether 8 U.S.C. § 1252(f)(1) barred class-wide relief and whether, in any event, class-wide relief was necessary in this case, Dkt. 58, and the Court provided the parties with an opportunity to respond to each other's supplemental briefs, Dkt. 60; Dkt. 61.

Finally, after the close of briefing, the Court concluded that it required additional information from both Plaintiffs and Defendants to resolve the pending motions and to ensure that the record is complete for purposes of any appeal. The Court ordered Plaintiffs to file supplemental declarations from each individual plaintiff "indicating whether he or she provided Federal officials with the medical information, criminal history, and other background information required by the Proclamation," Min. Entry (May 13, 2025), and gave Defendants an opportunity to respond to those declarations, Min. Entry (May 20, 2025). The Court also ordered Defendants to compile and produce the complete administrative record. *See id.* The additional

materials have now been filed, *see* Dkt. 64; Dkt. 65; Dkt. 67, and the case is now ripe for

decision as to persons who have not yet been removed from the United States.

## II. LEGAL STANDARD

In the normal course, summary judgment may be granted "if the pleadings, the discovery

and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine

issue as to any material fact and that the movant is entitled to a judgment as matter of law." *Air

Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 31–32 (D.D.C. 2010),

*aff'd*, 663 F.3d 476 (D.C. Cir. 2011). On the other hand, "[i]n a case involving review of a final

agency action under the Administrative Procedure Act, . . . the Court's role is limited to

reviewing the administrative record, so the standard set forth in Rule 56(c) does not apply." *Id.*

at 32. Instead, summary judgment serves as "the mechanism for deciding, as a matter of law,

whether the agency action is supported by the administrative record and otherwise consistent

with the APA standard of review." *Cath. Health Initiatives v. Sebelius*, 658 F. Supp. 2d 113, 117

(D.D.C. 2009) (internal quotations omitted).

Under the APA, "agency actions will be set aside if they are contrary to law—if, in other

words, they are not 'authorized by the statutory text,'" *Fisher v. Pension Benefit Guar. Corp.*,

151 F. Supp. 3d 159, 165 (D.D.C. 2016) (quoting *Gonzales v. Oregon*, 546 U.S. 243, 255

(2006)), or some other source of lawful authority. In reviewing the executive's reliance on

statutory authority, the Court should pay "[c]areful attention to the judgment of the Executive

Branch" to the extent it "help[s] inform that inquiry" and should "respect" lawful delegations of

"authority to an agency." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024). But the

meaning of the relevant statutory text is ultimately a question for the Court, which "must

exercise [its] independent judgment" in interpreting the law. *Id.* at 412.

Nor does the fact that "the 'executive's' action . . . is essentially that of the President . . . insulate the entire executive branch from judicial review." *Chamber of Com. of the U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("*Reich*").  To the contrary, "it is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive."  *Id*. (citing *Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring in part and concurring in the judgment)); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).  It is well-settled, moreover, that even though the President is not an "agency" subject to suit under the APA, his "actions may still be reviewed for constitutionality," *Franklin*, 505 U.S. at 801 (citing *Youngstown*, 343 U.S. at 579); *see also Dalton v. Specter*, 511 U.S. 462, 469 (1992).

## III.  ANALYSIS

### A.     Threshold Issues

1.     *Article III Standing*

"Because Article III limits federal judicial jurisdiction to cases and controversies, *see* U.S. Const. art. III, § 2, federal courts are without authority" to resolve disputes unless the plaintiff has standing—that is, "'a personal stake in the outcome of the controversy [sufficient] to warrant *his* invocation of federal-court jurisdiction."  *Chamber of Com. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  This limitation "is founded in concern about the proper—and properly limited—role of the courts in a democratic society."  *Summers*, 555 U.S. at 492–93 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  To establish Article III standing, a plaintiff must demonstrate a "concrete and particularized" injury that is "fairly traceable" to the defendant's conduct and "that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39 (2016)

(quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  At least one plaintiff, moreover, must have standing "for each claim" the plaintiffs "seek[] to press," *DaimlerChrysler v. Cuno*, 547 U.S. 332, 352 (2006), and for "each form of relief requested," *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017).  The plaintiffs "bear[] the burden of establishing" the elements of standing "with the manner and degree of evidence required at the successive stages of the litigation," *Lujan*, 504 U.S. at 561.

### a.   Individual Plaintiffs in the United States

The individual plaintiffs still present in the United States (A.M., Z.A., T.A., A.T., B.R., M.A., and G.A.) have established standing to challenge the bar on asylum and withholding of removal contained in the Proclamation and implementing guidance, as well as the guidance's extra-regulatory procedures for those seeking CAT protection.  They have standing because the Proclamation and implementing guidance make it more difficult for them to access these forms of relief.  Defendants do not dispute that asylum, withholding of removal, and CAT protection are valuable forms of relief that protect non-U.S. citizens from removal to countries where they may face persecution or torture.  Asylum is particularly valuable because it affords the asylee benefits above and beyond avoiding removal, including a path to lawful permanent resident status and citizenship.  As a result, the bars on asylum and withholding of removal and the extra-regulatory procedures for adjudicating CAT claims each injure the individual plaintiffs still in the United States because they make it more difficult (or, with respect to asylum and withholding of removal, impossible) for those plaintiffs to access these valuable forms of relief.[6]  *See Lujan*,

---

[6] The Proclamation applies under two sets of circumstances.  The first, second, fourth, and fifth sections of the Proclamation are directed at those "engaged in the invasion across the southern border of the United States," Proclamation, §§ 1, 2, 4, 5, which, according to the guidance, includes all aliens "who crosse[d] between the points of entry on the southern land border," Dkt. 52-1 at 5.  The third section of the Proclamation is directed at those who "fail[], before entering

504 U.S. at 561–62 (holding that "there is ordinarily little question" that a plaintiff has standing

if she herself is "an object of the action . . . at issue").  Each individual plaintiff, moreover, has

submitted a declaration expressing a desire to seek asylum and setting forth facts sufficient to

state a plausible claim to asylum, withholding of removal, or CAT protection.  *See, e.g.*, Dkt. 12-

1 (A.M. Decl.); Dkt. 12-4 (B.R. Decl.); Dkt. 12-5 (M.A. Decl.); Dkt. 12-6 (G.A. Decl.).  That is

enough to establish an injury in fact that is fairly traceable to the challenged actions.  *See Lujan*,

504 U.S. at 560–61.

Defendants do not dispute that the individual plaintiffs still in the United States are

suffering a cognizable injury caused by the Proclamation and the implementing guidance.

Instead, they argue that the individual plaintiffs' injuries are non-redressable based on 8 U.S.C.

§ 1252(f)(1).  Dkt. 44 at 26.  On Defendants' telling, § 1252(f)(1) forecloses any equitable relief

that would undermine the operation of the Proclamation (including declaratory relief or vacatur

of the implementing guidance) because it prohibits courts, other than the Supreme Court, from

"enjoin[ing] or restrain[ing] the operation of the provisions" of part IV of the INA, which

includes the provisions that govern regular removal proceedings, 8 U.S.C. § 1229a; expedited

---

the United States, to provide Federal officials with sufficient medical information and reliable
criminal history and background information as to enable fulfillment of the requirements of" 8
U.S.C. § 1182(a)(1)–(3).  Proclamation, § 3.  Both sets of circumstances can apply to the same
person, and, here, the Court is persuaded by Plaintiffs' supplemental declarations, filed at the
Court's request, that there is at least one individual plaintiff in the United States who is a covered
alien in both relevant respects, *see* Dkt. 64-5 at 1 (G.A. Decl. ¶¶ 4, 9) (declaring that G.A.
crossed the border "on or about February 1, 2025" without submitting any health or other
background information).  After Plaintiffs filed their supplemental declarations, Defendants—for
the first time—argued that Plaintiffs lack standing to challenge Section 3 of the Proclamation
because "[w]here Sections 1 and 2 of the Proclamation apply, there is no need to apply Section
3" and so it "has no practical applicability."  Dkt. 66 at 3, 6.  But that argument ignores the fact
that, if Plaintiffs prevail on their challenges to Sections 1 and 2 of the Proclamation, Section 3
will still stand as a bar to obtaining access to asylum and withholding of removal and will still
impose additional barriers to obtaining CAT protection.  Thus, at least one of the individual
plaintiffs has standing to challenge the restrictions as applied to both classes of covered aliens.

removal proceedings, *id.* § 1225(b)(1); and withholding of removal, *id.* § 1231, *see* Dkt. 44 at 68 n.7.  *See* Dkt. 55 at 9–13.  For several reasons, the Court is unpersuaded.

To start, Defendants' redressability argument ignores the fact that § 1252(f)(1) contains a carve-out for claims by "individual alien[s] against whom proceedings under such part have been initiated."  8 U.S.C. § 1252(f)(1).  Thus, even if the provision might limit the Court's ability to provide injunctive relief to individuals who are not yet in immigration proceedings, it has no bearing on the redressability of the individual plaintiffs' claims to the extent that immigration proceedings have been initiated against each of them "under" part IV of the INA, *see* Dkt. 43-3 at 3–5 (Hollinder Decl. ¶¶ 4–11) (attesting that A.M., Z.A., T.A., A.T., B.R., M.A., and G.A. were all issued I-860 Notices to Appear).  And, to the extent the new "212(f) Expedited Removal" and "212(f) Direct Repatriation" proceedings are not brought "under" part IV of the INA but, instead, are brought pursuant to the Proclamation, as Defendants assert, § 1252(f)(1) has no bearing on Plaintiffs' challenges to those extra-statutory proceedings.

Defendants' redressability argument also fails because § 1252(f)(1) does not, in any event, limit the Court's authority to vacate unlawful agency action under the APA, 5 U.S.C. § 706(2), or its authority to issue declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, and the availability of those remedies alone establishes redressability.

Starting with the availability of APA vacatur, Defendants' contention that § 1252(f)(1) precludes courts from setting aside unlawful agency action under the APA is meritless.  Two well-established principles guide the Court's understanding of the interplay between § 1252(f)(1) and the APA.  First, the courts recognize a "'stron[g] presum[ption]' that repeals by implication are 'disfavored,'" and, thus, "[a] party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly expressed

congressional intention' that such a result should follow." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (internal citation omitted). This rule, as the Supreme Court has explained, is premised on a "respect for the separation of powers" and "an appreciation that it's the job of Congress by legislation, not th[e] Court by supposition, both to write the laws and to repeal them." *Id.* at 511. Second, courts apply a "presumption favoring judicial review of administrative action" and, thus, "when a statutory provision is reasonably susceptible to divergent interpretation, [courts] adopt the reading that accords with [the] traditional understanding[] and basic principle[] that executive determinations generally are subject to judicial review." *Make the Road*, 962 F.3d at 623–24 (internal quotation marks and citation omitted). This "presumption can be overcome only by clear and convincing evidence of congressional intent to preclude judicial review." *Id.* at 624 (internal quotation marks and citation omitted).

Here, Defendants' argument fails even before the Court applies either presumption. The APA mandates that a "reviewing court *shall* . . . set aside agency action . . . found to be . . . not in accordance with law [or] contrary to constitutional . . . power," 5 U.S.C. § 706(2) (emphasis added), and nothing in § 1252(f)(1) conflicts with or otherwise limits that mandate. Section 1252(f)(1) provides that:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to *enjoin or restrain the operation* of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1) (emphasis added). Thus, by its own terms, § 1252(f)(1) limits only the lower courts' jurisdiction "to enjoin or restrain the operation" of specific statutory provisions; it

neither expressly nor implicitly repeals or supersedes the APA's mandate that reviewing courts shall "set aside" unlawful agency action.

Section 1252(f)(1) says nothing about vacatur and, instead, "prohibits lower courts from *entering injunctions* that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out" statutory provisions in part IV of the INA, *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) (emphasis added). There is a meaningful difference, moreover, between an injunction and an order vacating a rule or administrative guidance. "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)), while vacatur is the ordinary and presumptive remedy for substantive violations of the APA, *see, e.g.*, *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010) (noting that "both the Supreme Court and the D.C. Circuit have held that . . . vacatur[] is the presumptively appropriate remedy for a violation of the APA"); *see also Allina Health Serv. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) ("[V]acatur is the normal remedy."); *Ill. Pub. Telecomms. Ass'n v. FCC*, 123 F.3d 693, 693 (D.C. Cir. 1997) ("[T]he practice of the court is ordinarily to vacate [an unlawful] rule."). Understood in this light, the limitation found in § 1252(f)(1) is consistent with established precedent, which distinguishes between the typical APA remedy of "vacating an agency action" and the more dramatic remedy of enjoining future agency action, which courts should refrain from doing unless necessary to effectuate the court's decision. *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 36 (D.D.C. 2020).

Defendants respond by noting that § 1252(f)(1) not only restricts the authority of lower courts "to enjoin" the operation of the provisions of part IV but also precludes lower courts from "restrain[ing]" the operation of those provisions. Dkt. 55 at 12. The parties debate whether "the

term 'restrain' in [§] 1252(f)(1)" merely forms the second half of "a 'common doublet'" or whether it imposes a distinct limitation more sweeping than the bar on class-wide injunctive relief. *Id.* For present purposes, however, the Court need not join this debate, because regardless of whether the words "enjoin" and "restrain" are synonyms or merely close cousins, "restrain" does not mean "vacate." The word "restrain" means "to hold (as a person) back from some action, procedure, or course." *Restrain*, Webster's Third New International Dictionary at 1936 (1993); *see also Aleman Gonzalez*, 596 U.S. at 549 (quoting Oxford English Dictionary). It is, in other words, concerned with barring future action. A "vacatur" order, in contrast, "annul[s]" an action already taken. *Vacatur*, Black's Law Dictionary at 1782 (10th ed. 2014).

To be sure, the word "restrain" is, at times, given a broader meaning, which "captures orders that merely inhibit acts," *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 12–13 (2015) (emphasis omitted); *see also Aleman Gonzalez*, 596 U.S. at 549. But statutory terms are best construed in light of the company that they keep, *see Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008), and, here, § 1252(f)—which is entitled "Limit on Injunctive Relief"—refers to the "authority to *enjoin* or restrain," 8 U.S.C. § 1252(f)(1) (emphasis added). It follows that § 1252(f)(1) is best construed to give the word "restrain" a meaning that is similar in kind to the commonly understood meaning of "enjoin." Both refer to a court order that bars the party that is the subject of the order from taking a future action, on pain of contempt. Yet, even if the Court were to accept Defendants' dubious premise and were to assume that "restrain" simply means to "inhibit," their argument would still fail. Simply put, the word "restrain," even if so broadly construed, cannot plausibly be read to encompass a judicial order that affects future agency action only by vacating some past action. Had Congress intended the prohibition to sweep that broadly, it could easily "have said so in words far simpler than those that it wrote." *Biden v.*

*Texas*, 597 U.S. 785, 798 (2022).  It could have, for example, barred lower courts from entering

any order "respecting the operation of the provisions of part IV" of the INA.  Congress is

presumed to have chosen its words with care, and this Court is bound by that choice.

The Court, accordingly, concludes that § 1252(f)(1) cannot plausibly be read to supersede

the APA and to bar lower courts from granting the traditional form of APA relief in cases that

are otherwise properly brought under the APA and that challenge agency action taken under (or

relating to) part IV of the INA.

The same is true of declaratory relief.  Here, Defendants candidly concede that the D.C.

Circuit rejected their capacious reading of § 1252(f)(1) in *Make the Road New York*, where the

court held that § 1252(f)(1) "prohibits only injunctions" and "does not proscribe the issuance of a

declaratory judgment," 962 F.3d at 635.  *See* Dkt. 55 at 13 n.2.  Defendants, nonetheless, contend

that the Supreme Court's decision in *Aleman Gonzalez*, 596 U.S. at 543, has somehow called that

holding into question. Dkt. 55 at 13 n.2.  But—far from it—*Aleman Gonzalez* expressed no view

on the question, merely observing: "Because only injunctive relief was entered here, we have no

occasion to address" the Government's argument that "§ 1252(f)(1) not only bars class-wide

injunctive relief but also prohibits . . . class-wide declaratory relief."  596 U.S. at 551 n.2.  This

Court, accordingly, must follow binding D.C. Circuit precedent.  *See Brewster v. Comm'r of

Internal Revenue*, 607 F.2d 1369, 1373 (D.C. Cir. 1979).

That resolves the question.  It bears note, however, that six Supreme Court justices have

expressed the same view, albeit in separate opinions in different cases.  Most recently, Justice

Alito wrote for the plurality in *Nielsen v. Preap* that the district courts have "jurisdiction to

entertain . . . request[s] for declaratory relief," notwithstanding § 1252(f)(1).  586 U.S. 392, 402

(2019) (Alito, J., joined by Roberts, C.J., and Kavanaugh, J.).  And, in *Jennings v. Rodriguez*,

Justices Breyer, Ginsburg, and Sotomayor reached the same conclusion. *See* 583 U.S. 281, 355 (Breyer, J., joined by Ginsburg, J., and Sotomayor, J., dissenting); *see also Aleman Gonzalez*, 596 U.S. at 572 n.9 (Sotomayor, J., joined by Kagan, J., and Breyer, J., concurring in part) (expressing skepticism that § 1252(f)(1) limits class-wide declaratory relief). As a matter of plain language, that conclusion is well-founded.

Although the Supreme Court has not had occasion to address the application of § 1252(f)(1) to claims for vacatur or declaratory relief in a controlling opinion, the Court's recent opinion in *Biden v. Texas* further supports this reading of the statute. In that case, the Court had no reason to decide whether § 1252(f)(1) applies to "declaratory relief and relief under [§] 706 of the APA," 597 U.S. at 801 n.4, but the Court stressed that the "scope" of § 1252(f)(1) is "narrow[]" and that it "deprives courts of the power to issue a *specific* category of remedies: those that 'enjoin or restrain the operation of' the relevant sections of the statute." 597 U.S. 785, 798 (2022) (emphasis added). The Court also cited to its prior observation in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999), that, "[b]y its plain terms, and even by its title, [§ 1252(f)(1)] is nothing more or less than a limit on injunctive relief." *Biden v. Texas*, 597 U.S. at 801 (citing *Reno*, 525 U.S. at 481).

In reaching these conclusions, the Court relied on two features of the statutory text that bear on Defendants' argument here. First, the Court noted that nothing in the language of § 1252(f)(1) "strips the lower courts of subject matter jurisdiction over" claims brought under the INA or the APA. *Id.* at 798. As the Court explained, "[a] limitation on subject matter jurisdiction . . . restricts a court's 'power to adjudicate a case,'" *id.* (quoting *United States v. Cotton*, 535 U.S. 625, 630 (2002)), whereas § 1252(f)(1) "bears no indication that lower courts lack power to hear any claim brought under" part IV of the INA. *Id.* It simply limits the

authority of the lower courts to order a particular form of relief.  *Id.*  Second, a "parenthetical"

contained in § 1252(f)(1) "explicitly preserves [the Supreme] Court's power to enter injunctive

relief," which shows that Congress intended to preserve the Supreme Court's authority to grant

even that drastic form of relief.  *Id.* at 786.  But because the Supreme Court's original

jurisdiction does not extend to adjudicating claims under the INA and the APA, *see* U.S. Const.,

art. III, § 2, the only way that parenthetical can be given meaning is by preserving the authority

of the lower courts to grant *some* form of relief in these cases.  *Id*. at 799.

 Given the plain language of § 1252(f), the "strong presumption favoring judicial review

of administrative action," *Salinas v. U.S. R.R. Ret. Bd.*, 592 U.S. 188, 196 (2021), and existing

precedent, it is thus unsurprising that other courts have held that § 1252(f)(1) does not strip lower

courts of authority to grant declaratory relief and to vacate agency action that is not in

accordance with law.  *See, e.g.*, *Florida v. United States*, 660 F. Supp. 3d 1239, 1284–85 (N.D.

Fla. 2023); *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1045 (S.D. Cal. 2022).  This

Court concurs in that reading of the statute.

 At this point, it is worth pausing to note that the Supreme Court not only read

§ 1252(f)(1) narrowly in *Biden v. Texas*, but the Court also held that there is "no basis for . . .

conclu[ding] that [§] 1252(f)(1) concerns subject matter jurisdiction" at all.  597 U.S. at 801.

Thus, to the extent Defendants raise a jurisdictional argument, one might reasonably conclude

that they run head on into binding Supreme Court precedent holding that § 1252(f)(1) merely

limits the form of relief a court may grant and does not limit a court's subject-matter jurisdiction.

Defendants answer this difficulty by framing their argument as one of redressability.  If

§ 1252(f)(1) bars *every* form of relief that this Court might grant to a plaintiff with respect to a

particular claim, that claim is non-redressable, and the plaintiff lacks standing.  But even

assuming that a merits defense can so easily be transformed into a jurisdictional bar, *cf.*
*Sandpiper Residents Ass'n v. U.S. Dep't of Hous. & Urb. Dev.*, 106 F.4th 1134, 1141 (D.C. Cir.
2024) (so long as claim to relief remains "facially plausible," "nothing more is required to
preserve jurisdiction"), Defendants' non-redressability defense faces a high hurdle, which
Defendants cannot clear. For the reasons discussed above, § 1252(f)(1) does not limit the
Court's authority to order vacatur of an unlawful rule or guidance or to grant declaratory relief.
In other words, it leaves in place significant, alternative forms of redress.

Defendants raise one, final redressability argument, which merits only brief discussion.
They argue that the Court lacks authority to enjoin the President, Dkt. 55 at 19 (citing *Mississippi
v. Johnson*, 71 U.S. 475, 501 (1867)), and that, as a result, setting aside the implementing
guidance will not redress the Plaintiffs' asserted injuries. On Defendants' telling, no matter what
the Court does, the Proclamation will remain in effect and, even if the implementing guidance is
enjoined or vacated, the Proclamation will continue to preclude immigration officials from
considering Plaintiffs' requests for asylum or withholding of removal. Justice Scalia spoke
directly to this issue in his concurring opinion in *Franklin v. Massachusetts*. He wrote:

> None of these conclusions, of course, in any way suggests that Presidential action is *unreviewable*. Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive, *see, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 572 (1952); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)—just as unlawful legislative action can be reviewed, not by suing Members of Congress for the performance of their legislative duties, *see, e.g.*, *Powell v. McCormack*, 395 U.S. 486, 503–06 (1969); *Dombrowski v. Eastland*, 387 U.S. 82 (1967); *Kilbourn v. Thompson*, 103 U.S. 168 (1881), but by enjoining those congressional (or executive) agents who carry out Congress's directive. Unless the other branches are to be entirely subordinated to the Judiciary, we cannot direct the President to take a specified executive act or the Congress to perform particular legislative duties.

505 U.S. at 828–29 (Scalia, J., concurring in part and concurring in the judgment). D.C. Circuit precedent, moreover, is to the same effect. As the D.C. Circuit observed in *Reich*: "Even if the Secretary were acting at the behest of the President, this 'does not leave the courts without power to review the legality'" of the action and "'to compel subordinate executive officials to disobey illegal Presidential commands.'" 74 F.3d at 1328 (quoting *Soucie v. David*, 448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971)). Because the President does not personally take "the final step necessary" to reject a request for asylum or withholding of removal, much less to repatriate or to remove an individual from the United States, this is not one of those rare cases in which the courts are powerless to review executive action. *Pub. Citizen v. U.S. Trade Rep.*, 5 F.3d 549, 552 (D.C. Cir. 1993). As a result, the question of how most appropriately to effectuate the Court's decision is a question of remedy and not redressability.

### b. Organizational Plaintiffs

The organizational plaintiffs also have standing to challenge the Proclamation and implementing guidance, including the restrictions on asylum and withholding of removal, the use of "212(f) Direct Repatriations" and "212(f) Expedited Removal," and the extra-regulatory procedures for adjudicating CAT protection claims.

An organization "can assert standing on its own behalf, on behalf of its members or both." *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011).  Here, the organizational plaintiffs rely on the first approach, which requires that they, "like an individual plaintiff, . . . show 'actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.'"  *Id.* (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990)).  To meet this burden, Plaintiffs rely on the framework recognized in *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982).  In that case, a fair housing organization claimed that the defendant's discriminatory housing practices "perceptibly impaired" the organization's ability to "provide counseling and referral services for low- and moderate-income homeseekers," forcing it "to devote significant resources to identify and counteract" the alleged discriminatory practices.  *Id.*  The Supreme Court held that the organization had standing to challenge the housing practices.  As the Court explained, "there [could] be no question that the organization . . . suffered injury in fact" because it established a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—[that] constitute[d] far more than simply a setback to the organization's abstract social interests."  *Id.*

The D.C. Circuit "has applied *Havens Realty* to justify organizational standing in a wide range of circumstances."  *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (collecting cases); *see also* 13A Charles Alan Wright & Aruther R. Miller, *Federal Practice & Procedure* § 3531.9.5 (3d ed. 2018) (same).  But *Havens* is not without limits.  When "a plaintiff challenges the government's 'unlawful regulation (or lack of regulation) of *someone else*,' 'standing is not precluded, but it is ordinarily substantially more difficult to establish.'"  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024)

(emphasis in original) (quoting *Lujan*, 504 U.S. at 562).  An organization that seeks to establish *Havens* standing must show more than a mere "setback to the organization's abstract social interests," *Havens*, 455 U.S. at 379, a "'self-inflicted' budgetary choice,'" *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) ("*ASPCA*") (quoting *Equal Rights Ctr.*, 633 F.3d at 1139), or an effect on the "organization['s] lobbying activities," *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005). Rather, it must show that the challenged action "directly affected and interfered with" the organizations' "core business activities," *All. for Hippocratic Med.*, 602 U.S. at 395, and that "the [organization] used its resources to counteract that injury" or incurred other tangible losses, *ASPCA*, 659 F.3d at 25.[7]

Here, the organizational plaintiffs have satisfied this burden.  RAICES, Las Americas, and Florence Project have each identified various ways that the Proclamation and implementing guidance have interfered with their core business activity of providing direct legal services to individuals at risk of removal, including asylum seekers.  The declaration submitted by RAICES' legal director, for example, attests that the organization "provides free and low-cost immigration legal services to underserved immigrant children, families and individuals" in support of its mission to "defend the rights of immigrants and refugees."  Dkt. 14-1 at 1 (Hidalgo Decl. ¶ 3). The Proclamation and guidance interfere with that work because "the process of summarily expelling noncitizens without the opportunity for credible fear interviews frustrates and impedes RAICES from [its] fundamental day-to-day work of representing noncitizens with protection needs."  *Id.* (Hidalgo Decl. ¶ 4).  The Proclamation, for example, has greatly diminished

---

[7] It is unclear whether *ASPCA*'s separate use-of-resources inquiry is still required after *Alliance of Hippocratic Medicine*, but the Court will, out of an abundance of caution, consider whether Plaintiffs could satisfy the requirement, if it still exists.

RAICES' ability to provide legal services to those who would ordinarily proceed through the expedited removal process. Last year, RAICES provided legal services to about 15 such people every week. *See id.* at 2 (Hidalgo Decl. ¶ 9). Since the Proclamation went into effect on January 20, those opportunities have vanished. RAICES has "made contact with" only a few aliens who entered the country after that date, and "none of those people have been permitted to seek protection." *Id.* at 3 (Hidalgo Decl. ¶ 14). RAICES has had to "divert resources" to respond to the Proclamation and guidance by, among other things, "searching for alternative ways to contact detained individuals and families" and "training staff." *Id.* at 3 (Hidalgo Decl. ¶ 17). As a result, the organization has incurred additional expenses and has faced new obstacles in pursuing its core business activity. *Id.* at 4 (Hidalgo Decl. ¶ 18).

Similarly, Las Americas has shown that the Proclamation and guidance have frustrated and will continue to frustrate its ability to provide legal services to immigrants and will impose tangible burdens on the organization. The declaration submitted by Las Americas' legal services director describes the organization's mission and the activities that it pursues to support that mission. *See generally* Dkt. 14-2 (Babaie Decl.). Las Americas' mission is "to provide high-quality legal services to low-income immigrants, and to advocate for human rights." *Id.* at 1 (Babaie Decl. ¶ 3). To that end, the organization "provide[s] immigration counseling and representation to immigrants seeking asylum and other forms of humanitarian relief, including by representing individuals facing expedited removal who are referred for credible fear interviews." *Id.* The organization "cannot carry out much of [its] core work" if "noncitizens cannot access asylum or other statutory protections." *Id.* at 6 (Babaie Decl. ¶ 30). As the Babaie declaration explains, Las Americas "opened more than 800 new cases in 2024" and "[m]ore than half of the people that Las Americas serves are asylum seekers." *Id.* at 3 (Babaie Decl. ¶ 13).

Yet, since the Proclamation was issued, the organization has "not received calls for [a credible fear interview] consultation from anyone who entered the country." *Id.* at 4 (Babaie Decl. ¶ 19). Indeed, "[i]n response to the enforcement of the Proclamation, it is fair to say that *all* of Las Americas' work has been forced to change." *Id.* at 5 (Babaie Decl. ¶ 24). The Proclamation has also "forced [the organization] to divert limited resources away from individual representation" to find alternative ways to serve its missions, including, for example, "assisting families trying to find the location of loved ones who attempt[] to seek protection at the border." *Id.* at 6 (Babaie Decl. ¶ 31). Finally, the Babaie declaration explains that 85% of the organization's revenue comes from grants, some of which "have requirements regarding the number of people [the organization] serve[s] as well as caveats on the geography and types of services provided." *Id.* at 2 (Babaie Decl. ¶ 7). Because Las Americas' grants, most of which "are heavily metrics based," *id.* at 6 (Babaie Decl. ¶ 32), and because "many funders are interested in funding work that reaches the greatest number of people possible," *id.* at 7 (Babaie Decl. ¶ 35), the organization will incur expenses working to shore up its donor relationships and risks "losing out on grants" aimed at reaching the greatest number of people, since the Proclamation has undermined, and will continue to undermine, Las Americas' ability to connect with clients, *id.*

Finally, the Florence Project has also shown that the Proclamation and guidance have frustrated, and will continue to frustrate, its activities and will impair its ability to provide legal services to those seeking asylum, withholding of removal, and CAT protection. The Florence Project "is a 501(c)(3) non-profit legal services organization" whose "mission is to provide free legal and social services to detained adults and children facing immigration removal proceedings in Arizona." Dkt. 14-3 at 1 (St. John Decl. ¶ 2). Its goal is to "ensure that all immigrants facing removal have access to counsel, understand their rights under the law, and are treated fairly and

humanely." *Id.* The organization "represent[s] hundreds of adult clients before the asylum office, immigration courts, and the Board of Immigration Appeals . . . each year, including many who are seeking humanitarian relief, such as asylum, withholding of removal, and protection under the Convention Against Torture." *Id.* at 2 (St. John Decl. ¶ 4). "In 2023, Florence Project staff provided individualized legal support to at least one thousand adults in ICE custody who specifically were seeking some fear-based form of protection." *Id.* at 3 (St. John Decl. ¶ 9). Yet, "in sharp contrast to years of experience and migration and detention trends, as of February 18, 2025, Florence Project has still not been able to identify or [to] meet with any asylum seekers in ICE custody who entered the United States, whether by entering without inspection or presenting at a port of entry, after the Proclamation took effect on January 20, 2025." *Id.* at 4 (St. John Decl. ¶ 13). The Proclamation and guidance have, as a result, "substantially interfere[d] with" the organization's "core" activity of providing legal services to those seeking "fear-based humanitarian protection" or connecting those individuals "with *pro bono* legal representation." *Id.* (St. John Decl. ¶¶ 13–14). Like the other organizations, these hurdles have also required the Florence Project to divert resources to responding to the changed landscape and threaten "serious long-term financial consequences." *Id.* at 4–7 (St. John Decl. ¶¶ 15–20). As "the number of people who can be helped with asylum and related forms of relief will inevitably decrease[,] . . . so too will [the organization's] ability to be paid to do that mission-driven work." *Id.* at 6 (St John Decl. ¶ 19). Indeed, "[t]he Florence Project receives funding through the [National Qualified Representative Program] prime contractor on a flat rate based on the number of cases [it has] open and the number of net new cases [it] agree[s] to accept in a given option year," and, given the restrictions imposed in the Proclamation and guidance, the organization "stands to lose tens, if not hundreds of thousands of dollars[,] in funding." *Id.* at 6–7 (St. John Decl. ¶ 20).

These uncontested declarations demonstrate that the Proclamation and implementing guidance have had—and will continue to have—a significant and direct detrimental effect on the organizational plaintiffs' "core business activities," *All. for Hippocratic Med.*, 602 U.S. at 395; have required—and will continue to require—the organizational plaintiffs to expend substantial "resources to counteract that injury," *ASPCA*, 659 F.3d at 25; and will likely result in either a large loss of funding to the organizations or require the expenditure of resources to renegotiate or to amend grants or contracts or to find alternative sources of funding.  In *Alliance for Hippocratic Medicine*, the Supreme Court noted that the effect on the "core business activities" of the organizational plaintiff in *Havens* was "not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer."  602 U.S. at 395.  By the same token, the "core business activities" of the organizational plaintiffs in this case are not dissimilar to the interests of a "vendor who is prevented from selling his product to third parties by [an] unlawful regulation" and who "may challenge that regulation 'on the basis of the vendor-vendee relationship alone.'"  *Lepelletier v. FDIC*, 164 F.3d 37, 44 (D.C. Cir. 1999) (emphasis and citation omitted).  No more is required to establish standing under *Havens* and *Alliance for Hippocratic Medicine*.

Defendants disagree, arguing that a "less demanding case load" does not injure the organizations' "ability to carry out" their existing activities: they can still provide services to aliens who do end up in the "expedited removal credible fear process or in removal proceedings."  Dkt. 44 at 29–30 (emphasis omitted).  But there is no requirement that an organization prove that the challenged agency actions absolutely foreclose it from pursuing its core business activities.  A defendant's actions need only cause a "perceptibl[e] impair[ment],"

*Havens*, 455 U.S. at 379, and some attendant expenditure or loss of resources, *ASPCA*, 659 F.3d at 25.  The organizational plaintiffs have made that showing—and then some.

      2.    *Statutory Jurisdiction*

Defendants also contend that the Court lacks statutory jurisdiction to consider the organizational plaintiffs' claims that (1) "challenge the Proclamation" on the ground that "it 'contradicts the specific restrictions' found in the expedited removal statute;" (2) allege that "agency actions are leading to 'removals without compliance with the procedures required by the INA,' including procedures related to expedited removal;" or (3) "seek relief from any expedited removal orders entered pursuant to the Proclamation."  Dkt. 55 at 23 (citations omitted).  Defendants' argument fails for several reasons.

Most fundamentally, Defendants' argument misconstrues Plaintiffs' claims and misconceives the nature of the challenged governmental action.  Before turning to those difficulties, however, the Court pauses to note Defendants' concession that § 1252 allows "claim[s] that can be asserted . . . by an individual alien."  *Id.*  Their argument, in other words, applies only to the organizational plaintiffs, and the Court agrees that Defendants' § 1252 argument does not extend to the claims of the individual plaintiffs.  Given the Court's conclusion that the individual plaintiffs have Article III standing as well, and because only one plaintiff needs standing to maintain each claim asserted in a case, *see Town of Chester*, 581 U.S. at 439, it seems unlikely that the Court even needs to reach Defendants' challenge to the Court's statutory jurisdiction to consider the organizational plaintiffs' claims.  *See L.M.-M.*, 442 F. Supp. 3d at 22–23.  But, in any event, that challenge is unfounded.

The Court starts, as it must, with the statutory text. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004). Section 1252(a)(2) provides, in relevant part, as follows:

**(A)  Review relating to section 1225(b)(1)**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review—

(i)   except as provided in subsection (e), any *individual determination* or to entertain any other cause or *claim arising from or relating* to the implementation or operation of an order of removal *pursuant to section 1225(b)(1)* of [Title 8],

(ii)  except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of *such section*,

(iii) the application of *such section* to individual aliens, including the determination made *under section 1225(b)(1)(B)* of [Title 8], or

(iv)  except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement *the provisions of section 1225(b)(1)* of [Title 8].

8 U.S.C. § 1252(a)(2)(A) (emphasis added).  Boiling these subparagraphs down to their operative terms, § 1252(a)(2)(A) divests the courts of habeas, mandamus, all writs, or any other jurisdiction to "review" any action taken pursuant to—or taken to invoke, to apply, or to implement—the expedited removal statute, § 1225(b)(1), except as authorized in § 1252(e). When it came to the application and implementation of the expedited removal statute, Congress covered the waterfront: § 1252(e) provides the sole avenue of review for expedited removal "determination[s]" and the "implementation or operation of" expedited removal orders, 8 U.S.C. § 1252(a)(2)(A)(i); decisions made by the Attorney General (or the Secretary) "to invoke" the expedited removal procedure, *id.* § 1252(a)(2)(A)(ii); "the application of" the expedited removal provision "to individual aliens," *id.* § 1252(a)(2)(A)(iii); or the adoption "by the Attorney

General" or the Secretary of "procedures and policies" to implement the expedited removal statute, *id*. § 1252(a)(2)(A)(iv).

Here, however, Plaintiffs do not challenge any expedited removal order entered pursuant to § 1225(b)(1) or the implementation of any such order.  Nor do they challenge the Attorney General or the Secretary's decision to invoke § 1225(b)(1), their application of § 1225(b)(1) to any individual alien, or their adoption of any procedures or policies "to implement" § 1225(b)(1).  Rather, Plaintiffs challenge the lawfulness of the Proclamation—raising the question whether the President is authorized under 8 U.S.C. § 1182(f) and § 1185(a) or the Constitution to restrict and suspend access to each and every provision "of the INA that would permit" the covered individuals to remain in the United States, Proclamation, §§ 2, 3—and the lawfulness of the agency guidance that implements the Proclamation—including by "repatriat[ing]" or "remov[ing]" individuals pursuant to the Proclamation, Proclamation § 5, rather than under the usual INA procedures.

Although the Court must avoid conflating jurisdiction with the merits, Plaintiffs' contention that they are challenging the Proclamation and its implementation (and not the Attorney General or the Secretary's implementation of § 1225(b)(1)) finds support in the administrative record.  To start, the Proclamation itself purports to authorize "repatriation" and "removal" of "any alien engaged in the invasion across the southern border," not as an exercise of the Attorney General or the Secretary's authority under § 1225(b)(1), but, rather, "as an exercise of the [President's] suspension power in [8 U.S.C. § 1182(f) and § 1185(a)] of the INA . . . or as an exercise of [the President's] delegated authority under the Constitution of the United States."  Proclamation, § 5.  Consistent with that command, the implementing guidance directs that "[a]ll illegal aliens subject to Presidential Proclamation 10888 . . . will be processed pursuant

to sections 212(f) [8 U.S.C. § 1182(f)] and 215(a) [8 U.S.C. § 1185(a)] of the Immigration and Nationality Act." Dkt. 52-1 at 20. The documentation provided to covered individuals is to the same effect. The "212(f) Tear Sheet" included in the administrative record informs the affected individual that he or she is "being transported from the United States . . . *under Presidential Proclamation 10888* . . . as an alien whose entry to the United States has been suspended *pursuant to sections 212(f) and 215(a)* of the Immigration and Naturalization Act, as well as the power of the President under the Constitution of the United States." *Id.* at 25 (emphases added).

Other portions of the administrative record refer to "212(f) Direct Repatriations" and "212(f) Expedited Removal" or "Expedited Removal – Per 212(F)." *See, e.g.*, *id*. at 6, 11–14, 18–19, 21. When asked to explain the difference between a "212(f) Direct Repatriation" and a "212(f) Expedited Removal," Defendants identified only one difference: An individual subject to "212(f) Expedited Removal" receives "a Notice to Alien Ordered Removed and [is] issued an Expedited Removal Order," while an individual subject to a "212(f) Direct Repatriation" does not. Dkt. 59 at 7–8. As Defendants further explained, *id.* at 8, this difference has collateral immigration consequences, given the temporary inadmissibility of those previously subject to removal orders and the risk of criminal liability for reentry, *see* 8 U.S.C. §§ 1182(a)(9)(A), 1231(a)(5), 1326, but it is otherwise inconsequential.

Two things stand out about this approach. First, there is no such thing as "direct repatriation" under the INA. Second, "212(f) Expedited Removal" is not the same thing as expedited removal under 8 U.S.C. § 1225(b)(1). Section 1225(b)(1) permits "an immigration officer" to order the immediate removal of an inadmissible alien, "*unless* the alien indicates either an intention to apply for asylum under section 1158 of [Title 8] or a fear of persecution." 8 U.S.C. § 1225(b)(1) (emphasis added). The provision then goes on to describe, in detail, the

procedures for conducting the required asylum and credible fear interviews, reviewing the initial determinations made by asylum officers, and referring matters for full removal proceedings. *Id.* And all of that—that is, the defining characteristics of a § 1225(b)(1) expedited removal proceeding—is precisely what the Proclamation and guidance do not allow. Notably, Defendants are not even purporting to implement § 1225(b)(1); they are, on their own telling, implementing the Proclamation. *See infra* at 107–10. The Proclamation is premised on a distinct set of statutory and constitutional provisions, and, by its own terms, the Proclamation operates separate and apart from "provisions of the INA that would permit [an alien's] continued presence in the United States." Proclamation, §§ 2, 3. Nothing in § 1252(a)(2)(A) limits the Court's jurisdiction to consider the lawfulness of a proclamation (or the implementation of a proclamation) issued pursuant to § 1182(f) and § 1185(a) and the President's non-INA "authority to protect the sovereignty of the United States," *see* Proclamation, preamble.

Finally, the Court notes an important difference between § 1252(a)(2)(A)(i) and § 1252(f)(1). In *Aleman Gonzalez*, the Supreme Court read § 1252(f)(1)—and, in particular, the limitation on class-wide court orders enjoining or restraining "the operation of the provisions of part IV"—to deprive the lower courts of authority to issue "injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." 596 U.S. at 548, 550 (emphasis omitted). Section 1252(a)(2)(A)(i), in contrast, does not refer to the "operation" of any statutory provision but, rather, refers to the "operation of *an order of removal pursuant to [§] 1225(b)(1)*." 8 U.S.C. § 1252(a)(2)(A)(i) (emphasis added). That matters because this case does not involve "an order of removal [entered] pursuant to [§] 1225(b)(1)." *Id.* To the contrary, by Defendants' own account, all of the "212(f) Direct Repatriations" and all of the "212(f) Expedited Removal"

orders are undertaken "per" § 1182(f) (INA § 212(f))—not § 1225(b)(1). *See, e.g.*, Dkt. 52-1 at 12; *see also* Dkt. 44 at 20, 58; Dkt. 55 at 28–29 (asserting that covered aliens "do not fall within the bounds of" § 1225(b)(1)).

Accordingly, even if the Court did not have statutory jurisdiction based on the individual plaintiffs' claims, the Court would have both Article III and statutory jurisdiction based on the organizational plaintiffs' claims.[8]

3.    *Causes of Action*

Defendants' final set of threshold arguments posit that Plaintiffs lack an APA or a non-statutory cause of action.  They are incorrect on both counts.

a.    APA Cause of Action

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  At times, the APA merely provides the required waiver of sovereign immunity necessary to bring suit under another statute, while, at other times,

---

[8] Although the Court need not reach the issue, the Court's conclusion would, in any event, likely remain the same, even if § 1252(a)(2)(A) applied to the organizational plaintiffs' claims.  That is because § 1252(a)(2)(A) permits challenges under § 1252(e)(3), and that provision authorizes timely challenges to "written policy guideline[s]" implementing § 1225(b)(1).  Defendants' sole counterargument posits that § 1252(e)(3) only permits claims by "*individuals* subject to . . . expedited removal."  Dkt. 44 at 35–36.  But that misreads both the statute and is inconsistent with recent precedent from this Court.  Most notably, nothing in the text of § 1252(e)(3) limits review to individuals.  Although Defendants invoke *American Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000) ("*AILA*"), in support of their reading of the statute, recent precedent from this Court reads *AILA* to address only third-party standing—a theory that the organizational plaintiffs do not advance in this case and that, accordingly, Defendants do not challenge.  *See Las Americas Immigrant Advocacy Center*, 2025 WL 1403811, at *9 n.8.  And although Defendants also invoke the D.C. Circuit's decision in *Make the Road New York*, 962 F.3d at 627, that decision also read *AILA* to address only third-party standing.  When it came to resolving the jurisdictional question that was before it, moreover, the *Make the Road New York* court held that Make the Road New York *had standing*, albeit on a theory of associational standing.  *Id.* at 623–28.

the APA provides both the waiver of sovereign immunity and the cause of action.  *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 183–91 (D.C. Cir. 2006).  The APA cause of action, however, is available only to review "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.  The APA's scope of review provision, in turn, authorizes a reviewing court to, among other things, "set aside agency action . . . found to be . . . not in accordance with law."  *Id.* § 706(2)(A).  Here, Defendants contend that APA review is unavailable to the Plaintiffs for a variety of reasons, none of which are ultimately persuasive.

*First*, Defendants argue that the Proclamation does not constitute "agency action" and that the implementing guidance does not constitute "final agency action distinct from the Proclamation."  Dkt. 44 at 39.  Although they are correct that the Proclamation is not itself subject to APA review, their characterization of the implementing guidance misses the mark.  An agency action is deemed final if two conditions are met.  First, the action "must mark the consummation of the agency's decisionmaking process" and "must not be of a merely tentative or interlocutory nature."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citation omitted).  "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.* at 178 (internal quotation marks omitted).  Both conditions are satisfied here.  The guidance "consummates" the Department of Homeland Security's decision regarding the implementation of the Proclamation; there is nothing preliminary, tentative, or inchoate about it.  It is equally clear, moreover, that the guidance has real "legal consequences" for those subject to the Proclamation, including the individual plaintiffs in this case, some of whom have already been removed from the United States pursuant to the guidance.

Nor is the guidance "indistinct" from the Proclamation.  To be sure, the guidance implements the Proclamation, but it also adds both detail and real-world consequences.  The guidance—not the Proclamation—sets out two types of removal procedures that will apply to aliens subject to the Proclamation, instructs officers and agents not to ask aliens specific fear questions or to use forms otherwise required under the agencies' regulations, and instructs immigration officers to use a heightened standard when screening covered aliens for CAT protection.  *See, e.g.*, Dkt. 52-1 at 13.  This is not a case of guidance that is "purely informational in nature" or that merely "'restate[s]' legal requirements derived from independent sources of law."  Dkt. 55 at 21 (quoting *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004)).  Defendants maintain that "[t]o the extent aliens are removed or repatriated because they entered in violation of the Proclamation, that is a direct legal consequence of the President's suspension order."  Dkt. 55 at 21–22.  But as the D.C. Circuit observed in response to a similar argument in *Reich*, the fact that the agency is implementing a presidential directive "hardly seems to insulate" the agency action "from judicial review under the APA, even if the validity of the" presidential directive is "thereby drawn into question."  74 F.3d at 1327.  If this were a case in which the President had "final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties," the implementing guidance might be disregarded.  *Pub. Citizen*, 5 F.3d at 552.  But it is not.  Indeed, in recognition of that fact, the Proclamation directs "[t]he Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General" to "take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion."  Proclamation, § 5.

*Second*, Defendants argue that APA review is precluded here because of "other limitations on judicial review" that the APA leaves intact.  Dkt. 44 at 41 (quoting 5 U.S.C.

§ 702(1)).  In particular, Defendants maintain that "the longstanding limitation on review of Executive decisions to deny entry to aliens" bars review.  *Id.*  If that were all that was at issue, this would be a far different case, and it might raise the question regarding the President's independent constitutional authority to protect the borders of the United States, which was left unanswered in *Trump v. Hawaii*, 585 U.S. 667 (2018), and *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993).  But this case, unlike *Trump v. Hawaii* and *Sale*, turns on whether the President's authority to limit "entry" carries with it the authority to close the avenues of humanitarian relief that are available to those who have already entered the United States and whether that authority can supersede or displace the INA.  None of the language in § 1182(f) that "exudes deference to the President," such as "'[w]henever [the President] finds that the entry' of aliens 'would be detrimental' to the national interest,'" he may suspend or limit entry "'for such period as he shall deem necessary,'" *Trump v. Hawaii*, 585 U.S. at 684 (quoting 8 U.S.C. § 1182(f)), is at issue here.

*Third*, Defendants argue that APA review is unavailable because the decision at issue— the President's decision to invoke § 1182(f) and § 1185(a)—is "committed to agency discretion by law."  Dkt. 44 at 41 (quoting 5 U.S.C. § 701(a)(2)).  The Court does not doubt that the President is entitled to substantial deference in deciding whether to "suspend the entry of all aliens or any class of aliens" to promote "the interests of the United States."  8 U.S.C. § 1182(f); *see also Trump v. Hawaii*, 585 U.S. at 684.  The deference that the President receives *within the realm* of § 1182(f)—that is, when deciding whether and when to suspend or limit "entry" into the United States and whom to include in the excluded class—does not mean, however, that he is entitled to the same level of deference *outside that realm*—that is, when attempting to deny those

who have already entered the United States access to "portions of the immigration system," to those who have already entered the United States, *see* Proclamation, preamble.

*Fourth*, Defendants argue that the organizational plaintiffs lack zone-of-interests standing. Dkt. 44 at 36–38. Zone-of-interests standing is a non-jurisdictional doctrine that asks whether a "plaintiff's complaint fall[s] within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (internal quotation marks and citation omitted). The zone-of-interests test is, in other words, a "tool for determining who may invoke the cause of action" created in the statute at issue. *Id.* at 130. "[I]n keeping with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable,'" the test, at least in the APA context, "'is not meant to be especially demanding.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quoting *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987)). "The interest [the plaintiff] asserts must be 'arguably within the zone of interests to be protected or regulated by the [underlying] statute' that [the plaintiff] says was violated." *Id.* at 224 (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). Courts "do not require any 'indication of congressional purpose to benefit the would-be plaintiff,'" and the Supreme Court has "always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff." *Id.* at 225 (quoting *Clarke*, 479 U.S. at 399–400). "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* (quoting *Clarke*, 479 U.S. at 399).

The organizational plaintiffs satisfy this permissive test. Notably, their interests in providing legal assistance to asylum seekers is consistent with the INA's purpose to "establish[]

. . . [the] statutory procedure for granting asylum to refugees." *Cardoza-Fonseca*, 480 U.S. at 427. As in *O.A.*, the organizational plaintiffs' "interest in representing asylum seekers furthers the purposes of the INA," *see* 404 F. Supp. 3d at 144, which instructs the government to advise aliens filing an application for asylum "of the privilege of being represented by counsel" and to "provide the alien a list of persons . . . who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis," 8 U.S.C. § 1158(d)(4).

Defendants argue that *O.A.* relied on a "more lenient version" of the zone-of-interests test that "no longer survives the Supreme Court's more recent decision in *United States v. Texas*, 599 U.S. 670 (2023)." Dkt. 44 at 38. According to Defendants, *Texas* "clarified . . . that third parties like Plaintiffs have no cognizable interest in the way the Executive enforces the immigration laws against others." *Id.* (citing *United States v. Texas*, 599 U.S. at 674, 677). But the Supreme Court has made clear that Article III standing and zone-of-interests standing are entirely different concepts, and *United States v. Texas* addressed only Article III standing. Nothing in that decision calls into question the zone-of-interests test set forth in *Lexmark*, 572 U.S. at 126, and *Patchak,* 567 U.S. at 225, which is the standard that the Court applied in *O.A.*, 404 F. Supp. 3d at 144. Nor did the Supreme Court announce a new understanding of Article III standing in *United States v. Texas*. To the contrary, the Court merely applied the well-established rule that the executive's exercise of prosecutorial discretion is, by and large, unreviewable. *United States v. Texas*, 599 U.S. at 674 (quoting *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973)).[9]

---

[9] Neither *INS v. Legalization Assistance Project of the Los Angeles County Federation of Labor* ("*LAP*"), 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers) nor *Federation for American Immigration Reform, Inc. v. Reno* ("*FAIR*"), 93 F.3d 897, 900–04 (D.C. Cir. 1996), supports a contrary conclusion. *See* Dkt. 44 at 37. Justice O'Connor's in-chambers opinion in *LAP* reflects the views of a single Justice relating to a different statute, the Immigration Reform and Control Act of 1986 ("IRCA"). *FAIR*, too, is inapposite. The organization at issue in that case was

b.  <u>Non-Statutory Cause of Action</u>

Plaintiffs also bring a non-statutory—or equitable—cause of action challenging the Proclamation itself.  Defendants argue that no such cause of action is cognizable for a hodgepodge of reasons, most of which receive little more than a sentence in Defendants' briefs. They argue that the Proclamation itself "unambiguously forecloses judicial review," Dkt. 44 at 43; that, in any event, "proclamations are [simply] management tools for implementing the President's policies, not legally binding documents that may be enforced against the Executive Branch," *id.*; that § 1182(f) and § 1185(a) vest the President with discretion that is not subject to "judicial second-guessing," *id.* at 43–45; that the President's authority to exclude or expel aliens "remains largely immune from judicial control," *id.* at 45 (citation omitted); that the President's authority "stems not [only] from legislative power but is inherent in the executive power to control the foreign affairs of the nation," *id.* (citation and emphasis omitted); that "the power over aliens is of a political character and therefore subject only to narrow judicial review," *id.* at 46 (citation and emphasis omitted); that the "courts are categorically barred from issuing injunctions that would purport to enjoin or otherwise constrain the President in the performance of his official duties," Dkt. 55 at 19 (citation omitted); that Plaintiffs' claims here are statutory, "even if dressed in separation-of-powers garb," *id.*; and, finally, that Plaintiffs' claims fail to

---

"dedicated to ensuring that levels of legal immigration are consistent with the absorptive capacity of the local areas where immigrants are likely to settle," and it brought suit challenging the INA's scheme for "parole and adjustment of status of Cuban nationals" into the United States.  *FAIR*, 93 F.3d at 899 (internal quotation omitted).  The D.C. Circuit held that the organization's mission bore no more than a "marginal[] rela[tionship]" to the statutory purposes of the INA, because it pointed to no language of congressional intent that "even hint[ed] at a concern about [the] regional impact" of immigration.  *Id*. at 900–01 (internal quotation marks omitted).

allege a violation sufficiently egregious to support "an *ultra vires* claim," *id.* at 20 n.4 (emphasis added).

To the extent this litany of arguments either rehashes arguments addressed above or anticipates the merits, which are addressed below, the Court will not repeat itself here. A couple of points, however, warrant at least brief mention. To start, non-statutory review of unlawful executive action existed long before the APA was enacted, and "[n]othing in the subsequent enactment of the APA altered" the understanding that, "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988); *see also Reich*, 74 F.3d at 1328. Nor is there any merit to Defendants' suggestion that *ultra vires* review is available only in cases alleging a constitutional claim. To be sure, *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015), involved a claim premised on the Supremacy Clause. But the Supreme Court did not limit its recognition of a right to sue to enjoin "violations of federal law by federal officials" to constitutional claims. *Id.* As the D.C. Circuit explains in *Reich*, moreover, the long history of the non-statutory cause of action started with a statutory claim in *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902), in which the Supreme Court assumed the constitutionality of the statutes at issue and addressed, instead, whether the Postmaster General acted in accordance with those statutes, and has been applied on numerous occasions to statutory claims. 74 F.3d at 1327–28 (citing leading cases).

Nor is there any merit to Defendants' suggestion that presidential actions lie beyond the scope of review, even when the relief is limited to enjoining the actions of subordinate government officials. To the contrary, the D.C. Circuit engaged in precisely that form of review in *Reich*, 74 F.3d at 1328; it is the approach that Justice Scalia endorsed in his concurrence in

*Franklin v. Massachusetts*, 505 U.S. at 823–29; and it is what happened in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).  As the D.C. Circuit wrote in *Soucie v. David*: "The fact that the President may have ordered" the subordinate official to engage in the challenged conduct "does not leave the courts without power to review the legality of" that conduct, "for courts have power to compel subordinate executive officials to disobey illegal Presidential commands."  448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971).  In this respect, Defendants' unsupported contention that federal courts not only lack the power to enjoin the President, but also lack the power to "otherwise constrain" how he discharges his "official duties," Dkt. 55 at 19, is not only wrong, but at odds with the fundamental tenet that ours is "a government of laws and not of men," *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting) (internal quotation marks omitted); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 575 (D.D.C. 1952).  And their argument that the substance of the Proclamation is unreviewable merely because it recites the usual boilerplate disclaiming the creation of "any right or benefit, substantive or procedural, enforceable at law or in equity," Proclamation, § 6, requires only the briefest of responses; putting aside Defendants' misreading of the Proclamation, the Executive Branch, in any event, cannot avoid judicial review by simply declaring that its actions are unreviewable.

There are, of course, limits on the availability of *ultra vires* or non-statutory review.  Congress (unlike the Executive Branch) may "preclude[] non-statutory judicial review," *Reich*, 74 F.3d at 1328, and certain exercises of presidential authority are committed to the President's exclusive discretion.  The Court, however, has already addressed the relevant statutory limits on its jurisdiction and authority, and, in the field of immigration, the President shares authority with Congress.  *See* U.S. Const. art. I, § 8 ("The Congress shall have Power To . . . establish an

uniform Rule of Naturalization.").  As precedent reflects, in areas of shared presidential and congressional authority, the courts have presumptive authority to determine whether the President has usurped an authority that Congress neither delegated to him nor left for him to exercise unimpeded by statute.  *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654 (1981); *Youngstown*, 343 U.S. 579; *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993).[10]

## B.     Merits

Plaintiffs challenge the Proclamation and implementing guidance as an unlawful effort to supplant the detailed provisions of the INA with an alternative set of immigration laws established by executive "fiat."  Dkt. 52 at 11.  They argue that the Proclamation and guidance purport to establish an alternative extra-statutory system for removing or repatriating aliens in "212(f) Expedited Removals" and "212(f) Direct Repatriations," rather than under the rules and procedures that Congress has enacted.  And they argue that, under this alternative system, the right to apply for asylum, 8 U.S.C. § 1158, the right to withholding of removal, 8 U.S.C. § 1231(b)(3), 8 C.F.R. §§ 208.16, 1208.16, and the procedural protections ordinarily available to CAT applicants, 8 U.S.C. § 1231 note (head of agency must implement CAT by "prescrib[ing] regulations"); 8 C.F.R. §§ 208.9, 208.30, 1208.30, are abrogated for those aliens subject to the Proclamation.

Plaintiffs further argue that none of the authorities that Defendants invoke in support of the Proclamation and guidance authorize such a wholesale rewriting of the INA and the governing regulations.  Plaintiffs stress that, even if § 1182(f) and § 1185(a) confer broad

---

[10] Defendants also contend that the determination of what constitutes an "invasion" is a nonjusticiable political question.  *See* Dkt. 44 at 47–48.  But because the Invasion Clause of Article IV does not provide authority for the challenged actions that is not found elsewhere, *see infra* at 84–89, the Court need not make any such determination.

discretion on the President to suspend or to restrict "entry" into the United States, those

provisions do not authorize the President or the Secretary to suspend access to asylum and

withholding of removal or to disregard the regulations governing CAT determinations.  Nor, on

Plaintiffs' telling, do those provisions permit the President or the Secretary to supplant the INA's

detailed procedures for removal of aliens who are unlawfully present in the United States with

non-statutory, non-regulatory, and less protective "212(f) Expedited Removals" and "212(f)

Direct Repatriations."  And, Plaintiffs continue, neither the President's Article II authority nor

whatever independent authority he might have under Article IV, Section 4 allows him or those

acting at his direction to take any of these actions.  As the Supreme Court recently observed,

Congress maintains "plenary power over immigration," and the President's exercise of delegated

authority cannot exceed the bounds that Congress has set.  *SEC v. Jarkesy*, 603 U.S. 109, 129

(2024).  Yet, according to Plaintiffs, that is precisely what the Proclamation and implementing

guidance purport to do.

Defendants disagree with each of these arguments, and they maintain that the

Proclamation and implementing guidance constitute a permissible, albeit novel, use of § 1182(f)

and § 1185(a), and that the President's constitutional authority both bolsters that conclusion and

provides an independent basis for the Proclamation and guidance.  Their arguments, for the most

part, turn on an appeal to efficacy and an implied (albeit not express) authority to take all steps

necessary to stop unauthorized individuals from crossing the southern border, Proclamation, § 2,

or entering the United States elsewhere, without "sufficient medical information and reliable

criminal history and background information," Proclamation, § 3.

For the reasons explained below, the Court concludes that Plaintiffs have the better of the

arguments and that neither the INA nor the Constitution authorizes the changes in immigration

law embodied in the Proclamation and implementing guidance.  The Court will first address the

creation of the new "212(f) Direct Repatriation" and "212(f) Expedited Removal" mechanisms

and will then consider the suspension of the rights to apply for asylum and to obtain withholding

of removal and the changes made to the procedures for seeking CAT protection.

      1.     *"212(f) Direct Repatriation" and "212(f) Expedited Removal"*

          a.   <u>Statutory Authority</u>

The first question is whether the INA authorizes the use of the new "212(f) Direct

Repatriation" and "212(f) Expedited Removal" mechanisms in lieu of traditional removal

procedures.  The parties agree that the regular removal procedures set forth in § 1229a constitute

"'the sole and exclusive procedure[s]' for ordering the removal of noncitizens" from the United

States, Dkt. 52 at 16 (quoting 8 U.S.C. § 1229a(a)(3)), "[u]nless otherwise specified in [the

INA]," Dkt. 55 (quoting same).[11]  They also agree that expedited removal under § 1225(b)(1)

constitutes an "otherwise specified" procedure, thereby establishing at least two routes to

removal: regular removal and expedited removal.  Their disagreement, instead, turns on whether

"§ 1182(f) is an INA provision that 'otherwise specifie[s]' that an alien may be repatriated" or

---

[11] This reading of the statute most naturally starts with § 1225(a), which provides that any "alien present in the United States who has not been admitted . . . shall be deemed for purposes of [Chapter 12 of the INA] an applicant for admission."  8 U.S.C. § 1225(a)(1).  Section 1229a(a)(3), in turn, provides that, "[u]nless otherwise specified in [Chapter 12], a proceeding under [§ 1229a] shall be the sole and exclusive procedure for determining whether an alien may be admitted," 8 U.S.C. § 1229a(a)(3).  Section 1225(b)(1) qualifies under the "otherwise specified" exception because it provides for expedited removal of certain aliens.  Absent some other authorization found in Chapter 12, these provisions provide the "sole and exclusive procedure[s]" for removal of an alien who enters the United States without documentation.  *See United States v. Guzman*, 998 F.3d 562, 567 (4th Cir. 2021); *cf. Marcello v. Bonds*, 349 U.S. 302, 309–10 (1955) (holding that Congress intended the pre-IIRIRA removal procedures to be the sole and exclusive means for deportation of aliens).  Finally, even without § 1229a(a)(3)'s exclusivity provision, the same conclusion would apply.  Congress has crafted detailed rules and procedures that would be rendered meaningless if an agency were free to adopt its own rules and procedures in place of those that Congress enacted.

removed without complying with the procedures set forth in § 1229a (regular removal) or

§ 1225(b)(1) (expedited removal).  Dkt. 55 at 24 (describing "[t]he government's claim here").

In Defendants' view, the President's authority to suspend or limit "entry" into the United States

necessarily carries with it the authority to "repatriate" those who enter the United States in

violation of the Proclamation.  In other words, according to Defendants, "212(f) Direct

Repatriation" (and, presumably, "212(f) Expedited Removal") is a necessary byproduct of the

right to deny entry, and that implied authority is sufficient to bring the President's exercise of his

§ 1182(f) authority within the "otherwise specified" exception to the exclusive-procedures

clause.  *Id.* at 24–26.  The Court is unpersuaded for several reasons.

At the outset, it bears note that the Proclamation does not purport to establish a new

"212(f) Direct Repatriation" or "212(f) Expedited Removal" mechanism in lieu of the existing

statutory procedures.  Rather, the word "repatriate" appears only twice in the Proclamation—

once in the preamble, where the President describes his constitutional (rather than statutory)

authority, and once in Section 5 of the Proclamation, where the President directs the Secretary to

"take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion

across the southern border of the United States."  It was only in the implementing guidance

issued by USCIS and U.S. Customs and Border Protection that the concepts of "212(f) Direct

Repatriation" and "212(f) Expedited Removal" emerge.  *See* Dkt. 52-1 at 5–6, 13–14.  As a

result, to the extent Defendants' argument is premised on an exercise of the President's authority

under § 1182(f), the President did not purport to create a new mechanism for expelling those

unlawfully in the United States—"otherwise" than as specified in § 1225(b)(1) and § 1229a.  Nor

do Defendants cite any authority indicating that the President's authority under § 1182(f) is

delegable to USCIS and U.S. Customs and Border Protection.

But, in any event, even if it were possible to read the INA to permit such a delegation of implied § 1182(f) authority, § 1182(f) cannot plausibly be read to authorize the President, the Secretary, or their subordinates to supplant the § 1225(b)(1) and § 1229a removal procedures with the new "212(f) Direct Repatriation" and "212(f) Expedited Removal" mechanisms.  The Court, once again, starts with the statutory text, which grants the President discretion to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants" or to "impose on the entry of aliens any restrictions he may deem appropriate."  8 U.S.C. § 1182(f).  "By its plain language, § 1182(f) grants the President broad discretion to suspend the entry of aliens into the United States."  *Trump v. Hawaii*, 585 U.S. at 683–84.  But that is all that it does.

Putting aside for the moment Defendants' claim of implied authority, it is safe to conclude that § 1182(f) does not, by its terms, authorize the President, the Secretary, or any of their subordinates to replace the regular, 8 U.S.C. § 1229a, or expedited, *id*. § 1225(b)(1), removal procedures set forth in the INA with a new, non-statutory "212(f) Direct Repatriation" or "212(f) Expedited Removal" mechanism.  At the time § 1182(f) was enacted, "entry" was defined to mean "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise."  INA, Pub. L. No. 414, § 101(a)(13), 66 Stat. 163, 167 (1952).  Section 1182(f), accordingly, authorizes the President to prohibit "all aliens or any class of aliens" from "coming . . . into" the United States for a designated period of time; it does not grant him the power to "repatriate" or to peremptorily remove those who have already entered without utilizing the statutory procedures for doing so.

Nor does the President's authority under § 1182(f) to impose "restrictions" "on the entry of aliens" suffice to trigger the "otherwise specified" exception to the "sole and exclusive procedure[s]" for removing those who have entered the United States.  8 U.S.C. § 1229a(a)(3).

As the Supreme Court explained in *Trump v. Hawaii*, "[f]airly read, [§ 1182(f)] vests authority in the President to impose additional limitations on entry beyond the grounds for exclusion set forth in the INA—including in response to circumstances that might affect the vetting system or other 'interests of the United States.'" 585 U.S. at 691. In other words, § 1182(f) is best read to permit the President to impose non-statutory restrictions on "the entry of aliens." But the authority to "impose on the *entry* of aliens any restrictions he may deem to be appropriate," 8 U.S.C. § 1182(f) (emphasis added), does not mean that the President has the authority to alter the rules that apply to those who have already entered.[12]

Defendants' attempts to sidestep the statutory text are unavailing. *First*, Defendants maintain that "[n]othing in Section 1182(f) forecloses repatriation of illegal immigrants who manage to gain physical entry into the United States notwithstanding a Proclamation barring such entry." Dkt. 44 at 49. That is true but unhelpful. A failure to forbid is not a grant of authority, and the authority granted here, as discussed above, is limited to the sphere of "entry." *See INS v. Chadha*, 462 U.S. 919, 953 n.16 ("Executive action [under legislatively delegated authority] is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review . . . ."); *see also Trump v. Hawaii*, 585 U.S. at 688 (finding that the § 1182(f) proclamation at issue in that case did "not exceed any textual

---

[12] Defendants do not argue that aliens subject to the Proclamation have not "entered" the United States, presumably because Plaintiffs do not raise a due process challenge, *see infra* at 83–84, and because the Proclamation and guidance seek to govern the expulsion of covered aliens, regardless of how long (after January 20, 2025) they have been in the United States, where they are located, or whether they are detained. A blurring of the meaning of the word "entry" as used in the INA would also complicate the enforcement of other provisions of the statute. For example, 8 U.S.C. § 1326 provides that any alien who "enters" after having previously been denied admission or removed is subject to a fine or imprisonment. It is hard to imagine the government taking the position that those criminal penalties would not attach to an alien who had only succeeded in making it a short way past the border before being apprehended.

limit on the President's authority"); *cf. La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("An agency may not confer power upon itself.").

*Second*, Defendants contend that a "[s]uspension on entry must necessarily encompass the ability to expel" because, otherwise, "the statute's authority to prohibit physical entry" would be "render[ed] . . . ineffective." Dkt. 44 at 49. This is not a textual argument but, rather, posits that § 1182(f) includes an implied authority to take whatever actions are necessary to give effect (or, more aptly, to give maximum effect) to a suspension of entry. As an initial matter, the Court notes that Defendants' implied-authority argument is a peculiar one under the present circumstances, since the President has suspended "entry" of individuals who were already forbidden from entering, only then to argue that he has the implied authority to take whatever actions he (or his subordinates) deems necessary to give effect to his (redundant) suspension of entry. There is an impressive bootstrapping element to that argument.

In other contexts, moreover, the authority to suspend entry is undoubtedly meaningful. That is, for example, what spurred the litigation leading to the Supreme Court's decision in *Trump v. Hawaii*, 585 U.S. 667 (2018). Presidents have also used § 1182(f) to exclude aliens whose actions "threaten[ed] the peace, security, or stability of Libya," Executive Order 13726, 81 Fed. Reg. 23559, 23559 (Apr. 21, 2016), or to exclude "members of the military junta in Sierra Leone and members of their families," Proclamation 7062, 63 Fed. Reg. 2871, 2871 (Jan. 16, 1998). In general, statutory grants of authority to the Executive Branch do not carry with them a sweeping, implied authority analogous to Congress's power under the Necessary and Proper Clause, *see McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819). Just as the courts will not "rewrite [a] statute . . . as if it" pursued "a single policy at all costs," *Advoc. Christ Medical Ctr. v. Kennedy*, 145 S. Ct. 1262, 1274 (2025), so too the President may not assert an

authority not found in the text of a statute merely because that additional authority would render his statutorily authorized actions more effective.

In this respect, Defendants' appeal to an implied authority runs headlong into the aphorism about hiding elephants in mouseholes. *See Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001). To be sure, § 1182(f) confers a broad authority on the President to suspend or restrict the entry of aliens when doing so, in his view, is in the "interests of the United States." 8 U.S.C. § 1182(f). But it is a different matter altogether to read § 1182(f) in a manner that is unmoored to the statutory text and, instead, to authorize the President (or his subordinates) to use a § 1182(f) suspension on entry as a springboard to take whatever enforcement actions deemed necessary to give effect to the suspension. That assertion of implied authority is particularly striking, moreover, when used to replace the statutorily prescribed procedures with non-statutory mechanisms—to permit immigration authorities, for example, to pack any covered aliens onto a bus or airplane and to expel them from the country, without complying with § 1225(b)(1) or § 1229a. It is also striking when used to enforce a presidential prohibition on entry that merely echoes the prohibition that Congress itself included in the INA. Indeed, if § 1182(f) could be read that capaciously, Congress could have altogether dispensed with enacting IIRIRA and creating the expedited removal procedure, since the President would have already had the unilateral authority to deploy a version of the expedited removal rules (or a truncated version of those rules or no rules at all) based on nothing more than his authority to suspend or restrict the entry of any class of aliens into the United States (including those who are already barred from entry). Neither the plain language of § 1182(f) nor history nor common sense permits cramming such a large elephant into even the most spacious of mouseholes.

Defendants assert, however, that two cases—the Supreme Court's decision in *Sale v. Haitian Centers Council Inc.*, 509 U.S. 155 (1993), and the D.C. Circuit's decision in *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022)—support their view that § 1182(f) must be read to grant the President (or his subordinates) an implied repatriation authority.  The Court is unpersuaded on both counts.  In *Sale*, the Supreme Court held, without any explanation, that it was "perfectly clear" that § 1182(f) authorized the President to place a naval blockade *outside* U.S. territorial waters to *turn back* Haitian migrants whose entry had been suspended.  509 U.S. at 187.  On Defendants' telling, the power to repatriate is "simply the other side of the *Sale* coin;" just as the President can take "preventative action to ensure that aliens subject to the Proclamation do not reach the border," so too can he take remedial action if a covered alien enters anyway.  Dkt. 44 at 50.  But *Sale*'s observation that a President could take an action to prevent aliens whose entry was suspended from ever reaching U.S. soil—that is, to prevent their "entry"—does not imply that he also enjoys the power to use extra-statutory methods to expel those aliens after they have already entered the United States.  Indeed, if anything, *Sale* suggests that once someone has physically entered the United States, the protections of the INA attach.  As the *Sale* Court observed, the naval blockade was intended to "prevent[] Haitians . . . from reaching our shores *and invoking* [*the INA's*] *protections*."  *Id.* at 160 (emphasis added).

Defendants' reliance on *Huisha-Huisha* is also misplaced.  *Huisha-Huisha* said nothing about 8 U.S.C. § 1182(f) and, instead, addressed a statute found in Title 42 that is designed to protect the public health.  27 F.4th at 721.  That provision, 42 U.S.C. § 265, authorizes the Surgeon General—and the Centers for Disease Control and Prevention ("CDC"), by delegation—to issue an order that "prohibit[s], in whole or in part, the introduction of persons and property from such countries or places as [the CDC] shall designate in order to avert" a

"serious danger" to the public health posed by "the danger of introduction" of a communicable

disease "into the United States."  In 2020, during the onset of the COVID-19 pandemic, the CDC

issued implementing interim regulations that defined "introduction into the United States of

person from a foreign country" to mean "the movement of a person from a foreign country . . .

into the United States so as to bring the person in contact with others in the United States, or so

as to cause the contamination of property in the United States . . . in a manner that the [CDC]

determines to present a risk of transmission of a communicable disease."  Suspension of

Introduction of Persons Into United States from Designated Foreign Countries or Places for

Public Health Purposes, 85 Fed. Reg. 16559, 16563 (Mar. 24, 2020).  The interim regulations

further defined "'serious danger of the introduction of such communicable disease into the

United States' to mean the potential for introduction of vectors of the communicable disease into

the United States, even if persons or property in the United States are already infected or

contaminated with the communicable disease."  *Id.*

Acting pursuant to this statutory and regulatory authority and in light of the threat to

public health posed by the COVID-19 pandemic, the CDC issued an order in March 2020

suspending "the introduction of all covered aliens"—defined to include those "traveling from

Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into

the congregate settings in land [Ports of Entry] or Border Patrol stations"—"into the United

States" for a designated period of time.  Notice of Order Under Sections 362 and 365 of the

Public Health Service Act, 85 Fed. Reg. 17060, 17061 (March 26, 2020).  The CDC

subsequently extended the designated period of time on several occasions, and took the position

that the "'suspension' clause in § 265 grants the CDC the 'authority to temporarily suspect the

effect of any law, rule, degree, or order by which a person would otherwise have the right to be

introduced or [to] seek introduction into the U.S.'" *Huisha-Huisha*, 718 F.4th at 726 (quoting 85 Fed. Reg. 56424, 56426 (Sept. 11, 2020)).  The rights subject to suspension under a § 265 order, on the CDC's view, included the right to apply for asylum and the right to seek withholding of removal or CAT protection.

Among other challenges, which are discussed below, the *Huisha-Huisha* plaintiffs argued that 42 U.S.C. § 265 permits the CDC only to bar "introduction" of an alien into the United States and that it does not authorize the CDC or the Department of Homeland Security to "expel" those who have already been "introduced into the United States." *Id.* at 728.  In the preliminary posture of a motion for a preliminary injunction, the D.C. Circuit was unpersuaded, but for reasons that have little bearing on this case.  First and foremost, the court stressed that § 265 provides public health officials with authority to bar the introduction of persons into the United States "during a public-health emergency." *Id.* at 729.  The COVID-19 pandemic and the spread of the virus throughout the United States was precisely the type of emergency that § 265 was designed to address.  The court, accordingly, observed that the authority provided in § 265 "could be rendered largely nugatory if the Executive could not take any action against a covered alien who disregarded the prohibition and managed to set foot on U.S. soil." *Id.*  That reading of a different statute than the statute at issue here, of course, made perfect sense, and it cohered with the governing regulations.  As the statutory text makes clear, the purpose of § 265 is not to control immigration but, rather, to control "the introduction of [a dangerous communicable disease] into the United States." 42 U.S.C. § 265.  And as the governing regulations made clear, a communicable disease is "introduced" into the United States when "vectors" of the disease reach into the country.  85 Fed. Reg. at 16563.  If those potential "vectors" were allowed to remain in place while removal proceedings played out, the disease would spread, and the goal of

preventing spread of the disease in the United States would not be achieved.  In short, the D.C.

Circuit reasoned that § 265 must read in light of its purpose, and that purpose can be served only

through prompt expulsion.

Section 1182(f) shares none of those unique characteristics.  To start with the obvious,

§ 1182(f) is not a public health statute, and it is not concerned with the vectors by which a

communicable disease can be spread.  Rather, it is located in § 1182, a provision within the INA

entitled "Inadmissible aliens."  As the Supreme Court explained in *Trump v. Hawaii*, § 1182

"establishes numerous grounds on which an alien abroad may be inadmissible to the United

States," and, in § 1182(f) "Congress has also delegated to the President authority to suspend or

restrict the entry of aliens in certain circumstances."  585 U.S. at 683.  By providing authority to

suspend "entry" into the United States, § 1182(f) is of a piece with rest of § 1182.  *Id.* at 695 n.4.

There is no textual or other reason, moreover, to conclude that a proclamation suspending entry

of a class of aliens pursuant to § 1182(f) confers greater enforcement authority—or better

justifies a reason to resort to extra-statutory enforcement mechanisms—that any other limitation

on entry or admissibility found in § 1182.

By Defendants' reasoning, one of two things must be true:  Either those federal agencies

engaged in enforcing the immigration laws should be allowed to "repatriate" anyone who is

inadmissible pursuant to any of the provisions of § 1182, including any "alien present in the

United States without being admitted or paroled," 8 U.S.C. § 1182(a)(6)(A)(i).  Or there is

something unique about those barred entry pursuant to § 1182(f).  But the first proposition

proves too much and would render the detailed provisions found in § 1225(b)(1) (expedited

removal) and § 1229a (regular removal)—as well as the "exclusive procedures" provision, 8

U.S.C. § 1229a(a)(3)—meaningless.  Use of those provisions would be optional, and

enforcement authorities would be free to craft their own rules and procedures (or, indeed, simply to dispense with any rules and procedures) for expelling aliens from the United States. That, of course, is not the system that Congress has prescribed. That, then, leaves the second proposition, which fares no better. Congress could have provided the President with the authority, not only to suspend or restrict "entry," but also to "suspend" the normal removal procedures when operating pursuant to § 1182(f). Unlike with respect to 42 U.S.C. § 265, however, there is no reason—and certainly no reason that can be coherently cabined—to read § 1182(f) to confer such additional implicit authority on the President. Indeed, if that were the case, § 1225(b)(1) and § 1229a would, again, be dead letters (or at least optional processes that the enforcement agencies could disregard), since the President could always do as he has done here and bar entry to a class of aliens who are already barred entry under any of the other provisions of § 1182, and then declare that the only way to give that proclamation meaning is to permit non-statutory expulsions.

*Huisha-Huisha* is unhelpful to Defendants for a second reason as well. Section 1182(f) and 42 U.S.C. § 265 not only appear in different titles of the U.S. Code (titles that are focused on very different substantive fields), but the controlling statutory text is different. As noted above, the governing CDC regulations defined "introduction into the United States" to mean "the movement of a person from a foreign country . . . into the United States *so as to bring the person in contact with others in the United States* . . . in a manner that the [CDC] determines to present a risk of transmission of the communicable disease." 85 Fed. Reg. at 16563 (emphasis added). That is a reasonable interpretation of the phrase "introduction of persons . . . in order to avert" the danger of a communicable disease, as that phrase is used in § 265. But that is not what the word "entry" means, as used in the INA; rather, as explained above, since the time § 1182(f) was enacted, and consistent with common usage, "entry" has referred to "any coming of an alien into

the United States, from a foreign port of place or from an outlying possession, whether voluntarily or otherwise."  INA, Pub. L. No. 414 § 101(a)(13), 66 Stat. 163, 167 (1952); *see also Entry*, *Entrance*, *Enter* Webster's New Collegiate Dictionary at 274–75 (1953) (defining "enter" as "entrance" and "entrance" as "the act of entering," which, in turn, is defined as "go[ing] or com[ing] in").  Thus, while § 265 can be read to cover the continuing "introduction" of a disease-causing "vector" into the interior of the United States, even after the individual has crossed the border, the same is not true of the word "entry," as used in § 1182(f).

That, then, leads to one final question posed by *Huisha-Huisha*'s analysis of the CDC's authorization to expel aliens pursuant to § 265.  In that case, the plaintiffs argued "that aliens finish introducing themselves once they cross the border."  27 F.4th at 729.  In response, the D.C. Circuit first observed that the concept of entry into the United States is not fixed and that, *for purposes of the due process clause*, the Supreme Court has held that an alien who merely "set foot on U.S. soil"—in that case, the plaintiff "succeeded in making it 25 yards into U.S. territory before he was caught"—"cannot be a said to have 'effected an entry.'"  *DHS v. Thuraissigiam*, 591 U.S. 103, 139–40 (2020); *Huisha-Huisha*, 27 F.4th at 729.  But far from calling into question the longstanding understanding of "entry" for purposes of construing § 1182(f), the D.C. Circuit reaffirmed that "aliens who make it one foot over the border are on U.S. soil and *are thus entitled to certain statutory protections*."  *Huisha-Huisha*, 27 F.4th at 729 (emphasis added).  And, notably, the Supreme Court decision the court cited in support of that proposition counted "the right to a 'determin[ation]' whether [the plaintiff] had 'a significant possibility' of

'establish[ing] eligibility for asylum,'" as among those statutory protections that attach upon entry.[13] *Thuraissigiam*, 591 U.S. at 140.

The Court, accordingly, concludes that Defendants lack statutory authority to supplant the usual removal procedures set forth in § 1225(b)(1) (expedited removal) and § 1229a (regular removal) with new, non-statutory "212(f) Direct Repatriation" and "212(f) Expedited Removal" procedures.

b.   Constitutional Authority

Nor is the Court persuaded by Defendants' contention that, "[e]ven without . . . Section 1182(f), the President's action here would be supported by the inherent authority of the Execuive over admission decisions."  Dkt. 44 at 52.  Defendants' argument involves two steps.  They first argue that "the power of excluding aliens from U.S. territory is an inherent attribute of sovereignty exercised by the political branches of government."  *Id.*  And they then argue that, even though "the Executive's inherent authority over expulsion is not likely as broad as its authority over exclusion," "mandating the repatriation of aliens whose entry was barred at the time they entered the United States on account of a Presidential Proclamation under Section

_____

[13] Although *Huisha-Huisha* also notes that an alien "'who is present in the United States in violation of . . . any . . . law of the United States . . . is deportable,'" 27 F.4th at 729 (quoting 8 U.S.C. § 1227(a)(1)(B)), that provision has no bearing on the question presented here.  Section 1227 addresses whether aliens who have been "admitted to the United States" are "deportable"— or, to use the language of IIRIRA, "removable."  It does not, however, address the separate question of what process immigration authorities must follow to effectuate that deportation or removal.  Nor does § 1227(a)(1)(B) otherwise apply to the individual plaintiffs and putative class members in this case, none of whom have been "admitted to the United States."  *See* 8 U.S.C. § 1101(a)(13) ("The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.").  Rather, as described above, aliens like the individual plaintiffs and putative class members who are "present in the United States" but who "have not been admitted" are deemed "applicant[s] for admission," *id.* § 1225(a)(1), and the "sole and exclusive procedure for determining whether an alien may be admitted" is a full removal proceeding under § 1229a, unless "otherwise specified" in Title 8, *id.* § 1229a(a)(3).

84

1182(f) is a permissible Executive Branch exercise of inherent authority, [which] is also consistent with the broad parameters Congress" has specified. *Id.* at 53. In Defendants' view, the President is therefore permissibly operating in *Youngstown* Category Two. *Id.* at 53–54 (citing *Youngstown*, 343 U.S. at 639 (Jackson, J., concurring)).

The argument fails for several reasons. As an initial matter, the Court once again notes that the President did not establish the new "212(f) Direct Repatriation" and "212(f) Expedited Removal" procedures as an exercise of his constitutional authority; at best, he delegated authority to the Secretary to "take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion across the southern border." Proclamation, § 5. Accordingly, the Court is not called upon to review a presidential decree in this respect but, rather, decisions made by U.S. Border Patrol and USCIS officials regarding how to implement the Proclamation. But even had the President directed that immigration enforcement authorities supplant the detailed procedures for removing inadmissible aliens set forth in § 1225(b)(1) (expedited removal) and § 1229a (regular removal) with the new "212(f) Direct Repatriation" and "212(f) Expedited Removal" procedures, the argument would fail.

The principal authority that Defendants invoke, *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950), does more harm than good to their argument. That case, of course, preceded enactment of the INA in 1952, but much of the Court's reasoning remains illuminating today. What is perhaps most notable about *U.S. ex rel. Knauff* is that it recognizes the shared responsibilities of the legislative and executive branches "concerning the admissibility of aliens," but it—appropriately—casts Congress as the lead when it comes to prescribing the rules. *Id.* at 542; *see also Jarkesy*, 603 U.S. at 129 (referring to Congress's "plenary power over immigration"); *Demore v. Kim*, 538 U.S. 510, 521 (2003) (referring to Congress's "broad power

over naturalization and immigration"). In *U.S. ex rel. Knauff*, the Court rejected a nondelegation challenge and upheld Congress's authority to "place[]" "the decision to admit or to exclude an alien . . . with the President." *U.S. ex rel. Knauff*, 338 U.S. at 543. The Supreme Court explained its reasoning as follows:

> Normally Congress supplies the conditions of the privilege of entry into the United States. But because the power of exclusion of aliens is also inherent in the executive department of the sovereign, *Congress may* in broad terms authorize the executive to exercise the power, *e.g.*, as was done here, for the best interests of the country during a time of national emergency. Executive officers may be entrusted with the duty of specifying the procedures for carrying out the congressional intent.

*Id.* (emphasis added). In other words, although the legislature typically sets the conditions on entry by legislation, Congress may authorize the Executive Branch to exercise the authority to limit entry when it is in "the best interests" of the United States to do so, and it may "entrust[]" the Executive Branch to set appropriate "procedures for carrying out . . . congressional intent." *Id.*

Nowhere in *U.S. ex rel. Knauff* or in any other decision has the Supreme Court ever suggested that the President's inherent authority to protect the borders of the United States permits him to supplant rules proscribed by Congress. In this respect, the present case is the polar opposite of *U.S. ex rel. Knauff*. In *U.S. ex rel. Knauff*, the question was whether Congress could authorize the President or his delegee to exclude certain aliens and to "specify the procedures for carrying out th[at] congressional intent." 338 U.S. at 542–43. Here, the question is whether the President or his delegees may disregard the rules that Congress has specified and expel individuals who are already in the United States without complying with the "exclusive procedure[s]" set by statute, *see* 8 U.S.C. § 1229a(a)(3); *see also id.* § 1225(b)(1) (expedited removal); *id.* § 1229a (regular removal). Except in circumstances, not present here, where the

President exercises an exclusive authority, *Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring), neither he nor his delegees are "free from the ordinary controls and checks of Congress merely because foreign affairs are at issue," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015), and they must abide by the law as Congress has prescribed it.  If military exigencies provided insufficient basis for President Truman to seize the steel mills, *Youngstown*, 343 U.S. at 587–88, the crisis at the southern border does not provide the President or his delegees with sufficient basis to ignore the removal procedures that Congress enacted in the INA and IIRIRA.

That conclusion carries particular force here, moreover, because, unlike in *U.S. ex rel. Knauff*, the present dispute is not about the power to exclude but, rather, about the power to expel.  *U.S. ex rel. Knauff* gestures at the importance of this difference, noting: "Whatever the rule may be concerning *deportation of persons who have gained entry into the United States*, it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branches of the Government *to exclude* a given alien."  338 U.S. at 543 (emphasis added).  Even more importantly, Defendants themselves candidly acknowledge that "the Executive's inherent authority over expulsion is not likely as broad as its authority over exclusion."  Dkt. 44 at 53.  That concession makes sense given the limited rights that aliens typically possess before entering the United States and the unique authority that the political branches maintain over who is permitted to enter the country.  *See, e.g.*, *U.S. ex rel. Knauff*, 338 U.S. at 542–43; *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892).  But once an alien has entered the United States, the INA and decades of historical practice, *see, e.g.*, *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) ("[L]ong settled and established practice is a consideration of great weight in proper interpretation of constitutional provisions regarding the relationship

87

between Congress and the President."), establish that the Executive Branch is bound to follow the will of Congress in expelling inadmissible aliens.

Defendants' reliance on the Constitution's guarantee that the "United States . . . shall protect each [state] against Invasion," U.S. Const., art. IV, § 4 (the "Invasion Clause"), fails for the same reasons.  Defendants themselves place little or no independent reliance on the Invasion Clause and, instead, merely suggest that the President plays *some* role in protecting the States "against Invasion."  Dkt. 44 at 65.  But even assuming that is correct, Defendants do not dispute that Congress plays the primary role in crafting the governing rules and that, under the *Youngstown* framework, *see Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring), the President may not act in derogation of the laws that Congress has enacted.  Although relevant precedent is sparse, the Supreme Court has opined that the responsibility for "carry[ing] into effect" the Guarantee Clause "is primarily a legislative power," *Texas v. White*, 74 U.S. 700, 701 (1868), *overruled on other grounds by Morgan v. United States*, 113 U.S. 476 (1885), and that it "rest[s] with Congress . . . to determine . . . the means proper to be adopted to fulfill th[e] guarantee" against "domestic violence," *Luther v. Borden*, 48 U.S. 1, 43 (1849).  There is no reason to believe that the Invasion Clause, which appears in the very same sentence of Article IV as these provisions, allocates responsibility any differently.  That conclusion finds further support in Article I of the Constitution, moreover, which grants Congress the power to "provide for calling forth the Militia to . . . repel Invasions," U.S. Const., art. I, § 8, cl. 15, leaving little doubt that responsibility under the Invasion Clause is, at the very least, shared between the political branches.  Finally, it is far from clear that the Invasion Clause confers any power to act that is not found elsewhere in Articles I and II of the Constitution.  Unlike Article IV, Section 4, which speaks in terms of the *responsibility* of "[t]he United States" to protect the States, Articles

88

I and II speak in terms of the "*Power*[s]" vested in the Congress and the President to perform their constitutional responsibilities.[14]  If the President lacks authority under the Vesting Clause of Article II to supplant the INA with an alternative set of immigration laws, that power cannot be found in Article IV, Section 4.

The Court, accordingly, concludes that the President lacks the inherent constitutional authority to supplant § 1225(b)(1) (expedited removal) and § 1229a (regular removal) with non-statutory repatriation or removal rules.  To hold otherwise would render much, if not most, of the INA simply optional.

    2.    *Suspension of Asylum*

Plaintiffs further argue that the Proclamation runs afoul of the asylum statute, 8 U.S.C. § 1158, by "restrict[ing]" covered aliens from "invoking" the asylum provisions of the INA. Proclamation, §§ 2, 3.  The Court agrees.

---

[14] Although the Court need not reach the issue, it is telling that Defendants have offered no support whatsoever for the dubious proposition that the Framers understood or used the word "Invasion" to include illegal immigration.  *See Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996) ("In order for a state to be afforded the protections of the Invasion Clause, it must be exposed to armed hostility from another political entity, such as another state or foreign country that is intending to overthrow the state's government.") (citing *The Federalist No. 43*, at 167 (James Madison) (Clinton Rossiter ed., 1961)).  To be sure, many questions relating to the implementation of Article IV, Section 4 may be nonjusticiable.  *But see New York v. United States*, 505 U.S. 144, 185 (1992).  "It is emphatically the province and duty of the judicial department," however, "to say what the law is."  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 137 (1803); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (quoting same).  Illegal immigration undoubtedly poses serious challenges, but Defendants do not suggest that it involves "armed hostility," threatened or effectuated, by "another political entity" against a "State in th[e] Union."  *Padavan*, 82 F.3d at 28.  Defendants' Invasion Clause argument, accordingly, fails for this reason as well.

The Court, once again, starts with the statutory text and "must enforce plain and unambiguous statutory language according to its terms," *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010).  As the Supreme Court "ha[s] stated time and again[,] . . . courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (citations omitted) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)).  The words of the statute, moreover, must be "placed in context," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000), and must be read "with a view to their place in the overall statutory scheme," *id.* at 133 (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

Here, the relevant text provides as follows:

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status *may apply for asylum* in accordance with this section or, where applicable, section 1225(b) of this title.

8 U.S.C. § 1158(a)(1) (emphasis added).  Although the word "may" is, of course, permissive, the choice of whether to apply for asylum is left to the applicant; the statute requires the government to provide the applicant with that opportunity.  In other words, under the plain language of § 1158(a)(1), the government *must* provide an alien present in the United States with the *option* of applying for asylum.  That requirement is then echoed in other provisions of the INA.  Under § 1225(b)(1), for example, if an "alien indicates either an intention to apply for asylum under section 1158 . . . or a fear of persecution, the officer *shall* refer the alien for an interview by an asylum officer," the "asylum officer *shall* conduct interviews of [those] aliens referred" to her, and, "[i]f the officer determines . . . that an alien has a credible fear of persecution . . . , the alien

*shall* be detained for further consideration of the application for asylum." 8 U.S.C.

§ 1225(b)(1)(A), (B) (emphases added). Read in this context, it is clear that, even though asylum is itself a discretionary form of relief, providing aliens with the opportunity to apply for asylum (and the opportunity to be heard) is mandatory.

Defendants offer two nontextual responses to this logic: they first argue that a bar on applying for asylum is necessary to give effect (or, at least, maximum effect) to the Proclamation's bar on entry, and, second, they argue that asylum is a discretionary form of relief that the Attorney General is free to deny and that, as a result, permitting aliens to apply for asylum would be futile if the Attorney General has already decided that their applications will be denied. Dkt. 44 at 56–57. Defendants invoke the D.C. Circuit's opinion in *Huisha-Huisha* in support of both contentions. A comparison of this case and *Huisha-Huisha*, however, merely highlights why Defendants' argument fails here.

### a.

Defendants' first argument regarding the right to apply for asylum tracks their argument regarding repatriation. In both contexts, Defendants rely on *Huisha-Huisha*'s observation that the statutory authority conferred in § 265 to "prohibit . . . the introduction of persons . . . in order to avert" the spread of a communicable disease in the United States, 42 U.S.C. § 265, "could be rendered largely nugatory if the Executive could not take any action against a covered alien who [has] disregarded the prohibition and managed to set foot on U.S. soil," *Huisha-Huisha*, 27 F.4th at 729. The flaws with extending that argument to § 1182(f), which are discussed above, apply equally here, and the Court will not repeat itself. But two additional difficulties warrant mention.

First, the conflict that the D.C. Circuit confronted in *Huisha-Huisha* was both direct and irreconcilable. Although the initial screening for asylum can take place quickly, for those who

establish a "credible fear of persecution," the process can take years to complete.  8 U.S.C.

§ 1225(b)(1)(B)(ii).  Permitting aliens who pose a "serious danger" of introducing a hazardous,

communicable disease into the United States, 42 U.S.C. § 265, to remain in the United States for

months or years while their asylum applications are finally adjudicated cannot be reconciled with

the "public health" imperative served by a § 265 order.  Despite this direct and clear conflict, the

D.C. Circuit nonetheless treated the § 265 order's "foreclose[ure] [of] the statutorily mandated

procedures that aliens use to apply for asylum" as "the closest question in [the] case" and a

question that "deserve[d] attention from the District Court . . . [on] the merits."  27 F.4th at 730.

And the court strove to "harmoniz[e]" the two statutory commands, as "best" it could, by relying

on the discretionary nature of asylum and by noting that "§ 265's text" might be read to allude

"to the suspension of [the asylum] procedures with its reference to the 'suspension of the right to

introduce such persons and property' as 'is required in the interest of the public health.'"  *Id.* at

730–31 (quoting 42 U.S.C. § 265).  That is, unlike § 1182(f), § 265 can plausibly be construed

not just to bar entry, but also to bar the continuing introduction of disease "vectors" into the

United States by permitting aliens to remain here while their asylum applications were

adjudicated, which would place it in direct conflict with the current asylum adjudication process.

Here, in contrast, the asserted conflict is far less direct and far less clear.  To be sure,

efforts to keep aliens from unlawfully entering the United States would be aided by denying

statutory benefits, including the right to apply for asylum, to those who have managed to cross

the border.  But that is a consideration that Congress sought to balance in the INA, when it—

even without a presidential proclamation—barred the admission of undocumented aliens, and

when it, nonetheless, mandated that "[*a*]*ny* alien who is physically present in the United States

. . . , *irrespective of such alien's status*, may apply for asylum in accordance with [§ 1158] or,

where applicable, section 1225(b)." 8 U.S.C. § 1158(a) (emphases added). One can agree or disagree with the balance that Congress struck, but there is little doubt that Congress considered the question when it enacted IIRIRA in 1996, *see O.A. v. Trump*, 404 F. Supp. 3d at 148, and it is that balance that the Court must apply.

Defendants' necessity argument confronts a second difficulty, which was not addressed in *Huisha-Huisha*, presumably because the order at issue in that case was issued pursuant to Title 42, while the proclamation at issue here was issued under the INA. In any event, the INA—as opposed to Title 42—provides the Executive Branch with substantial authority, which if exercised in accordance with law, allows the Secretary and the Attorney General to impose additional, non-statutory limitations on eligibility for asylum. That is the mechanism that the Executive Branch invoked to support the 2018 and 2024 Proclamations, discussed above, *see supra* at 19–26. Although those prior efforts were, in large part, unsuccessful for reasons not at issue here, *see id.*, Defendants fail even to gesture at the possibility that they could have, but have not, used the authority that Congress provided to curtail the right to asylum.

In particular, § 1158(b)(2)(C) provides that the Attorney General—and, now, the Secretary as well, *see* 6 U.S.C. §§ 251, 271(b)(3), (5), 557—"may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be eligible for asylum." 8 U.S.C. § 1158(b)(2)(C); *see also id.* § 1158(d)(5)(B) ("The Attorney General may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter."). That authority is sufficient to avoid a conflict of the type at issue in *Huisha-Huisha*, since the Secretary and the Attorney General are authorized to issue regulations that limit eligibility for asylum, and immigration officials can promptly resolve "mandatory denials" of asylum. *See* 8 C.F.R. § 208.13(c). To be

sure, those regulations must be "consistent with" the asylum statute, 8 U.S.C. § 1158(b)(2)(C), and an applicant who is ineligible for asylum is still eligible to considered for withholding of removal and CAT protection, *see* 8 C.F.R. § 208.13(c).  But Congress has enacted those limitations on prompt removal, and neither the President nor this Court is free to disregard those statutory mandates.  What matters for present purposes is that Defendants' necessity argument does not support the ban on asylum contained in the Proclamation.  To the extent that availability of asylum is the issue, Congress provided a mechanism—the adoption of regulations promulgated by the Attorney General and the Secretary—to alleviate that issue, and Defendants may not circumvent that statutorily prescribed means of adopting "additional limitations" on asylum.  8 U.S.C. § 1158(b)(2)(C).

Notably, this conclusion is not a new one, and, indeed, the Department of Justice itself has long held this view of the law.  As the Department explained in the 2024 final rule, although the Attorney General and Secretary have broad rulemaking authority, a presidential proclamation—standing alone—"cannot affect noncitizens' right to apply for asylum, their eligibility for asylum, or asylum procedures."  89 Fed. Reg. at 81163.  Indeed, "[t]his recognition that [§ 1182(f)] does not affect the right to pursue a claim for asylum has been the Executive Branch's consistent position for four decades."  *Id.*  That recognition started with Assistant Attorney General Theodore Olson's 1984 opinion concluding that § 1182(f) "did not permit the President to eliminate the asylum rights of noncitizens who had hijacked a plane," and it continued with the Department's 2018 reaffirmation—during the first Trump administration— that "'[a]n alien whose entry is suspended or restricted under [a § 1182(f)] proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the alien should not be in the United States, would remain subject to various procedures under immigration law[,]'

including 'expedited-removal proceedings' where they could 'raise any claims for protection.'" *Id.* at 81163 n.53 (quoting 2018 Rule). According to the Department of Justice, the President has invoked § 1182(f) more than 90 times since 1981, but, prior to the Proclamation at issue here, no president has ever sought to use that provision "to affect the right of noncitizens on U.S. soil to apply for, or noncitizens' statutory eligibility to receive, asylum." *Id.*

The Department of Justice is not typically in the business of construing presidential authority narrowly. *See* Jack Goldsmith, *The Terror Presidency* 36 (2007) ("Not surprisingly, OLCs of both parties have always held robust conceptions of presidential power.") Yet the Department rejected the precise assertion of congressionally delegated authority asserted in the Proclamation. Its analysis is persuasive and bears quoting at length:

> That longstanding understanding follows from the text and structure of the governing statutes. Section [1182(f)] provides that under certain circumstances, the President may "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." [ ] 8 U.S.C. 1182(f). Although this provision— first enacted in 1952—"grants the President broad discretion," it "operate[s]" only within its "sphere." *Trump v. Hawaii*, 585 U.S. 667, 683–84, 695 (2018). Section [1182] (entitled "Inadmissible aliens"), generally "defines the universe of aliens who are admissible" and "sets the boundaries of admissibility into the United States." *Id.* at 695. Hence, when section [1182(f)] authorizes the President to suspend "entry," it "enabl[es] the President to supplement the other grounds of inadmissibility in the INA," *id.* at 684 (citing *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986)), and to bar individuals from entry into the United States.
>
> This authority, though broad, does not authorize the President to override the asylum statute. First enacted in the Refugee Act, the asylum statute today provides that "[a]ny alien who is physically present in the United States or who arrives in the United States[,]. . . irrespective of such alien's status, may apply for asylum." . . . 8 U.S.C. 1158(a)(1). The right to apply for asylum thus turns on whether a noncitizen is "physically present" or has "arrive[d] in the United States." *Id.* As a result, the power under [§ 1182(f)] to suspend "entry" does not authorize the President to override the asylum rights of noncitizens who have already physically entered the United States and who are entitled to an adjudication of eligibility under the applicable statutory and regulatory rules and standards.

89 Fed. Reg. at 81163–64 (footnotes omitted).

Finally, it is noteworthy that the same Department of Justice that litigated the *Huisha-Huisha* case in the D.C. Circuit distinguished 42 U.S.C. § 265 and *Huisha-Huisha* from the present circumstances. Quoting the CDC final rule at issue in *Huisha-Huisha*, the Department explained that, unlike § 1182(f), § 265 "originates in a 'broad public health statue' that Congress intended to 'operate[] separately and independently of the immigration power' and authorizes the CDC 'to temporarily suspend the effect of any law[] . . . by which a person would otherwise have the right to be introduced . . . into the U.S.,' . . . including the immigration laws." 89 Fed. Reg. at 81164 n.55 (quoting Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 56424, 56426, 56442 (Sept. 11, 2020)). At least as of October 2024, the Department of Justice held the view that *Huisha-Huisha* dealt solely with an emergency public health statute that "has no relevance to the interpretation of [§ 1182(f)], which is in title 8." *Id.*

The Court, for all these reasons, is unpersuaded by Defendants' necessity argument.

### b.

Defendants' futility argument fares no better. As the D.C. Circuit observed in *Huisha-Huisha*, the § 265 order at issue in that case did more than foreclose a "grant of asylum; it also foreclose[d] the statutorily mandated procedures that aliens use to apply for asylum." 27 F.4th at 731. At least at the preliminary injunction stage, however, the court was unpersuaded that the loss of those procedures provided sufficient basis to enjoin the order. *Id.* That was because, as the court explained, "the asylum decision ha[d] already been made" in the § 265 order, and, as

result, foreclosing the procedures required by statute was harmless.  As the court wrote, "those procedures would be futile."  *Id.*

For the reasons explained above, however, that analysis does not hold here.  Rather, as the Department of Justice observed in the 2024 final rule, and consistent with four decades of Executive Branch interpretation, § 1182(f) does not authorize the President to restrict aliens from invoking protection under the asylum statute.  In short, the authority to suspend or restrict "entry" into the United States does not constitute—or carry with it—the authority to adopt "additional limitations" on eligibility for asylum.  And, if the Proclamation did not—and could not—alter the eligibility requirements for asylum, then the further suspension of "the statutorily mandated procedures that aliens use to apply for asylum," cannot "be futile." *Huisha-Huisha*, 27 F.4th at 731.[15]

\*    \*    \*

Finally, Defendants fail to advance any constitutional arguments that differ from those addressed and rejected above.  The Court, accordingly, concludes that the Proclamation and guidance are contrary to law to the extent that they prohibit covered aliens from applying for asylum or implement new limitations on asylum that have not been adopted by regulation.

---

[15] It is a closer question whether the President can, under § 1182(f), prohibit covered aliens from applying for asylum upon arrival at a port of entry.  Section 1158(a)(1) and § 1182(f) are at least arguably in greater tension with respect to aliens arriving at the border.  Pursuant to § 1158(a)(1), an alien "who arrives in the United States" may apply for asylum, which would provide such aliens a path to entry.  The President's authority to suspend entry pursuant to § 1182(f) thus might arguably extend to preventing aliens from applying for asylum prior to entry.  *Cf. Sale*, 509 U.S. at 160, 187 (stating that § 1182(f) gave the President the authority to set up a naval blockade to prevent covered aliens from reaching U.S. soil).  Because Plaintiffs do not press this theory or seek to limit operation of the Proclamation in this manner, the Court need not resolve the question.

3.    *Suspension of Withholding of Removal*

Plaintiffs also contend that the guidance violates the withholding of removal statute, 8 U.S.C. § 1231(b)(3)(A), because it instructs asylum officers that withholding of removal is not available for aliens subject to the Proclamation.  Withholding of removal, unlike asylum, is "mandatory;" it leaves "the Executive [with] no discretion" to deny the protection to those who can satisfy the statutory requirements.  *Huisha-Huisha*, 27 F.4th at 731.  Thus, "to expel aliens to places prohibited by § 1231(b)(3)(A), the Executive must identify a statute that creates an exception to § 1231(b)(3)(A)."  *Id.* at 731–32.  Neither § 1182(f) nor § 1185(a) is such a statute: those statutes make no mention of withholding of removal or § 1231(b)(3)(A), and they say nothing about the removal of aliens who have already entered the United States, much less about where the Executive Branch may send aliens subject to removal.  *Cf. Huisha-Huisha*, 27 F.4th at 732.  It is also plainly possible to "give effect . . . both" to § 1182(f) and § 1185(a) and to § 1231(b)(3)(A).  *Id.*  The President may suspend or restrict entry into the United States under § 1182(f) and § 1185(a), while still respecting § 1231(b)(3)(A), which does not authorize entry into the United States but merely precludes the government from expelling those who do enter "to a place where they will likely be persecuted."  *Id.*  In other words, the government can, consistent with the withholding of removal statute, still expel covered aliens so long as it does not send them to countries where they will likely face persecution.

Defendants respond that the withholding of removal statute constrains the Secretary and the Attorney General, not the President.  *See* Dkt. 55 at 28.  But that contention ignores two important facts.  *First*, the Proclamation says nothing about withholding of removal.  Rather, it says that covered aliens "are restricted from invoking provisions of the INA that would permit their continued presence in the United States."  Proclamation, §§ 2, 3.  And, as the D.C. Circuit observed in *Huisha-Huisha*, § 1231(b)(3)(A) "does not prohibit the Executive from immediately

expelling aliens;" it simply limits where an inadmissible alien may be sent.  27 F.4th at 732.

Presumably for this reason, the Proclamation includes an express reference to asylum (which

allows an eligible person to remain in the United States) but makes no mention of withholding

(which does not).

    *Second*, Defendants' argument ignores the fact that the removals and repatriations at

issue are, in fact, being carried out under the direction of the Secretary.  All of the relevant

guidance was issued by components of the Department of Homeland Security, and the USCIS

and U.S. Border Patrol officials and employees engaged in those processes operate under the

direction of the Secretary.  As a result, Defendants cannot escape the operation of

§ 1231(b)(3)(A), which declares that the Secretary "may not remove an alien to a country if the

[Secretary] decides that the alien's life or freedom would be threatened in that country because

of the alien's race, religion, nationality, membership in a particular social group, or political

opinion."  8 U.S.C. § 1231(b)(3)(A); *see also* 6 U.S.C. §§ 251, 271(b)(3), (5), 557.  That

provision does not include an exception for occasions when the President exercises his authority

under § 1182(f) and § 1185(a) to suspend or restrict entry.

    Defendants also suggest that § 1231(b)(3)(A) does not apply because covered aliens are

not subject to "removal" under the INA but, rather, to non-statutory "212(f) Direct Repatriation"

or "212(f) Expedited Removal."  That argument fails for the reasons given above, including the

fact that neither the President nor the Secretary possesses the authority to supplant the carefully

crafted INA removal procedures with less protective, non-statutory procedures.  The argument

also fails for the reasons given in *Huisha-Huisha*.  In that case, the covered aliens were subject to

the Title 42 procedures, instead of the INA procedures.  But the D.C. Circuit nonetheless

concluded that the plaintiffs were likely to prevail on the merits of their challenge to the CDC's

effort to restrict access to withholding of removal. 27 F.4th at 731–32. Finally, to the extent this argument turns on an asserted presidential authority to disregard—or to direct his subordinates to disregard—a clear statutory stricture, Defendants fail to argue—much less to carry their burden of showing—that the President may exercise a shared constitutional authority that runs counter to congressional mandate. *See id*.; *see also Youngstown*, 343 U.S. at 637 (Jackson, J., concurring); *Zivotofsky ex rel. Zivotofsky*, 576 U.S. at 10.

The Court, accordingly, concludes that the guidance is arbitrary and capricious and contrary to law to the extent it instructs asylum officers or others that withholding of removal is not available for aliens subject to the Proclamation. Except as Congress has specified, 8 U.S.C. § 1231(b)(3)(B), all aliens present in the United States are entitled to protection under § 1231(b)(3)(A).

4.    *Extra-Regulatory CAT Protection Procedures*

Finally, Plaintiffs contend that the guidance's extra-regulatory CAT protection procedures violate FARRA. FARRA instructed "the heads of the appropriate agencies" to issue regulations to implement the protections included in the Convention Against Torture. 8 U.S.C. § 1231 note (b). To comply with that directive, the Attorney General and Secretary have issued regulations that instruct asylum officers on the procedures for adjudicating CAT protection claims. *See, e.g.*, 8 C.F.R. § 208.16(c). Under those regulations, asylum officers first conduct a credible fear screening, at which aliens must demonstrate that there is "a significant possibility" that it is more likely than not that they will be tortured if returned to the country at issue. *Id.* § 208.30(e)(3). If the asylum officer makes a positive credible fear determination, USCIS can then send the applicant to full removal proceedings or can "retain jurisdiction over the application . . . for further consideration in a hearing pursuant to § 208.9." *Id.* § 208.30(f). If USCIS retains jurisdiction, an asylum officer will conduct a second interview to adjudicate the

individual's CAT protection claim. *Id.* § 208.9. That interview must be scheduled at least 21 days after the applicant has received the record of his positive credible fear determination. *Id.* § 208.9(a)(1). At the second interview, the applicant "may have counsel or a representative present, may present witnesses, and may submit affidavits of witnesses and other evidence." *Id.* § 208.9(b). To qualify for CAT protection, an applicant must demonstrate in the interview that "it is more likely than not that he or she would be tortured if removed to the proposed country." *Id.* § 208.16(c)(2).

The guidance that Plaintiffs challenge changes this process by instructing asylum officers to require that an alien carry his ultimate burden at the first interview. Instead of starting with a credible fear screening and then moving to an adjudication interview, the asylum officer conducts a "CAT-Only assessment," Dkt. 52-1 at 44, at which the applicant "must show that it is more likely than not that [the applicant] will be tortured in the country to which [the applicant] may be returned," *id.* at 46. Aliens in CAT-Only assessments are "not entitled to a consultant, legal representative, or a consultation period." *Id.* at 45. In essence, the new procedures require that an alien carry his burden at the initial hearing without the benefit of counsel or consultation and without the time to prepare accorded under the regulations.

Agencies are, of course, bound to follow their own regulations, even when the procedures therein are "possibly more rigorous than otherwise would be required," *Morton v. Ruiz*, 415 U.S. 199, 235 (1974), and they may not adopt guidance or other procedures that conflict with or disregard duly promulgated regulations, *see U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 35–36 (D.C. Cir. 2005) (holding that substantive changes to regulations must be promulgated through notice and comment rulemaking); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267–68 (1954) (holding that regulations are binding "as long as [they] remain operative"). Here,

Defendants do not dispute that the guidance at issue is inconsistent with the regulations.  The

guidance is, as a result, arbitrary and capricious and contrary to law.  *See Nat'l Environ. Dev.*

*Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1009–11 (D.C. Cir. 2014).

    Defendants offer two responses, which are in tension with one another.  In their opening

brief, they argued that the Proclamation applies only to those benefits found in the INA, and

since "CAT protection is not provided by the INA," it "is not subject to the Proclamation's

limitations."  Dkt. 44 at 62.  But if the Proclamation does not limit or modify the rules relating to

CAT protection, Defendants are left without any justification for discarding the CAT regulations

in the guidance.  Defendants then shift gears in their reply brief and argue that because "the

covered aliens do not fall within the bounds of the regulatory provisions cited by Plaintiffs,"

Defendants are not required to apply the CAT regulations in adjudicating their claims.  Dkt. 55 at

28–29.  Although not crystal clear, Defendants appear to argue that because the Proclamation

supplants the expedited (§ 1225(b)(1)) and regular (§ 1229a) removal procedures set forth in the

INA with the non-statutory "212(f) Direct Repatriation" and "212(f) Expedited Removal"

procedures, the CAT regulations—which take the INA removal procedures as a given—are

inapplicable.  But that argument has it exactly backwards.  As the Court has explained above,

nothing in § 1182(f) or § 1185(a) authorizes the President (or his subordinates) to supplant the

statutory removal procedures with alternative, less protective procedures.  The fact that the

Secretary and Attorney General complied with their statutory obligation to issue regulations to

implement the CAT protections, 8 U.S.C. § 1231 note (b), in the context of the INA-mandated

removal procedures does not imply that the CAT regulations apply only sometimes, but, rather,

confirms that no one—including the Secretary and the Attorney General—ever contemplated

that the Executive Branch could simply sidestep § 1225(b)(1) and § 1229a.

The Court, accordingly, concludes that the guidance is arbitrary and capricious and contrary to law to the extent it purports to replace the CAT procedures set forth in the existing regulations with less protective "§§ 212(f) and 215(a)" "CAT Assessment Instructions and Implementation Guidance." Dkt. 52-1 at 38–39.

## C.    Class Certification

The Court must next consider whether to grant Plaintiffs' motion for class certification.[16] To proceed on behalf of a class, a plaintiff or group of plaintiffs must clear two hurdles. First, the putative class representatives must demonstrate that "(1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These four "prerequisites," *DL v. District of Columbia*, 860 F.3d 713, 723 (D.C. Cir. 2017), are referred to as numerosity, commonality, typicality, and adequacy of representation, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455, 460 (2013). Second, the "plaintiffs must then demonstrate that their proposed class falls into one of the categories of class actions listed in Rule 23(b)." *DL*, 860 F.3d at 723. Here, Plaintiffs rely on

---

[16]  As in *O.A.*, "[t]he question of class certification arises in an unusual posture in this case because the Court directed that the parties brief the merits on an expedited basis (to obviate the need for further litigation on Plaintiffs' motions for preliminary relief) and because the parties consolidated their briefing on class certification with the merits." 404 F. Supp. 3d at 154. Although mindful of the fact that Rule 23(c)(1) directs courts to resolve class certification motions "[a]t an early practicable time," Fed. R. Civ. P. 23(c)(1)(A), the Court notes that the rule grants district courts "great discretion in determining the appropriate timing for such a ruling," *Hyman v. First Union Corp.*, 982 F. Supp. 8, 11 (D.D.C. 1997); *see also* 7A Charles Alan Wright & Aruther R. Miller, *Federal Practice & Procedure* § 1785.3 (3d ed. 2018) ("The time at which the court finds it appropriate to make its class-action determination may vary with the circumstances of the particular case."). Thus, district courts are not required to decide class certification issues before ruling on the merits.

Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Because "[t]he class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only,'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)), the party seeking class treatment "must affirmatively demonstrate . . . compliance" with Rule 23, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).

As explained below, the Court is persuaded that, with one modification to the class definition, Plaintiffs are entitled to proceed on behalf of the proposed class. The Court will, accordingly, certify a class (or subclass) consisting of all individuals who are or will be subject to the Proclamation and/or its implementation and who are now or will be present in the United States. The Court will postpone addressing whether it is also appropriate to certify a class (or subclass) of individuals who were subject to the Proclamation and guidance and have already been repatriated or removed from the United States because those individuals stand in a markedly different posture than those who have yet to be repatriated or removed, because their claims implicate distinct questions of law, and because the relief that they seek is different. *See Wagner v. Taylor*, 836 F.2d 578, 589–90 (D.C. Cir. 1987) (noting a court's "broad discretion to redefine and reshape the proposed class to the point that it qualifies for certification under Rule 23"); 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1759 (4th ed. 2025) ("[I]f plaintiff's definition of the class is found to be unacceptable, the court may . . . redefine the class to bring it within the scope of Rule 23 . . . .").

The Court will appoint Plaintiffs' counsel to represent the class of individuals who are or will be subject to the Proclamation and the guidance within the United States and will appoint the Individual Plaintiffs who still remain in the United States (A.M., Z.A., T.A., A.T., B.R., M.A., and G.A.) as the class (or subclass) representatives.

      1.     *Rule 23(a)*

The proposed class, as modified, satisfies the four "prerequisites" set forth in Rule 23(a). First, the proposed class satisfies the numerosity requirement. Although the numerosity requirement does not set a "specific threshold," "courts in this jurisdiction have observed that a class of at least forty members is sufficiently large to meet this requirement." *Taylor v. D.C. Water & Sewer Auth.*, 241 F.R.D. 33, 37 (D.D.C. 2007). Plaintiffs may satisfy the requirement, moreover, by supplying estimates of putative class members*, see Pigford v. Glickman*, 182 F.R.D. 341, 347–48 (D.D.C. 1998), "so long as there is a reasonable basis for the estimate provided," *Kifafi v. Hilton Hotels Ret. Plan*, 189 F.R.D. 174, 176 (D.D.C. 1999). Relying on information shared on social media by U.S. Border Patrol officials, Plaintiffs estimate that "hundreds of noncitizens are being apprehended at the border each day and subjected to the Proclamation," Dkt. 13 at 5 & n.3, and Defendants' data supports that estimate, *see* Dkt. 43-2 at 18 (Gunduz Decl. ¶ 36) (reporting 240 encounters per day during a two-week period in February). That is more than sufficient to satisfy the numerosity requirement.

The second and third requirements, commonality and typicality, often overlap. The commonality requirement is satisfied if "there are questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2), and the typicality requirement is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class," Fed. R. Civ. P. 23(a)(3). For commonality, class members' claims must "depend upon a common contention" that "is capable of classwide resolution—which means that determination of its truth or falsity

will resolve an issue that is central to the validity of each one of the claims in one stroke."

*Dukes*, 564 U.S. at 350.  For typicality, the proposed representative plaintiffs must "possess the

same interest and suffer the same injury" as the members of the putative class.  *Gen. Tel. Co. of

Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (internal quotation marks and citations omitted).

"While commonality requires a showing that the *members* of the class suffered an injury

resulting from the defendant's conduct, the typicality requirement focuses on whether the

*representatives* of the class suffered a similar injury from the same course of conduct."  *Bynum v.

D.C.*, 214 F.R.D. 27, 34 (D.D.C. 2003).  Here, both requirements are satisfied by the proposed

class, as modified above.  All members of that class, including the proposed class

representatives, face the same threat of injury: (1) loss of the protections afforded to aliens under

§ 1225(b)(1) (expedited removal) or § 1229a (regular removal); (2) loss of the right to seek

asylum and the right to seek, and where appropriate to obtain, withholding of removal as set

forth in the INA and the extant regulations; and (3) loss of the right to apply for CAT protection

pursuant to regulations adopted pursuant to FARRA.  "Not only do all class members present the

same challenge[s] to the [Proclamation and guidance], but there is also no evident variation

among them concerning their ultimate entitlement to [the] relief [they seek]: if any person in the

class has a meritorious claim, they all do."  *J.D. v. Azar*, 925 F.3d 1291, 1321 (D.C. Cir. 2019).

Defendants disagree, arguing that the class is "overbroad" for several reasons.[17]  Some of

those reasons fall aside in light of the Court's decision to modify the proposed class to include, at

least for present purposes, only those individuals subject to the Proclamation and guidance who

---

[17] Defendants raise these arguments both to challenge the breadth of the proposed class and to
challenge Plaintiffs' efforts to satisfy the commonality and typicality requirements.  *See* Dkt. 43
at 25–32; *id.* at 32–36.  The Court will address the arguments together.

are still in the United States.  Defendants' remaining arguments remain relevant but are nonetheless unavailing.

*First*, Defendants argue that the proposed class is improper because "it includes those who lack entitlement to the claimed statutory protections;" that is, they object to the proposed class because not every proposed member has or will claim or manifest a fear of persecution and because some of the proposed class members are or will be "statutorily ineligible for protection." Dkt. 43 at 10–11.  The Court is unpersuaded.  Unlike in *Dukes*, where the Supreme Court reasoned that no "glue" held together each of the purported acts of discrimination alleged by a class of women, 564 U.S. at 352, Plaintiffs and the putative class members share an interest in some or all of the relief sought.  Commonality is satisfied where there is "a uniform policy or practice that affects all class members," *DL*, 713 F.3d at 128, and that principle applies with equal force to the typicality requirement.  Here, the Proclamation and guidance apply equally to—and they affect the legal rights of—all of the members of the proposed, modified class. Because all putative class members will, absent relief, face non-statutory repatriation or removal proceedings without the protections embodied in the INA, FARRA, and their implementing regulations, Defendants' first argument is unavailing.

*Second*, Defendants argue that the "procedures for implementing the Proclamation could change in the future in ways that are material to the proposed class members' claims and claimed injuries."  Dkt. 43 at 29.  But the relief Plaintiffs seek—vacatur of the current guidance and a declaration that the Proclamation is unlawful to the extent it prohibits them from seeking statutory and regulatory protections—does not depend on hypothetical future procedures that are not before the Court.

*Third*, Defendants argue that "[t]hose class members who have received, or will receive, § 1225(b)(1) expedited removal orders under the Proclamation can only obtain limited habeas review and relief with respect to their expedited removal orders" and that such review is ineligible for class treatment under § 1252(e)(1)(B).   Dkt. 43 at 35; *see also id*. at 30–31.   But § 1252(e)(1)(B) applies only to the extent that Plaintiffs seek "judicial review under" § 1252(e)—that is, if a plaintiff seeks "[j]udicial review of [(1)] determinations under section 1225(b)" or (2) the "implementation" of § 1225(b), 8 U.S.C. § 1252(e)(3)(A).   Here, Plaintiffs do not seek judicial review of either a determination rendered under § 1225(b) or the Secretary or Attorney General's implementation of that provision.

Significantly, Plaintiffs do not seek judicial review of a determination entered pursuant to § 1225(b).   As explained above, the "212(f) Expedited Removal" orders at issue in this case were issued under the auspices of the President's § 1182(f) authority, not under the Secretary or Attorney General's authority under § 1225(b).   *See supra* at 57–61; *see also Tabatabaeifar v. Scott*, 2025 WL 1397114, at *2 (D. Ariz. May 14, 2025) (concluding that an alien being processed under the Proclamation for "Expedited Removal – Section 212(f)" was not being removed "pursuant to Seton 1225(b)").   Defendants themselves concede as much.   They argue, for example, that the "212(f) Direct Repatriations" and "212(f) Expedited Removals" at issue are not subject to the rules set forth in § 1225(b) (or § 1229a) because "[t]he Proclamation does not speak to removal proceedings" and, instead, constitutes an exercise of the President's authority under § 1182(f), § 1185(a), and the Constitution, *see, e.g.*, Dkt. 44 at 43, 58; *see also id.* at 60; Dkt. 55 at 24–25, 27–30.   They cannot have it both ways.   Defendants cannot in some places argue that the removals at issue are governed solely by the Proclamation and the President's authority under § 1182(f), § 1185(a), and the Constitution, while arguing in others that many

(and perhaps most) of the removals at issue are, in fact, governed by § 1225(b) and are thus subject to the limitations found in § 1252(e)(1)(B).  Simply put:  If § 1225(b) does apply, Plaintiffs are entitled to apply for asylum and withholding of removal, which are the fundamental procedural protections that exists in expedited removal.  And, if it does not apply, § 1252(e)(1)(B) has no bearing on Plaintiffs' motion for class certification.

Even putting this concession aside, Defendants offer no plausible basis to conclude that the "212(f) Expedited Removal" orders constitute "determinations under section 1225(b)." Calling the process "expedited removal"—or, more precisely, "212(f) Expedited Removal"— does not, of course, mean that the resulting order qualifies as a "determination under section 1225(b)."  As the Supreme Court has observed, "calling a thing by a name does not make it so," *City of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Emp. Relations Comm'n*, 429 U.S. 167, 174 (1976), and thus merely incorporating the words "expedited removal" into the label at issue here is of no moment.  But even more to the point, the "212(f) Expedited Removal" process lacks *any* of the hallmarks of a § 1225(b) removal.  Under § 1225(b), the immigration officer must "order the alien removed from the United States . . . unless the alien indicates either an intention to apply for asylum under section 1158 . . . or a fear of prosecution."  8 U.S.C. § 1225(b)(1)(A)(i). If the alien expresses "an intention to apply for asylum . . . or a fear of prosecution, the officer shall refer the alien for an interview by an asylum officer."  *Id.* § 1225(b)(1)(A)(ii).  The asylum officer then conducts the required interview and, if she "determines . . . that [the] alien has a credible fear of persecution . . . , the alien shall be detained for further consideration of the application for asylum," *id.* § 1225(b)(1)(B)(ii), and if the officer determines that the "alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States without further hearing or review," *id.* § 1225(b)(1)(B)(iii)(I).  None of that occurs under a

"212(f) Expedited Removal."  To the contrary, when asked to explain the difference between
"212(f) Direct Repatriation" (which involves, as far as the Court can discern, nothing more than
the physical expulsion of the individual at issue) and "212(f) Expedited Removal," Defendants
identified only one thing: aliens processed pursuant to the latter receive Form I-860: Notice and
Order of Expedited Removal, which is a form used in § 1225(b) proceedings.  Dkt. 59 at 7.
Without attempting to chronicle the essential elements of a § 1225(b) removal determination, it
is safe to conclude that a single form—which is not mentioned in the statute and simply informs
the recipient that the Secretary has determined that she is inadmissible and has ordered her
removal—does not suffice.  The Court, accordingly, is unpersuaded that a "212(f) Expedited
Removal" order qualifies as a "determination[] under section 1225(b)(1)."

Defendants do not even suggest that Plaintiffs' challenge is directed at the Secretary or
Attorney General's "implementation" of § 1225(b)—and for good reason.  As explained above,
Plaintiffs challenge the Proclamation and its implementation.  *See, e.g.*, Dkt. 11 at 4 (Am.
Compl. ¶ 3) ("The Proclamation is both unlawful and unprecedented."); *id.* at 34 (Am. Compl.
¶ 113) ("The Proclamation and Defendants' actions to implement and enforce the Proclamation
violate 8 U.S.C. § 1158(a)(1)."); *see also id.* at 37–38 (Am. Compl. ¶¶ 128–31).  The
Proclamation, in turn, is not premised on any authority assertedly found in § 1225(b)(1) or on the
Attorney General's (and now the Secretary's) authority to interpret and to implement IIRIRA.
To the contrary, all agree that the challenged actions rise or fall based on the President's asserted

authorities under § 1182(f), § 1185(a), and the Constitution. In short, this case does not implicate the "implementation" of IIRIRA.[18]

Finally, Plaintiffs also satisfy Rule 23(a)'s adequacy of representation requirement. This requirement imposes two conditions on plaintiffs seeking to represent a class: first, "the named representative must not have antagonistic or conflicting interests with the unnamed members of the class," and second, "the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997). Defendants do not dispute that the proposed class representatives share interests with the members of the class, and the Court has no reason to conclude otherwise. Nor do Defendants dispute that Plaintiffs' counsel are qualified to represent the class, and, in any event, the Court has considered that question *sua sponte* and concludes that current counsel are well-qualified. The declarations submitted in support of class certification demonstrate that current counsel are willing and able to vigorously litigate this case and to protect the interests of absent class members. *See* Dkt. 13-1 (Crow Decl.); Dkt. 13-2 (Michelman Decl.); Dkt. 13-3 (Russell Decl.); Dkt. 13-4 (Zwick Decl.). The Court, accordingly, concludes that the adequacy of representation requirement is satisfied.

---

[18] Although Defendants do not raise the issue, the Court concludes for these same reasons that judicial review of this case is not proscribed by 8 U.S.C. § 1252(b)(9), often referred to as the "zipper clause." That provision provides that:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States *under this subchapter* shall be available only in judicial review of a final order under this section.

8 U.S.C. § 1252(b)(9) (emphasis added). Because the actions taken to remove the individual plaintiffs and putative class members were taken outside the procedures set forth in the INA, the zipper clause does not bar review of those actions prior to the issuance of a final order of removal.

2.      *Rule 23(b)(2)*

Plaintiffs have also carried their burden under Rule 23(b).  As Plaintiffs explain, they ask the Court to certify the class under Rule 23(b)(2), which applies if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Dukes*, 564 U.S. at 360 (internal quotation marks and citations omitted).  Rule 23(b)(2) imposes "two requirements: (1) that defendant's actions or refusal to act are generally applicable to the class and (2) that plaintiffs seek final injunctive relief or corresponding declaratory relief on behalf of the class."  *Bynum*, 214 F.R.D. at 37.  "To certify a class under this provision, a single injunction must be able to 'provide relief to each member of the class.'"  *DL*, 860 F.3d at 726 (quoting *Dukes*, 564 U.S. at 360).

Both requirements of Rule 23(b)(2) are satisfied.  The Proclamation and guidance preclude all putative class members from seeking asylum or withholding of removal and will make it more difficult to secure CAT protection.  These actions are generally applicable to the individual plaintiffs and the class they seek to represent.  The relief Plaintiffs seek, moreover—vacatur of the guidance, a declaration that the challenged aspects of the Proclamation are unlawful, and an injunction prohibiting Defendants from implementing the Proclamation would, "in one stroke," prevent Defendants from employing non-statutory procedures to remove or repatriate those subject to the Proclamation and would require Defendants to provide all covered individuals with access to the forms of humanitarian relief set forth in § 1158, § 1231(b)(3), FARRA, and the implementing regulations.  *Dukes*, 564 U.S. at 350.

In response, Defendants argue that the proposed class does not qualify under Rule 23(b)(2) because no "single injunction" can provide complete relief to all Plaintiffs. Dkt. 43 at 36–37. They argue, in particular, that a prospective injunction would not redress the claims of class members who were already removed. *Id.* at 37. But the Court is not yet prepared to certify a class that includes those who have already been repatriated or removed pursuant to the Proclamation and guidance. This is, accordingly, a question for another day.

*    *    *

The Court, accordingly, concludes that Plaintiffs have carried their burden of demonstrating that class treatment is warranted under Rule 23(b)(2). The Court will enter a separate order certifying the proposed class, designating the individual plaintiffs who are still present in the United States as class representatives, and appointing Plaintiffs' counsel to serve as class counsel.

## D.    Remedy

This brings the Court to the question of remedy. Plaintiffs urge the Court (1) to "[v]acate the guidance insofar as it permits Defendants" to engage in non-statutory removals, restricts covered individuals from invoking the INA's protections, and departs from the regulatory CAT screening standards; (2) to "[d]eclare that Defendants [] cannot lawfully implement or enforce the Proclamation or [the implementing guidance]" to take any of those actions; and (3) to "[e]njoin Defendants from implementing or enforcing the Proclamation" to take any of those three actions. Dkt. 52 at 42–43.[19] Defendants disagree, countering that "the Court may not issue

---

[19] Plaintiffs also ask that the Court restrict Defendants from relying on removal orders issued pursuant to the Proclamation and order Defendants to facilitate the return of individual plaintiffs and other class members who were removed or repatriated under the Proclamation. *See* Dkt. 52 at 42–43. As explained above, the Court requires further briefing before it can resolve whether it

113

relief that is broader than necessary to remedy actual harm shown by specific Plaintiffs;" that the Court lacks jurisdiction to enter a class-wide injunction under § 1252(f)(1); and that, even if the Court could issue broad injunctive relief, it should decline to do so because "[t]he balance of the equities weighs heavily against issuing injunctive relief because the Proclamation is critical for combating a sustained surge of illegal migration across the southern border." Dkt. 55 at 30–31.

The Court will consider each form of relief in turn.

1.    *Vacatur*

As explained above, the Court has concluded that the implementing guidance is "not in accordance with law," 5 U.S.C. § 706(2)(A). When a court reaches that conclusion, the APA typically mandates that the Court "shall" "set aside" the challenged "agency action." *Id*. § 706. That is, under the plain language of the APA, the Court must "annul or vacate" the unlawful agency action. *See Set Aside*, Black's Law Dictionary (10th ed. 2014). That reading of the APA, moreover, is consistent with longstanding and consistent practice in this circuit. *See, e.g.*, *Humane Soc'y of United States v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017) ("A common remedy when we find a rule is invalid is to vacate."); *Blue Water Navy Viet. Veterans Ass'n, Inc. v. McDonald*, 830 F.3d 570, 578 (D.C. Cir. 2016) ("[V]acatur is the 'normal remedy.'") (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)); *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) ("Normally when an agency . . . clearly violates the APA we would vacate its action."). To be sure, decisions in this circuit have, on occasion, remanded a rule without vacatu*r, see Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993), but Defendants cite no authority suggesting

---

has the authority to—and whether it should—grant relief to aliens no longer present in the United States.

that any remedy short of vacatur is appropriate here. *Cf. Milk Train, Inc. v. Veneman*, 310 F.3d 747, 757 (D.C. Cir. 2002) (Sentelle, J., dissenting) (positing that vacatur is always required); *Checkosky v. SEC*, 23 F.3d 452, 491 (D.C. Cir. 1994) (Randolph, J., concurring) (same).

To the extent Defendants argue that the vacatur remedy should be limited to the individual plaintiffs, that contention is both at odds with settled precedent and difficult to square with the statutory text of the APA, which offers no such limitation.  The D.C. Circuit has "made clear that '[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—*not that their application to the individual petitioners is proscribed*.'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C. Cir. 1989)) (emphasis added).

In explaining its basis for reaching that conclusion, the D.C. Circuit invoked Justice Blackmun's opinion in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), which, although a dissent, "apparently express[ed] the view of all nine Justices on th[e] question."  *Nat'l Mining Ass'n*, 145 F.3d at 1409.  Justice Blackmun wrote:

> The Administrative Procedure Act permits suit to be brought by any person "adversely affected or aggrieved by agency action."  In some cases the "agency action" will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual.  Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain "programmatic" relief that affects the rights of parties not before the court.  On the other hand, if a generally lawful policy is applied in an illegal manner on a particular occasion, one who is injured is not thereby entitled to challenge other applications of the rule.

*Lujan*, 497 U.S. at 913 (Blackmun, J., dissenting).  As explained by the D.C. Circuit in *National Mining Association*, this view was shared by the three Justices who joined Justice Blackmun's dissent and by the majority, which observed that a final agency action may "be challenged under

the APA by a person adversely affected—and the entire [agency program], insofar as the content of that particular action is concerned, would thereby be affected." *Id.* at 890 n.2; *see also Nat'l Mining Ass'n*, 145 F.3d at 1409 (citing same). This Court is, of course, bound by the D.C. Circuit's decision in *National Mining Association* and the "countless" Supreme Court and D.C. Circuit opinions that have "vacated agency actions . . . rather than merely providing injunctive relief that enjoined enforcement of the rules against the specific plaintiffs," *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 830–31 (2024) (Kavanaugh, J., concurring) (collecting cases); *see also, e.g., Trump v. Casa, Inc.*, No. 24A886, 606 U.S. ___, ___, 25 WL 1773631, at *19 (June 27, 2025) (Kavanaugh, J., concurring) (noting that "in cases under the Administrative Procedure Act, plaintiffs may ask a court to . . . 'set aside' a new agency rule"); *Thornburgh*, 878 F.2d at 495 n. 21.

Even without this controlling precedent, moreover, the Court would follow the plain language of the APA, which provides that "[t]he reviewing court *shall . . . set aside* agency actions . . . found to be . . . not in accordance with law." 5 U.S.C. § 706 (emphasis added). Defendants, moreover, have failed to identify any plausible manner in which the Court could set the guidance aside as to the individual plaintiffs and the organizational plaintiffs, while leaving it in place as to all others. Fortunately, however, the Court need not engage in such gymnastics because the language of the APA, the controlling D.C. Circuit precedent, and decades of Supreme Court and D.C. Circuit practice leave little doubt that, if unlawful, the guidance must be "set aside"—that is, cancelled, annulled, or revoked, *see Corner Post, Inc.*, 603 U.S. at 829 (Kavanaugh, concurring) (quoting Black's Law Dictionary 1612 (3d ed. 1933)).

The Court, accordingly, concludes that the proper remedy includes vacatur of the challenged guidance. This remedy is appropriate with or without a class action and with or

without the organizational plaintiffs, *See Nat'l Mining Ass'n*, 145 F.3d at 1409, and it will afford

much—although not all—of the relief that Plaintiffs seek in this case.

      2.    *Declaratory Judgment*

The Court will also enter a declaratory judgment as to all Defendants other than the

President declaring that the Proclamation is unlawful insofar as it purports to suspend or restrict

access to asylum, withholding of removal, or the existing regulatory processes for obtaining

CAT protection.  The Court will not, however, enter declaratory relief against the President.

Although "the possibility" that declaratory relief "*might* be available against the President in

extraordinary cases" appears to have been "le[ft] open" by the D.C. Circuit, such relief would be

appropriate only if "the conduct at issue . . . involve[s] a ministerial duty" or if "relief is

[un]available against other executive officials and so the President" must be "sued as a last

resort." *McCray v. Biden*, 574 F. Supp. 3d 1, 10–11 (D.D.C. 2021).  Neither of those two

circumstances is present here.  Plaintiffs, however, argue that declaratory relief against the

President is available under the D.C. Circuit's decision in *National Treasury Employees Union v.

Nixon (NTEU)*, 492 F.2d 587 (D.C. Cir. 1974).  But that case involved a "ministerial duty," *id.* at

616, and Plaintiffs do not argue—nor could they—that the conduct at issue here is ministerial in

nature.  More importantly, declaratory relief that runs against the executive officials responsible

for carrying out the Proclamation suffices to clarify which aspects of the Proclamation cannot be

lawfully implemented by those officials.

      3.    *Injunction*

Plaintiffs also seek an injunction prohibiting the Agency Defendants from implementing

the Proclamation to take any of the challenged actions.  According to Defendants, 8 U.S.C.

§ 1252(f)(1) deprives the Court of "authority to issue an injunction against the implementation of

the Proclamation."  Dkt. 44 at 67.  Although § 1252(f)(1) does not bear on Plaintiffs' core claims

117

or the core relief that they seek both individually and on behalf of class, it does limit the scope of any class-wide relief that the Court might grant.

Section 1252(f)(1) provides as follows:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1).  The Supreme Court construed § 1252(f)(1) in *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022), and that decision and its progeny guide the Court's analysis.

The principal question addressed in *Aleman Gonzalez* was how best to read the phrase "to enjoin or restrain the operation of the provisions of part IV of this subchapter."  8 U.S.C. § 1252(f)(1).  The respondents in *Aleman Gonzalez* brought two suits—one in the Western District of Washington and the other in the Northern District of California—seeking to compel the government to comply with its obligation under 8 U.S.C. § 1231(a)(6) "to provide bond hearings in cases like theirs."  596 U.S. at 546.  The district courts "certified classes, agreed with respondents' claims on the merits, and entered class-wide injunctive relief," and the Ninth Circuit affirmed in relevant respects.  *Id.*  The question before the Supreme Court was whether that injunction enjoined or restrained "the operation of" § 1231(a)(6) or, instead, merely compelled compliance with that provision.

The Supreme Court concluded that § 1252(f)(1) not only bars class-wide injunctive relief limiting the "operation" of a covered provision but also bars injunctive relief compelling officials to comply with the covered provisions.  As the Court construed § 1252(f)(1), it "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain

from taking actions to enforce, implement, or otherwise carry out the specified statutory

provisions." *Id.* at 550. Applying *Aleman Gonzalez* here, Defendants correctly observe that

§ 1252(f)(1) would preclude the Court from granting a class-wide injunction compelling the

Secretary "to provide aliens with credible fear interviews under Section 1225 or [full] removal

proceedings under Section 1229a," since both of those provisions are found in part IV of the

INA. Dkt. 43 at 38. But, with one exception discussed below, that is not the relief that Plaintiffs

seek, nor does it accurately reflect the nature of their claims.

What Plaintiffs do seek, and what is not subject to § 1252(f)(1), is an order enjoining the

Agency Defendants from implementing the Proclamation. *See, e.g.*, Dkt. 70 at 1. No portion of

the Proclamation is premised on any provision found in part IV of the INA, nor (except as

discussed below) do Plaintiffs challenge the Proclamation on the ground that it fails to comply

with any provision found in that part. Instead, they argue that neither § 1182(f) and § 1185(a),

which are located in part II of the INA, nor the Constitution provide the authority asserted in the

Proclamation, and they ask that the Court enjoin the implementation of the Proclamation on the

ground that it lacks any statutory or constitutional basis. The asylum statute, 8 U.S.C. § 1158(a),

which provides Plaintiffs with the right to apply for asylum and which is the only statutory right

expressly suspended in the Proclamation, is also found in part II of the INA, and the CAT

provision is found in FARRA, which is an entirely different statute. To the extent Plaintiffs seek

class-wide injunctive relief (running against the Agency Defendants) relating to the operation or

implementation of *these* provisions, Defendants' reliance on § 1252(f)(1) is unavailing. The

Court can grant effective injunctive relief without ordering any federal official "to take or to

refrain from taking actions to enforce, implement, or otherwise carry out" any provision found in

part IV. *Aleman Gonzalez*, 596 U.S. at 550.

To be sure, but-for the Proclamation and guidance, the putative class members' claims for asylum and withholding of removal would, in all likelihood, be processed pursuant to the provisions of the INA governing expedited removal, 8 U.S.C. § 1225(b)(1), or regular removal, *id.* § 1229a.  Although those provisions are found in part IV, Plaintiffs are not asserting a class-wide right to participate in any particular form of removal proceeding and, indeed, they are not asking to be placed in any specific type of removal proceedings.  Rather, they are asking the Court to bar Agency Defendants' non-statutory, Proclamation-based efforts to expel them from the United States without providing them with the right to apply for asylum under § 1158(a), without complying with the requirements contained in § 1158(b)(2)(C) for adopting additional limitations on eligibility for asylum, and without complying with the established CAT procedures, as required by FARRA.  To the extent the relief that Plaintiffs seek—enjoining implementation of the Proclamation—might have downstream effects on removal proceedings, those effects are merely incidental to Plaintiffs' permissible challenges to the Proclamation and guidance, and such "collateral effect[s]" do not trigger § 1252(f)(1).  *Aleman Gonzalez*, 596 U.S. at 553 n.4 (distinguishing circumstances in which "a court may enjoin unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision") (emphasis in original); *see also Gonzales v. Dep't of Homeland Sec.*, 508 F.3d 1227, 1233 (9th Cir. 2007) ("Section 1252(f)(1) does not prohibit the current injunction because . . . it directly implicates the adjustment of status provision which falls under part V of subchapter II, notwithstanding that a reinstatement proceeding [under part IV] may be a collateral consequence of an unsuccessful adjustment application.").  In this respect, Plaintiffs' claims are unlike those raised in *N.S. v. Dixon*, No. 21-5275, __ F.4th __, 2025 WL 1775150, at *8 (D.C. Cir. June 27, 2025), where the injunction at issue "directly and

substantially restricted the ability of . . . federal officials to 'carry out'" the arrest and detention

of deportable aliens pursuant to 8 U.S.C. § 1226, which is located in part IV of the INA.

Although Plaintiffs do not seek an order requiring Defendants to institute removal

proceedings under § 1225(b)(1) or § 1229a or to "enforce, implement, or otherwise carry out

[those] statutory provisions," *Aleman Gonzalez*, 596 U.S. at 550, they do invoke the exclusive-

procedure provision found in § 1229a(a)(3), which is located in part IV of the INA.  They do so,

however, only to support their contention that § 1182(f) and § 1185(a) do not authorize the

President to establish a non-statutory removal regime and to show that, under the *Youngstown*

framework, the President lacks the independent constitutional authority to do so.  But neither of

those arguments seeks to "enjoin or restrain the operation of" § 1229a(a)(3); rather, they merely

bolster Plaintiffs' contention that neither § 1182(f) and § 1185(a), nor the Constitution, authorize

the President (or his subordinates) to adopt and to implement an extra-statutory system for

expelling aliens from the United States.

The relevant question for purposes of § 1252(f)(1), however, is whether the "the plaintiff

seeks to "enjoin or restrain" a "provision" located in part IV, not whether the plaintiff cites to

authority found in part IV to support his request to enjoin or restrain a federal official's

enforcement or implementation of a distinct statutory or constitutional provision.  In seeking a

stay in *U.S Department of Homeland Security v. D.V.D*, the Solicitor General made precisely this

point.  He stressed that courts must avoid

> conflat[ing] the question of what provisions the injunction is *enforcing* with the
> question of what provisions the injunction is *restraining*.  Section 1252(f)(1)
> does not address *why* an injunction may issue; it addresses *what* that injunction
> may run against.

*U.S. Department of Homeland Security v. D.V.D*, No. 24A1153, Reply Br. in Support of

Application for Stay of Injunction (June 5, 2025), at 4 (emphasis in original); *see also* Dkt. 70-1

at 6.  That describes the current circumstances to a tee.  Plaintiffs do not seek an order compelling Defendants to comply with § 1229a(a)(3)—or § 1229a or § 1225(b) more generally—but discuss those provisions merely to show that neither § 1182(f) and § 1185(a) nor the Constitution authorize the President (or his subordinates) to adopt extra-statutory procedures for expelling aliens and to support their request that the Court enjoin the Agency Defendants from implementing the Proclamation.

One of Plaintiffs' claims does, however, implicate § 1252(f)(1).  In particular, in Count Two of the Amended Complaint, Plaintiffs allege that § 1231(b)(3) "precludes the removal of noncitizens to countries where it is more likely than not that their 'life or freedom would be threatened . . . because of [their] race, religion, nationality, membership in a particular social group or political opposition,'" and they allege that "[t]he Proclamation and Defendants' actions to implement and enforce the Proclamation violate 8 U.S.C. § 1231(b)(3) and its implementing regulations by barring withholding of removal for noncitizens in the United States."  Dkt. 11 at 35 (Am. Compl. ¶¶ 116–17) (quoting 8 U.S.C. § 1231(b)(3)).  Because this provision—which codifies the right to withholding of removal—is found in part IV of the INA, the Court must consider whether § 1252(f)(1), as construed in *Aleman Gonzalez*, precludes the Court from granting class-wide injunctive relief with respect to that claim.

The question is a close one because Plaintiffs' principal challenge is directed at the Proclamation and its implementation, and they do not ask that the Court enter an injunction compelling Defendants to comply with § 1231(b)(3).  *See* Dkt. 51-1 at 1–3.  Instead, they challenge the wholesale displacement of § 1231(b)(3) and a host of other portions of the INA with a presidentially decreed, alternative immigration system, and they challenge the President's authority under § 1182(f) and § 1185(a) and the Constitution to effect such a change in the law.

Dkt. 11 at 35 (Am. Compl. ¶ 118). But Plaintiffs' complaint turns, at least in part, on the contention that § 1231(b)(3) establishes a statutory right to withholding of removal and that Defendants should be required to comply with that statutory mandate, and *Aleman Gonzalez* holds that § 1252(f)(1) "is not limited to the covered provisions 'as *properly* interpreted.'" *N.S.*, 2025 WL 1775150, at *7 (quoting *Aleman Gonzalez*, 596 U.S. at 552–54) (emphasis in original).

In any event, the Court is persuaded that it lacks authority to issue a class-wide injunction requiring the Agency Defendants to comply with § 1231(b)(3), and the Court, accordingly, will not do so. But that does not mean that the Court must deny the principal injunctive relief that Plaintiffs seek—that is, an order precluding the Agency Defendants from implementing the Proclamation. Among other things, as noted above, the Proclamation expressly refers to asylum, but it says nothing about withholding of removal, and although the Proclamation purports to suspend "access to provisions of the INA that would permit continued presence in the United States," Proclamation, §§ 2–3, withholding of removal does not permit aliens to remain in the United States—it merely specifies to where an alien may be removed. As a result, enjoining the Agency Defendants from implementing the Proclamation would not "enjoin or restrain" the operation of § 1231(b)(3).

It is one thing to read the phrase "authority to enjoin or restrain the operation of the provisions of part IV" to prevent lower courts from issuing class-wide injunctions directing how the Secretary and Attorney General should implement the covered provisions. *Aleman Gonzalez*, 596 U.S. at 550. It would be a different matter altogether to read that phase to preclude a court from enjoining the implementation of the Proclamation, which contains no mention of § 1231(b)(3). The Court, accordingly, concludes that it has jurisdiction to enter a class-wide injunction that enjoins implementation of the Proclamation, notwithstanding the prohibition in

§ 1252(f)(1), but the Court clarifies that the class-wide injunction does not compel compliance with § 1231(b)(3).  In this limited respect, the class will need to rely on the Court's vacatur order and declaratory judgment.

*   *   *

Having concluded that an injunction is available, the Court must decide, as a matter of its equitable discretion, whether to exercise that authority?

Notably, the Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless doing so would "have [a] meaningful practical effect independent of its vacatur."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).  This is because "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course" or where "a less drastic remedy . . . [is] sufficient to redress" the plaintiffs' injury.  *Id.*  When addressing a similar question in the past, this Court declined to issue an injunction for just this reason.  *See O.A.*, 404 F. Supp. 3d at 154.

The present circumstances, however, differ in an important respect.  In *O.A.*, the Court relied on the defendants' representation "that they w[ould] abide by the Court's order, . . . and Department of Justice guidance regarding vacatur under the APA provide[d] that the 'Department litigators should' comply 'with circuit precedent,' including the D.C. Circuit's decision in *National Mining Association*," which instructs that the legal consequences of vacatur under the APA extend beyond the parties to a case.  *Id.*  Here, in contrast, Defendants have themselves expressed doubt that an order merely setting aside the guidance would be effective. They assert that, "if the guidance alone were . . . vacated . . . , the Plaintiffs would still be able to be repatriated under the Proclamation's authority."  Dkt. 55 at 22.  When asked about this at oral argument, moreover, Defendants doubled down, asserting that all of the actions that Plaintiffs

challenge "flow from the Proclamation itself, which is the only final action at issue." Dkt. 56 at

51 (Hrg. Tr. 51:7–10). The Court has, of course, rejected that proposition, *see supra* 62–63, but

Defendants' suggestion that the Proclamation will continue to compel immigration officials to

operate outside the ordinary bounds of the INA, even if the implementing guidance is set aside,

is enough to distinguish this case from *O.A.* and to raise doubts about whether an order setting

aside the implementing guidance will suffice.

The Court, accordingly, concludes that this is one of the rare cases in which injunctive

relief is required. The injunction, of course, will not run against the President. Moreover, the

Court will narrowly tailor the injunction to prohibit defendants from implementing the

Proclamation, including by adopting extra-statutory expulsion procedures pursuant to § 1182(f)

and § 1185(a) and the President's residual constitutional authority; removing aliens without

complying with § 1158(a); narrowing eligibility for asylum without complying with

§ 1158(b)(2)(C); or altering the CAT procedures in violation of FARRA.

## E.   Request for Stay Pending Appeal

Finally, Defendants "ask for a stay pending appeal" or for "a 14-day delay of the

effective date of any order" to "seek a stay from the D.C. Circuit in an orderly manner" and to

address the "significant operational concerns involved in turning . . . off the proclamation." Dkt.

56 at 65–66 (Hrg. Tr. 65:23–66:6). The Court appreciates those concerns but must also weigh

the fact that thousands of individuals will be repatriated or removed from the United States

pursuant to an unlawful assertion of extra-statutory authority and the risk that, once repatriated or

removed, their likelihood of obtaining meaningful relief will suffer a significant, if not

insurmountable, setback.

The Court concludes that Defendants have failed to carry their burden of satisfying "the

stringent requirements for a stay pending appeal." *Citizens for Resp. & Ethics in Wash. v. FEC*,

904 F.3d 1014, 1016 (D.C. Cir. 2018); *Archdiocese of Wash. v. WMATA*, 877 F.3d 1066, 1066 (D.C. Cir. 2017). In deciding whether to grant a stay pending appeal, the Court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 779 (1987)); *see also Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985). "The first two factors of the traditional standard are the most critical," and they require, respectively, "'[m]ore than a mere 'possibility' of relief'" and more than "some 'possibility of irreparable injury.'" *Nken*, 556 U.S. at 434 (citations omitted). Here, Defendants have failed to carry their burden with respect to any of the four factors.

First, for all the reasons given above, the Court is unpersuaded that Defendants are likely to succeed on the merits on appeal. Defendants have offered no separate argument that "casts doubt on the Court's decision." *TECO Guatemala Holdings, LLC v. Rep. of Guatemala*, No. 17-102, 2020 WL 13612440, at *2 (D.D.C. Mar. 6, 2020).

Second, although the Court recognizes that the judiciary should not lightly intervene in the affairs of the Executive Branch and that implementing the immigration laws presents supreme challenges, the Court is unpersuaded that requiring Defendants to return to the processes that Congress required and that applied just a few months ago would cause Defendants irreparable harm. Although enjoining the President from exercising an exclusive constitutional prerogative might, standing alone, give rise to irreparable injury, requiring the Agency Defendants to comply with the law as Congress enacted pursuant to its "plenary power over immigration," *Jarkesy*, 603 U.S. at 129 (2024), would not. For decades, courts have, where

126

appropriate, set aside or enjoined agency action that is contrary to law without any suggestion that such orders inflict *per se* irreparable injury on the government.

The final two factors weigh heavily in favor of denying Defendants' request for a stay.  A stay would allow Defendants to continue removing class members using extra-statutory procedures, and Defendants have taken the position that this Court lacks the authority to provide relief to any aliens once they are removed.  *See, e.g.*, Dkt. 44 at 25–26; Dkt. 55 at 14.  Although the Court has yet to address the merits of that contention, the question is a difficult one, and a substantial possibility exists that continued implementation of the Proclamation during the pendency of an appeal will effectively deprive tens of thousands of individuals of the lawful processes to which they are entitled.   The Court recognizes that timing is crucial—both for Defendants and Plaintiffs—and that the question whether to grant a stay can, at times, matter as much as the underlying merits of a case.  But where the Court is persuaded that the government is acting unlawfully; where that unlawful activity may well cause irreparable injury to the plaintiffs; and where the government may continue to enforce the law using lawful means, the balance of harms and public interest weigh against granting a stay.

Although the Court is unpersuaded that it should stay its decision pending appeal, the Court agrees with Defendants that they should have the opportunity to seek a stay from the court of appeals and that it will take some time to effectuate the Court's class-wide order.  The Court will, accordingly, postpone the effective date of its class-wide order by fourteen days.  During that period, however, Defendants shall take steps to ensure that they will are fully prepared to implement the Court's order without further delay.  The Court's order granting relief to the individual plaintiffs who remain in the United States will take immediate effect.

**CONCLUSION**

For all these reasons, the Court will **GRANT** in part Plaintiffs' motion for summary judgment, Dkt. 51, will **GRANT** in part Plaintiffs' motion to certify a class, Dkt. 13, will **DENY** as moot Plaintiffs' motion for a preliminary injunction, Dkt. 14, and will **DEFER** ruling on the remaining portions of the parties' cross-motions. The Court will postpone the effective date of its class-wide order for fourteen days to permit Defendants to seek a stay pending appeal from the Court of Appeals and to prepare to implement the Court's order. Pursuant to Rule 54(b), the Court determines that there is no just reason for delaying entry of final judgment with respect to the individual and class claims of those Plaintiffs and class members who are present in the United States or will be in the United States, with the exception of their two APA arbitrary-and-capricious claims and their APA claim that the guidance was adopted without observance of procedures required by law in violation of 5 U.S.C. § 706(2)(D), *see* Dkt. 11 at 38–40 (Am. Compl. ¶¶ 132–43). The Court will, accordingly, **ENTER** partial final judgment. Finally, the Court will **DIRECT** that the parties promptly submit a joint status report proposing a schedule for further briefing on whether the Court can and should grant relief to those Plaintiffs and putative class members who are no longer present in the United States.

Separate orders will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: July 2, 2025

128